EXHIBIT 3

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") and the defendant OZ AFRICA MANAGEMENT GP, LLC (the "Defendant" or "OZ AFRICA"). OZ AFRICA hereby agrees and stipulates that the following information is true and accurate. Certain of the facts herein are based on information obtained from third parties by the Offices through their investigation and described to OZ AFRICA. OZ AFRICA admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, OZ AFRICA acknowledges that the Offices would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the Criminal Information:

I.  The Foreign Corrupt Practices Act

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

II. The Defendant and Relevant Entities and Individuals

2. Och-Ziff Capital Management Group LLC ("Och-Ziff"), which has been charged separately, was a Delaware limited liability company and one of the largest alternative

asset and hedge fund managers in the world. Och-Ziff had its headquarters in New York, New York and was listed on the New York Stock Exchange on November 14, 2007. Since that time, Och-Ziff has had a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and has been required to file annual reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Exchange Act, Title 15, United States Code, Section 78o(d). Accordingly, since November 14, 2007, Och-Ziff has been an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b). Prior to its initial public offering on November 14, 2007, Och-Ziff was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

3. Och-Ziff controlled numerous consolidated subsidiaries through which Och-Ziff operated and provided investment advisory and management services for individual hedge funds and alternative investment vehicles (the "Och-Ziff Hedge Funds") in return for management fees and incentive income. During the relevant time period, Och-Ziff had approximately $30 billion in assets under management and had offices located in New York, London and Hong Kong.

4. OZ Management LP was a Delaware limited partnership and subsidiary of Och-Ziff through which Och-Ziff registered as an investment adviser. Thus, OZ Management LP was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

5. The defendant, OZ AFRICA MANAGEMENT GP, LLC (the "defendant" or "OZ AFRICA") was a Delaware limited liability company and wholly-owned subsidiary of

2

OZ Management LP. OZ AFRICA held Och-Ziff's interests for its joint venture in Africa. OZ AFRICA was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

6. Africa Management Limited ("AML") was a joint-venture company started by Och-Ziff, the defendant OZ AFRICA, and affiliated and subsidiary entities with various South African business partners in 2007. AML established multiple investment funds under the "African Global Capital" ("AGC") name which invested in companies with African mining and mineral assets and rights. The joint-venture partner and Och-Ziff owned 60 percent and 40 percent of the interest in AML, respectively. Och-Ziff's approval was required for all investments by AGC funds, and AML and AGC relied upon Och-Ziff's legal and compliance functions to perform due diligence, provide legal advice and document transactions.

7. "Och-Ziff Employee 1," a U.S. citizen whose identity is known to the United States and the defendant OZ AFRICA, was a high-ranking officer of Och-Ziff. Och-Ziff Employee 1 was based in Och-Ziff's New York office. Och-Ziff Employee 1 was an officer of OZ AFRICA. Och-Ziff Employee 1 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "officer" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8. "Och-Ziff Employee 2," a U.S. citizen whose identity is known to the United States and the defendant OZ AFRICA, was a high-ranking officer of Och-Ziff. Och-Ziff Employee 2 was based in Och-Ziff's New York office. Och-Ziff Employee 2 was an officer of OZ AFRICA and executed various documents on its behalf. Och-Ziff Employee 2 was a

3

"domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "officer" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

9. "Och-Ziff Employee 3," a U.S. citizen whose identity is known to the United States and the defendant OZ AFRICA, was a senior executive of Och-Ziff and a member of Och-Ziff's partner management committee who headed Och-Ziff's London office. Och-Ziff Employee 3 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

10. "Och-Ziff Employee 4," a U.S. citizen whose identity is known to the United States and the defendant OZ AFRICA, was a senior member of Och-Ziff's investor relations department. Och-Ziff Employee 4 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

