# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

OZ AFRICA MANAGEMENT GP, LLC,

Defendant.

Case No.: 1:16-cr-00515-NGG-LB

Expert Report of Ronnie Barnes, Ph.D.

March 6, 2020

Expert Report of Ronnie Barnes, Ph.D.

Table of Contents

I.      Professional and Educational Background .......................................................... 1

II.     Assignment and Compensation.......................................................................... 1

III.    Summary of Opinions ........................................................................................ 2

IV.     Factual Background ........................................................................................... 3

V.      Valuation Methodologies and Their Application to the Kalukundi Mining Rights ........... 7

        A.      The Market Price Approach.................................................................... 8

                1.      Introduction.............................................................................. 8

                2.      Market Efficiency ..................................................................... 9

                3.      The Use of Africo's Public Share Price to Determine the Value of the
                        Kalukundi Mining Rights ......................................................... 14

        B.      The DCF Methodology .......................................................................... 20

                1.      Introduction.............................................................................. 20

                2.      DCF Valuation Is Not a Reliable Methodology to Use in This Matter .... 22

VI.     Conclusion ...................................................................................................... 25

Expert Report of Ronnie Barnes, Ph.D.

## I.      Professional and Educational Background

1.      I am a Principal at Cornerstone Research, a financial and economic consulting firm, where I specialize in financial, accounting, and economic analysis.  I hold a BA (Hons.) degree in Mathematics from the University of Oxford; a Master of Advanced Study in Mathematics (with a specialization in theoretical physics) from the University of Cambridge; and both an MSc (with distinction) in Finance and a PhD in Accounting from London Business School.  I am also a qualified Chartered Accountant.

2.      I am an expert on valuation and valuation methodologies, and have been retained as an expert in a number of matters involving the valuation of illiquid assets.  Additionally, I have published a number of articles that address complex valuation issues.

3.      Prior to joining Cornerstone Research in October 2012, I held positions at Credit Suisse International and at the Royal Bank of Scotland.  From 2006 to 2008, I was a Principal at CRA International, where my role was similar to the one I currently hold.  Prior to that, I spent over ten years on the faculty at London Business School, teaching courses across a wide range of subjects in the fields of Finance and Accounting and performing research on the interaction between accounting information and financial markets.  Many of the courses I taught included components that dealt with corporate valuation, and with the informational efficiency of financial markets.  In my last two years at London Business School, I was the Associate Dean for Finance programs, in which role I was responsible for the academic direction of the school's Masters in Finance program and its suite of executive education programs in Finance.  I have also held positions in a large accounting firm (Price Waterhouse) and two other investment banks (Bankers Trust and Paribas Capital Markets).

4.      A copy of my curriculum vitae is attached as **Appendix A**.  A list of cases in which I have testified or provided expert reports over the past four years is attached as **Appendix B**.

## II.     Assignment and Compensation

5.      I am informed that the Court is considering the issue of Claimants' request for restitution, and that Claimants are former shareholders of Africo Resources Ltd. ("Africo").

6.      I have been retained by counsel for OZ Africa Management GP, LLC to review the November 22, 2019 submissions on behalf of (i) Claimants ("Claimants' Submission")[1], and (ii) the United States of America (the "Government's Submission"),[2] (together the "Submissions") and to opine on (i) the most reliable and accurate methodology for determining Claimants' losses, and (ii) whether the facts surrounding the trading of common shares of Africo during the period from December 15, 2006 through July 24, 2008 are supportive of a conclusion that the shares were traded in an efficient market such that Africo's share price during this period accurately reflected the expected value of Africo's assets and opportunities, including its opportunity to develop and profit from the Kalukundi mining rights.

7.      I have been assisted in this matter by Cornerstone Research staff, who worked under my direction.  Cornerstone Research is being compensated for my time at my standard billing rate of $760 per hour.  The payment of Cornerstone Research's fees is in no way contingent or based upon the opinions I provide, or upon the outcome of this litigation or any other matter.  The analyses and opinions expressed in this declaration are my own.

### III.      Summary of Opinions

8.      Africo's common shares were listed for trading on the Toronto Stock Exchange ("TSX") from December 2006 until July 2016.  I have conducted an event study which demonstrates that, at least for the period from December 15, 2006 through July 24, 2008 (the "relevant period"), Africo's public share price responded to new, value-relevant information, a finding that is strongly supportive of a conclusion that Africo's common shares traded in an efficient market.[3] Consequently, during the relevant period, this public share price accurately reflected the

---

[1] Opening Submission Regarding the Calculation of the Appropriate Restitution Amount for the Claimants, *United States of America v. OZ Africa Management GP, LLC*, November 22, 2019.

[2] Letter from the U.S. Department of Justice to Judge Garaufis, "Re: United States v. OZ Africa Management GP, LLC," *United States of America v. OZ Africa Management GP, LLC*, November 22, 2019.

[3] That the share price reflects value-relevant information is the key, defining, characteristic of an efficient market: "An efficient capital market is a market that is efficient in processing information. The prices of securities observed at any time are based on "correct" evaluation of all information available at that time. In an efficient market, prices 'fully reflect' available information."  Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices*, New York:  Basic Books, 1976, p. 133.

expected value of Africo's assets and opportunities, in particular its opportunity to develop and profit from the Kalukundi mining rights.

9.      At all times, Africo's only material operating asset was an indirect interest in the Kalukundi mining rights (as defined in the Submissions), and, during the period from December 15, 2006 through April 26, 2007 (the "pre-dispute period"), Africo's ownership of this interest was undisputed.  Both the Government's and Claimants' submissions use a discounted cash flow ("DCF") methodology to value these rights.  However, in my opinion, given the facts and circumstances of this matter, the most reliable and accurate measure of the value of the mining rights during the pre-dispute period is one that is based on Africo's public share price.  In contrast to a DCF valuation, which reflects the assumptions and subjective judgments of a single valuer, the public share price is the consensus valuation of market participants as a whole based upon all publicly-available information concerning the company, its business, and its prospects. Consequently, a DCF valuation that results in a value that is markedly different from the value inferred from the public share price is inherently questionable.

10.      During the period from April 27, 2007 through July 24, 2008 (the "dispute period"), market participants were informed that Africo's ownership of its indirect interest in the mining rights was disputed, as a result of which Africo's public share price reflected the consensus view of market participants on the impact of this dispute on the expected value of Africo's interest.

11.      Accordingly, as discussed below, it is my opinion that an analysis of Africo's public share price is the most accurate and reliable basis for measuring Claimants' loss, particularly as compared to a DCF valuation, which is based on subjective and deterministic inputs.

## IV.    Factual Background[4]

12.      Africo was incorporated on July 4, 2006 under the name CopperCo Resource Corp.[5]  On December 8, 2006, an arrangement was completed with Rubicon Minerals Corporation, Africo

---

[4] This section contains those facts that are directly relevant to the questions I have been asked to consider, and the conclusions I have reached.

[5] Africo Resources Consolidated Financial Statements December 31, 2006, March 27, 2007 ("Africo 2006 Annual Report"), p. 7.

Resources (B.C.) Ltd., and Paragon Minerals Corporation,[6] and on December 15, 2006, Africo shares listed on the TSX, and started trading under the symbol "ARL."[7]

13.    At all times, Africo's only material operating asset was an indirect interest in the mining rights to the Kalukundi property.[8]  For example, in its 2006 Annual Report, Africo noted that its "significant mineral properties" were Kalukundi and Kamasani, but went on to note in respect of the latter that "[b]y December 31, 2005, [it] had not been able to establish matters in respect of title, and all costs associated with this property...were written off."[9]  Similarly, in its 2015 Annual Report, Africo noted that "[c]urrently, [its] principal mineral property [was] the Kalukundi Property,"[10] and its balance sheet category of "exploration and evaluation assets" related solely to this property.[11]

14.    On April 13, 2007, Africo publicly announced that it had entered into an equity financing agreement underwritten by a syndicate led by Paradigm Capital Inc. ("Paradigm Capital"), "pursuant to which the Underwriters [had] agreed to purchase [approximately 27 million] common shares...at a price of C$3.70...for total gross proceeds of [approximately C$100 million]," noting that "[t]he net proceeds...[would] be primarily used to fund the equity

---

[6] Africo 2006 Annual Report, p. 7.

[7] "Africo Resources Ltd. Commences Trading on The Toronto Stock Exchange," Africo Resources News Release, December 21, 2006.

[8] Africo 2006 Annual Report, p. 13; Africo Resources Consolidated Financial Statements December 31, 2007, March 28, 2008, pp. 7, 13–14; Africo Resources Consolidated Financial Statements December 31, 2008, March 25, 2009, pp. 12–13; Africo Resources Consolidated Financial Statements for the years ended December 31, 2009 and 2008, March 24, 2010, pp. 7, 14–15; Africo Resources Consolidated Financial Statements for the years ended December 31, 2010 and 2009, March 30, 2011, pp. 8, 13–14; Africo Resources Consolidated Financial Statements for the years ended December 31, 2011 and 2010, March 29, 2012, pp. 9, 26–27; Africo Resources Consolidated Financial Statements for the Years Ended December 31, 2012 and 2011, March 15, 2013, pp. 9, 20–21; Africo Resources Consolidated Financial Statements for the Years Ended December 31, 2013 and 2012, March 27, 2014, pp. 9, 20; Africo Resources Consolidated Financial Statements for the Years Ended December 31, 2014 and 2013, March 20, 2015, pp. 8, 19; Africo Resources Annual Consolidated Financial Statements for the Years Ended December 31, 2015 and 2014, March 15, 2016 ("Africo 2015 Annual Report"), pp. 8, 18.