11. "Och-Ziff Employee 5," an Australian citizen whose identity is known to the United States and the defendant OZ AFRICA, was an employee of Och-Ziff Management Europe Limited, the London-based subsidiary of OZ Management LP and a member of Och-Ziff's European private investment team, which also had responsibility for investments in Africa. Och-Ziff Employee 5 was responsible for overseeing certain Och-Ziff investments involving mineral extraction, oil and other natural resources in Africa, and thus was an "employee" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

4

12.     "Och-Ziff Employee 6," a U.S. citizen whose identity is known to the United States and the defendant OZ AFRICA, was a member of Och-Ziff's legal department and worked in multiple Och-Ziff offices. Och-Ziff Employee 6 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "DRC Partner," an Israeli businessman whose identity is known to the United States and the defendant OZ AFRICA, had significant interests in the diamond and mineral mining industries in the Democratic Republic of the Congo (the "DRC"). Och-Ziff, through the defendant OZ AFRICA, AGC, and various subsidiary companies, and DRC Partner were investment partners for mining and mineral opportunities in the DRC. For these purposes, DRC Partner was an "agent" of an issuer, Och-Ziff, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

III.    Democratic Republic of the Congo and Officials

14.     "DRC Official 1," an individual whose identity is known to the United States and the defendant OZ AFRICA, was a senior official in the DRC who had the ability to take official action and exert official influence over mining matters in the DRC. DRC Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

15.     "DRC Official 2," an individual whose identity is known to the United States and the defendant OZ AFRICA, was a senior official in the DRC and close advisor to DRC Official 1. Since at least 2004, DRC Official 2 was an Ambassador-at-Large for the DRC government and also a national parliamentarian. DRC Official 2 had the ability to take official

5

action and exert official influence over mining matters in the DRC, and was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

## IV.  The DRC Corruption Scheme

### A.  Overview of the Scheme

16.  In or about and between 2005 and 2015, DRC Partner, together with others, paid more than one-hundred million U.S. dollars in bribes to DRC officials to obtain special access to and preferential prices for opportunities in the government-controlled mining sector in the DRC. Beginning in December 2007, Och-Ziff, through Och-Ziff Employee 3 and Och-Ziff Employee 5, had discussions with DRC Partner about forming a joint venture between Och-Ziff and DRC Partner, through DRC Partner's companies, for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large publicly traded mining company. The underlying premise of the proposed joint venture was that DRC Partner had special access to attractive investment opportunities in the DRC through his relationships with officials at the highest levels of the DRC government. In return for access to these attractive investment opportunities, Och-Ziff would finance DRC Partner's operations in the DRC. Och-Ziff Employee 3 and Och-Ziff Employee 5 understood that Och-Ziff's funds would be used, in part, to pay substantial sums of money to DRC officials to secure access to these opportunities in the DRC mining sector. Although the parties did not enter into a written partnership agreement, as a result of agreeing to the corrupt arrangement, Och-Ziff Employee 3 and Och-Ziff Employee 5 secured long-term deal flow for Och-Ziff and AGC in the DRC mining sector.

6

B.   Och-Ziff's Agreements with DRC Partner

17.   In or about and between December 2007 and March 2008, Och-Ziff, through Och-Ziff Employee 3 and Och-Ziff Employee 5, began discussions with DRC Partner and others about forming a joint venture for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large mining company. At that time, DRC Partner communicated to Och-Ziff Employee 3 and Och-Ziff Employee 5 that DRC Partner would have to pay substantial sums of money to DRC officials, including DRC Official 1, and "local partners" to secure access to the attractive investment opportunities in the DRC mining sector. DRC Partner communicated to Och-Ziff Employee 3 and Och-Ziff Employee 5 that, as part of the joint venture, DRC Partner expected Och-Ziff to help fund these corrupt payments, which would be above and beyond the acquisition and operational costs of the specific assets and transactions. Neither Och-Ziff Employee 3 nor Och-Ziff Employee 5 shared this information with anyone within Och-Ziff's legal or compliance departments.