[9] Africo 2006 Annual Report, p. 13.  From 2007 to 2011, Africo also briefly acquired an interest in the Mporokoso gold exploration project in Zambia.  However, "as significant exploration work was required to be carried on [the] project during the year ended December 31, 2011, [Africo] allowed the interest in the project to lapse," and the project did not move beyond the exploration stage.  Africo Resources Consolidated Financial Statements for the years ended December 31, 2011 and 2010, March 29, 2012, p. 27.

[10] Africo 2015 Annual Report, p. 8.

[11] Africo 2015 Annual Report, p. 18.

Expert Report of Ronnie Barnes, Ph.D.

requirements for the development of [its] Kalukundi project and for general corporate purposes including working capital."[12]  Later that day, it made a further public announcement that "the financing [had] been increased to [approximately 35 million common shares] for gross proceeds of [approximately C$130 million]."[13]  However, on April 27, 2007, the offering was cancelled after Africo issued a public news release stating that it had been made aware of a court's decision to accept the claim made by Akam Mining s.p.r.l. ("Akam") that it had acquired Africo's mining rights at a sale.[14]

15.    Around November 28, 2007, Africo obtained an injection of equity capital from the International Finance Corporation ("IFC"), selling 1,731,602 common shares and a warrant entitling the IFC to purchase up to 1,731,602 common shares, for gross proceeds of C$4.0 [US$4.1] million.[15]

16.    On December 21, 2007, Africo completed an equity private placement with certain of its directors, employees and consultants, selling 148,491 units (each unit comprised of one Africo common share and one warrant to purchase one common share) for gross proceeds of C$343,014 [US$346,024].[16]

17.    On April 21, 2008, at which point its ownership of the mining rights was still disputed, Africo issued a public news release in which it announced "that it ha[d] entered into a Subscription Agreement for [an equity] private placement of [C]$100 million...at a price of

---

[12] "Africo Announces C$100 million Financing," Africo Resources News Release, April 13, 2007.  At the then-prevailing exchange rate, C$3.70 was equivalent to US$3.25.  I note that if I use the CAD-to-USD FX rate from April 19, 2007 when the preliminary prospectus for the Paradigm transaction was filed, the C$3.70 price was equivalent to US$3.28.  Africo Resources Preliminary Short Form Prospectus, April 19, 2007.  Throughout this report, I convert CAD values to USD using the end-of-day CAD-to-USD exchange rate as provided by Thomson Reuters Refinitiv Eikon.

[13] "Africo Increases Financing," Africo Resources News Release, April 13, 2007.  At the then-prevailing exchange rate, C$130 million was equivalent to approximately US$115 million.

[14] "Africo Resources Ltd. - Press Release," Africo Resources News Release, April 27, 2007; "Africo Resources Ltd. - Financing Cancelled," Africo Resources News Release, April 27, 2007.  In particular, Akam claimed that it had acquired 75% of Swanmines s.p.r.l. ("Swanmines"), which was "the entity that [owned] the Kalukundi copper/cobalt deposit in the DRC."  "Africo Resources Ltd. - Press Release," Africo Resources News Release, April 27, 2007.

[15] "Africo completes C$4.0 million equity financing with IFC," Africo Resources News Release, November 28, 2007.

[16] "Africo completes C$343,000 equity financing," Africo Resources News Release, December 21, 2007.

Expert Report of Ronnie Barnes, Ph.D.

[C]$2.50 per unit with Camrose Resources Limited ('Camrose')."[17]  Each of the 40 million units "consist[ed] of a common share and one-half of a share purchase warrant [with] each whole warrant [entitling] Camrose to acquire an additional common share at a price of [C]$3.50 per share for an eighteen month period following closing."[18]  Additionally, 5.4 million common shares were issued to Camrose in consideration for "Africo's subsidiary...unequivocally confirm[ing] ownership of 75% of the outstanding shares of Swanmines."[19]  The transaction (the "Camrose Transaction") officially closed on July 24, 2008. [20]

18.    Over the ensuing years, a wholly-owned subsidiary of Eurasian Natural Resources Corporation acquired a controlling equity interest in, and eventually the entire share capital of, Camrose.[21]  On May 13, 2016, it was announced that Camrose would acquire all of the issued and outstanding common shares in Africo that it did not already own for cash consideration of C$1.00 [US$0.77] per share.[22]  The transaction (the "Going Private Transaction") closed on July 6, 2016, and Africo's shares were delisted from the TSX on July 11, 2016.[23]  The Board of Directors of Africo recommended the Going Private Transaction, which was supported by an

---

[17] "Africo Resources announces CAD$100 million private placement to develop the Kalukundi project, signs agreements to acquire property contiguous to the Kalukundi project **and to re-establish its ownership of Swanmines,**" Africo Resources News Release, April 21, 2008 (emphasis added) ("Camrose Transaction News Release").  At the then-prevailing exchange rate, C$100 million and C$2.50 were equivalent to approximately US$100 million and US$2.49, respectively.

[18] Camrose Transaction News Release.  At the then-prevailing exchange rate, C$3.50 was equivalent to approximately US$3.48.

[19] Camrose Transaction News Release.  Camrose also entered into an agreement to acquire the outstanding shares of Akam, which "purportedly [held], indirectly through [Swanmines], the Kalukundi property."

[20] "Africo Resources completes CAD$100 million private placement with Camrose Resources Limited to develop the Kalukundi project and re-establish its ownership of Swanmines," Africo Resources News Release, July 24, 2008.

[21] "Eurasian Natural Resources Corporation PLC Acquisition of 50.5% of the Shares of Camrose Resources Limited," Eurasian Resources Group News Release, August 20, 2010; Blamey, Andy, "ENRC shareholders back purchase of DRC miner Camrose," *Platts Metals Daily*, December 28, 2012.

[22] "Africo Resources Ltd. Enters into Definitive Agreement with Camrose Resources Limited for Going Private Transaction," Africo Resources News Release, May 13, 2016; Ma, Raymond, "Africo Resources inks deal with majority shareholder to go private," *SNL Metals & Mining Daily: East Edition*, May 18, 2016.

[23] "Eurasian Resources Group completes transaction to acquire 100% of Africo Resources Limited," Eurasian Resources Group News Release, July 7, 2016.

Expert Report of Ronnie Barnes, Ph.D.

independent fairness opinion,[24] as "fair to [s]hareholders,"[25] and 99.997% of Africo's shareholders voted in favor of the transaction.[26]  The Canadian court overseeing the Going Private Transaction considered its "fairness and reasonableness" and approved the transaction.[27]

## V.    Valuation Methodologies and Their Application to the Kalukundi Mining Rights

19.    In response to the Court's request for supplemental briefing, the Government and Claimants have advanced DCF values of the mining rights to the Kalukundi property, as of November 2019, that range from US$188.7 million to US$387.2 million (excluding the valuation based on the speculative and counterfactual hypothetical of a fully developed mine).[28]

20.    The significant difference between the Government's and Claimants' November 2019 DCF valuations, which are based on the same information, is suggestive of a lack of reliability in the analyses that underpin them, and illustrates that each of these valuations reflects the subjective judgments and assumptions of a single valuer.  In contrast, Africo's public share price reflects the consensus of market participants as a whole.

21.    As previously noted, Africo's common shares were publicly traded on the TSX from December 2006 through July 2016, and throughout this period, the company's only material operating asset was its indirect part-ownership interest in the Kalukundi mining rights.  Over the pre-dispute period, the aggregate public market value of Africo's common shares—its market capitalization—ranged from a low of US$61.5 million to a high of US$97.1 million, while it ranged from a low of US$19.6 million to a high of US$72.9 million during the dispute period.[29]

---

[24] Africo Resources Notice of Annual and Special Meeting and Management Proxy Circular for the Meeting of Shareholders to be Held on June 29, 2016, May 31, 2016, ("Africo Notice of Meeting"), p. 22.

[25] Africo Notice of Meeting, p. 20.

[26] Africo Resources Report of Voting Results, June 29, 2016.

[27] Africo Notice of Meeting, p. 33; Africo Resources Plan of Arrangement and Court Order, July 6, 2016.

[28] Claimants' Submission; Government's Submission; "November 2019 Addendum to the Valuation of the Kalukundi Copper/Cobalt Project, Report Prepared by SRK Consulting," November 22, 2019 ("2019 SRK Report").

[29] Bloomberg.  I note that there are at times small discrepancies in the count of shares outstanding between Bloomberg's reported figures and Africo's annual and quarterly filings.  As Bloomberg figures are updated on a monthly basis, rather than the quarterly figures provided by Africo, I chose to use Bloomberg data for my analysis. As the count of Africo's shares outstanding was unavailable from Bloomberg from December 15, 2006 through December 31, 2006, I used the first value available from January 2, 2007 for this period.

Expert Report of Ronnie Barnes, Ph.D.

As indicated, Africo went private in July 2016 at a price of US$0.77 per share in a transaction approved by 99.997% of its shareholders and its board of directors, making its market capitalization at the time approximately US$55 million. In November 2017, only 16 months later, Claimants' expert arrived at a purported value of US$683 million for Africo's part interest in the mining rights, which is *over 12 times higher*.[30]  Based on these observations, it should be clear that the reliability of the DCF valuation methodology used by Claimants' expert must be at the very least questionable.

22.     In the remainder of this report, I provide an economic overview of the valuation methodology that involves determining the value of an asset from the market price of the shares of the company that owns the asset (the "market price" approach). I then explain why this is the preferred approach, particularly when the shares are publicly traded in what is referred to as an "efficient market." I go on to discuss the applicability of the market price approach to the valuation of the Kalukundi mining rights. Finally, I provide a more detailed discussion of the DCF valuation methodology, and of the inherent challenges in applying this methodology in the current matter.