18.   Och-Ziff Employee 3 started the internal process within Och-Ziff to enter into business with DRC Partner. Consistent with Och-Ziff's anti-corruption policy as it related to prospective business partners, on or about February 14, 2008, Och-Ziff Employee 6 sent an e-mail to a due diligence firm requesting a background report on DRC Partner. In that e-mail, Och-Ziff Employee 6 noted that information about DRC Partner "will be very easy to find . . . perhaps the impetus behind the movie 'Blood Diamonds.'"

19.   On or about February 21, 2008, Och-Ziff Employee 6 received an e-mail that attached the initial findings of the due diligence firm, which stated, among other things:

7

> [DRC Partner] has been willing to use his significant political influence with [DRC Official 1]. . . and his clique to facilitate acquisitions, settle disputes and frustrate competitors. . . . [DRC Partner] was rumoured to have used his influence with [DRC Official 2], [DRC Official 1's] closest aide, and former Katanga governor in order to settle [a commercial] dispute in his favor. . . . Several compliance Watch Lists identify [DRC Partner] as a political [sic] exposed individual as a result of his close ties to the DRC government. He is known to enjoy an extremely close relationship with [DRC Official 1]. . . . He is happy to use his political influence against those with whom he is in dispute. . . . Whether through good PR and legal advice or indeed innocence, no allegations against him have yet been proved. That said, he has been named in a UN report [and] keeps what can only be described as unsavory business associates.

20. Based upon the report, and other publicly available information, various Och-Ziff senior employees had concerns about proceeding with any transaction with DRC Partner. For example, Och-Ziff Employee 6 did not believe Och-Ziff should do business with DRC Partner and expressed to Och-Ziff Employee 3 strong concerns about doing business with DRC Partner. Separately, Och-Ziff Employee 2 had come to believe that it was likely that DRC Partner was able to operate and acquire assets in the DRC because he paid bribes to officials. In or about late February 2008, several members of Och-Ziff senior management advised Och-Ziff Employee 1 that although there was no strict legal or regulatory prohibition on doing business with DRC Partner, such as DRC Partner having being designated by the Office of Foreign Assets Control on a prohibited persons list, they recommended not undertaking transactions with him. Thereafter, Och-Ziff proceeded to conduct several business transactions with DRC Partner in the DRC.

21. Och-Ziff Employee 6 also forwarded the due diligence report on DRC Partner to an outside attorney representing Och-Ziff on anti-corruption issues. The outside attorney advised that providing a convertible loan to DRC Partner would be high-risk, but that

8

there would be "no [anti-money laundering] or anti-corruption issue" as long as DRC Partner "has no discretion with regard to how to spend the proceeds of the loan." As described below, the subsequent agreements provided DRC Partner with a significant amount of discretion over the use of the loan proceeds.

22.     In or about and between March 2008 and February 2011, Och-Ziff entered into several DRC-related transactions with DRC Partner: (1) an April 2008 purchase of approximately $150 million of shares in a publicly traded DRC-focused mining company controlled by DRC Partner ("Company A"); (2) a $124 million convertible loan through a subsidiary company and AGC to "Company B," a DRC Partner-controlled shell entity, funded in or about and between April and October 2008 (the "Convertible Loan Agreement"); and (3) a $130 million margin loan to Company C, a DRC Partner-controlled shell entity, in November 2010 and February 2011 (the "Margin Loan Agreement"). Leading up to and through these transactions, Och-Ziff Employee 3 and Och-Ziff Employee 5 were made aware of and participated in the corrupt payments, using funds provided by Och-Ziff to Company B and Company C, that DRC Partner made to various DRC officials to secure mining interests in the DRC.