23.     At the outset, it is important to note that the valuation methodology that is most appropriate to a given situation depends on the facts and circumstances of that situation. The superiority of the market price approach to the valuation of the Kalukundi mining rights in the current matter is a function of the facts and circumstances of this matter, including the degree of efficiency of the market for Africo shares, and the lack of an operating track record on which to base reliable forecasts of the future cash flows from the Kalukundi property.

### A.     The Market Price Approach

#### 1.     Introduction

24.     The basic idea behind the market price approach is that the company's public share price may be used to determine the market's perception of the present value of the company's assets and future cash flows. Put slightly differently, the company's market capitalization may be

---

[30] "Valuation of the Kalukundi Copper/Cobalt Project, Report Prepared by SRK Consulting," November 21, 2017, p. 1.

thought of as the result of the market's collective analysis of the value of the company's assets and business prospects.[31]

## 2. Market Efficiency

25.     The use of share price or market capitalization to infer the value of a company's assets is particularly appropriate when the market for the company's shares is (informationally) efficient. The concept of the efficiency of the market for a given company's stock relates to the extent to which the company's share price reflects information that is relevant to valuing the stock.  As described in a leading corporate finance textbook:

> Economists define three levels of market efficiency, which are distinguished by the degree of information reflected in security prices.  In the first level, prices reflect the information contained in the record of past prices.  This is called *weak market efficiency*.  If markets are efficient in the weak sense, then it is impossible to make consistently superior profits by studying past returns.[32]
>
> The second level of efficiency requires that prices reflect not just past prices but all other public information, for example, from the Internet or the financial press.  This is known as *semistrong market efficiency*.  If markets are semistrong efficient, then prices will adjust immediately to public information such as the announcement of the last quarter's earnings, a new issue of stock, or a proposal to merge two companies.[33]
>
> With *strong market efficiency*, prices reflect *all* the information that can be acquired by painstaking analysis of the company and the economy.  In such a market we would observe lucky and unlucky investors, but we wouldn't find any superior investment managers who can consistently beat the market. [34]

26.     For the purposes of the current matter, the key implication is that if the public market in which Africo's shares traded was "semistrong efficient," then the company's public share price

---

[31] To the extent that there are securities beyond common shares (such as debt, warrants or share options), certain adjustments will be needed, but the approach of using the public share price to infer the market's perceived value of a company's assets and business prospects remains valid.

[32] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, Maidenhead, England:  McGraw-Hill Education, Eleventh Global Edition, 2014 ("Brealey, Myers, and Allen"), p. 324.

[33] Brealey, Myers, and Allen, pp. 324–325.

[34] Brealey, Myers, and Allen, p. 325.

Expert Report of Ronnie Barnes, Ph.D.

can be used to infer the market's consensus regarding the value of the Kalukundi mining rights.
Moreover, basing an assessment of value on such a market consensus will likely lead to a more
reliable and accurate assessment of value than one which relies on the assumptions and
subjective judgments of a single valuer. The use of share prices in this way, or indeed as a basis
for making corporate financing or investing decisions, is explicitly endorsed in the corporate
finance literature. For example, the Brealey, Myers, and Allen textbook referred to above
advocates this approach in numerous places:

> What can you do to prevent forecast errors from swamping genuine
> information? We suggest that you begin by looking at market values.[35]

> Security analysts face a similar problem whenever they value a company's
> stock. They must consider the information that is already known to the
> market about a company, *and* they must evaluate the information that is
> known only to them…Investors have already evaluated the information
> that is generally known. Security analysts do not need to evaluate this
> information again. They can *start* with the market price of the stock and
> concentrate on valuing their private information.[36]

> [F]inancial assets, such as stocks and bonds, are traded in reasonably
> competitive markets. When you have the market value of such an asset,
> *use it*, at least as a starting point for your analysis.[37]

> [I]n an efficient market it is not possible to find expected returns greater
> (or less) than the risk-adjusted opportunity cost of capital. This implies
> that every security trades at its fundamental value, based on future cash
> flows [] and the opportunity cost of capital… If price equals fundamental
> value, the expected rate of return is the opportunity cost of capital, no
> more and no less.[38]

> In an efficient market you can trust prices, for they impound all available
> information about the value of each security.[39]

---

[35] Brealey, Myers, and Allen, p. 274.

[36] Brealey, Myers, and Allen, p. 274.

[37] Brealey, Myers, and Allen, p. 288.

[38] Brealey, Myers, and Allen, p. 328.

[39] Brealey, Myers, and Allen, p. 337.

Expert Report of Ronnie Barnes, Ph.D.

> If the market is efficient, prices impound all available information…
> [T]he market's assessment of the company's securities can [] provide
> important information about the firm's prospects.[40]

27.    Other leading corporate finance textbooks make the same point equally forcefully.  This literature is replete with discussions of the superiority of market prices as a basis for assessing value or for corporate decision-making.  For example:

> Stock prices aggregate the information of many investors.  Therefore, if
> our valuation disagrees with the stock's market price, it is more likely an
> indication that our assumptions about the firm's cash flows are wrong.[41]

> Ultimately, investors trade until they reach a consensus regarding the
> value of the stock.  In this way, stock markets aggregate the information
> and views of many different investors.[42]

> For a publicly traded firm, its market price should already provide very
> accurate information, aggregated from a multitude of investors, regarding
> the true value of its shares.  Therefore, in most situations, a valuation
> model is best applied to tell us something about the firm's future cash
> flows or cost of capital, based on its current stock price.[43]

28.    The notion that the use of a company's share price to infer the value of its assets when those shares are publicly traded in an efficient market is preferable to DCF analysis is discussed at length in a recently published article in *The Business Lawyer*.  The authors note that:

> Recently, courts in Delaware explicitly have embraced the [Efficient
> Capital Markets Hypothesis ("ECMH")] and have correctly observed that
> it is methodologically and analytically superior to discounted cash flow
> ('DCF') analysis as a means for determining fair value in appraisal
> proceedings[44]

---

[40] Brealey, Myers, and Allen, p. 337.

[41] Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Harlow, England:  Pearson Education, Third Edition, Global Edition, 2014 ("Berk and DeMarzo"), p. 302.

[42] Berk and DeMarzo, p. 294.

[43] Berk and DeMarzo, p. 295.

[44] Macey, Jonathan and Joshua Mitts, "Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets," *The Business Lawyer* Vol. 74, Fall 2019, pp. 1015–1064 ("Macey and Mitts"), p. 1016.

and go on to explain repeatedly why the use of the share price should, in an efficient market, be preferred to the results of a DCF analysis—for example:

> The court in *Dell* also correctly observed that 'the efficient market hypothesis . . .teaches that the price of a company's stock reflects all publicly available information as a consensus, per-share valuation.' Similarly, the court pointed out, again correctly, that 'the price produced by an efficient market is *generally a more reliable assessment of fair value* than the view of a single analyst.'[45]

> The *DFC* court also noted that '[i]n an efficient market you can trust prices, for they impound all available information about the value of each security.' Thus, Delaware has recognized the important point that stock market prices in an informationally efficient capital market reflect fundamental (or 'fair') values.[46]

> [W]here market prices are available, they are the best basis for valuation, despite their imperfections. In this context, we note that whatever cognitive biases afflict the *markets* that set prices for stocks and other financial assets also afflict the *individuals* who are tasked with determining valuations in the event that market prices are ignored.[47]

> In particular, we note that, whatever its shortcomings, the ECMH is vastly superior to alternative, subjective valuation methodologies, such as DCF analysis. In particular, in corporate finance, '[m]arket prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares.'[48]

> It seems clear that actual prices generated in the market are an unambiguously superior methodology for determining fair value than is the DCF analysis. DCF calculations are highly subjective…[49]

> Similarly, as the court observed in *DFC*, '[m]arket prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill

---

[45] Macey and Mitts, p. 1021.

[46] Macey and Mitts, p. 1021.

[47] Macey and Mitts, p. 1031.

[48] Macey and Mitts, pp. 1031–1032.

[49] Macey and Mitts, p. 1032.

the collective judgment of the many based on all the publicly available information about a given company and the value of its shares.'[50]

29.     Finally, it is important to note that even if the market for a given company's shares is not perfectly efficient, the conclusion above regarding the potential supremacy of a market share price analysis over the results of a valuation performed by a single valuer is still valid.  Market efficiency is not a "zero-one" question:

> The concept of market efficiency has been adopted by courts in a variety of contexts.  In reality, markets can never be perfectly efficient or inefficient, but exist somewhere in between depending on the facts and circumstances.[51]

30.     Macey and Mitts address this issue and conclude that:

> Even if trading prices are not fully efficient in the semi-strong sense, they may yield information that is of use to a court because they contain valuable, unbiased information about value.  This is particularly true in light of the flaws in the alternative valuation methods.  As Bradford Cornell has observed, '[a] market that is not perfectly efficient may still value securities more accurately than appraisers who are forced to work with limited information and whose judgments by nature reflect their own views and biases.'[52]

> However, we would go further for the simple reason that even prices produced in an inefficient market are a more reliable assessment of fair value than the wildly divergent predictions of an expert witness who tailors his or her valuation to the litigation imperatives of his or her client.[53]

> In our view, the focus in *Norcraft* and other valuation cases in which markets may not be efficient should be on a question other than the broad question of market efficiency.  The better question for courts to ask in the valuation process is whether, on the date on which a value must be

---

[50] Macey and Mitts, p. 1045.