C.     The Bribery Scheme to Consolidate DRC Copper Mines

23.     The first aspect of Och-Ziff's partnership with DRC Partner involved Och-Ziff, the defendant OZ AFRICA or AGC structuring and funding simultaneous investments into two companies controlled by DRC Partner: Company A and Company B. On or about March 7, 2008, Och-Ziff Employee 3 e-mailed a description of the first part of this plan to Och-Ziff Employee 1. In the e-mail, Och-Ziff Employee 3 stated that there would be three upcoming transactions requiring Och-Ziff funds. First, Och-Ziff would buy $150 million of new shares to

9

be issued by Company A, controlled by DRC Partner, which Och-Ziff Employee 3 described as "the second biggest copper company in DRC." Second, DRC Partner would offer AGC 50 percent of a nearby copper and cobalt mine "at a very attractive price," and AGC would likely invest up to $200 million in it. Third, AGC and DRC Partner would buy 55 percent of a company called Africo Resources Limited ("Africo"), which owned a copper asset "next door" to DRC Partner's copper and cobalt mine. Och-Ziff Employee 3 wrote that the "[g]ame plan is to eventually merge [the copper and cobalt mine] and Africo into [Company A] for stock and control the company jointly with [DRC Partner]."

24. Africo was a Canadian mining company engaged in a dispute concerning its ownership interest in a DRC copper mine (the "DRC Mine"). The dispute involved a Congolese company called Akam Mining SPRL ("Akam"), which had obtained an *ex parte* default judgment against Africo following an employment dispute. In fact, DRC Official 2 had orchestrated the taking of Africo's interest in the DRC Mine and made it available to DRC Partner. Africo had engaged in legal proceedings in the DRC courts to try to nullify the seizure of its interest in the DRC Mine, which remained pending in March 2008.

25. On or about March 16, 2008, Och-Ziff Employee 3 received an e-mail from DRC Partner, which stated in part:

> As you can see, our only real point is this flexibility. The DRC landscape is in the making and I am shaping it - like no one else. I would love to have you beside me as a long-term partner. As 40% [Company A] shareholder, I facilitated your entry at an attractive time / price knowing that you see there is a bigger picture in all of this. What this bigger picture exactly looks like, is yet to be determined, but it is your partner who is holding the pen - I just need flexibility on the drawing board to create full value for our partnership.

26. Following DRC Partner's negotiations on behalf of Och-Ziff, on or about March 27, 2008, Och Ziff entered into a supplemental subscription agreement with Company A, as contemplated in Och-Ziff Employee 3's e-mails above, to purchase a total of 150 million shares for a total of approximately $150 million. The stated purpose of the offering by Company A, to which Och-Ziff subscribed, was to raise capital to fund the company's ongoing mining efforts in the DRC. That same day, on or about March 27, 2008, DRC Partner caused $11 million to be delivered to DRC Official 2.

27. Och-Ziff and DRC Partner agreed on a multi-step plan to obtain the disputed mining interest by acquiring Akam using Och-Ziff funds, and then settling the legal dispute over the DRC Mine. As part of its agreement, Och-Ziff, through AGC, provided Company B with significant financing to carry out the resolution of the DRC legal dispute and to gain control of Africo. This financing was provided through the Convertible Loan Agreement, which was originally intended to be approximately $115 million, funded in two tranches of $15 million and $100 million.

28. On or about April 3, 2008, Och-Ziff Employee 5 sent an e-mail to Och-Ziff Employee 3 and others seeking approval to fund the first tranche under the Convertible Loan Agreement, in the amount of $15 million, to acquire Akam.

29. On or about April 7, 2008, DRC Partner caused $2.2 million to be delivered to DRC Official 2, and on or about April 10, 2008, DRC Partner caused $2.8 million to be delivered to DRC Official 2.

30. On or about April 17, 2008, Och-Ziff, through AGC, funded the first tranche of the Convertible Loan Agreement through wire transfers from New York. This first tranche of $15.750 million was funded purportedly to acquire Akam, make a shareholder loan to

11

Africo, and pay legal expenses. A few days later, on or about April 21, 2008, Africo announced that it reached an agreement with Company B for a private placement of CAD $100 million that would result in Company B (*i.e.*, DRC Partner's company) owning approximately 60 percent of Africo. This agreement required the approval of Africo's shareholders.