[51] Cornell, Bradford and John Haut, "How Efficient Is Sufficient: Applying the Concept of Market Efficiency in Litigation," *The Business Lawyer* Vol. 74, Spring 2019, pp. 417–434, p. 417.

[52] Macey and Mitts, p. 1046.

[53] Macey and Mitts, p. 1047.

assigned to a company, there is any material information that is not reflected in the firm's share price.[54]

31.     As noted in another leading corporate valuation textbook, "[t]he bottom line is that although the market may not be perfectly efficient, there is no evidence that any other pricing mechanism works consistently better."[55]

32.     Importantly, the conclusion that the use of the market price approach is a superior method of assessing value compared to alternative approaches such as DCF holds even without recourse to the implicit bias on the part of the valuer to which Macey and Mitts allude.

### 3.     The Use of Africo's Public Share Price to Determine the Value of the Kalukundi Mining Rights

33.     The potential advantage of using Africo's public share price to determine the value of the Kalukundi mining rights was acknowledged by the Government when it noted that "a share price analysis may provide an effective way of measuring and apportioning restitution in this case,"[56] because the use of such an analysis "would seemingly reduce speculation and subjective factors regarding the value of the mining rights vis-à-vis attempting to value the Kalukundi mine itself."[57]

34.     In effect, the Government correctly recognized that Africo was essentially a start-up business with no operating track record nor any historical results on which to support estimates of future cash flows, thereby increasing the inherent subjectivity of any DCF valuation.[58] Moreover, at all times, the sole material operating asset of Africo was an indirect interest in the right to develop the Kalukundi property.  In these circumstances, the public trading price of

---

[54] Macey and Mitts, p. 1050.

[55] Cornell, Bradford, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, Homewood, IL: Business One Irwin, 1993, p. 46.

[56] Government's Submission, p. 11.

[57] Government's Submission, p. 14.

[58] "While the DCF method may provide a means to assess the potential value of the Kalukundi mining rights, it is also limited by the reliability and accuracy of the various inputs utilized to estimate the revenues, costs, risks and resulting cash flows. Adjustments to certain inputs can have a significant effect on the concluded value. Further, because the Kalukundi mine remains undeveloped, no historical results exist on which to support estimates of future cash flows." Government's Submission, pp. 5–6.

Africo's common shares provides a market consensus from which to infer the value of that opportunity. In the remainder of this sub-section, I explain why this is a preferable and sounder methodology compared to the use of the DCF approach, given the facts and circumstances of this matter.

35.     First, I address the question of the efficiency of the market for Africo's common shares, which were publicly traded on the TSX, one of the largest and most active stock exchanges in the world.[59] In its submission, the Government noted that:

> there is some reason to believe that Africo stock traded in an efficient market. First, Africo stock traded on the [TSX], a well-established major international stock market. Second, Africo had been publicly traded for approximately four months when the loss of the mining rights was revealed to the market... Finally, based on the government's preliminary analysis..., Africo's share price and trading volume appeared to materially and quickly react to new public information including the fact that Africo's Kalukundi mining rights had been transferred to Akam and that subsequent efforts to recover them through litigation in the DRC failed.[60]

36.     To assess the question of the efficiency of the market in which Africo's common stock traded, and to control for market and industry factors, I conducted an event study, a commonly employed methodology, to assess whether the public share price reacted swiftly to new and value-relevant company-specific information.[61] As can be seen in Exhibit 1, I focused on the period December 2006 through July 2008 because this encompasses the period from when the shares were first publicly traded through the dispute period.

---

[59] As of December 31, 2007, the TSX Group was the second largest equity exchange group in the world in terms of listings, and the seventh largest exchange group in the world and the third largest exchange group in North America in terms of market capitalization. The TSX Group is formed of TSX and TSX Venture Exchange, which focuses on public venture capital. Annual Report 2007, TSX Group, 2007, p.1. 1,612 stocks were listed on the exchange as of that date, with a total market capitalization of over C$2 [US$2] trillion. Africo's market capitalization ranked in the 28th percentile of these 1,612 stocks. Toronto Stock Exchange.

[60] Government's Submission, footnote 12.

[61] "Event studies have their origins in the academic literature. Financial economists use event studies to measure the relationship between stock prices and various types of events. The core contribution of the event study is its ability to differentiate between price fluctuations that reflect the range of typical variation for a security and a highly unusual price impact that often may reasonably be inferred from a highly unusual price movement that occurs immediately after an event and has no other potential causes." Fisch, Jill E., Jonah B. Gelbach and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* Vol. 96:553, 2018, pp. 554–621, p. 555.

Expert Report of Ronnie Barnes, Ph.D.

37.     To conduct my event study, I used a statistical technique known as a regression model to determine the company-specific portion of returns after market and industry-wide effects have been removed (henceforth, I refer to these as residual returns). I then analyzed the magnitude of residual returns on days ("news-dates") on which company-specific, value-relevant, and unexpected news was released. A statistically significant residual return is indicative of a reaction that cannot be explained solely by factors that affect the market and/or the industry.

38.     For the regression model, I used a two-factor model to identify the company-specific portion of the returns on Africo's common shares, regressing Africo's daily returns[62] on the total returns[63] of (i) a market index, and (ii) an industry index. I used the S&P/TSX Composite Index to model market returns, and the Solactive Global Copper Miners Total Returns Index to model industry returns,[64] and estimated the model over a period from December 18, 2006 through July 24, 2008 inclusive.[65]

39.     I then reviewed news articles relating to Africo over the relevant period and identified 23 news-dates. News-dates were selected by searching Factiva articles published about Africo during this time period for new information that could impact the valuation of Africo, including, but not limited to, progress updates on the development of the Kalukundi mine, any corporate transactions such as financing agreements, and news regarding the ownership of Kalukundi,

---

[62] Because Africo never paid a dividend on its common shares, daily returns are defined as the percentage change in the closing price of Africo's common stock from one trading day to the next, where the closing price is the price at which the last recorded trade was executed.

[63] The total return includes returns to an investor from price appreciation, dividends, interest payments, and all other distributions.

[64] The Solactive Global Copper Miners Total Returns Index is comprised of international companies active in the exploration, mining, and/or refining of copper. Because the index returns calculations are primarily reported in USD, I used the daily USD/CAD FX rate from Thomson Reuters Refinitiv Eikon to calculate daily CAD-denominated returns for comparison with the CAD-denominated returns of Africo and the S&P/TSX Composite Index. "Solactive Global Copper Miners Total Return Index," Solactive, https://www.solactive.com/Indices/?index=DE000A1DKEA1, accessed on March 2, 2020.

[65] Africo held its IPO on Friday December 15, 2006, therefore the first day for which returns are available is Monday December 18, 2006. July 24, 2008 marked the completion of the Camrose Transaction. "Africo Resources completes CAD$100 million private placement with Camrose Resources Limited to develop the Kalukundi project and re-establish its ownership of Swanmines," Africo Resources News Release, July 24, 2008. The results of my event study are robust to the use of alternate specifications.

Africo, and Camrose.[66]  Using a 95% confidence level, eight of the news-dates from the relevant period had statistically significant residual returns on the market impact date.[67]  At that confidence level, a given day chosen at random has, by definition, a 5% chance of being significant.  Consequently, if 23 days were chosen at random, the expected number of days with a statistically significant residual return is $5\% \times 23 = 1.15$, while the probability of observing eight or more days with a statistically significant residual return is only 0.001%.[68]  In other words, the much higher than expected number of statistically significant days is supportive of the conclusion that Africo's public share price typically reacted in response to new information, the defining characteristic of an efficient market.

40.    The ability of the price of a stock to react on a timely basis to the release of new value-relevant information is a function of, *inter alia*, the volume of trading in the shares.  Broadly speaking, a stock with a high turnover in its shares on a regular basis indicates that many market participants are buying and selling shares and constantly assessing the stock's value.  During the relevant period, Africo's average weekly trading volume was 1.50% of its outstanding shares, again consistent with the notion that it was trading in an efficient market.[69]  Following a request by counsel, I have also calculated Africo's average weekly trading volume between April 2007 and November 2007, which was even higher at 2.14%.

41.    I now address the implications of this conclusion for the valuation of the Kalukundi mining rights.  As discussed above, Africo's common shares commenced public trading on the

---

[66] Factiva is a news aggregation service used for targeted keyword searches across numerous publications which allows one to ascertain when news was released to the market about a specific event.

[67] The market impact date is the same as the news-date for news that were released during trading hours, and is the next trading day for news that were released after market close, or during a trading halt in Africo's common shares that was not resolved until the next trading day.

[68] Exhibit 2.  The probability of observing eight or more such days is 0.01% if the percentage of statistically significant days in the sample is used in the calculation instead.

[69] Bloomberg.  To calculate the average weekly trading volume, I first calculate the average daily trading volume and multiply this number by five.  The trading volume for a given day is the number of shares traded on that day divided by the number of shares outstanding.  As the count of Africo's shares outstanding was unavailable from Bloomberg from December 15, 2006 through December 31, 2006 I used the first available value (from January 2, 2007) for this period.

TSX, effective December 15, 2006.  By no later than December 21, 2006, disclosure had been made that:

> Africo...is a development stage copper-cobalt company with an operational base in the DRC...  Africo is developing the high-grade Kalukundi copper cobalt deposit near Kolwezi in the DRC...  A feasibility study was carried out on behalf of [Swanmines] which controls the deposit.  Gécamines, the state mining company, is a 25% carried shareholder of Swanmines.  Africo has an option to acquire 100% of the shares of the remaining, 75% shareholder, which option is scheduled to be exercised by the end of 2006.[70]

42.    From the outset, therefore, market participants, including Africo's shareholders, were aware of the fact that Africo held an indirect interest in mining rights with respect to the Kalukundi property.  Consequently, the securities issued by Africo were, in aggregate, an indirect claim on Africo's interest in any cash flows that the Kalukundi project might generate in the future.  As a result, the aggregate value of these securities can be used as a basis for determining the value of these mining rights.