D.   Bribes Resolve Africo and Akam Dispute in DRC

31.   DRC Partner caused bribes to be paid to DRC officials, including judges, to ensure that Africo did not obtain a favorable court ruling in its case against Akam that could have affected the outcome of the Africo shareholder vote.

32.   On or about June 4, 2008, DRC Partner and one of his associates arranged to pay $500,000 to DRC officials, including judges, who were involved in the Africo court case to corruptly influence the outcome of those proceedings to the benefit of Och-Ziff and DRC Partner. The associate sent a text message to DRC Partner, which read:

> Hi [DRC Partner], im with the main lawyer... in the africo story, he has to arrange with supreme court, attorney genral [sic] and magistrates, he wants 500 to give to all the officials and 600 for 3 lawyers cabinets that worked on the file in defense[lawyer] and batonnier [lawyer]. the converstaion is vey tough. (while talking i said to ask money to [one of the Akam shareholders], [the Akam shareholder] said he cant because most of the money has to go to [DRC Official 2]... i dont know if he wants to provoke me or it was something [the Akam shareholder] invented...) but they are now at 1,1 in total.

33.   On or about June 4, 2008, the associate sent another text message to DRC Partner, which stated: "he wants 500 for officials, 300 for them (3 lawyers office), 800 and in even in one month an extra 100 to make 900, he is very categoric[.]" Approximately thirty minutes later, the associate sent a text message to DRC Partner, which stated: "with 800 they guarantee the results and they want me to promise that i will add 100 after." Less than one

12

minute later, DRC Partner responded to the associate's text message, writing: "We can't accept a mid result... Africo must be screwd and finished totally!!!!"

34. On or about June 5, 2008, an associate of DRC Partner sent a text message to DRC Partner, which stated: "[lawyer] has met attorney general and the magistrat[e] that has to write the opinion, he also had contact with the 3 judges of supreme court. they got clear instructions to rewrite the opinion and to make sure that akam wins. they also agreed to do the lecture of the opinion on JUNE 13!"

35. On or about June 12, 2008, Africo announced that its shareholders had voted to approve the private placement by DRC Partner through Company B.

36. On or about June 18, 2008, DRC Partner caused $2.5 million to be delivered to DRC Official 2.

E. <u>Och-Ziff Learns of Allegations of Serious Misconduct Involving Company A and then Provides DRC Partner an Additional $109 Million</u>

37. On or about June 13, 2008, Och-Ziff Employee 3 and Och-Ziff Employee 5 learned of allegations that a significant portion of the money that had been invested in Company A through the April 2008 private placement may have been diverted from a mining investment to a political party in Zimbabwe. Och-Ziff Employee 3 received a message which stated: "[Company A] paid 4 arms into zim, and rented boat from china. Journo has bank transfers apparently." Neither Och-Ziff Employee 3 nor Och-Ziff Employee 5 reported this matter to Och-Ziff's legal and compliance employees nor undertook efforts to determine whether the funds had been used as described in the message.

38. On or about June 24, 2008, Och-Ziff, through AGC, funded the second tranche of the Convertible Loan Agreement totaling $98.275 million. The purpose of this tranche was to allow Company B to acquire the Africo shares and gain control over Africo.

39. On or about July 10, 2008, Och-Ziff Employee 3 sent an e-mail to another Och-Ziff employee that read: "U have [Och-Ziff Employee 5's] mobile. [DRC Partner] just got a big asset for us."

40. Later that month, on or about July 24, 2008, Och-Ziff, AGC and DRC Partner amended the Convertible Loan Agreement to provide for a $9 million third tranche for "financing the working capital requirements. . . . to the extent such requirements are in accordance with the Business Plan." Och-Ziff Employee 3 and Och-Ziff Employee 5 knew that the operating expenses for Company B's business plan included paying bribes to high-level DRC officials.