43.    In effect, this aggregate value would reflect the distillation of the collective judgment of the market as a whole of the present value of the expected future cash flows from Africo's interest in the Kalukundi property, based on all available information about the property and its prospects and risks.  As a mining company listed on the TSX, Africo was subject to stringent disclosure requirements based on required definitions of terms, as a result of which investors had access to a broad set of information regarding the Kalukundi property.[71]

---

[70] "Africo Resources Ltd. Commences Trading on The Toronto Stock Exchange," Africo Resources News Release, December 21, 2006.

[71] In this respect, it is important to highlight the information that was available to investors in Africo's common shares during the period that it was listed on the TSX.  As part of its "ongoing reporting and disclosure obligations," Africo was required to file an Annual Information Form which "is a disclosure document intended to provide material information about the issuer and its business at a point in time, in the context of its historical and possible future development [and which] describes the company, its operations, prospects, risks and other external factors that impact the company specifically."  "Technical Guide to Listing," Toronto Stock Exchange and TSX Venture Exchange, 2018, https://tsx.com/ebooks/en/technical-guide-to-listing/48/, accessed on February 26, 2020.  Further, the Toronto Stock Exchange required that listed mining companies use the definitions set forth by the Canadian Institute of Mining in their public disclosures concerning their mineral interests.  "Appendix B Disclosure Standards for Companies Engaged in Mineral Exploration, Development & Production," Toronto Stock Exchange Company Manual, July 2002, available at https://mrmr.cim.org/media/1018/tsx-appendix-b.pdf, accessed on February 26, 2020.  Africo's first such Annual Information Form was for the fiscal year ended December 31, 2006 and contained

44. For the period from April 27, 2007 to July 24, 2008, the market was on notice of the possibility that Africo may have lost its indirect interest in the mining rights, as a result of which the market price of Africo's common shares was depressed relative to what it would have been had there been no dispute over Africo's ownership. Consequently, Africo's market capitalization during this period reflects the market's assessment of the impact of the dispute on the value of the company and the expected value of its sole material asset, including the impact on the company's opportunities to develop the mining rights. Moreover, even during this period, the results of my event study indicate that this share price was reacting to new value-relevant information, meaning that it was the most reliable and accurate measure of the expected value of the company's assets and opportunities, including the mining rights and the temporary loss thereof as a result of the offense.

45. In summary, the market price of Africo's common shares during the relevant period is the most reliable and accurate basis on which to measure the expected value of Africo's assets and opportunities. The reliability of the share price is further supported by large blocks of shares being transacted at prices close to market price. Each of the large-scale transactions during this period involved sophisticated arm's-length offerors (Paradigm Capital and the IFC), or involved knowledgeable insiders of Africo (the December 2007 equity private placement). Moreover, each of the foregoing transactions was proposed, agreed, or closed at or near to the then-public market price of Africo common shares as reflected on the TSX, which tends to confirm that the market was pricing Africo's common shares accurately and efficiently.

46. Consider, for example, the Paradigm Capital transaction. As described, this transaction as agreed involved the private placement of approximately 35 million Africo common shares at a price of C$3.70 [US$ 3.25] per share, or approximately C$130 [US$115] million in total. On April 12, 2007—the day before the transaction was announced—the closing price of Africo's common shares was C$3.90 [US$3.44]. At the time, Africo had approximately 25 million outstanding shares.[72] Consequently, had this transaction been completed, the new shareholders

---

a seven-page extract from "a technical report on the Kalukundi Property dated June 2006" that was "compliant with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects.*" Africo Resources Annual Information Form for the Fiscal Year Ended December 31, 2006, March 30, 2007 ("2006 Africo Annual Information Form"), p. 5.

[72] Bloomberg.

would have owned 58% of Africo's common shares.  In other words, Africo's management was willing to allow its existing shareholders to be diluted by almost 60% at a price that was 5% *lower* than the then-prevailing public share price.  This is clearly inconsistent with any claim that Africo's management believed the true value of its indirect interest in the Kalukundi mining rights to be significantly *in excess of* the value implied from the share price.

47.     Similar comments may be made in respect of the IFC financing and the equity private placement.  In both cases, the price at which the shares were issued was tied to the then prevailing share price.  This is consistent with the market's assessment of the impact of the dispute on the expected value of Africo's interest in the mining rights being broadly in line with the assessment of Africo's management:

      a.   In respect of the IFC financing, Africo agreed the price per share issued was tied to the "volume weighted average market price" in the five trading days prior to the agreement being signed on November 27, 2007, resulting in a per share price of C\$2.31 [US\$2.32].[73]

      b.   In respect of the private placement on December 21, 2007, Africo directors agreed to purchase shares at C\$2.31 [US\$2.33], a transaction that was specifically designed to align with the IFC placement and thus the company's public share price.[74]

The willingness of Africo's management to accept financing at these prices is inconsistent with a claim that Africo's public share price was not a reliable indicator of value.

## B.     The DCF Methodology

### 1.     Introduction

48.     Both Claimants' and the Government's experts rely almost exclusively on the DCF methodology to determine the valuation of the Kalukundi mining rights for the purposes of a

---

[73] "Africo Resources Announces C\$4.0 million IFC Private Equity Placement," Africo Resources News Release, November 16, 2007; "Africo completes C\$4.0 million equity financing with IFC," Africo Resources News Release, November 28, 2007.  The quoted price of C\$2.31 per share is actually an upper bound, since it appears to be calculated based on the assumption that the warrant given to the IFC was worthless.

[74] Africo Resources Form 51-102F3 Material Change Report, December 21, 2007.  Again, the quoted price appears to be an upper bound.

restitution award.  In this sub-section, I provide a more detailed description of this methodology and explain why, given the facts and circumstances of the current matter, it is difficult for the application of the methodology to lead to a robust and reliable valuation.

49.      The basic premise underlying the DCF methodology is that the value of any investment (be it a company, a project, or an individual asset) at a given date is determined by the net present value ("NPV") of the future cash flows that the investment is expected to generate from that date onwards.  The implementation of the methodology involves two distinct, but related, steps:

      a.  First, determine the expected cash flow at each future point in time.[75]

      b.  Second, determine the appropriate rate at which these expected future cash flows should be discounted back to the valuation date, taking account of both the time value of money and the need to address the risk in the future cash flows.[76]

50.      The word "expected" in the first step is important here.  By definition, the cash flows that the investment will actually generate in the future are, as of the valuation date, unknown and subject to risk.  The expected cash flow at a given future point in time is the probability-weighted average of all the possible cash flow outcomes at that future date.  This does not mean that a DCF valuation requires an explicit articulation of the possible future cash flow outcomes and their relative probabilities—indeed, in most cases, the valuer will simply forecast expected future cash flows directly.  However, because no one knows what the future will bring, it does mean that the possibility of varying and even extreme outcomes must be taken into account.

51.      For example, suppose (as is the case here) that a project requires a government license in order to continue operating.[77]  In such a case, the expected future cash flows that enter into a

---

[75] Typically, a DCF valuation will be based on annual cash flow forecasts, i.e., a forecast of the expected cash flow one year from the valuation date, two years from the valuation date, and so on, although more frequent forecasts (semi-annual, quarterly, monthly) may be used in appropriate circumstances.

[76] The rate of return used to discount expected future cash flows back to their present value at the valuation date is referred to as the "discount rate."  As a simple example of how discounting works, given a discount rate of 15%, the discounted or present value of an expected cash flow of $100 five years from the valuation date is $100/(1.15)^5 = $49.72.  As can be seen from this calculation, present value is, in essence, compound interest in reverse.  The NPV of a set of future cash flows is simply the sum of the present values of each individual future cash flow.

[77] See, for example, "Africo requires licences[sic] and permits in order to access its mineral projects." 2006 Africo Annual Information Form, p. 15.  "The Kalukundi Project is secured under an Exploitation License, PE591, which

Expert Report of Ronnie Barnes, Ph.D.

valuation of the project should be adjusted downwards to reflect the possibility that the license will not be granted (or extended)—failing to do so will lead to expected future cash flows, and a resulting valuation, that are too high.[78]  Similarly, if there is a risk of government expropriation (by military force or confiscatory taxation), this too needs to be factored into the expected future cash flows on which the valuation is based.

52.    It is important to note that performing a DCF valuation is inherently a forward-looking exercise since it involves the forecasting of <u>future</u> cash flows, which are increasingly uncertain as time frames are extended.  This requires that the valuer make a number of assumptions and subjective judgments regarding these cash flows, as a result of which two valuers—even when they have access to exactly the same information at the time they are undertaking their valuations—can arrive at very different valuations.  These differences may be exacerbated by differences in the discount rates used by the valuers—again, these differences are the result of variations in the assumptions and judgments made by the valuers, rather than any differences in the information to which they have access.

### 2.    DCF Valuation Is Not a Reliable Methodology to Use in This Matter

53.    The fact that assumptions and subjective judgments are an integral part of any DCF analysis has led commentators to discuss the potential for its abuse.  For example, Macey and Mitts note that:

> With regard to the reliability of DCF analysis, Bradford Cornell, a foremost authority on market efficiency, observes in his seminal treatise on corporate valuation that DCF models must be treated with caution and skepticism because such models are 'easily abused.'  Further, because 'value can be created out of thin air by optimistic forecasting . . . the

---

was issued on October 11, 2001 for a term of 20 years.  There can be no assurance that the Exploitation License will be able to be renewed for two additional 15-year terms or at all." Africo Resources Annual Information Form for the Fiscal Year Ended December 31, 2015, March 16, 2016, p. 25.