41. On or about October 9, 2008, Och-Ziff funded its share of the third tranche of the Convertible Loan Agreement totaling $4.5 million while the joint-venture partner in AGC contributed the remaining $4.5 million.

F.   Och-Ziff's Audit Uncovers Bribery in DRC Partner's Operations

42. In or about November 2008, AGC employees who were based in South Africa and reported to Och-Ziff Employee 5 conducted an audit of Company B's expenses to ensure that the third tranche of the Convertible Loan Agreement was properly spent. These AGC employees were given limited access to DRC Partner's business records. Their draft audit report, which was sent to Och-Ziff Employee 5 and another Och-Ziff employee, included the following paragraph:

14

> Satisfactory answers could not be extracted during my discussions (with [DRC Partner's employees]) for some of these expenses and it leads one to believe that these are actually the costs of maintaining "political alignment" and for "protocol" with the authorities in the DRC – in other words with senior Government officials. **This issue needs to be investigated at the highest level directly with [DRC Partner's company]. This issue should be flagged as a concern considering AGC's compliance requirements.**
> (emphasis in original)

43. After reviewing the draft audit report, Och-Ziff Employee 5 spoke with one of the employees who drafted it and instructed that the above-described paragraph referencing payments for "political alignment" with senior government officials be removed from the report. The employee did as instructed by Och-Ziff Employee 5, and on or about December 9, 2008, the employee sent an e-mail to Och-Ziff Employee 5, which stated, in part: "[Och-Ziff Employee 5,] As discussed please find attached the revised report[.]" The attached revised report did not contain the paragraph that referenced payments to senior government officials.

G. Och-Ziff and DRC Partner Find a Buyer for DRC Assets

44. Och-Ziff, through the defendant OZ AFRICA's controlled entities, and AGC did not exercise the option to convert into equity in Company B, did not require payment on the loan when it was due to be repaid in full on or about April 24, 2009, and did not seek to exercise its rights on the collateral of the loan. Instead, the repayment dates for the Convertible Loan Agreement were continually extended until a publicly traded mining company ("Mining Company 1") purchased Company B.

45. To attract a buyer for Company B, Och-Ziff Employee 5 worked with DRC Partner to obtain additional assets to inject into or sell alongside Company B, including assets known as Kolwezi Tailings and SMKK. Och-Ziff knew that Kolwezi Tailings had been

15

stripped by the DRC government from a mining company immediately before being obtained by a group of companies controlled by DRC Partner and the DRC government. Och-Ziff also knew that the SMKK asset was the subject of a back-to-back sale that allowed DRC Partner to purchase the asset for $15 million from the DRC-owned and controlled mining company, La Générale des Carrières et des Mines ("Gécamines"), and immediately resell it to Mining Company 1 for $75 million even though Mining Company 1 had the right of first refusal to buy that same interest directly from Gécamines.

46.     Throughout the period of DRC Partner's acquisition of Kolwezi Tailings and SMKK, DRC Partner continued to make corrupt payments to DRC Official 2. For example, on or about December 23, 2009, DRC Partner delivered $1 million to DRC Official 2; on or about January 5, 2010, DRC Partner delivered $2 million to DRC Official 2.

47.     On or about August 20, 2010, Mining Company 1 acquired 50.5 percent of Company B. Mining Company 1 agreed to pay up to $575 million over two years, including $50 million in cash. Och-Ziff Employee 3 and Och-Ziff Employee 5 were informed by a co-conspirator that the $50 million was for DRC Partner to "use on the ground" to corruptly acquire Kolwezi Tailings. As part of the deal, Mining Company 1 guaranteed repayment of the Convertible Loan Agreement through a novation of the loan.