[78] Despite the fact that Africo's indirect interest in the mining rights has been undisputed for the past twelve years since the Camrose Transaction in 2008, I am not aware of any action taken by Africo to extend the mining license, which, as noted in Footnote 77, is scheduled to expire in October 2021.  The submissions of Claimants and the Government do not address the likelihood—and cost—of Africo obtaining an extension of the mining license.  Given that the property remains wholly undeveloped as of this date, there would appear to be no chance whatsoever of realizing operating income from the mining license before its scheduled expiration.

> weight applied to a [DCF model] forecast should be directly proportional to the confidence that can be placed in the cash flow forecasts.'[79]

and also comment that:

> DCF calculations are highly subjective, and courts have expressed frustration with the wildly divergent views of competing experts who often arrive at wildly different valuations for companies when employing a DCF analysis.[80]

54.     Forecasts built into a DCF analysis cannot be "verified" at the time they are made. Rather, they can only be assessed for reasonableness by reference to the relevant available information.  In the case of an operating entity with a track record of revenues and of meeting its financial forecasts, there may be a basis on which to build reliable forecasts that can be used in a DCF analysis.  In the case of a start-up, with no track record of operating revenue, or of accurate forecasts, building such reliable forecasts can be extremely difficult.

55.      Africo falls into the latter category.  Indeed, as the Government acknowledges in its Submission, "because the Kalukundi mine remains undeveloped, no historical results exist on which to support estimates of future cash flows."[81]  Africo's disclosure that "[t]here is no assurance that [it] can successfully develop the Kalukundi Property, generate revenues, operate profitably, or provide a return on investment in the future"[82] further emphasizes the real challenges involved in developing reliable estimates of future cash flows from the Kalukundi property.

56.     The implications are also clear.  As the Government notes, "[w]hile the DCF method **may** provide a means to assess the potential value of the Kalukundi mining rights, it is also limited by the reliability and accuracy of the various inputs utilized to estimate the revenues, costs, risks and resulting cash flows.  Adjustments to certain inputs can have a significant effect on the concluded value (emphasis added)."[83]

---

[79] Macey and Mitts, pp. 1044–1045.

[80] Macey and Mitts, p. 1032.

[81] Government's Submission, p. 6.

[82] Africo Resources Annual Information Form for the Fiscal Year Ended December 31, 2008, March 25, 2009, p. 19.

[83] Government's Submission, pp. 5–6.

Expert Report of Ronnie Barnes, Ph.D.

57.     As I have previously explained, both the Government and Claimants rely extensively on the DCF methodology in determining what they consider to be an appropriate valuation of the Kalukundi mining rights at various points in time.  A comparison of the valuations that the Government and Claimants attribute to the Kalukundi mining rights as of November 2019 provides a stark illustration of just how significant the differences between valuers can be.  The 2019 SRK Report states that "the undeveloped Kalukundi mining rights as of the time of sentencing (November 2019) are worth approximately US$387.2 million, with US$290.4 million representing the 75% share held by Africo."[84]  By contrast, after discussing the assumptions regarding various inputs to the DCF calculation and amending certain of these assumptions, the Government's Submission concluded that "[t]he DCF method performed using the assumptions identified above resulted in a present-day valuation for the Kalukundi Project of $188.7 million."[85]

58.     Any implementation of the DCF valuation methodology requires the valuer to make a number of assumptions and subjective judgments that can have a material impact on the resulting valuation.  Moreover, the assumptions and judgments made by different valuers may differ significantly, even when these are based on the same information.  This issue can be particularly severe when the investment being valued does not—as is the case with the Kalukundi property—have anything in the way of an historic operating track record.

59.     I am not suggesting that DCF analysis can never play a role in the assessment of value.  However, in situations where, as here, there is no historic basis from which to project future cash flows, establishing inputs that are sufficiently reliable to generate an accurate valuation is extremely difficult.  Where, as here, the option exists of using Africo's publicly traded share price to value the company and its sole material asset, it is unquestionably the more reliable option.[86]

---

[84] 2019 SRK Report, p. 5.

[85] Government's Submission, p. 11.

[86] I am informed by counsel that the MVRA also requires an estimate of loss as of the time of sentencing.  The inherent unreliability of the DCF methodology in this matter remains to the present day, meaning that an alternative valuation approach is required.  Such an approach may utilize the Africo public share price from a prior period, with appropriate adjustments to project what the share price would be at the current date if the shares were still publicly traded.  However, a consideration of the details of such a methodology is beyond the scope of this report.

Expert Report of Ronnie Barnes, Ph.D.

## VI.    Conclusion

60.    The facts and circumstances of this matter are of a company with a single material operating asset whose common shares were publicly traded in a market that, during the period from December 2006 through July 2008, exhibits the key, defining characteristic of an efficient market.  Consequently, the most reliable methodology by which to value that asset is, during the period from December 2006 through April 2007 when Africo's ownership of the asset was undisputed, an approach that uses the public price of these shares.  Such an approach is objective, easily applied, avoids the need for assumptions and subjective judgments to which assessments of value can be highly sensitive, and is the methodology preferred by academics for the valuations of enterprises and assets.

Executed this 6th day of March, 2020

_____

Ronnie Barnes, Ph.D.

Expert Report of Ronnie Barnes, Ph.D.


**Appendix A**

March 2020

**RONNIE BARNES, PhD**
**Principal**
**Cornerstone Research UK Limited**
4 More London Riverside, 5th Floor • London SE1 2AU
Tel: +44.20.3655.0903 • Mobile: +44.7425.337902
rbarnes@cornerstone.com

## PROFESSIONAL EXPERIENCE

2012 – present    **Cornerstone Research**                    New York, NY; London, England
*Principal and Head of International Arbitration Practice*
- Provide written and oral expert testimony on accounting, financial and economic issues in litigation, arbitration and regulatory investigations
- Oversee teams supporting other testifying experts

Areas of expertise and selected case assignments:
- Valuation and the cost of capital
    - Economic analysis of lost profits due to a contract breach
    - Valuation of an industrial business
- Derivatives and risk management
    - Risk management at a large financial institution
    - Price impact of derivatives trading
    - Currency derivatives
    - Valuation of a large portfolio of complex over-the-counter (OTC) derivatives
- Financial institutions, markets and products
    - Investment strategy returns
    - Tax-motivated trading
    - Credit ratings
    - Collateralized debt obligations
    - Residential mortgage-backed securities
    - Structure of the credit default swap market

2011 – 2012    **Credit Suisse International**                    London, England
*Director and Head of Credit Exposure Methodology*
- Led a team responsible for:
    - Developing models to determine counterparty credit exposure on OTC derivatives and securities financing transactions (SFTs)
    - Maintaining and enhancing existing exposure models
- Responsible for managing model developments through internal validation and governance process, as well as regulatory (e.g., Financial Services Authority (FSA) and Swiss Financial Market Supervisory Authority) approval and review.

2008 – 2011    **Royal Bank of Scotland – Global Banking and Markets**    London, England
*Director and Head of Market and Credit Risk Methodology*
- Led a team responsible for:
    - Developing models used to determine counterparty credit exposure on OTC derivatives and SFTs
    - Maintaining and enhancing existing exposure models
    - Developing, enhancing and validating market risk methodologies

Expert Report of Ronnie Barnes, Ph.D.



**Appendix A**

- Oversaw liaison with FSA on methodological issues, including bringing model developments and changes through internal governance process.
- Significant management responsibilities, including hiring control and speaking at International Swaps and Derivatives Association and Risk conferences.

2006 – 2008  **CRA International**                                              London, England
*Principal, Financial Economics*
Oversaw production of expert reports and provided expert testimony in litigation and arbitration, on issues requiring in-depth knowledge of advanced finance concepts, such as cost of capital estimation, derivatives valuation and securitisation.

1995 – 2005  **London Business School**                                        London, England
*Associate Dean, Finance Programmes* (2004 – 2005)
- Held senior management role responsible for full-time and part-time Masters in Finance and executive finance programmes, including:
  o Design of academic content
  o Student recruitment
  o Faculty and external liaison

*Teaching Fellow* (1995 – 2000)*; Assistant Professor* (2000 – 2004)
- Taught wide range of accounting, finance, brand valuation and financial analysis courses across masters- and executive-level programmes
- Researched accounting and finance topics
- Managed external consulting and executive education activities

1994 – 1995  **Paribas Capital Markets**                                       London, England
*Executive, Risk Management*
Managed analysis and production of market risk reports for exotic interest rate swaps desk.

1993 – 1994  **Bankers Trust**                                                 London, England
*Assistant Vice President, Equity Derivatives*
Project role focused on improving Management Information Systems for equity derivatives operations.

1987 – 1993  **Price Waterhouse**                                              Manchester, England
*Manager*
Managed audits of a wide range of clients across different industries. Seconded to tax and technical departments.


**EXPERT TESTIMONY**
**Damages estimation**
- Joint expert, International Chamber of Commerce proceedings relating to the valuation of a Middle Eastern telecommunications company
- Expert, US District Court for the Eastern District of New York, in case relating to the valuation of mining rights
- Joint expert, International Court of Arbitration proceedings relating to the early termination of a long-term gas supply contract
- Expert witness statements, International Court of Arbitration proceedings relating to an alleged breach of EU regulations
- Joint expert, ICSID proceedings relating to the imposition of tariffs on renewable energy investments

Expert Report of Ronnie Barnes, Ph.D.