48.     Following the novation of the Convertible Loan Agreement, Och-Ziff continued to provide DRC Partner with financing in exchange for deal flow of investment opportunities in the DRC, per their original agreement.

### H. Och-Ziff Provides DRC Partner an Additional $130 Million

49. On or about November 11, 2010, Och-Ziff Employee 3 sent an e-mail to another Och-Ziff employee, which stated: "[DRC Partner] has asked for a margin loan on katanga shares which want u to handle."

50. On or about November 16, 2010, an Och-Ziff employee sent a draft term sheet for the loan to Och-Ziff Employee 3, who then forwarded it on to DRC Partner. The parties then negotiated the terms of the loan. DRC Partner's representatives stressed that they would need to make intercompany loans with the proceeds of the loan and that any "use of proceeds" provision in the loan document would have to be generic.

51. On or about November 18, 2010, Och-Ziff incorporated a new Cayman Islands based partnership called CML Investments Ltd. ("CML"). CML was controlled by Och-Ziff.

52. On or about November 24, 2010, Och-Ziff, in two separate transfers through CML, extended a $110 million margin loan to Lora Enterprises Limited ("Lora"), a DRC-Partner-controlled company. The use of proceeds provision allowed for: "(ii) funding existing activities of Affiliates of the Borrower and acquisitions of other business interests by its Affiliates; and (iii) other general purposes of the Borrower's Affiliates."

53. On or about February 17, 2011, CML and Lora agreed to an amended and restated margin loan agreement which increased the amount of funding available to Lora by an additional $20 million.

54. In or about and between November 2010 and February 2011, DRC Partner caused approximately $20 million in corrupt payments to be made to various DRC officials, including the following payments made on or about the following dates:

17

| Date | Amount in USD | Bribe Recipient |
|---|---|---|
| December 1, 2010 | $1 million | DRC Official 1 |
| December 3, 2010 | $2 million | DRC Official 1 |
| December 7, 2010 | $2 million | DRC Official 1 |
| December 9, 2010 | $2 million | DRC Official 1 |
| December 15, 2010 | $350,000 | DRC Official 2 |
| December 17, 2010 | $250,000 | DRC Official 2 |
| January 13, 2011 | $500,000 | DRC Official 2 |
| February 9, 2011 | $3 million | DRC Official 1 |
| February 9, 2011 | $1 million | DRC Official 2 |

55.     On or about February 12, 2012, DRC Official 2 died. On or about February 13, 2012, Och-Ziff Employee 5 sent an e-mail message to Och-Ziff Employee 3, which stated: "FYI, [DRC Official 2 is] dead, [DRC Partner's] key guy in DRC." Och-Ziff Employee 5's e-mail included the text of a Financial Times article on the official's death, which stated, among other things: "[DRC Official 2], member of parliament and a former governor of Congo's copper heartlands province, Katanga, cut a shadowy figure. Diplomats associate him with Congo's entrenched corruption and a series of secret investments. Congo is one of the world's poorest countries despite its mineral wealth, and ranks among the worst places to do business."

56.     On or about February 15, 2012, DRC Partner sent a text message to Och-Ziff Employee 5, which stated, "I'm fine. . . sad but fine. . . I will have to help [DRC Official 1] much more now. . . tomorrow the burial will take place."

57. On or about February 12, 2013, Och-Ziff Employee 2, while in New York, New York, signed a draw down notice directing an entity under the management and control of the defendant OZ AFRICA to transfer approximately $160,077,301.77, which represented the proceeds of the Convertible Loan Agreement to each of "OZ Africa MD," "OZ Africa ME," and "OZ Africa SI" funds. These funds were based in the Cayman Islands and under the control of Och-Ziff and the Och-Ziff Hedge Funds.

58. In total, Och-Ziff received wire transfers of $342,091,110 from DRC Partner-controlled companies as satisfaction of the outstanding agreements, representing a profit of approximately $91,181,182.