**Appendix A**

- Testifying expert, International Court of Arbitration proceedings relating to failure to contribute products to a joint venture

**Cost of capital estimation**
- Expert witness statement, South African Competition Tribunal
- Expert witness statement, Queen's Bench of Alberta

**Market manipulation**
- Expert, two cases in Irish High Court arising from the alleged use of derivative contracts for share price manipulation

**Foreign exchange (FX)**
- Testifying expert, US District Court for the Southern District of New York, in case relating to equivalence of FX futures and forwards

**Investment returns**
- Expert, UK High Court, in case on returns available from various bond and index investments

**Collateralized debt obligations (CDOs)**
- Expert, US District Court for the Southern District of New York, in case relating to modelling issues regarding CDOs

**Hire purchase contracts**
- Testifying expert, VAT Tribunal, in case relating to treatment of VAT on hire purchase contracts

**EDUCATION**

| 1995 – 2000 | **London Business School** | London, England |

*PhD, Accounting*
Dissertation title: Essays in Financial Accounting

| 1993 – 1995 | **London Business School** | London, England |

*MSc, Finance (with distinction)*

| 1986 – 1987 | **University of Cambridge (St. Edmund's College)** | Cambridge, England |

*Master of Advanced Study, Mathematics*

| 1983 – 1986 | **University of Oxford (Wadham College)** | Oxford, England |

*BA Honours, Mathematics (Upper Second Class)*

**PUBLICATIONS**
- "Issues in Cross-Border Valuation and the Implications for Damages Assessments in Investor-State Disputes", forthcoming in *The International Comparative Legal Guide to Investor-State Arbitration 2019* (ed. Barton Legum).
- "Economic Analysis in UK Shareholder Group Actions", *Commercial Dispute Resolution*, 13 December 2018.
- "When to Use Options Analysis in Damages Assessments", *Law360*, 31 August 2018.
- "The Role of Economic Analysis in U.K. Shareholder Actions" (with Kristin Feitzinger and Amir Rozen), 2018, available at https://www.cornerstone.com/Publications/Research/Economic-Analysis-in-UK-Shareholder-Actions.pdf.
- "The Use of Econometric and Statistical Analysis and Tools", in *The Guide to Damages in International Arbitration, 3rd Edition* (2018), (ed. John A. Trenor), pp. 331–48.
- "Not So 'Rare': The Valuation Method Behind the Tethyan Challenge," *Global Arbitration Review*, 6 September 2017.
- "CVA and the Equivalent Bond" (with Riccardo Rebonato and Mike Sherring), *Risk*, September 2010.
- "Hedging – An Obstacle or a Blessing?" in *Financial Times – Mastering Finance* (1998), pp. 319–24.
- "Current Cost Accounting", in Financial Times – Mastering Management.

Expert Report of Ronnie Barnes, Ph.D.                                    **Appendix A**

**WORKING PAPERS**

- "Earnings Volatility and Market Valuation: An Empirical Investigation", 2002, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=335380.
- "Accounting for Derivatives and Corporate Risk Management Policies", 2002, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=298021.
- "The Stock Market Response to Changes in Business Combinations Accounting" (with Henri Servaes), 2002, available at http://faculty.london.edu/hservaes/barnes_servaes.pdf.

**PROFESSIONAL AFFILIATIONS**

- Institute of Chartered Accountants in England and Wales 1990 – present
  2000 – 2003: Examiner, Professional Examinations
- American Finance Association 1995 – present

**TEACHING EXPERIENCE**

- Corporate Finance and Valuation 1996 – 2004
- Capital Markets and Financing 1995 – 2004; 2012; 2015
- Foundations of Finance 2001 – 2005
- Finance II 2006
- Financial Analysis of Mergers, Acquisitions and Other Complex Corporate Restructurings 2002 – 2005
- Introduction to Financial Accounting 1996 – 2001; 2008 – 2011
- Brand Valuation (session on Brand Management elective course) 2001 – 2002
- Hedge Accounting (session on International Finance elective course) 2003

**CONSULTING AND EXECUTIVE EDUCATION**

- International Faculty of Finance, 1996: Accounting for Interest Rate Derivatives
- Lincoln Electric (Europe), 1996: Capital Expenditure Analysis
- Salomon Brothers, 1997: Mathematics for Finance
- Merrill Lynch, 1997 – 1998: Introduction to Derivatives; Interest Rate Derivatives
- Credit Suisse First Boston, 2000: Accounting for Derivatives
- marchFirst, 2001: Corporate Finance
- IIR, 2001: Analysing the Cost of Capital
- Allianz AG, 2001: Finance for Non-Finance Executives
- Abbey National, 2002: Accounting for Hire Purchase Contracts
- Euromoney, 2003: Accounting for Financial Instruments
- Clifford Chance, 2004: Accounting for Derivatives
- WRMA, 2004: Accounting for Weather Derivatives
- Charles River Associates, 2005: Introduction to Financial Reporting; Valuation and Cost of Capital

# PRIOR TESTIMONY AND REPORTS OF RONNIE BARNES
## IN THE PAST FOUR YEARS

**Case Name:** Engie et al v. Norske Shell
International Court of Arbitration
**Date of Testimony:** First Report 2 March 2018; Second Report 21 December 2018

**Case Name:** Litigation Silver Ridge Power BV v Republic of Italy
International Court of Arbitration
**Case No.:** ICSID Case No. ARB/15/37
**Date of Testimony:** Affirmation 29 September 2017; Rebuttal 18 May 2018

**Case Name:** Yukos Finance B.V. & Others v Stephen Lynch & Others
High Court of Justice, Business and Property Court of England and Wales
**Case No.:** CL-2015-000829
**Date of Testimony:** First Report 3 April 2019; Joint Memorandum 26 April 2019; Supplemental Report 13 May 2019

**Case Name:** Financial Guaranty Insurance Co. v. The Putnam Advisory Company LLC
**Case No.:** 12 Civ. 7372 (RWS)
**Date of Testimony:** Declaration 15 November 2019; Corrected Declaration 20 November 2019

**Case Name:** Iraq Telecom Limited v. Korek International Ltd. and Sirwan Saber Mustafa
**Case No.:** ICC Case No. 23685/AYZ
**Date of Testimony:** Expert Report 22 January 2020

**Case Name:** Iraq Telecom Limited v. Intercontinental Bank of Lebanon S.A.L. and Korek Telecom Company LLC and International Holdings Limited
**Case No.:** LAC Case No. 175/2018
**Date of Testimony:** Expert Report 21 February 2020

**Case Name:** Irish Bank Resolution Corporation Limited v. Thomas Browne
**Case No.:** The High Court of Ireland Record No. 2010/4996S
**Date of Testimony:** Expert Report 28 February 2020

Expert Report of Ronnie Barnes, Ph.D.                                                                                           **Exhibit 1**

# Event Study Analysis
## 12/15/06 – 7/24/08 [1]

| News Date | Market Impact Date [2] | Event | Raw Return | Market Return [3] | Industry Return [4] | Residual Return [5] | Significant [6] |
|---|---|---|---|---|---|---|---|
| 1/30/07 | 1/30/07 | **3:06 ET** Africo announces "excellent cobalt values" and the "implie[d] presence of significant copper mineralization" in the exploration results for the Kalukundi project. | 4.70% | 0.54% | 0.35% | 4.33% | |
| 2/1/07 | 2/1/07 | **8:35 ET** Africo plans to raise US$160 million in debt financing for the development of the Kalukundi project. | 4.68% | 0.85% | 1.24% | 3.57% | |
| 2/23/07 | 2/23/07 | **6:31 ET** Africo has learned that a former employee, Alessandro Berardone, obtained an ex parte default judgment against the company in a dispute regarding the termination of his employment, in the amount of US$3 million.  Africo has "initiated the appropriate legal steps to have the default judgement [] set aside," and Africo's CEO condemns the judgment as "frivolous, illegal and unenforceable." | 0.50% | 0.19% | 1.37% | -0.51% | |
| 4/13/07 | 4/13/07 | **8:59 ET** Africo announces that it has entered into a financing agreement with an underwriting syndicate led by Paradigm Capital Inc.  The underwriters have agreed to purchase 27 million common shares of Africo at a price of C$3.70 per common share for total gross proceeds of C$100 million.<br><br>**15:35 ET** Africo announces that it has increased its financing through the underwriters to 35.15 million common shares at C$3.70 per common share for gross proceeds of C$130 million. | 3.85% | 0.58% | 1.26% | 2.80% | |
| 4/18/07 | 4/18/07 | **12:44 ET** Africo announces that it has acquired the shares of The Enterprise H&J Swanepoel Famille Trust ("H&J") that it did not already own.  H&J holds 75% of the shares of Swanmines, which in turn holds the exploitation permit for the Kalukundi property.  Following the transaction, Africo now holds a 75% interest in Kalukundi. | -2.25% | 0.40% | -1.12% | -1.51% | |

Expert Report of Ronnie Barnes, Ph.D.

**Exhibit 1**

| News Date | Market Impact Date [2] | Event | Raw Return | Market Return [3] | Industry Return [4] | Residual Return [5] | Significant [6] |
|---|---|---|---|---|---|---|---|
| 4/27/07 | 4/30/07 | **9:30 ET** A court in Lubumbashi, DRC, appears to accept Akam Mining's ("Akam") claim that it, and not Africo, owns 75% of Swanmines.<br><br>The decision relates to a DRC court's sale of Africo's share of Swanmines as part of a default judgment against Africo, in a suit brought by Mr. Berardone, a former employee. Africo announces that it is filing a complaint for judicial misconduct by the Lubumbashi court in the Supreme Court of the DRC.<br><br>**18:54 ET** Africo and its underwriters mutually withdraw the offering announced on April 13, 2007.<br><br>Trading for Africo is halted before market open and does not resume until the next trading day. | -26.32% | -1.32% | -1.30% | -24.94% | ✓ |
| 5/7/07 | 5/7/07 | **9:34 ET** Africo has initiated several legal proceedings in the DRC in an effort to have the judgment in favor of Mr. Berardone set aside and to assert ownership of Swanmines. Africo states that it has received a copy of a letter from DRC's Minister of Justice to the president of the court that issued the Akam decision, requesting the "court to govern itself in accordance with relevant legislation and the provisions of the constitution of the DRC." | -4.58% | 0.69% | 0.63% | -5.20% | |
| 5/29/07 | 5/29/07 | **9:29 ET** Africo announces that the General Prosecutor of the DRC found Africo's motion for judicial misconduct to be admissible at a hearing of the DRC Supreme Court in Kinshasa on May 25, 2007, as it was made in compliance with applicable procedural law. | -16.67% | -0.38% | -0.16% | -16.40% | ✓ |
| 6/25/07 | 6/25/07 | **14:41 ET** The DRC Supreme Court authorizes the lodging of a judicial misconduct application in relation to the judgments obtained by Mr. Berardone and Akam. Africo's CEO states that this ruling will help Africo maintain its ownership of Kalukundi. | -12.00% | -1.02% | -0.96% | -10.96% | |
| 7/24/07 | 7/24/07 | **8:50 ET** Africo agrees to a financing proposal of US$7.6 million equity and up to US$40 million in debt financing proposal from the International Finance Corporation ("IFC") for the development of the Kalukundi project and related infrastructure, expected to close on or about September 5, 2007. The equity investment may be cancelled if any events that can negatively impact Africo occur, including an adverse final judgment in the Kalukundi dispute. | 5.66% | -2.73% | -2.43% | 8.27% | |

Expert Report of Ronnie Barnes, Ph.D.

**Exhibit 1**

| News Date | Market Impact Date [2] | Event | Raw Return | Market Return [3] | Industry Return [4] | Residual Return [5] | Significant [6] |
|---|---|---|---|---|---|---|---|
| 8/13/07 | 8/13/07 | **9:56 ET** Africo faces a setback in its effort to reclaim its rights to Swanmines following a ruling from the DRC Supreme Court. The Supreme Court has determined that it cannot examine the actions of the Lubumbashi court for judicial misconduct as they "took the form of orders and not judgements." Africo states that it will continue to pursue other legal actions. | -40.38% | -0.28% | 3.46% | -42.77% | ✓ |
| 9/5/07 | 9/5/07 | **15:55 ET** Africo's CEO issues a letter to shareholders providing a summary of events regarding the Kalukundi dispute and maintains that the company is positive about its prospects of reasserting its ownership of Swanmines. | 17.98% | -0.51% | -0.58% | 18.59% | ✓ |
| 9/13/07 | 9/14/07 | **15:28 ET** Africo shares the content of a letter from DRC's Minister of Justice, expressing support for Africo in the Kalukundi dispute.<br><br>Trading for Africo is halted pending news at 2:56 EST, and does not resume until the next trading day. | 61.02% | 0.65% | 0.41% | 60.57% | ✓ |
| 9/19/07 | 9/20/07 | **12:59 ET** Africo announces that an ordinance was obtained from the Kinshasa/Gombe District Court stating that Africo (through its subsidiaries) still holds 75% of the shares of Swanmines.<br><br>Trading for Africo is halted pending news at 12:02 EST, and does not resume until the next trading day. | 27.27% | -0.72% | 0.12% | 27.44% | ✓ |
| 10/24/07 | 10/25/07 | **18:21 ET** A letter issued by the Governor of Katanga to Akam refers to "the non-existence of the shares" that Akam bought in Swanmines, and directs that Akam "cease any disturbance to Swanmines' activities." | 10.87% | 0.26% | 0.63% | 10.38% | |

Expert Report of Ronnie Barnes, Ph.D.

# Exhibit 1

| News Date | Market Impact Date [2] | Event | Raw Return | Market Return [3] | Industry Return [4] | Residual Return [5] | Significant [6] |
|---|---|---|---|---|---|---|---|
| 11/7/07 | 11/7/07 | **13:03 ET** DRC's Minister of Justice confirms Africo's ownership of Swanmines and states that Akam purchased non-existent shares. | 19.16% | -1.75% | -1.30% | 20.66% | ✓ |
| 11/16/07 | 11/16/07 | **8:40 ET** Africo announces that it has secured a C$4 million private equity injection from the IFC.  In addition, IFC has agreed to participate in a planned debt financing arrangement that would lead to a US$40 million loan to be extended to Africo. | 6.22% | 0.05% | -1.10% | 7.05% | |
| 2/7/08 | 2/7/08 | **10:36 ET** Africo announces positive exploration results from the Kalukundi project and that it expects to restate the ore resources in two of the mining fragments.  It is also announced that the company has been pursuing legal matters rigorously to retain the rights to the Kalukundi property and that it applied to transfer the case regarding Kalukundi's ownership from the court in Lubumbashi to Kinshasa "in an attempt to elevate and expedite matters." | -5.29% | 0.45% | 0.31% | -5.61% | |
| 2/20/08 | 2/20/08 | **13:13 ET** DRC government provides Swanmines the results of its review of the Kalukundi mining contract and demands a response.  The government asks Swanmines to address certain areas such as the "fair distribution of shares" with regards to Gécamines, "visible impact social actions" and "the dispute regarding the ownership of Swanmines."  Africo's CEO states that some of these points have already been addressed, and that this discussion with the government will help establish Africo's legitimacy at Kalukundi. | -3.31% | 0.78% | 1.20% | -4.38% | |
| 3/31/08 | 3/31/08 | **15:49 ET** Africo reports that its application to transfer pending appeals regarding the dispute over Kalukundi mining rights from the court in Lubumbashi to Kinshasa/Gombe has been granted.  Africo's CEO comments that they are pleased with the decision. | -11.18% | 0.88% | -0.19% | -11.25% | |

Expert Report of Ronnie Barnes, Ph.D.

# Exhibit 1

| News Date | Market Impact Date [2] | Event | Raw Return | Market Return [3] | Industry Return [4] | Residual Return [5] | Significant [6] |
|---|---|---|---|---|---|---|---|
| 4/21/08 | 4/21/08 | **12:05 ET** Africo announces that it has entered into an agreement with Camrose for a private placement of C$100 million, which will be used to develop the Kalukundi project.  The placement will result in Camrose owning approximately 60% of the outstanding share capital of Africo.<br><br>Camrose will also acquire the outstanding shares of Akam, and thus Africo's "ownership of 75% of the outstanding shares of Swanmines" will be "unequivocally confirm[ed] [] concurrently with the completion of the private placement."  In addition, Africo has agreed to purchase 75% of the neighboring Mashitu property from an affiliate of Camrose. | -10.00% | 0.59% | 1.18% | -10.99% | |
| 6/13/08 | 6/13/08 | **9:28 ET** Africo shareholders approve the C$100 million private placement by Camrose. | 0.00% | 1.20% | 1.00% | -1.03% | |
| 7/24/08 | 7/24/08 | **14:41 ET** Africo completes the Camrose private placement.  It is announced that Africo through its subsidiaries will re-establish 75% ownership of Kalukundi, and that legal proceedings between Akam and Africo have ceased.  Plans to acquire the Mashitu property are re-affirmed. | 12.64% | -2.27% | -3.72% | 16.05% | ✓ |

Source:  Bloomberg; Factiva; Thomson Reuters Refinitiv Eikon.
Note:
[1]   The regression model is estimated over December 18, 2006 through July 24, 2008.  Africo held its IPO on Friday December 15, 2006, therefore the first day for which returns are available is Monday December 18, 2006.
[2]   Market Impact Date is the same as the News Date for news that was released during trading hours, and is the next trading day for news that was  released after market close, or during a trading halt in Africo's common shares that was not resolved until the next trading day.
[3]   Market Returns are calculated using the S&P TSX Composite Total Returns Index.
[4]   Industry Returns are calculated using the Solactive Global Copper Miners Total Return Index.  Closing index prices are converted to CAD on each day using end-of-day USD-to-CAD exchange rate.
[5]   Residual returns represent the Africo-specific portion of the stock price movement on a given day, after accounting for market and industry movements. The results are based on a two-factor regression model estimated over a period from December 18, 2006 through July 24, 2008 inclusive.  Market Impact Dates of the news displayed in the exhibit are excluded from the estimation.  When closing prices are missing for Africo or one of the indices, returns on the next day are calculated over two-day windows for Africo as well as the market and the industry indices.
[6]   "✓" denotes statistical significance at the 95% confidence level or greater.

Expert Report of Ronnie Barnes, Ph.D.

**Exhibit 2**

# Probability of Observing Eight or More Statistically Significant News Days

| | |
|---|---|
| Proportion of News Days Expected to be Statistically Significant | 5% |
| Number of News Days [1] | 23 |
| Number of Statistically Significant News Days | 8 |
| Probability of Observing Eight or More Statistically Significant News Days [2] | 0.001% |

Source:  Bloomberg; Factiva; Thomson Reuters Refinitiv Eikon.
Note:

[1]  The regression model is estimated over December 18, 2006 through July 24, 2008.  Africo held its IPO on Friday December 15, 2006, therefore the first day for which returns are available is Monday December 18, 2006.

[2]  A binomial distribution was used to calculate the probability of observing eight or more days that are statistically significant at the 95% confidence level.