# Exhibit 3

# In the Matter Between:

# United States of America
# v.
# OZ Africa Management GP, LLC

# Case No. 1:16-cr-00515-NGG-LB

# Expert Report of
# Graham Clow and Richard Lambert

# March 6, 2020

55 University Ave. Suite 501 | Toronto, ON, Canada M5J 2H7 | T +1 (416) 947 0907 www.rpacan.com

RPA Now part of SLR

# TABLE OF CONTENTS

1. INTRODUCTION ........ 1

2. OPINIONS SOUGHT AND SCOPE OF WORK ........ 2

3. EXECUTIVE SUMMARY ........ 3

4. THE KALUKUNDI PROJECT ........ 5

5. KALUKUNDI PROJECT STUDIES, REVIEWS, AND VALUATIONS ........ 22

5.1. The 2006 MDM Feasibility Study and Updates ........ 23

5.2. The RSG Global Technical Reports ........ 25

5.3. The 2008 AGC (Oz) Investment Review ........ 26

5.4. The 2008 Venmyn Valuation ........ 26

5.5. The 2008 SRK Valuation ........ 26

5.6. The 2013 AMEC Technical Report ........ 27

5.7. The 2017 and 2019 SRK Valuations ........ 27

5.8. The Government Brief of November 22, 2019 ........ 27

6. SRK REVIEWS AND VALUATIONS ........ 30

6.1. The 2008 SRK Valuation ........ 30

6.2. The 2017 SRK Valuation ........ 33

6.3. The 2019 SRK Valuation ........ 34

7. METAL PRICES ........ 37

8. RPA RESTATEMENT OF THE 2019 SRK LIFE OF MINE PLAN AND INCOME APPROACH VALUATION ........ 39

8.1. Mineral Resources and Mineral Reserves ........ 39

8.2. Mine Planning and Design ........ 40

8.3. Metallurgy and Processing ........ 40

8.4. Capital Costs ........ 41

8.5. Operating Costs ........ 41

8.6. Environment and Permitting ........ 42

8.7. RPA Adjusted Model ........ 42

**9. VALUATION OF THE KALUKUNDI PROJECT USING COMPARABLE TRANSACTIONS ....................................................44**

**9.1. Valuation Approaches and Methods ....................................................44**

**9.2. Comparable Transactions Valuation of Kalukundi by Others ....................................................45**

**10. ACKNOWLEDGEMENT OF EXPERT'S DUTY....................................................51**

**11. ANNEX 1 – REFERENCES....................................................52**

**12. ANNEX 2 - QUALIFICATIONS OF EXPERTS AND RPA ....................................................53**

**13. ANNEX 3 - CURRICULA VITAE OF EXPERTS....................................................58**

**14. ANNEX 4 - INDUSTRY NORMS, CUSTOMS, USAGE, AND STANDARDS IN CONNECTION WITH THE DEVELOPMENT OF MINERAL PROJECTS....................................................64**

**14.1. Mineral Resource and Mineral Reserve Reporting....................................................64**

**14.2. Stages of Mineral Project Development....................................................66**

**14.3. Feasibility Studies ....................................................69**


## LIST OF TABLES


Table 1 2006 MDM FS Kalukundi Mineral Resource Estimate .................................... 9

Table 2 2013 AMEC Kalukundi Mineral Resource Estimate....................................12

Table 3 2006 MDM FS Predicted Leach Recoveries with Depth ....................................16

Table 4 Capital Cost Estimates....................................20

Table 5 Operating Costs ....................................21

Table 6 Comparison of Kalukundi Studies and Reviews ....................................28

Table 7 Kalukundi Leach Recoveries with Depth ....................................41

Table 8 Comparison of SRK Model and RPA Adjusted Model (Spot and Consensus Prices)..43

Table 9 RPA Issues with SRK Comparable Transactions ....................................48

Table 10 AACE Accuracy of Studies....................................70


## LIST OF FIGURES


Figure 1 Kalukundi Project Location.................................... 6

Figure 2 Typical Cross-Section Through Mineralized Portion of the Central African Copperbelt ....................................10

Figure 3 General Mine Site Plan ........................................................................................14
Figure 4 Simplified Process Flowsheet......................................................................................17
Figure 5 Historical and Consensus Forecast Copper and Cobalt Prices.................................38
Figure 6 SRK Transaction Values vs Transaction Date.........................................................49

**In the Matter Between:**

**United States of America**

**v.**

**OZ Africa Management GP, LLC**

## 1. INTRODUCTION

1. Roscoe Postle Associates Inc., now part of SLR Consulting Ltd (collectively, RPA), was retained by counsel for OZ Africa Management GP LLC, Cahill Gordon & Reindel LLP (Cahill), for the completion of an expert report in relation to the case of United States of America v. OZ Africa Management GP, LLC (the Case) on various aspects of the Kalukundi Copper-Cobalt Project (Kalukundi or the Project), located in the Democratic Republic of the Congo (the DRC).[1]
2. This expert report is intended solely for use in the Case.
3. The qualifications of RPA and RPA's testifying experts – Graham Clow and Richard Lambert - are presented in Annex 2. Mr. Clow has more than 45 years of experience in the mining industry covering all aspects of operations from development, through construction to closure. At the corporate level, he has been CEO and director of a number of companies. He is a member of the Canadian Institute of Mining, Metallurgy, and Petroleum (CIM) and the former Chairman of CIM's Metal Mining Division, former member of the Committee on Ore Reserve Definitions and former the Chairman of the Committee on Production Cost Reporting Standards, which is a joint effort of CIM and the Canadian Securities Administrators. Mr. Lambert has over 40 years of management and consulting experience in many types of operations, particularly large open pit copper mines. He is a member of the Society of Mining Engineers (SME) and currently sits on the SME Resource Reserve committee that recently published new disclosure standards for US reporting issuers, in conjunction with the SEC.
4. The CVs of the testifying experts are provided in Annex 3.
5. To the best of our knowledge, RPA and the experts have no prior relationship and have not provided independent services in this matter to any of the parties. Our fees are not contingent upon the opinions expressed herein, and neither Graham Clow, Richard

[1] MEMORANDUM & ORDER 16-CR-515 (NGG) (ECF-51).

Lambert, nor RPA or any of its principals or employees have a financial interest in this matter.

6. We believe that the opinions expressed in this expert report are true and accurate.

7. All sections of this report were prepared by, or under the supervision of, Graham Clow and Richard Lambert individually and/or together.

8. In the Case, OZ Africa Management GP LLC, (OZ Africa) pled guilty to violation of the Foreign Corrupt Practices Act. Following the guilty plea, a group of former shareholders (the Claimants) of the Canadian mining company Africo Resources Ltd. (Africo) sought restitution for losses they allegedly incurred as a result of OZ Africa's actions, pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (the MVRA). The United States District Court Eastern District of New York (the Court) found that the Claimants are victims of OZ Africa's crime under the MVRA and has directed the parties to submit supplemental briefing regarding how to calculate the appropriate restitution amount[2] (the Restitution).

9. This expert report summarizes the results of our technical and cost review of the Project as well as our opinions on certain issues related to the Project, all of which are relevant to the valuation of the Project (the Valuation) and quantification of Restitution by Quadrant Economics LLC (Quadrant). References to documents in this expert report are to exhibits marked as "RPA-___".

10. We have assumed that the materials provided are complete and true copies, properly executed and the facts presented are true.

## 2. OPINIONS SOUGHT AND SCOPE OF WORK

11. We have been retained by counsel to provide our opinion on certain issues in relation to the matter noted above. The issues on which our opinion has been sought are set out below:

- Review and critical comment of 2019 SRK Income Method valuation.[3]
- Provision of reasonable technical, capital cost, and operating cost assumptions to allow Quadrant to prepare an Income Method valuation.

---

[2] *Ibid*., p. 1.

[3] SRK Consulting (U.S.) Inc., 2019, November 2019 Addendum to the Valuation of the Kalukundi Copper/Cobalt Project ("2019 SRK Valuation Report") (November 22, 2019), Section 6.3.1 (ECF 69-1).

- Review and critical comment of SRK Market Comparable valuation.[4]

## 3. EXECUTIVE SUMMARY

12. The Project area is located in the Kolwezi District of the Katanga Province in southeastern Democratic Republic of Congo (DRC) and 60 km to the east of the major mining centre of Kolwezi.

13. The distance by road to the major centre of the Katanga Province, the capital of Lubumbashi, is 250 km. The mining centre of Likashi is 120 km from Kalukundi.

14. In 2006 a feasibility study was carried out on the Kalukundi Project by MDM PTY Ltd. (MDM) ("2006 MDM FS").[5]

15. At the time of the 2006 MDM FS, the property was held by Swanmines SPRL and the Project was managed through a joint venture (Swanmines) held 75% by the H&J Swanepoel Family Trust (H&J) and the remaining 25% by La Générale des Carrières et des Mines (Gécamines).[6] Africo held an option to acquire 100% of H&J.

16. Beginning with the 2006 MDM FS, there were a number of reviews and valuations of the Kalukundi Project.

17. AMEC E&C Services Inc (AMEC) was retained in 2012 to prepare an updated Mineral Resource estimate for Kalukundi. The total Mineral Resource (Indicated plus Inferred Mineral Resources) was estimated at 55.6 Mt at an average grade of 2.08% TCu and 0.46% TCo. Although we have not been provided with the underlying data to support the AMEC estimate, both RPA and SRK agree that the AMEC estimate is appropriate to use as a data point for the Kalukundi valuation since it is the most recent estimate and was carried out by a well-known international independent consultant. Since we were unable to verify the underlying data, we have adopted SRK's mine plan containing 13.9 Mt as the basis for the valuation. However, as discussed in paragraph 20 below, SRK's use of 13.9 Mt overstates the actual mine plan tonnage due to its failure to consider Inferred resources in accordance with industry standards.

---

[4] *Ibid*., Section 6.3.2.

[5] MDM Engineering, 2006, Kalukundi Feasibility Study ("2006 MDM FS") (RPA-001). The 2006 MDM FS was completed by MDM Ferroman (Pty) Ltd. (MDM) on behalf of Swanmines.

[6] RSG Global, 2006, Kalukundi Project Democratic Republic of the Congo ("2006 RGS Global TR"), prepared by RSG Global for Africo Resources Limited (June 2006), Section 1.3 at p. 1 (ECF 68-2).

18. SRK has carried out three separate reviews and valuations on the Kalukundi Project in 2008, 2017, and 2019. In our opinion, the 2008 SRK Valuation Report[7] provides the most accurate portrayal of the Kalukundi Project for the following reasons: 1) SRK staff carried out site visits to the Kalukundi Project at the time the 2006 MDM FS was developed and had access to all of the relevant information and site staff; and 2) SRK identified a number of real concerns with the 2006 MDM FS, particularly relating to the inadequacy of the capital cost estimate. The 2008 SRK Valuation Report also correctly follows the CIMVal guidelines for the inclusion of Inferred Resources as part of the mine plan.

19. Without explanation, the 2019 SRK Valuation Report simply dismisses all the findings of the 2008 SRK Valuation Report.

20. SRK makes multiple fundamental technical errors in its analysis and we are of the opinion that the SRK 2019 Income Approach valuation materially overstates the value of Kalukundi as of November 2019. Our opinion is based on the following:
    - SRK materially overstates the mineral recovery rate and ignores technical recommendations made in the 2006 MDM FS. These errors are "fatal flaws" in the technical basis for SRK's valuation;
    - SRK has not properly incorporated recognition of the risk associated with Inferred resources according to accepted mining industry valuation standards. Accordingly, we disagree with SRK's use of the 13.9 Mt resource estimate without accounting for this risk;
    - The 2006 MDM FS does not meet industry standards for a feasibility study; and
    - SRK significantly underestimates operating and capital costs. For example, the initial capital costs are based on a lower plant capacity than used in the life of mine plan and they have omitted material cost components required for production such as owner's costs and adequate contingencies.

21. We have incorporated these comments and those listed below in preparing a restatement of the physicals and cost assumptions used in the 2019 SRK Income Approach valuation.

22. We have used these more realistic technical and cost assumptions for the mining scenario that considers all known or reasonably forecasted data available as of November 2019 (the

[7] SRK Consulting (South Africa) (Pty) Ltd., 2008, Kalukundi-Mashitu Valuation Report ("2008 SRK Valuation Report") (ECF 68-9).

Valuation Date). We have provided this production model (2020 RPA Adjusted Model)[8] to Quadrant, which is valuing the Project using the Income Approach.

## 4. THE KALUKUNDI PROJECT

23. Annex 4 comprises a summary of general mining industry terms, norms and standards. The following description of the various aspects of the Project are as stated in the 2006 MDM FS.[9]

### 4.1. PROJECT LOCATION

24. The Project area is located in the Kolwezi District of the Katanga Province in southeastern Democratic Republic of Congo (DRC) and 60 km to the east of the major mining centre of Kolwezi. The Project location is shown in Figure 1.[10]

25. The distance by road to the major centre of the Katanga Province, the capital of Lubumbashi, is 250 km. The mining centre of Likashi is 120 km from Kalukundi.

26. At the time of the 2006 MDM FS, the property was held by Swanmines SPRL and the Project was managed through a joint venture (Swanmines) held 75% by the H&J Swanepoel Family Trust (H&J) and the remaining 25% by La Générale des Carrières et des Mines (Gécamines).[11] Africo held an option to acquire 100% of H&J.

[8] 2020 RPA Adjusted Model (RPA-002).

[9] 2006 MDM FS (RPA-001).

[10] *Ibid*., Figure 3.2.1 at p. 3.5.

[11] 2006 RGS Global TR, Section 1.3 at p. 1 (ECF 68-2).

RPA Now part of SLR

www.rpacan.com



### 4.2. PROJECT HISTORY

27. The description of project history is largely taken from the 2006 RSG Global TR.[12]

28. Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the 'manual' drilling of shallow exploratory holes for mapping purposes.

29. Active exploration has been carried out by three main companies, Gécamines, JCI, and Swanmines since about 1986 which has resulted in the definition of stratigraphy and mineralized areas.

30. Gécamines completed eight diamond drillholes between 1986 and 1987, along with extensive trenching, pitting, and geological mapping. These were intermediate to deep holes up to 600 m, focused on determining the continuity of the copper ore geology at depth.

31. In late 2001 and early 2002, Geo-Consult, on behalf of JCI drilled twelve boreholes totaling 1,440 m, along with further geological mapping and interpretation. Geo-Consult assayed all their drillholes for Cu and Co. In addition, they analyzed 1/3 of the drillholes for Au, Ag, Ca, Mg, Ni, Fe, Mn, S, Si and P, and determined bulk densities for the mineralized zones.

32. In August 2002, a metallurgical assessment was carried out. Numerous options were considered for leaching and flotation of the ores to produce various products.

33. In September 2002, Swanmines negotiated the rights to the Kalukundi property thus taking over from JCI.

34. Historical production from the Kalukundi deposit occurred during two phases - informal mining by artisan workers and limited surface mining by Swanmines. Production records from the former can at best be estimated, but largely constitute mining by manual methods from relatively narrow excavations to depths of up to about 20 m below surface.

35. A washing plant was established on the site, but washing of a limited amount of material was unsuccessful and the operation was abandoned. No production records for the latter were retained due to the small amount of material used in the plant as test work. An estimate of material extracted prior to 2006 is approximately 200,000 t.

36. The 2006 MDM FS was commissioned by Swanmines in 2004 with MDM PTY Ltd. (MDM) as the lead consultant.[13]

---

[12] *Ibid*., Sections 6.2 and 6.4.

[13] 2006 MDM FS (RPA-001).

37. At February 2020, the Project was idle. We understand that no development has been carried out since 2012.

## 4.3. GEOLOGY, MINERAL RESOURCES, AND MINERAL RESERVES

### 4.3.1. Geology

38. The Regional and Local Geological settings of the Kalukundi deposit are described in the 2006 RSG Global TR.[14]

39. In the Central African Copperbelt, there are two main deposit types: i) continuous stratabound, sediment-hosted deposits with significant strike extent (e.g., Tenke-Fungurume) and ii) discontinuous, raft-style deposits (e.g., Kalukundi).[15]

40. Mineralization at Kalukundi occurs within the Mines Sequence which is correlated to Lower Roan Group rocks elsewhere in the Lufilian Arc. The Mines Sequence rocks in particular have undergone deep weathering and alteration to create the oxide ore from the breakdown of sulphide ore.

41. The geology in the immediate area of the Kalukundi property is structurally deformed and complex.[16] Venmyn commented on the structural complexity of the Mashitu deposit area, which is contiguous with the Kalukundi deposit, indicating that it hampered the exploration efforts in the area.[17]

42. Twelve isolated, structurally dismembered "rafts" or fragments of the prospective Roan stratigraphy, bounded by large shear and fault zones, occur in the Kalukundi area, five of which are known to host mineralization. The fragments are folded into a series of steeply dipping synclinal and anticlinal folds and the orientation of these folds is variable, consistent with the interpretation of chaotic fragments within the mega-breccia.[18]

43. The mineralized zones have been faulted and/or folded to varying degrees of intensity.[19]

44. We consider that several factors combine to result in a very complex geological setting at Kalukundi including both the original distribution of the mineralized zones because of

---

[14] 2006 RSG Global TR, Sections 7.1 and 7.2 (ECF 68-2).

[15] *Ibid*., Section 8 at p. 29.

[16] 2006 MDM FS, Section 5.3.1 at p. 5-15 (RPA-001).

[17] Venmyn Rand (Pty) Ltd., 2008, Mashitu Project Mineral Resource Statement and Mineral Asset Valuation Report ("2008 Venmyn Report") October 2008, p. 7 (ECF 68-8).

[18] 2006 RSG Global TR, Sections 7.3 and 8.0 (ECF 68-2).

[19] 2006 MDM FS, Section 5.3.3 at p. 5-22 (RPA-001).

structural features (folding and faulting) and the subsequent weathering regime. This has resulted in highly variable distribution of the mineralization.

45. Figure 2 shows a typical cross section showing the Mine Series and demonstrates some of the complexity.[20]

#### 4.3.2. Mineral Resources

46. According to 2006 RSG Global TR, the classification of the mineral resources at Kalukundi was based on data quality, drill spacing, confidence in continuity and various kriging efficiency measures. RSG Global considered the confidence in the grade estimates to be good, even though drill hole density was limited down dip.[21]

47. Only resources above 200 m below surface were considered “potentially economically extractable”. Resource models existed below 200 m, but extraction of this material would most likely be by underground methods. No evaluations of underground parameters were carried out and hence no resources were quoted below this level. These resources were predicated on very limited drilling information.[22]

48. Table 1 lists the Kalukundi Mineral Resource estimate as of March 30, 2006 at a cut-off grade of 1.5% CuEq.[23]

**TABLE 1 2006 MDM FS KALUKUNDI MINERAL RESOURCE ESTIMATE**
**March 30, 2006**

| Classification | Tonnes | Copper (%) | Copper (Tonnes) | Cobalt (%) | Cobalt (Tonnes) |
|---|---|---|---|---|---|
| Measured to 150 m | 9,648,209 | 2.45 | 236,625 | 0.61 | 59,031 |
| Indicated to 150 m | 2,461,234 | 2.31 | 56,856 | 0.61 | 15,088 |
| Total Inferred to 200 m | 15,020,674 | 2.63 | 395,044 | 0.58 | 87,120 |

[20] Schuh, W., et al., 2012, Geology of the Tenke-Fungurume Sediment-Hosted Strata-Bound Copper-Cobalt District, Katanga, Democratic Republic of Congo, Chapter 12, Economic Geology Special Publication 16, Society of Economic Geologists, Inc., p. 272-273 (RPA-003).

[21] 2006 RSG Global TR, Section 1.7 at p. 3 (ECF 68-2).

[22] *Ibid.*

[23] 2006 MDM FS, Table 1.3-1 at p. 1-7 (RPA-001).




Figure 2

**Sculptor Capital Management, Inc.**

***Kalukundi Copper-Cobalt Project***

*Democratic Republic of the Congo*

**Typical Cross-Section Through Mineralized Portion of Central African Copperbelt**

*March 2020*

***Source: Society of Economic Geologists, Special Publication 16, p. 272-273, 2012.***

#### 4.3.3. 2013 AMEC Updated Mineral Resource Estimate

49. In 2013, AMEC, on behalf of Africo, completed an updated Mineral Resource Estimate for the Kalukundi project, as further drilling had been carried out and many of the inputs to the feasibility study and the 2006 Mineral Resource Estimate were no longer considered current.[24]

50. We note that the 2013 Mineral Resource Estimate includes five deposits, compared to four deposits in the 2006 Mineral Resource Estimate. Sufficient drilling was completed on the Kesho fragment to prepare a Mineral Resource estimate in 2013.

51. Separate copper and cobalt mineralized envelopes were prepared to define the geometry and extent of mineralization. The copper grade shell was constructed using a 0.3% cut-off grade for TCu and a 0.1% cut-off for TCo.[25] We are of the opinion that the cut-off grades used for preparation of the mineralized wireframes are not sufficiently reflective of the economic cut-off grades. This may result in over-estimation of the total tonnage and under-estimation of the average metal grades.

52. We note that the Acid Soluble to Total Copper ratio (ASCu:TCu ratio) was used to delineate the boundary between oxide and sulphide ores. We are of the opinion that this ratio needs to be reviewed and confirmed by metallurgical test work.

53. Mineral Resources were reported within the Lerch-Grossman (LG) pit shell using a net value per tonne cut-off of US$0.01. The net value assumes the block is potentially economic after G&A and variable block processing costs have been met.[26]

54. Mineral Resources estimated by AMEC are summarized in Table 2.[27]

55. We note that the Indicated plus Inferred Mineral Resources in Table 2 total 55.6 Mt at an average grade of 2.08% TCu and 0.46% TCo.

---

[24] AMEC, 2013, Kalukundi Copper – Cobalt Project, NI 43-101 Technical Report on Updated Mineral Resource Estimate ("2013 AMEC Report"), prepared for Africo Resources Ltd. (May 23, 2013), Section 1.0 at p. 1-1 (ECF 26-6 at Exhibit 4).

[25] *Ibid.*, Section 1.15 at p. 1-18.

[26] *Ibid.*, Section 1.16 at p. 1-21.

[27] *Ibid.*, Table 1-1 at p. 1-22.

**TABLE 2 2013 AMEC KALUKUNDI MINERAL RESOURCE ESTIMATE**
**November 15, 2012**

| Deposit | Tonnes (x1000) | TCu (%) | ASCu (%) | TCo (%) | Contained Cu (kt) | Contained Co (kt) |
|---|---|---|---|---|---|---|
| **Indicated** | | | | | | |
| Kii | 4,220 | 2.47 | 2.12 | 0.49 | 104 | 21 |
| Kalukundi | 5,470 | 2.50 | 1.30 | 0.35 | 137 | 19 |
| Kesho | 0 | -- | -- | -- | 0 | 0 |
| Anticline | 9,570 | 2.47 | 1.48 | 0.37 | 236 | 36 |
| Principal | 11,200 | 2.26 | 1.74 | 0.58 | 252 | 64 |
| **Total** | **30,400** | **2.40** | **1.63** | **0.46** | **730** | **140** |
| | | | | | | |
| **Inferred** | | | | | | |
| Kii | 0 | -- | -- | -- | 0 | 0 |
| Kalukundi | 3,190 | 2.76 | 0.56 | 0.30 | 88 | 10 |
| Kesho | 10,700 | 1.46 | 1.43 | 0.59 | 157 | 63 |
| Anticline | 2,700 | 1.65 | 0.88 | 0.15 | 45 | 4 |
| Principal | 8,570 | 1.65 | 0.85 | 0.43 | 142 | 37 |
| **Total** | **25,200** | **1.71** | **1.06** | **0.45** | **431** | **114** |

Notes to accompany Mineral Resource table:

1. Mineral Resources have an effective date of November 15, 2012. The qualified person for the Mineral Resources is Gordon Seibel, SME Registered Member, and an employee of AMEC. The Mineral Resource estimate was prepared by Mr. Seibel.
2. Mineral Resources that are not Mineral Reserves do not have demonstrated economic viability.
3. Mineral Resources are reported as undiluted. No mining recovery has been applied.
4. Acid-soluble copper (ASCu) is a sub-set of, and is not additive to, total copper (TCu).
5. There are reasonable prospects for economic extraction by constraining the resources within a conceptual economic open pit shell constructed using a long-term copper price of US$3.26/lb, cobalt price of US$9.20/lb, mining cost at US$1.77/tonne, G&A cost at US$2.50/tonne processed, a pit slope angle of 45°, and variable processing costs ranging from US$25.00/tonne to US$50.00/tonne.
6. Mineral Resources are reported within the pit shell at a cut-off using a net value per tonne of US$0.01. The net value assumes the block is potentially economic after G&A and variable block processing costs have been met.
7. Processing is assumed to be on site. Transportation costs for shipping material off-site for processing are not included.
8. Tonnages are reported in metric units and grades in percent. Tonnages are rounded to the nearest thousand tonnes, grades are rounded to two decimal places.
9. Copper grade shells to define the geometry of the copper mineralization were shaped manually using a cut-off grade of 0.3% TCu.
10. Cobalt grade shells to define the geometry of the cobalt mineralization were shaped manually using a cut-off grade of 0.1% TCo.
11. Copper and cobalt shells are where the copper and cobalt grade shells overlap.
12. Rounding as required by reporting guidelines may result in apparent summation differences between tonnes, grade and contained metal content.

### 4.4. MINING AND MINE DESIGN

56. According to the 2006 MDM FS, the proposed mining method involved a conventional open pit operation of four areas, namely the Principal, Anticline, Kalukundi, and Kii deposits.[28] Based on a process plant throughput of 800,000 tpa and given the reserves contemplated in the feasibility study, this resulted in a 10-year mine life.

57. The project would involve multiple pits, multiple cut back mining philosophy in which the new mining areas are periodically released for mining.[29] It is envisioned that a five metre working bench height would be maintained with free dig or blasted material excavated in two discrete flitches, each 2.5 m high to minimize dilution and maximize orebody recovery. The pits were designed for truck and excavator operations.[30]

58. The pit design was carried out based on a geotechnical study by Knight Piésold (KP), an international consulting firm that specialized in geotechnical engineering. The geotechnical parameters recommended by KP are in the range of approximately 15° to 40° in the upper portions of the deposit (oxide material) and steepen to approximately 45° to 51° in the deeper sulphide material.[31] The slope parameters also include a recommendation for a wide berm between the oxide and sulphide zones (approximately 10 m to 25 m, depending on the pit) and the parameters do not account for ramps. The overall average effective pit slopes for the five pits are all in the 30-degree range accounting for the flatter slopes in the oxides, the step out between the oxide and sulphide zones, and accounting for ramps in the pit design to allow trucks to access the pit bottom.

59. Different material types comprising the ore will be identified and delineated on the basis of reverse circulation (RC) drilling. The ore will be hauled to the run of mine (ROM) ore pad for crushing or stockpiling. It is anticipated that two mining areas may be in operation at any given time in order to provide for the required ore blend to the processing plant.[32]

60. Figure 3 shows the general mine site plan.[33]

---

[28] 2006 MDM FS, Section 6.2.1 at p. 6-8 (RPA-001).

[29] *Ibid.*, Section 6.2.2.

[30] *Ibid.*, Section 6.2.2.3 at p. 6-9.

[31] *Ibid.*, Section 6.3.

[32] *Ibid.*, Section 6.2.2.4 at p. 6-10.

[33] 2006 RSG Global TR, Figure 7.2-1 at p. 119 and Figures 23.1.6_1 and 23.1.6_2 at p. 122 (ECF 68-2); 2013 AMEC Report, Figure 7-3 at p. 7.8 (ECF 26-6 at Exhibit 4). Images modified by RPA.




Figure 3

**Sculptor Capital Management, Inc.**

***Kalukundi Copper-Cobalt Project***
*Democratic Republic of the Congo*
**General Mine Site Plan**

March 2020 ***Source: Modified from Africo Resources, 2006.***

### 4.5. METALLURGY AND PROCESSING

61. A metallurgical test program was developed to test the viability of the ore body and to develop the best process. The first phase of test work was performed on core samples to determine the comminution and leaching characteristics of the ore. During the second phase to test work, the plant design was confirmed by a pilot plant campaign.

62. The Kalukundi ore will be processed using crushing, semi-autogenous grinding (SAG), and ball mill grinding, and treated using various hydrometallurgical process steps to produce copper and cobalt metal as final products. The simplified process flowsheet is shown in Figure 4.[34]

63. The product from the grinding process will be leached using sulphuric acid and sulphur dioxide as leaching agents. The leached product will then be washed in a six-stage counter current decantation (CCD) plant to ensure a clarified solution is sent to the copper recovery circuit.

64. The copper recovery circuit consists of a copper solvent extraction (SX) step, where the copper in solution is extracted into an organic phase before being stripped using sulfuric acid to produce a concentrated copper electrolyte for treatment in a copper electrowinning tankhouse. In copper electrowinning (EW), pure copper metal in the form of cathode plate is produced for sale to the market. A stream from the copper circuit is then sent to the cobalt recovery circuit.

65. The cobalt circuit consists of several purification steps where impurities like iron, aluminum, manganese, zinc, and finally copper are removed by precipitation, solvent extraction, and ion exchange methods, before the purified cobalt liquor is sent to the solvent extraction circuit. In the cobalt solvent extraction circuit, the cobalt in solution is extracted into an organic phase before being stripped to produce a concentrated cobalt electrolyte for treatment in a cobalt electrowinning tankhouse. In cobalt electrowinning, pure cobalt metal in the form of cathode is produced for sale to the market.

66. The process plant is designed with a capacity of 720 ktpa, ore feed, however, following a number of plant reviews during the 2006 MDM FS, the process plant throughput was

[34] 2006 MDM FS, Section 1.5 and Figure 7.4.4.1 at p. 7-65 (RPA-001).

increased to 800 ktpa. In 2008, MDM carried out a study to re-estimate costs for the 800 ktpa plant and a new estimate for a 1,250 ktpa plant.[35]

67. The leaching process is only effective on the oxidized portions of the mineral deposit (oxide or oxide material) which is located in the upper portion of the deposit near the surface. The unoxidized, or sulphide ores, lie beneath the oxide ores. Metallurgical test work carried out as part of the 2006 MDM FS indicates that copper and cobalt recoveries average approximately 90% and 70% respectively in the oxide, followed by a significant reduction as the deposit changes from oxide to sulphide material. This reduction in recoveries (highlighted in red text) is shown in Table 3.[36]

**TABLE 3 2006 MDM FS PREDICTED LEACH RECOVERIES WITH DEPTH**

Table 23.2_2
Kalukundi Project
Leach Recoveries and Operating Costs with Depth.

| Depth | Composited Fragments | | | | Predicted Recoveries | | | | Individual Fragments | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recovery to Metal | Estimate Average | Recovery to Metal | Estimate Average | Principle Rec. to Metal | | Anticline Rec. to Metal | | Kalukundi Rec. to Metal | | Kii Rec. to Metal | |
| | Cu | | Co | | Cu | Co | Cu | Co | Cu | Co | Cu | Co |
| 0-10m | 93 | | 78 | | 93 | 78 | 93 | 78 | 93 | 78 | 93 | 78 |
| 10-20m | | 91 | | 74 | 91 | 74 | 91 | 74 | 91 | 74 | 91 | 74 |
| 20-30m | | 91 | | 74 | 91 | 74 | 91 | 74 | 91 | 74 | 91 | 74 |
| 30-40m | 89 | | 70 | | 89 | 70 | 89 | 70 | 89 | 70 | 89 | 70 |
| 40-50m | 89 | | 70 | | 89 | 70 | 89 | 70 | 20 | 50 | 89 | 70 |
| 50-60m | 89 | | 70 | | 89 | 70 | 89 | 70 | 10 | 30 | 89 | 70 |
| 60-70m | | 83 | | 70 | 89 | 70 | 89 | 70 | 5 | 20 | 89 | 70 |
| 70-80m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 80-90m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 90-100m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 100-110m | | | | | 89 | 70 | 60 | 55 | 5 | 0 | 60 | 55 |
| 110-120m | | | | | 89 | 70 | 40 | 20 | 5 | 0 | 40 | 20 |
| 120-130m | | | | | 60 | 55 | 20 | 0 | 5 | 0 | 20 | 0 |
| 130-140m | | | | | 40 | 20 | 10 | 0 | 5 | 0 | 10 | 0 |
| 140-150m | | | | | 20 | 0 | 5 | 0 | 5 | 0 | 5 | 0 |

68. Any cash flow projections based on 2006 MDM FS that include sulphide ore will need to incorporate the very low sulphide recoveries applicable to that type of ore or an expansion to the plant.

[35] MDM Engineering, 2008, FEED CBE Recost, Kalukundi Copper Cobalt Project ("2008 MDM Report"), Section 1 at p. 3 (ECF 26-6 at Exhibit 2).

[36] 2006 RSG Global TR, Table 23.2_2 at p. 90 (ECF 68-2).




Figure 4

**Sculptor Capital Management, Inc.**

***Kalukundi Copper-Cobalt Project***

*Democratic Republic of the Congo*

**Simplified Process Flowsheet**

*March 2020*

***Source: RPA, 2020.***

### 4.6. TAILINGS AND WASTE MANAGEMENT

70. Golder Associates Africa (Pty) Ltd. established that the Project required a tailings disposal facility (TSF) that could accommodate 12 million tonnes of tailings at a deposition rate of 60,000 tpm over the life of the project (tailings are the materials left over after the process of separating the valuable fraction from the uneconomic fraction of an ore). Allowance was made for future expansion of the facility to 17 years capacity at proposed rates.[37]

71. A spigot deposition method has been adopted for optimized water return and creating a stable tailings dam. Storm water diversion trenches, upstream of the facility, will prevent clean storm water from the external catchment flowing into the tailings disposal facility. Catchment paddocks will contain eroded solids and surface runoff from the side slopes during the operational stage.[38]

72. Golder notes that its work on tailings management has been completed to "*a level of accuracy of plus 20%, minus 10% (not bankable)*".[39] According to the AACE study estimate accuracy classification, this is the level of a pre-feasibility study.[40]

### 4.7. INFRASTRUCTURE

73. All buildings will be either concrete with brick infill or structural steel framed with brick infill.[41] Water will be pumped from Lake Nzilo on the Luala River, 22 km to the site in a buried steel pipeline.[42]

74. The plant access road will be rehabilitated prior to the rainy season. The roads will receive ongoing maintenance over the life of the mine. All in-plant and camp roads will be interlocking blocks laid on a suitably prepared sub-base.[43]

75. Power will be supplied to the plant from the existing National Grid overhead power lines. Plant power transformers, two of 15MVA each, will be situated in the plant main switchyard. Power distribution on site will be at 11kV.[44]

---

[37] 2006 MDM FS, Section 1.6 at p. 1-15 (RPA-001).

[38] *Ibid.*

[39] *Ibid.,* Section 9.2 at p. 9-4.

[40] *See* Annex 4, Table 10.

[41] *Ibid.*, Section 1.10 at p. 1-23.

[42] *Ibid.,* Section 1.10 at p. 1-24.

[43] *Ibid.*

[44] *Ibid*.

76. The power lines (three) will need to be relocated as they pass near or across the Principal, Anticline, and Kesho pits.

### 4.8. ENVIRONMENT AND SOCIAL

77. An Environmental Impact Study and Environmental Management Plan was carried out by African Mining Consultants Ltd. (AMC).[45]

78. The major potential environmental impacts identified by AMC were:[46]
    - The mining of four open pits and the consequent waste rock dumps will have a large visual impact on the landscape;
    - The locations of the open pits may potentially induce a wide sphere of influence on the groundwater through dewatering;
    - Impacts on the surface and groundwater from spillages;
    - Contamination of surface water and safety impacts from the tailings storage facility (TSF); and
    - Dust blow may be generated from the tailings storage facility (TSF) during the dry season.

79. The major potential social impacts identified by AMC were:[47]
    - The effect of the introduction of a wage economy; and
    - Relocation of Kisankala Village. Kisankala has a population of approximately 2,400 people and is located in the centre of the mining area.

80. AMC concluded that the environmental and social aspects were manageable.[48]

### 4.9. CAPITAL COSTS

81. The Project capital requirements (from 2006 MDM FS) were reportedly developed at an accuracy of ± 10%.[49] Process plant and infrastructure was estimated at US$163.9 million and the First Fill and Consumables were estimated at US$8.6 million for a total of US$172.4 million. The capital cost estimate for the process plant assumed that a lump sum turnkey

---

[45] *Ibid.,* Section 11 at p. 11-8.

[46] *Ibid.,* Section 11 at p. 11-11 and 11-12.

[47] *Ibid.*

[48] *Ibid,* Section 11 at p. 11-12 - 11-15.

[49] *Ibid*., Section 15.1.

contract could be signed and includes a mark-up allowance.[50] Table 4 lists the Plant and Infrastructure Capital Cost.[51] The estimate does not include anything for mining or owner's costs.

### TABLE 4 CAPITAL COST ESTIMATES

| Description | Cost (US$) | Contingency (%) | Amount (US$) | Duty (US$) | Total cost (US$) |
|---|---|---|---|---|---|
| Civils Cost | 12,487,457 | 10% | 1,248,746 | 58,419 | 13,794,621 |
| Steelwork Cost | 12,501,474 | 5% | 625,074 | 250,029 | 13,376,578 |
| Plant Infrastructure Cost | 4,902,765 | 10% | 490,277 | 8,660 | 5,400,210 |
| Camp Infrastructure Cost | 6,417,373 | 10% | 641,737 | 42,361 | 7,101,471 |
| Mechanical Cost | 13,931,915 | 5% | 696,596 | 278,638 | 14,907,149 |
| Electrical Cost | 6,912,257 | 5% | 345,613 | 138,245 | 7,396,115 |
| Instrumentation Cost | 605,314 | 10% | 60,531 | 12,106 | 677,952 |
| Piping and Valves Cost | 3,991,381 | 15% | 598,707 | 79,828 | 4,669,916 |
| G & A Equipment Costs | 1,774,618 | 5% | 88,731 | 35,492 | 1,898,841 |
| Transport Costs | 8,661,816 | 5% | 433,091 | - | 9,094,906 |
| Construction Cost | 14,439,784 | 10% | 1,443,978 | - | 15,883,762 |
| Rail Spur | 7,112,892 | 7.5% | 533,467 | 42,677 | 7,689,036 |
| Tailings Facility | 4,529,476 | 10.0% | 452,948 | - | 4,982,424 |
| Village Relocation | 786,350 | 15.0% | 117,953 | | 904,303 |
| EPCM Cost | 8,248,667 | 5.0% | 412,433 | - | 8,661,101 |
| **Sub Total** | **107,303,539** | **7.6%** | **8,189,882** | **946,455** | **116,438,385** |
| Contractors Margin | 8,047,765 | | | - | 8,047,765 |
| Road Rehabilitation Provision | 1,600,000 | | | - | 1,600,000 |
| Outokumpu Package (SX/EW) | 22,540,000 | 0.0% | - | 450,800 | 22,990,800 |
| Acid Plant Package | 14,500,000 | 0.0% | - | 290,000 | 14,790,000 |
| **Total Plant and Infrastructure** | **153,991,304** | | **8,189,882** | **1,687,255** | **163,866,950** |
| First Fills | 8,568,456 | | | | 8,568,456 |
| **Total Initial Capital** | **162,559,760** | | **8,189,882** | **1,687,255** | **172,435,406** |

[50] *Ibid.*, Table 15.1 at p. 15-4 and Section 15.1.1 at p. 15-5.

[51] *Ibid.*, Table 15.1.1 at p. 15-5.

## 4.10. OPERATING COSTS

82. The overall operating costs for the plant and mining operation per tonne of ore mined were estimated using the mining plan developed by RSG in April 2006 and are shown in Table 5.[52]

**TABLE 5 OPERATING COSTS**

| Description | Unit | Value as reported by RSG | Corrected Value |
|---|---|---|---|
| Mining | (US$/t ore) | 4.32 (*) | 15.90 |
| Process Plant and Infrastructure | (US$/t ore) | 44.42 | 44.42 |
| General & Administration | (US$/t ore) | 7.28 | 4.25 |
| **Total Operating Costs** | (US$/t ore) | **56.02** | 67.60 |

83. We note that the value for mining marked by an asterisk in the table above is described as being on a per tonne ore processed basis, however, we believe it is on a per tonne ore mined basis as is shown on page 6-24 of the 2006 MDM FS. When the correct numbers are used, the Mining cost is $15.90 per tonne ore and the overall cost is $67.60.[53] This correction accounts for the fact that for every tonne of ore moved, 2.68 tonnes of waste will need to be moved (that is, the stripping ratio, the amount of waste to ore, is 2.68:1).

## 4.11. LIFE OF MINE PLAN

84. Following a number of plant reviews, the process plant throughput was increased to 800,000 tpa, used as the basis for the final mine schedule. After a pre-strip period of six months, mining is scheduled at a rate of 7.3 Mtpa for the first year, then 6.3 Mtpa for the second year. After Year 2 and until the end of mining in Year 11, the mining rate steadily decreases in line with the decreasing strip ratio in the pits. The timing of the pit development is as follows: Pre-production commences in Quarter 2, Year 0 from the Principal and Kii pits; Kalukundi Pit commences in Quarter 4, Year 2; Anticline Pit commences in Quarter 4, Year 2.[54]

---

[52] *Ibid.,* Section 16.1 and Table 16.1.1 at p. 16-3.

[53] 2006 RSG Global TR, Tables 23.14_1 at p. 106 and 23.16.3_1 at p. 109 (ECF 68-2).

[54] *Ibid*., Section 23.1.8 at p. 87.

85. In 2008, MDM prepared an update of the plant capital cost for 800 ktpa and a new estimate for a 1,250 ktpa plant.[55]

## 5. KALUKUNDI PROJECT STUDIES, REVIEWS, AND VALUATIONS

86. Beginning with the 2006 MDM FS, there were a number of reviews and valuations of the Kalukundi Project.

87. The objectives of the 2006 MDM FS were as follows:

- Complete a mineral resource and reserve evaluation in compliance with NI 43-101 or equivalent standards;
- Complete a mine design and plan to support the mineral reserve estimate;
- Complete an Environmental Impact Assessment;
- Carry out sufficient work to define capital and operating cost estimates; and
- Develop a financial model to evaluate the commercial feasibility of the project.

88. Following the completion of the 2006 MDM FS there was a change to the project scope to increase the processing rates from 720 ktpa to 1,250 ktpa. This increase in the processing rate of the plant would require additional capital expenditures to achieve the higher throughput rate.

89. Additionally, AMEC E&C Services Inc (AMEC) was retained in 2012 to prepare an updated Mineral Resource estimate for Kalukundi. The total Mineral Resource (Indicated plus Inferred Mineral Resources) was estimated at 55.6 Mt at an average grade of 2.08% TCu and 0.46% TCo. Both RPA and SRK have reviewed the AMEC Mineral Resource estimate and are in agreement that it is appropriate to use as a data point for the Kalukundi valuation.

90. As part of the work to complete the mine design, two key components were studied: 1) metallurgical recoveries, and 2) geotechnical pit slopes. Both of these components are fundamental in determining the mine design and ultimately deciding the total quantities of material in the ground that would be economic and, therefore, be included in the mine plan. The results for metallurgical testwork and the geotechnical pit slope parameters were shown in detail in the 2006 MDM FS, however, the 2019 SRK Valuation fails to use this information, and instead makes its own assumptions.

91. With respect to the capital cost estimate in the 2006 MDM FS, the 2008 SRK Valuation correctly identifies the inadequacy of the estimate. Despite these obvious conclusions, the

[55] 2008 MDM Report (ECF 26-6 at Exhibit 2).

SRK 2019 ignores the 2008 SRK Valuation findings and continues to rely on the estimates from the 2006 MDM FS.

92. Table 6 presents a summary of the Kalukundi studies and reviews.[56,57,58,59,60,61,62,63,64,65]

## 5.1. THE 2006 MDM FEASIBILITY STUDY AND UPDATES

93. The 2006 MDM FS study concluded that an "*economically viable mining operation could be developed at Kalukundi with production possible in late 2008*".[66]

94. As discussed in Section 4, the 2006 MDM FS contemplated a process plant of 720,000 tonnes per annum (tpa) capacity, later increased to 800,000 tpa. The mine life was ten years. The initial capital was estimated to be US$167 million plus US$7 million for pre-stripping. Total copper production was estimated to be 164,296 tonnes and total cobalt production was estimated to be 38,485 tonnes.[67]

95. Using prices of US$1.25 per pound copper and US$12.00 per pound cobalt, the 2006 MDM FS estimated an after tax all equity $NPV_{10}$ (NPV at a 10% discount rate) of US$97 million for 100% of Kalukundi.[68] We understand that Rubicon Minerals Corp. publicly stated an after tax all equity $NPV_{10}$ of US$43.6 million for Kalukundi, excluding non-reserve resources per TSX disclosure standards.[69]

---

[56] 2006 MDM FS (RPA-001).

[57] 2006 RSG Global TR (ECF 68-2).

[58] 2008 AGC (Oz) Investment Memo (ECF 26-6 at Appendix R).

[59] 2008 MDM Report (ECF 26-6 at Exhibit 2).

[60] 2008 Venmyn Report (ECF 68-8).

[61] 2008 SRK Valuation Report (ECF 68-9).

[62] 2013 AMEC Report (ECF 26-6 at Exhibit 4).

[63] SRK Consulting (U.S.) Inc., 2017 Valuation of the Kalukundi Copper/Cobalt Project ("2017 SRK Valuation Report") (November 21, 2017) (ECF 26-6).

[64] 2019 SRK Valuation Report (ECF 69-1).

[65] Government Brief, November 22, 2019 (ECF 68).

[66] 2006 MDM FS, Section 1.1 at p. 1-4 (RPA-001).

[67] *Ibid*., Section 1.1 at p. 1-5.

[68] *Ibid*., Table 1_9 at p. 19-14

[69] Rubicon Minerals Corp. Form 51-102F3 Material Change Report, May 23, 2006, at p. 5 (RPA-004).

96. The 2006 MDM FS was updated in 2007 for an increase in process plant construction costs. It was updated again in 2008 for a further increase in process plant construction costs and an increase in capacity to 1.25 million tpa.[70]

97. We reviewed the 2006 MDM FS and based on that review, plus the comments in the 2008 SRK review (see Section 6.1, paragraph 119) we consider the 2006 MDM FS to be incomplete and better described as a pre-feasibility study (see Annex 4, Section 14.3). We come to this conclusion for the following reasons:

- The capital estimate excludes the following aspects:
  - Any mining related costs such as mining fleet or contractor establishment;
  - Mining related accommodation;
  - Owners costs;
  - Resource drilling for mine planning purposes; and
  - Provision for construction camp operation including feeding of the construction team.
- The capital estimate has inadequate provisions for the following:
  - Inadequate provision has been made for the cost of plant commissioning.
  - Inadequate contingency provision. The 2006 MDM FS allowed only approximately 5% contingency on the plant and infrastructure and none at all on mining. The contingency is described as "minor errors and omissions contingency".[71] 2008 MDM Reportallowed approximately 9% contingency. 2008 SRK Valuation Report recommended an allowance of 15% contingency on all costs.
  - Inadequate provision for taxes and other imposed duties.
- With regard to mining technical assumptions in the 2006 MDM FS, the 2008 SRK Valuation Report notes the following:[72]
  - The geotechnical recommendations have been based on inferences from limited information.
  - Very little is known about the hydrogeology of the Kalukundi site with a study by African Mining Consultants reportedly under way at the time of the Mining study.

---

[70] 2008 MDM Report, Section 1 at p. 3 (ECF 26-6 at Exhibit 2).

[71] 2006 MDM FS, Section 15.2 at p. 15-8 (RPA-001).

[72] 2008 SRK Valuation Report, Sections 2.5.3 – 2.5.5 (ECF 68-9).

- It is anticipated that free dig conditions will extend to about 50 m below the surface. Most of the waste rock types can be excavated by ripping and dozing with the requirement for drilling and blasting restricted to benches at depth in more competent rock. In all the fresh rock units, drilling and blasting will be required.
- The metallurgical test work is regarded as adequate for the project, although additional variability samples should be submitted for acid soluble rather than total copper and cobalt determinations.
- No provision is included in the process plant for recovery of sulphide mineralogy. This may be necessary subject to the mining plan and the quantity of sulphide ore to be mined.
- With regard to tailings management, in its report Golder refers to its cost estimates as non-bankable[73] and makes the following remarks:[74]
  - Contingencies: "*[n]o contingencies were allowed for in the costing*".
  - Costing Accuracy: "*[t]he cost estimate has been prepared to a 20% level of accuracy for the supply cost of all major capital cost items. Operating and closure costs are subject to many unknowns and must be considered to be of a lower accuracy than 20%*".
- We consider the Golder report to be at a pre-feasibility level only.

## 5.2. THE RSG GLOBAL TECHNICAL REPORTS

98. RSG Global prepared the resource estimate, mine plan, and reserve estimate for the 2006 MDM FS. Additionally, they prepared the NI 43-101 Technical Report (2006 RSG Global TR) that summarized all aspects of the feasibility study and economics for disclosure.[75]

99. The Technical Report was updated again in 2008 (2008 RSG Global TR) for minor additional disclosure.[76] There are no material differences between the estimates and conclusions in the 2006 MDM FS and the RSG Global Technical Reports (2006 and 2008).

---

[73] 2006 MDM FS, Section 9.2 at p. 9-4 (RPA-001).

[74] *Ibid.*, Section 9.19 at p. 9-28.

[75] 2006 RSG Global TR (ECF 68-2).

[76] RSG Global, 2008, Kalukundi Project Democratic Republic of the Congo, Technical Report (Revised) ("2008 RGS Global TR"), prepared by RSG Global for Africo Resources Limited (July 2008) (ECF 68-6).

## 5.3. THE 2008 AGC (OZ) INVESTMENT REVIEW

100. African Global Capital (AGC) carried out a review of Kalukundi in July 2008 as part of the assessment of a possible investment in a group of assets in the DRC.[77]

101. The review, using the Income Approach, placed a valuation of 100% of Kalukundi at approximately US$150 million.[78] We do not consider this valuation to be realistic because it was based on the incomplete 2006 MDM FS and included what was clearly a high conversion rate of Inferred Mineral Resource to Mineral Reserves to allow a mine life of 22 years.[79]

## 5.4. THE 2008 VENMYN VALUATION

102. In October 2008, Venmyn completed a valuation of the Mashitu Project for Comide s.p.r.l. using the Market approach.[80] Mashitu is adjacent and geologically similar to Kalukundi.

103. Venmyn did not do a separate valuation of Kalukundi and provides no detail on its methodology.

104. In summarizing its valuation of Mashitu, Venmyn applies comparative unit values from comparables to Kalukundi, resulting in a valuation of US$143 million for 100%.[81]

## 5.5. THE 2008 SRK VALUATION

105. In 2008, SRK Consulting (South Africa) (Pty) Ltd. (SRK SA) was commissioned by Africo and Comide s.p.r.l. to determine independent values for the Kalukundi and Mashitu Projects.[82]

106. The Kalukundi valuation was based on the 2006 MDM FS. Using the Income Approach, SRK estimated a Fair Market Value (FMV) for 100% of the Kalukundi Project of US$102.6 million, within a range of US$41.3 million to US$168.8 million.[83]

107. Further commentary on the 2008 SRK Valuation Report is provided in Section 9.2.1.

---

[77] 2008 AGC (Oz) Investment Memo (ECF 26-6 at Appendix R).

[78] Government Brief, November 22, 2019, p. 2 (ECF-68).

[79] *Ibid*., p. 9.

[80] 2008 Venmyn Report, p. 6 (ECF 68-8).

[81] *Ibid*., p. 8.

[82] 2008 SRK Valuation Report, Sections 6.3 and 6.4 (ECF 68-9).

[83] *Ibid*., Table 6.5 at p. 54.

### 5.6. THE 2013 AMEC TECHNICAL REPORT

108. AMEC was retained in 2012 to prepare an updated Mineral Resource estimate for Kalukundi, based on an updated database to November 2012.[84] This database incorporates the results of a drilling campaign carried out in 2011-2012.

109. The AMEC estimate is described in Section 4.3.3. This estimate was used by SRK as the basis for its 2017 and 2019 valuations.

110. We consider the 2013 AMEC estimate to be completed to industry standards and the most current for the Project.

### 5.7. THE 2017 AND 2019 SRK VALUATIONS

111. These valuations are described and commented on in Sections 6.2 and 6.3, respectively.

### 5.8. THE GOVERNMENT BRIEF OF NOVEMBER 22, 2019

112. In November 2019, as part of the court proceedings, the US Government submitted a brief summarizing its valuation of Kalukundi, based on work carried out by its consultant, Stout Risius Ross, LLC (Stout).

113. On the basis of a plant processing 1.25 million tpa, the Government estimates the value of Kalukundi to be US$189 million for 100%.[85] Based on a plant processing 800,000 tpa, the Government estimates the value of Kalukundi to be US$38 million for 100%.[86]

[84] 2013 AMEC Report, Section 1.0 at p. 1-1 (ECF 26-6 at Exhibit 4).

[85] Government Brief, November 22, 2019, p. 11 (ECF-68).

[86] Government Brief, January 31, 2020, p. 3 (ECF-81).

**TABLE 6 COMPARISON OF KALUKUNDI STUDIES AND REVI**

| | | MDM 2006 June | RSG Global 2006 June | MDM 2007 August | RSG Global 2008 July | AGC OZ 2008 July | MDM 2008 October | MDM 2008 October | Venmyn 2008 October |
|---|---|---|---|---|---|---|---|---|---|
| Resource Base M&I | '000 tonnes | 12,109 | 12,154 | | 12,154 | | | | |
| Cu Total | % | 2.42 | 2.42 | | 2.42 | | | | |
| Cu Acid Soluble | % | | | | | | | | |
| Co | % | 0.61 | 0.61 | | 0.61 | | | | |
| Resource Base Inferred | '000 tonnes | 15,021 | 15,021 | | 15,021 | | | | |
| Cu Total | % | 2.63 | 2.63 | | 2.63 | | | | |
| Cu Acid Soluble | % | | | | | | | | |
| Co | % | 0.58 | 0.58 | | 0.58 | | | | |
| Reserve Base | '000 tonnes | 7,830 | 7,830 | | 7,830 | | | | |
| Cu | % | 2.37 | 2.37 | | 2.37 | | | | |
| Co | % | 0.69 | 0.69 | | 0.69 | | | | |
| Annual Processing Capacity | '000 tonnes | 720/800 | 800 | 800 | 800 | | 800 | 1,250 | |
| Metallurgical Recovery - Cu | % | 89/93 | 89/93 | | 89/93 | | | | |
| Metallurgical Recovery - Co | % | 70/78 | 70/78 | | 70/78 | | | | |
| Mine Life | years | 10 | 10 | | 10 | 22 | | | |
| Construction | months | 18 | 18 | | 18 | | | | |
| Initial capital - Plant & Infrastructure | US$ millions | 166.6 | 166.6 | 174.8 | 166.6 | | 238.4 | 275.7 | |
| Initial Capital | US$ millions | 173.45 | 173.45 | | 173.45 | | | | |
| Annual Sustaining Capital | US$ millions | 0.05 | 0.05 | | 0.05 | | | | |
| Closure Cost | US$ millions | 0.97 | 0.97 | | 0.97 | | | | |
| Annual Operating Cost | US$ millions | 44.87 | 44.87 | | 44.87 | | | | |
| Unit Operating Cost Processing | US$/t processed | 44.42 | 44.42 | | 44.42 | | 65.84 | 56 to 77 | |
| Unit Operating Cost Total | US$/t processed | 56.02 | 56.02 | | 56.02 | | | | |

**TABLE 6 COMPARISON OF KALUKUNDI STUDIES AND REV**

| | | MDM 2006 June | RSG Global 2006 June | MDM 2007 August | RSG Global 2008 July | AGC OZ 2008 July | MDM 2008 October | MDM 2008 October | Venmyn 2008 October |
|---|---|---|---|---|---|---|---|---|---|
| C1 Cash cost per lb Cu net of Co | US$/lb Cu | 1.12 | 1.12 | | 1.12 | | | | |
| Metal Price - Cu | US$/lb Cu | 1.25 | 1.25 | | 1.25 | 1.50 | | | |
| Metal Price - Co | US$/lb Co | 12.00 | 12.00 | | 12.00 | 12.00 | | | |
| Pre-tax LOM Cash Flow | US$ millions | 535 | 580 | | 580 | | | | |
| After-tax LOM Cash Flow | US$ millions | 378 | 403 | | 403 | | | | |
| Discount Rate | % | 10 | 10 | | 10 | 30 | | | |
| Valuation 100% Debt Case | US$ millions | 228.4 | not stated | | not stated | | | | |
| Valuation 100% Equity Case | US$ millions | 97 | not stated | | 149.8 | 150 | | | 143 |
| | US$ millions | | | | | | | | |
| Terminal Value of Unmined | US$ millions | | | | | | | | |

## 6. SRK REVIEWS AND VALUATIONS

114. SRK has carried out three separate reviews and valuations on the Kalukundi Project in 2008, 2017, and 2019. In our opinion, the 2008 SRK Valuation Report provides the most accurate portrayal of the Kalukundi Project for the following reasons: 1) SRK staff carried out site visits to the Kalukundi Project at the time the 2006 MDM FS was developed and had access to all of the relevant information and site staff; and 2) SRK identified a number of real concerns with the 2006 MDM FS, especially relating to the inadequacy of the capital cost estimate. The 2008 SRK Valuation Report also correctly follows the CIMVal guidelines for the inclusion of Inferred Resources as part of the mine plan.

115. Without explanation, the 2019 SRK Valuation Report simply dismisses all the findings relating to capital costs and Inferred Resources from the 2008 SRK Valuation.

116. SRK makes two fundamental technical errors in its assumptions used to determine the mineable portion of the Mineral Resources. Firstly, it ignores the metallurgical test work provided in the 2006 MDM FS which clearly shows that recoveries decrease with depth. Instead, SRK assumes that the recovery will be a fixed 90% and 70% for copper and cobalt, respectively, even in material that is not amenable to leaching (sulphides). Secondly, it ignores geotechnical recommendations made by KP (as discussed in Section 4.4) and instead assumes pit slopes of 45° for all pits (compared to the approximately 30° recommended by KP). This has a significant effect on the economics of the pits since the flatter slopes result in a much greater quantity of waste that needs to be mined in order to access the ore, negatively impacting the mining costs.

117. We consider both errors made by SRK to be "fatal flaws" in the technical basis for its valuation.

118. In addition to the technical errors, 2019 SRK has underestimated the capital and operating costs and has not properly incorporated recognition of the risk associated with Inferred resources according to accepted mining industry valuation standards.

### 6.1. THE 2008 SRK VALUATION

119. In 2008, SRK was retained to review the 2006 MDM FS as part of a wider valuation. SRK was very critical of many aspects of the 2006 MDM FS, in particular, the capital cost estimate.

120. In addition, SRK was critical of some of the key underlying technical assumptions.

121. On capital costs, SRK notes the following:[87]

- The capital estimate <u>excludes</u> the following aspects:
  - Any mining related costs such as mining fleet or contractor establishment;
  - Mining related accommodation;
  - Owners costs estimated at least US$15 million in March 2006 terms;
  - Resource drilling for mine planning purposes; and
  - Provision for construction camp operation including feeding of the construction team.
- Inadequate provision has been made for the cost of plant commissioning. An additional US$5.0 million will be required for commissioning and de-bottlenecking teams from completion of the plant and prior to actual commissioning.
- Inadequate provision seems to have been made for operation of the construction camp and an additional US$3.65 million will be required.
- The capital cost at March 2006 is more likely to be US$212 million, plus sustaining capital of US$3.0 million per annum, and Owner's costs of US$15.0 million.
- A contingency provision of 15% should also be included in the financial model. (Note that this is consistent with industry practice as in Annex 4, Section 14.3.2.)
- An additional 10% provision for taxes and other imposed duties should be included in the estimate.
- In summary, the capital cost in November 2008 terms for this processing plant and infrastructure will have escalated by approximately 2% per month since March 2006, or about 64%. It is estimated that the capital cost will be about US$348 million, US$24.6 for owner's costs, US$5.0 million per annum for sustaining capital and a 15% contingency provision.

122. As part of the cash flow modelling carried out in 2008 SRK Report, Inferred Resources were discounted by 30%,[88] which is in line with CIMVal guidelines[89] (discussed later in this report). The 2019 SRK Valuation Report does not apply any discount to Inferred Resources. This is not consistent with industry standards.

---

[87] 2008 SRK Valuation Report, Sections 2.6.6 – 2.6.8 (ECF 68-9).

[88] *Ibid*., Section 6.4.4 at p. 64 (ECF 68-9).

[89] CIMVal Standards and Guidelines for Valuation of Mineral Properties ("CIMVal 2003"), Guideline G4.7 at p. 24-25 (RPA-005).

123. Based on the 2008 SRK analysis, we estimate the actual capital costs at that time would be approximately US$428 million rather than the US$174 million in the 2008 RSG Global TR.

124. With regard to mining technical assumptions in the 2006 MDM FS, the 2008 SRK Valuation Report notes the following:[90]

- The geotechnical recommendations have been based on inferences from limited information.
- Very little is known about the hydrogeology of the Kalukundi site with a study by African Mining Consultants reportedly under way at the time of the Mining study.
- It is anticipated that free dig conditions will extend to about 50 m below the surface. Most of the waste rock types can be excavated by ripping and dozing with the requirement for drilling and blasting restricted to benches at depth in more competent rock. In all the fresh rock units, drilling and blasting will be required.

125. With regard to tailings management, in its report Golder refers to its cost estimates as non-bankable[91] and makes the following remarks:[92]

  - Contingencies: "*[n]o contingencies were allowed for in the costing*".
  - Costing Accuracy: "*[t]he cost estimate has been prepared to a 20% level of accuracy for the supply cost of all major capital cost items. Operating and closure costs are subject to many unknowns and must be considered to be of a lower accuracy than 20%*".

126. We consider the Golder report to be at a pre-feasibility level only.

127. Overall, we consider the 2008 SRK Valuation Report to be the best analysis of the project from the information provided because it was carried out by knowledgeable people close to the time the 2006 MDM FS was completed, with access to those people and the Owner's team (site visits to Kalukundi were carried out by SRK in 2006)[93].

128. In our opinion, the analysis shows that the 2006 MDM FS is not a "Bankable Feasibility Study" as is repeatedly asserted in the 2019 SRK Valuation Report.[94] The 2006 MDM FS

---

[90] 2008 SRK Valuation Report, Sections 2.5.3 – 2.5.5 (ECF 68.9).

[91] 2006 MDM FS, Section 9.2 at p. 9-4 (RPA-001).

[92] *Ibid*., Section 9.19 at p. 9-28.

[93] 2008 SRK Valuation Report, Section 1.2.4 at p. 11 (ECF 68-9).

[94] 2019 SRK Valuation Report, Section I at p. 3 and 4 and Section 3 at p. 6 (ECF 69-1).

is probably better described as a Pre-Feasibility Study, with a lower level of accuracy of the cost estimates.

129. The 2019 SRK Valuation Report, on the other hand, dismisses the findings of the 2008 SRK Valuation Report with the following comments:[95]

- *"[w]e noted that this valuation was based on a substantially reduced resource estimate than that contained in the 2006 Bankable Feasibility Study, pre-dated the discovery of substantial additional resources at Kalukundi".*[96]
- *"was made at the time of the global financial crisis when project financing was much more difficult to obtain".*[97]
- *"the valuation report appears to have been completed on the basis of limited access to site, people and information. Normally, this will require those valuing a project to err on the conservative side due to an abundance of caution resulting from real or perceived recognition of incomplete data sets".*[98]

- We note that none of these comments specifically address the differences of opinion (especially with respect to inadequacy of the capital costs and discounting of Inferred Resources) SRK had with the assumptions from 2008.
- We also find it surprising that no attempt was made by Dr. Rigby to effectively explain the comments and observations his fellow SRK employees made at the time of the 2006 MDM FS with his own comments and observations made more than ten years later.

## 6.2. THE 2017 SRK VALUATION

130. The 2017 SRK Valuation forms the basis for the 2019 SRK Valuation update. Other than metal prices, there are no material changes in technical or cost assumptions from 2017 to 2019 other than escalation. We will address these in the following section.

---

[95] *Ibid.*, Section I at p. 3.

[96] *Ibid.*

[97] *Ibid.*

[98] *Ibid.*

### 6.3. THE 2019 SRK VALUATION

#### 6.3.1. Mineral Resources and Mineral Reserves

131. SRK used the 2013 AMEC Mineral Resource estimate as the basis for determining the mineable portion of the Mineral Resources. Although we have not been provided with the underlying data to support the AMEC estimate, both RPA and SRK agree that the AMEC estimate is appropriate to use as a data point for the Kalukundi valuation since it is the most recent estimate and was carried out by a well-known international independent consultant. Since we were unable to verify the underlying data, we have adopted SRK's mine plan containing 13.9 Mt as the basis for the valuation.

#### 6.3.2. Mine Planning and Design

132. SRK prepared a mine design and production schedule using Whittle software (limiting the pits to a maximum depth of 150 m). We generally agree with this approach, however, we disagree with the SRK parameters for operating costs, pit slopes, and metallurgical recovery. SRK makes two fundamental errors in its assumptions used to determine the mineable portion of the Mineral Resources. Firstly, it ignores the metallurgical test work provided in the 2006 MDM FS which clearly shows that recoveries decrease with depth. Instead, SRK assumes that the recovery will be a fixed 90% and 70% for copper and cobalt, respectively, even in material that is not amenable to leaching (sulphides). Secondly, it ignores geotechnical recommendations made by KP (as discussed in Section 4.4) and instead assumes pit slopes of 45° for all pits (compared to the approximately 30° recommended by KP). This has a significant effect on the economics of the pits since the flatter slopes result in a much greater quantity of waste that needs to be mined in order to access the ore, negatively impacting the mining costs.

133. We consider both errors made by SRK to be "fatal flaws" in the technical basis for its valuation.

134. We note that SRK has based its mining schedule on a Whittle optimization using a block model of all five pits combined.[99] This creates a mining schedule that purportedly maximizes the overall grade by high-grading each of the five pits. This is done by scheduling the best grade from one of the five with no regard to the practicality of moving

[99] 2019 SRK Valuation Report, Figure 9 in Exhibit 1 (ECF 69-1).

equipment between pits on an as required basis to access this best grade.[100] We disagree with this approach as it is not a practical way to utilize equipment and may, in fact, not be possible to achieve at all. In order to reflect this inefficiency, we have applied a 2% reduction in head grade. This is an adjustment intended to recognize the likely inability to achieve the operating efficiencies, resulting in an inability to access the higher grade material as scheduled, leading to higher dilution.

135. We further note that the SRK combined block model optimization leads to a violation of one of the key criteria in CIMVal 2003, that being the risk adjustment for Inferred mineralization.

136. All Mineral Resources, regardless of category (Measured, Indicated, and Inferred) have been included in the SRK mine plan and SRK makes no distinction in terms of valuing the resources based on category.[101] While we agree that all categories should be included when determining the value of a property, Inferred Resources should be treated differently than Measured and Indicated Resources to account for their speculative nature.

137. CIMVal 2003 states under Guideline G4.7: *"[w]here Measured and Indicated Mineral Resources are used in the Income Approach and/or where technical and related parameters are at a lower confidence level than Prefeasibility Study level it is recommended that the higher risk or uncertainty be recognized by some means, which might include using a higher discount rate, reducing the quantum of the Mineral Resources, or delaying the timing of production of the Mineral Resources in the Income Approach model, or some other appropriate means of reflecting the higher risk of including Mineral Resources".*[102]

138. We would normally recommend applying a factor (for example, 50%) to reduce the quantum of Inferred Resources to be included in the mine plan to reflect the fact that often Inferred Resources do not convert into Measured and Indicated Resources when further drilling is carried out.

---

[100] *Ibid*., Appendix E. See notes on the SRK Pit Optimization when comparing the 2019 and 2017 Whittle results: *"This change resulted in a lower stripping ratio early in the mine life with higher grades due to the ability to mine multiple pits simultaneously instead of consecutively".*

[101] *Ibid.,* p. 78.

[102] CIMVal 2003, Guideline G4.7 at p. 24-25 (RPA-005).

139. In order to better reflect the risk in using Inferred Resources, it is common practice to schedule Inferred Resources at the end of the mine life,[103] thereby decreasing its influence through discounting.

140. We note, for example, that the Kesho pit is entirely based on Inferred Resources, which calls into question the validity of its inclusion in the mine plan entirely. Nevertheless, SRK's 2019 analysis combines everything together and schedules it, with no consideration of the extra risk for Inferred Mineral Resources.

141. CIMVal 2003 Guideline G4.8 allows the use of Inferred Resources in the Income Approach (DCF) and states the following: *"[i]nferred Mineral Resources should be used in the Income Approach with great care, and should not be used if the inferred mineral Resources account for all or are a dominant part of total Mineral Resources"*.[104]

142. According to Table 3 of this report, the Inferred Mineral Resources make up 45.3% of the tonnage, which is not the "dominant part" of the total Mineral Resource.

### 6.3.3. Metallurgy and Processing

143. SRK has made a fundamental error in its production assumptions by assuming the metallurgical recoveries for copper and cobalt are consistent from surface to 150 m.

144. From the metallurgical test work, it is very clear that this is not the case (see Section 4.5, paragraph 67, Table 3).[105] With the transition from oxide ore to predominantly sulphide ore, the process recoveries decline markedly and could only be improved by the construction of an entirely different process plant, which would add significant costs. Since this is not the case, we have used the recoveries estimated in Section 8.3.

### 6.3.4. Capital Costs

145. SRK has estimated 2019 initial capital costs based on what it describes as those in the 2006 MDM FS (US$249 million) and then escalating to 2019 (US$346 million), based solely on applying factors to account for inflation over the 2006 to 2019 period.

146. We have a number of concerns with this approach:

- Firstly, we are unable to trace the amount of US$249 million to the 2006 MDM FS.

[103] *Ibid.*, Guideline G4.8 at p. 25.

[104] *Ibid.*

[105] 2006 MDM FS, Table 10.5.4_1 at p. 6-60 (RPA-001).

- Secondly, the US$249.0 million appears to be based on a plant capacity of 800,000 tpa rather than 1,250,000 tpa.
- Thirdly, the US$249 million estimate completely ignores SRK's own estimate of US$428.0 million in 2008.[106]

147. We have made an adjustment to the initial capital as described in Section 8.4.

#### 6.3.5. Operating Costs

148. SRK has estimated life of mine ("LOM") unit operating costs based on what it describes as those in the 2006 MDM FS (US$57.75 and US$9.46 per tonne of ore for processing and general and administrative (G&A), respectively) and escalates to 2019 costs of US$78.32 and US$12.84 per tonne of ore for processing and G&A, respectively using an escalation factor from CostMine.[107] SRK states that there were no mining costs provided in the 2006 MDM FS (as denoted by an "NA" in the table in Appendix I).[108] It then assumes a cost of US$2.50 per tonne mined and escalates this to a 2019 cost of US$2.91 per tonne mined.[109] We note that, contrary to SRK's assertion, mining costs (based on contractor quotes) were provided in the 2006 MDM FS. Those costs were US$4.32 per tonne of material moved,[110] much higher than the SRK estimate.

149. SRK estimates total LOM operating costs of US$226 million, US$1,232 million, and US$202 million for mining, processing, and G&A, respectively.[111]

#### 6.3.6. Environment and Permitting

150. This area was not discussed by SRK in either the 2017 or 2019 SRK Valuation Reports. SRK assumes reclamation and closure costs of US$24.5 million.

## 7. METAL PRICES

151. Copper and cobalt are freely traded in international markets, at prices that are widely known.

---

[106] 2008 SRK Valuation Report, Section 2.6.7 at p. 34 (ECF 68-9). (US$348 million + US$24.6 million + US$55.9 million (15% contingency) = US$428.5 million.

[107] 2019 SRK Valuation Report, Appendix I (ECF 69-1).

[108] *Ibid.*

[109] *Ibid.*, Appendix J.

[110] 2006 MDM FS, Section 6.6.5 at p. 6-24 (RPA-001).

[111] 2019 SRK Valuation Report, Appendix F (ECF 69-1).

152. For the purposes of this report, we have been instructed to use forecast metal prices as determined by Consensus Economics as of February 2020[112] and spot prices as of October 21, 2019 used in the 2019 SRK Valuation Report.

153. The historical copper and cobalt prices, as quoted by the London Metal Exchange (LME), and Consensus Economics forecast prices are shown in Figure 5.

**FIGURE 5 HISTORICAL AND CONSENSUS FORECAST COPPER AND COBALT PRICES**




154. In summary, we used spot prices (as of October 21, 2019) of US$2.54/lb copper and US$16.10/lb cobalt and February 2020 consensus prices of US$2.85/lb copper and US$20.72/lb cobalt.[113]

---

[112] Consensus Economics Metal Prices, February 2020 (RPA-006).

[113] 2020 RPA Adjusted Model (RPA-002).

# 8. RPA RESTATEMENT OF THE 2019 SRK LIFE OF MINE PLAN AND INCOME APPROACH VALUATION

155. We have reviewed the 2019 SRK Income Approach valuation and the documentation and the assumptions on which it is based and are of the opinion that it materially overstates the value of Kalukundi as of November 2019. As discussed in previous sections, our opinion is based on the following:

- The 2008 SRK Valuation Report is the most relevant commentary on the Project status at that time;
- The 2006 MDM FS does not meet industry standards for a feasibility study and significantly underestimates costs as concluded in the 2008 SRK Valuation Report;
- SRK based its mine plan on a Whittle optimization pit shell and not on a mine design (which accounts for real mining factors such as ramps, etc.), is preliminary in nature, and has not been completed to industry standards;
- The SRK mine optimization in Whittle ignores the geotechnical information from the 2006 MDM FS and instead assumes a fixed slope of 45°;
- SRK does not appropriately incorporate the metallurgical recoveries determined from metallurgical test work and instead uses a fixed recovery rate that materially overstates metal recoveries;
- There is no consideration of hydrogeology;
- The initial capital costs are based on a lower capacity plant than used in the life of mine plan; and
- The capital costs have omitted material components. This resulted in an initial capital cost estimate of US$633 million versus SRK's estimate of US$346 million.

156. We have incorporated these comments and those listed below in preparing a restatement of the physicals and cost assumptions used in the 2019 SRK Income Approach valuation. This has been provided to Quadrant for use in preparing its valuation. A summary comparison table to the data from the 2019 SRK Valuation Report is shown in Table 8.

## 8.1. MINERAL RESOURCES AND MINERAL RESERVES

157. We have reviewed the 2013 AMEC Technical Report on Mineral Resources and are of the opinion that it has been completed to industry standards and it is an appropriate data point for determining a mine plan for valuation purposes.

### 8.2. MINE PLANNING AND DESIGN

158. We made modifications to SRK's existing 2019 LOM plan to account for 1) metallurgical recoveries and 2) geotechnical parameters (pit slopes).

159. We made the following adjustments to SRK's 2019 LOM plan:

   1) Metallurgical recoveries were estimated by depth for each of the deposits based on the 2006 MDM FS metallurgical recovery test work[114] (see paragraphs 161 to 164) and the tonnage by depth in the SRK mine plan.[115] This resulted in average metallurgical recoveries for copper and cobalt of 69% and 56%, respectively, as compared to SRK's values of 90% and 70%.

   2) We re-ran SRK's Whittle pit shells using a pit slope of 30°. This downward adjustment from 45° to 30° resulted in an increase of waste tonnes of approximately 75% as compared to the SRK mine plan. This additional waste tonnage was added to the modified 2019 SRK LOM plan which has a direct impact on mining cost since more material needs to be moved.

160. Furthermore, as described in paragraph 134, we have applied a 2% downward adjustment to the head grade to allow for inefficiency in the proposed high-grading operating procedure to be used in the mine.

### 8.3. METALLURGY AND PROCESSING

161. The primary issue relating to metallurgical recovery is that SRK assumes a constant recovery of 90% and 70% for copper and cobalt, respectively, for all resources down to 150 m below the surface.

162. Metallurgical test work shows that in reality, the recoveries for the whole ore leach process are variable and, in some cases, decrease to 0%, well before reaching the 150 m depth mark. Not unexpectedly, lower recoveries are directly related to the increasing content of sulphide vs oxide ore. Surface oxidation of sulphide ore occurs in all deposits like Kalukundi.

163. The metallurgical test work that we relied on is shown in Table 7.[116] The steep drop in recoveries with depth is shown in red.

---

[114] 2006 RSG Global TR, Table 23.2_2 at p. 90 (ECF 68-2).

[115] 2017 SRK Valuation Report, Figure 9 at p. 25 (ECF 26-6).

[116] 2006 RSG Global TR, Table 23.2_2 at p. 90 (ECF 68-2).

## TABLE 7 KALUKUNDI LEACH RECOVERIES WITH DEPTH

Table 23.2_2
Kalukundi Project
Leach Recoveries and Operating Costs with Depth.

| Depth | Composited Fragments | | | | Predicted Recoveries | | | | Individual Fragments | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recovery to Metal | Estimate Average | Recovery to Metal | Estimate Average | Principle Rec. to Metal | | Anticline Rec. to Metal | | Kalukundi Rec. to Metal | | Kii Rec. to Metal | |
| | Cu | | Co | | Cu | Co | Cu | Co | Cu | Co | Cu | Co |
| 0-10m | 93 | | 78 | | 93 | 78 | 93 | 78 | 93 | 78 | 93 | 78 |
| 10-20m | | 91 | | 74 | 91 | 74 | 91 | 74 | 91 | 74 | 91 | 74 |
| 20-30m | | 91 | | 74 | 91 | 74 | 91 | 74 | 91 | 74 | 91 | 74 |
| 30-40m | 89 | | 70 | | 89 | 70 | 89 | 70 | 89 | 70 | 89 | 70 |
| 40-50m | 89 | | 70 | | 89 | 70 | 89 | 70 | 20 | 50 | 89 | 70 |
| 50-60m | 89 | | 70 | | 89 | 70 | 89 | 70 | 10 | 30 | 89 | 70 |
| 60-70m | | 83 | | 70 | 89 | 70 | 89 | 70 | 5 | 20 | 89 | 70 |
| 70-80m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 80-90m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 90-100m | 78 | | 70 | | 89 | 70 | 89 | 70 | 5 | 0 | 89 | 70 |
| 100-110m | | | | | 89 | 70 | 60 | 55 | 5 | 0 | 60 | 55 |
| 110-120m | | | | | 89 | 70 | 40 | 20 | 5 | 0 | 40 | 20 |
| 120-130m | | | | | 60 | 55 | 20 | 0 | 5 | 0 | 20 | 0 |
| 130-140m | | | | | 40 | 20 | 10 | 0 | 5 | 0 | 10 | 0 |
| 140-150m | | | | | 20 | 0 | 5 | 0 | 5 | 0 | 5 | 0 |

164. The incorporation of the change in recoveries with depth has resulted in an overall drop in average copper recovery from 90% to 69% and in cobalt recovery from 70% to 56%.

### 8.4. CAPITAL COSTS

165. In paragraph 81, we note that the 2006 MDM FS was developed to an accuracy of +/-10%. This would qualify it as the most accurate level of an AACE Class 3 study as shown in Annex 4, Section 14.3.1. In Section 6.1, we demonstrate, by SRK's own analysis, that this is not the case.

166. Accordingly, we have revised the capital cost estimate to be based on information in the 2008 SRK Valuation Report and escalated the data to 2019 using the same methodology as SRK. This resulted in an initial capital cost estimate of US$633 million versus SRK's estimate of US$346 million.

167. We used the same sustaining capital and closure costs as SRK, as there was no other information to consider.

### 8.5. OPERATING COSTS

168. We escalated the operating costs from the 2006 MDM FS in a similar manner to SRK.

169. We estimated Mining costs to be US$3.50 per tonne moved (compared to SRK's estimate of US$2.91 per tonne)[117] based on benchmarking to other operations.

170. We estimated Processing and G&A costs to be US$80.00 and US$14.00 per tonne of ore processed, slightly higher than SRK's estimates of US$78.32 and US$12.84.

171. All other costs associated with cathode transport, marketing, concession fees, and corporate costs remain unchanged from SRK's 2019 LOM plan. This results in total LOM operating costs of US$1,608 million and US$1,398 million for the RPA Adjusted models at consensus and spot prices, respectively.

### 8.6. ENVIRONMENT AND PERMITTING

172. We maintained the same permitting assumptions, milestones, and timelines as assumed by SRK.

### 8.7. RPA ADJUSTED MODEL

173. We have developed the 2020 RPA Adjusted Model[118] based on making the abovementioned changes to the SRK model. Table 8 summarizes a comparison of the SRK model and the RPA Adjusted Model. SRK has produced models using both spot and consensus prices for copper and cobalt. We have adjusted the SRK models to account for the changes described in this report. The spot prices (as of October 21, 2019) of US$2.54/lb copper and US$16.10/lb cobalt are the same for both the RPA Adjusted Model and SRK model. For the consensus price model, SRK uses long term consensus price forecast as of November 2019 of US$2.84/lb copper and US$20.57/lb cobalt. In the RPA Adjusted Model, February 2020 consensus prices of US$2.85/lb copper and US$20.72/lb cobalt are used, which are similar to the SRK prices from November 2019.[119,120]

---

[117] 2019 SRK Valuation Report, Appendix F (ECF 69-1).

[118] 2020 RPA Adjusted Model (RPA-002).

[119] 2019 SRK Valuation Report, Appendix F and Appendix T (ECF 69-1).

[120] 2020 RPA Adjusted Model (RPA-002).

## TABLE 8 COMPARISON OF SRK MODEL AND RPA ADJUSTED MODEL (SPOT AND CONSENSUS PRICES)

| Parameter | | Unit | Spot Prices SRK Spot 21 Oct-19 | RPA Adj_Spot 21 Oct-19 | Consensus Prices SRK Cons Nov-19 | RPA Adj_Cons Feb-20 |
|---|---|---|---|---|---|---|
| Construction period | | | 2021 - 2022 | 2021 - 2022 | 2021 - 2022 | 2021 - 2022 |
| Operating Period | | | 2023 - 2034 | 2023 - 2034 | 2023 - 2037 | 2023 - 2034 |
| Mine Life | | years | 12 | 12 | 15 | 13 |
| Reserves Mined | | '000 t | 13,943 | 13,943 | 16,856 | 16,250 |
| | Cu | % | 3.05% | 2.99% | 2.79% | 2.73% |
| | Co | % | 0.81% | 0.79% | 0.74% | 0.73% |
| Plant Capacity | Annual | '000 t | 1,250 | 1,250 | 1,250 | 1,250 |
| Recovery | Cu | % | 90% | 69% | 90% | 62% |
| | Co | % | 70% | 56% | 70% | 49% |
| Sales | Cu | million lbs | 844 | 627 | 934 | 589 |
| | Co | million lbs | 174 | 135 | 193 | 129 |
| Price | Cu | US$/lb | 2.54 | 2.54 | 2.84 | 2.85 |
| | Co | US$/lb | 16.10 | 16.10 | 20.57 | 20.72 |
| Gross Revenue | | US$ millions | 4,953 | 3,773 | 6,628 | 4,345 |
| Offsite costs | | US$ millions | 350 | 264 | 411 | 264 |
| Royalties and other non-Income based taxes | | US$ millions | 538 | 385 | 733 | 447 |
| Net Revenue | | US$ millions | 4,064 | 3,124 | 5,484 | 3,634 |
| Operating Costs | | US$ millions | 1,485 | 1,726 | 1,800 | 2,026 |
| Operating Cash Flow | | US$ millions | 2,579 | 1,398 | 3,684 | 1,608 |
| Initial Capital Costs | | US$ millions | 346 | 633 | 346 | 633 |
| Sustaining Capital Costs | | US$ millions | 104 | 167 | 130 | 183 |
| Closure Costs | | US$ millions | 24 | 24 | 24 | 24 |

# 9. VALUATION OF THE KALUKUNDI PROJECT USING COMPARABLE TRANSACTIONS

174. We have reviewed SRK's Comparable Transactions Analyses and found them unreliable.

## 9.1. VALUATION APPROACHES AND METHODS

### 9.1.1. Comparable Transactions Analysis

175. The value of a non-producing mineral property depends on its perceived potential for the existence and discovery of an economic mineral deposit. The potential in turn depends on several factors that must be considered when choosing market comparables. These comparability factors include such items as geology, mineralization, stage of exploration and results, mineral resources, location and geography, and political jurisdiction. The date of the market comparables must be within a reasonable time period of the valuation date of the subject property. The method is described in articles by W.E. Roscoe (2003 and 2007).[121,122]

176. Although it is difficult to find good market comparables due to the unique nature of mineral properties, these difficulties are compensated for by analyzing a number of transactions on similar properties to develop a range of values for the subject property.

177. For valuation purposes, market comparables can be expressed in terms of total property value, value per unit area (e.g., US$ per hectare (US$/ha)), or value per unit of metal contained in Mineral Resources (e.g., US$ per ounce (US$/oz) of gold, or US$ per pound (US$/lb) of copper). Value can also be expressed as a percentage of the Cu price.

178. For market transactions on exploration properties without Mineral Resources, a US$/ha value can be calculated by dividing the property value by the property size in hectares. If the transaction is for less than 100% of the property, the transaction value is normalized to a 100% interest.

179. The market comparable ratios (US$/ha, US$/lb, US$/oz) are further analyzed to derive a range of ratios to apply to the subject property to estimate a range of values.

---

[121] Roscoe, William E., 2003, Valuation of Non-Producing Mineral Properties, Journal of Business Valuation, 2003, p. 305-327 (RPA-007).

[122] Roscoe, William E., 2007, Valuation Mineral Properties Using Market Comparables, 2007, Journal of Business Valuation, 2007, p. 207-231 (RPA-008).

#### 9.1.2. Option Agreement Terms Analysis

180. The Option Agreement Terms Analysis Method is utilized to value many properties used as market comparable transactions. The method is described in articles by W.E. Roscoe (2003 and 2007).[123,124]

181. Most market transactions on non-producing mineral properties are not forthright cash or share deals, but rather are typically option, earn-in, or joint venture agreements whereby one party obtains the right to earn an interest in the property from another party by fulfilling certain commitments over a period of time. The terms of the option or earn-in agreement must be analyzed to estimate a value for the property being transacted.

182. In a typical option agreement, a schedule of firm and optional commitments must be fulfilled to earn an interest in the property. The commitments may include payment of cash, issue of shares by the earn-in party, expenditures on mineral exploration, and royalties on production. In general, the commitments are firm in the first year and optional in subsequent years.

183. Option Agreement Terms Analysis considers the firm commitments to contribute 100% to the value of the property. The optional commitments are assigned a subjective probability of the earn-in party fulfilling each of the annual commitments in the subsequent years of the agreement. The optional commitments multiplied by the probability factor for each year are considered to be the contribution to value. The transaction value is the sum of the firm commitment values and the probability-weighted optional commitment values. If the transaction is for a partial interest in the property, the value is adjusted to a 100% interest in the property.

### 9.2. COMPARABLE TRANSACTIONS VALUATION OF KALUKUNDI BY OTHERS

184. SRK has carried out Comparable Transactions Analyses for the undeveloped Kalukundi property in 2008, 2017, and 2019.[125,126,127] The following comments pertain only to SRK's

---

[123] Roscoe, William E., 2003, Valuation of Non-Producing Mineral Properties, Journal of Business Valuation, 2003, p. 305-327 (RPA-007).

[124] Roscoe, William E., 2007, Valuation Mineral Properties Using Market Comparables, 2007, Journal of Business Valuation, 2007, p. 207-231 (RPA-008).

[125] 2008 SRK Valuation Report, Sections 6.3.2 – 6.3.5 (ECF 68-9).

[126] 2017 SRK Valuation Report, Section VIII.B. (ECF 26-6).

[127] 2019 SRK Valuation Report, Section III (ECF 69-1).

Comparable Transactions Analysis (a Market Approach) carried out for the Kalukundi property for valuation dates in 2008, 2017, and 2019. The 2017 and 2019 valuations relied on a 2008 valuation by Venmyn Rand (Pty) Ltd., which is also reviewed herein.[128]

185. In its 2017 and 2019 reports, SRK also includes a "comparable transactions" analysis to value the Kalukundi mining rights as of the date of sentencing. In 2008, SRK correctly explained the criteria for a "comparable transactions" analysis as follows: "*For a transaction to be considered comparable it should be similar to the asset being valued in terms of location, timing and commodity, and the transaction can be regarded as of 'arm's length'*".[129] SRK's 2017 "comparable transactions" analysis, as well as its 2019 update, does not follow those criteria, it is flawed, and should be disregarded for several reasons: (i) it includes transactions for mines at significantly more advanced stages of development than Kalukundi, including some mines already in operation with established cash flows; (ii) it considers transactions completed within an overly broad time span; (iii) it includes valuations, that do not reflect market transactions; and (iv) none of the market transactions considered are recent enough to include the negative effect of the 2018 DRC Mining Code, thus overstating SRK's results. SRK itself acknowledges that the chosen transactions are only "*broadly similar to the Kalukundi project, in that they all relate to copper/copper-cobalt deposits in the DRC*",[130] but broadly similar is not sufficient. The Government does not present a comparable transactions analysis of its own.[131] The comparable transactions analysis put forth by SRK is not reliable.

### 9.2.1. 2008 SRK Valuation

186. SRK completed separate valuations of the Kalukundi and Mashitu properties on behalf of Africo. SRK audited the 2006 Kalukundi resource estimate and found it to be flawed. SRK generated a modified resource estimate which it used in its 2008 valuation.

- SRK identified 20 comparable transactions in four development categories from the Metals Economics Group (MEG) database (Reserve Development, Feasibility, Pre-Production and Production). To its credit, SRK did not use the six transactions on

[128] 2008 Venmyn Report, p. 5-7 (ECF 68-8).

[129] 2008 SRK Valuation Report, Section 6.1 at p. 49 (ECF 68-9).

[130] 2017 SRK Valuation Report, Para. 71 (ECF 26-6).

[131] Government Brief, November 22, 2019 (ECF 68).

Production properties that it identified in its analysis in 2008 (unlike SRK did in 2017 and 2019).

- Because it could not find sufficient information for all of the remaining 14 comparables, SRK was only able to derive US$/lb CuEq values for 10 of the comparables ranging from U$0.00 to US$0.15/lb.
- Of the 10 comparables analyzed by SRK, we are of the opinion that many are not acceptable based on many of the same reasons that SRK's 2017 comparables are not acceptable.

187. Based on the analysis of the comparable transactions, SRK in 2008 derived a range of values from US$19.2M to US$237.3M with an average of US$118M.

- This is a very wide range and reflects the uncertainty in the valuation
- SRK did not eliminate any comparables as outliers which probably contributed to the wide range in values.

188. In its 2017 valuation, SRK downplayed its 2008 valuation because it was based on a 30% smaller resource and the valuation used more conservative long range metal prices.

### 9.2.2. 2017 SRK Valuation

189. SRK completed a valuation as of 2017, based on a 2013 resource estimate by AMEC. SRK compiled a set of 13 transactions on Cu and Cu-Co properties over the period 2007 to 2017 in order to derive a US¢/lb CuEq value to apply to the contained metal in the Kalukundi resources. SRK derived values for each transaction ranging from US¢26.79/lb to US¢1.56/lb. All 13 comparables are located in the DRC and would have similar country risk, geology/mineralization, and general infrastructure.

190. We have identified several major concerns with the SRK 2017 analysis indicating that SRK's Comparable Transactions Analysis is flawed, namely: i) the use of transactions involving producing properties to value a non-producing property; ii) the use of transactions which are too old (more than 5 years earlier); iii) the use of asset valuations rather than actual transactions; and iv) the use of corporate entity transactions rather than asset transactions.

**TABLE 9 RPA ISSUES WITH SRK COMPARABLE TRANSACTIONS**

| | Producer or Construction | Transaction > 5 Years Prior to 2019 | Valuation | Corporate Transaction |
|---|---|---|---|---|
| Tenke Fungurume | X | X | | |
| Nikanor | | X | | X |
| Mashitu Valuation | | X | X | |
| Kinsevere Valuation | X | X | X | |
| Kamoa | | | | |
| Metorex | X | X | | X |
| Anvil (Kinsevere) | X | X | | X |
| Frontier | X | X | | |
| Mutanda (40%) | X | X | | |
| Mutanda (14.5%) | X | X | | |
| Tenke Fungurume (56%) | X | | | |
| Tenke Fungurume (24%) | X | | | |
| Mutanda (31%) | X | | | |

191. Two of the transactions in Table 9 (Kinsevere Valuation and Mashitu Valuation) are not transactions at all, but valuations and should not have been included in the transactions analysis. Of the remaining eleven transactions, as of their transaction date, eight were producers, one (Tenge Fungarume) was under construction, and two were non-producing properties (termed Developers by SRK). In our experience, producing properties transact at higher unit metal prices than non-producing properties, and the two groups should not be mixed for comparative valuation purposes.

192. Table 9 also shows that nine of the transactions and valuations have dates greater than five years prior to the November 2019 valuation date.[132] In our experience, market values change over time and comparable transactions should be within a reasonable time period prior to the valuation date. Only one of the non-producing property transactions (Kamoa) is within five years of the November 2019 valuation date.

193. The points discussed above about producer versus non producer property values and valuation date are illustrated in Figure 6, which is a plot of US¢/lb CuEq for the SRK transactions from 2007 to 2017, not including the two valuations. It can be seen that the Producers have significantly higher ¢/lb values than the Developers, and that the ¢/lb values for both Developers and Producers have decreased significantly from 2007 to 2017.

[132] 2017 SRK Valuation Report, Figure 17 at p. 30 (ECF 26-6).

**FIGURE 6 SRK TRANSACTION VALUES VS TRANSACTION DATE**




194. Based on the above review, we consider the only acceptable SRK transaction is the 2015 acquisition of the Kamoa asset by Zijin. SRK calculated a US¢/lb CuEq value of 1.56, however, it considers this transaction as an outlier for part of its analysis.

### 9.2.3. 2019 SRK Valuation

195. In November 2019 SRK prepared an Addendum to its 2017 valuation (2019 SRK Valuation Report) to reflect market changes in the intervening two-year period:

- SRK used the same set of comparable transactions as for the 2017 valuation;
- The only changes involved changes in metal prices; and
- The value of Africo's 75% interest in Kalukundi decreased from a range of US$518 million to US$710 million in 2017 to a range of US$407 million to US$562 million in 2019.

196. In both the 2017 and 2019 SRK valuations, the Market Approach value was weighted with the Income Approach (DCF) value to derive a range of values for the Kalukundi property.

197. SRK assigns a terminal value to those resources that are not included in the mine plan. The resources that are not part of the mine are generally those that are below the 150 m level. As shown in Table 10.5.4_1 of the 2006 MDM FS, these resources would have recoveries of approximately 0 to 5% rendering them completely uneconomic. Ascribing

value to those resources which would not have any economic value results in an additional US$21 million per the SRK valuation.

#### 9.2.4. 2008 Venmyn Valuation

198. As part of its 2017 valuation, SRK reviewed a 2008 Market Approach valuation report by Venmyn on the Mashitu deposit which is located immediately adjacent to the Kalukundi property. Venmyn determined the value of in-situ Cu-Co mineral resources based on a 2006 resource estimate. SRK used the US¢/lb CuEq values derived in the 2008 Venmyn report to apply to the Indicated and Inferred Mineral Resources of the Kalukundi property in its 2017 and 2019 Comparable Transactions Analysis:

- The metal prices used by Venmyn in its analysis and report are unknown
- Venmyn identified factors that could cast doubt as to the reliability of the Mineral Resource estimates carried out by SRK including: questions regarding the QA/QC reports for the Mashitu drilling, sampling errors based on a failure to correctly identify mineralization, low spatial continuity and a high variability in the data, assumptions with respect to the calculations of volume, specific gravity and grade, and the method used to calculate specific gravity.
- In the 2008 SRK Valuation Report, SRK also disputed the 2006 estimate and was of the opinion that it overstated the Mashitu resources.

199. Venmyn developed a copper-cobalt valuation curve based on two transactions and three valuations from which it derived a value for Mashitu.

200. We consider all five of Venmyn's comparatives to be unacceptable based on many of the same reasons that SRK's 2017 comparables are unacceptable, including: three are more advanced than Kalukundi (two were in production and one was under construction), three are based on valuations rather than actual transactions, and one is from Peru which brings into question the selectivity of the comparatives, let alone the comparability based on country risk, geology, infrastructure, and other factors.

## 10. ACKNOWLEDGEMENT OF EXPERT'S DUTY

201. We certify that we are aware of our duty as expert witnesses to assist the tribunal and not to be an advocate for any party. We have made this report in conformity with that duty, and, if called on to give oral or written testimony, we will give testimony in conformity with our duty as expert witnesses.

March 6, 2020

GRAHAM G. CLOW, P.ENG.

RICHARD J. LAMBERT, MBA, P.E., P.ENG.

## 11. ANNEX 1 – REFERENCES


RPA-001 MDM Engineering, 2006, Kalukundi Feasibility Study.

RPA-002 2020 RPA Adjusted Model.

RPA-003 Schuh, W., et al., 2012, Geology of the Tenke-Fungurume Sediment-Hosted Strata-Bound Copper-Cobalt District, Kataga, Democratic Republic of Congo, Chapter 12, Economic Geology Special Publication 16, Society of Economic Geologists, Inc., p. 269-301.

RPA-004 Rubicon Minerals Corp. Form 51-102F3 Material Change Report, May 23, 2006.

RPA-005 CIMVal 2003, Standards and Guidelines for Valuation of Mineral Properties.

RPA-006 Consensus Economics Metal Prices, February 2020.

RPA-007 Roscoe, William E., 2003, Valuation of Non-Producing Mineral Properties, Journal of Business Valuation, 2003.

RPA-008 Roscoe, William E., 2007, Valuation Mineral Properties Using Market Comparables, 2007, Journal of Business Valuation, 2007).

RPA-009 CIM Standing Committee on Reserve Definitions, CIM Definition Standards - For Mineral Resources and Mineral Reserves.

RPA-010 National Instrument 43-101 Standards of Disclosure for Mineral Projects, June 24, 2011.

RPA-011 AACE International, 2012, AACE International Recommend Practice No. 47R-11, Cost Estimate Classification System – As Applied in the Mining and Mineral Processing Industries, TCM Framework: 7.3 – Cost Estimating and Budgeting (July 6, 2012).

RPA-012 AusIMM, 2012, Cost Estimation Handbook, 2nd Edition, Monograph 27, Chapter 4 Capital Cost Estimation.

## 12. ANNEX 2 - QUALIFICATIONS OF EXPERTS AND RPA

### GRAHAM G. CLOW, P.ENG.

202. My name is Graham George Clow. I live at 55 Harbour Square, Suite 2413, in the City of Toronto, in the Province of Ontario.

203. I am a mining engineer by training, with degrees in Mining Engineering (1974) and Geological Engineering (1972), both from Queen's University.

204. I am licensed as a Professional Engineer (P.Eng.) in Ontario and designated as a Consulting Engineer in Ontario. I am a Qualified Person as defined in Canadian Securities Administrators (CSA) National Instrument 43-101, entitled Standards of Disclosure for Mineral Projects, a policy which sets out the disclosure standards for public mining companies across Canada. A detailed version of my relevant experience and credentials is found in my curriculum vitae attached as Annex 3.

205. I am Strategy Director, Global Mining Advisory for SLR. Prior to SLR acquisition, I was Principal Mining Engineer and Chairman of the Board of RPA, responsible for all aspects of the company's worldwide mining practice (which is described in more detail below) and overseeing the work of 70 technical professionals. In my consulting work, I advise clients on all matters related to mining, including Mineral Resources and Mineral Reserves, mine planning, processing, environmental matters, management, capital and operating costs, markets, project economics, and regulatory matters. As part of my work, I keep up-to-date on key standards and practices in the mining industry worldwide. A large part of RPA's work is preparing technical reports to NI 43-101 standards.

206. I have forty-five years of experience in the mining industry, including twelve years in operations up to the level of Senior Vice President, thirteen years in project acquisition, development, and construction to the level of Chief Executive Officer, and twenty years as a consultant. The core of my consulting work has been leading teams providing strategic advice and carrying out due diligence for mergers, acquisitions, and financings (both debt and equity) for mining companies and financial institutions. Over the span of my experience, I have worked on projects involving most types of metals and in most mining areas of the world.

207. I have direct experience in the assessment, development, construction, and operation of mining projects in Africa, Australia, the Americas, and Europe.

208. From 2006 to 2008, I was Adjunct Professor at the Lassonde Institute of Mineral Engineering at the University of Toronto, lecturing in Mineral Reserve Estimation.

209. I am a member of the Canadian Institute of Mining, Metallurgy, and Petroleum (CIM) and the former Chairman of CIM's Metal Mining Division and former member of the Committee on Ore Reserve Definitions. I was formerly the Chairman of the Committee on Production Cost Reporting Standards, which is a joint effort of CIM and the Canadian Securities Administrators.

210. I have been designated a Fellow of CIM in recognition of contributions to the mining industry and a recipient of the Metal Mining Award for contributions to CIM and recipient of Vale Medal for Meritorious Contributions to Mining.

**RICHARD J. LAMBERT, MBA, P.E., P.ENG.**

211. My name is Richard J. Lambert. I live at 1 Hurontario St., in the City of Mississauga, in the Province of Ontario, Canada.

212. I hold a Bachelor of Science degree in Mining Engineering from the Mackay School of Mines, University of Nevada, Reno (1980) and a Master of Business Administration degree from Boise State University (1995). I was an Adjunct Professor at the University of Toronto, Lassonde Institute of Mineral Engineering, where I taught the MIN 401 course on Mineral Reserve and Mineral Resource Estimation along with Dr. William E. Roscoe from 2008 to 2011.

213. I am a Registered Professional Engineer in Wyoming (No. 4857), Idaho (No. 6069), and Montana, United States (No. 11475) and a licensed Professional Engineer in the Province of Ontario, Canada (No. 100139998).

214. I am Technical Director, US Mining Advisory for SLR. Prior to SLR acquisition, I was Executive Vice President, Chief Operating Officer, and Principal Mining Engineer at RPA, a professional mining consultancy specializing in providing independent opinions to mining companies, financial institutions, governments and investors on mineral resources and ore reserves, technical aspects and economics of mining projects, valuation of mining and exploration properties, and feasibility studies. A large part of RPA's work is preparing technical reports to NI 43-101 standards.

215. Prior to joining RPA, I worked at other leading consulting and mining firms, including as Vice President of Pincock, Allen & Holt, a mining consulting and engineering firm; General Manager for Washington Group International, a firm providing integrated mine engineering, construction, operation, and management services; Chief Engineer for Phelps Dodge; and Technical Superintendent for NERCO DeLamar, both major mining companies and Fortune 500 companies at the time.

216. From 2002 to 2006, I served on the Board of Directors of the Society for Mining, Metallurgy and Exploration (SME), an international society of professionals in the mining industry with more than 12,000 members in nearly 100 countries. I have been a member of the SME since 1975 and a Registered Member (No. 1825610) since May 2006.

217. I have over 40 years of experience in mine management, mine engineering, mine operations and mine financial analyses, involving copper, gold, silver, nickel, cobalt, uranium, oil shale, phosphates, coal, and base metals located in the North America, Australia, South America, Europe and Asia.

218. I have experience in large truck/shovel open-pit operations. I also worked for two major copper producers (Kennecott and Phelps Dodge) at mine operations and developing feasibility studies for ongoing operations, acquisitions, and exploration properties.

219. I worked for Kennecott at the Bingham Canyon Mine and was Mine Planning Engineer and Ore Control Engineer. I worked for Phelps Dodge for four years as Chief Engineer and was a member of the PD Mine Steering Committee. While at Phelps Dodge, my copper project experience included Morenci, Chino, Tyrone, Tintaya, and Lumwana. While at the Washington Group, I worked on other copper projects including Montana Resources, Equatorial Tonopah, Mount Polley, and Quellaveco.

220. After joining PAH and RPA, I worked on the Salobo and Sossego mines in Brazil; Constancia in Peru, Caserones, Candelaria, Esperanza, Antucoya, Chuquicamata, Andina, Mantoverde, Mantos Blancos, and Quebrada Blanca mines in Chile, Northparkes, Peak and Cobar mines in Australia, RTB Bor mine in Serbia; and Safford mine in Arizona.

221. I am a member of the SME Resource Reserve Committee that recently developed the SK1300 disclosure rules for US reporting issuers, in conjunction with the SEC.

## RPA

223. RPA is a group of technical professionals who have provided advice to the mining industry for over 35 years. During this time, RPA has grown into a highly respected organization regarded as *the specialty firm of choice for resource and reserve work*. RPA provides services to the mining industry at all stages of project development from exploration and resource evaluation through scoping, prefeasibility and feasibility studies, financing, permitting, construction, operation, closure and rehabilitation. Our portfolio of clients includes banking (both debt and equity), institutional investors, government, major mining companies, exploration and development firms, law firms, individual investors, and private equity ventures.

224. As of September 2019, RPA became a part of SLR, a global leader in environmental, permitting, and social/stakeholder engagement services through its network of 77 offices and over 1,200 personnel in Europe, North America, Asia Pacific, and Africa.

225. SLR and RPA have collaborated on client projects for several years and together we will now be able to offer our clients an enhanced and more complete consulting service extending from value creation and generation from resource evaluation through scoping, prefeasibility and feasibility studies, financing, permitting, environmental and social aspects, construction, operation, closure and rehabilitation including risk and liability management.

226. RPA offices are located in Canada, the United States, and the United Kingdom. Our professionals work globally, visiting mines and projects on six continents. Our home office is located in Toronto, Ontario.

227. Our mission is to apply our broad and deep experience to provide objective, independent advice. Our vision is to enable mining industry operators and investors to make the right decisions for business success. Clients return to RPA repeatedly because of the accurate, credible technical reports and advice we deliver, reports that are accepted and relied on time and time again, among financial institutions and major regulatory bodies worldwide.

228. RPA capabilities include:

- Mineral Resource and Mineral Reserve estimates and audits, compliant with all worldwide reporting codes
- Mine design and optimization
- Metallurgical assessment and process review
- Estimation of project capital and operating costs

- Preliminary economic assessments, scoping, prefeasibility, and feasibility studies
- Valuation of mineral properties
- M&A due diligence reviews of mining and exploration projects
- Lender advisory services
- Project financial modeling and analysis
- Expert witness services
- Design and management of exploration programs
- Reporting for public disclosure, including NI43-101 Technical Reports, Competent Persons Reports, and Mineral Expert Reports
- QA/QC audits and reporting
- Operations benchmarking, optimization programs and troubleshooting
- Strategic planning and advice for boards and senior management

# 13. ANNEX 3 - CURRICULA VITAE OF EXPERTS



## Curriculum Vitae

# Graham G. Clow

B.Sc., P.Eng.

Now part of SLR

## Details

**Position**
Strategy Director,
Global Mining Advisory

**Discipline**
Mining Engineering
Geological Engineering

**Languages**
English

**Qualifications**
- B.Sc. Geology, Queens University, 1972
- B.Sc. Mining Engineering, Queens University, 1974
- Professional Engineers of Ontario
- Designated Consulting Engineer, Ontario
- Association of Professional Engineers and Geoscientists of British Columbia
- Canadian Institute of Mining, Metallurgy, and Petroleum.

**Key Skills**
- M&A
- Due Diligence
- Mine Operation
- Mineral Reserves
- Feasibility Studies
- Finance
- Expert Witness
- Strategic Planning
- Troubleshooting

## Synopsis

Graham Clow is a senior mining executive with more than 45 years of experience in all aspects of acquisitions, exploration, feasibility, finance, development, construction, operations, and closure. In addition to providing strategy and direction for RPA, he manages RPA's due diligence and M&A work, bringing together experienced teams to assess and advise on projects worldwide. He leads RPA's expert practice, coordinating the work of technical professionals on numerous legal and arbitration cases in the mining industry. Mr. Clow has been recognized as a consulting expert in *Who's Who Legal: Mining 2019*.

Prior to joining RPA, Mr. Clow spent more than 20 years in senior executive and operating positions with publicly listed mining companies. This experience included financing, development, and management of open pit and underground mines, start-ups, feasibility studies, due diligence, and M&A.

His experience ranges from the high arctic to the tropics, in base and precious metals and industrial minerals. He has been responsible for mergers and acquisitions for public companies.

Graham Clow is Past Chairman of the Metal Mining Division of the Canadian Institute of Mining, Metallurgy, and Petroleum (CIM), and was a Member of the Committee on Ore Reserve Definitions. Mr. Clow is a Fellow of CIM and has been awarded the Metal Mining Award for contributions to the industry. In 2016 he was awarded the CIM Vale Medal for meritorious and practical contribution to the mining and metallurgical industry of Canada.

For several years, Mr. Clow was an Adjunct Professor at the Lassonde Institute for Mineral Engineering at the University of Toronto, lecturing on mineral reserve estimation.

## Selected Professional History

- M.D. responsibility for a group of 100 technical specialists providing high level consulting services worldwide.
- C.E.O. responsibility for listed mining and exploration companies in North and South America.
- Experience in:
  - Open pit and underground mines.
  - Base metals, precious metals, diamonds, and industrial minerals.
  - Operating mines in North America, Central America, South America, and North Africa.
  - High Arctic underground and open pit mines.
- Due diligence and project evaluation, financial modeling, merger and acquisition planning and implementation.
- Preparation and implementation of feasibility studies.
- Stock Exchange Listings/IPOs and financings – Canada, UK, and Hong Kong
- Construction management and operations startup.
- Negotiation with the highest levels of governments for project development approvals and concessions.
- Negotiation of cooperation and Impact and Benefit Agreements with First Nations and other indigenous peoples.
- Consulting, troubleshooting and problem solving.
- Concentrate marketing and shipping.
- Recruitment and staffing at all levels, including board of directors.
- Remote location management.
- Expert Witness for international arbitration and commercial disputes.
- Project Valuation.

RPA Now part of SLR

**Curriculum Vitae**
Graham G. Clow

## Selected Expert Witness Assignments

**Graphite Mine, Madagascar**
Expert Report on behalf of the Respondent in connection with a dispute filed under the London Court of International Arbitration pertaining to an option agreement on a graphite mine in Madagascar. RPA prepared a valuation of the mine in support of the Respondent, and a settlement of was reached prior to the hearing.

**Mine and Smelter, Bolivia**
Expert Report on the mining and processing operations of Bolivian assets (mine and smelter) for use in an arbitration.

**Gold Mine, Kazakhstan**
Expert Report on the Uzboy open pit heap leach gold mine in Kazakhstan for use in the arbitration of Alhambra Resources Ltd. and Alhambra Coöperatief U.A. v. The Republic of Kazakhstan.

**Gold Mines, Kazakhstan**
Expert Report in relation to the assessment of three operating open pit heap leach or carbon-in-leach gold mines and valuation of other assets for use in an arbitration before the United Nations Commission on International Trade Law (UNCITRAL) in London, U.K.

**Silver Project, Peru**
Technical Review of the Santa Ana Silver Project, including a high-level technical review of the smaller Corani Silver Project, Peru, and a Response Report to the Government of Peru's critiques of the RPA Technical Review in connection with the dispute between Bear Creek Mining Corporation and the Government of Peru.

**Iron Ore Concentrator**
Expert Report to be used in connection with a legal action regarding the construction of a concentrator for an iron ore mine.

**Mining Claims, Ontario, Canada**
Expert Report on the impact, if any, of an easement on a company's ability to explore mining claims that are the subject of an easement application, for an Ontario Mining and Lands Commissioner hearing.

**Mining Operation Joint Venture**
Expert Witness for a legal dispute concerning a joint venture agreement for a North American open pit mining operation.

**Joint Venture Project, Mexico**
Expert Witness for a legal dispute concerning a joint venture agreement for a Mexican project.

**Mining Property, Venezuela**
Expert Witness for a legal dispute regarding the expropriation of a mining property by the government of Venezuela.

**Royalty Agreement**
Expert Witness for a legal dispute concerning a royalty agreement between two North American mining companies.

**Mining Property Joint Venture, Argentina**
Expert Witness for a legal dispute between two North American mining companies over interpretation of a joint venture agreement on a mining property in Argentina.

RPA
Now part of SLR

**Curriculum Vitae**
Graham G. Clow

**Selected Expert Witness Assignments** (continued)

**Mining Property, Bolivia**
Valuation support, Response Report and Expert Witness for a legal dispute regarding expropriation of a mining property by the government of Bolivia.

**Base Metals Smelter, Peru**
Valuation support for a creditor in the bankruptcy of a Peruvian base metals smelter.

**Nickel Smelter, Venezuela**
Expert Witness and valuation support for a legal dispute regarding the expropriation of a nickel smelter by the government of Venezuela.

**Base Metals Property, Peru**
Expert Witness and valuation support for a legal dispute regarding the expropriation of a base metals property by the government of Peru.

**Iron Ore Project, Mauritania**
Expert Report and Reply Report on the technical and cost aspects of an iron ore project in Mauritania for the Islamic Republic of Mauritania for use in an arbitration case before the International Centre for the Settlement of Investment Disputes.

**Silver Project, Bolivia**
Valuation Report on the Malku Khota Silver-Indium Project, Bolivia, and a Response Report to the Government of Bolivia's critiques of RPA's Valuation Report prepared in connection with the dispute between South American Silver Ltd. and the Government of Bolivia.

**Gold Project, Costa Rica**
Expert Report on the technical aspects of the Crucitas Gold Project, Costa Rica, with respect to the arbitration between Infinito Gold Ltd. and the Government of the Republic of Costa Rica.

**Nickel Laterite Project, Venezuela**
Expert Report on the technical and cost aspects of the Loma de Niquel nickel laterite project, Venezuela, in connection with the arbitration between Anglo American plc and Bolivarian Republic of Venezuela.

**Gold Properties, Kazakhstan**
Expert Report in two separate cases of international arbitration between two gold mining companies and the Republic of Kazakhstan.



## Curriculum Vitae

# Richard J. Lambert

B.S., M.B.A., P.E., P. Eng.

RPA Now part of SLR

## Details

**Position**
Technical Director,
US Mining Advisory

**Discipline**
Mining Engineering

**Languages**
English, Spanish (basic)

**Qualifications**
- M.B.A. Boise State University, 1995
- B.S. Mining Engineering, Mackay School of Mines, University of Nevada, 1980
- Registered Professional Engineer – Wyoming, Idaho, and Montana
- Professional Engineers Ontario
- Registered Member of Society of Mining, Metallurgy and Exploration (SME)
- Surface Mining Association for Research & Technology (SMART)
- Canadian Institute of Mining, Metallurgy & Petroleum (CIM)
- Denver Gold Group

**Key Skills**
- Expert Witness
- Due Diligence
- Technical Audits and Mine Review
- Feasibility and Pre-Feasibility Studies
- Cost-Estimation
- Mine Planning and Design
- Short and Long Range Production Planning

## Synopsis

Richard Lambert has over 40 years of domestic and international experience in mine operations and management, mine engineering, project evaluation and financial analysis.

He has been project manager and lead technical advisor for many mine financings, mergers, acquisitions, and privatizations. Mr. Lambert has also provided expert opinions and testimony for many legal and arbitration cases in the mining industry. Richard Lambert has been recognized as a consulting expert in *Who's Who Legal: Mining 2019*.

Mr. Lambert has extensive experience in mine cost estimating and is skilled in management from project start-up to production, maintenance, and mine planning. Mr. Lambert has been involved in coal, industrial mineral, base metal, and precious metal mining projects around the world.

He is Past Vice President of Finance, and a member of the Board of Directors for the Society for Mining, Metallurgy, and Exploration, Inc. (SME). He currently serves as member of the Finance Strategic Committee and Resources/ Reserves Committee.

## Selected Professional History

**Mine and Smelter, Bolivia**
Expert Report on the mining and processing operations of Bolivian assets (mine and smelter) for use in an arbitration.

**Iron Ore Project, Uruguay**
Expert Report in relation to an iron ore project in Uruguay that is the subject of an international arbitration proceeding.

**Uzboy Gold Mine, Kazakhstan**
Expert Report on the Uzboy open pit heap leach gold mine in Kazakhstan for use in the arbitration of Alhambra Resources Ltd. and Alhambra Coöperatief U.A. v. The Republic of Kazakhstan.

**Gold Mines, Kazakhstan**
Expert Report in relation to the assessment of three operating open pit heap leach or carbon-in-leach gold mines and valuation of other assets for use in an arbitration before the United Nations Commission on International Trade Law (UNCITRAL) in London, U.K.

**Gold Mine Venezuela**
Expert Witness Report in the international arbitration for Gold Reserve Inc. v. Bolivarian Republic of Venezuela, and prepared an updated mine plan report to provide support for a compensation claim by Gold Reserve Inc. ICSID Award in the amount of approximately US$746 million.

**Nickel Laterite Project, Venezuela**
Expert Report on the technical and cost aspects of the Loma de Niquel nickel laterite project, Venezuela, in connection with the arbitration between Anglo American plc and Bolivarian Republic of Venezuela.

## Selected Professional History (continued)

**Gold Project, Kyrgyz Republic**
Expert Witness Report in the international arbitration for Consolidated Exploration Holdings Ltd. and others v. Kyrgyz Republic. Claim for Jerooy Gold Project of US$500 million. Award rendered embodying the parties' settlement agreement.

**Silver Projects, Peru**
Expert Witness Report in the international arbitration for Bear Creek Mining Corporation v. Republic of Peru. Technical Review of the Santa Ana and Corani Silver Projects. Expert testimony together with respondent's expert.

**Gold Mine, Chile**
Expert Witness Report and deposition in the AISLIC v. Fluor case for an insurance claim at the Compania Minera Maricunga's Refugio Project (Claim settled prior to trial).

**Washington Group Latin America**
Expert Witness Report for the Washington Group Latin America, Inc. v. Minera San Xavier, S.A. de C.V. American Arbitration International Case (Claim settled prior to trial).

**Gold Mines, Kazakhstan**
Expert Witness Report in two separate cases of international arbitration between two gold mining companies and the Republic of Kazakhstan

**Eagle Gold Project, Yukon Territory, Canada**
Due diligence report to be used by potential lenders to assess the projects technical, social, environmental, and financial merits and viability, and to formulate an appropriate debt facility structure for BNP Paribas.

**Aurora Gold Project, Guyana**
Project Director for a due diligence review, construction monitoring and operational monitoring of the open pit and underground project as Independent Engineer for project lenders.

**Esperanza Copper-Gold Project, Chile**
Independent Engineer to Lenders Group in connection with a $1.05 billion limited recourse financing. Due diligence, construction monitoring and operational monitoring.

**Caserones Copper Project, Chile**
Due diligence, construction monitoring, and operational monitoring as Independent Engineer to Lenders Group.

**Constancia Copper-Molybdenum-Silver-Gold Project, Peru**
Due diligence, construction monitoring, and operational monitoring as Independent Engineer to Lenders Group.

**Antucoya Copper Project, Chile**
Due diligence review and construction monitoring as Independent Engineer to Lenders Group.

# 14. ANNEX 4 - INDUSTRY NORMS, CUSTOMS, USAGE, AND STANDARDS IN CONNECTION WITH THE DEVELOPMENT OF MINERAL PROJECTS

## 14.1. MINERAL RESOURCE AND MINERAL RESERVE REPORTING

229. This report uses certain basic terms and concepts, discussed below, that follow the Committee for Mineral Reserves International Reporting Standards (CRIRSCO).

230. The Canadian Institute of Mining, Metallurgy and Petroleum (CIM) Definition Standards on Mineral Resources and Mineral Reserves (CIM Definition Standards) establish definitions and guidelines for the reporting of exploration information, mineral resources, and mineral reserves in Canada. The Mineral Resource and Mineral Reserve definitions were incorporated, by reference, in National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* (NI 43-101), which became effective February 1, 2001. The following Mineral Resource and Mineral Reserve definitions are taken from 2014 CIM Definition Standards.[133]

231. Mineral Resources and Mineral Reserves are key concepts in mining. In general, Mineral Resources describe the amount of potentially profitable mineral within a mineral deposit, and Mineral Reserves describe the amount of material within a Mineral Resource that can be economically mined. These terms are defined in greater detail below.

232. A Mineral Resource is a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade, and quantity that there are reasonable prospects for eventual economic extraction. The location, quantity, grade or quality, continuity and other geological characteristics of a Mineral Resource are known, estimated, or interpreted from specific geological evidence and knowledge, including sampling. Mineral Resources are sub-divided, in order of decreasing geological confidence, into the categories of Measured, Indicated, and Inferred Resources.

233. A Measured Mineral Resource is that part of a Mineral Resource for which quantity, densities, shape, and physical characteristics are estimated with confidence sufficient to allow the application of Modifying Factors to support *detailed* mine planning and *final* evaluation of the economic viability of the deposit. Geological evidence is derived from detailed and reliable exploration, sampling and testing and is sufficient to confirm geological

[133] *CIM Definition Standards - For Mineral Resources and Mineral Reserves* ("2014 CIM Definition Standards"), Prepared by the CIM Standing Committee on Reserve Definitions, Adopted by CIM Council on May 10, 2014 (RPA-009).

and grade or quality continuity between points of observation. A Measured Mineral Resource is the basis for determining a Proven (or Probable) Mineral Reserve, as discussed below. Emphasis has been added to distinguish Measured Mineral Resources from Indicated Mineral Resources.

234. An Indicated Mineral Resource is that part of a Mineral Resource for which quantity, densities, shape, and physical characteristics are estimated with sufficient confidence to allow the application of Modifying Factors in sufficient detail to support mine planning and evaluation of the economic viability of the deposit. Geological evidence is derived from adequately detailed and reliable exploration, sampling and testing and is sufficient to assume geological and grade or quality continuity between points of observation. An Indicated Mineral Resource has a lower level of confidence than a Measured Mineral Resource and is the basis for determining a Probable Mineral Reserve, as discussed below.

235. An Inferred Mineral Resource is that part of a Mineral Resource for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling. Geological evidence is sufficient to imply but not verify geological and grade or quality continuity. It is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes. For that reason, an Inferred Mineral Resource must not serve as a basis to determine a Mineral Reserve. Nevertheless, the existence of an Inferred Mineral Resource demonstrates economic potential beyond Measured and Indicated Mineral Resources. It is reasonably expected that the majority of Inferred Mineral Resources could be upgraded to Indicated Mineral Resources with continued exploration.

236. A Mineral Reserve is the economically mineable part of a Measured and/or Indicated Mineral Resource. It includes diluting materials and allowances for losses, which may occur when the material is mined or extracted and is defined by Pre-Feasibility or Feasibility level as appropriate that include application of Modifying Factors. Such studies demonstrate that, at the time of reporting, extraction could reasonably be justified. Mineral Reserves are sub-divided in order of decreasing confidence into Proven Mineral Reserves and Probable Mineral Reserves. A mineral reserve is determined by applying a well-supported set of technical, economic, and other Modifying Factors (defined to include mining, metallurgical, economic, marketing, legal, environmental, social and governmental considerations) to Measured and Indicated Mineral Resources to determine whether at the

time of reporting extraction could reasonably be justified. Inferred Mineral Resources cannot serve as the basis for Mineral Reserves.

237. A Proven Mineral Reserve is the economically mineable part of a Measured Mineral Resource. A Proven Mineral Reserve implies a high degree of confidence in the Modifying Factors. The term should be restricted to that part of the deposit where production planning is taking place and for which any variation in the estimate would not significantly affect the potential economic viability of the deposit.

238. A Probable Mineral Reserve is the economically mineable part of an Indicated, and in some circumstances, a Measured Mineral Resource. The confidence in the Modifying Factors applying to a Probable Mineral Reserve is lower than that applying to a Proven Mineral Reserve.

239. A Qualified Person (QP) is defined in NI 43-101[134] as an individual who:

(a) is an engineer or geoscientist with a university degree, or equivalent accreditation, in an area of geoscience, or engineering, relating to mineral exploration or mining;

(b) Has at least five years of experience in mineral exploration, mine development or operation, or mineral project assessment, or any combination of these that is relevant to his or her professional degree or area or practice;

(c) Has experience relevant to the subject matter of the mineral project and the technical report;

(d) Is in good standing with a professional association; and

(e) In the case of a professional association in a foreign jurisdiction, has a membership designation that requires attainment of a position of responsibility in their profession that requires the exercise of independent judgement and requires: A. a favourable confidential peer evaluation of the individual's character, professional judgement, experience, and ethical fitness; or B. a recommendation for membership by at least two peers, and demonstrated prominence or expertise in the field of mineral exploration of mining.

## 14.2. STAGES OF MINERAL PROJECT DEVELOPMENT

240. Early stage exploration includes reconnaissance, prospecting and preliminary sampling, geological mapping, geochemistry, geophysics, and other work. All of these are designed

[134] National Instrument 43-101 Standards of Disclosure for Mineral Projects, June 24, 2011 (RPA-010).

to provide geological data and information in sufficient detail to allow the operator to assess the potential of the property for follow-up exploration work.

241. Preliminary drilling is carried out on a wide spacing to test deposit targets identified in the early stage exploration. Drilling involves the drilling (normally diamond drilling) of a hole to sometimes considerable depths to extract a continuous core sample of the rock. The sample is then analyzed to determine the mineral content. Results of this work are analyzed to determine whether more work is warranted to further assess the targets. An early Mineral Resource estimate might be made at this stage. A resource estimate is an estimate of the size (tonnes) and grade (content of potentially economic minerals) of a deposit.

242. Advanced exploration, generally in the form of additional diamond drilling, is carried out on defined targets to collect more detailed data. This will allow preparation of a Mineral Resource estimate or a more detailed refinement of the resource estimate made at the preliminary stage. Preliminary economics of a deposit may be evaluated at this stage to determine if further work is warranted. First stage metallurgical testing may be done to determine what process might be required to extract and refine the mineral to a saleable product. Environmental data gathering will begin in most cases in order to determine what will be required for government permitting.

243. A Scoping Study/Preliminary Economic Assessment (PEA) may be carried out as the first stage of economic analysis and to identify areas of work required to proceed to the next stages should the scoping study provide sufficient encouragement. Estimation bases vary, however, it is normal and customary practice in the industry that the accuracy of estimates at this stage would target +/-35% or higher. Normal and customary practice in the industry for field work required for this stage to be limited to diamond drilling and perhaps some geotechnical work to assess the stability of the rock in a mining situation. Preliminary metallurgical test work may also be undertaken.

244. Assuming positive results at the Scoping Study stage, a project may advance to a Pre-Feasibility Study (PFS) or a Feasibility Study (FS). These studies comprise all the components of the Scoping Study but will be estimated to a greater level of accuracy, in the range of +/-20% to +/-25% for a Pre-Feasibility Study to +/-10% to +/-15% for a Feasibility Study. These studies determine mineral reserves, which are the key asset of a mining project, being the amount of extractable metal or other commodity hosted in the deposit. At this stage, field work, including more detailed metallurgical and geotechnical

testing will likely be carried out, as would more diamond drilling and environmental work. Work would have commenced on an environmental impact study and project permitting will be underway. Socio-economic engagement with local communities would likely be well underway.

245. Throughout the advancement of the project in the studies, it would be normal and customary practice in the industry for a mining company to consider options for financing the project. If the company decides to proceed, the next stage is detailed engineering wherein design specifications and drawings are prepared to such level of detail that they can be used for construction.

246. The construction phase includes access infrastructure, initial site clearing and grading, and proceeds to the construction of mine facilities, process facilities, buildings, maintenance shops, offices, and utilities, among others. The construction phase usually starts while detailed engineering is still ongoing, with those elements for which detailed engineering has been completed being constructed first.

247. The operation phase of a mining project begins with the completion of construction, commencement of exploitation of the deposit, and the start-up of the processing plant. Mining and processing of the ore increases over a few months, typically with the goal of reaching the plant's design capacity within the first year of production. This process is generally referred to as the ramp-up period. When the processing plant reaches the design capacity, it is usually considered to be in full "commercial production". The mine then continues with mining and processing for the entire Life of Mine until mineral reserves that can be economically mined and processed are depleted.

248. Mine closure and reclamation is the last phase of the mining cycle and typically involves shutdown and decommissioning (the removal of equipment, the dismantling of facilities, and the safe closure of all mine workings) and reclamation (the restoration of a site after mining or exploration activity is completed which involves earth work and site restoration, including for example the revegetation of waste rock disposal areas) The goal of reclamation is to restore areas affected by mining to a self-sustaining ecosystem that provides a healthy environment for fish, wildlife, and humans. The final stage of closure is monitoring, which includes environmental testing and structural assessments that commonly continue long after the mine is closed.

### 14.3. FEASIBILITY STUDIES

249. It is normal and customary practice in the industry that a Feasibility Study is the key document relied upon by a mining company in making a decision regarding whether to proceed with the development of a project. It also forms the basis for decisions regarding financing of the development. It is normal and customary practice in the industry that a mining exploration property would go through a number of stages on a project prior to commencement of a Feasibility Study. Each of these stages involves work aimed at de-risking the project by gaining a better understanding and higher level of confidence in the physical parameters, cost assumptions, and revenue assumptions that will comprise the Life of Mine Plan and cash flow model generated at the Feasibility Study stage.

250. The objective of any level of study is to prepare a Life of Mine production plan and a cash flow model derived from that production plan. The key components of the plan are mineral reserves tonnes and grade, metallurgical parameters, capital costs, operating costs, and metal prices. The following list shows a summary of the items to be considered in a study. In Scoping or Pre-feasibility Studies, some of the items in the list can be omitted, however, a Feasibility Study would include all of these, estimated in considerable detail. The following outlines lists typical topics to cover in a Feasibility Study table of contents:

1. Introduction
2. Executive Summary
3. Project Description
4. Project Background and History
5. Property/Land Ownership
6. Geology
7. Resources and Ore Reserves
8. Mining
9. Hydrology
10. Metallurgy
11. Process
12. Infrastructure and Utilities
13. Tailing Storage Facilities
14. Environmental and Permitting Requirements
15. Sustainability and social Acceptance Programs
16. Health, Safety and Training
17. Security
18. Operations Plan
19. Transport and Logistics
20. Project Schedule and Execution Plan
21. Capital Cost Estimate
22. Operating Cost Estimate

23. Risk Assessment and Opportunities
24. Financial Analysis
25. Marketing
26. Appendices
    a. Value Engineering Trade-Off Studies
    b. Consultant and/or Owner Specialist Reports (e.g., geotechnical, pilot tests, underground ventilation)

### 14.3.1. Accuracy of Feasibility Studies

251. The American Association of Cost Engineers (AACE) has established industry standards for study accuracy.[135] A feasibility study is typically considered to be Class 3.

**TABLE 10 AACE ACCURACY OF STUDIES**

| ESTIMATE CLASS | MATURITY LEVEL OF PROJECT DEFINITION DELIVERABLES Expressed as % of complete definition | END USAGE Typical purpose of estimate | METHODOLOGY Typical estimating method | EXPECTED ACCURACY RANGE Typical variation in low(L), and high(H) ranges[a] |
|---|---|---|---|---|
| Class 5 | 0% to 2% | Conceptual planning | Capacity factored, parametric models, judgment, or analogy | L: -20% to -50%<br>H: +30% to +100% |
| Class 4 | 1% to 15% | Screening options | Equipment factored or parametric models | L: -15% to -30%<br>H: +20% to +50% |
| Class 3 | 10% to 40% | Funding authorization | Semi-detailed unit costs with assembly level line items | L: -10% to -20%<br>H: +10% to +30% |
| Class 2 | 30% to 75% | Project control | Detailed unit cost with forced detailed take-off | L: -5% to -15%<br>H: +5% to +20% |
| Class 1 | 65% to 100% | Fixed price bid check estimate | Detailed unit cost with detailed take-off | L: -3% to -10%<br>H: +3% to +15% |

Notes: [a] The state of technology, availability of applicable reference cost data and many other risks affect the range markedly. The +/- values represent typical percentage variation of actual costs from the cost estimate after application of contingency (typically at a 50% level of confidence) for given scope.

[135] AACE International, 2012, AACE International Recommend Practice No. 47R-11, Cost Estimate Classification System – As Applied in the Mining and Mineral Processing Industries, TCM Framework: 7.3 – Cost Estimating and Budgeting (July 6, 2012), Table 1 at p. 5 (RPA-011).

#### 14.3.2. Contingency

252. The AusIMM Cost Estimation Handbook 2nd Edition[136] covers best practices of mining projects. With regard to contingency use in studies, it recommends the following:

- "*All contingency calculations must be presented in detail in the estimate or study report. If the contingency calculation recommends a level of contingency lower than the minimum standard amounts set out in Section A4.1 of Table 4.5 then the study report should*:
  - *state that the recommended contingency is less than the minimum standard*
  - *demonstrate that the recommended contingency is adequate and why*".[137]

253. Specifically for Feasibility Studies, The AusIMM Cost Estimation Handbook 2nd Edition recommends:[138]

- *"Detailed – by trade and area 10 - 15% of total costs*
- *Add up to 5% for project in existing operation*
- *Add up to 5% for new or novel technology or underground projects"*

[136] AusIMM, 2012, Cost Estimation Handbook, 2nd Edition, Monograph 27 ("AusIMM Cost Estimation Handbook 2nd Edition"), Chapter 4 Capital Cost Estimation, p. 48 (RPA-012).

[137] *Ibid.,* p. 48.

[138] *Ibid.,* Section A4.1 of Table 4.5 at p. 51.

# Exhibit RPA-001

(complete document available upon request)

# Section 1
# Executive Summary



# Exhibit RPA-002

Kalukundi Undeveloped Case March 2020 - February 2020 Consensus Prices

**RPA - Cash Flo**

**Cahill LLP - Kalukundi Unde**

| Date: | INPUTS | UNITS | SRK Totals | TOTAL | Year -3 | Year -2 | Year -1 | Year 1 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2021 | 2022 | 2023 | 2024 | 2025 |
| **MINING** | | | | | | | | | |
| **Open Pit** | | | | | | | | | |
| Operating Days | 350 | days | | 5,250 | | | | 350 | 3 |
| Tonnes milled per day | | tonnes / day | | 3,095 | | | | 3,571 | 3,5 |
| Tonnes moved per day | | tonnes / day | | 26,419 | | | | 24,265 | 24,2 |
| Production | 1,250 | '000 tonnes | 16,856 | 16,250 | | | | 1,250 | 1,2 |
| Copper | 0.98 | % | 2.79 | 2.73 | | | | 1.56 | 2. |
| Cobalt | 0.98 | % | 0.74 | 0.73 | | | | 0.74 | 0. |
| Waste | 1.69 | '000 tonnes | 73,917 | 122,450 | | | | 7,243 | 7,2 |
| Total Moved | | '000 tonnes | 90,773 | 138,700 | | | | 8,493 | 8,4 |
| Stripping Ratio | | | | 7.54 | | | | 5.79 | 5. |
| **PROCESSING** | | | | | | | | | |
| **Mill Feed** | | '000 tonnes | 16,856 | 16,250 | | | | 1,250 | 1,2 |
| Copper | | % | 2.79 | 2.73 | | | | 1.56 | 2. |
| Cobalt | | % | 0.74 | 0.73 | | | | 0.74 | 0. |
| Contained Cu | | tonnes | | 444,099 | | | | 19,441 | 31,8 |
| Contained Co | | tonnes | | 119,401 | | | | 9,261 | 11,5 |
| | | klb | 1,038,289 | 979,071 | | | | 42,860 | 70,2 |
| | | klb | 276,046 | 263,234 | | | | 20,417 | 25,3 |
| **Recovery** | | | | | | | | | |
| Cu | | % | 90% | 62% | | | | 92% | 9 |
| Co | | % | 70% | 49% | | | | 77% | 7 |
| **Production** | | | | | | | | | |
| Recovered Cu | | tonnes | | 267,216 | | | | 17,952 | 28,9 |
| | | klb | 934,460 | 589,112 | | | | 39,578 | 63,8 |
| Recovered Co | | tonnes | | 58,348 | | | | 7,102 | 8,5 |
| | | klb | 193,232 | 128,635 | | | | 15,658 | 18,7 |
| **REVENUE** | | | | | | | | | |
| Metal Prices | | | | | | | | | |
| Cu | | US$/lb | $ 2.84 | $ 2.85 | | | | $ 2.85 | $ 2. |
| Co | | US$/lb | $ 20.57 | $ 20.72 | | | | $ 20.72 | $ 20. |
| Gross Revenue | | | | | | | | | |
| Cu | | $ '000 | $ 2,653,942 | 1,678,824 | | | | 112,789 | 182,0 |
| Co | | $ '000 | $ 3,973,974 | 2,665,875 | | | | 324,492 | 388,9 |
| **Total Gross Revenue** | | **$ '000** | **$ 6,627,916** | **4,344,699** | | | | **437,281** | **571,0** |
| Transport | | | | | | | | | |
| Cu | $521.21/t | $ '000 | $ 220,924 | 139,275 | | | | 9,357 | 15,1 |
| Co | $654.98/t | $ '000 | $ 57,409 | 38,217 | | | | 4,652 | 5,5 |
| Marketing | | | | | | | | | |
| Cu & Co | 2% of Gross | $ '000 | $ 132,558 | $86,894 | | | | $8,746 | $11,4 |
| **Total Charges** | | $ '000 | **$ 410,891** | **$264,386** | | | | **$22,754** | **$32,1** |
| Gecamines Gross Revenue Royalty | 2.50% | $ '000 | $ 165,698 | $108,617 | | | | $10,932 | $14,2 |
| Gov't NSR Royalty | 7.00% | $ '000 | $ 467,006 | $274,977 | | | | $27,946 | $36,3 |
| RMS NSR Royalty | 0.50% | $ '000 | $ 21,255 | $19,641 | | | | $1,996 | $2,5 |
| Export taxes (% of Gross Revenue) | 1.00% | $ '000 | $ 66,279 | $43,447 | | | | $4,373 | $5,7 |
| **Total Royalties** | | **$ '000** | **$ 720,239** | **$446,683** | | | | **$45,246** | **$58,9** |
| **Net Revenue** | | $ '000 | **$ 5,496,786** | **$3,633,630** | | | | **$369,280** | **$479,9** |
| **Unit NSR** | | **US$/ t ore** | | **$224** | | | | **$295** | **$3** |
| **OPERATING COST** | | | | | | | | | |
| Mining | $ 3.50 | US$/ t Mined | 2.91 | $3.50 | | | | $3.50 | $3 |
| | | US$/t Processed | 15.65 | $29.87 | | | | $23.78 | $23 |
| Processing | $80.00/t milled | $ '000 | 78.32 | $80.00 | | | | $80.00 | $80 |
| G&A | $14.00/t milled | $ '000 | 12.84 | $14.00 | | | | $14.00 | $14 |
| **Total Unit Operating Cost** | | $ '000 | **106.80** | **$123.87** | | | | **$117.78** | **$117** |
| Mining | | $ '000 | $ 263,722 | $485,450 | | | | $29,725 | $29,7 |
| Processing | | $ '000 | $ 1,320,176 | $1,300,000 | | | | $100,000 | $100,0 |
| G&A | | $ '000 | $ 216,364 | $227,500 | | | | $17,500 | $17,5 |
| **Total Operating Cost** | | **$ '000** | **$ 1,800,262** | **$2,012,950** | | | | **$147,225** | **$147,2** |
| Annual Concession Fee | $ 14 | $ '000 | $ 210 | $182 | | | | $14 | $ |
| Corporate Cost | | $ '000 | $ 12,560 | $12,560 | | $272 | $2,881 | $4,241 | $3,3 |
| **Total Other Costs** | | **$ '000** | $ 12,770 | $12,742 | | $272 | $2,881 | $4,255 | $3,3 |
| Operating Cashflow | | **$ '000** | $ 3,683,754 | $1,607,937 | | ($272) | ($2,881) | $217,800 | $329,4 |
| **CAPITAL COST** | | | | | | | | | |
| **Initial Capital Cost** | | **$ '000** | **$ 346,027** | **$633,029** | | **$316,514** | **$316,514** | **$0** | |
| Sustaining | 2.5% | $ '000 | $ 129,760 | $183,083 | | $0 | $0 | $15,826 | $15,8 |
| Rehabilitation Allowance | 0.5% | $ '000 | $ 0 | $0 | | $0 | $0 | $2,463 | $3,2 |
| Working Capital | 20% | $ '000 | $ 0 | $0 | | $0 | $0 | $29,445 | |
| Reclamation | | $ '000 | $ 24,472 | $24,472 | | $0 | $0 | $0 | |
| **Total Capital Cost** | | **$ '000** | **$ 500,260** | **$840,584** | | **$316,514** | **$316,514** | **$47,734** | **$19,0** |
| **CASH FLOW** | | | | | | | | | |
| | | | | | | 1 | 2 | 3 | |
| **Pre- Tax Cash flow** | | | $ 3,183,494 | $767,353 | | ($316,787) | ($319,395) | $170,067 | $310,3 |
| Cumulative | | | | | | ($316,787) | ($636,182) | ($466,115) | ($155,7 |

**Kalukundi Undeveloped Case March 2020 - October 21, 2019 Spot Prices**

**RPA - Cash Flow**

**Cahill LLP - Kalukundi Undevelo**

| Date: | INPUTS | UNITS | SRK Totals | TOTAL | Year -3 2021 | Year -2 2022 | Year -1 2023 | Year 1 2024 | Year 2 2025 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MINING** | | | | | | | | | | |
| **Open Pit** | | | | | | | | | | |
| Operating Days | 350 | days | | 4,550 | | | | 350 | 350 | |
| Tonnes milled per day | | tonnes / day | | 3,064 | | | | 3,571 | 3,571 | |
| Tonnes moved per day | | tonnes / day | | 25,293 | | | | 25,675 | 25,675 | |
| Production | 1,250 | '000 tonnes | 13,943 | 13,943 | | | | 1,250 | 1,250 | |
| Copper | 0.98 | % | 3.05 | 2.99 | | | | 2.07 | 2.77 | |
| Cobalt | 0.98 | % | 0.81 | 0.79 | | | | 0.83 | 0.81 | |
| Waste | 1.69 | '000 tonnes | 59,826 | 101,140 | | | | 7,736 | 7,736 | |
| Total Moved | | '000 tonnes | 73,770 | 115,083 | | | | 8,986 | 8,986 | |
| Stripping Ratio | | | | 7.25 | | | | 6.19 | 6.19 | |
| **PROCESSING** | | | | | | | | | | |
| **Mill Feed** | | '000 tonnes | 13,943 | 13,943 | | | | 1,250 | 1,250 | |
| Copper | | % | 3.05 | 2.99 | | | | 2.07 | 2.77 | |
| Cobalt | | % | 0.81 | 0.79 | | | | 0.83 | 0.81 | |
| Contained Cu | | tonnes | | 417,084 | | | | 25,937 | 34,671 | |
| Contained Co | | tonnes | | 110,711 | | | | 10,335 | 10,129 | |
| | | klb | 938,270 | 919,514 | | | | 57,181 | 76,437 | |
| | | klb | 249,054 | 244,075 | | | | 22,785 | 22,330 | |
| **Recovery** | | | | | | | | | | |
| Cu | | % | 90% | 69% | | | | 92% | 91% | |
| Co | | % | 70% | 56% | | | | 77% | 74% | |
| **Production** | | | | | | | | | | |
| Recovered Cu | | tonnes | | 284,446 | | | | 23,951 | 31,551 | |
| | | klb | 844,443 | 627,097 | | | | 52,804 | 69,558 | |
| Recovered Co | | tonnes | | 61,425 | | | | 7,926 | 7,495 | |
| | | klb | 174,338 | 135,418 | | | | 17,474 | 16,524 | |
| **REVENUE** | | | | | | | | | | |
| Metal Prices | | | | | | | | | | |
| Cu | | US$/lb | $ 2.54 | $ 2.54 | | | | $ 2.54 | $ 2.54 | $ |
| Co | | US$/lb | $ 16.10 | $ 16.10 | | | | $ 16.10 | $ 16.10 | $ |
| Gross Revenue | | | | | | | | | | |
| Cu | | $ '000 | $ 2,144,881 | 1,592,827 | | | | 134,122 | 176,677 | |
| Co | | $ '000 | $ 2,807,628 | 2,180,236 | | | | 281,328 | 266,040 | |
| **Total Gross Revenue** | | **$ '000** | **$ 4,952,509** | **3,773,063** | | | | **415,450** | **442,717** | |
| Transport | | | | | | | | | | |
| Cu | $521.21/t | $ '000 | $ 199,642 | 148,256 | | | | 12,484 | 16,445 | |
| Co | $654.98/t | $ '000 | $ 51,796 | 40,232 | | | | 5,191 | 4,909 | |
| Marketing | | | | | | | | | | |
| Cu & Co | 2% of Gross | $ '000 | $ 99,050 | $75,461 | | | | $8,309 | $8,854 | |
| **Total Charges** | | $ '000 | **$ 350,488** | **$263,949** | | | | **$25,984** | **$30,208** | |
| Gecamines Gross Revenue Royalty | 2.50% | $ '000 | $ 123,813 | $94,327 | | | | $10,386 | $11,068 | |
| Gov't NSR Royalty | 7.00% | $ '000 | $ 336,550 | $236,394 | | | | $26,245 | $27,791 | |
| RMS NSR Royalty | 0.50% | $ '000 | $ 14,964 | $16,885 | | | | $1,875 | $1,985 | |
| Export taxes (% of Gross Revenue) | 1.00% | $ '000 | $ 49,525 | $37,731 | | | | $4,155 | $4,427 | |
| **Total Royalties** | | **$ '000** | **$ 524,852** | **$385,336** | | | | **$42,660** | **$45,271** | |
| **Net Revenue** | | $ '000 | **$ 4,077,169** | **$3,123,777** | | | | **$346,806** | **$367,238** | |
| **Unit NSR** | | **US$/ t ore** | | **$224** | | | | **$277** | **$294** | |
| **OPERATING COST** | | | | | | | | | | |
| Mining | $ 3.50 | US$/ t Mined | 2.91 | $3.50 | | | | $3.50 | $3.50 | |
| | | US$/t Processed | 15.37 | $28.89 | | | | $25.16 | $25.16 | |
| Processing | $80.00/t milled | $ '000 | 78.32 | $80.00 | | | | $80.00 | $80.00 | |
| G&A | $14.00/t milled | $ '000 | 12.84 | $14.00 | | | | $14.00 | $14.00 | |
| **Total Unit Operating Cost** | | $ '000 | **106.53** | **$122.89** | | | | **$119.16** | **$119.16** | |
| Mining | | $ '000 | $ 214,322 | $402,791 | | | | $31,452 | $31,452 | |
| Processing | | $ '000 | $ 1,092,021 | $1,115,443 | | | | $100,000 | $100,000 | |
| G&A | | $ '000 | $ 178,972 | $195,203 | | | | $17,500 | $17,500 | |
| **Total Operating Cost** | | **$ '000** | **$ 1,485,314** | **$1,713,437** | | | | **$148,952** | **$148,952** | |
| Annual Concession Fee | $ 14 | $ '000 | $ 168 | $168 | | | | $14 | $14 | |
| Corporate Cost | | $ '000 | $ 12,560 | $12,560 | | $272 | $2,881 | $4,241 | $3,329 | |
| **Total Other Costs** | | **$ '000** | $ 12,728 | $12,728 | | $272 | $2,881 | $4,255 | $3,343 | |
| Operating Cashflow | | **$ '000** | $ 2,579,127 | $1,397,612 | | ($272) | ($2,881) | $193,599 | $214,943 | |
| **CAPITAL COST** | | | | | | | | | | |
| **Initial Capital Cost** | | **$ '000** | **$ 346,027** | **$633,029** | | **$316,514** | **$316,514** | **$0** | **$0** | |
| Sustaining | 2.5% | $ '000 | $ 103,808 | $167,257 | | $0 | $0 | $15,826 | $15,826 | |
| Rehabilitation Allowance | 0.5% | $ '000 | $ 0 | $0 | | $0 | $0 | $2,695 | $2,871 | |
| Working Capital | 20% | $ '000 | $ 0 | $0 | | $0 | $0 | $29,790 | $0 | |
| Reclamation | | $ '000 | $ 24,472 | $24,472 | | $0 | $0 | $0 | $0 | |
| **Total Capital Cost** | | **$ '000** | **$ 474,308** | **$824,758** | **$0** | **$316,514** | **$316,514** | **$48,311** | **$18,697** | |
| **CASH FLOW** | | | | | | | | | | |
| | | | | | | 1 | 2 | 3 | 4 | |
| **Pre- Tax Cash flow** | | | $ 2,104,819 | $572,854 | | ($316,787) | ($319,395) | $145,289 | $196,246 | |
| Cumulative | | | | | | ($316,787) | ($636,182) | ($490,893) | ($294,647) | |

# Exhibit RPA-003

© 2012 Society of Economic Geologists, Inc.
*Special Publication* 16, pp. 269–301

# Chapter 12

# Geology of the Tenke-Fungurume Sediment-Hosted Strata-Bound Copper-Cobalt District, Katanga, Democratic Republic of Congo*

WOLFRAM SCHUH,[1,†] RICHARD A. LEVEILLE,[2] ISABEL FAY,[3] AND ROBERT NORTH[1]

[1] *Freeport McMoRan Exploration, 10861 N. Mavinee Drive, Tucson, Arizona 85737*

[2] *Freeport McMoRan Exploration, 333 North Central Avenue, Phoenix, Arizona 85004*

[3] *Department of Geosciences, University of Arizona, Tucson, Arizona 85721*

## Abstract

Tenke-Fungurume is one of the world's premier copper deposits with almost 17 billion pounds (7.7 million metric tons, Mt) of contained copper as reserves and mineralized material at a combined average grade exceeding 3 wt % Cu identified by Freeport McMoRan Copper and Gold, Inc. (Freeport). It is also the world's largest known resource of potentially mineable cobalt. Tenke-Fungurume lies within the Central African Copperbelt, which straddles the border between the Democratic Republic of Congo (DRC) and Zambia. The Central African Copperbelt is the largest copper- and cobalt-producing belt in Africa and one of the three most important copper regions in the world. The belt also contains half of the world's cobalt reserves.

The Tenke-Fungurume district consists of over 120 separate mineralized tectonic blocks, 30 of which have been drilled by Freeport to resource definition level with mineable reserves defined within 14 of those. Since 2006, Freeport has drilled approximately 350,000 m in over 2,000 diamond drill holes defining recoverable proven and probable reserves of 141 Mt at 3.00% Cu + 0.32% Co (8.4 billion lbs Cu and 860 million lbs Co) with an additional 105 Mt at 3.31% Cu and 0.307% Co as mineralized material adding a further 7.6 billion lbs of contained copper. Production is by open-pit mining and agitated leach processing at a current rate of 281 million lbs copper and 25 million lbs cobalt per year. Tenke-Fungurume is the third largest copper mine in Africa and the largest cobalt mine in the world.

All current production and reserves are from oxide ores with oxidation typically extending to depths of 80 to 150 m. Main oxide ore minerals include up to 91% malachite and up to 9% pseudomalachite and libethenite; oxide cobalt is mainly heterogenite. The oxide zone is underlain by a 50- to 200-m-thick zone of mixed ore characterized by pink cobaltoan dolomite, chrysocolla, and chalcocite. Sulfide mineralization below the mixed ore has been drilled to a 1,900-m depth. Sulfide minerals are chalcocite, bornite, carrollite, chalcopyrite, and scant pyrite.

The Central African Copperbelt coincides with the Neoproterozoic Lufilian arc, a platform sedimentary sequence of the Katanga Supergroup deposited between 880 and 570 Ma. Extension was followed by the 560 to 500 Ma compressional Lufilian orogeny that folded and thrust the ore-hosting sediments to the northeast.

The large majority of the copper-cobalt ores in Tenke-Fungurume are strata bound, hosted in the Mines Series of the Roan Group. The bulk of the ore occurs directly above a regional stratigraphic contact between red, oxidized hematitic beds below, and gray, reduced carbonate beds above. The former are reddish Roches Argileuses Talqueuses (RAT) lilas, the latter are gray algal dolomites of the Mines Series. This major redox boundary underlies copper-cobalt mineralization everywhere in the Central African Copperbelt.

Field and petrographic observations indicate that hypogene copper-cobalt mineralization took place in two main phases; an initial diagenetic event formed strata-bound, disseminated to fine laminated copper sulfides, and a second overprinting sulfide event generated crosscutting epigenetic veins related to the Lufilian orogeny. Deep supergene oxidation during the Tertiary formed the oxide orebodies.

## Introduction

THE TENKE-Fungurume district is located within the northern apex of a 350-km-long trend of copper-cobalt deposits in Katanga Province, Democratic Republic of Congo (DRC; Figs. 1, 2). Similar styles of sedimentary rock-hosted copper mineralization continue into neighboring Zambia and Angola, defining three segments of the Central African Copperbelt. Based both on geographic as well as geologic differences, the Central African Copperbelt is commonly subdivided into the Congo Copperbelt and the Zambian Copperbelt.

Based on historic slags at Luanzo Tshilongo (D. Muya, pers. commun., 2009) (Fig. 3a), copper has been mined at Tenke-Fungurume for over 500 years (John, 1873; Verbeeken and Walrat, 1954). Following the construction of the Lubumbashi smelter for Union Minière du Haut Katanga (UMHK; Sharp, 1946; Pirard, 2011), the first mechanized mining in Katanga started in 1909. The Fungurume cluster of deposits was first mentioned in 1904 (Büttgenbach, 1904, 1906; Sharp, 1946; Fig. 2). The railroad arrived in Tenke-Fungurume in 1917 with a large cut going straight through the Fungurume VII deposit. Exploration by the Comité Spécial du Katanga (CSK) and by UMHK started in 1919; the first diamond drilling was undertaken in 1930 in the Dipeta Valley (Fig. 3a). No industrial-scale mining took place until 2006 when Freeport developed

† Corresponding author: e-mail, wolfschuh@yahoo.com
*The Appendices to this paper appear separately on the CD-ROM.




FIG. 1. Location of the Tenke-Fungurume district in the Central African Copperbelt (CACB). Main ore deposits mentioned are labeled. Blue dotted lines delimit the outcropping boundaries of the main tectonic zones of the Lufilian arc.



FIG. 2. Fungurume Hills; the view to the southwest in 2007 in the area of deposit VI and VI extension. Overturned isoclinal antiforms, dipping away from viewer into the mountain. Vegetation clearing is natural, caused by excess copper in soils developed in orebodies. Hill crests are silicified Mines Series, and the slopes consist of soft RAT (Roches Argileuses Talqueuses).

the Kwatebala orebody. This included construction of an 8,000-t/p/d mill, agitation leach tanks, and solvent-extraction/electro-winning (SX/EW) plants with a cobalt circuit. The first copper cathode was produced in 2009.

## Regional Geologic and Tectonic Setting

The Tenke-Fungurume district is located in the Neoproterozoic Katanga intracratonic sedimentary basin (Cornet, 1894, 1903; Fig. 1). Sedimentation started sometime after 880 Ma and lasted until after 570 Ma (Armstrong et al., 2005), depositing the Katanga Supergroup (François, 1973, 1987; Fig. 4). There is no outcropping basement in the Tenke-Fungurume concession. However, it is inferred to be similar to a 2050 to 1850 Ma calc-alkaline volcanic arc sequence that is known throughout the region (Kampunzu et al., 1991; Rainaud et al., 2005).

Rocks exposed and observed in drill core at Tenke-Fungurume belong to the >7,000-m thick Katanga Supergroup, which is subdivided into three groups separated by regionally extensive diamictites (Fig. 4): the Roan (R), Nguba (Ng), and Kundelungu (K) groups (Cornet, 1903; Robert, 1912; Guillemain, 1913; François, 1973; Cailteux, 2003; Cailteux and Kampunzu, 2004; Batumike et al., 2007; Kampunzu et al., 2009; Fig. 3a).

The erosional source for the ore-hosting Roan sedimentary rocks (860?–735 Ma; Fig. 4) in Tenke-Fungurume is the Bangweulu basement block (Fig. 1; Master et al., 2005; J. Halpin and D. Selley, pers. commun., 2010), which contains high K, calc-alkaline, subduction-related volcanic rocks (Cailteux et al., 2005b; Rainaud et al., 2005). The >1,200-m-thick Roan basin was characterized by shallow marine, low-energy, laterally continuous, epicontinental sedimentation (Cailteux, 1994; Kampunzu et al., 2009). There is strong evidence for evaporite formation during periods of desertification in both the Roan R1 and R3 subgroups (François, 1973; Cailteux, 1991; Cailteux and Kampunzu, 1995; D. Broughton and M. Hitzman, pers. commun., 2004). The Roan Group is divided into the R.1 to R.4 subgroups: RAT (Roches Argileuses Talqueuses, Mines Series, Dipeta, and Mwashya; Fig. 4).

The RAT (R.1; Fig. 5) at Tenke-Fungurume consists of at least 200 m of purple-red, hematitic, evaporitic lacustrine siltstones and mudstones. The Mines Series (R.2) hosts 98% of the known copper-cobalt deposits in the Tenke-Fungurume district (Fig. 5). The ores occur immediately above the regional reduction-oxidation lithogeochemical contact between RAT lilas (R.1) and the lowermost Mines Series unit, the RAT gris (R.2.1.1); Figs. 5, 6). This boundary is easily visible in core and outcrop, with red, hematitic rocks below, and gray, reduced rocks above (Fig. A1; all the figures labeled A1-A22 are included in the digital Appendix).

The R.3 Dipeta Group displays sedimentary facies that are similar to the R.1 RAT such as siltstones, dolomites, and hematitic crackle breccias, many indications of evaporitic conditions and two major periods of hiatus (Fig. 6). The R.4 Mwashya consists of carbonaceous shales, laminated siltstones, and feldspathic sandstones. The deposition of 1,800 m of Nguba Group platform sediments took place between 735 (Key et al., 2001) and 635 Ma. The Nguba Group (formerly Lower Kundelungu) consists of siltstone, carbonates, and sandstone overlying a basal diamictite ("Grand Conglomérat").

The 3,100-m-thick Kundelungu Group (formerly Upper Kundelungu), deposited between 635 and 573 Ma (Master et al., 2005), consists of limestone, siltstone, and sandstone overlying a second basal diamictite ("Petit Conglomérat;" Fig. 4). During late Kundelungu Group time, sedimentation north of Tenke-Fungurume formed the flat-lying syn- to postorogenic siliciclastic rocks of the Plateau des Biano (Fig. 3a, b), interpreted as a continental molasse (Kampunzu and Cailteux, 1999) related to the Lufilian orogenic event.

The regional plate tectonic regime changed from extension to compression at about 560 Ma (Rainaud et al., 2005). The resulting Lufilian orogeny (Van Doorninck, 1928) peaked at about 530 Ma (John et al., 2004) and lasted until about 500 Ma (Fig. 4); it is the local manifestation of the Pan-African orogeny. The Lufilian arc consists of four parallel zones (Porada and Berhorst, 2000; Selley et al., 2005). Tenke-Fungurume occupies the northern two zones, mainly the thin-skinned thrust and fold belt, and a small part of the foreland zone (Fig. 1). Above the Katangan succession only Tertiary eolian Kalahari sands and Late Cenozoic valley-fill sediments are present, suggesting the area was largely quiescent throughout the Paleozoic and Mesozoic.

The local lithologies, facies, and thicknesses of the sedimentary sequence at Tenke-Fungurume are described in detail in the Appendix. Stratigraphic thicknesses are based on measurements from drilling and surface mapping; where unavailable, thicknesses were correlated with nearby sections in the Central African Copperbelt (François, 1973, 1987, 2006).

## Geologic Map and Main Structural Elements

Tenke-Fungurume occupies the northern apex of the Lufilian arc (Fig. 1) where there is a change from an E-W–trending structural grain with evidence for high compression in the west, to moderate, NW-SE–trending folds to the east. With an area of over 500 km$^2$, Tenke-Fungurume features the largest tectonic window of Roan Group rocks in the Central African Copperbelt. This central Roan window is surrounded by Nguba and Kundelungu lithotectonic assemblages.

The district geology map and cross section (Figs. 3a, b, 7) are based on compilations from unpublished geologic maps by UMHK supplemented by regional maps (Demesmaeker et al., 1963; Vets, 2004; François, 2006), new field mapping by Freeport geologists, and data from Freeport drill holes and extensive three-dimensional geologic modeling.

### *Roan Window (1)*

R.1 and R.3 (Roan Undifferentiated) subgroups encase the Mines Series (R.2; Fig. 8a-e), which forms scrambled blocks or écailles, a local structural term for tectonic blocks (Figs. 3a, 7). By definition, écailles have consistent internal stratigraphy and are fault bounded on all sides; as such, they can occur juxtaposed with any other stratigraphic unit. These blocks are typically several 10s to >500 m in length and downdip and from 20 to 200 m thick. Mines Series écailles form tight, upright or recumbent anticlines, monoclines, or fragments thereof; three-dimensioonal modeling shows relatively few Mines Series écailles form synclines. This structural style is different from that at Kolwezi, where low-angle thrusts and synforms of Mines Series dominate (Francois, 1974, plates 21a-c).

a



Lungwa fault
Kabula fault
Kamikongwa thrust
Kjaundji
26 21 00 E
10 24 00 S
26 28 00 E
10 29 30 S
26 28 00 E
10 41 30 S
26 05 30 E
10 28 00 S
26 00 00 E
10 42 00 S
Kitana S.
Konga A.
Mufufya S.
Lunda S.
Nguba
Manda
Mukondo Diapir
Mutaka S.
Nguba fault
Fungurume town
Fungurume deposits
Fig. 7
Fungurume Fault
Kasafi Fault
Kasafi-Kakanda Lineament
A
B
Shanika
Dipeta Syncline
Mambilima
Mwadinkomba
Kwatebala
Sefu
Kansalawile
Mudilandima
Fuulu
Tenke
Tenke Fault
Tenke town
Pumpi overthrust
Pumpi S.
Pumpi
Kobango A.
Haute Mofya
Lumbele
Kamwangala
Kabwe
Lukonde
Tshilongo A.
Luanzo Tshilongo
Plateau des Biano
5000 m
N




FIG. 3. a. Geologic map of the Tenke-Fungurume district with structural interpretation. Map shows large central window of Roan R1 to R4 in blue, surrounded by Nguba (green colors) and Kundelungu (brownish colors) lithotectonic assemblages. Roan units are scrambled, folded into tight anticlines, and broken into 100- to 1,000-m-long écailles with yellow R1 breccia as toothpaste-like material filling cores of anticlines. The Nguba and Kundelungu packages form gently folded synclines and are generally E-W trending. Blue outlines mark seven thrust klippen ("lambeau de poussee;" Francois, 1973, 2006) that cover the western part. They are gently folded, with axes in variable directions. The northern Kamikongwa thrust is a major regional thrust that forms the northern limit of allochthonous Roan in the Lufilian arc. North of the parallel Lungwa fault are flat-lying, undeformed Kundelungu rocks (Plateau des Biano). Line A–B denotes the cross section of (b). Names and color schemes follow François (1973, 2006). b. Cross section through the central areas of Tenke-Fungurume, looking to the west-southwest. Thin-skinned, low-angle thrust faults. Five types of structural domains include: 1. Overthrust nappes of Nguba and Kundelungu. 2. Roan Window (light blue), dominated by complex deformed Mines Series écailles (red lines), surrounded by lower parts of the Dipeta. An erosional remnant of Dipeta is still preserved in the Dipeta syncline. The Shanika klippe could be a remnant of a once larger tectonic cover of domain type 1 overthrusts. 3. Roan window with upper Dipeta (Mofya limestones) tectonic blocks (light blue lines). 4. Low-amplitude fold zone north of the regional Kamikongwa thrust. 5. Flat-lying, undeformed Upper Kundelungu foreland sediments. Shapes and amplitudes of folds in domains 2 and 3 are similar and likely underwent the same deformation but differ stratigraphically. The question marks denote an unknown basement under the Roan megabreccia sole thrust, as the deepest drilling (2,000 m) at Tenke-Fungurume has not reached basement.

| | Tenke - Fungurume | | | | | | African Copper Belt | |
|---|---|---|---|---|---|---|---|---|
| Age | Group | Subgroup | Thick-ness | Formation | Unit | Lithology | Mineralization and other age dates (Ma) | |
| 451<br>463<br>500<br>525<br>530<br>530<br>560 | | | | | (colors same as geologic map) | | Zn-Pb<br>Cu<br>Cu-U-Mo<br>Cu-Co | 451 Kipushi (Schneider et al., 2007)<br>490-463 Samba (Hitzman, pers. commun., 2010)<br>512-500 Cu-U-Mo Musoshi (Richards et al., 1988b)<br>525 +/- 3 Re-Os moly Nkana (Barra et al., 2004)<br>530 peak metamorphism of Roan in Zambia (John et al., 2004)<br>530+/-6 2nd U reconcentration event Kamoto (Decree et al. 2010)<br>560-500 Lufilian orogeny (Rainaud et al., 2005) |
| 573 | Kundelungu (formerly Upper Kundelungu) | Biano Ku3 | 350 | Ku 3 | Ks 3 | Arkoses, conglomerates, and argillaceous sandstones | | 573 +/- 5 detrital muscovites in the Biano is foreland basin for Lufulian orogen (Master et al., 2005)<br>583 +/- 24 Re/Os Cu sulfide in Nkana, Chibuluma, Nchanga (Barra et al. 2004) |
| | | Ngule Ku 2 | 1200 | Sampwe Ku 2.3 | Ks 2.2 | Dolomitic pelites, argillaceous to sandy siltstones | | |
| | | | 500 | Kiubo Ku 2.2 | Ks 2.1 | Dolomitic sandstones, siltstones, and pelites | Cu at base | 592, 531, 512 Metamorphism (Rainaud et al., 2005) |
| | | | 470 | Mongwe Ku 2.1 | Ks 1.3 | Dolomitic pelites, sandstones, and siltstones | (Cu) | |
| | | | 80 | Lubudi Ku 1.4 | Ks 1.2.4 | Pink oolithic limestones and sandy carbonate beds | | 638 - 573 Ma metamorphism Lufilian arc (Master et al., 2005) |
| | | Gombela Ku 1 | 515 | Kanianga Ku 1.3 | Ks 1.2.2 + 3 | Carbonate siltstones and shales | pyrite | 625 uraninite vein cuts Mine Series, Luiswishi (Kampunzu and Cailteux, 1999) |
| | | | | Lusele Ku 1.2 | Ks 1.2.1 | Micritic dolomite, pink to gray | 2-3% py, 0.5% cp | 620 Marinoan (Batumike et al., 2006) |
| 635 | | | 40 | Kyandamu Ku 1.1 | Ks 1.1 | Petit Conglomerat (glacial diamictite) - **MARINOAN global event** | Cu | 630 pitchblende Shinkolobwe SHRIMP (Decrée et al., 2010) |
| 635 | Nguba (formerly Lower Kundelungu) Ng | Bunkeya | 415 | Monwezi Ng 2.2 | Ki 2 | Dolomitic sandstones, siltstones, and pelites | Cu | 10-15m Cu-Ag in sandstones (El Desouky et al., 2008a) |
| | | Ng 2 | 520 | Katete Ng 2.1 (Cornet, 1903) | Ki 1.3 | Dolomitic sandstones, silstones | | 635 (Kampunzu et al., 2009) |
| | | Muombe Ng 1 | | Kipushi Ng 1.4 | Ki 1.2.2 | Dolomite with dolomitic shales | | 652 +/- 7 first Major U re-concentration in Lower Roan Kilongwe Luishia lineament, extensional setting (Decree et al., 2010) |
| | | | < 130 | Kakontwe Ng 1.3 | Ki 1.2.1 | Carbonates | Pb-Cu | 690 Uraninite veins in Mines Series Shinkolobwe (Loris et al., 1997) |
| 735 | | | | Kaponda Ng 1.2 | Ki 1.2.1 | Banded shales and dolomite beds | | 735 basal Nguba Zambia (Key et al., 2001) |
| 740 | | | 730 | Mwale Ng 1.1 | Ki 1.1 | Grand Conglomerate (tillite) -**STURTIAN** | (Cu) | 740 - global Sturtian age |
| | | | | | | *igneous activity* | | |
| 750 | | Mwashya R 4 | 10 | Kanzadi R 4.3 | R 4.3 | **765 - 735 Ma Mwashya Extension event** feldspathic **sandstones** | | 750 mafic lapili tuffs Likasi (Rainaud et al., 2000) |
| | | | 75 | Kafubu R 4.2 | R 4.2 | Finely bedded **black carbonaceous shales** | | |
| 765 - 735 | | | 45 | Kamoya R 4.1 | R 4.1 | Dolomitic silty**shales** Siltstones, sandstones, conglomerates, cherts | | |
| | | | 10 | | R 3.4.3 | Silicified dolomite with oolithic and hematitic horizons; ironstones at Nguba; pyroclastics in Mulungwishi (20 km SE of Tenke Fungurume) | Cu-Co *Shituru, Tilwezembe* | *750 Ma Pb ages Kipushi (Kampunzu et al., 1998)* |
| *765* | | Dipeta | > 18 | Kansuki R 3.4 | *R 3.4.2* | Strongly faulted rocks at base (tres apisses encore mal connue); fine sandy psammitic shales alternating with dolomites marneuses and 1-2 stromatolithic horizons | Cu-Co *Nyamumenda* | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | ***gap*** | | | ***hiatus*** at Tenke (Francois, 1987, 2006), marked by silty breccias - dissolved evaporite horizon? | | 765 +/- 5, mafic flows in Mwinilunga (DeWaele et al., 2008) |
| 765 | | R 3 | > 34 | | R 3.4.2 | Light-colored dolomite with one stromatolithic horizon at the base | | |
| | | | 60 | | R 3.4.1. | Hard, purple, psammitic fine sandstone, with cassures polyedriques | | |
| | | | 167 | Mofya - R 3.3 | R 3.3.2 | At base: 50 m gray, massive, vuggy dolomite; then 19 m sandy, pyritic dolomite with asbestos (riebeckite, crocidolite); then 98 m dolomites and marneuses dolomites; with oolithic horizon; andalusite porphyroblasts in the middle, and another oolithic horizon near the top | | |
| | | | ***gap*** | | | ***hiatus*** at Tenke (Francois, 1992), marked by silty breccias dissolved evaporite horizon? | | |
| | Roan | | > 100 | | R 3.3.1 | Purplish-gray sandy pelites | | |
| | | | 21 | Mofya - R 3.2. | R 3.2.2 | Dolomite with banks of greenish sandy pelites with one stromatolitic horizon | | |
| | R | | 30 | | R 3.2.1 | Purplish gray sandy pelites | | |
| | | | 119 | RGS - R 3.1 | R 3.1.2. | Alternating gray or white dolomites with gray dolomitic shales with green pelitic horizons | | |
| 790 | | | 35 | | **R 3.1.1** | 10 m reddish, fine-grained siltstone at base; overlain by arkosic sandstones with dolomitic horizons; argillaceous, dolomitic siltstones | | 790 Zr dep. age (Hitzman, pers. commun., 2008) |
| | | | 40 | | CMN R.2.3.2. | Light gray to white: stromatolitic, laminated, shaly, or talcose dolomites | | |
| | | Mine | 65 | Kambove - R 2.3 (Cornet, 1897) | CMN R.2.3.1 | Gray: stromatolitic, laminated, shaly or talcose dolomites; with two black horizons, one near base, one near top | Cu-Co | *Kinsevere* |
| | | Series | 78 | Dol. Shales R 2.2 | SD | Dolomitic sandstone, with 3 carbonaceous shales units, dolomites, arkosic sandtones | | |
| | | R 2 | 7 | | SDB | Dolomitic shale with evaporite nodules | Cu-Co | |
| 800 | | | 22 | | RSC | Bioherm stromatolitic dolomites | Cu-Co | 790 - 810 Zr ages (Hitzman et al., 2008) |
| | | | 8 | Kamoto R 2.1. | RSF | Banded stromatolitic dolimites | Cu-Co | 815 evaporite nodules HW Konkola (Barra et al., 2004) |
| | | | 3 | | DStrat | Banded dolomites | Cu-Co | 816 +/- 62 chalcopyrite Re/Os Konkola (Selley et al., 2005) |
| | | | 3 | | RAT gris | Gray argillaceous, dolomitic siltstones, sandstones | Cu-Co | |
| 839 | | RAT | 1. - 15 | Upper RAT | RAT lilas | Red argillaceous, dolomitic siltstones and pelites | | 839 Zr dep. age (M. Hitzman, pers. commun., 2008) |
| | | R 1 | > 200 | Lower RAT | RAT | Breccias | | 877 +/-11 Nchanga granite (Armstrong et al., 2005) maximum age for Roan in Zambia |
| 880 | | | | | | | | |

FIG. 4. Stratigraphy and thicknesses of the Katanga Supergroup in the Tenke-Fungurume area. Dates from the Lufilian arc region are summarized; ages from the references quoted in the chart are approximate to provide a chronologic framework for the sequence of geologic events. The right two columns show ages of regional base metal mineralization events in the Central African Copperbelt and stratigraphic levels of base metal deposits. The range of ages of base metal sulfide mineralization is over 350 m.y. Regional stratigraphic terminology from François (1974) and Cailteux (2003).




FIG. 5. Mines Series, the principal host rocks of copper and cobalt ores.




FIG. 6. Schematic section of spatial facies variations over time for the Roan Group at Tenke-Fungurume, showing two regressive-transgressive cycles; the spatial position of Tenke-Fungurume is shown by the vertical dotted line, with the main ore zones shown as thick dotted lines. Facies of RGS-Dipeta and RAT were very similar. The bulk of copper-cobalt ore is in the stratigraphically lowest, high sulfur- and high carbon-bearing units (RSF, SDB). Diagram shows that evaporitic facies rocks developed both in footwall and in hanging wall of the Mines Series. Modified from M. Hitzman (pers. commun. 2008).

Within the Roan window, Mines Series écailles crop out only in the southern parts (Fig. 3a, b). This zone hosts virtually all hitherto known economic copper-cobalt orebodies. Additional ore deposits include the Pumpi écailles in the far west and the Manda and Nguba écailles in the far southeast (Fig. 3a). Within the northern part of the Roan Window there is a 15-km E-W–trending, 5- to 7-km-wide belt of the Mofya Formation, part of the Dipeta Group (Fig. 3a); this belt forms a peculiar landscape of 50- to 100-m-tall limestone knobs. Mapping by Freeport geologists shows that the tectonic deformation style of the Mofya Formation (part of R.3) is comparable to that of the Mines Series (i.e., convoluted isoclinal folds, subvertical dips, broken folds), indicating that R.3 and R.2 underwent the same type of structural deformation.

The northern limit of Roan outcrops in the Tenke-Fungurume district is the E-NE–trending Kamikongwa thrust. This major regional thrust continues into the adjacent western part of the Lufilian arc (François, 1973).

*Nguba and Kundelungu (2)*

Nguba and Kundelungu lithotectonic assemblages form gently folded E-W–trending synclines. On the south side of the concession is the southwestern Pumpi syncline, separated by the Kasafi fault from the southeastern Mutaka syncline (Fig. 3a). The Nguba-Kundelungu Group rocks in these two southern folded thrust sheets show differences in thicknesses, facies and strike orientation, probably due to juxtaposition by thrust emplacement. The rocks in these structures also differ in thickness and structural orientation from the four gently folded, parallel-trending synclines along the eastern side of the concession (Lunda, Mufufya, Kitana, and Kansele).

*Thrust klippen (3)*

Seven fault-bound blocks (termed "lambeau de poussee" by François, 1973, 2006) cover the western part of the concession. They are 1 to 3 km across and their facies (François, 1973) correspond to the surrounding Nguba-Kundelungu lithologies. The lambeaux are very gently folded but with fold axes in variable directions. They extend into adjacent western map sheets, where they have been described as thin-skinned, pancake-shaped thrust sheets floating on Roan megabreccias (François, 1973, 2006; Jackson et al., 2003).

*Kamikongwa-Lungwa corridor (4)*

Between the Lungwa fault (Fig. 3a) and the subparallel Kamikongwa thrust 2 to 5 km north are three E-NE–trending faulted anticlines. In all three anticlines the core axes have been faulted off. Near these anticlines there are minor copper showings on structures cutting the general structural trend at high angles.

*Plateau des Biano (5)*

Outcrops north of the Lungwa fault are flat-lying, undeformed upper Kundelungu (Biano subgroup, Ku3) molasse sedimentary rocks in the Plateau des Biano. These appear to disconformably overlie the lower Kundelungu subgroups. Similar relationships exist at Dikulushi, 300 km to the east (Haest et al., 2007).




FIG. 7. Detailed geologic map and principal orebodies of the Central Tenke-Fungurume district. Names of major orebodies referenced in the text are shown. The orebodies are hosted in R.2 Mines Series lithostratigraphic assemblages. At present exposure levels, most of the RAT R.1 (yellow) is stratigraphically in place below the Mines Series but is locally discordant where small diapirs have pierced through, in toothpaste fashion, to the CMN (Kambove Dolomite; dark pink) stratigraphic level. The geometry of the Mambilima dome suggests a recumbent isocline has been domed by later interference folding. The Dipeta syncline has the geometry of late gentle syncline refolding of an older recumbent fold nappe. The black lines denote the geologic sections in Figure 10a-d. For legend, see Figure 3a.




FIG. 8. Main rock types, Mines Series and RAT. a. RAT breccia in outcrop and drill core; polymict composition, shapes from angular to rounded, and poorly bedded. Width 60 cm. b. DStrat with bedding-parallel veins; dark bands are Mg chlorite and light bands are dolomite (+ minor quartz). Sulfide mineral is bedding-parallel bornite. Width 5 cm. c. RSF bedding-parallel mineralization; jack veins with chalcopyrite. Width 8 cm. d. RSC, typical stromatolite bioherm, with massive silicification. Geologist for scale is 2.00 m tall. e. SDB shaly dolomite with submillimeter thin chalcopyrite laminae. Width 5 cm.

The regional geology suggests that Lufilian deformation was most compressive in the western part of the concession. There, it is manifested as low-angle thrusting of the lambeaux in the Pumpi area. It was least compressive in the east of the concession where gently deformed Nguba-Kundelungu synclines prevail. The Kasafi fault, a regional SE-trending strike slip (?) fault (Fig. 3a), enters from the southeast into the Tenke-Fungurume concession and cuts across the south-central part of the Roan écailles. Near Tenke (formerly known as Goma) this structure controls an unusually deep (200 m) valley between the Goma and Shimbidi écailles. At Mudilandima there is a significant morphologic drop and an unusual lack of outcropping écailles west of the Kasafi lineament (Fig. 3a). The role of this lineament in ore mineralization is still uncertain.

Summarizing, three major tectonic domains form the Tenke-Fungurume district:

1. Roan Undifferentiated, containing structurally very complex megabrecccias of Mines Series fragments (écailles); hosts the bulk of the copper ores.

2. Nguba-Kundelungu-age sedimentary rocks form gently folded thrust sheets, lambeaux, synclines, and anticlines; hosts small copper occurrences.

3. Undeformed, flat-lying youngest Kundelungu sedimentary rocks in the north; no known copper deposits.

## Orebodies

### *Reserves and resources*

Recoverable proven reserves as of December 2011 are 54 Mt at 3.26% Cu and 0.36% Co plus probable reserves of 87 Mt at 2.84% Cu and 0.30% Co for agitation-leachable ore at a cut-off grade of 1.11% copper equiv. In addition, there are 22 Mt at 2.81% Cu and 0.29% Co as mineralized material for leaching. Mineralized material for milling contributes an additional 83 Mt at 3.44% Cu and 0.29% Co (Freeport McMoRan, 2012). In total, recoverable proven and probable reserves (2P) are 141 Mt at 3.00 % Cu and 0.32% Co plus 105 Mt at 3.31% Cu and 0.307% Co as mineralized material (Freeport McMoRan, 2012). This corresponds roughly to 17 billion lbs of contained copper (7.7 Mt Cu), and 1.6 billion pounds cobalt (725,000 t Co).

Production is by open-pit mining at Kwatebala (Fig. 9a, b), Fwaulu, and Shimbidi, with processing by agitated leaching. Current annual production is 281 million lbs of copper (127,400 t) and 25 million lbs (11,300 t) of cobalt (Freeport McMoRan, 2012). All current production and proven reserves are from oxide ores only. Tenke-Fungurume is already the third largest copper mine in Africa and the largest cobalt mine in the world.




FIG. 9. a. Kwatebala deposit, premining natural outcrops in 2004, looking east. Southern overturned flank of Kwatebala anticline; Mines Series strata dip 70° to left. Lack of vegetation is a natural copper clearing. Massive silicified RSC is most erosion resistant and forms cliffs. Di = Dipeta syncline, Fu = Fungurume hills. b. Kwatebala deposit mining surface view of Mines Series in 2008, 1,480-m level. Aerial view to east-northeast, northwest corner of deposit. Northern flank of anticline; Mines Series strata dip 40° to left.

*Ore classes*

For mining and mineral processing, ore is classified as (1) near surface, oxide; (2) intermediate depth, mixed; and (3) deep, sulfide. Oxide ores contain less than 20% sulfide minerals; mixed ores 20 to 80% sulfide minerals; and sulfide ores more than 80% sulfide minerals. The Tenke-Fungurume deposits have been classified based on the paragenetic sequence of ore mineral deposition (discussed below): (1) strata bound, (2) crosscutting hypogene sulfides, and (3) supergene oxides.

*Geometries and shapes of the orebodies*

Stratigraphically, the 20- to 45-m-thick Mines Series subgroup is subdivided into three units (Figs. 5, 8a-e, 9a, b): The Upper orebody occurs within a 5- to 12-m-thick, micritic, shaly dolomite named SDB (Schistes Dolomitiques de Base; Figs. 8e, A6a-c) and contains 10 to 20% of the copper reserves. The Intermediate ore zone is commonly subeconomic and is hosted in the 15- to 30-m-thick, massive, stromatolitic RSC (Roches Siliceuses Cellulaires; Figs. 8d, A5a, b), which can locally contain up to 10 to 15% of the ore. The Lower orebody contains 60 to 80% of the metals and is hosted in three units which are, from top down: RSF (Roches Siliceuses Feuilletées), a 4- to 10-m silicified cyanophyta algal laminate (Figs. 8c, A4a, b); DStrat (Dolomies Stratifiees), a 2- to 6-m stratified dolomite with alternating bands of coarse dolomite and cyanophyta algae mats (Figs. 8b, A3a, b); and RAT gris, the 2- to 5-m reduced, gray, sandy, argillic basal unit of the Mines Series (Fig. 5). The strike and dip extent of individual orebodies are several 10s to several 100s of meters. The orebodies are typically fault-bound, i.e., orebodies also end where their host écailles are faulted off (Fig. 7). Geologic sections show that shapes of the orebodies largely mimick the predeformation geometries of the Mines Series sedimentary rocks (Fig. 10a-c).

Oxide ore minerals typically extend to 80- to 150-m depth but can locally be much deeper. At Fungurume, native copper occurs at 990-m depth (Oosterbosch and Schuiling, 1951) and at Pumpi, malachite occurs deeper than 430 m. The low relief (<200 m) of the current extensive Katanga plateau is insufficient to account for the observed deep oxidation. Deep Tertiary desertification (Robert, 1956; Giresse, 2005; Gasse, 2006; M. Hitzman, pers. commun., 2007) may have provided the conditions that allowed the deep oxide minerals to form.




FIG. 10. a. Geologic cross section through the Kwatebala ore deposit; geology compared with ore zones (looking to the west; location in Fig. 7). Thin black lines are drill holes. South-vergent overturned nose of a RAT/RGS-Dipeta-cored recumbent anticline; note structural complexities in the nose. Labels in italics denote structures resembling those in salt tectonics, including isoclinal salt antiforms, salt-based thrusts, and allochthonous salt sheets. On the right side, there is an open diapiric structure of RGS-Dipeta injected into the overlying Mines Series. A smaller, similar teepee injection of RAT is present in the center.




FIG. 10. *(Cont.)* b. Geologic cross section (location shown in Fig. 7) of the Tenke deposit. Broad syncline, with a remnant of an isoclinal anticline preserved in the Goma mountain top. Complex, low-angle thrusting has been suggested to explain subhorizontal offsets in the anticline sector. Most of the syncline sits on thinned-out RAT, underlain by RGS-Dipeta. The RAT pinches at the base of the synform, possibly indicating a salt weld. The high mountain top is supergene leached, and the underlying SD formation in the southeastern flank of the Tenke syncline has much thicker than normal copper mineralization, presumably from secondary enrichment sourced from the leach zone.

Oxide copper minerals are 91% malachite and 9% pseudomalachite and libethenite (Freeport McMoRan, 2006, unpub. data). Oxide cobalt is mainly dark brown heterogenite (Fig. A5a). Visual inspection shows different phases of brown oxide minerals associated with heterogenite. Additional cobalt oxide phases are suspected to be present.

Mixed ore underlies the oxidized zone, typically to depths of 50 to 200 m below the surface (Fig. 10a-c). Hanging-wall and footwall contacts are irregular. Mixed ore is characterized by pink cobaltoan dolomite (Fig. A5c), chrysocolla, and supergene chalcocite. These minerals are all indicators of paleoground-water levels, which must have varied over time, to create the highly variable mixture of sulfides and oxides, as well as the highly variable thickness of the mixed ore zone.

Sulfide ore underlies the mixed ore, starting at highly variable depths, from 50 to 400 m. Within a given elevation, the mixed sulfide and mixed oxide interface can vary several tens of meters between individual beds of the Mines Series (Fay and Barton, 2012). At Fungurume ore-grade (over 3% Cu for underground mineable thicknesses) sulfide-mineralized intercepts occur as deep as 1,980 m (Fig. 10d) and include 9 m at 5.5% Cu, 11 m at 4.5% Cu, and 7.5 m at 3% Cu between 1,906- and 1,980-m depth (François, 2006; not true thicknesses). Deepest sulfide intercepts at Tenke are >1,100 and >1,200 m at Kwatebala and Fwaulu, respectively (see Fig. 7 for locations). As a comparison, Mines Series-hosted sulfide ores in Kolwezi bottom out above a basal thrust in 1,400-m depth, underlain by Kundelungu (K 1.3) sedimentary rocks (François, 1973). At Tenke-Fungurume, the ultimate depth of sulfide mineralization is not yet known but is believed to exceed 2,000 m (Fig. 10d).

Exceptions from the generally good spatial correlation between orebody shape and host-rock shape are (1) changes in grade along strike that are related to facies changes; shallow-water facies correlate with higher grades and deeper water facies hosts lower copper-cobalt grades (e.g., between Mwadinkomba anticline—deeper water facies—and higher grade Mwadinkomba monocline; D. Broughton and M. Hitzman, pers. commun., 2004); (2) local high-grade (>5% Cu) oxide ores, typically related to supergene enrichment (Fig. 10b); and (3) locally restricted, higher grade (>5% Cu) sulfide ores mainly related to zones of high structural complexity (faults, fold noses) with a higher than normal density of crosscutting, late-stage, hypogene sulfide veins. Higher grades in complexly folded zones have also been observed at Nkana, where crosscutting sulfide veins increase in grade and thickness in fold apices (Brems et al., 2009). While similar late-stage sulfide veins occur at Musonoi and Kamoto in the Kolwezi district they do not add much volume or grade to the hypogene ores (Dewaele et al., 2006).

The écailles in the top portions of the anticlines at Tenke-Fungurume have the structural appearance of overturned anticlinal folds (Fig. 10a), mushroom shapes, and flower structures (Fwaulu). These features are internally complex, such as







| Depth (m) | Length | Grade | Unit |
|---|---|---|---|
| 1886.5 - 1881.9 | 15.4 m | 2.9 % Cu | SDB |
| 1906.2 - 1915.2 | 9.0 m | 5.5 % Cu | RSF - Dstrat |
| 1930.0 - 1941.2 | 11.2 m | 4.5 % Cu | RATg - RSF |
| 1972.6 - 1980.1 | 7.5 m | 3.0 % Cu | RSC - SDB |

FIG. 10. (*Cont.*) c. Geologic cross section through Fungurume deposits X, IV, XI, and I; comparison of geology and ore zones (looking northeast, black lines are drill holes; Fig. 7). Center shows anticline with RAT core of deposit IV. RGS-Dipeta rocks with similar facies underlie the ecaille number X on the left. The steep attitude of the central anticline is characteristic for many of the Tenke-Fungurume deposits. Salt-tectonic style structures; the antiformal anticline is a classic example of an injection fold (M. Jackson, pers. commun., 2012). Note the isoclinal concordant limbs with discordant diapir at its crest, flanked on southeast by broad gentle syncline. d. Depth extent of the Mines Series at Fungurume. Ore-grade with a mineable thickness in sulfide-type Mines Series continues to at least 2,000 m below the surface at Fungurume.

the stacking of multiple écailles, commonly completely surrounded by ductile RAT.

## Mineralogy

Petrographic examination of samples from Kansalawile, Mambilima, Kwatebala, and Fungurume focused on textural relationships to decipher the temporal sequence of precipitation of alteration and ore minerals (Figs. 11a-c, 12, 13a-i). For more detail on the various mineralization-alteration stages, the reader is referred to photomicrographs of sulfides and gangue minerals in the Appendix (Figs. A7-A12).

### *Alteration*

Hydrothermal alteration was observed in hand specimen, thin section, and by QEMSCAN (Figs. 14, A13-A20) and cathodoluminescence analysis (Fig. A8d, f, with detailed descriptions in the Appendix). There has been extensive research on mineral paragenesis and its relationship to structural history




FIG. 11. Thin section photomicrographs of complex, multistage alteration sequence, RAT at Kwatebala. a. Multiple types of metasomatic grains in the RAT: Mg chlorite + Mg tourmaline, Mg chlorite + muscovite; a silicified grain with quartz-dolomite alteration, with small anhydrite-celestite-K-feldspar inclusions in close proximity. This assemblage is difficult to explain as one single alteration event, i.e., of one single precursor phase (e.g., K-feldspar). Possibly preferential replacement of different original grain types with distinct compositions (K-feldspar, clay, dolomite, sulfate grains?). Some of the multiphase mineral grain compositions were possibly detrital. b. Stage 3, Mg metasomatism. Mg tourmaline and Mg chlorite overgrow detrital grains and early quartz; replace or form original matrix. Sample is from RAT lilas, Kwatebala. c. Stage 6, dolomite overgrowing Mg tourmaline. Photographs from D. Broughton and M. Hitzman (pers. commun., 2007).

Case 1:16-cr-00515-NGG-LB Document 88-3 Filed 03/06/20 Page 99 of 305 PageID #: 2685






FIG. 12. RAT alteration sequence, major element alteration at Kwatebala; up to eight alteration phases can be recognized. Early Mg metasomatism dominates, followed by K-Ba, which in turn is followed by silcification, and then a second Mg overprint. The low K (and Ba) in RAT may be explained by a combination of low abundance of detrital K phases (vs. Zambian Copperbelt which is proximal to granitic basement), and by the replacement of detrital K-feldspar by quartz and dolomite, and alkali stripping. Based on thin section petrographic and scanning electron microscopy; see Figure 11a.

in the Central African Copperbelt. Dewaele et al. (2006) found evidence for multiple generations of dolomitization at Kamoto and Musonoi in the Kolwezi district. Alteration at Tenke-Fungurume was studied by Oosterbosch (1951), Schuh (2008), and D. Broughton and M. Hitzman (pers. commun., 2004). Fay and Barton (2012) provided the most complete published work for the Kansalawile and Mambilima orebodies.

*Magnesian alteration:* Dolomitic rocks within the Mines Series have been extensively recrystallized (Oosterbosch and Schuiling, 1951). Up to four separate dolomitization phases are now recognized by petrography (Fig. 13a-i) and QEMSCAN (Figs. A13-A19). Chlorites in the DStrat contain relatively low aluminum and iron but have high magnesium contents. Oosterbosch (1951) noted a direct correlation between copper grades and the amount of chlorite within the DStrat; he suggested that the chlorite-rich units interbedded with dolomite-rich units provided the right porosity and secondary structural permeability to allow for sulfide precipitation. QEMSCAN work on the RSF from Kwatebala shows a separation of copper and cobalt; bornite-dolomite occur mainly in the light dolomitic beds, whereas thin laminations of carrollite with dolomite or quartz are more commonly associated with the dark Mg chlorite beds (J. Woodhead, pers. commun., 2010; Fig. A16).

There were at least two separate Mg alteration events, each following a silicification event; Mg chlorite and Mg tourmaline also overgrow secondary quartz in the RAT (Fig. 11a-b; D. Broughton, pers. commun., 2007), and the Mg tourmaline in turn is overgrown by dolomite (Fig. 11c). Preliminary cathodoluminescence work indicates three generations of dolomite (at least two are visible in Fig. A8d, f). Similar multistage Mg metasomatism and change from Fe- to Mg-rich tourmaline occurs in other Cu-Co deposits in the Congo Copperbelt, for example, Luiswishi (LeRouge et al., 2005) and at Kamoto (Moine et al., 1988). Similar sequences were described at Kambove (Broughton and Hitzman, 2007), and Lubembe (Selley, 2007).

The Mg alteration event is quantitatively the largest and most extensive metasomatism to have affected the host rocks at Tenke-Fungurume. It is multistage and intrinsically associated with both diagenetic and epigenetic sulfide mineralization events.

*Silicification:* Silicification of the originally dolomitic RSC unit in the Congolese Copperbelt was recognized early by Studt (1913). At Fungurume, Oosterbosch (1951) described three types of silicification: early diagenetic, late diagenetic, and epigenetic. More recent work confirms this sequence (Figs. 12; A8a, f) but has identified two additional substages for the late diagenetic and epigenetic events. Silicification appears to have alternated and partially overlapped with an equally complex sequence of four dolomitization events. Silica contents increase within the RSF toward its hanging wall




FIG. 13. Paragenetic sequence from petrography and cathodoluminescence. Images are arranged according to their position in paragenetic sequence.

contact with the RSC (Figs. 13, 15). Within the Mines Series, the RSC underwent the most pervasive silicification, resulting in massive siliceous, internally unfoliated, competent rocks (Fig. A5a-b). The degree of silicification has an inverse relationship with organic-rich, fine-grained silty layers within the RSC. Massively silicified RSC is cut by epigenetic quartz sulfide veins (Fig. A17).

Silicification appears to occur lateral to and beyond the zone of copper sulfide mineralization. Barren drill holes may display comparable intensities of silicification to those of well-mineralized holes. Paragenetically, quartz tends to be associated more with carrollite and less with bornite (Fig. A17). Silicification is the second most important alteration in the ores at Tenke-Fungurume.

*Sodic alteration:* A number of outcrops of sodic-altered ferruginous siltstones occur in the Tenke-Fungurume district, primarily to the north of the known ore deposits in rocks stratigraphically above those that host the major ore deposits. Riebeckite, a bluish-colored Na-Fe amphibole, has been observed at the Mofya and Salabwe quarries, 800 m northeast of Kwatebala, road cuts on the Mulumbu road, and at several other locations in the Dipeta subgroup. Riebeckite alteration forms distinct stockworks of millimeter- to centimeter-thick veins without any other gangue minerals and is hosted by a ferruginous siltstone in the Mofya R.3.3.2 sequence. Current field mapping information suggests that sodic alteration forms a broad outer halo many 100s of meters above the Mines Series. Sodium is also enriched relative to that observed in the Mines Series within the underlying RAT lilas (Fig. 15). This enrichment may be due to minor secondary albite in the RAT matrix (M. Hitzman, pers. commun., 2008). No Na minerals have been observed in direct association with sulfides.

*Potassic alteration:* While potassic alteration is ubiquitous in the Zambian Copperbelt (Selley et al., 2005), there is minor indication that it occurred at Tenke-Fungurume. Early




FIG. 14. Quantitative mineralogical analysis by QEMSCAN of the Mines Series at Kwatebala, summarizing images A13 to A19 in the Appendix. A strong contrast in paragenetic assemblage exists between RAT (red rocks) and the Mines Series (gray rocks). The silica flooding of the RSC and the symmetry of mineralogy on either side can be seen; an increase in iron sulfides in the uppermost sample possibly reflects a more reduced marine facies in the SDB. The extensive muscovite illite in the RSF and SDB is the reason for the high K, Al, Si, accompanied by kaolinitization, whereas Mg chlorite in the RAT accounts for the excess Al and Si. Images from J. Woodhead (pers. commun., 2012).




FIG. 15. Geochemical profile of a sulfide ore intercept at Kwatebala, Cu and Co distribution pattern vs. major elements. The RAT and Mines Series show contrasting compositions. Silica is highest in the RSC (compare with Fig. 14), with this central silica flooding flanked by symmetrical copper-cobalt peaks being characteristic at Tenke-Fungurume. $K_2O$ broadly matches the copper pattern; the entire sequence is strongly enriched in Mg (drill core 27.0/4.02, Kwatebala).

diagenetic quartz-dolomite alteration (stages 1 + 2, Fig. 12) shows remnant K-feldspar which was probably detrital (Fig. 11a). Minor secondary muscovite replaces Mg chlorite in the RAT (Fig. 11a). The SDB displays extensive sericite flakes in bedding-parallel dislocation planes but their genetic origin is not constrained. The content of potassium within the rocks of the Mines Series generally increases upward (Fig. 15).

*Summary alteration:* Textural studies suggest that there were at least four Mg alteration (Fig. 11b) and at least three silicification events. Magnesian alteration and silicification are the two dominant alteration types associated with sulfide mineralization. On a district scale, there is also a broad sodic zone mostly associated with R3 Dipeta rocks, which is possibly a halo 100s of meters or more distal from ore; it may also constitute a separate late event. By constrast, K alteration is minor. The sequence of alteration resembles progressive evaporation of seawater to produce residual bittern brines successively enriched in Ca, Na, then Mg, and finally K (Fig. 12).

*Gangue minerals:* Major gangue minerals include silica phases (quartz, cryptocrystalline quartz, and chalcedony), dolomite, and Mg chlorite. Dolomite occurs as fine- to coarse-grained (>2 cm) crystals. The finest grained (cryptocrystalline) quartz phase and fine dolomite are too small for textural observations to yield many insights into their paragenesis, but coarser grained phases and the chalcedony exhibit many distinctive crosscutting, overgrowth, and inclusion relationships (Fig. 12).

Anhydrite is the earliest mineral (Fig. 11a), now replaced by rectangular laths of quartz and dolomite plus chalcocite pseudomorphs but with visible anhydrite inclusions still present (Fig. A7). These syngenetic to early diagenetic laths, minor constituents of the Si-Mg alteration suite, are most abundant in the DStrat and rare in the RSF and SDB. Their orientations are either random or aligned with the rock laminations.

Chalcedony occurs in distinctive, commonly brown-colored fans similar to the type described by Dong et al. (1995) as colloform-crustiform (Fig. A8a). These fans are crosscut and locally replaced by euhedral dolomite crystals, quartz pseudomorphs after dolomite, and quartz veins (Fig. A8a). Chalcedony is most common in the RSC; it is rare in other Mines Series strata at Tenke-Fungurume.

Quartz is common in all Mines Series strata and is most heavily concentrated throughout the RSC and for 1 to 2 m above and below it (Fig. 15). Coarse-grained dolomite replaces and is pseudomorphous after quartz crystals but is overgrown by other dolomites. Inclusions of sulfides, chalcedony, and dolomite grains commonly occur within quartz crystals. Iron oxide inclusions commonly display concentric outlines mimicking the shape of dolomite rhombs (Fig. A8b, c). Iron oxide inclusions in quartz are most abundant in the RSC and DStrat.

Coarse-grained dolomite occurs as two types that are similar under transmitted light but readily distinguishable in cathodoluminescence (CL; Fig. A8d, e). The first type has a deep red CL signature without internal zoning. This type of dolomite is commonly partly replaced by quartz, leaving pseudomorphs of dolomite (Fig. A8f), and is crosscut by quartz veins.The second type of dolomite is strongly zoned in CL from yellow to dark red and is found as overgrowths on quartz in veins; this dolomite is commonly intergrown with an oxide-carbonate copper suite (Fig. A8g).

Layer-parallel veins contain coarse crystals of dolomite with antitaxial textures (Fig. A8h). These coarse dolomite grains are typically rimmed by small quartz crystals and commonly contain inclusions of chalcocite. Layer-parallel veins range from 1 mm to 2 cm in thickness and can extend up to 0.5 m laterally; rock laminations deform smoothly around their terminations. The dolomite crystals in these veins chiefly display a homogeneous deep red CL signature but may be overgrown by the later banded CL-type dolomite (Fig. A8i).

### *Early ore: Disseminated sulfides*

Early-stage, disseminated copper sulfide minerals are, in order of abundance (1) chalcocite, (2) bornite, (3) carrollite, and (4) chalcopyrite. Carrollite, bornite, chalcopyrite, and digenite also form small inclusions in quartz grains.

Chalcopyrite is the most common sulfide ore mineral in the SDB (Fig. 14). Chalcocite, bornite, and carrollite are the most common ore minerals in the RSF and DStrat. However, minor bornite occurs in the SDB and minor chalcocite and pyrite in the RSF and DStrat.

Carrollite occurs as disseminated coarse grains in the RSC but rarely reaches ore grade. Scarce pyrite occurs in the SDB and very rarely in the Kamoto Subgroup below. Chalcocite may either appear internally homogeneous and pristine, or contain abundant inclusions; the two types are found close together (Figs. 13h, A10a-d). Chalcocite overgrows or replaces carrollite (Fig. A11a-d). Some chalcocite appears to be associated texturally with coarse-grained dolomite partly replaced by quartz.

The majority (85–90%) of diagenetic sulfides are strata bound. Five types of diagenetic sulfides have been recognized: (1) fine disseminations, (2) coarse, blebby grains, (3) nodules, (4) jack veins, and (5) fine laminations.

*Fine disseminations:* Bornite, carrollite, chalcopyrite, and chalcocite occurr finely disseminated in the matrix of all units of the Mines Series (Figs. A14-A19). They measure less than 100 μm across, are similar in size to nonsulfide minerals, and occur alone or associated with secondary quartz and dolomite.

*Coarse, blebby sulfides:* Blebby disseminated sulfides are coarser grained than the nonsulfide minerals in their host matrix (Figs. A12b, A18, A19). The blebby ore texture is lithologically controlled, found predominantly in the dolomitized evaporite-bearing dolosiltstone layers of the DStrat and SD (Dolomitic Shales) units, in the coarse dolomite beds in the RSF, and as characteristic millimeter- to centimeter-sized carrollite crystals in the silicified parts of the RSC. Based on similarities in sulfide and alteration mineral assemblages, the blebs appear to be coeval with the antitaxial jack veins. The blebs are possibly replacements of evaporite minerals and of coarse-grained dolomite crystals by quartz and sulfides (Fig. A18).

*Nodules:* Nodules are ubiquitous throughout Tenke-Fungurume and are most common in the DStrat, RSF, and SDB units (described at the Fungurume II deposit; Oosterbosch and Schuiling, 1951). Sulfide-bearing nodules are typically dominated by coarse dolomite and quartz in their interiors and by irregularly intergrown pyrite and chalcopyrite toward their rims (Fig. A18). Both quartz and dolomite preserve

small inclusions of remnant anhydrite, or, more rarely, barite (Fig. A13). The quartz-dolomite contacts are polygonal, indicating evaporitic replacement (J. Woodhead, pers. commun., 2012; Fig. A15). Similar textures have been described from Kamoto, Musonoi, and Luiswishi (Muchez et al., 2008, and references therein), and at Kambove (Cailteux, 1997).

*Jack veins:* Fibrous, bedding-parallel sulfide-carbonate veins have been attributed to later stage compressive Lufilian tectonics (Sillitoe et al., 2010). However, geologists in the oil industry have long suggested that jack veins can also form early, during burial and compaction of shales as a consequence of overpressuring (Stonely, 1983; Eugster, 1985). This mechanism has also been proven in experiments (Zanella and Cobbold, 2012). In Tenke-Fungurume, jack veins occur mainly in organic-rich shale beds of the RSF (Figs. 8c, A4c) and DStrat. These veins typically lack alteration halos and have very sharp contacts. Overpressuring is also common (Shearman et al., 1972; Stoneley 1983) beneath hydrologically impermeable evaporite beds where low permeability prevents the escape of connate water during burial, impeding compaction (Fig. 8c). These veins formed almost immediately after sediment deposition (Zanella and Cobbold, 2012). Early bedding-parallel veins may also have been reactivated and recrystallized during Lufulian deformation.

*Fine laminations:* Bedding-parallel bands of submillimetre-thick laminated early pyrite-copper (-cobalt) sulfides occur in the RSF (Fig. 8c), SDB (Fig. 8e), and SD units. Such laminations contain only minor dolomite or quartz. Assemblages in the RSF are commonly bornite rich in association with dolomite-quartz beds (Fig. A15) and contain carrollite and dolomite in more phengite-illite-Mg-chlorite rich beds (Fig. A16). Laminations in the SDB contain pyrite-chalcopyrite with fine-grained muscovite-chlorite bands. The three shale members of the SD commonly contain very fine, pyritic, early diagenetic laminations.

### *Epigenetic ore: Crosscutting hypogene mineralization*

Late-stage veins cut earlier bedding parallel veins at Tenke-Fungurume. Late veins are best developed and most abundant in zones of complex deformation such as fold noses or adjacent to major faults. Alteration halos around late veins range from absent to well developed. Where abundant, such late veins can contribute significantly to ore grades, especially where affected by supergene oxidization. Like the jack veins, the late sulfide veins commonly display fibrous textures; they occur throughout the entire Mines Series (R2) but have not been observed in the underlying hematitic RAT lilas (R1). There, dolomite-hematite crackle breccia veins may represent the syn- and postfolding equivalent. Small chalcocite veins in the RAT lilas appear texturally to be supergene in origin.

Sulfide minerals in the crosscutting veins are mainly chalcocite; other sulfide phases (bornite, carrollite, chalcopyrite) occur but are less common; however, textural evidence suggests that most of the chalcocite in the crosscutting veins has replaced earlier sulfide phases. Clean vein carrollite differs texturally from disseminated carrollite which commonly has a pitted appearance (Fig. A12a, b). Vein occurrences of chalcopyrite are rare.

Similar late-stage sulfide veins have been well dated across the Central African Copperbelt to around 530 Ma (Barra et al., 2004; Decree et al., 2010). Fluid inclusion work suggests mineralization was related to a separate, hotter, and more saline fluid (Muchez et al., 2008; El Desouky et. al., 2009a), which may be related to orogenesis and associated with redeposition of preexisting strata-bound mineralization.

### *Supergene mineralization*

Supergene sulfide minerals are mainly chalcocite and minor covellite and digenite replacing earlier sulfide phases. Supergene oxide phases are copper carbonates (malachite, azurite, and cobaltoan dolomite), phosphates (libethenite, pseudomalachite), silicates (chrysocolla), and oxides (cuprite, heterogenite). SEM examination of inclusion-rich supergene chalcocite identified kolwezite and a Co-Mg carbonate with trace Mn, likely cobaltoan dolomite (Figs. A5c, A10d). Late chalcocite occurs in veins with Cu-Co oxides and carbonates.

Best known supergene mineralization periods were 10 to 5 and 5.3 to 2.3 Ma (U-Pb SIMS measurements of heterogenite, Decree et al., 2010) Miocene to Pliocene uplift exposing sulfide ores to oxidation, leaching, and subsequent erosion event under arid conditions (Robert, 1930; Gasse, 2006). This was followed by an arid Pliocene event starting around 2 Ma. Heterogenite from Luiswishi was dated 3.4 ± 0.8 Ma (Decree et al., 2010). This geologically short period is surprising, considered the massive banding of up to 20-cm-thick supergene malachite. Presumably more studies are warranted to investigate if there were older supergene events. More details are provided in the Phanerozoic chapter of the electronic appendix to this article.

Near-surface oxide ores tend to have the highest copper grades in the first 15 to 30 m, with a transition downward into deeper oxide ore, without significant leached capping development. This occurs where carbonate host rocks immediately buffered any downward-percolating supergene acidic solutions and the geometry of the orebodies and the rate of erosion allowed sulfide ores to weather themselves in lockstep with erosion. Exceptions have been observed at four deposits (see below).

### *Development of leached capping*

Tenke, Mwadinkomba, Kansalawile, and parts of Pumpi have leached capping (Figs. 10b, 16a, b) from the surface down to 50- to 80-m depth. These appear to have developed best downdip along acid-leachable, hydrologically favorable units. Underneath the leached capping, oxide ore can be exceptionally rich (Fig. A3c). Besides lithochemical controls, the orientation of the écailles also seems important; simple monoclines with dips from 40° to 90° that form hill tops appear to be the best combination for leached capping development. No true exotic copper deposits have yet been found.

Cobalt is not remobilized as much as copper. This is reflected in soil geochemical surveys, where cobalt isogrades forms narrow envelopes right on the écailles, while the more mobile copper develops into much broader, smeared out halos extending several tens to hundreds of meters beyond their source outcrops.

### *Petrography*

*Quantitative mineralogy:* Detailed mineralogical observations by QEMSCAN analysis have been conducted on samples from Kwatebala (Figs. 14, A13-A19; J. Woodhead,




FIG. 16. Leached capping at the Kansalawile orebody, located on the south side of the Dipeta syncline. Monoclinal orebody, dipping to north; three-dimensional view is toward west. Surface corresponds to the undulating, dip slope surface of the RSF ore unit; dip is approximately 35° to 45° to the northeast. Scale is ~300 m from top of the Kansalawile ridge (labeled) to bottom of model. a. Leached zone (gray) is variably developed as far as 50-m downdip from highest ridge in dip-slope fashion. Highest grades (in purple, >5% Cu) have developed downdip below the leached zone; farther downdip there is regular hypogene ore (>3% Cu). No vegetation anomaly (copper clearing) occurs above the leached capping zone. b. Three-dimensional view of the same area for total cobalt contents; note that cobalt does not show the strong leaching enrichment distribution of copper.

pers. commun., 2012). The RAT consists almost entirely of Mg-bearing minerals (Mg chlorite, dolomite) and has the lowest quartz content of all strata. Silica increases and reaches a maximum in the quartz-flooded RSC. In contrast to the RAT, the DStrat has very low Mg chlorite; although Mg concentrations are high, the Mg is present as dolomite.

The paragenetic sequence of QEMSCAN images for Kwatebala samples (Figs. A13-A19) was compared with the petrographic observations at Fungurume. One point of variance is the association of bornite and chalcopyrite in the dolomite and quartz veins that at Fungurume only contain chalcocite. This may simply reflect deposit-scale differences in the geochemistry of the mineralizing fluids, which precipitated chalcocite at Fungurume and assorted other sulfides at Kwatebala, Tenke, Fwaulu, and most other deposits.

Otherwise, all textures seen in the QEMSCAN images from Kwatebala correspond to events in the paragenetic sequence observed in thin and polished sections. There, early diagenetic anhydrite and celestite are mostly replaced by dolomite and quartz, which still contain inclusions of anhydrite. The dolomite falls into two types based on its association (or not) with quartz, corresponding to two generations; this feature is also observed at Fungurume with petrography and cathodoluminscence. The first of these, dolomite with quartz, appears to have been contemporaneous with some of the sulfides, as it is in Fungurume. This quartz and dolomite replaces nodules, preserving the polygonal texture characteristic of evaporite replacement.

Earlier sulfide inclusions are preserved in some of the quartz. Its texture relative to the dolomite suggests that dolomite began forming slightly before the quartz; the edges of dolomite contain quartz and sulfides, further evidence that Mg alteration and dolomite preceded the influx of silica and sulfide minerals. The second type of dolomite, with little or no quartz, formed later and crystallized with interstitial sulfides.

*Petrographic microscopy:* Figure 13 summarizes the paragenetic relationships of sulfides and their gangue minerals. Early formation of anhydrite is indicated by the preferential alignment of laths with rock laminations, and early formation of dolomite is indicated by the ductile deformation of laminations around the curved ends of the layer-parallel dolomite veins. These must have occurred prior to full lithification of the rock. Chalcedony must also have precipitated relatively early in the diagenetic process, certainly before the precipitation of the minerals that crosscut it, but there is no evidence that it formed before lithification.

The Fe oxide inclusions tracing rhombs probably represent a generation of coarse-grained dolomite, now entirely replaced by later dolomite and quartz that preserved its texture. This relict texture places a phantom dolomite event before the coarse dolomite and quartz. The quartz includes and partly replaces one of the coarse dolomite types, indicating that the first surviving coarse dolomite preceded the quartz. The quartz was later overgrown by the second coarse dolomite, whose association with the oxide Cu suite indicates its supergene timing.

The replacement relationships among disseminated bornite, digenite, and carrollite indicate that myrmekitic bornite-digenite precipitated first, followed by carrollite that partly replaces them (Fig. A9c). Lamellae of digenite and of minor chalcopyrite in the bornite, and presence of idaite, indicate formation as solid solution and subsequent exsolution. Bornite-digenite and carrollite may have been separate stages of ore precipitation, or substages of one single event; the textural evidence is insufficient to determine which the case is. Their gangue association is unclear, but small fragments of all these sulfides are included in the coarse dolomite and quartz grains, though not in the chalcedony. Later chalcocite precipitation replaced carrollite (Fig. A12b), probably at the same time as the first coarse dolomite generation; the numerous Co-rich inclusions in the chalcocite grains attest to its replacement of carrollite. Thus, the hypogene, disseminated sulfides at Tenke-Fungurume formed in at least two generations; earlier, Cu-Co sulfides and a later generation of chalcocite. Lastly, supergene processes formed oxides, carbonates, and chalcocite (Fig. 13i).

The sulfides in veins, most of which are chalcocite, are contained in first-generation veins of coarse-grained dolomite and presumably formed at the same time. This means that they were contemporaneous with the formation of disseminated chalcocite. The observed vein-hosted carrollite differs substantially from the disseminated carrollite, in texture and in replacement relationships. Vein carrollite is pristine (Fig. A12a), whereas disseminated carrollite variably replaced earlier bornite-digenite (-idaite) phases (Fig. A12b). Vein carrollite occurs with chalcocite (Fig. A9c) and also with bornite, digenite, and chalcopyrite. Vein sulfides in general are almost entirely chalcocite; disseminated sulfides include chalcocite, carrollite, bornite, and digenite. Vein sulfides occur coexisting with the coarse dolomites, whereas disseminated sulfides occur as inclusions in the coarse dolomites. These differences in texture and association preclude the formation of both vein and disseminated hypogene sulfides in a single event. At least two hypogene sulfide precipitation episodes are required to form the textures observed at Tenke-Fungurume.

*Fluid inclusion petrography and thermometry results:* Fluid inclusion studies across the Central African Copperbelt, including deposits both southeast and west of Tenke-Fungurume (Luiswishi and Kamoto), indicate that sulfides were deposited from highly evolved, saline, and oxidized brines argued to be of marine origin, in two stages: (1) early moderately high salinity (8–18 wt % NaCl equiv) fluid at 100° to 180°C (Muchez et al., 2008); and (2) late, high salinity (35–45 wt % NaCl equiv), higher temperature, 270° to 385°C, fluid (P. Emsbo, D. Broughton, D. Selley, pers. commun., 2007; El Desouky et al., 2009a). P. Emsbo, D. Broughton, and D. Selley (pers. commun., 2007) concluded that there is no evidence for halite dissolution by the ore brines; that high acetate contents indicate that ore brines had strongly interacted with hydrocarbons; that high $NH_4$ indicates interaction with an organic source; and that for brines specifically in Katanga copper deposits, the degree of evaporation approached Mg saturation. Such Cl-rich brines were capable of complexing copper from red beds of the R1 and/or possibly leaching the underlying basement (François, 1973, 2006; Muchez et al., 2010). El Desouky et al. (2010) concluded that ore brines had strongly interacted with hydrocarbons in the Mines Series. Fluid inclusion studies in the Congo Copperbelt indicate chloride fluids typical of evaporites (Audéoud, 1982; El Dezouky et al., 2009; P. Emsbo, D. Broughton, D. Selley, pers. commun., 2007). We conclude that significant amounts of evaporites must have formed in the RAT and Dipeta subgroups.

## Ore Controls

### *Ore controls: Facies*

There is a regional systematic variation in sedimentary facies across the Mines Series (Cailteux et al., 2005b), with a north-to-south progression from near-shore to more reefal depositional environments (Fig. 17; François, 1973, 1974; Cailteux, 1978a, b, 1983, 1994; Lefebvre, 1989). This paleoenvironmental variation correlates with different copper-cobalt grades (François, 1973, 1974; Cailteux et al., 2005b). Over 85% of the Mines Series in the Tenke-Fungurume concession is in the Long facies (Fig. A21); the remainder (Fungurume I, II, VII, and Manda) is comprised of the Kalumbwe facies (François, 1974, 2006; Cailteux et al, 2005b; J. Nzita, pers. commun., 2004). The Long facies is characterized by few stromatolites, dolomites, and sandstones in the SD Formation and by the presence of sandstones in the Kambove Formation. Paradoxically, elsewhere in the Copperbelt, orebodies in Long facies tend to be poorly mineralized (Cailteux et al., 2005b). The Kalumbwe facies is marked by (1) lack of arkose in the SD, (2) stromatolites and clasts of stromatolites in RSC, and (3) lack of sandstones in dolomitic shales and the Kambove Formation. There are no dolomites in the Kalumbwe facies-type SD formation. This facies hosts important copper-cobalt deposits in other portions of the Congolese Copperbelt, for example, Kolwezi district (François, 1974) and Kisanfu.

### *Ore controls: Stratigraphy*

Stratigraphically, most hypogene copper-cobalt mineralization occurs in green or gray rocks of the Mines Series (Lombard and Nicolini, 1962). At Tenke-Fungurume, most of the copper-cobalt metal budget occurs in the first major reduced unit above the red RAT, i.e., in the DStrat and RSF. There is local hypogene sulfide mineralization in the RAT gris but this constitutes less than 5% of the overall copper budget at Tenke-Fungurume (R. North, pers. commun., 2012). Copper mineralization in stratigraphically younger units has long been recognized (Barnard, 1924; Gray, 1932; Robert, 1930; François, 1973) but has been underexplored. Minor zones of copper mineralization have been found in younger units at Tenke-Fungurume, such as in Kundelungu-age host rocks at

Case 1:16-cr-00515-NGG-LB Document 88-3 Filed 03/06/20 Page 106 of 305 PageID #: 2692






FIG. 17. Summary of the paragenetic sequence in the Tenke-Fungurume district based on combined hand specimen, thin section, and polished section petrography observations, and QUEMSCAN and SEM analyses (complemented by Oosterbosch and Schuiling, 1951; Fay and Barton, 2011; D. Broughton, pers. commun., 2008; J. Woodhead, pers. commun., 2012). Not all minerals may be present in all locations in each deposit. Comparison between Kwatebala and Fungurume shows similar assemblages and sequences. Diagram illustrates the complex, multistage history of hypogene and supergene mineralization events.

Kjaundji, various historic prospect pits in pyritiferous Grand Conglomérat in the north of the concession, pyritic beds at Kisuahila (Barnard, 1924), in Nguba units, and in Nguba-age units near the historic smelter site at Luanzo Tshilongo. Each of these stratigraphically younger sites represents a local redox boundary, presumably reached by mineralizing fluids ascending along transverse structures.

*Structures and ores*

At the district scale, the particular strike and dip orientation of individual écailles do not show good correlations with oxide copper grades. However, distinct clusters of écailles in two NE-trending zones (R. Scott, pers. commun., 2004; Fig. 3a) tend to have higher grades (Goma-Shimbidi trend near Tenke town; the Fungurume cluster near the eponymous town). Structurally simple areas tend to have distinctly lower grades (northeastern side of the Dipeta syncline; western end of Pumpi). Thus, degree of structural complexity can be a useful guide to oxide ore.

At the outcrop scale, box folds, kink folds, bedding-parallel dilation textures, and shear-dilatant en echelons filled with chalcopyrite appear to be coeval with sulfide mineralization. These mesoscopic structures are more common in the hard, competent, siliceous RSF, whereas the underlying dolomitic DStrat reacted to tectonic stress more commonly with plastic-ductile deformation textures that appear to have been less conducive to mineralization. Similar bedding-parallel and low-angle shears occur in the thin-laminated SDB and are commonly unmineralized.

The bulk of the sediment-hosted oxide and sulfide copper-cobalt ores in Tenke-Fungurume are strata bound. Minor portions are in crosscutting veins. By definition, the term strata bound implies that ores are bound to, or restricted to, distinct stratigraphic horizons, whereas they are not stratiform. Logging

and statistical analysis of hundreds of drillholes from 12 ore deposits shows that most of the oxide ore (86%) is indeed strata bound, whereas the remaining 14% occurs in crosscutting veins. The ratio for sulfide ores is 90% strata bound to 10% in veins.

Epigenetic, crosscutting, sulfide-mineralized quartz-dolomite veins up to 1 m in thickness have been encountered in drilling on the south limb of Kwatebala. These rather exceptional veins show virtually no alteration halos. There is not enough close-spaced drilling or contiguous sulfide underground mining data to verify if these veins represent possible feeders for strata-bound hypogene ores.

The duality of strata-bound and epigenetic mineralization seems to hold for all scales, from millimeter to hundreds of meters. On the district scale, this relationship is mirrored by zones of structural complexity versus zones of relatively continuous sedimentary beds. At outcrop scale, RAT-bounded nose ends of elongate écailles tend to develop copper clearings (Fig. 2; Brooks and Malaisse, 1989), which are caused by higher grades in soils above the Mines Series. Straight, unbroken, middle sections of the same ecaille tend to have no or minor vegetation anomalies, reflecting lower oxide grades. Field observations suggest a commensurate higher vein density at the terminations of écailles and at zones where major structures cut across Mines Series rocks. Examples of stronger development of copper clearings above the ends of écailles are Shadirandzoro, Mwinasefu, Mambilima, and Pumpi (Figs. 3a, 7).

## Role of Evaporites

### *Evidence for evaporites*

There are no preserved soluble salt beds in Roan drill intercepts at Tenke-Fungurume. However, saline springs occur at Nguba village on the Tenke-Fungurume concession and have been worked at industrial scale for NaCl (Buffard and Grujenshi, 1979). They are the most direct and most significant evidence for large volumes of undissolved salt still present in the Katanga Supergroup in the Tenke-Fungurume area.

There is, however, extensive evidence for arid and hypersaline conditions during Roan deposition. The presence in the Mines Series of laminates, algal mats, and dolostones all indicate coastal sabkhas. Similar textures have been observed at Kambove (Cailteux, 1983; Cailteux et al., 2005a, fig. 5). There are also pseudomorphs of gypsum crystals (Figs. A7, A13), anhydrite nodules (Fig. A18), enterolithic folds (caused by hydration of anhydrite to gypsum), and chickenwire texture. Further evidence for sabkha conditions during sedimentation include dessication tepees, mud-cracks, bird-foot textures, and edgewise conglomerates at the Mofya quarry. Trace and major element geochemistry is indicative of evaporative lacustrine environments (see later section on geochemistry). Similar geochemical indicators occur at Kambove West (Cailteux, 1983) and elsewhere in the Congo Copperbelt (Moine et al., 1981).

Stratigraphic gaps in Roan intervals separated by breccias (Leruite, 1965; DeMagnee and François, 1988; Cailteux et al., 1994; François, 2006; Fig. 4) have been explained by dissolution of at least three regional and two local evaporite beds. Although the thickness of such evaporite layers is not known, Jackson et al. (2003) have suggested that the presalt dissolution Roan thickness may have measured over 2,000 m, twice today's thickness. The red clayey breccia matrix of the (R.1) RAT (Fig. A2) presumably represents the insoluble residue from dissolution of evaporites (Jackson et al., 2003). The polylithic RAT breccias observed in Tenke-Fungurume have been interpreted elsewhere as friction breccias associated with liquefaction of evaporite beds and expulsion of brines related to decollement faulting (Cailteux and Kampunzu, 1995). Audéoud (1982) and El Desouky et al. (2009) also determined that chloride fluids typical of evaporites formed the ores in the Congo Copperbelt.

### *Salt tectonics*

The Mines Series écailles in Tenke-Fungurume form numerous anticlines of tens to several hundreds of meters in size. Cores of these anticlines are occupied by RAT polymict breccias, by brecciated RAT siltstones, and by RGS (Roches Gréso-Schisteuses) units. Openings along blocks of the Mines Series within the RAT breccia are commonly filled in toothpaste fashion by RAT injection breccias, cleanly crosscutting Mines Series units and piercing up to the stratigraphic level of the CMN. These injections are typically 10 to 100 m long, and 1 to 20 m wide (Fig. 10a-c).

Compared to fold belts that host evaporite sequences worldwide (e.g., Zagros fold belt, Iran; Kent, 1958; Pontides; Alps), the Mines Series anticlines (Fig. 10a, c) at Tenke-Fungurume show striking structural similarities to classic evaporite-cored anticlines (M. Jackson, pers. commun., 2012). This is a characteristic fold pattern where detachment on top of salt (M. Jackson, pers. commun., 2012) has taken place, and these kinds of antiforms commonly evolve into injection folds (Fig. 10c, d).

The elongate geometry of many anticlines (particularly the north and south flanks of the Dipeta syncline), their RAT-RGS breccia cores, evaporite geochemistry and mineralogical evidence support that they represent former subvertical salt walls. Such salt walls can be several kilometers tall, several kilometersm long, but commonly only tens to hundreds of meters across. Individual écailles can also move upward within the rising salt (Hitzman et al., 2012, fig. 5). Examples of mineralized Mines Series écailles floating inside Roches Argileuses breccias occur throughout the Congolese Copperbelt (at Kakanda, Kambove, Likasi, and Étoile).

Some of the anticlines appear to have been subjected to late Lufilian low-angle thrusting and folding (Kwatebala and parts of Tenke; Fig. 10a, b). However, Jackson et al. (2003) and D. Broughton and M. Hitzman (pers. commun., 2004) suggested that these complex anticlinal apices are primarily products of diapirism, dissolution, and collapse.

Several Roan diapirs in the Tenke-Fungurume area were emplaced at structural junctions and form star-shaped footprints (Fig. 3a). The best example is the Mukondo diapir on the southeastern border of the Tenke concession. In the northern apophysis, Roan evaporite-gigabreccia pierced several kilometers upward through the Nguba-Kundelungu folded thrust sheet in the southern limb of the Mutaka syncline.

Drilling and geophysical surveys indicate that the Dipeta syncline is a gently box-folded recumbent isoclinal fold with

steep to overturned inside flanks and a relatively flat bottom. The Dipeta syncline is possibly underlain by a salt weld with the evaporites having migrated into salt walls forming the northern anticlines at Mwadinkomba and Shadzirandzoro and into the southern anticlines at Kansalawile and Mambilima (Fig. 7). In this scenario, the Dipeta syncline would be a sunken synform underlain by R.1 breccias and overlain by R.3 breccias; this would also explain the preservation of the overlying R.3 Dipeta sequence as a remnant that fills the Dipeta syncline (Fig. 3b) in normal stratigraphic sequence.

*Timing of tectonic events:* With increasing lithostatic load from over 7,000 m of Katanga Supergroup sedimentation, mobilization of Roan salts may have begun during pre-Lufilian times in the waning stages of extension (Bell, 1989; Jackson et al., 2003). During early compressive Lufilian stages, evaporites played an important role in dismembering the succession (Cailteux and Kampunzu, 1995; Kampunzu and Cailteux, 1999; Jackson et al., 2003). During the latter stages of the orogeny, salt-cored anticlines were compressed further, dismembered, or overturned. During that period, residual salt that had not been incorporated into antiforms may also have facilitated salt sheet extrusions followed by extensive low-angle thrusting (Cailteux and Kampunzu, 1995). The Mukondo injection breccia was younger than all these events.

*Interpretation—salt tectonics*

Tenke-Fungurume represents the largest (>500 km$^2$) example in the Central African Copperbelt of an areally extensive salt extrusion breccia with discordant contacts against Mwashya-Kundelungu sediments (Fig. 1). As shown in Figure 3b, the Pumpi overthrust sheet would be the overriding nappe from the south, the Kamikongwa thrust forming the basal sole thrust. Extrusion of Roan units was directed from south to north.

As is the case for Kolwezi (François, 1974), the footwall of the sole thrust might be one single pre-orogenic unit (possibly Ku 2.1., or pre-Katangan basement). Salt glacier extrusions (Fig. A22a, b) can advance decimeters per day (Talbot and Rogers, 1980). Thus they can provide an excellent mechanism to quickly emplace a large (up to several 100 km$^2$) sheet of salt mush with Mines Series gigaclasts entrained within it (Fig. 3a, b). The Roan Undifferentiated tectonic unit (Fig. 3a) is such an allochthonous gigabreccia detachment. Still, gigaclasts of Mines Series preserved consistent internal stratigraphy. Roan R1 and R3 pieces may have parted along weaker beds (dissolution breccias, gaps in the stratigraphic sequence), inferred to be vanished evaporites (François, 1973; Jackson et al., 2003). Examples of geologic analogues of this extrusion mechanism are the 300-km$^2$ Garmsar salt nappe, Iran; the Salt Range, Pakistan; and Flinders Range, South Australia (Jackson et al., 2003; M. Jackson, pers. commun., 2012; Fig. A22a-d).

There has long been discussion among local geologists as to whether the Dipeta (R3) is indeed stratigraphically younger than the RAT (R.1) and shares a similar facies (Fig. 6), or if R.1 and R.3 were tectonically sourced from the same-age original stratum and were later stacked via décollement or duplexing, separated by evaporite-greased thrust sheets; the former concept is favored here (Fig. 3b). In this scenario, the central Roan window (Fig. 3a) forms a giant north-directed megabreccia extrusion lubricated by evaporites (Cailteux and Kampunzu, 1995). Despite complex deformation, the rudimentary overall stratigraphy of R.1, R.2, and R.3 has been retained. This whole package of internally folded Roan rocks is now tilted by 10° to 15° toward the north. As a result, all R.2 Mines Series units only crop out in the southern half of the Roan window together with local outcrops of R.1; R.3 (RGS-Dipeta) units form the outcrops in the northern part of the window. The stratigraphic interface between R.2 and R.3 packages dips by 10° to 15° northward. This structural model implies a possible deep, extensive Mines Series still preserved under R3 cover in the northern part of the Roan window under the Mofya ecailles (Fig. 3b).

The presence of R.2 and R.3 as a core inside an R.2 shell in the Kwatebala anticline (Fig. 10a) would require local low-angle duplex thrusting of the Mines Series on top of R3 and R2, prior to anticline rise. An alternate possibility is early olistostrome décollement of a sheet of Roan R.1-R.3 sliding on top of Roan R.2-R.3, resulting in a doubled sequence developing prior to anticlinal rise. At this point, both models are still debated.

## Ages and Provenances

U-Pb zircon dating at Tenke-Fungurume (J. Halpin and D. Selley, pers. commun., 2010) on Roan rocks indicates that that 87% of RAT, SD, and RGS detrital ages are between 2.03 to 1.80 Ga, with main and subordinate peaks at 1.98 to 1.87 and 1.97 to 1.94 Ga, respectively. Provenance analysis for RAT, SD, and RGS indicates that Roan detritus was derived almost entirely from the Paleoproterozic Bangweulu Block (Fig. 1) to the east, with very minor input from the Kibaran belt in the northwest. This is within the wider range of 1789 ± 35 to 2081 ± 27 Ma (Master et al., 2005) of detrital ages of Roan siliclastics from the Central African Copperbelt. The provenance result is significant, as many previous researchers assumed the much closer Kibaran High to the northwest as the source region for Mines Series rocks in Tenke-Fungurume. In contrast to multi-source zircons in the western (Kolwezi) and southern parts (Lupoto) of the Copperbelt, the single-source Bangweulu provenance remained consistent at Tenke-Fungurume throughout the entire Roan time. The Bangweulu block source region consists of Paleoproterozoic high K, calc-alkaline, subduction-related, primitive melt volcanic sequences (Master et al., 2005). The results indicate that the geometry of the Katanga basin (Cornet, 1897; Brock, 1962) has been preserved with a radial sediment dispersal pattern from all directions. Ages for the Katanga Supergroup sedimentary rocks that occur in Tenke-Fungurume are shown in Figure 4, based on regional dates across the Central African Copperbelt. These ages also provide the basis for the chronology of events discussed. There is no direct age yet for ores in Tenke-Fungurume, and dates from other ore deposits in the Lufilian arc indicate a very protracted range of several hundred million years of base metal mineralizing events (see ages in right column, Fig. 4).

## Geochemistry

Major element contents at Kwatebala (Fig. 15) indicate that the RAT has high Mg (17–19% MgO, mostly as Mg chlorite), high ferric iron, and P contents. High Boron, Li

(100–500 ppm), and low alkalis (Schuh, 2008) all suggest a possible lacustrine environment (Moine et al., 1986), with the latter being too low for normal primary sedimentary compositions (Moine et al., 1981). The CaO values are low in RAT, reflecting lower dolomite contents than in the Mines Series (Fig. 15).

The Mines Series shows anomalous enrichment in only a few elements, namely in Li, P, and Ba (Schuh, 2008), besides Cu, Co, and S. DStrat, RSF and RSC are all poor in alkalis and rich in MgO. The SDB is richer in alkalis, especially $K_2O$; sericite flakes on bedding planes are common in the SDB, as noted above, and hydrothermal muscovite was observed in the RAT (Fig. 11a). Although not high in absolute terms, the $K_2O$ pattern broadly matches copper distribution (Fig. 15). Cobalt shows a distinct donkey-ear pattern centered on the RSC, flanked by wider copper halos, shown schematically in Figure 5. Silica is highest in the RSC, creating a pattern of central silica flooding flanked by symmetrical copper-cobalt peaks, typical for the Mines Series throughout Tenke-Fungurume.

Geochemical characteristics of RAT and Mines Subgroups sedimentary rocks indicate deposition in an evaporitic environment that evolved from oxidized (RAT lilas) to reduced (RAT gris and Mines Subgroup) conditions. The symmetrically zoned Cu-Co patterns centered on the massive central silicification of the RSC suggest that the latter could have provided a major paleoaquifer for fluids in the Mines Series. This flow pattern may have resulted in the massive silicification of the RSC and in Co-Cu sulfide deposition in the adjacent SDB and RSF.

### Sulfur Isotopes

There have been a number of studies in the Central African Copperbelt (Dechow and Jensen, 1965; Ohmoto, 1986; Sweeney et al., 1986, 1991; Hoy and Ohmoto, 1989; LeRouge et al., 2005; Muchez et al., 2008, 2010; El Desouky et al., 2009b, 2010) to indicate the source of sulfur and conditions of ore deposition. Sulfur isotopes from 23 samples from Kwatebala, Mwina Sefu, and two deposits from the Dipeta syncline are shown in Figure A20 (P. Capistrant, pers. commun., 2012). At Kwatebala, most values in the DStrat, RSF, and RSC are negative, ranging from +1 to −11‰. The range is the same for disseminated, early mineralization as for late, crosscutting vein-hosted sulfides. For pairs of samples from the same stratigraphic unit, there is a minor shift toward lighter isotopes in late-stage veins. For Kwatebala, only chalcopyrite in the SDS shows heavy values (4–10‰). The isotope distribution from the small Dipeta deposits is somewhat wider than the larger Kwatebala deposit. Dipeta appears to have a more bimodal distribution with discrete negative isotopic compositions for the basal parts of RSF, and two distinct heavy compositions (20‰, pyrite; 10‰, chalcopyrite) in the upper RSF.

The sulfur isotope composition of chalcopyrite from an evaporitic nodule from Kansalawile was exceptionally high at 10.4‰ (Capistrant et al., 2011; Fig. A20), indicating that the sulfide component was likely derived from inorganic, evaporitic sulfur. However, most sulfur isotope data from the concession are in the range of −10 to +3‰ (Capistrant et al., 2011), possibly due to thermochemical reduction. However bacterial sulfate reduction (BSR) could also have resulted in the precipitation of Cu-Co sulfides. In a detailed study of sulfidized anhydrite nodules from Kamoto and Luiswhishi, Muchez et al. (2008) demonstrated that the reduced sulfide sulfur in the DStrat and RSF could have been sourced from BSR of anhydrite nodules during early diagenetic stages in a closed system. This early timing is also in agreement with our petrographic observations at Tenke-Fungurume.

### Paragenetic Sequence of Events

This section summarizes paragenetic observations from field and drill core observations, thin and polished section petrography, cathodoluminescence, and QEMSCAN analyses (Fig. 17). The sequence reflects a long-lived, complex, and multistage series of mineralization and alteration events as follows:

1. Early diagenetic: (a) Synsedimentary to early diagenetic celestite, gypsum, and anhydrite nodules. (b) Cryptocrystalline quartz deposition with minor early dirty carrollite in bedding-parallel bands and blebs. (c) BSR of anhydrite nodules leads to replacement by dolomite plus Cu-Co sulfide.
2. Diagenetic: (a) Bornite-digenite cogenetic and replaced by carrollite. (b) Diagenetic coarse dolomite plus chalcocite replaced early carrollite. (c) Diagenetic quartz replaced dolomite 1. (d) Early copper and cobalt sulfides in bedding-parallel veins and replacement of reactive, reduced (formerly organic-rich?) laminations; fine disseminated sulfides follow bedding parallel laminations. (d) Diagenetic silica 2 was deposited, followed by dolomite 2 + barite + magnesite. (e) Extensive Mg chlorite, Mg tourmaline alteration.
3. Epigenetic: (a) Crosscutting vein stage, with silica 3, then silica 4 + sulfides, includes clean carrollite 2. (b) Formation of main orogenic dolomite + chalcopyrite + bornite + chalcocite 2. (c) Late orogenic crosscutting quartz and dolomite-sulfide veins developed at sites of most structural deformation. Veins are clean, lacking any alteration selvages.
4. Supergene: (a) In the highly oxidized RAT, coeval mineralization may have included hematite-chalcocite crackle veining, late Fe chlorite, and apatite. (b) Supergene weathering and oxidation, leached capping development and local supergene sulfide enrichment during the Miocene; formation of heterogenite, malachite, cuprite, native copper, chrysocolla, cobaltoan dolomite. (c) Late generation chalcocite replacing carrollite.
5. Weathering and selective dissolution of coarse dolomite.

### Genetic Models

Over the last 90 years, a variety of models has been proposed for the genesis of ore deposits in the Central African Copperbelt, and they are briefly summarized below.

#### *Two-stage hypogene mineralization*

At Tenke-Fungurume, CSK and UMHK conducted regional geologic mapping starting in 1919. Two hypogene stages were recognized: early, laterally extensive dissemination-impregnation followed by a Lufilian overprint of crosscutting, epigenetic veins described at Fungurume (Robert, 1931), then supergene enrichment. For small copper deposits in the Kundelungu Plateau, Robert suggested a syngenetic origin, assuming these represented eroded and reworked Mines Series.

*Epigenetic-hydrothermal*

In the 1930s, Gray's (1932) work in Zambia strongly influenced the prevalent genetic model of the Central African Copperbelt ores. He proposed an epigenetic-hydrothermal origin, and inferred deep-seated magmas in pre-Katangan basement. Mineralizing fluids were thought to have risen along deep structures through the RAT and into the overlying Mines Series (Schuiling, 1947). This model did explain well why the best ores occur at the base of the Mines Series. However, it could not account for the complete lack of hypogene mineralization in the hematitic RAT. With new dating methods in the 1950s, the suggested source granites in Zambia turned out to be older than the Katangan sedimentary rocks that host ore, so the model became untenable.

*Synsedimentary-syngenetic*

The 1930s to 1960s saw the rise of the synsedimentary-syngenetic stratiform model (Schneiderhöhn, 1931, 1937; Garlick, 1961), mainly in Zambia. Patterned after earlier research in the Kupferschiefer, this model proposed erosion of metals from a metalliferous highland surrounding the Katangan basin. The metals would then have been precipitated from seawater where it came in contact with reduced, euxinic conditions. The stratiform (= syngenetic) model was not able to explain postdepositional alteration in Zambia (Darnley, 1960) and was challenged as early as 1962 by Brock (1962) on regional structural and sedimentological grounds. Brock also pointed out the long-lived nature of copper mineralizing events in Katanga.

*Diagenetic*

By the 1970s, a diagenetic origin was favored (Bartholomé et al., 1973; François, 1973; Bartholomé, 1974; Brown and Chartrand, 1983; Cailteux et al., 2005b). The former presence of evaporites was viewed more in their genetic role for metal-transporting, alkaline oxidized brines (François, 1973; De Magnee and François, 1988; Kirkham, 2001). Another role of evaporites, that of structural disruption (diapirs, salt wells, and lubricant for overthrusting), was recognized by François (1987), Cailteux and Kampunzu (1995), and Jackson et al. (2003). The latter authors applied long-established principles from hydrocarbon exploration to metal deposits and reinterpreted the structural history under the influence of halokinesis. Hitzman et al. (2005) and Australian Mineral Industry Research Association collaborators brought a global sedimentary copper perspective, again combined with petroleum geology concepts. The longevity of Katanga copper mineralization events for 100s of millions of years has been recognized for over 80 years (Robert, 1931) and was recently reemphasized (Hitzman et al., 2005, 2012; Selley et al., 2005; François, 2006).

*Multistage model*

Dewaele et al. (2006), Schuh (2008), El Desouky et al. (2009a, 2010), Haest and Muchez (2011), and Hitzman et al. (2012) all emphasized that the bulk of the ore formed during burial diagenesis and that late synorogenic sulfide veins represented only minor additions and remobilizations. The present authors subscribe to this model, with a few modifications.

*Alternatives*

Recent publications proposed early origins related to basin inversion at Nchanga in Zambia (McGowan et al., 2006) and late, post-Lufilian strata-bound Cu-Ag mineralization (El Desouky et al., 2008a, b) in the Democratic Republic of Congo. Sillitoe et al. (2010) proposed that most mineralization occurred postlithification of the host rocks, mainly during Lufilian inversion and orogenesis. Hitzman et al. (2012, 2013) provides further discussion on this and other genetic models.

## Sequence of Geologic Events

This section summarizes our current interpretation of the geologic evolution, the structural history, and the associated mineralization stages for the Tenke-Fungurume district (Figs. 3a-b, 17). The transitions from stage to stage are gradual; processes described under one specific stage may also have started in the preceeding stage and may have continued into subsequent stages. Ages shown are approximate only, to provide a chronologic guideline (Fig. 4).

1. Deposition of Roan sediments, early diagenesis (850?–765 Ma on an unknown basement): Terrestrial Roan red beds were derived from a Mesoproterozoic subduction-related, calc-alkaline volcanic arc, a viable source of copper. Spongy hematite crusts on oxidized siliciclastic grains in the Roan would provide an excellent trap for metals derived from erosion of mafic minerals and from sulfides eroded from the surrounding highlands or occurring in a metalliferous basement. Evaporation of seawater during deposition of RAT and RGS surpassed the NaCl stage and produced highly evolved Ca-Mg and slightly K-rich residual bittern brines. The dense brines migrated downward and circulated through the lower Roan and possibly through the basement. Salt beds occured both below and above the Mines Series strata, providing an inverse sandwich, with the competent beds in the middle. Diagenesis and lithification of sediments typically take place within a few million years from time of deposition. Complex early diagenetic processes led to the dissolution of primary minerals, creating the porosity for later mineralizing fluid flow. Early décollement along mobile salt beds during upper Roan times could have resulted in the observed duplication of R1 to R3 sequences. Pyrite, anhydrite nodules, and chalcedony formed during synegenetic to early diagenetic stages. Diagenetic copper sulfides replaced the anhydrite nodules accompanied by dolomitization. Comparable chalcopyrite nodules formed at Konkola at this time (Selley et al., 2005).
2. Nguba sedimentation and burial diagenesis (approx. 765–625 Ma): 1,800-m thick Nguba sediments were deposited on top of the Roan. This sediment load was sufficient to cause upward migration of residual Mg-Cl–rich bittern brines through the Roan. Diagenetic processes continued, involving brine circulation. A possible trigger for brine ascent may have been the sudden lithostatic load from rapid deposition of 1,000 m of Grand Conglomérat tillite after melting of the Sturtian global ice load at the base of the Nguba. Brines circulated through oxidized, hematitic RAT (and possibly Dipeta) sediments, leaching and complexing copper and cobalt. The brines leached cupriferous hematite crusts from siliciclastic grains in the red RAT and possibly metals from the

underlying basement. The bittern brines also would have protected halite salt from being dissolved by any undersaturated basinal fluids. Diagenetic copper sulfides developed in bedding-parallel veins and laminations and as selective replacement of millimeter-thick reduced, organic-rich cyanophyta laminations in the Mines Series; jack veins developed, likely due to fluid overpressurization of formational waters. Anhydrite nodules might have provided additional sulfur through BSR, and diagenetic pyrite provided additional reduction sites; 80 to 90% of the copper-cobalt sulfide budget in Tenke-Fungurume is related to these diagenetic processes that may have continued into Kundelungu times. A number of base metal deposits in the Central African Copperbelt formed in this period.

3. Kundelungu sedimentation (approx. 625–573 Ma): The sediment load was sufficient to trigger salt movement, causing buoyant evaporites to rise into elongate antiforms and salt walls. The early stages of basin inversion began, with basin thickening by lithologic load and subsidence; or by tectonic load from the onset of the earliest Lufilian thrusts propagating toward the north-northeast. The Katangan basin depocenter shifted north, due to the northward-advancing Lufilian compression. Ahead of this deformation front, the uppermost, nearly undeformed, flat-lying Kundelungu units were deposited as foreland fill.

4. Early Lufilian deformation: This stage started between 580 and 560 Ma. Salt antiforms were pinched and evaporite gigabreccias were expelled upward. Mobile Roan salt breccias at depth were further pressurized, setting the stage for later salt sheet extrusion.

5. Main Lufilian compression (peak at 530 Ma): This stage laterally squeezed the mobile Roan. Structural duplexing of Roan R.1 to R.3 may also have taken place at this stage. A 15- × 25-km evaporite salt sheet rapidly extruded on top of an unknown surface (Fig. 3b) emplaced the Roan R.1 to R.3. This salt glacier contained the diagenetically earlier mineralized Mines Series. Local antiforms (e.g., Kwatebala, Fwaulu, Sefu) and synforms (Mudilandima) could have developed as second-order, 1- to 3-km-sized, halokinetic structures during the waning stages of this salt glacier extrusion.

Within the Lufilian arc, Tenke-Fungurume appears to have undergone only intermediate-intensity horizontal compression, with subvertical anticlines preserved. Further evidence for predominantly vertical orientation is the minimum 2,000-m depth of the Mines Series, as defined by drilling.

Mineralization at Tenke-Fungurume at this stage was mostly associated with deformation-related structures. Copper-cobalt sulfide veins cut across earlier sulfide mineralization and across multiple earlier alteration assemblages. Veins tend to be mineralogically simple and mostly lack alteration halos; they are perpendicular or bedding-parallel, but always quite distinct from earlier stages. During Lufilian structural disruption, meteoric water finally accessed and dissolved halite salt. This may have resulted in the crosscutting, peripheral sodic alteration in the Dipeta Group.

6. Late Lufilian overthrusting (520?–500 Ma): This stage involved gentle folding and subsequent low-angle thrusting of Nguba and Kundelungu units. We agree with François' (1973) distinction between early Lufilian Kolwezi nappe emplacement and late Lufilian Kundulungu deformation. In Tenke-Fungurume, the latter stage is represented by two large, folded Nguba-Kundulungu thrust sheets in the south, four gentle synclines in the east, and by the Kamikongwa fault zone on the north side of the Roan window (Fig. 2). The timing of the seven lambeaux (klippes) in the west could correspond to the early Lufilian Kolwezi nappes. Low-angle thrusting displaced orebodies by 10s of meters (Fig. 10a, b).

7. Late diapirs pierced the thrust sheets (500 Ma?). The Kilukaka-Mukondo diapir in the southeastern corner of the Tenke-Fungurume concession pierced the Mutaka thrust sheet at a very late stage, undoubtedly after the overthrusting event. This indicates that some evaporites in the underlying Roan R.1 were still present after the Kundulungu low-angle thrust event.

8. Uplift, peneplanation (500–15 Ma): Africa became cratonized after the Lufilian orogeny. Uplift, erosion, and peneplanation occurred during most of the Phanerozoic.

9. Supergene oxidation (15–2 Ma): Extremely low groundwater tables during the Late Tertiary led to deep oxidation and eventually to the development of rich supergene oxide copper deposits since the Miocene (Gasse, 2006; Decree et al., 2010). Characteristically, hypogene ores at Tenke-Fungurume weather in situ. Less mobile cobalt remains in place, while more mobile copper moves meters to tens of meters down hydrologic gradients. Leached capping development, if any, is restricted to a few 10s of meters downdip, with supergene ores deposited immediately underneath them.

10. Quaternary erosion (2 Ma to present): Formation of inselbergs (Kwatebala) with locally lower ground-water tables preserves the supergene ores. Near major rivers, incision and backward erosion of supergene ores has resulted in mixed ore in outcrop at Fungurume II. This erosion removed and destroyed supergene ores in some areas.

## Conclusions

Tenke-Fungurume is a world-class strata-bound copper-cobalt mining district and is particularly notable as an ore district for the extent and high grade of the oxide portion of its total mineral inventory. Multistage mineralization took place with at least four separate dolomitization and four silicification events associated with several sulfide stages, with differing mineral assemblages. This reflects a complex and protracted history that included extension and orogenic compression from pre-800 to post-500 Ma, followed by a long quiescence throughout the Phanerozoic. During syngenetic to early diagenetic stages of basin extension, highly oxidized and saline residual marine bittern brines migrated through the RAT basal red-bed sequence. The brines also possibly circulated into the basement, mobilizing copper as chloride complexes. With increased subsidence, lithostatic load from the 7,000 m of overlying Katanga Supergroup drove copper-cobalt–rich brines laterally and vertically toward basin edges. Major feeder structures for fluids have not been identified despite over 350,000 m drilled in 2,000 holes. Copper and cobalt sulfides were precipitated where the brines encountered reductants, including organic-rich, stromatolitic, sour gas, or pyrite-rich beds. Sulfur sources appear to be from evaporitic anhydrite in proximal and deeper parts of hypogene ores. Diagenetic pyrite may have contributed additional sulfur in the reduced, stratigraphically higher parts of the

Mines Series. The bulk of the copper sulfides appear to have formed during diagenetic stages.

Salt rise probably took place early in the deeper parts of the basin during extension. With basin inversion, salt tectonics developed increasingly complex halokinetic structures during multiple events. Lufilian compression led to a megabreccia salt extrusion sheet in the central 500 km² of the Tenke-Fungurume window. There, continuous, preexisting diagenetic copper sulfide beds occur now within complex folded and faulted megabreccia fragments measuring 100s of meters to a few kilometers in size. Despite the extremely complex structural history, the megafragments still retain their original internal stratigraphy and centimeter-thin mineralization layers that can be closely correlated by fine stratigraphy for tens of kilometers. At peak orogeny, local remobilization of early-stage sulfides took place, resulting in mineralogically distinct late-stage sulfide veins that cut clean earlier mineralization assemblages. Supergene oxidation in the Miocene to Pliocene led to the development of world-class high-grade oxide copper-cobalt ores.

## Acknowledgments

The authors thank Freeport McMoRan Copper and Gold, Inc. for continued support in advancing the geologic understanding of Tenke-Fungurume. Joseph "Papa" Nzita Di Taty is especially acknowledged for invaluable comments and geologic advice, which reflect a life-long career as a tireless, highly professional exploration geologist in the Katangan Copperbelt. We thank the entire Freeport exploration team at Tenke Fungurume Mining for their contributions, especially geologists Budi Santoso, Stefan Brammer, Carlo Ascano, Pascal Mambwe Matanda, Alain Kapemba Mukanzila, Etienne Kadima, Marcel Banza Kayembe, Thsikambi Mazau, Johny Mpoyo, Bruno Tshiteng Kavbing, Bernard "Papa" Kaluendi (deceased), Pitchou Tambwe, Eric Eyumba, Stéphane Ngola Lukau, Danny Balufu, Didier Lumbala, Yves Kaputo, Stéphane Bila, and Nazireat Kapanta. Jean-Pierre Mpoyo Mulonda, and Serge Bombay, Antoine Kimbasi, Alain Mayonde, Eric Kasongo, and "Papa" Kapondo provided critical support with logistics, database, laboratory, and administration. At the Oro Valley office, Justin Cardwell, Sebastien Lavoie, Bill Stavast, and Jerry Waegli under the guidance of Ralph Stegen provided invaluable help with ore deposit modeling. We are grateful to Jon Woodhead for providing QEMSCAN data, descriptions, and discussion on paragenetic relationships, and to Patricia Capistrant (Colorado School of Mines) for the sulfur isotope data. We thank David Broughton for the use of thin section photomicrographs and for memorable joint field visits to sediment-hosted copper localities in Namibia, Zambia, Boleo, Tenke, Kupferschiefer, Dzhezkazgan, and White Pine. Murray Hitzman provided fruitful discussions and very valuable perspectives and insights from petroleum geology concepts applied to metal deposits. Sergio Castro-Reino provided creative insights and productive scientific discussions. This paper benefited from the results of the Colorado School of Mines-CODES University of Tasmania AMIRA project P872. We thank Martin Jackson for his review of halokinetic features and valuable advice based on extensive expertise in salt tectonics. Sebastien LaVoie provided valuable comments on the paper and Linda Dufek supplied the drafting of cross sections of the orebodies. We thank Jacques Cailteux and Philippe Muchez for their constructive reviews and thoughtful suggestions in the review process; they both helped to improve the manuscript. We also thank Murray Hitzman for reviewing the paper during his Christmas holidays, and Mike Harris and Jeff Hedenquist for their endless patience and thorough editing.

## REFERENCES

Alexandre-Pyre, S., 1971, Le plateau des Biano: Brussels, Belgium, Academie Royale des Sciences d'Outre-Mer, Classe des Sciences Techniques Memoires, Memoir 8, XVIII-3, 151 p.

Armstrong, R.A., Master, S., and Robb, L.J., 2005, Geochronology of the Nchanga Granite, and constraints on the maximum age of the Katanga Supergroup, Zambian Copperbelt: Journal of African Earth Sciences, v. 42, p. 32–40.

Audéoud, D., 1982, Les minéralisations uranifères et leur environnement à Kamoto, Kambove et Shinkolobwe (Shaba, Zaïre) pétrographie, géochimie et inclusions fluides: Unpublished thèse de doctorat, Université Claude-Bernard Lyon 1, 203 p.

Barnard, G., 1924, Service Geologique Fungurume-Ninga area: 1:125,000 scale maps of pyritic beds: Unpublished Union Minière du Haut-Katanga report.

Barra, F., Broughton, D., Ruiz, J., and Hitzman, M., 2004, Multi-stage mineralization in the Zambian Copperbelt based on Re-Os isotope constraints [abs.]: Geological Society of America Abstracts with Programs, v. 36, no. 5, p. 516.

Bartholomé, P., 1974, On the diagenetic formation of ores in sedimentary beds, with special reference to Kamoto, Shaba, Zaïre, *in* Bartholomé, P., ed., Gisements Stratiformes et Provinces Cupriféres: Liége, Centenaire de la Société Géologique de Belgique, p. 203–213.

Bartholomé, P., Evrard, P., Katekesha F., Lopez-Ruiz, J., and Ngongo, M., 1973, Diagenetic ore-forming processes at Kamoto, Katanga, Republic of the Congo, *in* Amstutz, G.C., and Bernard A.J., eds.: Ores in sediments: Heidelberg, Springer-Verlag, p. 21–41.

Batumike, M.J., Kampunzu, A.B., and Cailteux, J.L.H., 2006, Petrology and geochemistry of the Neoproterozoic Nguba and Kundelungu Groups, Katangan Supergroup, southeast Congo: Implications for provenance, paleoweathering and geotectonic setting: Journal of African Earth Sciences, v. 44, p. 97–115.

Batumike, M.J., Cailteux, J.L.H., and Kampunzu, A.B., 2007, Lithostratigraphy, basin development, base metal deposits, and regional correlations of the Neoproterozoic Nguba and Kundelungu rock successions, Central African Copperbelt: Gondwana Research, v. 11, p. 432–447.

Beetz, W., 1929, Über das wahrscheinlich altcambrische oder jungproterozoische Alter der Glazialschichten an der Basis des Kundelungu-Systems in Katanga und am unteren Kongo: Neues Jahrbuch für Mineralogie, Geologie und Paläontologie, Beilagebände, Abteilung B, v. 61, p. 61–82.

Bell, R.T., 1989, A conceptual model for development of megabreccias and associated mineral deposits in the Wernecke Mountains, Canada, Copperbelt, Zaire, and Flinders Range, Australia: International Atomic Energy Agency TecDoc p. 148–169.

Belliere, J., 1966, Les sediments kundelungiens dans l'Arc Mwashya-Bunkeya: Annales de la Societe Geologique de Belgique, v. 89, p. 357–37.

Bodiselitsch, B., Koeberl, C., Master, S., and Reimold, W.U., 2005, Estimating duration and intensity of Neoproterozoic snowball glaciations from Ir anomalies: Science, v. 308, p. 239–242.

Brems, D., Muchez, P., Sikazwe, O., and Mukumba, W., 2009, Metallogenesis of the Nkana copper-cobalt South orebody, Zambia: Journal of African Earth Sciences, v. 55, p. 185–196.

Brock, B.B., 1962, On the structure and sedimentation of the Katanga basin, *in* Lombard, J., and Nicolini, P., Gisements stratiformes de cuivre en Afrique: Congres geologique international, Association des Services Geologiques Africains, Lusaka, 1962, 2eme partie, Tectonique, p. 116–124.

Brooks, R.R., and Malaisse, F., 1989, Metal-enriched sites in South-Central Africa, *in* Shaw, J., ed.: Heavy metal tolerance in plants: Evolutionary aspects: Boca Raton, CRC Press, p. 53–73.

Broughton, D., and Hitzman, M., 2004, Report to Phelps Dodge Corporation on Tenke-Fungurume: Results of the field visit and work on maps, sections, samples at CSM: Colorado School of Mines, 45 p.

Brown, A.C., and Chartrand, F.M., 1983, Stratiform copper deposits and interactions with co-existing atmospheres, hydrospheres, biospheres and lithospheres: Precambrian Research, v. 20, p. 533–542.

Buffard, R., 1988, Un rift intracontinental du Precambrien Superieur: le Shaba meridional (Zaire). Evolution sédimentaire et tectonique du Supergroupe de Roan au Groupe du Kundelungu inférieur (Supergroupe du Kundelungu): Unpublished Thése de Doctorat en Sciences, France, Université Maine, 316 p.

Buffard, R., and Grujenshi, C., 1979, Les sources salines de l'Arc du Shaba méridional, Leur relation probable avec l'existence d'une assise salifère de la couverture katanguienne: Annales de la Societé Géologique de Belgique, v. 102, p. 285–294.

Bull, S., Selley, D., Broughton, D., Hitzman, M., Cailteux, J., Large, R., and McGoldrick, P., 2011, Sequence and carbon isotopic stratigraphy of the Neoproterozoic Roan Group strata of the Zambian copperbelt: Precambrian Research, v. 190, p. 70–89.

Büttgenbach, H., 1904, Les gisements de cuivre du Katanga: Annales de la Société Géologique de Belgique, v. 31, p. 515–564.

——1906, L'avenir industriel de l'état indépendant du Congo: Revue Universelle des Mines, v. 14, p. 115–147.

Cahen, L., 1974, Geological background of the copper-bearing strata of southern Shaba (Zaire): *in* Bartholomé, P., ed., Gisements Stratiformes et Provinces Cuprifères: Liège, Centenaire de la Société Géologique de Belgique, p. 57–77.

Cailteux, J., 1978a, Particularités stratigraphiques et pétrographiques du faisceau inférieur du Groupe des Mines au centre de l'Arc cuprifère shabien: Annales de la Société Géologique de Belgique, v. 100, p. 55–71.

——1978b, La succession stratigraphique du C.M.N. (ou R.2.3.) au centre de la sous-province cuprifère shabienne. (ou R.2.3): Annales de la Société Geologique de Belgique, v. 100, p. 73–85.

——1983, Le Roan shabien dans la région de Kambove (Shaba-Zaire). Etude sédimentologique et métallogénique: Unpublished Thèse de Doctorat en Sciences Appliquées, Belgium, University of Liege, 232 p.

——1994, Lithostratigraphy of the Neoproterozoic Shaba-type (Zaire) Roan Supergroup and metallogenesis of associated stratiform mineralization: Journal of African Earth Sciences, v. 19, p. 279–301.

——1997, Minéralisation à U-Pb-Se-Mo-Ni dans les gisements stratiformes cupro-cobaltifères de Kambove-Ouest (Shaba, Rép. Zaïre), *in* Charlet J-M., ed., International Cornet symposium strata-bound copper deposits and associated mineralization: Liège, Faculté Polytechnique de Mons and Royal Academy of Overseas Sciences, p. 245–286.

——2003, Proterozoic sediment-hosted base metal deposits of western Gondwana: International Geosciences Program, 3rd, United Nations, New York, IGCP-450 Conference, Lubumbashi, Democratic Republic of the Congo, Field Trip Guidebook p. 201–223.

Cailteux, J., and Kampunzu, A.B., 1995, The Katangan tectonic breccias in the Shaba province (Zaire) and their genetic significance: Musée Royal de 'Afrique Centrale, Tervuren (Belgium), Annales des Sciences Géologiques, v. 101, p. 63–76.

——2004, Third Workshop of IGCP 450: Proterozoic sediment-hosted base metal deposits of Western Gondwana: Episodes, v. 27, p. 209–213.

Cailteux, J., Binda, P.L., Katekesha, W.M., Kampunzu, A.B., Intiomale, M.M., Kapenda, D., Kaunda, C., Ngongo, K., Tshiauka, T., and Wendorff, M., 1994, Lithostratigraphical correlation of the Neoproterozoic Roan Supergroup from Shaba (Zaire) and Zambia, in the Central African copper-cobalt metallogenic province: Journal of African Earth Sciences, v. 19, p. 265–278.

Cailteux, J., Kampunzu, A.B., and Batumike, M.J., 2005a, Lithostratigraphic position and petrographic characteristics of RAT ("Roches Argilo-Talqueuses") Subgroup, Neoproterozoic Katangan belt (Congo): Journal of African Earth Sciences, v. 42, p. 82–94.

Cailteux, J.L.H., Kampunzu, A.B., Lerouge, C., Kaputo, A.K., and Milesi, J.P., 2005b, Genesis of sediment-hosted stratiform copper-cobalt deposits, Central African Copperbelt: Journal of African Earth Sciences, v. 42, p. 134–158.

Cailteux, J.L.H., Kampunzu, A.B., and Lerouge, C., 2007, The Neoproterozoic Mwashya-Kansuki sedimentary rock succession in the Central African Copperbelt, its Cu-Co mineralization, and regional correlations: Gondwana Research, v. 11, p. 414–431.

Capistrant, P., Fields, A., Stockhausen, T., and Hitzman, M., 2011, Comparative analysis of alteration and mineralization at Kwatebala and the Dipeta Syncline, Tenke-Fungurume sedimentary rock-hosted stratiform Cu-Co district, DRC: Association of Mining and Exploration of British Columbia, Cordilleran Roundup Conference poster, Vancouver, January 2011.

Cobbold, P.R., and Rodrigues, N., 2007, Seepage forces, important factors in the formation of horizontal hydraulic fractures and bedding-parallel fibrous veins ("beef" and "cone-in-cone"): GeoFluids v. 7, p. 313–322.

Cornet, J., 1892, A series of eleven field notebooks: Tervuren, Belgium, Archives of the Museum for Central Africa, Unpublished.

——1894, La géologie de la partie Sud-Est du Bassin du Congo et les Gisements Métallifères du Katanga: Revue Universelle des Mines, de la Métallurgie, v. 28, 217–280.

——1897, Observations sur les terrains anciens du Katanga faites aucour de l'expedition Bia-Francqui (1891–1893). Annales de la Societé Géologique de Belgique v. 24, p. 25–190.

——1903, Les gisements metalliferes du Katanga: Bulletin de la Société Belge de Géologie, v. 17.

Darnley, A.G., 1960, Petrology of some Rhodesian copperbelt orebodies and associated rocks: Transactions of the Institution of Mining and Metallurgy, v. 69, p.137–173.

Decrée, S., Deloule, E., Ruffet, G., Dewaele, S., Mees, F., Marignac, C., Yans, J., and De Putter, T., 2010, Geodynamic and climate controls in the formation of Mio-Pliocene world-class oxidized cobalt and manganese ores in the Katanga province, DR Congo: Mineralium Deposita, v. 45, p. 621–629.

De Magnee, I., and François, A., 1988, The origin of the Kipushi (Cu, Zn, Pb) deposit in direct relation with a Proterozoic sait diapir, Copperbelt of Central Africa, Shaba, Rep. of Zaïre: *in* Friedrich, G.H. and Herzig, P.M., eds, Base metal sulfide deposits: Heidelberg, Springer-Verlag, p. 74–93.

Demesmaeker, G., François, A., Oosterbosch, R., 1963, Gisements stratiformes de cuivre en Afrique: Symposium coordonne par J.Lombard et P. Nicolini, 2eme partie: Tectonique, Lusaka, 1962: Association de Services Geologiques Africaines, p. 47–76.

Dechow, E., and Jensen, M.L., 1965, Sulfur isotopes of some Central African sulfide deposits: Economic Geology v. 60, p. 894–941.

Dewaele, S., Muchez, Ph., Vets, J., Fernandez-Alonzo, M., and Tack, L., 2006, Multiphase origin of the Cu-Co ore deposits in the western part of the Lufilian fold-and-thrust belt, Katanga (Democratic Republic of Congo): Journal of African Earth Sciences v. 46, p. 455–469.

Dewaele, S., Muchez, P., El Desouky, H., Haest, M., and Heijlen, W., 2008, Multiphase origin of the base metal deposits in the Lufilian fold-and-thrust belt, Katanga (Democratic Republic of Congo): Leuven, Belgium, Royal Museum for Central Africa, 74 p. http://www.gecoproject.org/pdf/Report_GECO_multiphase_origin.pdf

Dong, G., Morrison, G., and Jaireth, S., 1995, Quartz textures in epithermal veins, Queensland: Classification, origin and implication: Economic Geology, v. 90, 6, p. 1841–1856.

El Desouky, H.A., Muchez, Ph., Dewaele, S., Boutwood, A., and Tyler, R., 2008a, Postorogenic origin of the stratiform Cu mineralization at Lufukwe, Lufilian foreland, Democratic Republic of Congo: Economic Geology, v. 103, p. 555–582.

El Desouky, H.A., Muchez, Ph., and Tyler, R., 2008b, The sandstone-hosted stratiform copper mineralization at Mwitapile and its relation to the mineralization at Lufukwe, Lufilian foreland, Democratic Republic of Congo: Ore Geology Reviews, v. 34, p. 561–579.

El Desouky, H., Muchez, Ph., Boyce, A., Cailteux, J., and Dewaele, S., 2009b, Sources of sulphur in the Katanga Copperbelt, Democratic Republic of Congo, *in* Williams, P.J. et al., eds., Smart science for exploration and mining: Rotterdam, Millbank, p. 432–434.

El Desouky, H.A., Muchez, P., and Cailteux, J., 2009a, Two Cu-Co sulfide phases and contrasting fluid systems in the Katanga Copperbelt, Democratic Republic of Congo: Ore Geology Reviews, v. 36, p. 315–332.

El Desouky, H.A., Muchez, P., Boyce, A.J., Schneider, J., Cailteux, J.H.L., Dewaele, S., and von Quadt, A., 2010, Genesis of sediment-hosted stratiform copper-cobalt mineralization at Luiswishi and Kamoto, Katanga Copperbelt (Democratic Republic of Congo): Mineralium Deposita, v. 45, p.735–763.

Eugster, H.P., 1985, Oil shales, evaporites and ore deposits: Geochimica et Cosmochimica Acta, v. 49, p. 619–635.

Fay, I., and Barton, M.D., 2012, Alteration and ore distribution in the Proterozoic Mines Series, Tenke-Fungurume Cu-Co district, Democratic Republic of Congo: Mineralium Deposita, v. 47, p. 501–519.

François, A., 1950, Geologic Map Tenke, Geologic Map Fungurume 1:20,000 scale : Unpublished Union Minière du Haut Katanga (UMHK) company maps.

——1973, L'extrémité Occidentale de l'Arc Cuprifère Shabien. Etude Géologique: Département Géologie Gécamines, Likasi, (République du Zaïre), Mémoir, p. 1–65.

——1974, Stratigraphie, tectonique et minéralisations dans l'Arc cuprifère du Shaba (Rép. du Zaïre), *in* Bartholomé, P., ed., Gisements Stratiformes

Case 1:16-cr-00515-NGG-LB Document 88-3 Filed 03/06/20 Page 114 of 305 PageID #: 2700



et Provinces Cuprifères: Liège, Centenaire de la Société Géologique de Belgique, p. 79–101.
——1987, Synthèse géologique sur l'Arc cuprifère du Shaba (République du Zaïre): Société Belge de Géologie, Centenaire 1987, p. 15–65.
——2006, La partie centrale de l'arc cuprifère du Katanga-Étude Géologique et carte géologique au 1/200.000: Tervuren, Belgium, Royal Africa Museum.
Freeport McMoRan, 2012, Annual Report, 10-k statement for the year 2011: http://www.fcx.com/ir/downloads/2011_Form_10-K.pdf
Garlick, W.G., 1961, The syngenetic theory, *in* Mendelsohn, ed., The geology of the northern Rhodesian Copperbelt: London, Macdonald and Co., p. 145–165.
Gasse, F., 2006, Climate and hydrological changes in tropical Africa during the past million years: Comptes rendus Academie du Sciences Paleontologiques v. 5, is. 1–2, p. 35–43.
Giresse, P., 2005, Mesozoic-Cenozoic history of the Congo Basin: Journal of African Earth Sciences, v. 43, p. 301–315.
Gray, A., 1932, The Mufulira copper deposit, northern Rhodesia: Economic Geology, v. 27, p. 315–343.
Grosemans, P., and Jamotte, A., 1937, L'horizon des cherts du Kundelungu supérieur: Comité Spécial du Katanga (CSK), Annales du Services des Mines, v. 8, p. 14–25.
Guillemain, C., 1913, Zur Geologie von Katanga: Zeitschrift der Deutschen Geologischen Gesellschaft : (Abhandlungen und Monatsberichte) Monatsberichte, v. 65, no. 1, p. 304–328.
Haest, M., and Muchez, P., 2011, Stratiform and vein-type deposits in the Pan-African orogen in central and southern Africa: Evidence for multiphase mineralization: Geologica Belgica, v. 14, p. 23–44.
Haest, M., Muchez, Ph., Dewaele, S, Franey, N., and Tyler, R., 2007, Structural control on the Dikulushi Cu-Ag deposit, Katanga, Democratic Republic of Congo: Economic Geology, v. 102, p. 1321–1333.
Heijlen, W., Banks, D.A., Muchez, Ph., Stensgard, B.M., and Yardley, B.W.D., 2008, The nature of mineralizing fluids of the Kipushi Zn-Cu deposit, Katanga, Democratic Repubic of Congo: Quantitative fluid inclusion analysis using laser ablation ICP-MS and bulk crush-leach methods: Economic Geology, v.103, p. 1459–1482.
Hitzman, M., Kirkham, R., Broughton, D., Thorson, J., and Selley, D., 2005, The sediment-hosted stratiform copper ore system: Economic Geology 100th Anniversary Volume, p. 609–642.
Hitzman, M.W., Selley, D., and Bull, S., 2010, Formation of sediment-hosted stratiform copper deposits through Earth history: Economic Geology, v. 105, p. 627–639.
Hitzman, M., Broughton, D., Selley, D., Woodhead, J, Wood, D., and Bull, S., 2012, The Central African Copperbelt: Diverse stratigraphic, structural, and temporal settings in the world's largest sedimentary copper district: Society of Economic Geologists Special Publication 16, p. 487–514.
Hoy, L.D., and Ohmoto, H., 1989, Constraints for the genesis of redbed associated stratiform Cu deposits from sulphur and carbon mass balance relations: Geological Association of Canada Special Paper 36, p. 135–149.
Jackson, M.P.A., Warin, O.N., Woad, G.M., and Hudec, M.R., 2003, Neoproterozoic allochthonous salt tectonics during the Lufulian orogeny in the Katanga Copperbelt, central Africa: Geological Society of America Bulletin, v. 115, p. 314–330.
John, M., 1873, The Land of Cazembe: Lacreda's journey to Cazembe in 1798, and Journey of the Pombeiros P. J. Baptista and Amaro Jose across Africa from Angola to Tette, on the Zambeze: Royal Geographical Society London, 1873, 271 p.
John, T., Schenk, V., Metzger, K., and Tembo, F., 2004, Timing and PT evolution of whiteschist metamorphism in the Lufilian Arc-Zambezi Belt orogen (Zambia): Implications for the assembly of Gondwana: Journal of Geology, v. 112, p. 71–90.
Kampunzu, A.B., Kapenda, D., and Manteka, B., 1991, Basic magmatism and geotectonic evolution of the Pan African belt in central Africa: Evidence from the Katangan and West Congolian segments: Tectonophysics, v. 190, p. 363–371.
Kampunzu, A.B., and Cailteux, J.L.H, 1999, Tectonic evolution of the Lufilian arc (Central Africa Copperbelt) during Neoproterozoic Pan African orogenesis: Gondwana Research, v. 2, p. 401–421.
Kampunzu, A.B., Cailteux, J.L.H., Haest, M., Moine, B., and Loris, H.N.B.T., 2005, Geochemical characterisation, provenance, source and depositional environment of Roches Argilo-Talqueuses (RAT) and Mines Subgroups sedimentary rocks in the Neoproterozoic Katangan Belt (Congo): Lithostratigraphic implications: Journal of African Earth Sciences, v. 42, p. 119–133.
Kampunzu, A.B., Cailteux, J.L.H., Kamona, A.F., Intiomale, M.M., and Melcher, F., 2009, Sediment-hosted Zn-Pb-Cu deposits in the Central African Copperbelt: Ore Geology Reviews, v. 35, p. 263–297.
Kent, P.E., 1958, Recent studies of south Persian salt plugs (Iran): American Association of Petroleum Geologists Bulletin, v. 42, p. 2951–2972.
Key, R.M., Liyungu, A.K., Njamu, F.M., Somwe, V., Banda, J., Mosley, P.N., and Armstrong, R.A., 2001, The western arm of the Lufilian arc in NW Zambia and its potential for copper mineralization: Journal of African Earth Sciences, v. 33, p. 503–528.
Kirkham, R.V., 1989, Distribution, settings, and genesis of sediment-hosted stratiform copper deposits: Geological Association of Canada Special Paper 36, p. 3–38.
Kirkham, R.V., 2001, Sediment-hosted stratiform copper (SSC), other stratabound base metal deposits and the importance of basinal brines and/or evaporites, halotectonics and halokinesis, *in* Piestrzynski, A. ed., Mineral deposits at the beginning of the 21st century: Lisse, Swets and Zeitlinger Publishers, p. 15–18.
Lefebvre, J.J., 1974, Mineralisations cupro-cobaltiferes associées aux horizons pyroclastiques situés dans le faisceau supérieur de la Serie de Roan, à Shituru, Shaba, Zaire, *in* Bartholomé, P. et al., eds., Gisements stratiformes et provinces cuprifères: Liège, Société Géologique de Belgique, p. 103–122.
——1975, Les roches ignées dans le Katangien du Shaba (Zaïre), le district d7u cuivre: Annales de la Société Géologique de Belgique, v. 98, p. 47–73.
——1976, Le contact entre le Kundelungu et le Roan a Mulungwishi, Shaba, Zaire: Annales Societe Geologique Belgique, v. 99, p. 451–466.
——1985, Le Groupe de Mwashya, megacyclotheme terminal du Roan (Shaba, Zaire Sudoriental). II. Volcanisme et dynamique du bassin sedimentaire: Rapport annuel 1983–1984: Tervuren, Belgique, Departement Geologie Mineralogie, Musee Royal de l'Afrique Centrale, p. 121–151.
——1989, Depositional environment of copper-cobalt mineralization in the Katangan sediments of Southeast Shaba, Zaire: Geological Association Canada Special Publication 36, p. 401–426.
Lerouge, C., Cailteux, J., Kampunzu, AB., Milesi, J.P., and Fléhoc, C., 2005, Sulphur isotope constraints on formation conditions of the Luiswishi ore deposit, Democratic Republic of Congo (DRC): Journal of African Earth Sciences, v. 42, p.173–182.
Leruite, M., 1965, Unpublished Union Minière du Haut Katanga (UMHK) company reports on drilling in the Dipeta syncline.
Lombard, J., and Nicolini, P., 1962, Conclusions generales recherche des caracteres plus frequemment associes aux mineralisations stratiformes de cuivre en Afrique, *in* Lombard, J., and Nicolini, P., Gisements stratiformes de cuivre en Afrique: Congres geologique international, Association des Services Geologiques Africains, Lusaka, 1962, 2eme partie, Tectonique, p. 205–212.
Lundin Mining, 2012, Operations and development. Reserves and resources for Tenke-Fungurume as of Dec 31, 2011: www.lundinmining.com/s/Reserves.asp website.
Master, S., Rainaud, C., Armstrong, R.A., Phillips, D., and Robb, L.J., 2005, Provenance ages of the Neoproterozoic Katanga Supergroup (Central African Copperbelt), with implications for basin evolution: Journal of African Earth Sciences, v. 42, p. 41–60.
McGowan, R.R., Roberts, S., and Boyce, A.J., 2006, Origin of the Nchanga copper-cobalt deposits of the Zambian Copperbelt: Mineralium Deposita, v.40, p. 617–638.
Moine, B., Sauvan, P., and Jarousse, J., 1981, Geochemistry of evaporite-bearing series: A tentative guide for the identification of metaevaporites: Contributions to Mineralogy and Petrology, v. 76, p. 401–412.
Moine, B., Guilloux, L., and Audéoud, D., 1986, Major element geochemistry of the host rocks in some sediment-hosted copper deposits: Society for Geology Applied to Mineral Deposits Special Publication 4, p. 443–460.
Muchez, Ph., Brems, D., El Desouky, H. Haest, M., Vanderhaeghen, P., Dewaele, S., Heijlen, W., and Mukumba, W., 2007, Base metal ore deposit evolution and geodynamics in the Central African Copperbelt, *in* Andrew et al., eds., Digging deeper. Proceedings of the 9th Biennial SGA Meeting, Dublin: Dublin, Ireland, Irish Association for Economic Geology, p. 213–216.
Muchez, Ph., Vanderhaeghen, P., El Desouky, H., Schneider, J., Boyce, A., Dewaele, S. and Cailteux, J., 2008, Anhydrite pseudomorphs and the origin of stratiform Cu-Co ores in the Katangan Copperbelt (Democratic Republic of Congo): Mineralium Deposita, v. 43, p. 575–589.
Muchez, Ph., Brems, D. Clara, E., De Cleyn, A., Lammens, L., Boyce, A., De Muynck, D., Mukumba, W., and Sikazwe, O., 2010, Evolution of Cu-Co

mineralizing fluids at Nkana mine, Central African Copperbelt, Zambia: Journal of African Earth Sciences, v. 58, p. 457–474.
Ohmoto, H., 1986, Stable isotope geochemistry of ore deposits: Reviews in Mineralogy and Geochemistry, v. 16, p. 491–559.
Oliver, N.H.S., McLellan, J.G., Hobbs, B.E., Cleverley, J.S., Ord, A., and Feltrin, L., 2006, Numerical models of extensional deformation, heat transfer, and fluid flow across basement-cover interfaces during basin related mineralization: Economic Geology, v. 101, p. 1–31.
Oosterbosch, R., 1950, La Série des Mines dans le Polygone de Fungurume: Bruxelles, Comité Spécial du Katanga (CSK), Comptes rendus des travaux-Congrès Scientifique-Elisabethville, v. 14, p. 1–18.
——1952, La Série des Mines dans le polygone de Fungurume, Comité Spécial du Katanga (CSK) Annual Congres d'Elisabethville, 1950, Bruxelles, II, p. 101–118.
——1962, Les minéralisations dans le système de Roan au Katanga, *in* Lombard, J., and Nicolini, P., eds., Gisements Stratiformes de Cuivre en Afrique, 1ère Partie, Copenhagen, 1960: Paris, Association des Services Géologiques Africains, p. 71–136.
——1963, Les relations entre la mineralization et la structure des roches dans les orebodies stratiformes de Katanga, *in* Lombard, J. and Nicolini, P., eds., Gisements Stratiformes de Cuivre en Afrique, Symposium, 2e partie: Association des Services Géologiques Africains, p. 105–115.
Oosterbosch, R., and Schuiling, H., 1951, Copper mineralization in the Fungurume region, Katanga: Economic Geology, v. 46, p. 121–148.
Pirard, E., 2011, A history of early copper exploration in Katanga (D.R. Congo), *in* Ortiz, J.E., Puche, O., Rábano, I., and Mazadiego, L.F., eds., History of research in mineral resources: Madrid, Cuadernos del Museo Geominero, Instituto Geológico y Minero de España, v. 13, p. 271–280.
Porada, H., and Berhorst, V., 2000, Towards a new understanding of the Neoproterozoic-Early Palaeozoic Lufilian and northern Zambezi Belts in Zambia and the Democratic Republic of Congo: Journal of African Earth Sciences, v. 30, is. 3, p. 727–771.
Rainaud, C. Master, S., Armstrong, R.A., and Robb, L.J., 2005, Geochronology and nature of the Palaeoproterozoic basement in the Central African Copperbelt (Zambia and the Democratic Republic of Congo), with regional implications: Journal of African Earth Sciences, v. 42, p.1–31.
Rainaud, C., Armstrong, R.A., Master, S., and Robb, L.J., 1999, A fertile Palaeoproterozoic magmatic arc beneath the Central African Copperbelt, *in* Stanley, C.J. et al., eds., Mineral deposits: Processes to processing: Proceedings of 5th Biennial Meeting of the Society of Geology Applied to Ore Deposits, London: Rotterdam, Balkema, v. 2, p. 1427–1430.
Richards, J.P., Krogh, T.E., and Spooner, E.T.C., 1988a, Fluid inclusion characteristics and U-Pb rutile age of late hydrothermal alteration and veining at the Musoshi stratiform copper deposit, Central African Copperbelt, Zaire: Economic Geology, v. 83, p. 118–139.
Richards, J.P., Cumming, G.L., Krstic, D., Wagner, P.A, and Spooner, E.T.C., 1988b, Pb isotope constraints on the age of sulfide ore deposition and U-Pb age of late uraninite veining at the Musoshi stratiform copper deposit, Central African Copperbelt, Zaire: Economic Geology, v. 83, p. 724–741.
Robert, M., 1912, La stratigraphie de systeme Kundelungu au Katanga: Annales de la Societe Geologique de Belgique, Annexe au tome 39.
——1930, An outline of the Geology and ore deposits of Katanga, Belgian Congo: Economic Geology, v. 26, p. 531–539.
——1940, La glaciation du Kundelungu au Katanga (Congo Belge): International Geological Congress 1937, 17th Session, Moscow, Report, v. 6, p. 99–113.
——1956, Géologie et géographie du Katanga: Bruxelles, Union minière du Haut-Katanga, 620 p.
Schneider, J., Melcher, F., and Brauns, M., 2007, Concordant ages for the giant Kipushi base metal deposit (DR Congo) from direct Rb-Sr and Re-Os dating of sulfides: Mineralium Deposita, v. 42, p. 791–797.
Schneiderhöhn, H., 1931, Mineralische Bodenschätze im südlichen Afrika: Berlin, NEM-Verlag, 111 p.
——1937, Die Kupferlagerstätten von North Rhodesia und Katanga: Journal: Geologische Rundschau, v. 28, Is. 3–4, p. 282–291.
Schuh, W., 1985, Geologie, Geochemie und Mineralogie der sedimentgebundenen Kupferlagerstätte Klein-Aub, Namibia: Unpublished Honor's thesis, Clausthal Technical University, 105 p.
——2008, Tenke-Fungurume—a new world-class sediment-hosted copper cobalt district in the DR Congo [abs.]: Society of Mining Engineers, Salt Lake City, 2008, Conference Abstracts, p. 38.
Schuiling, H., 1947, La tectonique des gîtes de cuivre du Katanga : Centenaire de Association des ingénieurs sortis de l'Ecole de Liège Congrès 1947, Section Coloniale, p. 309–313.
Selley, D., Broughton, D., Scott, R., Hitzman, M., Bull, S., Large, R., McGoldrick, P., Croaker, M., Pollington, N., and Barra, F., 2005, A new look at the geology of the Zambian Copperbelt: Economic Geology 100th Anniversary Volume, p. 965–1000.
Sharp, R. R., 1946, Early days in Katanga: Bulawayo, Rhodesian Printers Ltd., 210 p.
Shearman, D.J., 1966, Origin of marine evaporites by diagenesis: Transactions of the Institution of Mining and Metallurgy, v. 75, sec. B, p. 208–215.
Shearman, D.J., Mossop, G., Dunsmore, H., and Martin, M.M., 1972, Origin of gypsum veins by hydraulic fracture: Transactions of the Institution of Mining and Metallurgy, v. 81, sec. B, p. 149–155.
Sillitoe, R.H., Perelló, J., and García, A., 2010, Sulfide-bearing veinlets throughout the stratiform mineralization of the Central African Copperbelt: Temporal and genetic implications: Economic Geology, v. 105, p. 1361–1368.
Stoneley, R. 1983, Fibrous calcite veins, overpressures, and primary oil migration: American Association of Petroleum Geologists Bulletin, v. 67, p. 1427–1428.
Studt, F.E., 1910, Some notes on the geology of the Katanga Country and Copperbelt: Transactions of the Geological Society of South Africa, containing the papers read during 1909, edited by the Honorary Secretary, v. 12, p. 159–167.
——1913, The geology of Katanga and northern Rhodesia, an outline of the geology of South Central Africa: Transactions of the Geological Society of South Africa, v. 16, p. 44–102.
Studt, F.E., Cornet, J., and Buttgenbach, H.J.F., 1908, Carte géologique du Katanga et notes descriptives par Studt, F.-E., Cornet, J,. and Buttgenbach, H., Annales du Musee du Congo Belge, 3 plates, 99 p.
Stutzer, O., 1913, über glaziale Konglomerate im Lande Katanga, Belgisch-Kongo: Monatsberichte, v. 65, no. 2, p. 114.
Sweeney, M., Turner, P., and Vaughan, D.J., 1986, Stable isotope and geochemical studies of the role of early diagenesis in ore formation, Konkola basin, Zambian Copperbelt: Economic Geology v. 81, p. 1838–1852.
Sweeney, M.A., Binda, P.L., Vaughan, D.J., 1991, Genesis of the ores of the Zambian Copperbelt: Ore Geology Reviews, v. 6, p. 51–76.
Torrealday, H.I., Hitzman, M.W., Stein, H.J., Markley, R.J., Armstrong, R., and Broughton, D., 2000, Re-Os and U-Pb dating of the vein-hosted mineralization at the Kansanshi copper deposit, northern Zambia: Economic Geology, v. 95, p. 1165–1170.
Unrug, R., 1997, Rodinia to Gondwana: The geodynamic map of Gondwana supercontinent assembly: GSA Today, v. 7, p. 2–6.
Van Doorninck, N.H., 1929, De Lufilische plooing: G. Naeff, s'-Gravenhage, 1928, De Lufilische plooiing in den Boven Katanga (Belgischen Congo) naar eigen waarnemingen en naar critisch overzicht van de er over verschenen publicaties: GEOS, 1928.02.03, Unpublished Ph.D. thesis, Holland, Delft University.
Verbeken, A., and Walraet, M., 1954, La première traversée du Katanga en 1806, Voyage des «Pombeiros» d'Angola aux Rios de Sena: Bruxelles, Institut Royal Colonial Belge, 133 p.
Vets, J., 2004, Studie van het voorkomen van ertsafzettingen in relatie met de geologische structuren in het noordwestelijk deel van het Lufilische Orogeen (DRC) aan de hand van een geografisch informatie system compilatie: Unpublished Master's thesis, Leuven, Catholic University, 90 p.
Wendorff, M., 2000, Revision of the stratigraphical position of the "Roches Argilo-Talqueuses" (RAT) in the Neoproterozoic Katangan Belt, South Congo: Journal of African Earth Sciences, v. 30, p. 717–726.
——2003, Stratigraphy of the Fungurume Group—evolving foreland basin succession in the Lufilian fold-thrust belt, Neoproterozoic-Lower Palaeozoic, Democratic Republic of Congo: Journal of African Earth Sciences, v. 30, p. 703–715.
Zanella, A., and Cobbold, P.R., 2012, "Beef:" Evidence for fluid overpressure and hydraulic fracturing in source rocks during hydrocarbon generation and tectonic events: Field studies and physical modeling: GeoFluids VII–2012 Conference, Geosciences, France, University of Rennes, Geo Fluids, Rueil-Malmaison, 18 p.

# Exhibit RPA-004

**FORM 51-102F3**

**MATERIAL CHANGE REPORT**

## ITEM 1 – NAME AND ADDRESS OF COMPANY

Rubicon Minerals Corporation (the "Company")
1540 - 800 West Pender Street
Vancouver, British Columbia
V6C 2V6

## ITEM 2 – DATE OF MATERIAL CHANGE

May 23, 2006

## ITEM 3 – NEWS RELEASE

The press release was issued May 23, 2006 over CCN Matthews.

## ITEM 4 – SUMMARY OF MATERIAL CHANGE

The Company has been advised of the results of the completed feasibility study on the Kalukundi copper-cobalt deposit located in the Democratic Republic of Congo ("DRC"), which project is the principal asset of Africo Resources Ltd., a company in which the Company has a 36.9 equity ownership interest.

## ITEM 5 – FULL DESCRIPTION OF MATERIAL CHANGE

The Company has been advised of the results of the completed feasibility study on the Kalukundi copper-cobalt deposit located in the coppperbelt of the DRC.

The study was carried out on behalf of the Swanmines Joint Venture ("Swanmines") which controls the asset. Gecamines, the state mining company, is a 25% carried shareholder of Swanmines. Africo Resources Ltd. ("Africo"), a private B.C. Corporation, has an option to acquire 100% of the shares of the remaining 75% shareholder. Rubicon Minerals Corporation currently owns 39.6% of the issued shares of Africo Resources Ltd.

The robust economics of the deposit are based on a production rate of 800,000 tonnes per year for nominal annual production of 16,400 tonnes per year copper and 3,800 tonnes per year cobalt. Using long-term metal prices of copper at $1.25 per pound and cobalt at $12 per pound the feasibility base case shows a project NPV of $162.9 million (Gecamines share $60.2 million) and an after tax IRR of 28.5%. All dollar amounts are US dollars unless stated otherwise.

There is considerable scope to increase the initial reserve base of 7.8Mt of ore by proving up existing resources, by carrying out follow up studies and also through drilling of other mineralized surface bodies on the property, all of which will be aggressively pursued by Africo in 2006. The current feasibility study can thus be viewed as a 'minimum case' which is likely to be revisited through the course of 2006.

Independent consultant RSG Global Pty. Ltd. has also provided a heavily discounted valuation for non-reserve resources (within and below the existing reserves) of $65.5 million which is separate from and not included in the above project valuation. This valuation, which was carried out by RSG Global in accordance with the terms of the Valmin code, has used a value of 1% of the in situ metal value (using the study metal prices of $1.25 per pound for copper and $12 per pound for cobalt) for Inferred Resources, 2% for Indicated resources and 4.5% for Measured Resources. *Readers are cautioned not to assume that part or all of an inferred resource exists, or is economically or legally mineable.*

The scope of the feasibility study, including the delivery date and financing structure, was controlled by the terms of the Swanmines Joint Venture. This includes a delivery date to Swanmines on or before May 18, 2006 which has been met. The base case requires a minimum of 30% of capital to be raised as a shareholder loan by the 75% shareholder of Swanmines and the remainder through third party loans. The base case uses an inflation rate of 3%, an interest rate of LIBOR plus 2%, and the subsequent application of a 10% discount rate applied to the resulting net cash flow. The study assumes income tax of 30%, withholding taxes of 10% on dividends and 2%-5% import duties. Two royalties are payable and have been included in the financial model, one to Gecamines (2.5% NSR) and one to the government of the DRC (2% of gross revenue minus realization charges and costs of sales).

The independent feasibility study, dated May 15th, 2006, was prepared for Africo on behalf of Swanmines by MDM Engineering Ltd. of South Africa and included the following additional independent consultants:

- Mintek (Metallurgy)
- RSG Global Pty. Ltd. (Resource and Mining)
- MDM (Plant and Process)
- Knight Piésold (Pty.) Limited (Geotechnical)
- Golders Associates Africa (Pty.) Ltd. (Tailings)
- African Mining Consultants (AMC) Ltd. (Environmental)

The following summarizes the key assumptions and results of the study:

- Initial Life of Mine — 10 years

- Capital costs - $166.6 million

- Pre-stripping costs — $6.9 million
- IRR—28.5%
- Project NPV —$162.9 million
- Profit Margin — 54.4%
- Copper revenue at $1.25 per pound - $452.7 million
- Cobalt revenue at $12 per pound -$1,018.1 million
- Cash per pound copper on a co-product basis - $0.64
- Cash cost per pound copper net of cobalt by-product credit — minus $1.17
- Total copper production - 164,296 tonnes
- Total cobalt production — 38,485 tonnes
- With copper revenue based on modeled copper price, cobalt price can decrease by 83% before break-even operating cost is reached.

Recoveries to metal (SX-EW) - 88% Copper 71 % Cobalt

- Mine operating costs per tonne of ore mined - $56.02 (Mining, Plant and G&A)
- Anticipated start up Q1 2008.

## MINERAL RESERVES AND MINERAL RESOURCES

The 43-101 compliant mineral reserve at Kalukundi as of May 15, 2006 is as follows:

| **Classification** | **Tonnes** | **Copper Grade%** | **Copper Tonnes** | **Cobalt Grade%** | **Cobalt Tonnes** |
|---|---|---|---|---|---|
| Proved | 6.6 million | 2.44 | 160,268 | 0.69 | 45,119 |
| Probable | 1.3 million | 2.02 | 25,773 | 0.69 | 8,867 |
| **Total** | **7.8 million** | **2.37** | **186,041** | **0.69** | **53,986** |

Note: Mineral reserves are part of Mineral Resources, quoted below

The 43-101 complaint Mineral Resources at Kalukundi as of March 30, 2006 are as follows:

| Classification | Tonnes | Copper Grade% | Copper Tonnes | Cobalt Grade% | Cobalt Tonnes |
|---|---|---|---|---|---|
| Measured to 150 m | 9.65 million | 2.45 | 236,625 | 0.61 | 59,031 |
| Indicated to 150 m | 2.46 million | 2.31 | 56,856 | 0.61 | 15,088 |
| Inferred to 200 m | 15.02 million | 2.63 | 395,044 | 0.58 | 87,120 |

Note: Mineral Resources inciude the above Minera' Reserves

The above resources and reserves are based upon 78 boreholes (9650 m). An additional 30 boreholes were drilled by Africo for geotechnical, condemnation and exploration purposes and were not used in the resource evaluation. An additional eight mineralized fragments within the concession area have received only preliminary investigation. At least two of these are considered to warrant immediate resource-directed drilling.

**MINING**

The project involves a conventional open pit selective mining exploitation method using a mining contractor. Africo will operate a multiple pit, multiple cut back method which will require timely pre-stripping and blending of ore to maintain continuity of feed.

Mining is currently modeled using a waste to ore stripping ratio of 4.02:1. Capital and mine operating costs estimates were developed by MDM Engineering Ltd. and RSG Global Pty., respectively. Capital costs of the process plant assume a lump sum, turnkey contract and include a contractor's margin and average contingency of 7.6%. A shadow contractor mining cost model was developed by RSG Global to develop first principal costs estimates which provide a comparison against the current and future contract mining tender submissions.

**SENSITIVITY**

The NPV sensitivity to discount rate and metal price is illustrated below for a range of prices and discount rates which, for comparison purposes, are broadly consistent with those reported in 2006 by competitors in the DRC:

| Discount Rate (%) | Base Model (US$ millions) | +10% metal prices* | +20% metal prices** |
|---|---|---|---|
| 10 | 162.9 | 211.9 | 259.8 |
| 8 | 193.7 | 248.7 | 302.6 |
| 6 | 230.2 | 292.3 | 353.1 |

*$1.375 per pound copper and $13.20 per pound cobalt
**$1.50 per pound copper and $14.40 per pound cobalt
(Current Prices: $3.69 per pound copper and $16 per pound cobalt - May 18th, 2006. Source NYMEX (Copper) and BHP Billiton Open Sales System (Cobalt))

The following table also provides valuations for each of the shareholders in Swanmines for the base case and also shows project valuations based on 100% equity financing for the project.

| | | **70% Bank Financing** | | | **100% Equity** | |
|---|---|---|---|---|---|---|
| Cu Price US$ | Co Price US$ | H&J Trust* US$ millions | IRR % | Gecamines* US$ millions | NPV* US$ millions | IRR % |
| 1.25 | 12.00 | 102.7 | 28.5 | 60.2 | 43.6 | 14.7 |
| | 13.20 | 127.4 | 32.2 | 69.5 | 68.2 | 17.2 |
| | 14.40 | 152.3 | 35.7 | 78.9 | 93.5 | 19.6 |
| 1.40 | 12.00 | 115.5 | 30.4 | 65.0 | 56.2 | 16.0 |
| | 13.20 | 140.4 | 34.0 | 69.5 | 81.4 | 18.4 |
| | 14.40 | 164.8 | 37.3 | 78.9 | 106.7 | 20.8 |

*10% discount rate

## SOCIAL AND FINANCIAL BENEFITS TO THE DRC

*introduction of new technology and creation of value-added products*

The study has demonstrated that metal recoveries can be achieved that are considerably higher than those reported from past operations in the DRC. The planned introduction of SX-EW technology for both copper and cobalt at Kalukundi will be one of very few such plants planned in the copperbelt. Creation of high value metal products versus lower grade products maximizes the in-country value add for both metals to be produced.

*Direct and indirect project benefits*

Over the life of mine, income via royalties, income taxes and withholding taxes is estimated at $207.8 million in 2006 money terms. In addition, the project expects to purchase $35.8 million of power for the operation. These benefits are expected to have a significant positive impact in an immediate region that has little or no industry or employment. The project is expected to create approximately 540 direct jobs, over 80% of which will initially be Congolese, and which is expected to increase through implementation of training programs.

Swanmines anticipates expenditures of $1.6 million during 2006-7 on maintenance and improvement of local roads. Swanmines also has allowed for $0.8 million of expenditures in 2006 to provide significant improvements to the local community of Kisinkala. Swanmines will construct permanent housing, establish water supply and adequate sewage facilities, none of which currently exist. Over the life of mine, Swanmines will budget $2 million for social development programs in local communities. These programs will be developed in conjunction with local stakeholders and will be focused on health and educational initiatives. Swanmines will also commit to $950,000 over the life of mine to training programs to develop skills within the local population.

## ENVIRONMENTAL

A full Environmental Impact Study and Management Plan (EIA) has been prepared by African Mining Consultants Limited for the Kalukundi Copper Cobalt Project near Kolwezi in the Democratic Republic of the Congo.

The EtA has been compiled to World Bank Standards and meets the requirements of the new DRC Mine Code and regulations of 2003.

The project comprises four copper-cobalt deposits that will be mined by open pit methods. The ore is predominantly oxide and will be treated through separate leach SX electrowin plants to produce copper and cobalt metal on site.

A full social and bio-physical baseline environmental study was carried out between October 2004 and April 2006. The study facilitated a full evaluation of positive and negative impacts of the 10 year mining project.

Responsible environmental management of overburden waste, tailings, groundwater and other effluents has been fully addressed in the EIA, and a mine decommissioning and closure plan (beginning 2018) has been prepared and costed.

Public consultation has been initiated and will be carried out throughout the project, which has the support of the local population.

## OPPORTUNITIES

Significant opportunities exist to expand the current reserve base within 9-12 months. These can be summarized as follows:

1) Studies to convert existing Measured and Indicated Resources to reserves. Approximately 1.4 Mt of resource are currently not included in the mining plan as reserves due to the proximity of a powerline. The following is an extract from RSG Global's mining section regarding these resources:

*"Some 1.4Mt at* 2.29%Cu *and 0.43%Co of ore within the optimised pit she/i cannot be included in the design. At average recoveries of 90% for copper and 72% for cobalt, this represents 28,400t of recoverable copper and 4,280t of recoverable cobalt. This reduces the potential revenue of the project by approximately US$191.5M."*

Africo will carry out a small scale study to examine the feasibility of including these resources in the mine plan.

2) Carrying out drilling on high priority surface mineralized bodies. At least two of these are known to exist on the property. These will be the subject of diamond drilling and associated

programs designed to fast-track high quality oxide resources. It is anticipated that each target would require only about 2,500 metres of drilling to achieve this objective.

3) Drilling in the reported resource to convert resources to reserves. Significant resources exist beneath each proposed pit. Africo plans to carry out work designed to improve resource confidence and evaluate conversion to reserves through supplementary studies including metallurgical programs to evaluate mixed oxide-sulphide mineralization at increasing depths. Approximately 3000 metres of drilling would likely be required to achieve these resource expansion objectives.

4) Re-running the pit optimization using recently received gangue acid data (lower operating costs) which has potential to upgrade additional resources into reserves.

In summary, Kalukundi, while presently economically robust, has significant potential to increase in size within nine months at which time the feasibility study could be re-examined to evaluate project expansion. Africo plans to carry out an aggressive drilling program to achieve these objectives and further increase Swanmines shareholder value.

The results summarized in this material change report were generated by the independent consulting firms listed herein. Individual qualified persons, as defined by NI 43-101 are:

John Hearne, RSG Global, for the Mining section including Mining Opex
Julian Verbeek, RSG Global, for the Resources section
Dave Dodd, MDM Engineering Ltd., for the Metallurgy, Process Design, Capex and Process Opex sections
Kees Dekker, RSG Global for the Financial Evaluation section
Mike Evans, Africo Resources Ltd., for the Geology section
Angela Duerden, African Mining Consultants (AMC) Ltd. for the Environmental section.

## ITEM 6 – RELIANCE ON SUBSECTION 7.1(2) OR (3) OF NATIONAL INSTRUMENT 51-102

Not applicable.

## ITEM 7 – OMITTED INFORMATION

Not applicable.

## ITEM 8 – EXECUTIVE OFFICER

David W. Adamson, President (business telephone number: (604) 623-3333), is the officer of Rubicon knowledgeable about the details of this material change report.

## ITEM 9 – DATE OF REPORT

DATED at Vancouver, B.C. the 2nd day of June, 2006.

# Exhibit RPA-005

# STANDARDS AND GUIDELINES FOR VALUATION OF MINERAL PROPERTIES

## SPECIAL COMMITTEE OF THE CANADIAN INSTITUTE OF MINING, METALLURGY AND PETROLEUM ON VALUATION OF MINERAL PROPERTIES (CIMVAL)

## FEBRUARY 2003

## (FINAL VERSION)

# TABLE OF CONTENTS

| | Page |
|---|---|
| PREAMBLE | 1 |
| P1.0 BACKGROUND | 1 |
| P2.0 COMMENTARY | 3 |
| P3.0 OTHER VALUATION RELATED STANDARDS | 4 |
| P3.1 THE AUSTRALIAN VALMIN CODE | 4 |
| P3.2 NATIONAL INSTRUMENT 43-101 (NI 43-101) | 5 |
| P3.3 CANADIAN INSTITUTE OF CHARTERED BUSINESS VALUATORS | 6 |
| P3.4 ONTARIO SECURITIES COMMISSION RULE 61-501 | 6 |
| P3.5 INVESTMENT DEALERS ASSOCIATION OF CANADA | 6 |
| P3.6 INTERNATIONAL VALUATION STANDARDS COMMITTEE | 7 |
| P3.7 THE SOUTH AFRICAN SAMVAL CODE | 7 |
| STANDARDS | 8 |
| S1.0 DEFINITIONS | 8 |
| S2.0 SCOPE AND LIMITATIONS OF THE STANDARDS | 13 |
| S3.0 STANDARD OF VALUE | 13 |
| S4.0 VALUATION TENETS | 13 |
| S5.0 QUALIFICATIONS AND RESPONSIBILITIES OF VALUATORS | 14 |
| S6.0 COMMISSIONING A VALUATION | 15 |
| S7.0 VALUATION | 16 |
| S8.0 VALUATION REPORTS | 16 |
| GUIDELINES | 20 |
| G1.0 PROFESSIONAL ASSOCIATIONS FOR QUALIFIED VALUATOR | 20 |
| G2.0 VALUATION PRINCIPLES | 20 |
| G3.0 VALUATION APPROACHES AND METHODS | 21 |
| G4.0 USE OF MINERAL RESERVES AND MINERAL RESOURCES | 24 |
| G5.0 VALUATION REPORTS - RECOMMENDED TABLE OF CONTENTS | 25 |

# PREAMBLE

## P1.0 BACKGROUND

**P1.1** There are at present no comprehensive standards for valuation of Mineral Properties in the Canadian mining industry. The Mining Standards Task Force (MSTF) of the Toronto Stock Exchange and the Ontario Securities Commission in its Final Report (January 1999) specifically recommended that the Canadian Institute of Mining, Metallurgy and Petroleum (CIM) form a committee of valuation practitioners to review and advise on approaches to valuation of Mineral Properties.

**P1.2** On May 5, 1999 at the Calgary Annual General Meeting, CIM Council approved the formation of a Special Committee on Valuation of Mineral Properties (CIMVal) to be co-chaired by Keith Spence (Chairman of the CIM Mineral Economics Society) and Dr. William Roscoe (Roscoe Postle Associates Inc.).

**P1.3** The mandate of CIMVal is to recommend Standards and Guidelines for Valuation of Mineral Properties to be used by the mining industry in general and to be adopted by Canadian securities regulators and Canadian stock exchanges.

**P1.4** The members of CIMVal represent of a mix of professional disciplines and experience in the field of Mineral Property valuation:

Keith N. Spence (Co-chair), Alliance Pacific Resources Inc., Toronto
William E. Roscoe (Co-chair), Roscoe Postle Associates Inc., Toronto
Michael J. Bourassa (Secretary), Aird & Berlis LLP, Toronto
Christopher R. Lattanzi, Micon International Limited, Toronto
Ross D. Lawrence, Watts, Griffis and McOuat Limited, Toronto
Paul E. Lunney, Noranda Inc., Toronto
Craig A. Roberts, Pacific International Securities, Vancouver
David A. Scott, CIBC World Markets, Toronto
Ian S. Thompson, Derry, Michener, Booth & Wahl Consultants Ltd., Vancouver
Willoughby A. Trythall, retired Placer Dome executive and consultant, Vancouver

**P1.5** At the CIM Annual General Meeting in Toronto (Mining Millennium 2000), the CIMVal Committee organized a **"Valuation Day"** on March 8, 2000. Various industry experts presented papers on valuation of Mineral Properties. **A proceedings volume** of the papers was subsequently published by CIM (copies are available by contacting the CIM Head Office in Montreal).

**P1.6** In the Spring of 2000 the CIMVal Committee published an **"Initial Framework for Discussion"** which categorized and listed various issues for initial consideration in devising valuation standards. Input and comments were solicited via this publication and by direct and Internet requests to numerous organizations and individuals with an interest in mineral valuation. Fifteen responses were received and were considered in a Draft Discussion Paper along with input from the CIMVal Committee members.

**P1.7** A **"Draft Discussion Paper"** was released at the CIM Annual General Meeting in Quebec in May 2001. Again, comments and submissions were requested from all interested parties. The Draft Discussion Paper set out the CIMVal Committee's preliminary views, opinions and unresolved questions on the issues involved in establishing a set of Standards and Guidelines for Valuation of Mineral Properties. Twenty responses were received and were carefully considered in the **"Draft Standards and Guidelines for Valuation of Mineral Properties"**, released in February, 2002.

**P1.8** On March 9, 2002, CIM Council adopted and approved the Draft Standards and Guidelines for Valuation of Mineral Properties, subject to any material changes in the final document being brought back to CIM Council for adoption and approval. The CIMVal Committee called for comments and submissions from all interested parties on the Draft Standards and Guidelines for Valuation of Mineral Properties. The CIMVal Committee received 39 submissions by April 30, 2002. Because some significant issues were raised in the submissions, the CIMVal Committee produced a **"Revised Draft Standards and Guidelines"** in September 2002 which was again distributed for comment.

**P1.9** A further 17 submissions were received by November 29, 2002 with respect to the Revised Draft Standards and Guidelines. The committee evaluated and considered all submissions

during the course of several meetings in December 2002 and January 2003, prior to producing this final document. CIM Council adopted and approved this final document on March 9, 2003. The full name of this document is as stated on the cover page hereof. Within the document itself, it will be referred to as the "CIMVal Standards and Guidelines" or simply the "Standards and Guidelines".

## P2.0 COMMENTARY

**P2.1** The guiding philosophy and intent of the CIMVal Standards and Guidelines is that Mineral Property Valuations be carried out by appropriately qualified individuals and that all relevant information be fully disclosed. The Standards and Guidelines are based on industry best practices and allow for professional judgement in certain instances.

For purposes of clarification, Valuation in the CIMVal Standards and Guidelines is concerned with the value or worth of a Mineral Property as opposed to "evaluation" where the key objective is an economic assessment or determination of the economic merit of a property.

**P2.2** The CIMVal Standards and Guidelines are organized into two parts. The first part consists of Standards which are general rules that are mandatory in the Valuation of Mineral Properties. The second part contains Guidelines which elaborate on the Standards and, while not mandatory, provide guidance and best practices which are highly recommended to be followed in the Valuation of Mineral Properties. Definitions are given at the beginning of the Standards for terms used. Where practical, terms are defined in a manner consistent with National Instrument 43-101.

**P2.3** As noted above, the MSTF Final Report recommended that CIM review and advise on approaches to Valuation of Mineral Properties. The majority of the respondents to the Draft Discussion Paper indicated that the Valuation approaches and methods should be chosen by the valuator. The Australian VALMIN Code, 1998 Edition (Section C24) states that the decision as to the valuation methodology or methodologies to be used is solely the responsibility of the valuator, and that the valuator must state the reasons for selecting each methodology used. OSC Rule 61-501 and Companion Policy 61-501 CP (Insider Bids, Issuer Bids, Going Private

Transactions, and Related Party Transactions) do not specify what valuations methods should be used.

**P2.4** CIMVal has accepted the view that the valuator is responsible for choosing approaches and methods. CIMVal's view is that, although the valuator can choose the approaches and methods for Valuation of a Mineral Property, there is a body of published papers, published valuations, presentations and court judgments to guide his or her choice. Certain approaches and methods appear to be currently accepted as standard practice, although they could change over time. The Guidelines provide guidance and commentary on the use and application of various approaches and methods.

**P2.5** Mineral Property Valuations are carried out for a variety of reasons, such as mergers and acquisitions, non arm's length transactions, a component of pricing of initial public offering of stock, listing support, support of audited financial statements, support for property agreements, determination of vendor considerations, litigation, expropriation compensation, income tax matters, insurance claims, and as components of corporate valuations and fairness opinions, among others.

**P2.6** Regulatory bodies under certain circumstances require Valuations of Mineral Properties. CIMVal recommends that the Standards and Guidelines be followed for Valuation of Mineral Properties required by regulatory bodies or where such Valuations are prepared for purposes of public disclosure. CIMVal encourages the use of the Standards and Guidelines for other purposes, including internal corporate matters.

## P3.0 OTHER VALUATION RELATED STANDARDS

### P3.1 THE AUSTRALIAN VALMIN CODE

**P3.1.1** In Australia, the VALMIN Code and Guidelines govern the technical assessment and/or valuation of mineral and petroleum assets and securities and set standards for independent expert reports. It was introduced in 1995 and revised in 1997 by The Australasian Institute of Mining and Metallurgy (AusIMM). The VALMIN Code is currently being reviewed by AusIMM to

assess its impact and its effectiveness, and to determine whether amendments may be required. The VALMIN Code is obligatory for AusIMM members for reports relating to mineral and petroleum assets required under Corporations law and is supported by many other entities, including the Australian Stock Exchange, the Australian Securities and Investment Commission, the Institute of Chartered Accountants in Australia, and the Australian Institute of Company Directors.

**P3.1.2** The VALMIN Code is a comprehensive document which covers purpose and type of technical reports and valuation reports, qualifications of experts and specialists involved in valuations, valuation methodology, obligations of the commissioning entity, items to consider in the valuation, and contents of a report. The four main tenets of the VALMIN Code are transparency, materiality, competence, and independence. It is implicit in the VALMIN Code that reasonableness is another major tenet.

**P3.1.3** The VALMIN Code has withstood the test of time, and is respected internationally. Many non-Australian valuators attempt to follow the VALMIN Code. Accordingly it provides an extremely useful model for Canada, and is already accepted by many Canadian valuators. Although the situation in Canada is somewhat different from that in Australia, the VALMIN Code has provided much useful material and many key concepts for the CIMVal Standards and Guidelines. The VALMIN Code, including Guidelines, can be downloaded from www.mica.org.au.

**P3.2 NATIONAL INSTRUMENT 43-101 (NI 43-101)**

**P3.2.1** NI 43-101, Standards of Disclosure for Mineral Projects, came into effect on February 1, 2001. NI 43-101 was formulated by the Canadian Securities Administrators (CSA), an umbrella association of Provincial Securities Commissions across Canada. The Instrument includes Form 43-101F1 (Technical Report) and Companion Policy 43-101CP, and is now the principal regulatory document in Canada for disclosure of information on mining projects.

**P3.2.2** NI 43-101 contains a number of items with relevance to issues in mineral valuation, as noted in several places in these Standards and Guidelines. Some of the definitions in the

Standards are consistent with those used in NI 43-101 (e.g. "Qualified Person"). NI 43-101 can be referenced on the Ontario Securities Commission website. (www.osc.gov.on.ca/en/Regulation/Rulemaking/Rules.html)

**P3.2.3** Part 4, Section 4.2(1) of NI 43-101 states that an issuer shall file a current Technical Report where a valuation is required to be prepared and filed under securities legislation. Section 4.2(1) does not refer to the contents of a valuation report to be prepared and filed in such circumstances. The CIMVal Standards and Guidelines recommend contents for a "Valuation Report", and its relationship to a Technical Report.

**P3.2.4** The CIMVal Standards and Guidelines are intended to augment NI 43-101, with respect to the valuation of Mineral Properties

**P3.3 CANADIAN INSTITUTE OF CHARTERED BUSINESS VALUATORS**

The Canadian Institute of Chartered Business Valuators (www.cicbv.ca) has standards for the valuation of businesses and corporations which its members must follow.

**P3.4 ONTARIO SECURITIES COMMISSION RULE 61-501**

On May 1, 2000, Ontario Securities Commission Rule 61-501 came into effect. This document replaced OSC Policy 9.1. It governs insider bids, issuer bids, going private transactions and related party transactions. Under certain situations, such as insider bids, a formal valuation is required. The rule provides that the valuator shall be qualified and independent and outlines certain requirements as to the content of a valuation report. The rule does not specifically deal with mineral valuations or the valuation standards or methodologies used in the valuation of mineral properties (www.osc.gov.on.ca/en/Regulation/Rulemaking/Rules/rules.html)

**P3.5 INVESTMENT DEALERS ASSOCIATION OF CANADA**

The Investment Dealers Association of Canada, in Bulletin #2827 dated March 5, 2001, issued Amendments and Interpretation Notes on "Disclosure Standards for Formal Valuations and Fairness Opinions in Transactions Governed by OSC Rule 61-501 Now in Force". The intention of CIMVal is that the CIMVal Standards and Guidelines not conflict with this document. (www.ida.ca/Files/Regulation/Bulletins/B2827_en.pdf)

**P3.6 INTERNATIONAL VALUATION STANDARDS COMMITTEE**

The International Valuation Standards Committee (IVSC) is a sister organization of the International Accounting Standards Board. IVSC's aim is to develop a set of International Valuation Standards (IVS) which will ultimately be adopted globally. CIMVal intends to be consistent with the general thrust of this organization's work such that, if and when the IVSC's standards are adopted globally in the future, the CIMVal Standards and Guidelines will be readily adaptable. (www.ivsc.org/pubs/submission0106-A4.pdf)

**P3.7 THE SOUTH AFRICAN SAMVAL CODE**

The South African Institute of Mining and Metallurgy is coordinating an effort to constitute a set of standards and guidelines (SAMVAL) for valuation of mineral projects, properties and assets, for use by the South African securities regulators and stock exchanges. The SAMVAL Code is formulated to supplement the IVS being developed by the IVSC. The SAMVAL Code is in preparation and draws on the VALMIN Code, the CIMVal Standards and Guidelines, and the IVS. The CIMVal, VALMIN, and SAMVAL Committees are in communication with each other and with the IVSC and are working towards international consistency.

# STANDARDS

The Standards are mandatory in the Valuation of Mineral Properties.

## S1.0 DEFINITIONS

***Commissioning Entity*** means the organization, company or person commissioning a Valuation.

***Competence*** or ***Competent*** means having relevant qualifications and relevant experience.

***Current*** means current with respect to, and relative to, the Valuation Date.

***Data Verification*** means the process of confirming that data has been generated with appropriate procedures, has been accurately transcribed from the original source and is suitable to be used (NI 43-101, Section 1.2 Definitions).

***Development Property*** means a Mineral Property that is being prepared for mineral production and for which economic viability has been demonstrated by a Feasibility Study or Prefeasibility Study and includes a Mineral Property which has a Current positive Feasibility Study or Prefeasibility Study but which is not yet financed or under construction.

***Exploration Property*** means a Mineral Property that has been acquired, or is being explored, for mineral deposits but for which economic viability has not been demonstrated.

***Fair Market Value*** means the highest price, expressed in terms of money or money's worth, obtainable in an open and unrestricted market between knowledgeable, informed and prudent parties, acting at arm's length, neither party being under any compulsion to transact (Income Tax Act of Canada).

***Feasibility Study*** means a comprehensive study of a deposit in which all geological, engineering, operating, economic and other relevant factors are considered in sufficient detail that it could reasonably serve as the basis for a final decision by a financial institution to finance the development of the deposit for mineral production (NI 43-101, Section 1.2 Definitions).

***Guideline*** means a best practices recommendation, which, while not mandatory in the Valuation of Mineral Properties, is highly recommended.

***Independence*** or ***Independent*** means that, other than professional fees and disbursements received or to be received in connection with the Valuation concerned, the Qualified Valuator or Qualified Person (as the case requires) has no pecuniary or beneficial (present or contingent) interest in any of the Mineral Properties being valued, nor has any association with the Commissioning Entity or any holder(s) of any rights in Mineral Properties which are the subject of the Valuation, which is likely to create an apprehension of bias. The concepts of "Independence" and "Independent" are questions of fact. For example, where a Qualified Valuator's fees depend in whole or in part on an understanding or arrangement that an incentive will be paid based on a certain value being obtained, such Qualified Valuator is not Independent. For securities purposes, in addition to the general definition above, section 6.1 of the Ontario Securities Commission Rule 61-501 ("Insider Bids, Issuer Bids, Going Private Transactions and Related Party Transactions") and section 5.2 of its Companion Policy 61-501CP provide further guidance on the meaning of "Independence" and "Independent".

***Materiality*** and ***Material*** refer to data or information which contribute to the determination of the Mineral Property value, such that the inclusion or omission of such data or information might result in the reader of a Valuation Report coming to a substantially different conclusion as to the value of the Mineral Property. Material data and information are those which would reasonably be required to make an informed assessment of the value of the subject Mineral Property. In addition to the general definition above, section 2.4 of Companion Policy 43-101CP to National Instrument 43-101 provides further guidance on the meaning of "Material" and "Materiality".

***Mineral Property*** means any right, title or interest to property held or acquired in connection with the exploration, development, extraction or processing of minerals which may be located

on or under the surface of such property, together with all fixed plant, equipment, and infrastructure owned or acquired for the exploration, development, extraction and processing of minerals in connection with such properties. Such properties shall include, but not be limited to, real property, unpatented mining claims, prospecting permits, prospecting licenses, reconnaissance permits, reconnaissance licenses, exploration permits, exploration licenses, development permits, development licenses, mining licenses, mining leases, leasehold patents, crown grants, licenses of occupation, patented mining claims, and royalty interests

***Mineral Reserves and Mineral Resources***. The terms Mineral Reserve, Proven Mineral Reserve, Probable Mineral Reserve, Mineral Resource, Measured Mineral Resource, Indicated Mineral Resource, and Inferred Mineral Resource and their usage have the meaning ascribed by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") Standards on Mineral Resources and Reserves Definitions and Guidelines adopted by CIM Council on August 20, 2000 (CIM Bulletin October 2000), as may be amended from time to time by CIM, and as included by reference in NI 43-101.

***Mineral Resource Property*** means a Mineral Property which contains a Mineral Resource that has not been demonstrated to be economically viable by a Feasibility Study or Prefeasibility Study. Mineral Resource Properties may include past producing mines, mines temporarily closed or on care-and-maintenance status, advanced exploration properties, projects with Prefeasibility or Feasibility Studies in progress, and properties with Mineral Resources which need improved circumstances to be economically viable.

***Prefeasibility Study*** and ***Preliminary Feasibility Study*** mean a comprehensive study of the viability of a mineral project that has advanced to a stage where the mining method, in the case of underground mining, or the pit configuration, in the case of an open pit, has been established, and which, if an effective method of mineral processing has been determined, includes a financial analysis based on reasonable assumptions of technical, engineering, operating, economic factors and the assessment of other relevant factors which are sufficient for a Qualified Person, acting reasonably, to determine if all or part of the Mineral Resource may be classified as a Mineral Reserve (adapted from NI 43-101, Section 1.2 Definitions). A Prefeasibility Study is at a lower confidence level than a Feasibility Study.

***Preliminary Assessment*** means a preliminary economic study by a Qualified Person that includes Inferred Mineral Resources. The Preliminary Assessment must include a statement that the Inferred Mineral Resources are considered too speculative geologically to have the economic considerations applied to them that would enable them to be categorized as Mineral Reserves, outlines the basis for the Preliminary Assessment and any qualifications and assumptions made, and specifies that there is no certainty that the Preliminary Assessment will be realized (adapted from NI 43-101, Section 2.3 (3)).

***Production Property*** is a Mineral Property with an operating mine, with or without processing plant, which has been fully commissioned and is in production.

***Professional Association*** is a self-regulatory organization of engineers, geoscientists or both engineers and geoscientists that (a) has been given authority or recognition by law; (b) admits members primarily on the basis of their academic qualifications and experience; (c) requires compliance with the professional standards of competence and the code of ethics established by the organization; and (d) has disciplinary powers, including the power to suspend or expel a member. (adapted from NI 43-101, Section 1.2).

***Qualified Person*** is an individual who (a) is an engineer or geoscientist with at least five years of experience in mineral exploration, mine development or operations or mineral project assessment, or any combination of these; (b) has experience relevant to the subject matter of the mineral project and the Technical Report; and (c) is a member in good standing of a Professional Association (NI 43-101, Section 1.2).

***Qualified Valuator*** is an individual who (a) is a professional with demonstrated extensive experience in the Valuation of Mineral Properties, (b) has experience relevant to the subject Mineral Property or has relied on a Current Technical Report on the subject Mineral Property by a Qualified Person, and (c) is regulated by or is a member in good standing of a Professional Association or a Self-Regulatory Professional Organization.

***Reasonableness***, in reference to the Valuation of a Mineral Property, means that other appropriately qualified and experienced valuators with access to the same information would value the property at approximately the same range. A Reasonableness test serves to identify Valuations which may be out of step with industry standards and industry norms. It is not sufficient for a Qualified Valuator to determine that he or she personally believes the value determined is appropriate without satisfying an objective standard of proof (adapted from NI 43-101CP, Section 1.6).

***Report Date*** means the date upon which the Valuation Report is signed and dated.

***Self-Regulatory Professional Organization*** means a self-regulatory organization of professionals that (a) admits members or registers employees of members primarily on the basis of their educational qualifications, knowledge and experience; (b) requires compliance with the professional standards of competence and code of ethics established by the organization; and (c) has disciplinary powers, including the power to suspend or expel a member or an employee of the member.

***Standard*** means a general rule which is mandatory in the Valuation of Mineral Properties.

***Technical Report*** means a report prepared, filed and certified in accordance with NI 43-101 and Form 43-101F1 Technical Report (NI 43-101, Section 1.2 Definitions).

***Transparency*** and ***Transparent*** means that the Material data and information used in (or excluded from) the Valuation of a Mineral Property, the assumptions, the Valuation approaches and methods, and the Valuation itself must be set out clearly in the Valuation Report, along with the rationale for the choices and conclusions of the Qualified Valuator.

***Valuation*** is the process of estimating or determining the value of a Mineral Property.

***Valuation Date*** means the effective date of the Valuation, which may be different from the Report Date or from the cut-off date for the data used in the Valuation.

***Valuation Report*** means a report prepared in accordance with these Standards and Guidelines.

## S2.0 SCOPE AND LIMITATIONS OF THE STANDARDS

**S2.1** The Standards are limited to Valuation of Mineral Properties (including any interests therein), and do not cover valuation of corporations or other entities that hold Mineral Properties as assets. However, it is recommended that the Standards govern the Valuation of Mineral Properties which are included as assets in the valuation of corporations and as assets in valuations related to fairness opinions.

**S2.2** The Standards cover Valuation of metallic and non-metallic Mineral Properties, which also include bedrock, alluvium, placers, industrial minerals, dimension stone, aggregates, and energy fuels that could be produced by mining such as coal, uranium, oil sands and oil shales. Mining includes solution mining of such materials as uranium, potash and other salts. The Standards do not cover oil and gas properties.

## S3.0 STANDARD OF VALUE

**S3.1** Value in the Standards and Guidelines refers primarily to Fair Market Value. If some other type of value is utilized, a clear definition must be provided by the Qualified Valuator and highlighted in the Valuation Report.

## S4.0 VALUATION TENETS

**S4.1** The following basic tenets (see S1.0 Definitions) must be followed in the Valuation process and in the preparation of a Valuation Report. General principles of Valuation are discussed in the Guidelines.

Materiality
Transparency
Independence
Competence
Reasonableness

## S5.0 QUALIFICATIONS AND RESPONSIBILITIES OF VALUATORS

**S5.1** A Qualified Valuator is responsible for the overall Valuation of a Mineral Property and the preparation of the Valuation Report. The Qualified Valuator may be assisted in, or rely on, various aspects of the Valuation and the Valuation Report by one or more Qualified Persons.

**S5.2** In situations where a Qualified Valuator is not a Qualified Person as defined in NI 43-101, all technical data relating to the Mineral Property being valued is subject to Data Verification by one or more Qualified Persons. If a Current Technical Report already exists, the Qualified Valuator may rely on a Current Technical Report to support the Valuation, and shall clearly disclose in the Valuation Report the extent to which such reliance is made.

**S5.3** The Qualified Valuator is responsible for assuring that the Qualified Persons who contribute to the Valuation, or upon whom the Qualified Valuator relies, are appropriately qualified and experienced.

**S5.4** The Qualified Valuator must be Independent, except for circumstances specified in S5.5. There must be clear, full, and plain disclosure of any past, present or anticipated business relationships, direct or indirect, between the Qualified Valuator and the Commissioning Entity or other interested parties which may be relevant to the Qualified Valuator's Independence, or a lack thereof.

**S5.5** If a Valuation is undertaken, which under the particular circumstances does not require the Qualified Valuator to be Independent, the Qualified Valuator must clearly disclose in the introduction and in the summary of the Valuation Report: (i) why Independence of the Qualified Valuator is not required in the particular circumstances; (ii) that he or she is not Independent; and (iii) his or her relationship to the Commissioning Entity, to the holder of any right, title or interest to the Mineral Property, and/or to the Mineral Property, as the case may be.

**S5.6** A Qualified Valuator must certify in the Valuation Report that he or she meets all of the attributes of the definition of "Qualified Valuator", and must stamp the Valuation Report with his or her professional seal, if applicable. In addition, non-Canadian valuators must certify and

provide evidence that their professional organization meets all of the attributes of a Professional Association or a Self-Regulatory Professional Organization.

**S5.7** The Qualified Valuator is responsible for adhering to the tenets of Materiality, Transparency and Reasonableness in the Valuation of the subject Mineral Property and in the Valuation Report.

**S5.8** The Qualified Valuator shall retain his or her work file and all supporting data relating to a Valuation and to a Valuation Report for a minimum of five years after the Report Date.

## S6.0 COMMISSIONING A VALUATION

**S6.1** A Commissioning Entity must reasonably establish that the Qualified Valuator is sufficiently Competent and Independent to carry out the Valuation of the subject Mineral Property or Properties.

**S6.2** The Commissioning Entity and the Qualified Valuator must agree, in an engagement letter or written contract, on the terms of reference of the Valuation assignment, which terms must be summarized and disclosed in the Valuation Report.

**S6.3** The Commissioning Entity must represent in writing to the Qualified Valuator that complete, accurate and true disclosure is made to the Qualified Valuator of all Material data and information relevant to the Valuation and that the Qualified Valuator has reasonable access to the Commissioning Entity's records and personnel to enable a proper Valuation to be made.

**S6.4** The Commissioning Entity must inform the Qualified Valuator which, if any, of the data and information supplied is confidential and the extent to which it should or should not be disclosed to the public.

## S7.0 VALUATION

**S7.1** The Qualified Valuator has the responsibility to decide which Valuation approaches and methods to use. The choice of the specific approaches and methods used, or excluded, must be justified and explained by the Qualified Valuator. The limitations of each method must be explained.

**S7.2** The three generally accepted Valuation approaches of Income, Market and Cost must be considered and discussed in the Valuation Report. More than one approach should be used in the Valuation of each Mineral Property. If a Qualified Valuator is strongly of the opinion that only one approach should be used in particular circumstances, the Qualified Valuator must justify and explain why other approaches are not used.

**S7.3** The Valuation of a Mineral Property must be reported as a range of values to reflect the uncertainty and subjective nature of the Valuation process. If reporting of a single value is required, the selection of a single value from the range must be explained.

## S8.0 VALUATION REPORTS

**S8.1** A Valuation under these Standards and Guidelines must be reported in a Valuation Report. Instructions for the preparation of a Valuation Report and a recommended table of contents are set out in the Guidelines.

**S8.2** NI 43-101 (Part 4, Section 4.2(1)) states "an issuer shall file a current Technical Report where a Valuation is required to be prepared and filed under securities legislation". For such Valuations that require a Technical Report to be filed, the Technical Report may be: (i) appended to the Valuation Report, or (ii) incorporated therein by reference, if the Technical Report is already publicly available. In such circumstances, the Technical Report may be referred to so that the same contents need not be repeated. The Technical Report must be Current, to the extent that there are no Material changes since the date of the Technical Report, which must be confirmed by a Qualified Person.

**S8.3** All Current estimates of Mineral Resources and Mineral Reserves (as well as any reserves and resources that do not comply with or pre-date the CIM categories and definitions of Mineral Resources and Mineral Reserves) for the Mineral Property being valued must be disclosed and discussed in the Valuation Report, unless disclosed and discussed in an appended Technical Report. If there is more than one estimate of Mineral Resources and Mineral Reserves, a Qualified Person must decide which estimates are Material to use in the Valuation and state the reasons.

**S8.4** If estimates of reserves and resources in non-Canadian jurisdictions and other reserves and resources which do not comply with or pre-date the CIM categories and definitions of Mineral Resources and Mineral Reserves are included in a Valuation Report, they must be disclosed and discussed along the lines specified in NI 43-101, Section 7.1. This allows the use of these reserves and resources, provided that a reconciliation by a Qualified Person to the CIM categories and definitions of Mineral Resources and Mineral Reserves is set out in the Valuation Report or the referenced Technical Report.

**S8.5** The Valuation Report must specify the Valuation Date and refer to all previous Valuations of the subject Mineral Property within the last twenty-four months and explain any Material differences between them and the present Valuation.

**S8.6** The Valuation Report must specify the key risks, assumptions and limitations in the Valuation and explain why the assumptions used are reasonable and appropriate in the circumstances.

**S8.7** A Valuation Report must be signed by the Qualified Valuator who is responsible for the Valuation Report, or by a corporation, partnership, limited partnership or other entity (each an "Entity") provided that the Valuation has been supervised by a Qualified Valuator employed or engaged by such Entity.

**S8.8** The Valuation Report must include a certificate of qualifications for the Qualified Valuator who supervised or is responsible for the Valuation, and any Qualified Persons involved in the

Valuation. The certificate of qualifications must contain information similar to those specified in NI 43-101, Section 8.1.

**S8.9** The Valuation Report must contain a statement that the Valuation complies with these Standards in their entirety. If such a statement is absent from the Valuation Report or is qualified or limited in any way, the Valuation does not comply with these Standards. However, in circumstances where Independence is not required, and proper disclosure is made in the Valuation Report in accordance with Standard 5.5, the Valuation Report may contain a statement that the Valuation complies with these Standards, with the exception of Independence.

**S8.10** The Valuation Report must contain a statement regarding the extent to which the Valuation is consistent with the Guidelines. Such statement must disclose and explain the reasons for any inconsistencies or deviations from the Guidelines. If such a disclosure statement is absent from the Valuation Report, the Valuation does not comply with these Standards.

**S8.11** The Qualified Valuator or a Qualified Person relied upon by the Qualified Valuator should undertake a site visit to the Mineral Property being valued. The date of the site visit, the name of the person who conducted the site visit, and the extent of the examination must be specified in the Valuation Report or the appended Technical Report. If a site visit is not undertaken, the reason or reasons must be given.

**S8.12** A Valuation Report shall contain a summary and introduction section. A Valuation Report shall address, if applicable, each of the following topics. Guideline 5.0 provides recommendations on the discussion to be contained with respect to each topic:

Summary
Introduction and Terms of Reference
Scope of the Valuation
Compliance with the CIMVal Standards
Property Location, Access and Infrastructure
Property Ownership, Status and Agreements
History of Exploration and Production

Geology and Mineralization

Exploration Results and Potential

Sampling and Assaying

Mineral Resources and Mineral Reserves

Metallurgy

Environmental Considerations

Mining and Processing Operations

Key Assumptions, Risk and Limitations

Valuation Approaches and Methods

Valuation

Valuation Conclusions

References

Certificate of Qualifications

# GUIDELINES

The Guidelines, while not mandatory, provide guidance and best practices which are highly recommended to be followed in the Valuation of Mineral Properties

## G1.0 PROFESSIONAL ASSOCIATIONS FOR QUALIFIED VALUATOR

**G1.1** For the purpose of the definition of "Qualified Valuator" in the Standards, the Qualified Valuator shall be a member of one or more of the following organizations:

(a) a Professional Association; or

(b) a Self-Regulatory Professional Organization. In addition to other organizations that meet the definition of "Self-Regulatory Professional Organization" in the Standards, the CIMVal Committee recognizes the following two organizations as acceptable Self-Regulatory Professional Organizations:

(i) Canadian Institute of Chartered Business Valuators (CICBV)

(ii) Investment Dealers Association of Canada (IDA).

There may be other associations or organizations that also meet the criteria set out in the definitions of Professional Association and Self-Regulatory Professional Organization.

## G2.0 VALUATION PRINCIPLES

**G2.1** There is a body of knowledge and accepted principles and standards in the general field of valuation that do not deal specifically with valuation of Mineral Properties. Many of these have application to the Valuation of Mineral Properties. A number of these widely accepted fundamental valuation principles, which must be applied when estimating value, are briefly described below. More information can be obtained in general literature on valuation.

1. Value relates to a specific point in time. Valuation opinions must be given as at the Valuation Date.
2. Value relates to Current and future expectations
3. The value of assets is based on, or directly related to, what they can earn.
4. If rights additional to mineral rights or mining rights are attached to the Mineral Property, the principle of "highest and best use" should be considered.

5. Hindsight is, in general, inadmissible in reaching valuation conclusions.
6. The market dictates the required rate of return.

## G3.0 VALUATION APPROACHES AND METHODS

**G3.1** The three generally accepted Valuation approaches are:

- Income Approach
- Market Approach
- Cost Approach

The *Income Approach* is based on the principle of anticipation of benefits and includes all methods that are based on the income or cash flow generation potential of the Mineral Property.

The *Market Approach* is based primarily on the principle of substitution and is also called the Sales Comparison Approach. The Mineral Property being valued is compared with the transaction value of similar Mineral Properties, transacted in an open market. Methods include comparable transactions and option or farm-in agreement terms analysis.

The *Cost Approach* is based on the principle of contribution to value. The appraised value method, is one commonly used method where exploration expenditures are analyzed for their contribution to the exploration potential of the Mineral Property.

**G3.2** As applied to Mineral Properties, the Valuation approach depends on the stage of exploration or development of the property. For convenience, Mineral Properties can be categorized as four types. It should be noted that there are no clear-cut boundaries between these types, and it may be difficult to classify some Mineral Properties as to one specific category.

- Exploration Properties
- Mineral Resource Properties
- Development Properties
- Production Properties

**G3.3** Table 1 shows which Valuation approaches are generally considered appropriate to apply to each type of Mineral Property.

**TABLE 1. Valuation Approaches for Different Types of Mineral Properties**

| Valuation Approach | Exploration Properties | Mineral Resource Properties | Development Properties | Production Properties |
|---|---|---|---|---|
| **Income** | No | In some cases | Yes | Yes |
| **Market** | Yes | Yes | Yes | Yes |
| **Cost** | Yes | In some cases | No | No |

**G3.4** Valuation methods are, in general, subsets of Valuation approaches. For example the Income Approach includes several methods. Certain Valuation methods are more widely used and may be more generally acceptable as industry practice than others, although this could change over time. Some methods can be considered to be primary methods for Valuation while others are secondary methods or rules of thumb considered suitable only to check Valuations by primary methods.

**G3.5** Table 2 lists a number of Valuation methods for Mineral Properties, classifies them as to approach, specifies whether it is ranked as a primary or secondary Valuation method, and provides comments. Methods with no primary or secondary ranking are considered to be unreliable or are not widely accepted.

**TABLE 2. Valuation Methods for Mineral Properties**

| Valuation Approach | Valuation Method | Method Ranking | Comments |
|---|---|---|---|
| **Income** | Discounted Cash Flow (DCF) | Primary | Very widely used. Generally accepted in Canada as the preferred method. |
| **Income** | Monte Carlo Analysis | Primary | Less widely used, but gaining in acceptance |
| **Income** | Option Pricing | Primary | Not widely used and not widely understood but gaining in acceptance |

| Valuation Approach | Valuation Method | Method Ranking | Comments |
|---|---|---|---|
| **Income** | Probabilistic Methods | | Not widely used, not much accepted |
| **Market** | Comparable Transactions | Primary | Widely used with variations |
| **Market** | Option Agreement Terms | Primary | Widely used but option aspect commonly not discounted, as it should be |
| **Market** | Gross "in situ" Metal Value | | Not acceptable |
| **Market** | Net Metal Value or Value per unit of metal | Secondary | Widely used rule of thumb |
| **Market** | Value per Unit Area | Secondary | Used for large Exploration Properties |
| **Market** | Market Capitalization | Secondary | More applicable to Valuation of single property asset junior companies than to properties |
| **Cost** | Appraised Value | Primary | Widely used but not accepted by all regulators |
| **Cost** | Multiple of Exploration Expenditure | Primary | Similar to the Appraised Value Method but includes a multiplier factor. More commonly used in Australia |
| **Cost** | Geoscience Factor | Secondary | Not widely used |

**G3.6** A current sampling of recent papers on Valuation methods can be obtained from presentations made at the Mining Millennium 2000 Valuation Day published in a Mineral Property Proceedings volume (www.cim.org) and which were subsequently published in the CIM Bulletin, from publications on VALMIN by the AusIMM (www.ausimm.com.au/publications/books.asp), and in other publications (many of which are referenced in the above papers). The VALMIN publications are "Mineral Valuation Methodologies 1994" and "Mineral Asset Valuation Issues for the Next Millennium 2001".

## G4.0 USE OF MINERAL RESERVES AND MINERAL RESOURCES

**G4.1** All Mineral Reserves and Mineral Resources on a Mineral Property should be considered in its Valuation. Depending on the circumstances, the Income Approach, the Market Approach or the Cost Approach may be more appropriate for the Valuation of a Mineral Property containing Mineral Reserves and Mineral Resources.

**G4.2** For the Income Approach methods, it is generally acceptable to use all Proven Mineral Reserves and Probable Mineral Reserves, and to use Measured Mineral Resources and Indicated Mineral Resources in the circumstances described below.

**G4.3** Mineral Reserves and Mineral Resources used in the Income Approach must be estimated or confirmed by a Qualified Person and must be Current with respect to the Valuation Date.

**G4.4** It is generally acceptable to use Mineral Resources in the Income Approach if Mineral Reserves are also present and if, in general, mined ahead of the Mineral Resources in the same Income Approach model, provided that in the opinion of a Qualified Person the Mineral Resources as depicted in the Income Approach model are likely to be economically viable.

**G4.5** It is generally acceptable to use Measured and Indicated Mineral Resources in the Income Approach if Mineral Reserves are not present provided that in the opinion of a Qualified Person the Mineral Resources as depicted in the Income Approach model are likely to be economically viable.

**G4.6** Where Measured and Indicated Mineral Resources are used in the Income Approach, the technical and related parameters used must be estimated or confirmed by one or more Qualified Persons and a qualifying statement must be included in the Valuation Report about the confidence level of the technical and related parameters relative to Feasibility Study or Prefeasibility Study confidence level. Technical and related parameters must be Current with respect to the Valuation Date.

**G4.7** Where Measured and Indicated Mineral Resources are used in the Income Approach and/or where technical and related parameters are at a lower confidence level than Prefeasibility

Study level it is recommended that the higher risk or uncertainty be recognized by some means, which might include using a higher discount rate, reducing the quantum of the Mineral Resources, or delaying the timing of production of the Mineral Resources in the Income Approach model, or some other appropriate means of reflecting the higher risk of including Mineral Resources.

**G4.8** Inferred Mineral Resources should be used in the Income Approach with great care, and should not be used if the Inferred Mineral Resources account for all or are a dominant part of total Mineral Resources. Any use of Inferred Mineral Resources in the Income Approach must be justified in the Valuation Report and treated appropriately for the substantially higher risk or uncertainty of Inferred Mineral Resources compared to Measured and Indicated Mineral Resources. Inferred Mineral Resources should only be used in the Income Approach if Mineral Reserves are present and if, in general, mined ahead of the Inferred Mineral Resources in the Income Approach model, and/or if Measured and/or Indicated Mineral Resources are used as specified in G4.3 to G4.7 and if, in general, mined ahead of Inferred Mineral Resources in the Income Approach model.

**G4.9** It is not acceptable to use, in the Income Approach, "potential resources", "hypothetical resources" and other such categories that do not conform to the definitions of Mineral Reserves and Mineral Resources.

**G4.10** Technical and related parameters include, but are not limited to, Mineral Reserves, Mineral Resources, mining recovery, mining dilution, mining plan, production schedule, metallurgical testwork, metallurgical recovery, process plant design, project engineering, construction schedule, environmental aspects, permitting, socio-economic aspects, political risk, reclamation and rehabilitation, capital costs, operating costs, smelter terms, product marketing and sales contracts and commodity prices. The relevant technical and related parameters should be disclosed in the Valuation Report or the appended Technical Report.

## G5.0 VALUATION REPORTS - RECOMMENDED TABLE OF CONTENTS

**G5.1** The Valuation Report should consist of technical information and Valuation analyses. Where a Technical Report is appended to or supports the Valuation Report, the technical

information can be incorporated by reference to the Technical Report and need not be repeated in the Valuation Report.

**G5.2** The following outline is intended to be a checklist for information purposes regarding the topics of discussion that must be addressed according to S8.12 The checklist is provided to assist the Qualified Valuator in identifying areas that may be appropriate to be included in a Valuation Report. It is not intended that the Valuation Report address all of the items on the checklist since it is in the discretion of the Qualified Valuator to determine their appropriateness to the Mineral Property being valued. Depending on the status of the property, the level of detail needed will vary. For instance, the information required in sections 8, 9 and 10 may be critical in valuing an Exploration Property, whereas the value of a Production Property will depend to a far greater extent on the information in sections 12, 13 and 14.

1. Summary
   - Provide a brief description of the terms of reference, scope of work, the Valuation Date, the Mineral Property, its location, ownership, geology and mineralization, history of exploration and production, current status, exploration potential and/or production forecast, Mineral Resources and Mineral Reserves, production facilities if any, environmental and permitting considerations, Valuation approaches and methods, Valuation and conclusions.

2. Introduction and Terms of Reference
   - Identify the Commissioning Entity for whom the Valuation is prepared, identify any other intended users, state the owner of the Mineral Property, and confirm who has paid for the Valuation.
   - Describe the Valuation mandate and terms of reference.
   - Outline the purpose of the Valuation and its intended use.
   - Describe the Mineral Property briefly, state the interest in the property that is being valued and indicate its type and stage.
   - State the Valuation Date and the Report Date.

- Name the Qualified Valuator and any Qualified Persons involved in the Valuation and their independence or lack of independence.
- Provide a definition of the type of value being determined.
- Provide other definitions used in the report.

3. Scope of the Valuation
    - Scope of work performed.
    - Describe information reviewed, or relied upon, and its source.
    - Describe steps taken to assure the reliability of the information relied upon.
    - Describe how Data Verification was done.
    - Name the Qualified Valuator or Qualified Person who carried out the site visit, when it was done, and what was examined, or explain why such a visit was not undertaken.
    - Specify if data are confidential, and why.
    - State any disclaimers that apply to the data or the Mineral Property title, or that apply to the extent that certain information or opinions of others are relied on.

4. Compliance with the CIMVal Standards
    - State that the Valuation complies with the Standards (as per S8.9).
    - Where the Valuation is inconsistent with the Guidelines, disclose and explain such inconsistencies or deviations and reasons therefor (as per S8.10).

5. Property Location, Access and Infrastructure
    - Describe the Mineral Property location in detail, including area, and provide a location map.
    - Provide distances to major centres, and an outline of how the property can be reached.
    - Describe the availability of infrastructure such as roads, rail, shipping, airports, power, water, pipelines, labour, supplies and services.
    - Provide a summary of other relevant local issues such as military or terrorist activities, social unrest, seismic risks and the like.

- Provide maps on a regional and local scale, showing all relevant infrastructure including roads, railways, power lines, pipelines, and tailings disposal sites. Provide geographic coordinates using national and international systems.

6. Property Ownership, Status and Agreements
   - Describe the Mineral Property title and the owner's interest in the property, including surface rights, including obligations that must be met to retain the property, and the expiry dates of claims, licences and other tenure rights, along with any encumbrances to the title.
   - Describe any applicable agreements, such as options, joint ventures, farm-ins, royalties, back-in rights, payments, and the like.
   - Describe the status of the Mineral Property at the Valuation Date including statutory work requirements, surface rights, water rights, easements, aboriginal land claims, any legal issues, environmental and permitting issues and the impact these may have on property development.

7. History of Exploration and Production
   - Provide chronology of previous exploration programs, including methods employed and results, quality of the work, and ownership at the time of the work.
   - Tabulate historical Mineral Resource and Mineral Reserve estimates, if relevant, along with the source and the quality of the estimates.
   - Tabulate production history showing annual amounts and grades. Provide a reconciliation between Mineral Reserves and production, where possible.
   - Provide information of a similar nature for the region and for adjacent properties, if relevant.

8. Geology and Mineralization
   - Describe the regional geology and mineralization.
   - Describe the detailed geology of the Mineral Property.
   - Describe the mineralization encountered on the property, the host rocks, and relevant geological controls. Give details on geometry and dimensions of the mineralized

zones, along with the type, character, continuity and distribution of the mineralization.

- Outline current thinking about sources and controls of mineralization and the models and concepts being applied to exploration.
- Provide similar information about adjacent properties, if relevant.
- Provide regional and property geology maps showing mineralization and other relevant details.

9. Exploration Results and Potential

- Describe recent exploration work on the Mineral Property and discuss results, their interpretation and their significance. Discuss the quality and reliability of the exploration work and the data.
- Provide opinion on the exploration potential for existence and discovery of economic mineralization on the Mineral Property.
- Where a significant mineral deposit is indicated, provide an assessment of the potential for the discovery of additional mineralization.
- Information from adjacent properties may be included provided that the distinction is clearly made between information on the adjacent properties and the property being valued.
- Describe any constraints to further success, such as legal disputes, land claims, permitting constraints, or physical impediments to effective exploration.

10. Sampling and Assaying

- Describe the methods of sampling and details of location, number, type, nature and spacing or density of samples collected, and the area covered.
- Identify any drilling, sampling or recovery factors that could Materially impact the accuracy or reliability of results.
- Describe sample preparation, security and analytical procedures, assay quality assurance and quality control procedures, and check assays; and discuss their adequacy.

- Note where the analytical data have been verified by a Qualified Person and any limitations on that verification.

11. Mineral Resources and Mineral Reserves

- Provide estimates of Mineral Resources and Mineral Reserves, if any, and how Current they are, and confirm that the work was carried out by a Qualified Person.
- State the date when they were effective, and describe any subsequent sampling, production or other information that would change the Mineral Resources and Mineral Reserves.
- Describe the reserve/resource database and how it was validated.
- Discuss geological interpretation and continuity of mineralization.
- Describe estimation methods and how they were applied.
- Discuss technical and economic parameters such as cut-off grade, dilution and mining recovery.
- Provide details of any reconciliation between Mineral Reserve estimates and subsequent production results.
- Discuss the classification of the Mineral Resources and Mineral Reserves.
- Provide representative plans and sections depicting the configuration of sampling data and the Mineral Resource and Mineral Reserve outlines or blocks.

12. Metallurgy

- Describe mineralogy of the mineralization, and the results of thin section, polished section and similar studies.
- Describe sampling procedures for metallurgical tests and discuss the representativeness of the samples.
- Provide details of metallurgical testwork including the laboratories used, who supervised and carried out the work, methods employed, results obtained.
- Describe proposed beneficiation process and flowsheet.

13. Environmental Considerations

- Describe the environmental standards that have to be met, and the permits needed to continue work on the Mineral Property and any limitations they may impose on the exploration, development and production on the property.
- Describe the status of environmental baseline studies.
- Provide an outline of environmental issues that have to be dealt with, and the proposed means for dealing with them.
- Describe plans for bonding, pre-closure remediation, reclamation, closure plan, and post-closure responsibilities.

14. Mining and Processing Operations

- Outline current status and proposed activities for the future.
- Where property is at a Feasibility Study stage, provide a full description of the engineering, Prefeasiblity Studies and Feasibility Studies completed and planned, and discuss the significance of these studies and the plans for future work.
- Where property is in production, provide a full description of mining and processing methods, mining dilution, metallurgical performance, throughput and output capacities, an assessment of operating costs, infrastructure, management capabilities and products marketing. Describe any technical or financial issues that may impact on Value, and discuss measures proposed to deal with these.
- Provide an outline of capital and operating costs, contracts, taxes, and royalties.
- Provide details and results of any cash flow analysis or economic study.

15. Key Assumptions, Risks and Limitations

- Describe and discuss all Material assumptions and limiting conditions that affect the analyses, opinions and conclusions reached and upon which the Valuation is based.
- Discuss the Material risks associated with the Mineral Property including technical, operating, financial, socio-economic, environmental, permitting, marketing, commodity prices and political risks.
- Describe reliance on information obtained from management.

16. Valuation Approaches and Methods

- Provide a list of recent Valuations of the Mineral Property (for at least the past two years), briefly describe the methods employed, and provide the resulting Valuations.
- Consider whether the highest and best use of the property may be other than its potential for the development of a mineral deposit, and, if so, describe the valuator's opinion of the highest and best use for the property.
- Discuss the possible application of various approaches and explain why each approach was utilized or not.
- Describe the methods selected for the Valuation and justify their applicability. Include a discussion of the exposure time to the market and the marketing effort assumed.

17. Valuation

- Provide an overview of the economic context within which the Valuation is carried out. For Exploration Properties, this might include comments on the demand for such properties by junior and major mining companies, and the availability of financing for exploration work. For Development Properties and Production Properties, the current economics of the mining industry and the particular commodity being studied should be discussed. The outlook for commodity prices and the availability and cost of funding should be outlined.
- Specify currency used and provide any exchange rates utilized.
- Provide details of database used to support each method.
- Provide a clear description and analysis of the information utilized, the methods followed, and the reasoning that supports the analysis, opinions and conclusions as to value.

18. Valuation Conclusions

- Provide a summary of the Valuation estimates reached using each method employed. Provide a reconciliation of justification of any significant differences in the Valuation estimates.

- State the Valuation conclusions, expressed as a range of values. Discuss any reliance on or weighting of different Valuation estimates used to develop the range of values.
- Where a single value is required, discuss the rationale used to select this value within the stated range.

19. References

- Include a detailed list of all sources of information cited in the Valuation Report

20. Certificate of Qualifications

- The Qualified Valuator (QV) and each Qualified Person (QP) who contributed to the Valuation report must provide a certificate of qualifications which should include the following information:
    - Name, address and occupation.
    - Qualifications including relevant experience, education, the name of each Professional Association or Self-Regulatory Professional Association to which the QV or QP belongs, and a statement that the person is a QV or QP for the purpose of the Valuation.
    - Dates of the most recent visits to the Mineral Property.
    - Sections of the report for which each QP is responsible.
    - That the QV, and QP if applicable, is not aware of any Material fact not in the Valuation Report which would make the report misleading.
    - If the QV and QPs are independent.
    - What prior involvement with the Mineral Property that the QV or QP may have had.
    - That the Valuation Report has been prepared consistent with these Valuation standards.
- Qualified Valuators belonging to non-Canadian Professional Associations or Self-Regulatory Professional Associations must certify that their professional organization meets all the attributes of a Professional Association or a Self-Regulatory Professional Association.

# Exhibit RPA-006

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Copper (US$/tonne)** | | | | | | | | | | | | | | | |
| 2 | | © Copyright Consensus Economics Inc. | | | | | *Nominal Quarterly Averages* | | | | | | | | | |
| 3 | **Survey Date:** | | | | | | | | | | | | | | | |
| 4 | February 17, 2020 | **Spot Price** | | | | | ***% change*** | | | | | | | | | |
| 5 | | **on Survey Date** | **Mar-20** | **Jun-20** | **Sep-20** | **Dec-20** | ***from spot*** | **Mar-21** | **Jun-21** | **Sep-21** | **Dec-21** | | | | **2022** | **2023** |
| 6 | | | (nominal) | | | | | (nominal) | | | | | | | | |
| 7 | **Consensus (Mean)** | **5801** | **5977** | **6077** | **6178** | **6230** | ***7.4%*** | **6328** | **6370** | **6394** | **6412** | | | | **6439** | **6665** |
| 8 | | | | | | | | | | | | | | | | |
| 9 | **High** | | 6300 | 6612 | 6614 | 6863 | | 7100 | 7351 | 7573 | 7755 | | | | 8063 | 8550 |
| 10 | **Low** | | 5600 | 5800 | 5798 | 5719 | | 5632 | 5548 | 5290 | 5290 | | | | 4740 | 5400 |
| 11 | **Standard Deviation** | | 164 | 182 | 216 | 298 | | 330 | 368 | 477 | 530 | | | | 680 | 740 |
| 12 | **Number of Forecasts** | | 28 | 29 | 29 | 29 | | 26 | 26 | 25 | 24 | | | | 20 | 18 |
| 13 | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | |
| 20 | **Moody's Analytics** | | 5898 | 6198 | 6554 | 6863 | *18.3%* | 7100 | 7351 | 7573 | 7755 | | | | 8063 | 8550 |
| 21 | **BoA Securities** | | 5800 | 6000 | 6250 | 6750 | *16.4%* | 6250 | 6250 | 6008 | 6200 | | | | 6616 | 6921 |
| 22 | **Investec** | | 6283 | 6283 | 6614 | 6614 | *14.0%* | 6724 | 6724 | 6944 | 6944 | | | | 7165 | 7606 |
| 23 | **Liberum Capital** | | na | 6612 | 6612 | 6612 | *14.0%* | 6612 | 6612 | 6612 | na | | | | 6612 | 6612 |
| 24 | **ABN Amro** | | 5936 | 6100 | 6498 | 6601 | *13.8%* | 6707 | 6820 | 6834 | 6962 | | | | na | |
| 25 | **Standard Chartered** | | 6150 | 6275 | 6400 | 6500 | *12.0%* | 6160 | 6300 | na | na | | | | na | |
| 26 | **Capital Economics** | | 5975 | 5900 | 6150 | 6450 | *11.2%* | 6650 | 6750 | 6850 | 6950 | | | | na | |
| 27 | **Morgan Stanley** | | 6173 | 6173 | 6283 | 6393 | *10.2%* | 6504 | 6393 | 6283 | 6173 | | | | 5842 | 6118 |
| 28 | **Pezco Economics** | | 5871 | 6056 | 6240 | 6388 | *10.1%* | 6428 | 6436 | 6444 | 6452 | | | | 6475 | 6535 |
| 29 | **ANZ** | | 6002 | 6002 | 6201 | 6300 | *8.6%* | 6401 | 6651 | 7001 | 7202 | | | | 6810 | 7125 |
| 30 | **Citigroup** | | 5600 | 5800 | 6300 | 6300 | *8.6%* | 6600 | 6600 | 6600 | 6600 | | | | 6800 | |
| 31 | **Societe Generale** | | 5900 | 6000 | 6200 | 6300 | *8.6%* | 6500 | 6500 | 6500 | 6500 | | | | 6400 | |
| 32 | **IHS Markit** | | 5823 | 6101 | 6203 | 6287 | *8.4%* | 6356 | 6413 | 6495 | 6534 | | | | 6664 | 7001 |
| 33 | **UBS** | | 5842 | 5952 | 6173 | 6283 | *8.3%* | 6283 | 6283 | 6724 | 6724 | | | | 7055 | 7275 |
| 34 | **Econ Intelligence Unit** | | 6010 | 6100 | 6200 | 6250 | *7.7%* | 6350 | 6420 | 6450 | 6500 | | | | 6614 | 6746 |
| 35 | **Oxford Economics** | | 5939 | 6029 | 6119 | 6211 | *7.1%* | 6273 | 6336 | 6399 | 6463 | | | | 6626 | 6895 |
| 36 | **BMO** | | 6100 | 6400 | 6200 | 6200 | *6.9%* | 6600 | 6600 | 6200 | 6200 | | | | 5825 | 6013 |
| 37 | **Deutsche Bank** | | 6300 | 6200 | 6200 | 6200 | *6.9%* | na | na | na | na | | | | 6200 | 6400 |
| 38 | **TD Economics** | | 6173 | 6173 | 6173 | 6173 | *6.4%* | 6107 | 6107 | 6107 | 6107 | | | | na | |
| 39 | **RBC Capital Markets** | | 5842 | 5842 | 6063 | 6063 | *4.5%* | 6063 | 6063 | 6063 | 6063 | | | | 6063 | 6063 |
| 40 | **Bank of China International** | | 6150 | 6250 | 6100 | 6000 | *3.4%* | na | na | na | na | | | | na | |
| 41 | **Prometeia** | | 5897 | 5974 | 6101 | 5969 | *2.9%* | 6015 | 6075 | 6302 | 6234 | | | | na | |
| 42 | **CIBC** | | 5952 | 5952 | 5952 | 5952 | *2.6%* | 6393 | 6393 | 6393 | 6393 | | | | na | |
| 43 | **Credit Suisse** | | 5950 | 5950 | 5950 | 5950 | *2.6%* | 5740 | 5740 | 5290 | 5290 | | | | 4740 | 5400 |
| 44 | **Macquarie** | | 5800 | 5800 | 5800 | 5900 | *1.7%* | 5900 | 5900 | 5900 | 5900 | | | | 6175 | 6400 |
| 45 | **Commonwealth Bank** | | 6173 | 6063 | 5952 | 5842 | *0.7%* | 5952 | 6063 | 6173 | 6283 | | | | 6535 | 6734 |
| 46 | **Australia Dept of Industry** | | 5940 | 5930 | 5880 | 5810 | *0.2%* | 6240 | 6290 | 6230 | 5990 | | | | na | |
| 47 | **JP Morgan** | | 5800 | 6200 | 6000 | 5800 | *0.0%* | na | na | na | na | | | | na | |
| 48 | **Euromonitor International** | | 6071 | 5924 | 5798 | 5719 | *-1.4%* | 5632 | 5548 | 5481 | 5472 | | | | 5495 | 5574 |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **Cobalt (US$/lb)** | | | | | | | | | | | | | | | |
| 2 | | © Copyright Consensus Economics Inc. | | | | | *Nominal Quarterly Averages* | | | | | | | | | |
| 3 | **Survey Date:** | | | | | | | | | | | | | | | |
| 4 | February 17, 2020 | **Spot Price** | | | | | ***% change*** | | | | | | | | | |
| 5 | | **on Survey Date** | **Mar-20** | **Jun-20** | **Sep-20** | **Dec-20** | ***from spot*** | **Mar-21** | **Jun-21** | **Sep-21** | **Dec-21** | | | | **2022** | **2023** |
| 6 | | | (nominal) | | | | | (nominal) | | | | | | | | |
| 7 | **Consensus (Mean)** | **17.88** | **17.57** | **18.13** | **19.02** | **19.19** | *7.3%* | **19.80** | **19.89** | **20.20** | **19.53** | | | | **21.16** | **22.36** |
| 8 | | | | | | | | | | | | | | | | |
| 9 | **High** | | 21.00 | 21.00 | 25.00 | 25.00 | | 25.00 | 25.00 | 25.00 | 25.00 | | | | 27.50 | 33.50 |
| 10 | **Low** | | 15.04 | 15.42 | 15.65 | 15.88 | | 15.88 | 16.10 | 16.56 | 17.01 | | | | 16.75 | 15.00 |
| 11 | **Standard Deviation** | | 1.70 | 1.54 | 2.53 | 2.60 | | 2.80 | 2.93 | 2.92 | 2.50 | | | | 3.63 | 5.90 |
| 12 | **Number of Forecasts** | | 11 | 11 | 11 | 11 | | 10 | 10 | 9 | 8 | | | | 10 | 10 |
| 13 | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | |
| 20 | **Liberum Capital** | | 20.00 | 20.00 | 25.00 | 25.00 | *39.8%* | 25.00 | 25.00 | 25.00 | na | | | | 25.00 | 25.00 |
| 21 | **Macquarie** | | 17.00 | 19.00 | 21.00 | 22.00 | *23.0%* | 23.00 | 24.00 | 24.00 | 25.00 | | | | 27.50 | 33.50 |
| 22 | **BMO** | | 21.00 | 21.00 | 20.00 | 20.00 | *11.9%* | 18.00 | 18.00 | 20.00 | 20.00 | | | | 25.00 | 30.00 |
| 23 | **BoA Securities** | | 18.00 | 18.00 | 20.00 | 20.00 | *11.9%* | 20.00 | 20.00 | na | na | | | | 19.17 | 18.76 |
| 24 | **Morgan Stanley** | | 18.00 | 19.00 | 19.50 | 20.00 | *11.9%* | 22.00 | 22.00 | 22.00 | 20.00 | | | | 16.75 | 15.00 |
| 25 | **IHS Markit** | | 16.35 | 17.75 | 18.30 | 18.51 | *3.5%* | 18.61 | 18.34 | 18.23 | 18.23 | | | | 17.54 | 16.83 |
| 26 | **Investec** | | 17.00 | 17.00 | 17.50 | 17.50 | *-2.1%* | 18.00 | 18.00 | 18.50 | 18.50 | | | | 18.88 | 19.75 |
| 27 | **RBC Capital Markets** | | 16.10 | 17.50 | 17.50 | 17.50 | *-2.1%* | 20.00 | 20.00 | 20.00 | 20.00 | | | | 22.50 | 25.00 |
| 28 | **UBS** | | 17.50 | 17.50 | 17.50 | 17.50 | *-2.1%* | 17.50 | 17.50 | 17.50 | 17.50 | | | | 20.00 | 20.00 |
| 29 | **Deutsche Bank** | | 17.24 | 17.24 | 17.24 | 17.24 | *-3.6%* | na | na | na | na | | | | 19.22 | 19.76 |
| 30 | **Capital Economics** | | 15.04 | 15.42 | 15.65 | 15.88 | *-11.2%* | 15.88 | 16.10 | 16.56 | 17.01 | | | | na | |

# Exhibit RPA-007

2003

# The Journal of Business Valuation

Proceedings of
The Fifth
Joint Business Valuation
Conference of
The Canadian Institute of
Chartered Business Valuators
and the
American Society of Appraisers

Orlando
October 24 - 26, 2002

# 19

# VALUATION OF NON-PRODUCING MINERAL PROPERTIES

*by William E. Roscoe, Ph.D., P.Eng.*
*President*

*Roscoe Postle Associates Inc.*
*Toronto, Ontario*

## ABSTRACT

Valuation methods are well established for mineral properties with production or imminent production, and include discounted cash flow and comparable transactions. Valuation methods for non-producing mineral properties, however, are more subjective.

Non-producing mineral properties include those at various stages of exploration, properties at the prefeasibility or feasibility stage, properties with currently uneconomic mineral resources, and past-producers. Different valuation methods may be appropriate for different types of mineral properties.

Income approach methods such as discounted cash flow and option pricing are generally not applicable to properties at the exploration stage. The market approach is generally appropriate to all types of mineral properties, although it is difficult to find good comparables because of the unique nature of mineral properties and the small number of transactions. Cost approach methods, such as appraised value and geoscience factor, are commonly used for exploration stage properties.

Canadian standards and guidelines for valuation of mineral properties are in the process of being finalized by a Special Committee of the Canadian Institute of Mining, Metallurgy and Petroleum (CIMVal Committee). The CIMVal Standards are intended to be consistent with National Instrument 43-101, which sets regulatory standards of disclosure for mineral projects, and with International Valuation Standards. The intent of the CIMVal Standards and Guidelines is that mineral property valuation be carried out by appropriately qualified individuals and that all relevant information be disclosed.

The Standards and Guidelines are based on industry best practice and allow for professional judgment in certain instances.

## INTRODUCTION

The purpose of this paper is to describe approaches and methodology for the valuation of non-producing mineral properties, to provide some valuation examples, and to outline general levels of mineral property values. By way of background, different types of mineral properties are defined, since they require different valuation approaches and methods. Since the vast majority of mineral properties are non-producing properties at the exploration stage, the nature of exploration properties and the exploration process are covered.

Valuations of mineral properties are needed for various reasons, including mergers and acquisitions, non-arms' length transactions, pricing of initial public offering of stock, support for property agreements, litigation, compensation for expropriation, and insurance claims. Independence of the valuator is usually implicit for these applications.

Value and valuation in this paper refer to fair market value. In some circumstances, other definitions of value may apply, such as net present value, replacement value, salvage value, book value, assessed value, insured value, etc.

Mineral property refers to any right, title or interest to property held or acquired in connection with the exploration, development, extraction or processing of minerals which may be located in, on or under the surface of the property, together with all related plant, equipment and infrastructure. Mineral property may take the form of real property, unpatented mining claims, prospecting permits, development and mining licenses, mining leases, patented mining claims, etc.

One of the important concepts of fair market value that is critical to mineral properties is the effective date of valuation. This is because mineral property values vary over time, depending on events on neighbouring properties, market interest, commodity prices, etc. In respect of a valuation for an expropriation, insurance claim or litigation, the effective date may be a very contentious issue. This is because the mineral property owner may perceive that the property will be more valuable in the future, when market conditions improve, and that the expropriation or legal issue forces the valuation in poor market conditions.

## STANDARDS FOR VALUATION OF MINERAL PROPERTIES

Canadian standards and guidelines for valuation of mineral properties are in the process of being finalized by the CIMVal Committee.

In the wake of the Bre-X gold salting scandal, the Mining Standards Task Force (MSTF) was formed by the Toronto Stock Exchange and the Ontario Securities Commission. The MSTF made a number of recommendations in its 1999 final report with

a view to improving the regulatory climate in the exploration and mining industries. Many of the recommendations dealt with the establishment of professional standards in several areas, including valuation of mineral properties. This led to the formation of the CIMVal Committee, of which the writer is Co-Chair. The CIMVal Draft Standards and Guidelines were released in February 2002 for comments by interested parties. A final draft was released for further comments in September 2002. The CIMVal Standards and Guidelines for Valuation of Mineral Properties are expected to be finalized in late 2002.

National Instrument 43-101, Standards for Disclosure of Mineral Projects (NI 43-101), which came into force February 1, 2001, was formulated by the Canadian Securities Administrators, an umbrella association of provincial securities commissions. NI 43-101 is now the principal regulatory document in Canada for disclosure of information on mining projects. The CIMVal Standards and Guidelines have been drafted to be consistent with and to augment NI 43-101 with respect to valuation of mineral properties. The CIMVal Standards and Guidelines are also intended to be consistent with the general thrust of the International Valuation Standards being developed by the International Valuation Standards Committee.

The Australian VALMIN Code and Guidelines govern the technical assessment and/or valuation of mineral and petroleum assets and securities and set standards for independent expert reports. In South Africa, standards and guidelines for valuation of mineral projects, properties and assets are at the drafting stage (SAMVAL Code). The International Valuation Standards Committee aims to develop standards for the valuation of mineral properties within the framework of its International Valuation Standards.

The CIMVal Standards recognize other documents relevant to valuation in general. These include Ontario Securities Commission Rule 61-501, Canadian Institute of Chartered Business Valuators standards for the valuation of businesses and corporations, and Investment Dealers Association of Canada Bulletin #2827.

The guiding philosophy and intent of the CIMVal Standards and Guidelines is that mineral property valuation be carried out by appropriately qualified individuals and that all relevant information be disclosed. The Standards and Guidelines are based on industry best practice and allow for professional judgement in certain instances. Key features of the Draft Standards and Guidelines are:

- They cover valuation of mineral properties but not valuation of corporations.
- They cover metallic and non-metallic mineral properties, both subsurface and surface, and energy fuels. Oil and gas properties are not covered.
- Value refers primarily to Fair Market Value.
- The basic tenets are materiality, transparency, independence, competence and reasonableness.
- A Qualified Valuator (QV) is responsible for the overall valuation, and may be

assisted in or rely on a Qualified Person (QP) for various aspects. The QV must be a professional with at least five years of relevant experience, and must belong to a self-regulatory professional organization. The QP is a geoscientist or engineer with at least five years of relevant experience, and must belong to a self-regulatory professional organization.

- All technical input to a valuation, including Mineral Reserves and Mineral Resources, must be verified by a QP.
- The entity commissioning a valuation must reasonably establish that the QV is sufficiently qualified, competent and independent. Similarly, the QV must be satisfied with the credentials of any QPs involved in the valuation.
- The QV has the responsibility to decide which valuation approaches and methods to use. The three standard methods of Income, Market and Cost must be considered.
- The valuation must be reported as a range of values to reflect the uncertainty of the valuation process.
- The valuation must be reported in a Valuation Report that sets out, among other things, the key risks and assumptions used. The Guidelines recommend a table of contents for the Valuation Report.
- Mineral Reserve and Mineral Resource estimates must be disclosed, and must follow definitions as set out in NI 43-101.
- For Income Approach methods, such as discounted cash flow, it is generally acceptable to use all Proven and Probable Mineral Reserves, and to use Mineral Resources that a QP states are likely to be economically viable and for which the higher risk is recognized in the valuation by some appropriate means.
- The valuation date must be specified and all valuations within the previous 24 months must be discussed.
- The Valuation Report must include Certificates of Qualifications for the QV and any QPs involved, and a statement that the valuation complies with the Standards and Guidelines.

## TYPES OF MINERAL PROPERTIES

There are three main categories of mineral properties that require different approaches to valuation. These are development properties, exploration properties, and marginal development properties, which are defined below. This subdivision is based on technical information rather on the type of mineral tenure. Exploration properties and marginal development properties are non-producing mineral properties.

In the minerals industry, mineral exploration properties are optioned, joint ventured, bought, sold and traded on the basis of perceived exploration potential. There are a number of different approaches and methods that are used to value mineral exploration properties, all of which are subjective.

There is also a spectrum of mineral properties, ranging from exploration properties to producing mines, each of which requires different valuation approaches. For convenience here, mineral properties are categorized as development properties, exploration properties, and marginal development properties.

## Development Properties

Development properties are those on which an economically viable mineral deposit has been demonstrated to exist. Such properties are at a sufficiently advanced stage that enough reliable information exists to value the property by discounted cash flow analysis, with a reasonable degree of confidence. In general, such information includes reasonably assured mineable reserves, workable mining plan and rate, metallurgical test results and process recoveries, capital and operating cost estimates, environmental and reclamation cost estimates, and commodity price projections.

The value of a development property is the net present value of a stream of estimated cash flows, discounted at an appropriate rate to properly reflect the risk of the mining project. Development properties include producing mines as well as properties on which development of an economically viable operation is feasible, planned or under construction.

## Exploration Properties

Exploration properties are those on which an economically viable mineral deposit has **not** been demonstrated to exist. The real value of an exploration property lies in its potential for the existence and discovery of an economically viable mineral deposit. Only a very small number of exploration properties will ultimately become mining properties, as discussed in the following section, but until exploration potential is reasonably well tested, they have value. Exploration properties can be further subdivided into those with and without quantifiable mineral resources.

## Marginal Development Properties

Dividing mineral properties into exploration or development properties is relatively straightforward for the most part. There are some mineral properties, however, which fall into a grey area between the two groups. These are properties which contain well-defined mineral resources which would become economically mineable reserves under improved circumstances, and have enough reliable data to show that the economics are

marginal under prevailing conditions at the time of valuation. Improved circumstances can include commodity prices, technology improvements, establishment of local infrastructure, etc. Such properties are herein called marginal development properties. These also include mines which are temporarily closed down due to low commodity prices. Marginal development properties may have to be valued by a third type of valuation approach, such as the option pricing method.

## EXPLORATION PROPERTIES AND THE EXPLORATION PROCESS

Exploration properties are non-producing mineral properties that are acquired for their perceived potential to host an economic mineral deposit. The challenge of the exploration process is to discover economic mineral deposits on those very few exploration properties where they exist.

Modern exploration is a staged process. In general, each stage of exploration work is designed to get to the next decision point, that is, whether or not to continue exploration on a property, based on results of the previous stage. Each successive stage is, in general, more expensive, due to the progressively more detailed nature of the work required. Whenever an exploration program moves to the next stage, the value of a property may be enhanced, reduced, or remain the same, depending on how results of the program affect the perceived exploration potential.

The objective of the exploration process is to identify and concentrate work on the properties that show more promise in terms of exploration potential, and screen out the properties that are downgraded by ongoing work. Obviously the properties on which work demonstrates higher exploration potential are more valuable to mining companies. A corollary is that exploration properties on which work demonstrates little or no potential have little or no value.

Figure 1 illustrates how the values of exploration properties vary over time and emphasizes the importance of the effective date of valuation. Exploration work on Property A gave encouraging results year after year, which shows up as an increase in value over time. Exploration work on Property B gave encouraging results and increased in value over the first two stages of exploration in the first two years, but exploration work in year 3 was discouraging, resulting in a decrease in value. No work was done in years 4 and 5 on Property B, resulting in a leveling off then a decrease in value and market interest declined.

**Figure 1: Variation in the Values of Exploration Properties over Time**




The intrinsic value of an exploration property lies in its potential for the existence and discovery of an economic mineral deposit. In the mining industry, mineral exploration properties are optioned, joint ventured, bought, sold and traded on the basis of perceived exploration potential. There are a number of different approaches and methods that are used to value mineral exploration properties, all of which are subjective.

## VALUATION APPROACHES AND METHODOLOGY

As in other fields, the three main approaches to valuation of mineral properties are income, cost and market approaches. Different approaches apply to different types of mineral properties as do different methods, in the writer's view, as summarized in Table 1.

### Table 1: Valuation Approaches and Methods for Different Types of Mineral Properties

| Valuation Approach | Valuation Method | Development Properties | Marginal Development Properties | Exploration Properties |
|---|---|---|---|---|
| | | | | |
| Income | Discounted Cash Flow | Yes | Maybe | No |
| | Option Pricing | Yes | Yes | No |
| | | | | |
| Cost | Appraised Value | No | Yes | Yes |
| | Geoscience Factor | No | Maybe | Yes |
| | | | | |
| Market | Comparable Transactions | Yes | Yes | Yes |
| | Option Agreement Terms | Yes | Yes | Yes |

## INCOME APPROACH

### Discounted Cash Flow Method

As noted above, development properties are those on which an economically viable mineral deposit has been demonstrated to exist. Development properties may be in production or may be in preparation for production. Demonstration of economic viability requires that sufficiently reliable technical, financial and other information have been generated to assess the economics of the property with a reasonable degree of confidence. The appropriate approach to valuing development properties is discounted cash flow (DCF) analysis to determine the net present value of a stream of estimated future cash flows. The DCF method can also be used for marginal development properties, but its usefulness is doubtful because low or negative values may be derived which do not necessarily reflect the market value.

The DCF method is a well established and standard method used in the mining industry to value development properties. Such properties are commonly bought and sold on the basis of net present value derived from DCF analysis.

DCF analysis requires that the property is sufficiently advanced that reliable and up to date information is available in the following areas:

- reasonably assured mineable reserves (proven and probable);
- mining plan, rate and schedule;
- metallurgical test or operating results;
- process recovery and design;
- capital cost estimates including mine, process plant, surface facilities and infrastructure, environmental compliance, decommissioning and reclamation, working capital, etc.; and
- operating cost estimates including mining, processing, administration and management, transportation, infrastructure, environmental compliance, sales, royalties, etc.

Other factors which form important components of a DCF analysis are:

- reasonable commodity price projections and currency exchange rate;
- federal, provincial and municipal taxes; and
- appropriate discount rate.

Valuations by the DCF method should always allow for the return of the capital invested in determination of the net present value. The net present value should also take into account all applicable taxes.

Sensitivity analyses are commonly done in connection with DCF analysis to determine the effect of various estimated parameters on the net present value. This is very useful for identifying variables that have a large effect on the viability (and value) of the property, such as metal grade, operating cost, commodity price or capital cost. Monte Carlo analysis can be used to quantify the expected value in response to variability in input parameters.

The main advantage of the DCF method is that it is a well established and widely accepted method of valuing advanced mineral properties and operating mines. There are two main disadvantages to the method. One disadvantage is that it is commonly applied without due regard for the quality and reliability of the input factors, particularly technical parameters such as mineral reserve tonnage and grade, estimated capital and operating costs, metallurgical recovery, etc. The other disadvantage is that the method may undervalue mineral properties in times of low commodity prices.

## Option Pricing Method

The option pricing method is suited to the valuation of marginal development properties, where the level of information in terms of detail and reliability is similar to that of

development properties, but DCF analysis results in a very low or negative net present value at current commodity prices. Such marginal development properties nevertheless have value, since transactions do occur. Marginal development properties also include mines temporarily closed down due to low commodity prices.

The option pricing method is described in publications by Brennan and Schwartz (1985), McKnight (2002), McKnight and Goldie (1990), and Palm et al. (1986). In general, the method is poorly understood and is not used much in valuation of mineral properties.

In the option pricing method, a mineral property is regarded as a complex option on its mineral reserves. The approach involves developing various models for the options available, which include:

- the option to develop and commence production;
- the option to shut down or resume production;
- the option to hedge production;
- the option to change the rate of production; and
- the option to change the grade of production.

An option pricing model can be developed whereby a value is generated by modelling such factors as the strike price, the costs of exercising the option, and the probability that the option would be exercised. The strike price is the price of the underlying commodity at which management would consider exercising the option.

The advantage of the option pricing method is its ability to value marginal development properties, which in the real world change hands for significant consideration, while standard DCF analysis renders low or negative values. One disadvantage may be the complex mathematics involved. In the option pricing approach, care must be taken that the various options available to management of an operation, such as to shut down and reopen, must be realistic in terms of practicality, cost, and the time needed.

## COST APPROACH

Methods using a cost approach, such as the appraised value method and the geoscience factor method, are applicable to non-producing mineral properties, that is, exploration properties and in many cases marginal development properties.

### Appraised Value Method

The appraised value method is based on the premise that the real value of an exploration property or a marginal development property lies in its potential for the existence and

discovery of an economic mineral deposit. The appraised value method assumes that the amount of exploration expenditure justified on a property is related to its value. The cost approach is given some validity by the fact that option agreements on mineral properties are often based on expenditures required to earn an interest. There is also often a reference to past exploration expenditures in option agreements, which can be related to value of the residual interest of the optionee.

The appraised value method is described in papers by Roscoe (1988, 1999, 2001, 2002), Agnerian (1996a), Thompson (1991) and Lawrence (1989, 1998).

The basic tenet of the appraised value method is that an exploration property is worth the **meaningful past exploration expenditures plus warranted future costs**. An important element of this method, which is often overlooked in its application, is that only those past expenditures that are considered reasonable and productive are retained as value. Productive means that the results of the work give sufficient encouragement to warrant further work by identifying potential for the existence and discovery of an economic mineral deposit.

Warranted future costs comprise a reasonable exploration budget to test the identified potential, which can be geophysical or geochemical anomalies, or promising mineralization already identified. As noted previously, if exploration work downgrades potential, it is not productive and should not be retained as value. Obviously, if the property is considered to have negligible exploration potential, it has little or no value.

Past expenditures are usually analyzed on an annual basis, using technical expertise to assess which expenditures to retain and which to reject in terms of identifying remaining exploration potential. In times of high inflation, past expenditures are escalated to the effective date of valuation or current unit costs are applied to the work retained. Usually little of the expenditures more than five or so years prior to the effective valuation date are retained.

In the case of dual or multiple property ownership, the Appraised Value of the whole property is determined first. Then the value is apportioned to one or more of the property owners. During an option or earn-in period, the property interests of each party are assumed to be the final earned interests. Some properties carry a royalty, commonly as a net smelter return or net profits interest. Such royalties are deducted as a pro rata percentage from the Appraised Value apportioned to the non-royalty holder. This is done to recognize the existence of the royalty and is not meant to imply a value for the royalty. In some cases it may be necessary to differentiate between a net smelter return and net profits interest royalty by using a higher percentage for the former relative to the latter.

The derivation of an Appraised Value by adding the retained past expenditures to the warranted future costs should be thought of as an abstract exercise to determine the cost of an exploration "play" on a property, which is considered to be the Appraised Value. It should not be thought of in terms of who pays for the future exploration

program, although it is similar to the earn-in aspect of some option agreements. It should also not be thought of as an accounting exercise where exploration expenditures are booked and can be written off over time or against income.

The Appraised Value Method is best applied to properties that are actively being explored. It is more difficult to apply the method to properties that have been idle for some years, especially those that have had substantial expenditures in the past. Many such properties have subeconomic or marginal resources outlined by the past work, and some qualify as marginal development properties. The key to the valuation of inactive properties is a realistic assessment of the remaining exploration potential, which could be in the form of untested targets, potential to increase the grade or tonnage of the existing resource, or potential for development with changes in technology or economic conditions.

For marginal development properties and inactive exploration properties, Roscoe Postle Associates has developed a set of guidelines for what proportion of the past expenditures to retain as value, depicted in Table 2.

### Table 2: Guidelines for Retained Expenditures for Marginal and Inactive Properties

| Retained Portion of Past Expenditures | Guidelines |
|---|---|
| 75% | Property with resources but no work done for some years. Some future work is warranted. Usually a property with marginal resources and potential for more but not quite exciting enough to attract exploration expenditures easily. May be at the underground exploration stage. |
| 50% | Property with subeconomic resources, but may have some potential in future, conditional on commodity prices, infrastructure, improved technology, economic conditions, etc. No work recommended at time of valuation. Could be a property with potential for a commodity with a low price or low demand at the time of valuation. |
| 25% | Inactive property with subeconomic resources with very little hope for development, but cannot write them off completely. The resources represent *in situ* mineral inventory with only a long shot at eventual development. No work recommended. |
| 0 to 10% | Inactive property with no resources and negligible or very little exploration potential. Could be a property with all of the geophysical targets tested that will be dropped when assessment credits run out. |
| Nominal value of $5,000 to $10,000 | Inactive property with indeterminate but low or negligible exploration potential. Could be a property with little or no data available but in a geologically uninteresting area. |

The Appraised Value may have to be adjusted to Fair Market Value if the local market for properties is markedly depressed or markedly high as of the effective date of the valuation. For example, during the peak of flow-through financing in Canada from 1986 to 1988, exploration property transactions values were at high levels. Unit costs for exploration expenditures were also commonly higher than before and after the flow-through period. In other periods, such as in the early 1990s and the late 1990s, exploration activity was at a relatively low level, which was reflected in low market activity for exploration properties. These conditions can be recognized by applying a subjective market factor, usually in increments of 25%, as either a discount or a premium to the Appraised Value. A premium may be applied to the Appraised Value to recognize an advantageous location such as proximity and geological similarity to an operating mine or new discovery.

Application of the appraised value method requires a thorough understanding of the exploration process, industry standards, and unit costs for drilling and other exploration techniques. The valuer, therefore, must become familiar with the geological setting, exploration targets, exploration history and results, appropriate exploration techniques, mining parameter, costs, processing methods, etc. Hence, a seasoned exploration geologist or engineer, who has varied experience and sound technical judgment, would be required. Above all, the valuer needs familiarity with "real-world" mineral property transaction values.

One advantage of the appraised value method is that exploration cost information and technical data are readily available for most exploration properties and marginal development properties. It is a good way of comparing the relative values of exploration properties. The main disadvantage is that experienced judgement is required to separate the past expenditures considered to be productive from those considered not to contribute to the value of the property. This leaves the method open to misuse and possible abuse.

It is prudent for the valuator to compare the Appraised Value of a mineral property with values derived from other methods, particularly those that use a market approach, as summarized in a later section.

## Geoscience Factor Method

The geoscience factor method is a variant on the cost approach, used for non-producing mineral properties. The method is based on ranked and weighted geological aspects, including proximity to mines and deposits, the significance of the mining camp, and the commodities sought (Thompson, 1991 and 2002). One such method was published by Kilburn (1990) for valuation of mineral properties without exploitable mineral reserves. The general approach is similar to a point system once used to assist the British Columbia Securities Commission in assessing suitability of exploration properties for financing.

The Kilburn (1990) geoscience factor method is based on four main characteristics: location with respect to other mineral occurrences, grade and amount of mineralization, geophysical and geochemical targets, and geological patterns considered favourable for mineralization. These main categories are divided into subcategories which are then ranked by relative importance and assigned factors. Each mineral claim equivalent in the property is given a base value and the various geoscience factors are estimated by the valuer. The value of each claim is determined by multiplying the base value by all of the geoscience factors. The claim values are summed to arrive at the total property value.

Kilburn (1990) points out that the value determined by his method is based on the expertise of geologists and engineers, commodity market factors, financial market factors, stock market factors, mineral property market factors, metal prices and political and economic conditions, which vary with time.

One advantage of this method is that it forces a disciplined technical approach on the geologist or engineer doing the valuation, so that different parts of a property and different properties should be ranked according to their technical merit. A major disadvantage of the method is the degree of dependence of the property value on the assumed basic value of each claim (or area unit). A change in the basic claim value has a proportional effect on both the claim and the property value. In addition, large properties would tend to have very high values and very small properties would tend to have very low values, which may not reflect the real exploration potential. These disadvantages make it difficult to recommend the geoscience factor method for valuation of non-producing exploration properties and marginal development properties.

## MARKET APPROACH

Methods using a market approach are applicable to all types of mineral properties. The two methods described here are comparable transactions and option agreement terms. The option agreement terms method is often used to place a value on mineral property transactions used for comparative purposes, since most mineral property transactions are not cash sales. For these and other methods, the effective date of the valuation is important, therefore comparable transactions should be within a reasonable time from that date.

### Comparable Transaction Method

The comparable transaction method uses the transaction price of comparable properties to establish a value for the subject property (Thompson, 1991; Roscoe, 1999; Lawrence, 2002; Ward and Lawrence, 1998). The difficulty of this approach in the mining industry is that there are no true comparables (unlike real estate or oil and gas), since each property is unique with respect to key factors such as geology, mineralization, costs, stage of exploration, and infrastructure. In addition, there are relatively few transactions for

mineral properties compared to the frequency of real estate transactions in general. When transactions do occur they rarely involve strictly cash, leaving the valuator the task of converting blocks of shares, royalties or option terms into present day money equivalent.

In spite of the above qualifications, transaction prices of comparable properties can indicate a range of values for a particular property. Exploration property transactions also give an indication of how active the market may be at any given time. For example, in the late 1990s there were relatively few exploration property transactions across Canada because of the depressed state of the exploration and mining industries. Consequently market values were relatively low.

As discussed previously, the value of an exploration property depends on its potential for the existence and discovery of an economic mineral deposit. The potential of a mineral exploration property depends to some extent on its acreage, but depends to a greater extent on its geological attributes, mineralization, exploration results and targets, neighbouring properties, and other factors. There is an analogy with real estate properties in that location is important. Non-producing exploration properties in established mining areas often have a premium value because of the higher perceived potential for discovery of a mineral deposit, and because of developed infrastructure.

The main advantage of this method is that it "ground truths" the value of mineral properties derived by other methods, and provides a general measure of relative property values. The main disadvantage is that there are no true comparables; each mineral property is unique as noted above. Subjective judgment is needed to identify similar properties.

## Option Agreement Terms Method

The option agreement terms method can be applied where a property is subject to an existing option agreement. In a typical option agreement involving a non-producing mineral property, a schedule of committed and optional cash payments and work commitments applies over a period of several years. An approximation of the value of the property is reflected in the payments made and work commitments fulfilled, plus the subjective probability of the optionee making the rest of the payments and fulfilling the balance of the exploration programs. In some cases payments are made in stock of the company earning in. Table 3 provides an example of how a transaction value is estimated from the option agreement terms.

This method is best applied to properties being actively explored during the option period. The method is generally not applicable to properties on which the option has been exercised by fulfilment of the payment terms and work commitments, at which stage the property value usually exceeds the payments made.

## Table 3: Analysis of Option Agreement Terms to Estimate Transaction Value

| Option agreement terms to earn a 60% interest in the mineral property | | | | | |
|---|---|---|---|---|---|
| **Year of Agreement** | **Nature of Commit-ment** | **Payment Schedule** | **Exploration Expenditure Schedule** | **Probability of Realization** | **Value Component** |
| 1 | Firm | $25,000 | $100,000 | 100% | $125,000 |
| 2 | Optional | $50,000 | $200,000 | 75% | $187,500 |
| 3 | Optional | $100,000 | $300,000 | 25% | $100,000 |
| 4 | Optional | $225,000 | $400,000 | 10% | $62,500 |
| Totals | | $400,000 | $1,000,000 | | $475,000 |
| • Value of 60% of property = $475,000 | | | | | |
| • Value of 100% of property = $791,667 | | | | | |
| • Round to $790,000 | | | | | |

One advantage of the option agreement terms method is that it has some real world validity in the early years of the option period. A disadvantage is that the valuation is meaningful only during the early years of the option period. As time goes on and more exploration results are collected, the property value is likely to diverge either up or down from the option agreement terms. Either the results will not justify continued expenditures and the option is dropped, or results will be good enough that further expenditure and payment terms will seem to be a bargain compared to the property value.

The option agreement terms method can be used to determine the value of comparable transactions, since most exploration property transactions are option or joint venture earn-in agreements.

## OTHER VALUATION METHODS FOR NON-PRODUCING PROPERTIES

The valuation methods described above are those considered by the writer to be the most commonly used and the most widely accepted. Several other methods used by mineral valuation practitioners for non-producing properties are described briefly below, along with the writer's view on their acceptability.

A probabilistic DCF method uses assumed mineral reserves to produce a net present value, which is then factored by the subjective probability of realizing the assumed mineral reserves. This method is not widely used and is generally not well accepted because of its highly subjective nature.

The gross value of metal in the ground, based on a mineral resource estimate, is used occasionally to characterize the value of a mineral property. This method is unacceptable since it fails to take into account the cost of extracting and processing the mineral deposit to a saleable product.

A related method uses an estimate of the net value of metal in the ground, based on a mineral resource estimate. In many cases the "net value" is an arbitrary number, for example US$50 per ounce of gold. This widely used rule of thumb should not be used as a primary valuation method, but can be used as a check on valuations by other methods or to compare property values on an order of magnitude basis.

Value per unit area ($ per acre or hectare) factors are sometimes used to estimate the value of large exploration properties. This should be used as an order of magnitude check on valuations by other methods or to adjust transaction values on large properties by area for comparison purposes (see Valuation Example 4 in Appendix).

Many publicly traded junior mining companies hold a dominant exploration property as their major asset. This leads to the practice of putting a value on that exploration property based on the market capitalization of the junior company. Although this method may have some validity in some circumstances, the market capitalization is more related to the perceived value of the company than to the value of its major property asset, in the writer's view. The property value is just one of many components of the market capitalization of the company.

## MINERAL PROPERTY VALUATION EXAMPLES

Seven examples of mineral exploration property valuations are given in the Appendix. These give a brief description of the subject property, then show how the value is derived, by one or more methods.

## RANGE OF EXPLORATION PROPERTY VALUES

Roscoe Postle Associates has developed an extensive database of mineral exploration property values, based on published transactions (Agnerian, 1996b). Figure 2 shows the range of values for 445 exploration property transactions located across Canada during 1995 and 1996. The histogram shows the percentage frequency in each range of values, on a logarithmic scale. Some 50% of the property values lie between $100,000 and $1,000,000. Some 27% of the property values are less than $100,000 and 23% are greater that $1,000,000.

**Figure 2: Frequency Distribution of 445 Transactions in Canada in 1995-96**




## CONCLUSIONS

Non-producing mineral properties include those at various stages of exploration, properties at the prefeasibility or feasibility stage, properties with currently uneconomic mineral resources, and past-producers. Different valuation methods may be appropriate for different types of mineral properties.

Income approach methods such as discounted cash flow and option pricing are generally not applicable to properties at the exploration stage. The market approach is generally appropriate to all types of mineral properties, although it is difficult to find good comparables because of the unique nature of mineral properties and the small number of transactions. Cost approach methods, such as appraised value and geoscience factor, are commonly used for exploration stage properties.

Canadian standards and guidelines for valuation of mineral properties are in the process of being finalized by the CIMVal Committee.

Valuation of non-producing mineral properties is best accomplished by professional geologists or engineers with relevant experience, sound technical judgment and familiarity with mineral property transaction values.

## REFERENCES

Agnerian, Hrayr (1996a): Valuation of Exploration Properties; CIM Bulletin, v. 89, no. 1004

Agnerian, Hrayr (1996b): Survey of Mineral Property Transactions July 1994 to June 1996; Canadian Mining Journal, July 1996

Brennan, Michael J. and Eduardo S. Schwartz (1985): Evaluating Natural Resource Investments; Journal of Business, v. 58, No. 2, pp. 135-157

Kilburn, Lionel C. (1990): Valuation of Mineral Properties which do not Contain Exploitable Reserves; CIM Bulletin, v. 83, pp. 90-93, August 1990

Lawrence, Ross D. (1989): Valuation of Mineral Assets: Accountancy or Alchemy?; Paper presented at the CIM Annual General Meeting, Quebec, May 2, 1989

Lawrence, Ross D. (1998): Valuation of Mineral Assets: An Overview; Paper presented as part of a course offered by the Geological Association of Canada and the Prospectors and Developers Association of Canada, May 17, 1998

Lawrence, Ross D. (2002): Valuation of Mineral Properties without Mineral Resources; a Review of Market-Based Approaches; CIM Bulletin, v. 95, no. 1060

McKnight, Robert T. (2002): Valuing Mineral Opportunities as Options; CIM Bulletin, v. 95, in press

McKnight, Robert T. and Raymond J. Goldie (1990): The Use of Option Theory to Value Mining Projects and Mining Equities; Paper presented at the Pacific Rim '90 Congress, Queensland, May 1990

Palm, Scott K., Neil D. Pearson and James A. Read, Jr. (1986): Option Pricing: a New Approach to Mine Valuation; CIM Bulletin, v. 79, No. 889, pp. 61-66, May 1986

Roscoe, William E. (1988): Valuation of Mining Exploration Properties; The Land Economist, v. 18, No. 4, p. 3, January 1988

Roscoe, William E. (1999): The Valuation of Mineral Properties for Compensation; paper presented at the Fall Seminar of the British Columbia Expropriation Association, Vancouver, B.C., October 1999

Roscoe, William E. (2001): Outline of the Cost Approach to Valuation of Mineral Exploration Properties; *in* Mineral Asset Valuation Issues for the Next Millenium 2001, The Australian Institute of Mining and Metallurgy, Publication Series 5/01, pp. 138-146, October 2001

Roscoe, William E. (2002): Valuation of Mineral Properties Using the Cost Approach; CIM Bulletin, v. 95, no. 1059

Spence, Keith N. (2002): An Overview of Valuation Practices and the Development of a Canadian Code for the Valuation of Mineral Properties; CIM Bulletin, v. 95, no. 1057

Thompson, Ian S. (1991): Valuing Mineral Properties without Quantifiable Reserves; Paper presented at CIM Mineral Economics Symposium, Toronto, January 17, 1991

Thompson, Ian S. (2002): A Critique of Valuation Methods for Exploration Properties and Undeveloped Resources; CIM Bulletin, v. 95, no. 1061

Ward, Mary-Claire and Lawrence, Ross D. (1998): Comparable Transaction Analysis: the Market Place is always Right; Paper presented at a Short Course, Prospectors and Developers Association of Canada, March 11, 1998

## APPENDIX

### Valuation Example 1

- British Columbia exploration property, 1993 valuation date
- Remote location, helicopter access
- Some potential for Ni-Cu-PGE mineralization
- Some anomalous soil and rock samples
- No future work warranted in 1993
- Total past expenditures estimated at $65,000

| Appraised Value (1993) | |
|---|---|
| Retained value of past work | $26,000 |
| Warranted future exploration | nil |
| Appraised Value | $26,000 |
| Fair market value adjustment (50% to 75%) | $13,000 to $20,000 |

| Comparable Transactions (1993) | |
|---|---|
| $11,000 | $25,000 |
| $18,000 | $31,000 |
| $24,000 | $36,000 |

**Fair Market Value Range $13,000 to $20,000**

### Valuation Example 2

- British Columbia exploration property, 1993 valuation date
- Difficult location, old track access

- Quartz vein with some gold values
- Moderate exploration potential for small gold veins
- Several drill holes recommended
- Total past expenditures 1983 to 1992 estimated at $200,000

| Appraised Value (1993) | |
|---|---|
| Retained value of past work | $50,000 |
| Warranted future exploration | $260,000 |
| Appraised Value | $310,000 |
| Fair market value adjustment (50% to 75%) | $155,000 to $235,000 |

| Comparable Transactions (1993) | |
|---|---|
| $102,000 | $144,000 |
| $114,000 | $204,000 |

**Fair Market Value Range $155,000 to $200,000**

## Valuation Example 3

- Large grassroots exploration property, 1998 valuation date
- Northwestern Quebec location, fixed wing or helicopter access
- Company has option to earn 50% interest
- Gold and base metal showings in banded iron formation
- Some soil, till and EM anomalies
- Good potential for economic gold mineralization
- Total past expenditures $100,000

| Appraised Value (1998) | |
|---|---|
| Retained value of past work | $100,000 |
| Warranted future exploration | $365,000 |
| Appraised Value | $465,000 |
| Value of Company share (50%) | $233,000 |

**Fair Market Value of Company Share $233,000**

## Valuation Example 4

- Huge diamond exploration property, 1997 valuation date
- Northwest Territories location, fixed wing or helicopter access
- Company has 50% joint venture interest
- Much of past work downgraded diamond potential
- Property is adjacent to promising diamond prospect

- Future work involves reprocessing geophysics and till samples, plus follow-up geophysics and drilling
- Total past expenditures estimated at $5.3 million

| | |
|---|---|
| Appraised Value (1997) | |
| Retained value of past work | $2,466,000 |
| Warranted future exploration | $1,812,000 |
| Appraised Value | $4,278,000 |
| Value of Company share (50%) | $2,139,000 |

Comparable Transaction (1997)
$4.8 million (prorated from $8.0 million on a per hectare basis)

**Fair Market Value of Company Share $2,139,000**

## Valuation Example 5

- Small gold exploration property, 1998 valuation date
- Northwest Ontario location, adjacent to producing gold mine
- Valuation required for acquisition by owner of adjacent gold mine
- Negative results from near-surface drilling in the past
- Ore-bearing structure projects onto the property at depth
- Good deep exploration potential will be tested in the future
- Total past expenditures over 50 years estimated at $1.0 million in 1998 dollars

| | |
|---|---|
| Appraised Value (1998) | |
| Retained value of past workp | $250,000 |
| Warranted future exploration | $772,000 |
| Appraised Value | $1,022,000 |
| Appraised Value with 50% premium for proximity to producing mine | $1.5 million |

Comparable Transactions (1994-97)
Four transactions in the same area range from $0.5 to $3 million, but none are considered to be directly applicable

**Fair Market Value Range $1.0 to $1.5 million**

## Valuation Example 6

- Medium size property, 1988 valuation date
- Northern Manitoba location, fixed wing or helicopter access
- Exploration work followed up reported airborne EM conductors

- No significant results from 1984 exploration program
- Property dormant since 1984 and no work recommended

| | |
|---|---|
| Appraised Value (1988) | |
| Retained value of past work | nil |
| Warranted future exploration | nil |
| Nominal Value | $5,000 |

**Fair Market Value $5,000**

## Valuation Example 7

- Advanced small exploration property, 1997 valuation date
- Ontario location, good road access
- Company can purchase a 100% interest subject to a 2% net smelter return
- Property contains a significant low grade gold resource with heap leach potential
- Preliminary cash flow analysis gives encouraging results but is very sensitive to gold price, recovery and cost assumptions
- Future work includes drilling, metallurgical testwork, environmental work and prefeasibility work
- Total past expenditures 1986-90 estimated at $1,080,000

| | |
|---|---|
| Appraised Value (1997) | |
| Retained value of past work | $810,000 |
| Warranted future property payment and work | $900,000 |
| Appraised Value | $1,710,000 |
| Company Share net of 2% net smelter return | $1,676,000 |

| | |
|---|---|
| Comparable Transactions (1996, Western U.S.) | |
| $1.1 million | $3.4 million |
| $2.1 million | $3.9 million |
| $2.4 million | $4.4 million |

The subject property is considered to be most comparable to the low end of the range.

**Fair Market Value Range $1.1 to $1.7 million**

# Exhibit RPA-008

2007

# The Journal of Business Valuation

Proceedings of
the Sixth
Joint Business Valuation
Conference of The
Canadian Institute of
Chartered Business Valuators
and The
American Society of Appraisers

A S A

Toronto
October 19 - 20, 2006

**The Canadian Institute of Chartered Business Valuators**
277 Wellington Street West, Toronto, Ontario, Canada M5V 3H2

THOMSON
CARSWELL

# VALUATION OF NON-PRODUCING MINERAL PROPERTIES USING MARKET COMPARABLES

*by William E. Roscoe, Ph.D., P.Eng.*
*Scott Wilson Roscoe Postle Associates Inc., Toronto*

## 1. ABSTRACT

Non-producing mineral properties include those at various stages of exploration, properties at the pre-feasibility or feasibility stage, properties with currently uneconomic mineral resources, and past-producers. The market approach is applicable to all these types of non-producing mineral properties. Income approach methods such as discounted cash flow and option pricing are generally not applicable to properties at the exploration stage, but may be applicable to non-producing mineral properties with defined mineral reserves or mineral resources.

The value of a non-producing mineral property depends on its perceived potential for the existence and discovery of an economic mineral deposit. The potential, in turn, depends on a number of factors which must be considered when choosing market comparables. These comparability factors include such items as geology, mineralization, stage of exploration and results, mineral resources, location and geography, and political jurisdiction. The date of the market comparables must be within a reasonable time period of the valuation date of the subject property. Although it is difficult to find good market comparables because of the unique nature of mineral properties and the small number of transactions, these difficulties are compensated for by analyzing a number of transactions on similar properties to develop a range of values for the subject property.

For valuation purposes, market comparables can be expressed in terms of total property value, value per unit area (e.g., $ per hectare), or value per unit of metal contained in mineral resources (e.g., $ per ounce of gold, or $ per pound of copper). The market comparable value can be used to estimate the value of the subject property by using the total property value, unit area value or contained metal value.

Most market transactions on non-producing mineral properties are not straightforward cash or share deals, but rather are typically option, earn-in or joint venture agreements whereby one party obtains the right to earn an interest in the property from another party by fulfilling certain commitments over a period of time. The terms of the option or earn-in agreement must be analyzed to estimate a value for the property being transacted. The option agreement terms analysis method can be used to value the subject property, and must be used to value most properties used as market comparable transactions.

In a typical option agreement, a schedule of firm and optional commitments must be fulfilled to earn an interest in the property. The commitments may include payment of cash, issue of shares to be issued by the earn-in party, expenditures on mineral exploration, and royalties on production. In general the commitments are firm in the first year and optional in subsequent years.

Option agreement terms analysis considers the firm commitments to contribute 100 percent to the value of the property. The optional commitments are assigned a subjective probability of the earn-in party fulfilling each of the annual commitments in the subsequent years of the agreement. The optional commitments multiplied by the probability factor for each year are considered to be the contribution to value. The transaction value is the sum of the firm commitment values and the probability-weighted optional commitment values. If the transaction is for a partial interest in the property, the value is adjusted to a 100 percent interest in the property.

Overall market analysis covering a wide sector of the market can be used to obtain a general guide to the range of transaction values to be expected and to look for trends. Analysis of typical data sets for gold property transactions in recent years serves to illustrate some features of the overall market.

- Large value ranges spanning three orders of magnitude for total property values and for property values expressed as $/ha.
- Large range in $/oz gold values spanning two orders of magnitude.
- Skewed, lognormal-like distribution of total property values, $/ha values and $/oz gold values, characterized by numerous low values and relatively few high values.
- There is no obvious relationship between property value and property size.
- There is a general relationship between $/ha value and property size in that small properties have high $/ha values and large properties have low $/ha values.

In the writer's opinion, overall market analysis cannot be used reliably for valuation of individual mineral properties because of the large ranges in property values, values per

unit area, and value per unit contained metal. Instead, best-fit market analysis must be used for valuation of individual properties.

Best-fit market analysis uses a number of comparable transactions to define a reasonable range of values for the subject property. Considerations in choosing an appropriate range of values for the subject include:

- Consider the market comparables in terms of total property value, value per unit area, or value per unit of metal in mineral resources.
- Examine mean and median values as well as overall range of values.
- Consider eliminating outliers at the high and/or low end of the value range.
- Consider which properties are more similar to the subject.

A method is proposed for valuation by market comparables of properties with mineral resources which contain several metals (polymetallic deposits). For each of a number of market comparable transactions, the gross "value" of metals contained in the mineral resource is calculated using metal prices as of the date of the transaction. A ratio of the property value to the gross metal value is then calculated (metal transaction ratio). The gold transaction ratios are used in market comparables analysis to derive a range of values for the subject property.

Valuation of non-producing mineral properties is best accomplished by professional geologists or engineers with relevant experience, sound technical judgement and familiarity with mineral property transaction values.

## 2. INTRODUCTION

The purpose of this paper is to describe market comparables methodology for the valuation of non-producing mineral properties. Some valuation examples are provided and information is provided on general levels of mineral property values.

Mineral property refers to any right, title or interest to property held or acquired in connection with the exploration, development, extraction or processing of minerals which may be located in, on or under the surface of the property, together with all related plant, equipment and infrastructure. Mineral property may take the form of real property, unpatented mining claims, prospecting permits, development and mining licenses, mining leases, patented mining claims, and royalties.

In this paper, we are dealing with valuation of mineral properties rather than valuation of companies or business entities that hold such properties. In many cases, the value of mineral properties may be the major component of the value of exploration and mining companies. However, there are other components to the value of a company, such as, other assets and liabilities including cash and debt, quality of management, and market recognition and liquidity.

An earlier paper on valuation of non-producing mineral properties described cost approach and market approach methodologies (Roscoe 2003). The present paper elaborates on the market approach methods and repeats some of the information in the Roscoe (2003) paper so that it can be read as a stand-alone paper. The Roscoe (2003) paper should be referred to for other valuation approaches and methods for non-producing mineral properties and for information on standards for valuation of mineral properties.

By way of background, different types of mineral properties are defined since they require different valuation approaches and methods. As the vast majority of mineral properties are non-producing properties at the exploration stage, the nature of exploration properties and the exploration process are covered.

Valuations of mineral properties are needed for various reasons, including mergers and acquisitions, non-arms length transactions, pricing of initial public offering of stock, support for property agreements, litigation, compensation for expropriation, and insurance claims. Independence of the valuator is usually implicit for these applications.

Value and valuation in this paper refer to fair market value or market value. In some circumstances, other definitions of value may apply, such as fair value, net present value, replacement value, salvage value, book value, assessed value, insured value, etc.

As in any valuation, the effective date of the valuation is important. Mineral property values vary over time, depending on events on neighbouring properties, market interest, commodity prices, and other factors. For a valuation related to an expropriation, insurance claim or litigation, the effective date may be a contentious issue. This is because the mineral property owner may perceive that the property will be more valuable in the future, when market conditions improve, and that the expropriation or legal issue forces the valuation in a time of poor market conditions.

Many publicly-traded junior mining companies hold a dominant exploration property as their major asset. This leads to the practice of putting a value on that exploration property based on the market capitalization of the junior company. Although this method may have validity in some circumstances, in the writer's view, the market capitalization is more related to the perceived value of the company than to the value of its major property asset. The property value is just one of many components of the market capitalization of the company.

Valuation of non-producing mineral properties is best accomplished by professional geologists or engineers with relevant experience, sound technical judgement and familiarity with mineral property transaction values.

## 3. TYPES OF MINERAL PROPERTIES

There is a spectrum of mineral property exploration and development stages, ranging from early exploration properties to producing mines (Figure 1). For convenience, min-

eral properties can be divided into three general categories: production and development properties, exploration properties, and marginal development properties. The latter two types are non-producing mineral properties. Each type of mineral property requires different valuation approaches because of its stage of exploration and development and the type and amount of data available on the property.

### Figure 1: Generalized Stages of Exploration and Development of Mineral Properties

| Stage | No. of Properties | Value |
|---|---|---|
| Early exploration | Many | Low |
| Drilling | ↑ | ↓ |
| Detailed investigation | | |
| Feasibility study | | |
| Production | Few | High |
| Closure | | |

## 3.1 Production and Development Properties

Production and development properties include producing mines as well as properties on which development of an economically viable operation is feasible, planned or under construction. Such properties are those on which an economically viable mineral deposit has been demonstrated to exist, either by actual production or by a feasibility or preliminary feasibility study. Production and development properties are at a sufficiently advanced stage that enough reliable information exists to value the property by the income approach with a reasonable degree of confidence.

## 3.2 Non-Producing Mineral Properties

Non-procuring mineral properties include exploration properties and marginal development properties. Other non-producing mineral property types include advanced projects at the preliminary feasibility or feasibility stage and past-producing mine properties. For such advanced properties, a preliminary feasibility study or feasibility study may be underway and may not have reached a conclusion on the economic viability of the property at the time of the valuation. In this case, it is difficult to value using the income approach because key technical parameters may not yet be well defined. Past-producing mine properties may contain mineral resources and may have potential to resume production. They may also have environmental liabilities resulting from previous operations which may have a negative impact on property value.

### 3.3 Exploration Properties

Exploration properties are those on which an economically viable mineral deposit has **not** been demonstrated to exist. The value of an exploration property lies in its potential for the existence and discovery of an economically viable mineral deposit. Only a very small number of exploration properties will ultimately become mining properties, as discussed in the following section, but until exploration potential is reasonably well tested, they have value. Exploration properties can be at various stages from early grass-roots to delineation drilling and can be further subdivided into those with and without quantifiable mineral resources.

### 3.4 Marginal Development Properties

Marginal development properties contain well-defined mineral resources which could become economically mineable reserves under improved circumstances and have enough reliable data to show that the economics are marginal under prevailing conditions at the time of valuation. Improved circumstances include higher commodity prices, technological improvements, establishment of local infrastructure, and change in ownership. Marginal development properties include mines which are temporarily closed down due to low commodity prices.

## 4. MINERAL RESOURCES AND MINERAL RESERVES

Mineral resources and mineral reserves as used generally in this paper refer to the definitions set out by the Canadian Institute of Mining, Metallurgy and Petroleum (CIM 2004). These definitions are required by Canadian securities commissions and stock exchanges, as specified in Canadian Securities Administrators National Instrument 43-101. The CIM definitions standards can be summarized.

- A Mineral Resource is a mineral deposit that has reasonable prospects for economic extraction. Quantity and quality of the resource are commonly expressed as tons and grade in measured, indicated and inferred categories which represent decreasing confidence levels.
- A Mineral Reserve is that part of the mineral resource demonstrated, by at least a preliminary feasibility study, to be economically extractable. Allowable reserve categories are proven, which is converted from measured mineral resource, and probable, which is converted from indicated or measured resource. Note that inferred mineral resources cannot be converted to mineral reserves because of the low confidence level of the estimate.

The United States Securities and Exchange Commission (SEC) recognizes only proven and probable reserves which must be demonstrated to be economically viable by either production history or a feasibility study. The SEC allows the reporting of "min-

eralized material" but does not allow the reporting of mineral resources, except where reporting of resources is required by law in a foreign jurisdiction, such as Canada, in which case cautionary notes must be added to warn U.S. investors not to assume that the mineral resources will ever be converted into reserves.

## 5. EXPLORATION PROPERTIES AND THE EXPLORATION PROCESS

Exploration properties are non-producing mineral properties that are acquired for their perceived potential to host an economic mineral deposit. The challenge of the exploration process is to discover economic mineral deposits on those very few exploration properties where they exist.

Modern exploration is a staged process. In general, each stage of exploration work is designed to get to the next decision point, that is, whether or not to continue exploration on a property, based on results of the previous stage. Each successive stage is, in general, more expensive, due to the progressively more detailed nature of the work required. Whenever an exploration program moves to the next stage, the value of a property may be enhanced, reduced, or remain the same, depending on how results of the program affect the perceived exploration potential.

The objective of the exploration process is to identify and concentrate work on the properties that show more promise in terms of exploration potential, and screen out the properties that are downgraded by ongoing work. Obviously the properties on which work demonstrates higher exploration potential are more valuable to mining companies. A corollary is that exploration properties on which work demonstrates little or no potential have little or no value.

The intrinsic value of an exploration property lies in its potential for the existence and discovery of an economic mineral deposit. In the mining industry, mineral exploration properties are optioned, joint ventured, bought, sold and traded on the basis of perceived exploration potential. There are a number of different approaches and methods that are used to value mineral exploration properties, all of which are subjective.

## 6. VALUATION APPROACHES AND METHODOLOGY

As in other fields, the three main approaches to valuation of mineral properties are income, cost and market approaches. Different approaches apply to different types of mineral properties as do different methods, in the writer's view, as summarized in Figure 2.

**Figure 2: Valuation Approaches and Methods for Different Types of Mineral Properties**

| Valuation Approach | Valuation Method | Development Properties | Marginal Development Properties | Exploration Properties |
|---|---|---|---|---|
| Income | Discounted Cash Flow | Yes | Maybe | No |
| | Real Options | Yes | Yes | No |
| Cost | Appraised Value | No | Yes | Yes |
| | Geoscience Factor | No | Maybe | Yes |
| Market | Market Comparables | Yes | Yes | Yes |
| | Option Agreement Terms | Yes | Yes | Yes |

Descriptions of methods related to the income approach and cost approach can be found in Roscoe (2003) and other papers and presentations. The rest of this paper deals with market approach methodology.

## 7. MARKET APPROACH

### 7.1 Market Transactions on Comparable Properties

The market approach is applicable to all types of mineral properties. The market comparables method uses the transaction value of comparable properties to establish a value for the subject property (Thompson, 1991; Roscoe, 1999; Roscoe, 2003; Lawrence, 2002; Ward and Lawrence, 1998). The market comparables can be used directly to derive a value for the subject property or they can be adjusted by such parameters as property area or contained metal in mineral resources.

As noted in Roscoe (2003), difficulties with the market comparables method, such as lack of true mineral property comparables, relatively few transactions, and complexity of transaction agreements, are compensated for by analyzing a number of transactions on similar properties to develop a range of values for the subject property.

As noted previously, the value of a non-producing mineral property depends on its perceived potential for the existence and discovery of an economic mineral deposit. The potential in turn depends on a number of factors which must be considered when choosing market comparables. These comparability factors include:

- Commodity of group of commodities, e.g., gold, uranium, nickel-copper, diamonds.

- Political jurisdiction.
- Location, access, infrastructure.
- Property size – can normalize by acreage.
- Geological setting and mineralization style.
- Stage of exploration and exploration potential.
- Exploration results and targets.
- Mineral resources – can normalize by contained metal.
- Environmental liabilities from previous operations.
- Activity on neighbouring properties.
- Location, such as in a "hot" area with intense exploration activity and high price transactions versus an inactive area.

As the market for non-producing mineral properties changes over time, market comparable transactions should be within a reasonable time period of the subject property valuation date and in similar market conditions. Typical time periods may be within 6 to 18 months, depending on market conditions and number of transactions available for analysis. In the writer's view, comparable transactions after the subject property valuation date can be used as long as the market conditions remain the same. Although some may consider this practice to be hindsight, it is necessary to do so in many cases because of scarcity of suitable comparable transactions.

Most transactions on non-producing mineral properties are not straightforward cash or share deals, but rather are typically option, earn-in or joint venture agreements whereby one party obtains the right to earn an interest in the property from another party by fulfilling certain commitments over a period of time. The terms of the option or earn-in agreement must be analyzed to estimate a value for the property being transacted. The option agreement terms analysis method can be used to value the subject property, and must be used to value most properties used as market comparable transactions.

The following aspects of market comparables analysis are covered in subsequent sections, along with examples of use.

- Analysis of option agreement terms.
- Analysis of overall market sector transactions.
- Analysis of best-fit comparable market transactions.

## 8. OPTION AGREEMENT TERMS ANALYSIS

The option agreement terms analysis method can be applied where a property is subject to an existing option agreement. The agreement can also be in the form of an earn-in agreement or a joint venture agreement where one party is earning an interest in the property or the joint venture that holds the property. For simplicity, agreements of this general type are called option agreements in this paper.

In a typical option agreement involving a non-producing mineral property, a schedule of commitments must be fulfilled to earn an interest in the property. The commitments may include payment of cash, issue of shares, expenditures on mineral exploration, and royalties on production. The commitments are usually on an annual basis over a period of several years, typically three to five, and mark decision points for the earn-in party to proceed to the next stage or not. In general, the commitments are firm in the first year and optional in subsequent years. Another characteristic of mineral property option agreements is that the amount of the payments, share issues and work commitments usually increases with time in the later years of the agreement. If any of the subsequent years' commitments are not made, the agreement terminates and the earn-in party retains either no interest or a partial interest in the property, according to the terms of the specific option agreement.

The option agreement terms method involves an analysis of the firm and optional commitments to derive an estimate of the value of the property. The firm commitments in the form of cash payments, stock to be issued by the earn-in party, and exploration work expenditure commitments are considered to contribute 100 percent to the value of the property. The optional commitments are assigned a subjective probability of the earn-in party fulfilling each of the annual commitments in the subsequent years of the agreement. The optional commitments multiplied by the probability factor for each year are considered to be the contribution to value. When share issues are part of the option agreement, the share price on the date of the agreement is used for all years of the agreement. The probability is expected to decrease over time because the amount of the commitments becomes larger, and because of the nature of the exploration business whereby few properties move on to more advanced stages.

The transaction value is the sum of the firm commitment values and the probability-weighted optional commitment values. If the transaction is for a partial interest in the property, the value is adjusted to a 100 percent interest in the property. The transaction value can be adjusted to reflect the existence of a royalty.

An example of an option agreement terms analysis is given in Figure 3, based on the following published description of the deal:

> Great Northern Hope Inc. can earn a 60 percent interest in the Moose Meadows gold property of Golden Fleece Corp. by making payments of $250,000, issuing shares valued at $500,000 and expending a total of $1,000,000 on exploration over a period of 3 years. The first year

requires $50,000 cash and $100,000 in shares on signing and an expenditure commitment of $250,000. Further annual payments of $100,000 in cash and $200,000 in shares, plus work commitments of $500,000 and $750,000 in years 2 and 3, respectively, are optional.

### Figure 3: Analysis of Option Agreement Terms to Estimate Transaction Value

| Option agreement terms to earn a 60% interest in the mineral property | | | | | |
|---|---|---|---|---|---|
| Year of Agreement | Nature of Commitment | Payment Schedule | Exploration Expenditure Schedule | Probability of Realization | Value Component |
| 1 | Firm | $25,000 | $100,000 | 100% | $125,000 |
| 2 | Optional | $50,000 | $200,000 | 75% | $187,500 |
| 3 | Optional | $100,000 | $300,000 | 25% | $100,000 |
| 4 | Optional | $225,000 | $400,000 | 10% | $62,500 |
| Totals | | $400,000 | $1,000,000 | | $575,000 |
| Value of 60% of property = $575,000 | | | | | |
| Value of 100% of property = $958,333 | | | | | |
| Round to $960,000 | | | | | |

In many cases, published details of option agreements give total amounts for cash payments, shares to be issued and expenditure commitments, but are not specific as to the allocation of the firm and optional commitments in each year of the agreement. In these cases, the valuator must make assumptions based on his or her experience and the structure of typical option agreement.

The option agreement terms method can be used to value the subject property as well as to derive values of market transactions comparable to the subject property.

When used to value the subject property, the valuation date should be close to the date of the option agreement. This is because results of ongoing exploration work on the property may be encouraging or discouraging and the value will increase or decrease accordingly. Obviously, the method cannot be used for properties on which the option has been exercised by fulfillment of all the payment terms and work commitments, at which stage the property value usually exceeds the payments made.

## 9. OVERALL MARKET TRANSACTIONS

Market transactions over a wide sector of the market can be used to obtain a general guide to the range of values to be expected and to look for trends. Transaction information can be compiled on properties in a large market sector, such as copper properties with

large areas in British Columbia, or gold properties in Ontario and Quebec. The time period of the market transactions can be relatively broad, for example a one to 5-year period. Since most of the market transactions are not strictly cash or share deals, option agreement terms analysis is used to estimate property values.

In practice, analysis of a total market sector can result in very large ranges in property values. Similarly large ranges are found in other measures such as value per unit area and value per unit of contained metal in mineral resources. In the writer's opinion, overall market analysis cannot be used reliably for valuation of individual mineral properties because of these large ranges. Instead best-fit market analysis must be used for valuation of individual properties.

Some examples follow which illustrate the overall market approach.

Scott Wilson Roscoe Postle Associates Inc. (formerly Roscoe Postle Associates Inc.) has developed an extensive database of mineral exploration property values, based on published transactions (Agnerian, 1996). Figure 4 shows the overall market for gold property transactions in Canada for the years 2003 to 2005. There is a very wide range in values from $1,500 to $29,000,000. The mean value is $1,029,000 and the median value is $184,000. The large difference between the mean and median highlights the skewed nature of the distribution of values, which are plotted in a geometric progression in Figure 4. The distribution approaches lognormal with numerous low values and relatively few high values.

### Figure 4: Values of 492 Gold Property Transactions in Canada 2003 to 2005




The same set of transactions can be examined further when plotted in terms of value per hectare ($/ha) as shown in Figure 5. This is the same data set as in Figure 4 except that only 320 of the 492 properties had property size reported. Again there is a very large range in $/ha values from $1/ha to $74,000/ha. As can be seen by the geometric progression plot, the distribution is positively skewed with a mean value of $1,217/ha and a median of $187/ha.

**Figure 5: Dollar per Hectare Values for 320 Gold Property Transactions in Canada 2003 to 2005**




The 2003-05 gold transaction data set is examined further for relationships between property value, value per hectare, and property size. Figure 6 shows that there is no obvious relationship between property value and property size.

## Figure 6: Property Value versus Property Size for 320 Gold Property Transactions in Canada 2003 to 2005




When the $/ha values are plotted against property size, however, a general relationship emerges. Figures 7, 8 and 9 show $/ha value against property size for three ranges of property size. In general, it can be seen that small properties have high $/ha values and large properties have low $/ha values.

## Figure 7: Dollar per Hectare Values versus Property Sizes up to 2,000 Hectares



**Figure 8: Dollar per Hectare Values versus Property Sizes 2,000 to 10,000 Hectares**




**Figure 9: Dollar per Hectare Values versus Property Sizes larger than 10,000 Hectares**



Although the general trend goes from high $/ha values for small properties to low $/ha values for large properties, the relationship between $/ha and property size appears to be somewhat different in each of these ranges. The trend lines in Figures 7, 8 and 9 show a possible weak inverse correlation between $/ha values for properties smaller than 2,000 hectares (correlation coefficient – 13 percent), no correlation for properties between 2,000 and 10,000 hectares (correlation coefficient 0 percent), and a moderate correlation for properties larger than 10,000 hectares (correlation coefficient – 50 percent). Basic statistics for $/ha values and the property values in each of the property size ranges are shown in Figure 10.

### Figure 10: Statistics of $/ha Values and Property Values by Property Size Range

| Property Size Range (ha) | Number of Properties | $ per Hectare Values | | Property Values $000 | |
|---|---|---|---|---|---|
| | | Mean | Median | Mean | Median |
| <2,000 | 229 | 837 | 272 | 453 | 101 |
| 2,000-10,000 | 71 | 133 | 52 | 576 | 207 |
| >10,000 | 14 | 47 | 35 | 1,427 | 972 |

Note the large difference between mean and median $/ha values and property values for properties smaller than 10,000 ha. For properties larger than 10,000 ha the mean and median are closer for both $/ha and property values. The analysis indicates that, although the $/ha values decrease with increasing property size, there is considerable variability especially at property sizes smaller than 10,000 ha.

The overall market for non-producing properties can also be looked at in terms of value per unit metal contained in mineral resources, if mineral resources are reported for the property. Dollars per ounce of gold in mineral resources can be calculated for mineral property transactions. The property value from the transaction is divided by the ounces of gold contained in reported mineral resources to obtain the $/oz value, which is a widely used yardstick for comparing gold property transactions. The method is applied to both property transactions and company transactions.

In some cases where both gold and silver are present, the value per ounce of gold equivalent is calculated. In the writer's view, this is acceptable practice as long as the value of the gold ounces exceeds the value of the silver ounces. The method is more complicated and less meaningful when base metals are converted to precious metals equivalent, such as copper to gold equivalent ounces or nickel to platinum equivalent.

The dollars per unit metal method is also applied to other commodities such as dollars per pound of copper or uranium. The resulting values per pound metal can be used to determine a range of values for the overall market.

Figure 11 shows the frequency distribution of 47 gold property transactions in recent years for advanced exploration and feasibility stage properties. Note that the values per ounce are plotted in Figure 11 in a geometrical progression because the distribution is skewed to the right.

**Figure 11: Value of Gold Property Transactions in US$ per Ounce**




The mean value is US$28 and the median is US$18 per ounce gold equivalent. The values range from less than US$3 per ounce to greater than US$100 per ounce. Because of the large range of $/oz gold values, the overall market values cannot be used reliably for valuation of gold properties, but are commonly used as a rule of thumb for order of magnitude checking of property values. Gold property market transactions with similarities to the subject property (best-fit comparables) should be used to determine a value for the subject on a dollar per ounce of gold basis.

Gold values per ounce are sometimes expressed as a percentage of the gold price at the time of the transaction. For example, if the transactions indicates a value of $25 per ounce and the gold price is $500 per ounce, the value can be expressed as 5 percent of the gold price.

## 10. BEST-FIT MARKET COMPARABLE TRANSACTIONS

As noted previously, it is not possible to obtain an exactly comparable property to the subject property. For this reason, as well as the relatively small size of the market and considerable variability in transaction values, the writer recommends using a number of market comparables to define a reasonable range of values for the subject property. If the market permits, at least five or six market comparables should be used that have similarities to the subject property in terms of commodity, geographical and geological setting, mineralization style, stage of exploration, political jurisdiction and other characteristics noted previously. Because property value per unit area ($/ha) is somewhat dependent on property size, as shown in the previous section, market comparables should be in the same general property size range as the subject property for a best-fit market analysis.

Information on market transactions can be found in exploration and mining trade publications such as The Northern Miner, Stockwatch, Mining Journal, and, for valuation dates more than 10 years ago, The George Cross News Letter. Options agreement terms analysis is used in most cases to estimate the value of comparable properties, as described above.

Considerations in choosing an appropriate range of values for the subject include:

- The market comparables can be considered in terms of total property value, value per unit area ($/ha), or value per unit of metal in mineral resources ($/oz Au or $/lb Cu).
- Examine mean and median values as well as overall range of values.
- Consider eliminating outliers at the high and/or low end of the value range.
- Consider which properties are more similar to the subject.

The following examples illustrate the best-fit market comparables method.

Figure 12 shows an analysis of market comparable transactions for valuation of a gold exploration property in Ontario. The market transactions are in the period February 2004 to June 2004. The comparable property values range from $0.91 million to $3.04 million and the $/ha values range from $1,050 to $4,510. Property sizes are in the same general range. In this analysis, property E is eliminated because it is an outlier in terms of $/ha value. Without property E, the mean and median values are closer for both property value and $/ha value. The $/ha value is chosen for valuation of the subject because the $/ha values of the comparables are less variable than the property values. In this example, a reasonable range for valuation of the subject property is $1,600 to $1,700 per hectare, based on the mean and median values.

**Figure 12: Comparable Transactions for Valuation of an Ontario Gold Property**

| Property | Transaction Date | Size in hectares | Property Value $M | $/hectare |
|---|---|---|---|---|
| A | Mar 04 | 600 | 1.19 | 1,980 |
| B | Jun04 | 864 | 0.91 | 1,050 |
| C | May 04 | 896 | 0.98 | 1,090 |
| D | Feb 04 | 1,068 | 3.04 | 2,850 |
| E | Apr 04 | 665 | 3.00 | 4,510 |
| Mean | | | 1.82 | 2,296 |
| Median | | | 1.19 | 1,050 |
| Eliminate Property E: | | | | |
| Mean | | | 1.53 | **1,740** |
| Median | | | 1.09 | **1,540** |

Figure 13 shows an analysis of market comparable transactions for valuation of a gold exploration property in Brazil. The property values range from $0.18 million to $5.7 million and the $/ha values range from $192 to $1,566. The property sizes also cover a considerable range from 936 ha to 15,000 ha because of the relative scarcity of market transactions in Brazil at the time. When property H is eliminated as an outlier, the $/ha values are less variable and the mean and median values become closer. In this example, a reasonable range for valuation of the subject property is $200 to $250 per hectare, based on the mean and median values.

**Figure 13: Comparable Transactions for Valuation of a Brazilian Gold Property**

| Property | Transaction Date | Size in hectares | Property Value $M | $/hectare |
|---|---|---|---|---|
| F | Jun 03 | 12,000 | 5.70 | 475 |
| G | Jul 03 | 15,000 | 3.04 | 203 |
| H | Apr 03 | 2,235 | 3.50 | 1,566 |
| I | Jan 03 | 936 | 0.18 | 192 |
| J | May 03 | 5,265 | 1.09 | 207 |
| Mean | | | 2.70 | 434 |
| Median | | | 3.04 | 207 |
| Eliminate Property H: | | | | |
| Mean | | | 2.50 | **269** |
| Median | | | 2.07 | **205** |

Figure 14 shows an analysis of market comparable transactions for valuation of a non-producing gold property in the Americas. The market comparable properties are all at the advanced exploration stage to feasibility stage. They have mineral resources that range form 2.61 to 5.39 million ounces of contained gold and the property values range from $49 million to $418 million. The calculated $/oz gold figure vary from $9 to $119 per ounce. When the obvious outlier of $9/oz is eliminated, the range tightens to $77 to $119 per ounce and the mean and median values are very close. In this example, a reasonable range for valuation of the subject property is $90 to $100 per ounce of gold contained in the resource estimate, based on the mean and median values.

**Figure 14: Comparable Transactions for Valuation of a Gold Resource Property in the Americas**

| Property | Transaction Date | M oz Au in Resources | Property Value $M | $/oz Au |
|---|---|---|---|---|
| K | Dec 05 | 3.58 | 360 | 101 |
| L | Dec 05 | 5.39 | 49 | 9 |
| M | Nov 05 | 2.61 | 200 | 77 |
| N | Jan 06 | 4.33 | 386 | 89 |
| P | Oct 05 | 3.50 | 418 | 119 |
| Mean | | | 283 | 79 |
| Median | | | 360 | 89 |
| Eliminate Property L: | | | | |
| Mean | | | 341 | **96** |
| Median | | | 373 | **95** |

A method is proposed for valuation by market comparables of properties with mineral resources which contain several metals (polymetallic deposits). The proposed method uses the estimated mineral resources as illustrated by the example in Figure 15. Market comparable transactions are chosen for properties with a similar mix of base metals and mineral resources in the same order of magnitude. The gross "value" of metals contained in the mineral resource is calculated for each property using metal prices as of the date of the transactions. A ratio of the property value to the gross metal value is then calculated (metal transaction ratio). The gold transaction ratio is used for market comparables analysis. The metal transaction ratio is analogous to the ratio of $/oz value to gold price for a gold property transaction.

**Figure 15: Comparable Transactions for Valuation of a Polymetallic Base Metal Resource Property in the USA**

| Property | Transaction Date | Gross Value of Metals in Resource | Property Value $000 | Metal Transaction Ratio[1] |
|---|---|---|---|---|
| Q | Dec 04 | $926 M | 216 | 0.02% |
| R | Oct 04 | $1,010 M | 573 | 0.06% |
| S | Nov 04 | $679 M | 1,790 | 0.26% |
| T | Jun 04 | $538 M | 3,906 | 0.73% |
| U | Oct 04 | $339 M | 3,092 | 0.91% |
| Mean | | | 1,915 | 0.40% |
| Median | | | 1,790 | 0.26% |
| Eliminate highest and lowest ratios: | | | | |
| Mean | | | 2,090 | **0.35%** |
| Median | | | 1,790 | **0.26%** |

[1] Metal Transaction Ratio is the property value divided by the gross value of metals in the mineral resource expressed as a percent.

In the example in Figure 15, gross metals "values" in mineral resources range from $339 million to $1,010 million and property values range from $216,000 to 3,906,000. There is a large range in metal transaction ratios from 0.02 percent to 0.91 percent which is reduced somewhat when the highest and lowest ratios are eliminated. In this example, a reasonable range of metal transaction ratios for valuation of the subject property is 0.25 percent to 0.35 percent, based on the mean and median values. This range of metal transaction ratios is applied to the gross "value" of metals in mineral resources of the subject property to derive a value range.

## 11. CONCLUSIONS

Non-producing mineral properties include those at various stages of exploration, properties at the pre-feasibility or feasibility stage, properties with currently uneconomic mineral resources, and past-producers. The market approach is applicable to all types of non-producing mineral properties.

The value of a non-producing mineral property depends on its perceived potential for the existence and discovery of an economic mineral deposit which, in turn, depends on a number of factors which must be considered when choosing market comparables.

These include geology, mineralization, stage of exploration and results, mineral resources, location and geography, and political jurisdiction.

The date of the market comparables must be within a reasonable time period of the valuation date of the subject property, such as 6 to 18 months.

Although it is difficult to find good market comparables because of the unique nature of mineral properties and the small number of transactions, these difficulties are compensated for by analyzing at least five or six transactions on similar properties to develop a range of values for the subject property.

Market comparables can be expressed in terms of total property value, value per unit area (e.g., $ per hectare), or value per unit of metal contained in mineral resources (e.g., $ per ounce of gold, or $ per pound of copper). The market comparable value can be used to estimate the value of the subject property by using the property value, unit area value or contained metal value.

Since most market transactions on non-producing mineral properties are option type agreements, the terms must be analyzed to estimate a value for the property being transacted. Firm commitments are considered to contribute 100 percent to value and optional commitments are probability-weighted to estimate their contribution to value. The option agreement terms analysis method can be used to value the subject property, and must be used to value most properties used as market comparable transactions.

Overall market analysis of typical data sets for gold property transactions in recent years shows very large ranges and lognormal-like distributions for total property values, for $/ha values and for $/oz gold values. In the writer's opinion, overall market analysis cannot be used reliably for valuation of individual mineral properties because of these large ranges, and best-fit market analysis must be used. Best-fit market analysis uses a number of comparable transactions to define a reasonable range of values for the subject property, with consideration of mean and median values, range of values, and elimination of outliers.

A method is proposed for valuation of properties with mineral resources in poly-metallic deposits which calculates a "metal transaction ratio" of market comparable properties for use in deriving a range of values for the subject property.

Valuation of non-producing mineral properties is best accomplished by professional geologists or engineers with relevant experience, sound technical judgement and familiarity with mineral property transaction values.

## REFERENCES

Agnerian, Hrayr, "Survey of Mineral Property Transactions July 1994 to June 1996", *Canadian Mining Journal*, July 1996.

CIM, "CIM Definition Standards on Mineral Resources and Mineral Reserves" (prepared by the Standing Committee on Reserve Definitions of the Canadian Institute of Mining, Metallurgy and Petroleum) CIM Bulletin, 2004 and CIM website <www.cim.org>.

Lawrence, Ross D., "Valuation of Mineral Properties without Mineral Resources; a Review of Market-Based Approaches"; CIM Bulletin, v. 95, no. 1060 (2002).

Roscoe, William E., "The Valuation of Mineral Properties for Compensation" (paper presented at the Fall Seminar of the British Columbia Expropriation Association, Vancouver, B.C., October 1999).

Roscoe, William E., "Valuation of Non-Producing Mineral Properties", *Journal of Business Valuation*, 2003.

Ward, Mary-Claire and Ross D. Lawrence, "Comparable Transaction Analysis: the Market Place is always Right" (paper presented at a Short Course, Prospectors and Developers Association of Canada, March 11, 1998).

# Exhibit RPA-009

# **CIM DEFINITION STANDARDS** - For Mineral Resources and Mineral Reserves

**Prepared by the *CIM Standing Committee on Reserve Definitions***
**Adopted by CIM Council on *May 10, 2014***

## FOREWORD

The CIM Definition Standards on Mineral Resources and Reserves (CIM Definition Standards) establish definitions and guidance on the definitions for mineral resources, mineral reserves, and mining studies used in Canada. The Mineral Resource, Mineral Reserve, and Mining Study definitions are incorporated, by reference, into National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* (NI 43-101). The CIM Definition Standards can be viewed on the CIM website at www.cim.org.

Readers should be aware that reports written by persons issuing technical reports that disclose information about exploration or other mining properties to the public in Canada are governed by a number of securities regulations.

## CIM DEFINITION STANDARDS

The CIM Definition Standards presented herein provide definitions and guidance on those definitions for Mineral Resource and Mineral Reserve and their confidence categories. The category to which a mineral resource or mineral reserve estimate is assigned depends on the level of confidence in the geological information available on the mineral deposit; the quality and quantity of data available on the deposit; the level of detail of the technical and economic information which has been generated about the deposit, and the interpretation of the data and information. In the document the definitions are in bold type and the guidance is in italics. Defined terms referenced to other CIM Definitions are underlined and defined terms referenced to NI 43-101 are double underlined**.**

Throughout the CIM Definition Standards, where appropriate, "quality" may be substituted for "grade" and "volume" may be substituted for "tonnage". Technical Reports dealing with estimates of Mineral Resources and Mineral Reserves, or summarizing the results of Mining Studies (Preliminary Feasibility or Feasibility Studies), must use only the terms and definitions contained herein.

## DEFINITIONS

### Qualified Person

Mineral Resource and Mineral Reserve estimates and any supporting Technical Reports must be prepared by or under the direction of a Qualified Person, as that term is defined in NI 43-101.

*The Qualified Person(s) should be clearly satisfied that they could face their peers and demonstrate competence and relevant experience in the commodity, type of deposit and situation under consideration. If doubt*

*exists, the person must either seek or obtain opinions from other colleagues or demonstrate that he or she has obtained assistance from experts in areas where he or she lacked the necessary expertise.*

*Determination of what constitutes relevant experience can be a difficult area and common sense has to be exercised. For example, in estimating Mineral Resources for vein gold mineralization, experience in a high-nugget, vein-type mineralization such as tin, uranium etc. should be relevant whereas experience in massive base metal deposits may not be. As a second example, for a person to qualify as a Qualified Person in the estimation of Mineral Reserves for alluvial gold deposits, he or she would need to have relevant experience in the evaluation and extraction of such deposits. Experience with placer deposits containing minerals other than gold, may not necessarily provide appropriate relevant experience for gold.*

*In addition to experience in the style of mineralization, a Qualified Person preparing or taking responsibility for Mineral Resource estimates must have sufficient experience in the sampling, assaying, or other property testing techniques that are relevant to the deposit under consideration in order to be aware of problems that could affect the reliability of the data. Some appreciation of extraction and processing techniques applicable to that deposit type might also be important.*

*Estimation of Mineral Resources is often a team effort, for example, involving one person or team collecting the data and another person or team preparing the Mineral Resource estimate. Within this team, geologists usually occupy the pivotal role. Estimation of Mineral Reserves is almost always a team effort involving a number of technical disciplines, and within this team mining engineers have an important role. Documentation for a Mineral Resource and Mineral Reserve estimate must be compiled by, or under the supervision of, a Qualified Person(s), whether a geologist, mining engineer or member of another discipline. It is recommended that, where there is a clear division of responsibilities within a team, each Qualified Person should accept responsibility for his or her particular contribution. For example, one Qualified Person could accept responsibility for the collection of Mineral Resource data, another for the Mineral Reserve estimation process, another for the mining study, and the project leader could accept responsibility for the overall document. It is important that the Qualified Person accepting overall responsibility for a Mineral Resource and/or Mineral Reserve estimate and supporting documentation, which has been prepared in whole or in part by others, is satisfied that the other contributors are Qualified Persons with respect to the work for which they are taking responsibility and that such persons are provided adequate documentation.*

## Pre-Feasibility Study (Preliminary Feasibility Study)

*The CIM Definition Standards requires the completion of a Pre-Feasibility Study as the minimum prerequisite for the conversion of Mineral Resources to Mineral Reserves.*

**A Pre-Feasibility Study is a comprehensive study of a range of options for the technical and economic viability of a mineral project that has advanced to a stage where a preferred mining method, in the case of underground mining, or the pit configuration, in the case of an open pit, is established and an effective method of mineral processing is determined. It includes a financial analysis based on reasonable assumptions on the Modifying Factors and the evaluation of any other relevant factors which are sufficient for a Qualified Person, acting reasonably, to determine if all or part of the Mineral Resource may be converted to a Mineral Reserve at the time of reporting. A Pre-Feasibility Study is at a lower confidence level than a Feasibility Study.**

## Feasibility Study

**A Feasibility Study is a comprehensive technical and economic study of the selected development option for a mineral project that includes appropriately detailed assessments of applicable Modifying Factors together with any other relevant operational factors and detailed financial analysis that are necessary to demonstrate, at the time of reporting, that extraction is reasonably justified (economically mineable). The results of the study may reasonably serve as the basis for a final decision by a proponent or financial institution to proceed with, or finance, the development of the project. The confidence level of the study will be higher than that of a Pre-Feasibility Study.**

*The term proponent captures issuers who may finance a project without using traditional financial institutions. In these cases, the technical and economic confidence of the Feasibility Study is equivalent to that required by a financial institution.*

## Mineral Resource

*Mineral Resources are sub-divided, in order of increasing geological confidence, into Inferred, Indicated and Measured categories. An Inferred Mineral Resource has a lower level of confidence than that applied to an Indicated Mineral Resource. An Indicated Mineral Resource has a higher level of confidence than an Inferred Mineral Resource but has a lower level of confidence than a Measured Mineral Resource.*

**A Mineral Resource is a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade or quality and quantity that there are reasonable prospects for eventual economic extraction.**

**The location, quantity, grade or quality, continuity and other geological characteristics of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge, including sampling.**

*Material of economic interest refers to diamonds, natural solid inorganic material, or natural solid fossilized organic material including base and precious metals, coal, and industrial minerals.*

*The term Mineral Resource covers mineralization and natural material of intrinsic economic interest which has been identified and estimated through exploration and sampling and within which Mineral Reserves may subsequently be defined by the consideration and application of Modifying Factors. The phrase 'reasonable prospects for eventual economic extraction' implies a judgment by the Qualified Person in respect of the technical and economic factors likely to influence the prospect of economic extraction. The Qualified Person should consider and clearly state the basis for determining that the material has reasonable prospects for eventual economic extraction. Assumptions should include estimates of cutoff grade and geological continuity at the selected cut-off, metallurgical recovery, smelter payments, commodity price or product value, mining and processing method and mining, processing and general and administrative costs. The Qualified Person should state if the assessment is based on any direct evidence and testing.*

*Interpretation of the word 'eventual' in this context may vary depending on the commodity or mineral involved. For example, for some coal, iron, potash deposits and other bulk minerals or commodities, it may be reasonable to envisage 'eventual economic extraction' as covering time periods in excess of 50 years. However, for many gold deposits, application of the concept would normally be restricted to perhaps 10 to 15 years, and frequently to much shorter periods of time.*

## Inferred Mineral Resource

**An Inferred Mineral Resource is that part of a Mineral Resource for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling. Geological evidence is sufficient to imply but not verify geological and grade or quality continuity.**

**An Inferred Mineral Resource has a lower level of confidence than that applying to an Indicated Mineral Resource and must not be converted to a Mineral Reserve. It is reasonably expected that the majority of Inferred Mineral Resources could be upgraded to Indicated Mineral Resources with continued exploration.**

*An Inferred Mineral Resource is based on limited information and sampling gathered through appropriate sampling techniques from locations such as outcrops, trenches, pits, workings and drill holes. Inferred Mineral Resources must not be included in the economic analysis, production schedules, or estimated mine life in publicly disclosed Pre-Feasibility or Feasibility Studies, or in the Life of Mine plans and cash flow models of developed mines. Inferred Mineral Resources can only be used in economic studies as provided under NI 43-101.*

*There may be circumstances, where appropriate sampling, testing, and other measurements are sufficient to demonstrate data integrity, geological and grade/quality continuity of a Measured or Indicated Mineral Resource, however, quality assurance and quality control, or other information may not meet all industry norms for the disclosure of an Indicated or Measured Mineral Resource. Under these circumstances, it may be reasonable for the Qualified Person to report an Inferred Mineral Resource if the Qualified Person has taken steps to verify the information meets the requirements of an Inferred Mineral Resource.*

## Indicated Mineral Resource

**An Indicated Mineral Resource is that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics are estimated with sufficient confidence to allow the application of Modifying Factors in sufficient detail to support mine planning and evaluation of the economic viability of the deposit.**

**Geological evidence is derived from adequately detailed and reliable exploration, sampling and testing and is sufficient to assume geological and grade or quality continuity between points of observation.**

**An Indicated Mineral Resource has a lower level of confidence than that applying to a Measured Mineral Resource and may only be converted to a Probable Mineral Reserve.**

*Mineralization may be classified as an Indicated Mineral Resource by the Qualified Person when the nature, quality, quantity and distribution of data are such as to allow confident interpretation of the geological framework and to reasonably assume the continuity of mineralization. The Qualified Person must recognize the importance of the Indicated Mineral Resource category to the advancement of the feasibility of the project. An Indicated Mineral Resource estimate is of sufficient quality to support a Pre-Feasibility Study which can serve as the basis for major development decisions.*

## Measured Mineral Resource

**A Measured Mineral Resource is that part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are estimated with confidence sufficient to allow the application of Modifying Factors to support detailed mine planning and final evaluation of the economic viability of the deposit.**

**Geological evidence is derived from detailed and reliable exploration, sampling and testing and is sufficient to confirm geological and grade or quality continuity between points of observation.**

**A Measured Mineral Resource has a higher level of confidence than that applying to either an Indicated Mineral Resource or an Inferred Mineral Resource. It may be converted to a Proven Mineral Reserve or to a Probable Mineral Reserve.**

*Mineralization or other natural material of economic interest may be classified as a Measured Mineral Resource by the Qualified Person when the nature, quality, quantity and distribution of data are such that the tonnage and grade or quality of the mineralization can be estimated to within close limits and that variation from the estimate would not significantly affect potential economic viability of the deposit. This category requires a high level of confidence in, and understanding of, the geology and controls of the mineral deposit.*

## Modifying Factors

**Modifying Factors are considerations used to convert Mineral Resources to Mineral Reserves. These include, but are not restricted to, mining, processing, metallurgical, infrastructure, economic, marketing, legal, environmental, social and governmental factors.**

## Mineral Reserve

*Mineral Reserves are sub-divided in order of increasing confidence into Probable Mineral Reserves and Proven Mineral Reserves. A Probable Mineral Reserve has a lower level of confidence than a Proven Mineral Reserve.*

**A Mineral Reserve is the economically mineable part of a Measured and/or Indicated Mineral Resource. It includes diluting materials and allowances for losses, which may occur when the material is mined or extracted and is defined by studies at Pre-Feasibility or Feasibility level as appropriate that include application of Modifying Factors. Such studies demonstrate that, at the time of reporting, extraction could reasonably be justified.**

**The reference point at which Mineral Reserves are defined, usually the point where the ore is delivered to the processing plant, must be stated. It is important that, in all situations where the reference point is different, such as for a saleable product, a clarifying statement is included to ensure that the reader is fully informed as to what is being reported.**

**The public disclosure of a Mineral Reserve must be demonstrated by a Pre-Feasibility Study or Feasibility Study.**

*Mineral Reserves are those parts of Mineral Resources which, after the application of all mining factors, result in an estimated tonnage and grade which, in the opinion of the Qualified Person(s) making the estimates, is the basis of an economically viable project after taking account of all relevant Modifying Factors. Mineral Reserves are inclusive of diluting material that will be mined in conjunction with the Mineral Reserves and delivered to the treatment plant or equivalent facility. The term 'Mineral Reserve' need not necessarily signify that extraction facilities are in place or operative or that all governmental approvals have been received. It does signify that there are reasonable expectations of such approvals.*

*'Reference point' refers to the mining or process point at which the Qualified Person prepares a Mineral Reserve. For example, most metal deposits disclose mineral reserves with a "mill feed" reference point. In these cases, reserves are reported as mined ore delivered to the plant and do not include reductions attributed to anticipated plant losses. In contrast, coal reserves have traditionally been reported as tonnes of "clean coal". In this coal example, reserves are reported as a "saleable product" reference point and include reductions for plant yield (recovery). The Qualified Person must clearly state the 'reference point' used in the Mineral Reserve estimate.*

## Probable Mineral Reserve

**A Probable Mineral Reserve is the economically mineable part of an Indicated, and in some circumstances, a Measured Mineral Resource. The confidence in the Modifying Factors applying to a Probable Mineral Reserve is lower than that applying to a Proven Mineral Reserve.**

*The Qualified Person(s) may elect, to convert Measured Mineral Resources to Probable Mineral Reserves if the confidence in the Modifying Factors is lower than that applied to a Proven Mineral Reserve. Probable Mineral Reserve estimates must be demonstrated to be economic, at the time of reporting, by at least a Pre-Feasibility Study.*

## Proven Mineral Reserve (Proved Mineral Reserve)

**A Proven Mineral Reserve is the economically mineable part of a Measured Mineral Resource. A Proven Mineral Reserve implies a high degree of confidence in the Modifying Factors.**

*Application of the Proven Mineral Reserve category implies that the Qualified Person has the highest degree of confidence in the estimate with the consequent expectation in the minds of the readers of the report. The term should be restricted to that part of the deposit where production planning is taking place and for which any variation in the estimate would not significantly affect the potential economic viability of the deposit. Proven Mineral Reserve estimates must be demonstrated to be economic, at the time of reporting, by at least a Pre-Feasibility Study. Within the CIM Definition standards the term Proved Mineral Reserve is an equivalent term to a Proven Mineral Reserve.*

## MINERAL RESOURCE AND MINERAL RESERVE CLASSIFICATION

The CIM Definition Standards provide for a direct relationship between Indicated Mineral Resources and Probable Mineral Reserves and between Measured Mineral Resources and Proven Mineral Reserves. In other words, the level of geoscientific confidence for Probable Mineral Reserves is the same as that required for the in situ determination of Indicated Mineral Resources and for Proven Mineral Reserves is the same as that required for the in situ determination of Measured Mineral Resources. Figure 1, displays the relationship between the Mineral Resource and Mineral Reserve categories.




*Figure 1, Relationship between Mineral Reserves and Mineral Resources*

*Figure 1 sets out the framework for classifying tonnage and grade/quality estimates so as to reflect different levels of geological confidence and different degrees of technical and economic evaluation. Mineral Resources can be estimated by a Qualified Person, with input from persons in other disciplines, as necessary, on the basis of geoscientific information and reasonable assumptions of technical and economic factors likely to influence the eventual prospect of economic extraction. Mineral Reserves, which are a modified sub-set of the Indicated and Measured Mineral Resources (shown within the dashed outline in Figure 1), require consideration of modifying factors affecting profitable extraction, including mining, processing, metallurgical, economic, marketing, legal, environmental, infrastructure, social and governmental factors, and should be estimated with input from a range of disciplines. Additional test work, e.g. metallurgy, mining, environmental is required to reclassify a resource as a reserve.*

*In certain situations, Measured Mineral Resources could convert to Probable Mineral Reserves because of uncertainties associated with the modifying factors that are taken into account in the conversion from Mineral Resources to Mineral Reserves. This relationship is shown by the dashed arrow in Figure 1 (although the trend of the dashed arrow includes a vertical component, it does not, in this instance, imply a reduction in the level of geological knowledge or confidence). In such a situation these modifying factors should be fully explained. Under no circumstances can Indicated Resources convert directly to Proven Reserves.*

*In certain situations previously reported Mineral Reserves could revert to Mineral Resources. It is not intended that re-classification from Mineral Reserves to Mineral Resources should be applied as a result of changes expected to be of a short term or temporary nature, or where company management has made a deliberate decision to operate in the short term on a non-economic basis. Examples of such situations might be a commodity price drop expected to be of short duration, mine emergency of a non-permanent nature, transport strike etc.*

## GUIDANCE FOR REPORTING MINERAL RESOURCE AND MINERAL RESERVE INFORMATION

Qualified Persons preparing public Mineral Resource and Mineral Reserve reports in Canada must follow the requirements in Form 43-101F1 of National Instrument 43-101, available on the following websites: www.osc.gov.ca; www.bcsc.bc.ca; www.albertasecurities.com and www.cvmq.com.

The following discussion is included for additional guidance when preparing a Technical Report.

*Qualified Persons are encouraged to provide information that is as comprehensive as possible in their Technical Reports on Exploration Information, Mineral Resources and Mineral Reserves. The Mineral Exploration Best Practices Guidelines, the Estimation of Mineral Resource and Mineral Reserve Best Practice Guidelines provide, in a summary form, a list of the main criteria which should be considered when reporting Mineral Resources and Mineral Reserve estimates. These guidelines are available on the CIM website, www.cim.org.*

*These Guidelines are not prescriptive and it may not be necessary to comment on each item in the guidelines, however, the need for comment on each item should be considered. It is essential to discuss any matters that might materially affect the reader's understanding of the estimates being reported. Problems encountered in the collection of data or with the sufficiency of data must be clearly disclosed at all times, particularly when they affect directly the reliability of, or confidence in, an estimate of Mineral Resources and Mineral Reserves; for example, poor sample recovery, poor reproducibility of assay or laboratory results, limited information on tonnage factors, etc. Mineral Resources and Mineral Reserves must be reported on a site by site basis.*

*When reporting both Mineral Resources and Mineral Reserves, a clarifying statement must be included that clearly indicates whether Mineral Reserves are part of the Mineral Resource or that they have been removed from the Mineral Resource. A single form of reporting should be used in a report. Appropriate forms of clarifying statements may be:*

- *"The Measured and Indicated Mineral Resources are inclusive of those Mineral Resources modified to produce the Mineral Reserves", or*
- *"The Measured and Indicated Mineral Resources are additional to the Mineral Reserves".*

*Inferred Mineral Resources are, by definition, always additional to Mineral Reserves.*

## REPORTING OF COAL RESERVES

*For consistency in public reporting of Mineral Resources and Mineral Reserves for coal, it is recommended that all issuers use the Mineral Resource and Mineral Reserve categories set out in the CIM Definition Standards. Qualified Person(s) should be guided by the Estimation of Mineral Resources and Mineral Reserve Best Practices Guidelines for Coal and by GSC Paper 88-21: A Standardized coal Resource/Reserve Reporting System for Canada. It is acceptable to use the GSC Paper 88-21 as a framework for the development and categorization of coal estimates, but the GSC 88-21 categories should be converted to the equivalent CIM Definition Standard categories for public reporting.*

## REPORTING OF INDUSTRIAL MINERALS

*When reporting Mineral Resource and Mineral Reserve estimates relating to an industrial mineral site, the Qualified Person(s) should be guided by the Estimation of Mineral Resources and Mineral Reserves Best Practice Guidelines for Industrial Minera*ls.

## REPORTING OF DIAMONDS AND GEMSTONES

*When reporting diamond Exploration Information and Mineral Resources and Mineral Reserves the Qualified Person is expected to comply with the CIM Guidelines for the Reporting of Diamond Exploration Results and the Estimation of Mineral Resources and Mineral Reserves Best Practice Guidelines for Rock Hosted Diamonds.*

# Exhibit RPA-010

# Chapter 5

# Rules and Policies

## 5.1.1 NI 43-101 Standards of Disclosure for Mineral Projects, Form 43-101F1 Technical Report and Related Consequential Amendments

**NATIONAL INSTRUMENT 43-101**
***STANDARDS OF DISCLOSURE FOR MINERAL PROJECTS***

**Table of Contents**


| PART | TITLE |
|---|---|
| PART 1 | DEFINITIONS AND INTERPRETATION |
| | 1.1 Definitions |
| | 1.2 Mineral Resource |
| | 1.3 Mineral Reserve |
| | 1.4 Mining Studies |
| | 1.5 Independence |
| PART 2 | REQUIREMENTS APPLICABLE TO ALL DISCLOSURE |
| | 2.1 Requirements Applicable to All Disclosure |
| | 2.2 All Disclosure of Mineral Resources or Mineral Reserves |
| | 2.3 Restricted Disclosure |
| | 2.4 Disclosure of Historical Estimates |
| PART 3 | ADDITIONAL REQUIREMENTS FOR WRITTEN DISCLOSURE |
| | 3.1 Written Disclosure to Include Name of Qualified Person |
| | 3.2 Written Disclosure to Include Data Verification |
| | 3.3 Requirements Applicable to Written Disclosure of Exploration Information |
| | 3.4 Requirements Applicable to Written Disclosure of Mineral Resources and Mineral Reserves |
| | 3.5 Exception for Written Disclosure Already Filed |
| PART 4 | OBLIGATION TO FILE A TECHNICAL REPORT |
| | 4.1 Obligation to File a Technical Report Upon Becoming a Reporting Issuer |
| | 4.2 Obligation to File a Technical Report in Connection with Certain Written Disclosure About Mineral Projects on Material Properties |
| | 4.3 Required Form of Technical Report |
| PART 5 | AUTHOR OF TECHNICAL REPORT |
| | 5.1 Prepared by a Qualified Person |
| | 5.2 Execution of Technical Report |
| | 5.3 Independent Technical Report |
| PART 6 | PREPARATION OF TECHNICAL REPORT |
| | 6.1 The Technical Report |
| | 6.2 Current Personal Inspection |
| | 6.3 Maintenance of Records |
| | 6.4 Limitation on Disclaimers |
| PART 7 | USE OF FOREIGN CODE |
| | 7.1 Use of Foreign Code |
| PART 8 | CERTIFICATES AND CONSENTS OF QUALIFIED PERSONS FOR TECHNICAL REPORTS |
| | 8.1 Certificates of Qualified Persons |
| | 8.2 Addressed to Issuer |
| | 8.3 Consents of Qualified Persons |

PART 9 EXEMPTIONS
9.1 Authority to Grant Exemptions
9.2 Exemptions for Royalty or Similar Interests
9.3 Exemption for Certain Types of Filings

PART 10 EFFECTIVE DATE AND REPEAL
10.1 Effective Date
10.2 Repeal

**NATIONAL INSTRUMENT 43-101**
***STANDARDS OF DISCLOSURE FOR MINERAL PROJECTS***

## PART 1 DEFINITIONS AND INTERPRETATION

### Definitions

**1.1** In this Instrument

"acceptable foreign code" means the JORC Code, the PERC Code, the SAMREC Code, SEC Industry Guide 7, the Certification Code, or any other code, generally accepted in a foreign jurisdiction, that defines mineral resources and mineral reserves in a manner that is consistent with mineral resource and mineral reserve definitions and categories set out in sections 1.2 and 1.3;

"adjacent property" means a property

(a) in which the issuer does not have an interest;

(b) that has a boundary reasonably proximate to the property being reported on; and

(c) that has geological characteristics similar to those of the property being reported on;

"advanced property" means a property that has

(a) mineral reserves, or

(b) mineral resources the potential economic viability of which is supported by a preliminary economic assessment, a pre-feasibility study or a feasibility study;

"Certification Code" means the Certification Code for Exploration Prospects, Mineral Resources and Ore Reserves prepared by the Mineral Resources Committee of the Institution of Mining Engineers of Chile, as amended;

"data verification" means the process of confirming that data has been generated with proper procedures, has been accurately transcribed from the original source and is suitable to be used;

"disclosure" means any oral statement or written disclosure made by or on behalf of an issuer and intended to be, or reasonably likely to be, made available to the public in a jurisdiction of Canada, whether or not filed under securities legislation, but does not include written disclosure that is made available to the public only by reason of having been filed with a government or agency of government pursuant to a requirement of law other than securities legislation;

"early stage exploration property" means a property for which the technical report being filed has

(a) no current mineral resources or mineral reserves defined; and

(b) no drilling or trenching proposed;

"effective date" means, with reference to a technical report, the date of the most recent scientific or technical information included in the technical report;

"exploration information" means geological, geophysical, geochemical, sampling, drilling, trenching, analytical testing, assaying, mineralogical, metallurgical, and other similar information concerning a particular property that is derived from activities undertaken to locate, investigate, define, or delineate a mineral prospect or mineral deposit;

"historical estimate" means an estimate of the quantity, grade, or metal or mineral content of a deposit that an issuer has not verified as a current mineral resource or mineral reserve, and which was prepared before the issuer acquiring, or entering into an agreement to acquire, an interest in the property that contains the deposit;

"JORC Code" means the Australasian Code for Reporting of Exploration Results, Mineral Resources and Ore Reserves prepared by the Joint Ore Reserves Committee of the Australasian Institute of Mining and Metallurgy, Australian Institute of Geoscientists and Minerals Council of Australia, as amended;

"mineral project" means any exploration, development or production activity, including a royalty or similar interest in these activities, in respect of diamonds, natural solid inorganic material, or natural solid fossilized organic material including base and precious metals, coal, and industrial minerals;

"PERC Code" means the Pan-European Code for Reporting of Exploration Results, Mineral Resources and Reserves prepared by the Pan-European Reserves and Resources Reporting Committee, as amended;

"preliminary economic assessment" means a study, other than a pre-feasibility or feasibility study, that includes an economic analysis of the potential viability of mineral resources;

"producing issuer" means an issuer with annual audited financial statements that disclose

(a) gross revenue, derived from mining operations, of at least $30 million Canadian for the issuer's most recently completed financial year; and

(b) gross revenue, derived from mining operations, of at least $90 million Canadian in the aggregate for the issuer's three most recently completed financial years;

"professional association" means a self-regulatory organization of engineers, geoscientists or both engineers and geoscientists that

(a) is

(i) given authority or recognition by statute in a jurisdiction of Canada, or

(ii) a foreign association that is generally accepted within the international mining community as a reputable professional association;

(b) admits individuals on the basis of their academic qualifications, experience, and ethical fitness;

(c) requires compliance with the professional standards of competence and ethics established by the organization;

(d) requires or encourages continuing professional development; and

(e) has and applies disciplinary powers, including the power to suspend or expel a member regardless of where the member practises or resides;

"qualified person" means an individual who

(a) is an engineer or geoscientist with a university degree, or equivalent accreditation, in an area of geoscience, or engineering, relating to mineral exploration or mining;

(b) has at least five years of experience in mineral exploration, mine development or operation, or mineral project assessment, or any combination of these, that is relevant to his or her professional degree or area of practice;

(c) has experience relevant to the subject matter of the mineral project and the technical report;

(d) is in good standing with a professional association; and

(e) in the case of a professional association in a foreign jurisdiction, has a membership designation that

(i) requires attainment of a position of responsibility in their profession that requires the exercise of independent judgment; and

(ii) requires

A. a favourable confidential peer evaluation of the individual's character, professional judgement, experience, and ethical fitness; or

B. a recommendation for membership by at least two peers, and demonstrated prominence or expertise in the field of mineral exploration or mining;

"quantity" means either tonnage or volume, depending on which term is the standard in the mining industry for the type of mineral;

"SAMREC Code" means the South African Code for the Reporting of Exploration Results, Mineral Resources and Mineral Reserves prepared by the South African Mineral Resource Committee (SAMREC) under the Joint Auspices of the Southern African Institute of Mining and Metallurgy and the Geological Society of South Africa, as amended;

"SEC Industry Guide 7" means the mining industry guide entitled "Description of Property by Issuers Engaged or to be Engaged in Significant Mining Operations" contained in the Securities Act Industry Guides published by the United States Securities and Exchange Commission, as amended;

"specified exchange" means the Australian Stock Exchange, the Johannesburg Stock Exchange, the London Stock Exchange Main Market, the Nasdaq Stock Market, the New York Stock Exchange, or the Hong Kong Stock Exchange;

"technical report" means a report prepared and filed in accordance with this Instrument and Form 43-101F1 Technical Report that includes, in summary form, all material scientific and technical information in respect of the subject property as of the effective date of the technical report; and

"written disclosure" includes any writing, picture, map, or other printed representation whether produced, stored or disseminated on paper or electronically, including websites.

**Mineral Resource**

**1.2** In this Instrument, the terms "mineral resource", "inferred mineral resource", "indicated mineral resource" and "measured mineral resource" have the meanings ascribed to those terms by the Canadian Institute of Mining, Metallurgy and Petroleum, as the CIM Definition Standards on Mineral Resources and Mineral Reserves adopted by CIM Council, as amended.

**Mineral Reserve**

**1.3** In this Instrument, the terms "mineral reserve", "probable mineral reserve" and "proven mineral reserve" have the meanings ascribed to those terms by the Canadian Institute of Mining, Metallurgy and Petroleum, as the CIM Definition Standards on Mineral Resources and Mineral Reserves adopted by CIM Council, as amended.

**Mining Studies**

**1.4** In this Instrument, the terms "preliminary feasibility study", "pre-feasibility study" and "feasibility study" have the meanings ascribed to those terms by the Canadian Institute of Mining, Metallurgy and Petroleum, as the CIM Definition Standards on Mineral Resources and Mineral Reserves adopted by CIM Council, as amended.

**Independence**

**1.5** In this Instrument, a qualified person is independent of an issuer if there is no circumstance that, in the opinion of a reasonable person aware of all relevant facts, could interfere with the qualified person's judgment regarding the preparation of the technical report.

## PART 2 REQUIREMENTS APPLICABLE TO ALL DISCLOSURE

**Requirements Applicable to All Disclosure**

**2.1** All disclosure of scientific or technical information made by an issuer, including disclosure of a mineral resource or mineral reserve, concerning a mineral project on a property material to the issuer must be

(a) based upon information prepared by or under the supervision of a qualified person; or

(b) approved by a qualified person.

**All Disclosure of Mineral Resources or Mineral Reserves**

**2.2** An issuer must not disclose any information about a mineral resource or mineral reserve unless the disclosure

(a) uses only the applicable mineral resource and mineral reserve categories set out in sections 1.2 and 1.3;

(b) reports each category of mineral resources and mineral reserves separately, and states the extent, if any, to which mineral reserves are included in total mineral resources;

(c) does not add inferred mineral resources to the other categories of mineral resources; and

(d) states the grade or quality and the quantity for each category of the mineral resources and mineral reserves if the quantity of contained metal or mineral is included in the disclosure.

**Restricted Disclosure**

**2.3** (1) An issuer must not disclose

(a) the quantity, grade, or metal or mineral content of a deposit that has not been categorized as an inferred mineral resource, an indicated mineral resource, a measured mineral resource, a probable mineral reserve, or a proven mineral reserve;

(b) the results of an economic analysis that includes or is based on inferred mineral resources or an estimate permitted under subsection 2.3(2) or section 2.4;

(c) the gross value of metal or mineral in a deposit or a sampled interval or drill intersection; or

(d) a metal or mineral equivalent grade for a multiple commodity deposit, sampled interval, or drill intersection, unless it also discloses the grade of each metal or mineral used to establish the metal or mineral equivalent grade.

(2) Despite paragraph (1)(a), an issuer may disclose in writing the potential quantity and grade, expressed as ranges, of a target for further exploration if the disclosure

(a) states with equal prominence that the potential quantity and grade is conceptual in nature, that there has been insufficient exploration to define a mineral resource and that it is uncertain if further exploration will result in the target being delineated as a mineral resource; and

(b) states the basis on which the disclosed potential quantity and grade has been determined.

(3) Despite paragraph (1)(b), an issuer may disclose the results of a preliminary economic assessment that includes or is based on inferred mineral resources if the disclosure

(a) states with equal prominence that the preliminary economic assessment is preliminary in nature, that it includes inferred mineral resources that are considered too speculative geologically to have the economic considerations applied to them that would enable them to be categorized as mineral reserves, and there is no certainty that the preliminary economic assessment will be realized;

(b) states the basis for the preliminary economic assessment and any qualifications and assumptions made by the qualified person; and

(c) describes the impact of the preliminary economic assessment on the results of any pre-feasibility or feasibility study in respect of the subject property.

(4) An issuer must not use the term preliminary feasibility study, pre-feasibility study or feasibility study when referring to a study unless the study satisfies the criteria set out in the definition of the applicable term in section 1.4.

**Disclosure of Historical Estimates**

**2.4** Despite section 2.2, an issuer may disclose an historical estimate, using the original terminology, if the disclosure

(a) identifies the source and date of the historical estimate, including any existing technical report;

(b) comments on the relevance and reliability of the historical estimate;

(c) to the extent known, provides the key assumptions, parameters, and methods used to prepare the historical estimate;

(d) states whether the historical estimate uses categories other than the ones set out in sections 1.2 and 1.3 and, if so, includes an explanation of the differences;

(e) includes any more recent estimates or data available to the issuer;

(f) comments on what work needs to be done to upgrade or verify the historical estimate as current mineral resources or mineral reserves; and

(g) states with equal prominence that

(i) a qualified person has not done sufficient work to classify the historical estimate as current mineral resources or mineral reserves; and

(ii) the issuer is not treating the historical estimate as current mineral resources or mineral reserves.

**PART 3 ADDITIONAL REQUIREMENTS FOR WRITTEN DISCLOSURE**

**Written Disclosure to Include Name of Qualified Person**

**3.1** If an issuer discloses in writing scientific or technical information about a mineral project on a property material to the issuer, the issuer must include in the written disclosure the name and the relationship to the issuer of the qualified person who

(a) prepared or supervised the preparation of the information that forms the basis for the written disclosure; or

(b) approved the written disclosure.

**Written Disclosure to Include Data Verification**

**3.2** If an issuer discloses in writing scientific or technical information about a mineral project on a property material to the issuer, the issuer must include in the written disclosure

(a) a statement whether a qualified person has verified the data disclosed, including sampling, analytical, and test data underlying the information or opinions contained in the written disclosure;

(b) a description of how the data was verified and any limitations on the verification process; and

(c) an explanation of any failure to verify the data.

**Requirements Applicable to Written Disclosure of Exploration Information**

**3.3** (1) If an issuer discloses in writing exploration information about a mineral project on a property material to the issuer, the issuer must include in the written disclosure a summary of

(a) the material results of surveys and investigations regarding the property;

(b) the interpretation of the exploration information; and

(c) the quality assurance program and quality control measures applied during the execution of the work being reported on.

(2) If an issuer discloses in writing sample, analytical or testing results on a property material to the issuer, the issuer must include in the written disclosure, with respect to the results being disclosed,

(a) the location and type of the samples;

(b) the location, azimuth, and dip of the drill holes and the depth of the sample intervals;

(c) a summary of the relevant analytical values, widths, and to the extent known, the true widths of the mineralized zone;

(d) the results of any significantly higher grade intervals within a lower grade intersection;

(e) any drilling, sampling, recovery, or other factors that could materially affect the accuracy or reliability of the data referred to in this subsection; and

(f) a summary description of the type of analytical or testing procedures utilized, sample size, the name and location of each analytical or testing laboratory used, and any relationship of the laboratory to the issuer.

**Requirements Applicable to Written Disclosure of Mineral Resources and Mineral Reserves**

**3.4** If an issuer discloses in writing mineral resources or mineral reserves on a property material to the issuer, the issuer must include in the written disclosure

(a) the effective date of each estimate of mineral resources and mineral reserves;

(b) the quantity and grade or quality of each category of mineral resources and mineral reserves;

(c) the key assumptions, parameters, and methods used to estimate the mineral resources and mineral reserves;

(d) the identification of any known legal, political, environmental, or other risks that could materially affect the potential development of the mineral resources or mineral reserves; and

(e) if the disclosure includes the results of an economic analysis of mineral resources, an equally prominent statement that mineral resources that are not mineral reserves do not have demonstrated economic viability.

**Exception for Written Disclosure Already Filed**

**3.5** Sections 3.2 and 3.3 and paragraphs (a), (c) and (d) of section 3.4 do not apply if the issuer includes in the written disclosure a reference to the title and date of a document previously filed by the issuer that complies with those requirements.

**PART 4 OBLIGATION TO FILE A TECHNICAL REPORT**

**Obligation to File a Technical Report Upon Becoming a Reporting Issuer**

**4.1** (1) Upon becoming a reporting issuer in a jurisdiction of Canada an issuer must file in that jurisdiction a technical report for each mineral property material to the issuer.

(2) Subsection (1) does not apply if the issuer is a reporting issuer in a jurisdiction of Canada and subsequently becomes a reporting issuer in another jurisdiction of Canada.

(3) Subsection (1) does not apply if

(a) the issuer previously filed a technical report for the property;

(b) at the date the issuer becomes a reporting issuer, there is no new material scientific or technical information concerning the subject property not included in the previously filed technical report; and

(c) the previously filed technical report meets any independence requirements under section 5.3.

**Obligation to File a Technical Report in Connection with Certain Written Disclosure about Mineral Projects on Material Properties**

**4.2** (1) An issuer must file a technical report to support scientific or technical information that relates to a mineral project on a property material to the issuer, or in the case of paragraph (c), the resulting issuer, if the information is contained in any of the following documents filed or made available to the public in a jurisdiction of Canada:

(a) a preliminary prospectus, other than a preliminary short form prospectus filed in accordance with National Instrument 44-101 *Short Form Prospectus Distributions*;

(b) a preliminary short form prospectus filed in accordance with National Instrument 44-101 *Short Form Prospectus Distributions* that discloses for the first time

(i) mineral resources, mineral reserves or the results of a preliminary economic assessment on the property that constitute a material change in relation to the issuer; or

(ii) a change in mineral resources, mineral reserves or the results of a preliminary economic assessment from the most recently filed technical report if the change constitutes a material change in relation to the issuer;

(c) an information or proxy circular concerning a direct or indirect acquisition of a mineral property where the issuer or resulting issuer issues securities as consideration;

(d) an offering memorandum, other than an offering memorandum delivered solely to accredited investors as defined under securities legislation;

(e) for a reporting issuer, a rights offering circular;

(f) an annual information form;

(g) a valuation required to be prepared and filed under securities legislation;

(h) an offering document that complies with and is filed in accordance with Policy 4.6 - *Public Offering by Short Form Offering Document* and Exchange Form 4H - *Short Form Offering Document,* of the TSX Venture Exchange, as amended;

(i) a take-over bid circular that discloses mineral resources, mineral reserves or the results of a preliminary economic assessment on the property if securities of the offeror are being offered in exchange on the take-over bid; and

(j) any written disclosure made by or on behalf of an issuer, other than in a document described in paragraphs (a) to (i), that discloses for the first time

(i) mineral resources, mineral reserves or the results of a preliminary economic assessment on the property that constitute a material change in relation to the issuer; or

(ii) a change in mineral resources, mineral reserves or the results of a preliminary economic assessment from the most recently filed technical report if the change constitutes a material change in relation to the issuer.

(2) Subsection (1) does not apply for disclosure of an historical estimate in a document referred to in paragraph (1)(j) if the disclosure is made in accordance with subsection 2.4.

(3) If a technical report is filed under paragraph (1)(a) or (b), and new material scientific or technical information concerning the subject property becomes available before the filing of the final version of the prospectus or short form prospectus, the issuer must file an updated technical report or an addendum to the technical report with the final version of the prospectus or short form prospectus.

(4) The issuer must file the technical report referred to in subsection (1) not later than the time it files or makes available to the public the document listed in subsection (1) that the technical report supports.

(5) Despite subsection (4), an issuer must

(a) file a technical report supporting disclosure under paragraph (1)(j) not later than

(i) if the disclosure is also contained in a preliminary short form prospectus, the earlier of 45 days after the date of the disclosure and the date of filing the preliminary short form prospectus;

(ii) if the disclosure is also contained in a directors' circular, the earlier of 45 days after the date of the disclosure and 3 business days before expiry of the take-over bid; and

(iii) in all other cases, 45 days after the date of the disclosure;

(b) issue a news release at the time it files the technical report disclosing the filing of the technical report and reconciling any material differences in the mineral resources, mineral reserves or results of a preliminary economic assessment, between the technical report and the issuer's disclosure under paragraph (1)(j).

(6) Despite subsection (4), if a property referred to in an annual information form first becomes material to the issuer less than 30 days before the filing deadline for the annual information form, the issuer must file the technical report within 45 days of the date that the property first became material to the issuer.

(7) Despite subsection (4) and paragraph (5)(a), an issuer is not required to file a technical report within 45 days to support disclosure under subparagraph (1)(j)(i), if

(a) the mineral resources, mineral reserves or results of a preliminary economic assessment

(i) were prepared by or on behalf of another issuer who holds or previously held an interest in the property;

(ii) were disclosed by the other issuer in a document listed in subsection (1); and

(iii) are supported by a technical report filed by the other issuer;

(b) the issuer, in its disclosure under subparagraph (1)(j)(i),

(i) identifies the title and effective date of the previous technical report and the name of the other issuer that filed it;

(ii) names the qualified person who reviewed the technical report on behalf of the issuer; and

(iii) states with equal prominence that, to the best of the issuer's knowledge, information, and belief, there is no new material scientific or technical information that would make the disclosure of the mineral resources, mineral reserves or results of a preliminary economic assessment inaccurate or misleading; and

(c) the issuer files a technical report supporting its disclosure of the mineral resources, mineral reserves or results of a preliminary economic assessment;

(i) if the disclosure is also contained in a preliminary short form prospectus, by the earlier of 180 days after the date of the disclosure and the date of filing the short form prospectus; and

(ii) in all other cases, within 180 days after the date of the disclosure.

(8) Subsection (1) does not apply if

(a) the issuer previously filed a technical report that supports the scientific or technical information in the document;

(b) at the date of filing the document, there is no new material scientific or technical information concerning the subject property not included in the previously filed technical report; and

(c) the previously filed technical report meets any independence requirements under section 5.3.

**Required Form of Technical Report**

**4.3** A technical report that is required to be filed under this Part must be prepared

(a) in English or French; and

(b) in accordance with Form 43-101F1.

**PART 5 AUTHOR OF TECHNICAL REPORT**

**Prepared by a Qualified Person**

**5.1** A technical report must be prepared by or under the supervision of one or more qualified persons.

**Execution of Technical Report**

**5.2** A technical report must be dated, signed and, if the qualified person has a seal, sealed by

(a) each qualified person who is responsible for preparing or supervising the preparation of all or part of the report; or

(b) a person or company whose principal business is providing engineering or geoscientific services if each qualified person responsible for preparing or supervising the preparation of all or part of the report is an employee, officer, or director of that person or company.

**Independent Technical Report**

**5.3** (1) A technical report required under any of the following provisions of this Instrument must be prepared by or under the supervision of one or more qualified persons that are, at the effective and filing dates of the technical report, all independent of the issuer:

(a) section 4.1;

(b) paragraphs (a) and (g) of subsection 4.2(1); or

(c) paragraphs (b), (c), (d), (e), (f), (h), (i) and (j) of subsection 4.2(1), if the document discloses

(i) for the first time mineral resources, mineral reserves or the results of a preliminary economic assessment on a property material to the issuer, or

(ii) a 100 percent or greater change in the total mineral resources or total mineral reserves on a property material to the issuer, since the issuer's most recently filed independent technical report in respect of the property.

(2) Despite subsection (1), a technical report required to be filed by a producing issuer under paragraph (1)(a) is not required to be prepared by or under the supervision of an independent qualified person if the securities of the issuer trade on a specified exchange.

(3) Despite subsection (1), a technical report required to be filed by a producing issuer under paragraph (1)(b) or (c) is not required to be prepared by or under the supervision of an independent qualified person.

(4) Despite subsection (1), a technical report required to be filed by an issuer concerning a property which is or will be the subject of a joint venture with a producing issuer is not required to be prepared by or under

the supervision of an independent qualified person, if the qualified person preparing or supervising the preparation of the report relies on scientific and technical information prepared by or under the supervision of a qualified person that is an employee or consultant of the producing issuer.

## PART 6 PREPARATION OF TECHNICAL REPORT

### The Technical Report

**6.1** A technical report must be based on all available data relevant to the disclosure that it supports.

### Current Personal Inspection

**6.2** (1) Before an issuer files a technical report, the issuer must have at least one qualified person who is responsible for preparing or supervising the preparation of all or part of the technical report complete a current inspection on the property that is the subject of the technical report.

(2) Subsection (1) does not apply to an issuer provided that

(a) the property that is the subject of the technical report is an early stage exploration property;

(b) seasonal weather conditions prevent a qualified person from accessing any part of the property or obtaining beneficial information from it; and

(c) the issuer discloses in the technical report, and in the disclosure that the technical report supports, that a personal inspection by a qualified person was not conducted, the reasons why, and the intended time frame to complete the personal inspection.

(3) If an issuer relies on subsection (2), the issuer must

(a) as soon as practical, have at least one qualified person who is responsible for preparing or supervising the preparation of all or part of the technical report complete a current inspection on the property that is the subject of the technical report; and

(b) promptly file a technical report and the certificates and consents required under Part 8 of this Instrument.

### Maintenance of Records

**6.3** An issuer must keep for 7 years copies of assay and other analytical certificates, drill logs, and other information referenced in the technical report or used as a basis for the technical report.

### Limitation on Disclaimers

**6.4** (1) An issuer must not file a technical report that contains a disclaimer by any qualified person responsible for preparing or supervising the preparation of all or part of the report that

(a) disclaims responsibility for, or limits reliance by another party on, any information in the part of the report the qualified person prepared or supervised the preparation of; or

(b) limits the use or publication of the report in a manner that interferes with the issuer's obligation to reproduce the report by filing it on SEDAR.

(2) Despite subsection (1), an issuer may file a technical report that includes a disclaimer in accordance with Item 3 of Form 43-101F1.

## PART 7 USE OF FOREIGN CODE

### Use of Foreign Code

**7.1** (1) Despite section 2.2, an issuer may make disclosure and file a technical report that uses the mineral resource and mineral reserve categories of an acceptable foreign code, if the issuer

(a) is incorporated or organized in a foreign jurisdiction; or

(b) is incorporated or organized under the laws of Canada or a jurisdiction of Canada, for its properties located in a foreign jurisdiction.

(2) If an issuer relies on subsection (1), the issuer must include in the technical report a reconciliation of any material differences between the mineral resource and mineral reserve categories used and the categories set out in sections 1.2 and 1.3.

## PART 8 CERTIFICATES AND CONSENTS OF QUALIFIED PERSONS FOR TECHNICAL REPORTS

### Certificates of Qualified Persons

8.1 (1) An issuer must, when filing a technical report, file a certificate that is dated, signed, and if the signatory has a seal, sealed, of each qualified person responsible for preparing or supervising the preparation of all or part of the technical report.

(2) A certificate under subsection (1) must state

(a) the name, address, and occupation of the qualified person;

(b) the title and effective date of the technical report to which the certificate applies;

(c) the qualified person's qualifications, including a brief summary of relevant experience, the name of all professional associations to which the qualified person belongs, and that the qualified person is a "qualified person" for purposes of this Instrument;

(d) the date and duration of the qualified person's most recent personal inspection of each property, if applicable;

(e) the item or items of the technical report for which the qualified person is responsible;

(f) whether the qualified person is independent of the issuer as described in section 1.5;

(g) what prior involvement, if any, the qualified person has had with the property that is the subject of the technical report;

(h) that the qualified person has read this Instrument and the technical report, or part that the qualified person is responsible for, has been prepared in compliance with this Instrument; and

(i) that, at the effective date of the technical report, to the best of the qualified person's knowledge, information, and belief, the technical report, or part that the qualified person is responsible for, contains all scientific and technical information that is required to be disclosed to make the technical report not misleading.

### Addressed to Issuer

**8.2** All technical reports must be addressed to the issuer.

### Consents of Qualified Persons

**8.3** (1) An issuer must, when filing a technical report, file a statement of each qualified person responsible for preparing or supervising the preparation of all or part of the technical report, dated, and signed by the qualified person

(a) consenting to the public filing of the technical report;

(b) identifying the document that the technical report supports;

(c) consenting to the use of extracts from, or a summary of, the technical report in the document; and

(d) confirming that the qualified person has read the document and that it fairly and accurately represents the information in the technical report or part that the qualified person is responsible for.

(2) Paragraphs (1)(b), (c) and (d) do not apply to a consent filed with a technical report filed under section 4.1.

(3) If an issuer relies on subsection (2), the issuer must file an updated consent that includes paragraphs (1)(b), (c) and (d) for the first subsequent use of the technical report to support disclosure in a document filed under subsection 4.2(1).

## PART 9 EXEMPTIONS

### Authority to Grant Exemptions

**9.1** (1) The regulator or the securities regulatory authority may, on application, grant an exemption from this Instrument, in whole or in part, subject to such conditions or restrictions as may be imposed in the exemption in response to an application.

(2) Despite subsection (1), in Ontario, only the regulator may grant such an exemption.

(3) Except in Ontario, an exemption referred to in subsection (1) is granted under the statute referred to in Appendix B to National Instrument 14-101 *Definitions* opposite the name of the local jurisdiction.

### Exemptions for Royalty or Similar Interests

**9.2** (1) An issuer whose interest in a mineral project is only a royalty or similar interest is not required to file a technical report to support disclosure in a document under subsection 4.2(1) if

(a) the operator or owner of the mineral project is

(i) a reporting issuer in a jurisdiction of Canada, or

(ii) a producing issuer whose securities trade on a specified exchange and that discloses mineral resources and mineral reserves under an acceptable foreign code;

(b) the issuer identifies in its document under subsection 4.2(1) the source of the scientific and technical information; and

(c) the operator or owner of the mineral project has disclosed the scientific and technical information that is material to the issuer.

(2) An issuer whose interest in a mineral project is only a royalty or similar interest and that does not qualify to use the exemption in subsection (1) is not required to

(a) comply with section 6.2; and

(b) complete those items under Form 43-101F1 that require data verification, inspection of documents, or personal inspection of the property to complete those items.

(3) Paragraphs (2)(a) and (b) only apply if the issuer

(a) has requested but has not received access to the necessary data from the operator or owner and is not able to obtain the necessary information from the public domain;

(b) under Item 3 of Form 43-101F1, states the issuer has requested but has not received access to the necessary data from the operator or owner and is not able to obtain the necessary information from the public domain and describes the content referred to under each item of Form 43-101F1 that the issuer did not complete; and

(c) includes in all scientific and technical disclosure a statement that the issuer has an exemption from completing certain items under Form 43-101F1 in the technical report required to be filed and includes a reference to the title and effective date of that technical report.

**Exemption for Certain Types of Filings**

**9.3** This Instrument does not apply if the only reason an issuer files written disclosure of scientific or technical information is to comply with the requirement under securities legislation to file a copy of a record or disclosure material that was filed with a securities commission, exchange, or regulatory authority in another jurisdiction.

## PART 10 EFFECTIVE DATE AND REPEAL

**Effective Date**

**10.1** This Instrument comes into force on June 30, 2011.

**Repeal**

**10.2** National Instrument 43-101 *Standards of Disclosure for Mineral Projects,* which came into force on December 30, 2005, is repealed.

**FORM 43-101F1**
***TECHNICAL REPORT***

**Table of Contents**

**TITLE**

CONTENTS OF THE TECHNICAL REPORT

Title Page
Date and Signature Page
Table of Contents
Illustrations

Item 1: Summary
Item 2: Introduction
Item 3: Reliance on Other Experts
Item 4: Property Description and Location
Item 5: Accessibility, Climate, Local Resources, Infrastructure and Physiography
Item 6: History
Item 7: Geological Setting and Mineralization
Item 8: Deposit Types
Item 9: Exploration
Item 10: Drilling
Item 11: Sample Preparation, Analyses and Security
Item 12: Data Verification
Item 13: Mineral Processing and Metallurgical Testing
Item 14: Mineral Resource Estimates
Item 15: Mineral Reserve Estimates
Item 16: Mining Methods
Item 17: Recovery Methods
Item 18: Project Infrastructure
Item 19: Market Studies and Contracts
Item 20: Environmental Studies, Permitting and Social or Community Impact
Item 21: Capital and Operating Costs
Item 22: Economic Analysis
Item 23: Adjacent Properties
Item 24: Other Relevant Data and Information
Item 25: Interpretation and Conclusions
Item 26: Recommendations
Item 27: References

**FORM 43-101F1**
***TECHNICAL REPORT***

***INSTRUCTIONS:***

*(1) The objective of the technical report is to provide a summary of material scientific and technical information concerning mineral exploration, development, and production activities on a mineral property that is material to an issuer. This Form sets out the requirements for the preparation and content of a technical report.*

*(2) Terms used in this Form that are defined or interpreted in National Instrument 43-101 Standards of Disclosure for Mineral Projects (the "Instrument") will have that definition or interpretation. In addition, a general definition instrument has been adopted as National Instrument 14-101 Definitions that contains definitions of certain terms used in more than one national instrument. Readers of this Form should review both these national instruments for defined terms.*

*(3) The qualified person preparing the technical report should keep in mind that the intended audience is the investing public and their advisors who, in most cases, will not be mining experts. Therefore, to the extent possible, technical reports should be simplified and understandable to a reasonable investor. However, the technical report should include sufficient context and cautionary language to allow a reasonable investor to understand the nature, importance, and limitations of the data, interpretations, and conclusions summarized in the technical report.*

*(4) The qualified person preparing the technical report must use all of the headings of Items 1 to 14 and 23 to 27 in this Form and provide the information specified under each heading. For advanced properties, the qualified person must also use the headings of Items 15 to 22 and include the information required under each of these headings. The qualified person may create sub-headings. Disclosure included under one heading is not required to be repeated under another heading.*

*(5) The qualified person preparing the technical report may refer to information in a technical report previously filed by the issuer for the subject property if the information is still current and the technical report identifies the title, date and author of the previously filed technical report. However, the qualified person must still summarize or quote the referenced information in the current technical report and may not disclaim responsibility for the referenced information. Except as permitted by subsection 4.2(3) of the Instrument, an issuer may not update or revise a previously filed technical report by filing an addendum.*

*(6) While the Form mandates the headings and general format of the technical report, the qualified person preparing the technical report is responsible for determining the level of detail required under each Item based on the qualified person's assessment of the relevance and significance of the information.*

*(7) The technical report may only contain disclaimers that are in accordance with section 6.4 of the Instrument and Item 3 of this Form.*

*(8) Since a technical report is a summary document the inclusion and filing of comprehensive appendices is not generally necessary to comply with the requirements of the Form.*

*(9) The Instrument requires certificates and consents of qualified persons, prepared in accordance with sections 8.1 and 8.3 respectively, to be filed at the same time as the technical report. The Instrument does not specifically require the issuer to file the certificate of qualified person as a separate document. It is generally acceptable for the qualified person to include the certificate in the technical report and to use the certificate as the date and signature page.*

**CONTENTS OF THE TECHNICAL REPORT**

**Title Page –** Include a title page setting out the title of the technical report, the general location of the mineral project, the name and professional designation of each qualified person, and the effective date of the technical report.

**Date and Signature Page** – The technical report must have a signature page, at either the beginning or end of the technical report, signed in accordance with section 5.2 of the Instrument. The effective date of the technical report and date of signing must be on the signature page.

**Table of Contents –** Provide a table of contents listing the contents of the technical report, including figures and tables.

**Illustrations –** Technical reports must be illustrated by legible maps, plans and sections, all prepared at an appropriate scale to distinguish important features. Maps must be dated and include a legend, author or information source, a scale in bar or grid form, and an arrow indicating north. All technical reports must be accompanied by a location or index map and a compilation map outlining the general geology of the property. In addition, all technical reports must include more detailed maps showing all important features described in the text, relative to the property boundaries, including but not limited to

(a) for exploration projects, areas of previous or historical exploration, and the location of known mineralization, geochemical or geophysical anomalies, drilling, and mineral deposits;

(b) for advanced properties other than properties under development or in production, the location and surficial outline of mineral resources, mineral reserves, and, to the extent known, areas for potential access and infrastructure; and

(c) for properties under development or in production, the location of pit limits or underground development, plant sites, tailings storage areas, waste disposal areas, and all other significant infrastructure features.

If information is used from other sources in preparing maps, drawings, or diagrams, disclose the source of the information. If adjacent or nearby properties have an important bearing on the potential of the subject property, the location of the properties and any relevant mineralized structures discussed in the report must be shown in relationship to the subject property.

***INSTRUCTION:*** *Summarize and simplify the illustrations so that they are legible and suitable for electronic filing. For ease of reference, consider inserting the illustration in the text of the report in relative proximity to the text they illustrate.*

**Requirements for All Technical Reports**

**Item 1:** **Summary** – Briefly summarize important information in the technical report, including property description and ownership, geology and mineralization, the status of exploration, development and operations, mineral resource and mineral reserve estimates, and the qualified person's conclusions and recommendations.

**Item 2:** **Introduction** – Include a description of

(a) the issuer for whom the technical report is prepared;

(b) the terms of reference and purpose for which the technical report was prepared;

(c) the sources of information and data contained in the technical report or used in its preparation, with citations if applicable; and

(d) the details of the personal inspection on the property by each qualified person or, if applicable, the reason why a personal inspection has not been completed.

**Item 3:** **Reliance on Other Experts** – A qualified person who prepares or supervises the preparation of all or part of a technical report may include a limited disclaimer of responsibility if:

(a) The qualified person is relying on a report, opinion, or statement of another expert who is not a qualified person, or on information provided by the issuer, concerning legal, political, environmental, or tax matters relevant to the technical report, and the qualified person identifies

(i) the source of the information relied upon, including the date, title, and author of any report, opinion, or statement;

(ii) the extent of reliance; and

(iii) the portions of the technical report to which the disclaimer applies.

(b) The qualified person is relying on a report, opinion, or statement of another expert who is not a qualified person, concerning diamond or other gemstone valuations, or the pricing of commodities for which pricing is not publicly available, and the qualified person discloses

(i) the date, title, and author of the report, opinion, or statement;

(ii) the qualifications of the other expert and why it is reasonable for the qualified person to rely on the other expert;

(iii) any significant risks associated with the valuation or pricing; and

(iv) any steps the qualified person took to verify the information provided.

**Item 4: Property Description and Location** – To the extent applicable, describe

(a) the area of the property in hectares or other appropriate units;

(b) the location, reported by an easily recognizable geographic and grid location system;

(c) the type of mineral tenure (claim, license, lease, etc.) and the identifying name or number of each;

(d) the nature and extent of the issuer's title to, or interest in, the property including surface rights, legal access, the obligations that must be met to retain the property, and the expiration date of claims, licences, or other property tenure rights;

(e) to the extent known, the terms of any royalties, back-in rights, payments, or other agreements and encumbrances to which the property is subject;

(f) To the extent known, all environmental liabilities to which the property is subject;

(g) to the extent known, the permits that must be acquired to conduct the work proposed for the property, and if the permits have been obtained; and

(h) to the extent known, any other significant factors and risks that may affect access, title, or the right or ability to perform work on the property.

**Item 5: Accessibility, Climate, Local Resources, Infrastructure and Physiography** – Describe

(a) topography, elevation, and vegetation;

(b) the means of access to the property;

(c) the proximity of the property to a population centre, and the nature of transport;

(d) to the extent relevant to the mineral project, the climate and the length of the operating season; and

(e) to the extent relevant to the mineral project, the sufficiency of surface rights for mining operations, the availability and sources of power, water, mining personnel, potential tailings storage areas, potential waste disposal areas, heap leach pad areas, and potential processing plant sites.

**Item 6: History** – To the extent known, describe

(a) the prior ownership of the property and ownership changes;

(b) the type, amount, quantity, and general results of exploration and development work undertaken by any previous owners or operators;

(c) any significant historical mineral resource and mineral reserve estimates in accordance with section 2.4 of the Instrument; and

(d) any production from the property.

***INSTRUCTION:*** *If the technical report includes work that was conducted outside the current property boundaries, clearly distinguish this work from the work conducted on the property that is the subject of the technical report.*

**Item 7: Geological Setting and Mineralization** – Describe

(a) the regional, local, and property geology; and

(b) the significant mineralized zones encountered on the property, including a summary of the surrounding rock types, relevant geological controls, and the length, width, depth, and continuity of the mineralization, together with a description of the type, character, and distribution of the mineralization.

**Item 8: Deposit Types** – Describe the mineral deposit type(s) being investigated or being explored for and the geological model or concepts being applied in the investigation and on the basis of which the exploration program is planned.

**Item 9: Exploration** – Briefly describe the nature and extent of all relevant exploration work other than drilling, conducted by or on behalf of, the issuer, including

(a) the procedures and parameters relating to the surveys and investigations;

(b) the sampling methods and sample quality, including whether the samples are representative, and any factors that may have resulted in sample biases;

(c) relevant information of location, number, type, nature, and spacing or density of samples collected, and the size of the area covered; and

(d) the significant results and interpretation of the exploration information.

***INSTRUCTION:*** *If exploration results from previous operators are included, clearly identify the work conducted by or on behalf of the issuer.*

**Item 10: Drilling** – Describe

(a) the type and extent of drilling including the procedures followed and a summary and interpretation of all relevant results;

(b) any drilling, sampling, or recovery factors that could materially impact the accuracy and reliability of the results;

(c) for a property other than an advanced property

(i) the location, azimuth, and dip of any drill hole, and the depth of the relevant sample intervals;

(ii) the relationship between the sample length and the true thickness of the mineralization, if known, and if the orientation of the mineralization is unknown, state this; and

(iii) the results of any significantly higher grade intervals within a lower grade intersection.

***INSTRUCTIONS:***

*(1) For properties with mineral resource estimates, the qualified person may meet the requirements under Item 10 (c) by providing a drill plan and representative examples of drill sections through the mineral deposit.*

*(2) If drill results from previous operators are included, clearly identify the results of drilling conducted by or on behalf of the issuer.*

**Item 11: Sample Preparation, Analyses, and Security** – Describe

(a) sample preparation methods and quality control measures employed before dispatch of samples to an analytical or testing laboratory, the method or process of sample splitting and reduction, and the security measures taken to ensure the validity and integrity of samples taken;

(b) relevant information regarding sample preparation, assaying and analytical procedures used, the name and location of the analytical or testing laboratories, the relationship of the laboratory to the issuer, and whether the laboratories are certified by any standards association and the particulars of any certification;

(c) a summary of the nature, extent, and results of quality control procedures employed and quality assurance actions taken or recommended to provide adequate confidence in the data collection and processing; and

(d) the author's opinion on the adequacy of sample preparation, security, and analytical procedures.

**Item 12: Data Verification** – Describe the steps taken by the qualified person to verify the data in the technical report, including

(a) the data verification procedures applied by the qualified person;

(b) any limitations on or failure to conduct such verification, and the reasons for any such limitations or failure; and

(c) the qualified person's opinion on the adequacy of the data for the purposes used in the technical report.

**Item 13:** **Mineral Processing and Metallurgical Testing** – If mineral processing or metallurgical testing analyses have been carried out, discuss

(a) the nature and extent of the testing and analytical procedures, and provide a summary of the relevant results;

(b) the basis for any assumptions or predictions regarding recovery estimates;

(c) to the extent known, the degree to which the test samples are representative of the various types and styles of mineralization and the mineral deposit as a whole; and

(d) to the extent known, any processing factors or deleterious elements that could have a significant effect on potential economic extraction.

**Item 14:** **Mineral Resource Estimates** – A technical report disclosing mineral resources must

(a) provide sufficient discussion of the key assumptions, parameters, and methods used to estimate the mineral resources, for a reasonably informed reader to understand the basis for the estimate and how it was generated;

(b) comply with all disclosure requirements for mineral resources set out in the Instrument, including sections 2.2, 2.3, and 3.4;

(c) when the grade for a multiple commodity mineral resource is reported as metal or mineral equivalent, report the individual grade of each metal or mineral and the metal prices, recoveries, and any other relevant conversion factors used to estimate the metal or mineral equivalent grade; and

(d) include a general discussion on the extent to which the mineral resource estimates could be materially affected by any known environmental, permitting, legal, title, taxation, socio-economic, marketing, political, or other relevant factors.

***INSTRUCTIONS:***

*(1) A statement of quantity and grade or quality is an estimate and should be rounded to reflect the fact that it is an approximation.*

*(2) Where multiple cut-off grade scenarios are presented, the qualified person must identify and highlight the base case, or preferred scenario. All estimates resulting from each of the cut-off grade scenarios must meet the test of reasonable prospect of economic extraction.*

**Additional Requirements for Advanced Property Technical Reports**

**Item 15:** **Mineral Reserve Estimates** – A technical report disclosing mineral reserves must

(a) provide sufficient discussion and detail of the key assumptions, parameters, and methods used for a reasonably informed reader to understand how the qualified person converted the mineral resources to mineral reserves;

(b) comply with all disclosure requirements for mineral reserves set out in the Instrument, including sections 2.2, 2.3, and 3.4;

(c) when the grade for a multiple commodity mineral reserve is reported as metal or mineral equivalent, report the individual grade of each metal or mineral and the metal prices, recoveries, and any other relevant conversion factors used to estimate the metal or mineral equivalent grade; and

(d) discuss the extent to which the mineral reserve estimates could be materially affected by mining, metallurgical, infrastructure, permitting, and other relevant factors.

**Item 16:** **Mining Methods** – Discuss the current or proposed mining methods and provide a summary of the relevant information used to establish the amenability or potential amenability of the mineral resources or mineral reserves to the proposed mining methods. Consider and, where relevant, include

(a) geotechnical, hydrological, and other parameters relevant to mine or pit designs and plans;

(b) production rates, expected mine life, mining unit dimensions, and mining dilution factors used;

(c) requirements for stripping, underground development, and backfilling; and

(d) required mining fleet and machinery.

***INSTRUCTION:*** *Preliminary economic assessments, pre-feasibility studies, and feasibility studies generally analyse and assess the same geological, engineering, and economic factors with increasing detail and precision. Therefore, the criteria for Items 16 to 22 can be used as a framework for reporting the results of all three studies.*

**Item 17:** **Recovery Methods** – Discuss reasonably available information on test or operating results relating to the recoverability of the valuable component or commodity and amenability of the mineralization to the proposed processing methods. Consider and, where relevant, include

(a) a description or flow sheet of any current or proposed process plant;

(b) plant design, equipment characteristics and specifications, as applicable; and

(c) current or projected requirements for energy, water, and process materials.

**Item 18:** **Project Infrastructure** – Provide a summary of infrastructure and logistic requirements for the project, which could include roads, rail, port facilities, dams, dumps, stockpiles, leach pads, tailings disposal, power, and pipelines, as applicable.

**Item 19:** **Market Studies and Contracts**

(a) Provide a summary of reasonably available information concerning markets for the issuer's production, including the nature and material terms of any agency relationships. Discuss the nature of any studies or analyses completed by the issuer, including any relevant market studies, commodity price projections, product valuations, market entry strategies, or product specification requirements. Confirm that the qualified person has reviewed these studies and analyses and that the results support the assumptions in the technical report.

(b) Identify any contracts material to the issuer that are required for property development, including mining, concentrating, smelting, refining, transportation, handling, sales and hedging, and forward sales contracts or arrangements. State which contracts are in place and which are still under negotiation. For contracts that are in place, discuss whether the terms, rates or charges are within industry norms.

**Item 20 :** **Environmental Studies, Permitting, and Social or Community Impact** – Discuss reasonably available information on environmental, permitting, and social or community factors related to the project. Consider and, where relevant, include

(a) a summary of the results of any environmental studies and a discussion of any known environmental issues that could materially impact the issuer's ability to extract the mineral resources or mineral reserves;

(b) requirements and plans for waste and tailings disposal, site monitoring, and water management both during operations and post mine closure;

(c) project permitting requirements, the status of any permit applications, and any known requirements to post performance or reclamation bonds;

(d) a discussion of any potential social or community related requirements and plans for the project and the status of any negotiations or agreements with local communities; and

(e) a discussion of mine closure (remediation and reclamation) requirements and costs.

**Item 21:** **Capital and Operating Costs** – Provide a summary of capital and operating cost estimates, with the major components set out in tabular form. Explain and justify the basis for the cost estimates.

**Item 22:** **Economic Analysis** – Provide an economic analysis for the project that includes

(a) a clear statement of and justification for the principal assumptions;

(b) cash flow forecasts on an annual basis using mineral reserves or mineral resources and an annual production schedule for the life of project;

(c) a discussion of net present value (NPV), internal rate of return (IRR), and payback period of capital with imputed or actual interest;

(d) a summary of the taxes, royalties, and other government levies or interests applicable to the mineral project or to production, and to revenue or income from the mineral project; and

(e) sensitivity or other analysis using variants in commodity price, grade, capital and operating costs, or other significant parameters, as appropriate, and discuss the impact of the results.

***INSTRUCTIONS:***

*(1) Producing issuers may exclude the information required under Item 22 for technical reports on properties currently in production unless the technical report includes a material expansion of current production.*

*(2) The economic analysis in technical reports must comply with paragraphs 2.3(1)(b) and (c), subsections 2.3(3) and (4), and paragraph 3.4(e), of the Instrument, including any required cautionary language.*

**Requirements for All Technical Reports**

**Item 23:** **Adjacent Properties** – A technical report may include relevant information concerning an adjacent property if

(a) such information was publicly disclosed by the owner or operator of the adjacent property;

(b) the source of the information is identified;

(c) the technical report states that its qualified person has been unable to verify the information and that the information is not necessarily indicative of the mineralization on the property that is the subject of the technical report;

(d) the technical report clearly distinguishes between the information from the adjacent property and the information from the property that is the subject of the technical report; and

(e) any historical estimates of mineral resources or mineral reserves are disclosed in accordance with paragraph 2.4(a) of the Instrument.

**Item 24:** **Other Relevant Data and Information** – Include any additional information or explanation necessary to make the technical report understandable and not misleading.

**Item 25:** **Interpretation and Conclusions** – Summarize the relevant results and interpretations of the information and analysis being reported on. Discuss any significant risks and uncertainties that could reasonably be expected to affect the reliability or confidence in the exploration information, mineral resource or mineral reserve estimates, or projected economic outcomes. Discuss any reasonably foreseeable impacts of these risks and uncertainties to the project's potential economic viability or continued viability. A technical report concerning exploration information must include the conclusions of the qualified person.

**Item 26:** **Recommendations** – Provide particulars of recommended work programs and a breakdown of costs for each phase. If successive phases of work are recommended, each phase must culminate in a decision point. The recommendations must not apply to more than two phases of work. The recommendations must state whether advancing to a subsequent phase is contingent on positive results in the previous phase.

***INSTRUCTION:*** *In some specific cases, the qualified person may not be in a position to make meaningful recommendations for further work. Generally, these situations will be limited to properties under development or in production where material*

*exploration activities and engineering studies have largely concluded. In such cases, the qualified person should explain why they are not making further recommendations.*

**Item 27:** **References** – Include a detailed list of all references cited in the technical report.

**COMPANION POLICY 43-101CP**
**TO NATIONAL INSTRUMENT 43-101**
***STANDARDS OF DISCLOSURE FOR MINERAL PROJECTS***

**Table of Contents**


| PART | TITLE |
|---|---|
| | GENERAL GUIDANCE |
| PART 1 | DEFINITIONS AND INTERPRETATION |
| | 1.1 Definitions |
| | 1.5 Independence |
| PART 2 | REQUIREMENTS APPLICABLE TO ALL DISCLOSURE |
| | 2.1 Requirements Applicable to All Disclosure |
| | 2.2 All Disclosure of Mineral Resources or Mineral Reserves |
| | 2.3 Restricted Disclosure |
| | 2.4 Disclosure of Historical Estimates |
| PART 3 | ADDITIONAL REQUIREMENTS FOR WRITTEN DISCLOSURE |
| | 3.3 Requirements Applicable to Written Disclosure of Exploration Information |
| | 3.5 Exception for Written Disclosure Already Filed |
| PART 4 | OBLIGATION TO FILE A TECHNICAL REPORT |
| | 4.2 Obligation to File a Technical Report in Connection with Certain Disclosure about Mineral Projects on Material Properties |
| | 4.3 Required Form of Technical Report |
| PART 5 | AUTHOR OF TECHNICAL REPORT |
| | 5.1 Prepared by a Qualified Person |
| | 5.2 Execution of Technical Report |
| | 5.3 Independent Technical Report |
| PART 6 | PREPARATION OF TECHNICAL REPORT |
| | 6.1 The Technical Report |
| | 6.2 Current Personal Inspection |
| | 6.3 Maintenance of Records |
| | 6.4 Limitation on Disclaimers |
| PART 7 | USE OF FOREIGN CODE |
| | 7.1 Use of Foreign Code |
| PART 8 | CERTIFICATES AND CONSENTS OF QUALIFIED PERSONS FOR TECHNICAL REPORTS |
| | 8.1 Certificates of Qualified Persons |
| | 8.2 Addressed to Issuer |
| | 8.3 Consents of Qualified Persons |
| PART 9 | EXEMPTIONS |
| | 9.2 Exemptions for Royalty or Similar Interests |
| | APPENDICES |
| | Appendix A – Accepted Foreign Associations and Membership Designations |
| | Appendix B – Example of Consent of Qualified Person |

**COMPANION POLICY 43-101CP**
**TO NATIONAL INSTRUMENT 43-101**
***STANDARDS OF DISCLOSURE FOR MINERAL PROJECTS***

This companion policy (the "Policy") sets out the views of the Canadian securities regulatory authorities (the "securities regulatory authorities" or "we") as to how we interpret and apply certain provisions of National Instrument 43-101 and Form 43-101F1 (the "Instrument").

**GENERAL GUIDANCE**

(1) **Application of the Instrument** – The definition of "disclosure" in the Instrument includes oral and written disclosure. The Instrument establishes standards for disclosure of scientific and technical information regarding mineral projects and requires that the disclosure be based on a technical report or other information prepared by or under the supervision of a qualified person. The Instrument does not apply to disclosure concerning petroleum, natural gas, bituminous sands or shales, groundwater, coal bed methane, or other substances that do not fall within the meaning of the term "mineral project" in section 1.1 of the Instrument.

(2) **Supplements Other Requirements** – The Instrument supplements other continuous disclosure requirements of securities legislation that apply to reporting issuers in all business sectors.

(3) **Forward-Looking Information –** Part 4 of National Instrument 51-102 *Continuous Disclosure Obligations* (NI 51-102) sets out the requirements for disclosing forward-looking information. Frequently, scientific and technical information about a mineral project includes or is based on forward-looking information. A mining issuer must comply with the requirements of Part 4A of NI 51-102, including identifying forward-looking information, stating material factors and assumptions used, and providing the required cautions. Examples of forward-looking information include metal price assumptions, cash flow forecasts, projected capital and operating costs, metal or mineral recoveries, mine life and production rates, and other assumptions used in preliminary economic assessments, pre-feasibility studies, and feasibility studies.

(4) **Materiality** – An issuer should determine materiality in the context of the issuer's overall business and financial condition taking into account qualitative and quantitative factors, assessed in respect of the issuer as a whole**.**

In making materiality judgements, an issuer should consider a number of factors that cannot be captured in a simple bright-line standard or test, including the potential effect on both the market price and value of the issuer's securities in light of the current market activity. An assessment of materiality depends on the context. Information that is immaterial today could be material tomorrow; an item of information that is immaterial alone could be material if it is aggregated with other items.

(5) **Property Material to the Issuer** – An actively trading mining issuer, in most circumstances, will have at least one material property. We will generally assess an issuer's view of the materiality of a property based on the issuer's disclosure record, its deployment of resources, and other indicators. For example, we will likely conclude that a property is material if

(a) the issuer's disclosure record is focused on the property;

(b) the issuer's disclosure indicates or suggests the results are significant or important;

(c) the cumulative and projected acquisition costs or proposed exploration expenditures are significant compared to the issuer's other material properties; or

(d) the issuer is raising significant money or devoting significant resources to the exploration and development of the property.

In determining if a property is material, the issuer should consider how important or significant the property is to the issuer's overall business and in comparison to its other properties. For example

(e) more advanced stage properties will, in most cases, be more material than earlier stage properties;

(f) historical expenditures or book value might not be a good indicator of materiality for an inactive property if the issuer is focussing its resources on new properties;

(g) a small interest in a sizeable property might, in the circumstances, not be material to the issuer;

(h) a royalty or similar interest in an advanced property could be material to the issuer in comparison to its active projects; or

(i) several non-material properties in an area or region, when taken as a whole, could be material to the issuer.

(6) **Industry Best Practices Guidelines** – While the Instrument sets standards for disclosure of scientific and technical information about a mineral project, the standards and methodologies for collecting, analysing, and verifying this information are the responsibility of the qualified person. The Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") has published and adopted several industry best practice guidelines to assist qualified persons and other industry practitioners. These guidelines, as amended and supplemented, are posted on www.cim.org, and include

(a) Exploration Best Practice Guidelines – adopted August 20, 2000;

(b) Guidelines for Reporting of Diamond Exploration Results – adopted March 9, 2003; and

(c) Estimation of Mineral Resources and Mineral Reserves Best Practice Guidelines – adopted November 23, 2003, and related commodity-specific appendices.

The Instrument does not specifically require the qualified person to follow the CIM best practices guidelines. However, we think that a qualified person, acting in compliance with the professional standards of competence and ethics established by their professional association, will generally use procedures and methodologies that are consistent with industry standard practices, as established by CIM or similar organizations in other jurisdictions. Issuers that disclose scientific and technical information that does not conform to industry standard practices could be making misleading disclosure, which is an offence under securities legislation.

(7) **Objective Standard of Reasonableness** – Where a determination about the definitions or application of a requirement in the Instrument turns on reasonableness, the test is objective, not subjective. It is not sufficient for an officer of an issuer or a qualified person to determine that they personally believe the matter under consideration. The individual must form an opinion as to what a reasonable person would believe in the circumstances.

(8) **Improper Use of Terms in the French Language** – For an issuer preparing its disclosure using the French language, the words "gisement" and "gîte" have different meanings and using them interchangeably or in the wrong context may be misleading. The word "gisement" means a mineral deposit that is a continuous, well-defined mass of material containing a sufficient volume of mineralized material that can be or has been mined legally and economically. The word "gîte" means a mineral deposit that is a continuous, defined mass of material, containing a volume of mineralized material that has had no demonstration of economic viability.

## PART 1 DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

(1) **"acceptable foreign code" –** The definition of "acceptable foreign code" in the Instrument lists five internationally recognized foreign codes that govern the estimation and disclosure of mineral resources and mineral reserves. The JORC Code, PERC Code, SAMREC Code, and Certification Code use mineral resource and mineral reserve definitions and categories that are substantially the same as the CIM definitions mandated in the Instrument. These codes also use mineral resource and mineral reserve categories that are based on or consistent with the International Reporting Template, published by the Committee for Mineral Reserves International Reporting Standards ("the CRIRSCO Template"), as amended.

We think other foreign codes will generally meet the test in the definition if they

(a) have been adopted or recognized by appropriate government authorities or professional organizations in the foreign jurisdiction; and

(b) use mineral resource and mineral reserve categories that are based on the CRIRSCO Template, and are substantially the same as the CIM definitions mandated in the Instrument, the JORC Code, the PERC Code, the SAMREC Code, and the Certification Code, as amended and supplemented.

We will publish CSA Staff Notices periodically listing the codes that CSA members' staff think satisfy the definition of "acceptable foreign code". We will also consider submissions from market participants regarding the proposed addition of foreign codes to the list. Submissions should explain the basis for concluding that the proposed foreign code meets the test in the definition and include appropriate supporting documentation.

(2) **"effective date"** – This is the cut-off date for the scientific and technical information included in the technical report. Under section 8.1 of the Instrument, the qualified person must provide their certificate as at the effective date of the technical report and specify this date in their certificate. The effective date can precede the date of signing the technical report but if there is too long a period between these dates, the issuer is exposed to the risk that new material information could become available and the technical report would then not be current.

(3) **"mineral project" –** The definition of "mineral project" in the Instrument includes a royalty or similar interest. Scientific and technical disclosure regarding all types of royalty interests in a mineral project is subject to the Instrument.

(4) **"preliminary economic assessment" –** The term "preliminary economic assessment", which can include a study commonly referred to as a scoping study, is defined in the Instrument. A preliminary economic assessment might be based on measured, indicated, or inferred mineral resources, or a combination of any of these. We consider these types of economic analyses to include disclosure of forecast mine production rates that might contain capital costs to develop and sustain the mining operation, operating costs, and projected cash flows.

(5) **"professional association" –** Paragraph (a)(ii) of the definition of "professional association" in the Instrument includes a test for determining what constitutes an acceptable foreign association. In assessing whether we think a foreign professional association meets this test, we will consider the reputation of the association and whether it is substantially similar to a professional association in a jurisdiction of Canada.

Appendix A to the Policy provides a list of the foreign associations that we think meet all the tests in the definition as of the effective date of the Instrument. We will publish updates to the list periodically. An issuer that wishes to rely on a qualified person that is a member of a professional association not included in Appendix A but which the issuer believes meets the tests in the Instrument, may make submissions to have the association added to Appendix A. Submissions should include appropriate supporting documentation. The issuer should allow sufficient time for its submissions to be considered before naming the qualified person in connection with its disclosure or filing any technical report signed by the qualified person.

The listing of a professional association on Appendix A is only for purposes of the Instrument and does not supersede or alter local requirements where geoscience or engineering is a regulated profession.

(6) **definitions that include "property" –** The Instrument defines two different types of properties (early stage exploration, advanced) and requires a technical report to summarize material information about the subject property. We consider a property, in the context of the Instrument, to include multiple mineral claims or other documents of title that are contiguous or in such close proximity that any underlying mineral deposits would likely be developed using common infrastructure.

(7) **"qualified person" –** The definition of "qualified person" in the Instrument does not include engineering and geoscience technicians, engineers and geoscientists in training, and equivalent designations that restrict the individual's scope of practice or require the individual to practise under the supervision of another professional engineer, professional geoscientist, or equivalent**.**

Paragraph (d) of the definition requires a qualified person to be "in good standing with a professional association". We interpret this to include satisfying any related registration, licensing, or similar requirements. Canadian provincial and territorial legislation requires a qualified person to be registered if practising in a jurisdiction of Canada. It is the responsibility of the qualified person, in compliance with their professional association's code of ethics, to comply with laws requiring licensure of geoscientists and engineers.

Paragraph (e) of the definition includes a test for what constitutes an acceptable membership designation in a foreign professional association. Appendix A to the Policy provides a list of the membership designations that we think meet this test as of the effective date of the Instrument. We will update the list periodically. In assessing whether we think a membership designation meets the test, we will consider whether it is substantially similar to a membership designation in a professional association in a jurisdiction of Canada.

Subparagraph (e)(ii)(B) includes the concept of "demonstrated expertise in the field of mineral exploration or mining". We generally interpret this to mean having at least five years of professional experience and satisfying an additional entrance requirement relating to level of responsibility. Some examples of such a requirement are:

(a) at least three years in a position of responsibility where the person was depended on for significant participation and decision-making;

(b) experience of a responsible nature and involving the exercise of independent judgment in at least three of those years;

(c) at least five years in a position of major responsibility, or a senior technical position of responsibility.

(8) **"technical report" –** A report may constitute a "technical report" as defined in the Instrument, even if prepared considerably before the date the technical report is required to be filed, provided the information in the technical report remains accurate and complete as at the required filing date. However, a report that an issuer files that is not required under the Instrument will not be considered a technical report until the Instrument requires the issuer to file it and the issuer has filed the required certificates and consents of qualified persons.

The definition requires the technical report to include a summary of all material information about the subject property. The qualified person is responsible for preparing the technical report. Therefore, it is the qualified person, not the issuer, who has the responsibility of determining the materiality of the scientific or technical information to be included in the technical report.

**1.5 Independence**

(1) **Guidance on Independence –** Section 1.5 of the Instrument provides the test an issuer and a qualified person must apply to determine whether a qualified person is independent of the issuer. When an independent qualified person is required, an issuer must always apply the test in section 1.5 to confirm that the requirement is met.

Applying this test, the following are examples of when we would consider that a qualified person is not independent. These examples are not a complete list of non-independence situations.

We consider a qualified person is not independent when the qualified person

(a) is an employee, insider, or director of the issuer;

(b) is an employee, insider, or director of a related party of the issuer;

(c) is a partner of any person or company in paragraph (a) or (b);

(d) holds or expects to hold securities, either directly or indirectly, of the issuer or a related party of the issuer;

(e) holds or expects to hold securities, either directly or indirectly, in another issuer that has a direct or indirect interest in the property that is the subject of the technical report or in an adjacent property;

(f) is an employee, insider, or director of another issuer that has a direct or indirect interest in the property that is the subject of the technical report or in an adjacent property;

(g) has or expects to have, directly or indirectly, an ownership, royalty, or other interest in the property that is the subject of the technical report or an adjacent property; or

(h) has received the majority of their income, either directly or indirectly, in the three years preceding the date of the technical report from the issuer or a related party of the issuer.

For the purposes of (d) above, a related party of the issuer means an affiliate, associate, subsidiary, or control person of the issuer as those terms are defined in securities legislation.

(2) **Independence Not Compromised –** In some cases, it might be reasonable to consider the qualified person's independence is not compromised even though the qualified person holds an interest in the issuer's

securities, the securities of another issuer with an interest in the subject property, or in an adjacent property. The issuer needs to determine whether a reasonable person would consider such interest would interfere with the qualified person's judgement regarding the preparation of the technical report.

## PART 2 REQUIREMENTS APPLICABLE TO ALL DISCLOSURE

### 2.1 Requirements Applicable to All Disclosure

(1) **Disclosure is the Responsibility of the Issuer –** Primary responsibility for public disclosure remains with the issuer and its directors and officers. The qualified person is responsible for preparing or supervising the preparation of the technical report and providing scientific and technical advice in accordance with applicable professional standards. The proper use, by or on behalf of the issuer, of the technical report and other scientific and technical information provided by the qualified person is the responsibility of the issuer and its directors and officers.

The onus is on the issuer and its directors and officers and, in the case of a document filed with a securities regulatory authority, each signatory to the document, to ensure that disclosure in the document is consistent with the related technical report or advice. An issuer should consider having the qualified person review disclosure that summarizes or restates the technical report or the technical advice or opinion to ensure that the disclosure is accurate.

(2) **Material Information not yet Confirmed by a Qualified Person** – Securities legislation requires an issuer to disclose material facts and to make timely disclosure of material changes. We recognize that there can be circumstances in which an issuer expects that certain information concerning a mineral project may be material notwithstanding the fact that a qualified person has not prepared or supervised the preparation of the information. In this situation, the issuer may file a confidential material change report concerning this information while a qualified person reviews the information. Once a qualified person has confirmed the information, the issuer can issue a news release and the basis of confidentiality will end.

During the period of confidentiality, persons in a special relationship to the issuer are prohibited from tipping or trading until the information is disclosed to the public. National Policy 51-201 *Disclosure Standards* provides further guidance about materiality and timely disclosure obligations.

(3) **Use of Plain Language** – An issuer should apply plain language principles when preparing disclosure regarding mineral projects on its material properties, keeping in mind that the investing public are often not mining experts. An issuer should present written disclosure in an easy to read format using clear and unambiguous language and, wherever possible, should present data in table format. This includes information in the technical report, to the extent possible. We recognize that the technical report does not always lend itself well to plain language and therefore the issuer might want to consult the responsible qualified person when restating the data and conclusions from a technical report in its public disclosure.

**2.2 All Disclosure of Mineral Resources or Mineral Reserves – Use of GSC Paper 88-21** A qualified person estimating mineral resources or mineral reserves for coal may follow the guidelines of Paper 88-21 of the Geological Survey of Canada: A Standardized Coal Resource/Reserve Reporting System for Canada, as amended ("Paper 88-21"). However, for all disclosure of mineral resources or mineral reserves for coal, section 2.2 of the Instrument requires an issuer to use the equivalent mineral resource or mineral reserve categories set out in the CIM Definition Standards and not the categories set out in Paper 88-21.

### 2.3 Restricted Disclosure

(1) **Economic Analysis –** Subject to subsection 2.3(3) of the Instrument, paragraph 2.3(1)(b) of the Instrument prohibits the disclosure of the results of an economic analysis that includes or is based on inferred mineral resources, an historical estimate, or an exploration target.

CIM considers the confidence in inferred mineral resources is insufficient to allow the meaningful application of technical and economic parameters or to enable an evaluation of economic viability worthy of public disclosure. The Instrument extends this prohibition to exploration targets because such targets are conceptual and have even less confidence than inferred mineral resources. The Instrument also extends the prohibition to historical estimates because they have not been demonstrated or verified to the standards required for mineral resources or mineral reserves and, therefore, cannot be used in an economic analysis suitable for public disclosure.

(2) **Use of Term "Ore"** – We consider the use of the word "ore" in the context of mineral resource estimates to be potentially misleading because "ore" implies technical feasibility and economic viability that should only be attributed to mineral reserves.

(3) **Exceptions –** The Instrument permits an issuer to disclose the results of an economic analysis that uses inferred mineral resources, provided the issuer complies with the requirements of subsection 2.3(3). The issuer must also include the cautionary statement under paragraph 3.4(e) of the Instrument, which applies to disclosure of all economic analyses of mineral resources, to further alert investors to the limitations of the information. The exception under subsection 2.3(3) does not allow an issuer to disclose the results of an economic analysis using an exploration target or an historical estimate.

(4) **Impact of Preliminary Economic Assessment on Previous Feasibility or Pre- Feasibility Studies –** An issuer may disclose the results of a preliminary economic assessment that includes inferred mineral resources, after it has completed a feasibility study or pre-feasibility study that establishes mineral reserves, if the disclosure complies with subsection 2.3(3) of the Instrument. Under paragraph 2.3(3)(c), the issuer must discuss the impact of the preliminary economic assessment on the mineral reserves and feasibility study or pre-feasibility study. This means considering and disclosing whether the existing mineral reserves and feasibility study or pre-feasibility study are still current and valid in light of the key assumptions and parameters used in the preliminary economic assessment.

For example, if the preliminary economic assessment considers the potential economic viability of developing a satellite deposit in conjunction with the main development project, then the existing mineral reserves, feasibility study, and production scenario could still be current. However, if the preliminary economic assessment significantly modifies the key variables in the feasibility study, including metal prices, mine plan, and costs, the feasibility study and mineral reserves might no longer be current.

(5) **Gross Value of Metal or Mineral** – We interpret gross metal value or gross mineral value to include any representation of the potential monetary value of the metal or mineral in the ground that does not take into consideration the costs, recoveries, and other relevant factors associated with the extraction and recovery of the metal or mineral. We think this type of disclosure is misleading because it overstates the potential value of the mineral deposit.

(6) **Cautionary Language and Explanations –** The requirements of subsections 2.3(2), 2.3(3), and 3.4(e) of the Instrument mean the issuer must include the required cautionary statements and explanations each time it makes the disclosure permitted by these exceptions. These subsections also require the cautionary statements to have equal prominence with the rest of the disclosure. We interpret this to mean equal size type and proximate location. The issuer should consider including the cautionary language and explanations in the same paragraph as, or immediately following, the disclosure permitted by these exceptions.

**2.4 Disclosure of Historical Estimates**

(1) **Required Disclosure –** An issuer may disclose an estimate of resources or reserves made before it entered into an agreement to acquire an interest in the property, provided the issuer complies with the conditions set out in section 2.4 of the Instrument. Under this requirement, the issuer must provide the required disclosure each time it discloses the historical estimate, until the issuer has verified the historical estimate as a current mineral resource or mineral reserve. The required cautionary statements must also have equal prominence (see the discussion in subsection 2.3(6) of the Policy).

(2) **Source and Date –** Under paragraph 2.4(a) of the Instrument, the issuer must disclose the source and date of the historical estimate. This means the original source and date of the estimate, not third party documents, databases or other sources, including government databases, which may also report the historical estimate.

(3) **Suitability for Public Disclosure –** Under paragraph 2.4(b) of the Instrument, an issuer that discloses an historical estimate must comment on its relevance and reliability. In determining whether to disclose an historical estimate, an issuer should consider whether the historical estimate is suitable for public disclosure.

(4) **Historical Estimate Categories –** Under paragraph 2.4(d) of the Instrument, an issuer must explain any differences between the categories used in the historical estimate and those set out in sections 1.2 and 1.3 of the Instrument. If the historical estimate was prepared using an acceptable foreign code, the issuer may satisfy this requirement by identifying the acceptable foreign code.

(5) **Technical Report Trigger –** The disclosure of an historical estimate will not trigger the requirement to file a technical report under paragraph 4.2(1)(j) of the Instrument if the issuer discloses the historical estimate in

accordance with section 2.4 of the Instrument, including the cautionary statements required under paragraph 2.4(g).

An issuer could trigger the filing of a technical report under paragraph 4.2(1)(j) if it discloses the historical estimate in a manner that suggests or treats the historical estimate as a current mineral resource or mineral reserve. We will consider an issuer is treating the historical estimate as a current mineral resource or mineral reserve in its disclosure if, for example, it

(a) uses the historical estimate in an economic analysis or as the basis for a production decision;

(b) states it will be adding on or building on the historical estimate; or

(c) adds the historical estimate to current mineral resource or mineral reserve estimates.

## PART 3 ADDITIONAL REQUIREMENTS FOR WRITTEN DISCLOSURE

**3.3 Requirements Applicable to Written Disclosure of Exploration Information – Adjacent Property Information –** It is an offence under securities legislation to make misleading disclosure. An issuer may disclose in writing scientific and technical information about an adjacent property. However, in order for the disclosure not to be misleading, the issuer should clearly distinguish between the information from the adjacent property and its own property and not state or imply the issuer will obtain similar information from its own property.

**3.5 Exception for Written Disclosure Already Filed –** Section 3.5 of the Instrument provides that the disclosure requirements of sections 3.2 and 3.3 and paragraphs 3.4(a), (c) and (d) of the Instrument may be satisfied by referring to a previously filed document that includes the required disclosure. However, the disclosure as a whole must be factual, complete, and balanced and not present or omit information in a manner that is misleading.

## PART 4 OBLIGATION TO FILE A TECHNICAL REPORT

### 4.2 Obligation to File a Technical Report in Connection with Certain Written Disclosure about Mineral Projects on Material Properties

(1) **Information Circular Trigger (4.2(1)(c))**

(a) The requirement for "prospectus-level disclosure" in an information circular does not make this document a "prospectus" such that the prospectus trigger applies. The information circular is a separate trigger that applies only in certain situations specified in the Instrument.

(b) Paragraph 4.2(1)(c) of the Instrument requires the issuer to file technical reports for properties that will be material to the resulting issuer. Often the resulting issuer is not the issuer filing the information circular. In determining if it must file a technical report on a particular property, the issuer should consider if the property will be material to the resulting issuer after the completion of the proposed transaction.

(c) Our view is that the issuer filing the information circular does not need to file a technical report on its SEDAR profile if

(i) the other party to the transaction has filed the technical report;

(ii) the information circular refers to the other party's SEDAR profile; and

(iii) on completion of the transaction, technical reports for all material properties are filed on the resulting issuer's SEDAR profile or the SEDAR profile of a wholly-owned subsidiary.

(2) **Take-Over Bid Circular Trigger (4.2(1)(i)) –** For purposes of the take-over bid circular, the issuer referred to in the introductory language of subsection 4.2(1) of the Instrument and the offeror referred to in paragraph (i) of this subsection are the same entity. Since the offeror is the issuer that files the circular, the technical report trigger applies to properties that are material to the offeror.

(3) **First Time Disclosure Trigger (4.2(1)(j)(i)) –** In most cases, we think that first time disclosure of mineral resources, mineral reserves, or the results of a preliminary economic assessment, on a property material to the issuer will constitute a material change in the affairs of the issuer.

(4) **Property Acquisitions – 45-Day Filing Requirement –** Subsection 4.2(5) of the Instrument requires an issuer in certain cases to file a technical report within 45 days to support first time disclosure of mineral resources, mineral reserves, or the results of a preliminary economic assessment, on a property material to the issuer. Property materiality is not contingent on the issuer having acquired an actual interest in the property or having formal agreements in place. In many cases, the property will become material at the letter of intent stage, even if subject to conditions such as the approval of a third party or completion of a due diligence review. In such cases, the 45-day period will begin to run from the time the issuer first discloses the mineral resources, mineral reserves, or results of a preliminary economic assessment.

(5) **Property Acquisitions – Other Alternatives for Disclosure of Previous Estimates –** If an issuer options or agrees to buy a property material to the issuer, any previous estimates of mineral resources or mineral reserves on the property will be in many cases material information that the issuer must disclose.

The issuer has a number of options available for disclosing the previous estimate without triggering a technical report within 45 days. If the previous estimate is not well-documented, the issuer may choose to disclose this information as an exploration target, in compliance with subsection 2.3(2) of the Instrument. Alternatively, the issuer may be able to disclose the previous estimate as an historical estimate, in compliance with section 2.4 of the Instrument. Both these options require the issuer to include certain cautionary language and prohibit the issuer from using the previous estimates in an economic analysis.

In circumstances where the previous estimate is supported by a technical report prepared for another issuer, the issuer may be able to disclose the previous estimate as a mineral resource or mineral reserve, in compliance with subsection 4.2(7) of the Instrument. In this case, the issuer will still be required to file a technical report. However, it will have up to 180 days to do so.

(6) **Production Decision –** The Instrument does not require an issuer to file a technical report to support a production decision because the decision to put a mineral project into production is the responsibility of the issuer, based on information provided by qualified persons. The development of a mining operation typically involves large capital expenditures and a high degree of risk and uncertainty. To reduce this risk and uncertainty, the issuer typically makes its production decision based on a comprehensive feasibility study of established mineral reserves.

We recognize that there might be situations where the issuer decides to put a mineral project into production without first establishing mineral reserves supported by a technical report and completing a feasibility study. Historically, such projects have a much higher risk of economic or technical failure. To avoid making misleading disclosure, the issuer should disclose that it is not basing its production decision on a feasibility study of mineral reserves demonstrating economic and technical viability and should provide adequate disclosure of the increased uncertainty and the specific economic and technical risks of failure associated with its production decision.

Under paragraph 1.4(e) of Form 51-102F1, an issuer must also disclose in its MD&A whether a production decision or other significant development is based on a technical report.

(7) **Shelf Life of Technical Reports** – Economic analyses in technical reports are based on commodity prices, costs, sales, revenue, and other assumptions and projections that can change significantly over short periods of time. As a result, economic information in a technical report can quickly become outdated. Continued reference to outdated technical reports or economic projections without appropriate context and cautionary language could result in misleading disclosure. Where an issuer has triggered the requirement to file a technical report under subsection 4.2(1), it should consider the current validity of economic assumptions in its existing technical report to determine if the technical report is still current. An issuer might be able to extend the life of a technical report by having a qualified person include appropriate sensitivity analyses of the key economic variables.

(8) **Technical Reports Must be Current and Complete** – A "technical report" as defined in the Instrument must include in summary form all material scientific and technical information about the property. Any time an issuer is required to file a technical report, that report must be complete and current. There should only be one current technical report on a property at any point in time. When an issuer files a new technical report, it will replace any previously filed technical report as the current technical report on that property. This means the new technical report must include any material information documented in a previously filed technical report, to the extent that this information is still current and relevant.

If an issuer gets a new qualified person to update a previously filed technical report prepared by a different qualified person, the new qualified person must take responsibility for the entire technical report, including any information referenced or summarized from a previous technical report.

(9) **Limited Provision for Addendums** – The only exception to the requirement to file a complete technical report is under subsection 4.2(3) of the Instrument. An issuer may file an addendum if it is for a technical report that it originally filed with a preliminary short form prospectus or preliminary long form prospectus and new material scientific or technical information becomes available before the issuance of the final receipt.

(10) **Exception from Requirement to File Technical Report if Information Included in a Previously Filed Technical Report** – Subsection 4.2(8) of the Instrument provides an exemption from the technical report filing requirement if the disclosure document does not contain any new material scientific or technical information about a property that is the subject of a previously filed technical report.

In our view, a change to mineral resources or reserves due to mining depletion from a producing property generally will not constitute new material scientific or technical information as the change should be reasonably predictable based on an issuer's continuous disclosure record.

(11) **Filing on SEDAR** – If an issuer is required under National Instrument 13-101 *System for Electronic Document Analysis and Retrieval (SEDAR)* to be an electronic filer, then all technical reports must be prepared so that the issuer can file them on SEDAR. Figures required in the technical report must be included in the technical report filed on SEDAR and therefore should be prepared in electronic format.

(12) **Reports Not Required by the Instrument** – The securities regulatory authorities in most Canadian jurisdictions require an issuer to file, if not already filed with them, any record or disclosure material that the issuer files with any other securities regulator, including geological reports filed with stock exchanges. In other cases, an issuer might wish to file voluntarily a report in the form of a technical report. The Instrument does not prohibit an issuer from filing such reports in these situations. However, any document purporting to be a technical report must comply with the Instrument.

When an issuer files a report in the form of a technical report that is not required to be filed by the Instrument, the issuer is not required to file a consent of qualified person that complies with subsection 8.3(1) of the Instrument. The issuer should consider filing a cover letter with the report explaining why the issuer is filing the report and indicating that it is not filing the report as a requirement of the Instrument. Alternatively, the issuer should consider filing a modified consent with the report that provides the same information.

(13) **Preliminary Short Form Prospectus –** Under paragraph 4.2(1)(b) of the Instrument, an issuer must file a technical report with a preliminary short form prospectus if the prospectus discloses for the first time mineral resources, mineral reserves, or the results of a preliminary economic assessment that constitute a material change in relation to the issuer, or a change in this information, if the change constitutes a material change in relation to the issuer.

If this information is not disclosed for the first time in the preliminary short form prospectus itself, but is repeated or incorporated by reference into the preliminary short form prospectus, the technical report must still be filed at the same time as the preliminary short form prospectus. Subsections 4.2(5) and (7) of the Instrument, in certain limited circumstances, permit the delayed filing of a technical report. For example, an issuer normally has 45 days, or in some cases 180 days, to file a technical report supporting the first time disclosure of a mineral resource. However, if a preliminary short form prospectus that includes the prescribed disclosure is filed during the period of the delay, subparagraphs 4.2(5)(a)(i) and 4.2(7)(c)(i) require the technical report to be filed on the date of filing the preliminary short form prospectus.

(14) **Triggers with Thresholds –** The technical report triggers in paragraphs 4.2(1)(b), (i) and (j) only apply if the relevant disclosure meets certain thresholds. In these cases, the technical report filing requirement is triggered only for the material property or properties that meet the thresholds.

(15) **Triggers with Permitted Filing Delays –** Subsections 4.2(5), (6) and (7) allow technical reports in certain circumstances to be filed later than the disclosure documents they support. In these cases, once the requirement to file the technical report has been triggered, the issuer remains subject to the requirement irrespective of subsequent developments relating to the property, including, for example, the sale or abandonment of the property.

### 4.3 Required Form of Technical Report

(1) **Review** – Disclosure and technical reports filed under the Instrument may be subject to review by the securities regulatory authorities. If an issuer that is required to file a technical report under the Instrument files a technical report that does not meet the requirements of the Instrument, the issuer has not complied with securities legislation. This includes filing certificates and consents that do not comply with subsections 8.1(2) and 8.3(1) of the Instrument.

(2) **Filing Other Scientific and Technical Reports** – An issuer might have other reports or documents containing scientific or technical information, prepared by or under the supervision of a qualified person, which are not in the form of a technical report. We consider that filing such information on SEDAR as a technical report could be misleading. An issuer wishing to provide public access to these documents should consider posting them on its website.

(3) **Preparation in English or French** – Section 4.3 of the Instrument requires a technical report to be prepared in English or French. Reports prepared in a different language and translated into English or French are not acceptable due to the highly technical nature of the disclosure and the difficulties of ensuring accurate and reliable translations.

## PART 5 AUTHOR OF THE TECHNICAL REPORT

### 5.1 Prepared by a Qualified Person

(1) **Selection of Qualified Person** – It is the responsibility of the issuer and its directors and officers to retain a qualified person who meets the criteria listed under the definition of qualified person in the Instrument, including having the relevant experience and competence for the subject matter of the technical report.

(2) **Assistance of Non-Qualified Persons** – A person who is not a qualified person may work on a project. If a qualified person relies on the work of a non-qualified person to prepare a technical report or to provide information or advice to the issuer, the qualified person must take responsibility for that work, information, or advice. The qualified person must take whatever steps are appropriate, in their professional judgement, to ensure that the work, information, or advice that they rely on is sound.

(3) **Exemption from Qualified Person Requirement –** The securities regulatory authorities will rarely grant requests for exemption from the requirement that the qualified person belong to a professional association.

(4) **More than One Qualified Person** – Section 5.1 of the Instrument provides that one or more qualified persons must prepare or supervise the preparation of a technical report. Some technical reports, particularly for advanced properties, could require the involvement of several qualified persons with different areas of expertise. In that case, each qualified person taking responsibility for a part of the technical report must sign the technical report and provide a certificate and consent under Part 8 of the Instrument.

However, section 5.2 and Part 8 of the Instrument allow qualified persons who supervised the preparation of all or part of the technical report to take overall responsibility for the work conducted under their supervision by other qualified persons. While supervising qualified persons do not need to be experts in all aspects of the work they supervise, they should be sufficiently knowledgeable about the subject matter to understand the information and opinions for which they are accepting responsibility. Where there are supervising qualified persons, only the supervising qualified persons must sign the technical report and provide their certificates and consents.

(5) **A Qualified Person Must Be Responsible for All Items of Technical Report –** Section 5.1 of the Instrument requires a technical report to be prepared by or under the supervision of one or more qualified persons. By implication, this means that at least one qualified person must take responsibility for each section or item of the technical report, including any information incorporated from previously filed technical reports. If the qualified person, in response to a particular item, refers to the equivalent item in a previously filed technical report, the qualified person is implicitly saying that the information is still reliable and current and there have been no material changes. This would normally involve the qualified person doing a certain amount of background work and validation.

(6) **Previous Mineral Resources or Mineral Reserves** – When a technical report includes a mineral resource or mineral reserve estimate prepared by another qualified person for a previously filed technical report, under section 5.2 and Part 8 of the Instrument, one of the qualified persons preparing the new technical report must

take responsibility for those estimates. In doing this, that qualified person should make whatever investigations are necessary to reasonably rely on the estimates.

5.2 **Execution of Technical Report** – Section 5.2 and subsection 8.1(1) of the Instrument require the qualified person to date, sign, and if the qualified person has a seal, seal the technical report and certificate. Section 8.3 of the Instrument requires the qualified person to date and sign the consent. If a person's name appears in an electronic document with (signed by) or (sealed) next to the person's name or there is a similar indication in the document, the securities regulatory authorities will consider that the person has signed and sealed the document. Although not required, the qualified person may sign or seal maps and drawings in the same manner.

5.3 **Independent Technical Report**

(1) **Independent Qualified Persons –** Subsection 5.3(1) of the Instrument requires that one or more independent qualified persons prepare or supervise the preparation of the independent technical report. This subsection does not preclude non-independent qualified persons from co-authoring or assisting in the preparation of the technical report. However, to meet the independence requirement, the independent qualified persons must assume overall responsibility for all items of the technical report.

(2) **Hundred Percent or Greater Change –** Subparagraph 5.3(1)(c)(ii) of the Instrument requires the issuer to file an independent technical report to support its disclosure of a 100 percent or greater change in total mineral resources or total mineral reserves. We interpret this to mean a 100 percent or greater change in either the total tonnage or volume, or total contained metal or mineral content, of the mineral resource or mineral reserve. We also interpret the 100 percent or greater change to apply to mineral resources and mineral reserves separately. Therefore, a 100 percent or greater change in mineral resources on a material property will require the issuer to file an independent technical report regardless of any changes to mineral reserves, and vice versa.

(3) **Objectivity of Author –** We could question the objectivity of the author based on our review of a technical report. In order to preserve the requirement for independence of the qualified person, we could ask the issuer to provide further information, additional disclosure, or the opinion or involvement of another qualified person to address concerns about possible bias or partiality on the part of the author of a technical report.

## PART 6 PREPARATION OF TECHNICAL REPORT

6.1 **The Technical Report – Summary of Material Information** – Section 1.1 of the Instrument defines a technical report as a report that provides a <u>summary</u> of all material scientific and technical information about a property. Instruction (1) to Form 43-101F1 includes similar language. The target audience for technical reports are members of the investing public, many of whom have limited geological and mining expertise. To avoid misleading disclosure, technical reports must provide sufficient detail for a reasonably knowledgeable person to understand the nature and significance of the results, interpretation, conclusions, and recommendations presented in the technical report. However, we do not think that technical reports need to be a repository of all technical data and information about a property or include extensive geostatistical analysis, charts, data tables, assay certificate, drill logs, appendices, and other supporting technical information.

In addition, SEDAR might not be able to accommodate large technical report files. An issuer could have difficulty filing, and more importantly, the public could have difficulty accessing and downloading, large technical reports. An issuer should consider limiting the size of its technical reports to facilitate filing and public access to the reports.

6.2 **Current Personal Inspection**

(1) **Meaning** – The current personal inspection referred to in subsection 6.2(1) of the Instrument is the most recent personal inspection of the property, provided there is no new material scientific or technical information about the property since that personal inspection. A personal inspection may constitute a current personal inspection even if the qualified person conducted the personal inspection considerably before the filing date of the technical report, if there is no new material scientific or technical information about the property at the filing date. However, since the qualified person is certifying that the technical report contains all material information about the property, the qualified person should consider taking the necessary steps to verify independently that there has been no material work done on the property since their last site visit.

(2) **Importance of Personal Inspection** – We consider current personal inspections under section 6.2 of the Instrument to be particularly important because they enable qualified persons to become familiar with conditions on the property. Qualified persons can observe the geology and mineralization, verify the work done and, on that basis, design or review and recommend to the issuer an appropriate exploration or

development program. A current personal inspection is required even for properties with poor exposure. In such cases, it could be relevant for a qualified person to observe the depth and type of the overburden and cultural effects that could interfere with the results of the geophysics.

It is the responsibility of the issuer to arrange its affairs so that a qualified person can carry out a current personal inspection. A qualified person, or where required, an independent qualified person, must visit the site and cannot delegate the personal inspection requirement.

(3) **More than One Qualified Person** – Subsection 6.2(1) of the Instrument requires at least one qualified person who is responsible for preparing or supervising the preparation of the technical report to inspect the property. This is the minimum standard for a current personal inspection. There could be cases in advanced mineral projects where the qualified persons consider it necessary for more than one qualified person to conduct current personal inspections of the property, taking into account the nature of the work on the property and the different expertise required to prepare the technical report.

**6.3** **Maintenance of Records** – Section 6.3 of the Instrument requires an issuer to keep copies of underlying or supporting exploration information for at least 7 years. In our view, the issuer could satisfy this requirement by keeping records in any accessible format, not necessarily in hard copies.

**6.4** **Limitation on Disclaimers** – Paragraph 6.4(1)(a) of the Instrument prohibits certain disclaimers in technical reports.

These disclaimers are also potentially misleading disclosure because, in certain circumstances, securities legislation provides investors with a statutory right of action against a qualified person for a misrepresentation in disclosure that is based upon the qualified person's technical report. That right of action exists despite any disclaimer to the contrary that appears in the technical report. The securities regulatory authorities will generally require the issuer to have its qualified person remove any blanket disclaimers in a technical report that the issuer uses to support its public offering document.

Item 3 of Form 43-101F1 permits a qualified person to insert a limited disclaimer of responsibility in certain specified circumstances.

## PART 7 USE OF FOREIGN CODE

**7.1** **Use of Foreign Code – Use of Foreign Codes other than Acceptable Foreign Codes –** Section 2.2 and Part 7 of the Instrument require an issuer to disclose mineral resources or mineral reserves using either the CIM Definition Standards or an "acceptable foreign code" as defined in the Instrument. If an issuer wishes to announce an acquisition or proposed acquisition of a property that contains estimates of quantity and grade that are not in accordance with the CIM Definition Standards or an acceptable foreign code, the issuer might be able to disclose the estimate as an historical estimate, in compliance with section 2.4 of the Instrument. However, it might be more appropriate for the issuer to disclose the estimate as an exploration target, in compliance with subsection 2.3(2) of the Instrument, if the supporting information for the estimate is not well-documented or if the estimate is not comparable to a category in the CIM Definition Standards or an acceptable foreign code.

## PART 8 CERTIFICATES AND CONSENTS OF QUALIFIED PERSONS FOR TECHNICAL REPORTS

### 8.1 Certificates of Qualified Persons

(1) **Certificates Apply to the Entire Technical Report** – Section 8.1 of the Instrument requires certificates that apply to the entire technical report, including any sections that refer to information in a previously filed technical report. At least one qualified person must take responsibility for each Item required by Form 43-101F1.

(2) **Deficient Certificates** – Certificates must include all the statements required by subsection 8.1(2) of the Instrument. An issuer that files certificates with required statements that are missing or altered to change the intended meaning has not complied with the Instrument.

**8.2** **Addressed to Issuer –** We consider that the technical report is addressed to the issuer if the issuer's name appears on the title page as the party for which the qualified person prepared the technical report. We also consider that the technical report is addressed to the issuer filing the technical report if it is addressed to an issuer that is or will become a wholly-owned subsidiary of the issuer filing the technical report.

### 8.3 Consents of Qualified Persons

(1) **Consent of Experts** – If the technical report supports disclosure in a prospectus, the qualified person will likely have to provide an expert consent under the prospectus rules (section 8.1 of National Instrument 41-101 *General Prospectus Requirements* and section 4.1 of National Instrument 44-101 *Short Form Prospectus Distributions*), in addition to any consent of qualified person required under the Instrument.

(2) **Deficient Consents –** Consents must include all the statements required by subsection 8.3(1) of the Instrument. An issuer that files consents with required statements that are missing or altered to change the intended meaning has not complied with the Instrument. Appendix B to the Policy provides an example of an acceptable consent of a qualified person.

(3) **Modified Consents under Subsection 8.3(2**) – Subsection 8.3(1) of the Instrument requires the qualified person to identify and read the disclosure that the technical report supports and certify that the disclosure accurately represents the information in the technical report. We recognize that an issuer can become a reporting issuer in a jurisdiction of Canada without the requirement to file a disclosure document listed in subsection 4.2(1) of the Instrument. In these cases, the issuer has the option of filing a modified consent under subsection 8.3(2) of the Instrument that excludes the statements in paragraphs 8.3(1)(b), (c) and (d).

(4) **Filing of Full Consent Required –** If an issuer files a modified consent under subsection 8.3(2) of the Instrument, it must still file a full consent the next time it files a disclosure document that would normally trigger the filing of a technical report under subsection 4.2(1) of the Instrument. This requirement is set out in subsection 8.3(3) of the Instrument.

(5) **Filing of Consent for Technical Reports Not Required by the Instrument –** Where an issuer files a technical report voluntarily or as a requirement of a Canadian stock exchange, and the filing is not also required under the Instrument, the report is not a "technical report" subject to the consent requirements under subsection 8.3(1) of the Instrument. Therefore, when the issuer subsequently files a disclosure document that would normally trigger the filing of a technical report under subsection 4.2(1) of the Instrument, the issuer must file the consents of qualified persons in accordance with subsection 8.3(1).

If an issuer files a Filing Statement or other prospectus-level disclosure document with a Canadian stock exchange, and the filing is not also required under the Instrument, the issuer may choose or be required by the stock exchange to file a full consent that includes paragraphs 8.3(1)(b), (c) and (d) of the Instrument as they relate to the Filing Statement or other disclosure document.

## PART 9 EXEMPTIONS

### 9.2 Exemptions for Royalty or Similar Interests

(1) **Royalty or Similar Interest** – We consider a "royalty or similar interest" to include a gross overriding royalty, net smelter return, net profit interest, free carried interest, and a product tonnage royalty. We also consider a "royalty or similar interest" to include an interest in a revenue or commodity stream from a proposed or current mining operation, such as the right to purchase certain commodities produced from the operation.

(2) **Limitation on Exemptions** – The term "royalty or similar interest" does not include a participating or carried interest. Therefore, these exemptions do not apply where the issuer also has a participating or carried interest in the property or the mining operation, either direct or indirect.

(3) **Non-Reporting Subsidiaries Included** – Properties indirectly owned by an owner or operator that is a reporting issuer in a jurisdiction of Canada, through a subsidiary that is not a reporting issuer, would satisfy the condition of subparagraph 9.2(1)(a)(i) of the Instrument.

(4) **Consideration of Liability** – Holders of royalty or similar interests relying on the exemption in subsection 9.2(1) of the Instrument should consider, in the absence of a technical report of the royalty holder, who will be liable under applicable securities legislation for any misrepresentations in the royalty holder's scientific or technical information.

**Appendix A**
**Accepted Foreign Associations and Membership Designations**

| **Foreign Association** | **Membership Designation** |
|---|---|
| American Institute of Professional Geologists (AIPG) | Certified Professional Geologist (CPG) |
| The Society for Mining, Metallurgy and Exploration, Inc. (SME) | Registered Member |
| Mining and Metallurgical Society of America (MMSA) | Qualified Professional (QP) |
| Any state in the United States of America | Licensed or certified as a professional engineer |
| European Federation of Geologists (EFG) | European Geologist (EurGeol) |
| Institute of Geologists of Ireland (IGI) | Professional Member (PGeo) |
| Institute of Materials, Minerals and Mining (IMMM) | Professional Member (MIMMM), Fellow (FIMMM), Chartered Scientist (CSi MIMMM), or Chartered Engineer (CEng MIMMM) |
| Geological Society of London (GSL) | Chartered Geologist (CGeol) |
| Australasian Institute of Mining and Metallurgy (AusIMM) | Fellow (FAusIMM) or Chartered Professional Member or Fellow [MAusIMM (CP), FAusIMM (CP)] |
| Australian Institute of Geoscientists (AIG) | Member (MAIG), Fellow (FAIG) or Registered Professional Geoscientist Member or Fellow (MAIG RPGeo, FAIG RPGeo) |
| Southern African Institute of Mining and Metallurgy (SAIMM) | Fellow (FSAIMM) |
| South African Council for Natural Scientific Professions (SACNASP) | Professional Natural Scientist (Pr.Sci.Nat.) |
| Engineering Council of South Africa (ECSA) | Professional Engineer (Pr.Eng.) or Professional Certificated Engineer (Pr.Cert.Eng.) |
| Comisión Calificadora de Competencias en Recursos y Reservas Mineras (Chilean Mining Commission) | Registered Member |

**Appendix B**
**Example of Consent of Qualified Person**

[QP's Letterhead] or
[Insert name of QP]
[Insert name of QP's company]
[Insert address of QP or QP's company]

**CONSENT of QUALIFIED PERSON**

I, [name of QP], consent to the public filing of the technical report titled [insert title of report] and dated [insert date of report] (the "Technical Report") by [insert name of issuer filing the report].

I also consent to any extracts from or a summary of the Technical Report in the [insert date and type of disclosure document (i.e. news release, prospectus, AIF, etc.)] of [insert name of issuer making disclosure].

I certify that I have read [date and type of document (i.e. news release, prospectus, AIF, etc.) that the report supports] being filed by [insert name of issuer] and that it fairly and accurately represents the information in the sections of the technical report for which I am responsible.

Dated this [insert date].

__________________________ [Seal or Stamp]
Signature of Qualified Person

__________________________
Print name of Qualified Person

**AMENDMENTS TO**
**NATIONAL INSTRUMENT 44-101 *SHORT FORM PROSPECTUS DISTRIBUTIONS***

1. National Instrument 44-101 *Short Form Prospectus Distributions* is amended by this Instrument.

2. ***Part 4 is amended by adding the following section:***

***"*4.2.1 Alternative Consent** – (1) Despite subparagraph 4.2(a)(vii), if the expert whose consent is required is a "qualified person" as defined in NI 43-101, the issuer is not required to file the consent of the qualified person if

(a) the qualified person's consent is required in connection with a technical report that was not required to be filed with the preliminary short form prospectus,

(b) the qualified person was employed by a person or company at the date of signing the technical report,

(c) the principal business of the person or company is providing engineering or geoscientific services, and

(d) the issuer files the consent of the person or company.

(2) A consent filed under subsection (1) must be signed by an individual who is an authorized signatory of the person or company and who falls within paragraphs (a), (b), (d) and (e) of the definition of "qualified person" in NI 43-101.***"***

3. This Instrument comes into force on June 30, 2011.

**AMENDMENTS TO**
**FORM 51-102F1 *MANAGEMENT'S DISCUSSION AND ANALYSIS* AND**
**FORM 51-102F2 *ANNUAL INFORMATION FORM***

1. Form 51-102F1 *Management's Discussion and Analysis* and Form 51-102F2 *Annual Information Form* are amended by this Instrument.

2. ***Form 51-102F1 is amended by repealing paragraph (e) of section 1.4 and substituting the following:***

   **"**(e) for resource issuers with producing mines or mines under development, identify any milestone, including, without limitation, mine expansion plans, productivity improvements, plans to develop a new deposit, or production decisions, and whether the milestone is based on a technical report filed under National Instrument 43-101 *Standards of Disclosure for Mineral Projects*;**"**

3. ***Form 51-102F2 is amended by repealing Instruction (i) to Item 16 Interests of Experts.***

4. This Instrument comes into force on June 30, 2011.

**AMENDMENTS TO**
**NATIONAL INSTRUMENT 45-106 *PROSPECTUS AND REGISTRATION EXEMPTIONS***

1. National Instrument 45-106 *Prospectus and Registration Exemptions* is amended by this Instrument.

2. ***Section 2.9 is amended by repealing subsection (18).***

3. This Instrument comes into force on June 30, 2011.

**AMENDMENTS TO**
**NATIONAL INSTRUMENT 45-101 *RIGHTS OFFERINGS***

1. National Instrument 45-101 *Rights Offerings* is amended by this Instrument.

2. ***Subsection 3.1(1) is amended by repealing item 4 and substituting the following:***

   "4. A copy of the technical reports, certificates, and consents required under National Instrument 43-101 *Standards of Disclosure for Mineral Projects*."

3. This Instrument comes into force on June 30, 2011.

# Exhibit RPA-011

AACE INTERNATIONAL RECOMMENDED PRACTICE

47R-11

# COST ESTIMATE CLASSIFICATION SYSTEM – AS APPLIED IN THE MINING AND MINERAL PROCESSING INDUSTRIES

aace International®
The Authority for Total Cost Management®

AACE International Recommended Practice No. 47R-11

# COST ESTIMATE CLASSIFICATION SYSTEM – AS APPLIED IN THE MINING AND MINERAL PROCESSING INDUSTRIES

TCM Framework: 7.3 – Cost Estimating and Budgeting

Rev. July 6, 2012

Note: As AACE International Recommended Practices evolve over time, please refer to www.aacei.org for the latest revisions.

**Contributors:**

*Disclaimer: The opinions expressed by the authors and contributors to this recommended practice are their own and do not necessarily reflect those of their employers, unless otherwise stated.*

Allison Bull (Author)
John K. Hollmann, PE CCE CEP (Author)
Gord Zwaigenbaum, P.Eng. CCE (Author)
Nelson Augusto Alvares da Silva
Jonathon Brown
Simon P. Hoadley
Roy K. Howes
Gordon Robert Lawrence
Bruce A. Martin
Luis Miralles
Martin R. Oros Bergeret
Geoffrey A. Wilkie, P.Eng.
John A. Wilson
Allen Wong

# COST ESTIMATE CLASSIFICATION SYSTEM – AS APPLIED IN THE MINING AND MINERAL PROCESSING INDUSTRIES

TCM Framework: 7.3 – Cost Estimating and Budgeting

July 6, 2012

## PURPOSE

As a recommended practice (RP) of AACE International, the *Cost Estimate Classification System* provides guidelines for applying the general principles of estimate classification to project cost estimates (i.e., cost estimates that are used to evaluate, approve, and/or fund projects). The *Cost Estimate Classification System* maps the phases and stages of project cost estimating together with a generic project scope definition maturity and quality matrix, which can be applied across a wide variety of process industries.

This addendum to the generic recommended practice provides guidelines for applying the principles of estimate classification specifically to project estimates in the mining and mineral processing industries, excluding upstream oil and gas projects. This addendum supplements the generic recommended practice (17R-97)[1] by providing:

- a section that further defines classification concepts as they apply to the mining industries
- a section on the geopolitical nature and investment regulation of mining projects that impact on the estimating process and its basis definition deliverables
- a chart that maps the extent and maturity of estimate input information (project definition deliverables) against the class of estimate.

As with the generic RP, the intent of this addendum is to improve communications among all of the stakeholders involved with preparing, evaluating, and using project cost estimates, specifically for the mining and mineral processing industries.

The overall purpose of this recommended practice is to provide the mining and mineral processing industry definition deliverable maturity matrix which is not provided in 17R-97. It also provides an approximate representation of the relationship of specific design input data and design deliverable maturity to the estimate accuracy and methodology used to produce the cost estimate. The estimate accuracy range is driven by many other variables and risks, so the maturity and quality of the scope definition available at the time of the estimate is not the sole determinate of accuracy; risk analysis is required for that purpose.

It is understood that each enterprise may have its own project and estimating processes and terminology, and may classify estimates in particular ways. This guideline provides a generic and generally acceptable classification system for the mining industries that can be used as a basis to compare against. This addendum should allow each user to better assess, define, and communicate their own processes and standards in the light of generally-accepted cost engineering practice.

As a final note regarding purpose, users must be aware of the industry's well documented history of challenges with overruns of feasibility estimates [6 to 9]. An intent of this RP is to help improve upon this past performance.

## INTRODUCTION

For the purposes of this addendum, the term "mining industries" is assumed to include any firm that is involved in a mining (mineral) project, which is defined in NI 43-101 as "any exploration, development or production activity, including a royalty interest or similar interest in these activities, in respect of diamonds, natural solid inorganic material, or natural solid fossilized organic material including base and precious metals, coal and industrial minerals" [4].

Mining estimates depend on data from/for project permitting; drilling and exploration; underground and surface mining; ore handling, milling and metallurgical processing; tailings and water management; and other onsite and offsite infrastructure facilities that may be familiar to any process plant or uniquely mining. This recommended practice is intended to cover entire mining projects; this extends from the mine (surface or underground) through the initial processing phase of producing a marketable product, including all associated process and infrastructure facilities within the scope of the project. However, if the project is for a processing plant with no other mining aspect, it is assumed covered by 18R-97. Standalone exploration programs based on drilling or remote means are not included in this RP; however, exploration such as sinking shafts, driving drifts from an operation or drilling funded as part of mine development may be covered. In addition, projects for mine reclamation and closure may be included. Other than these exclusions, this addendum is specifically intended to cover the full mining project scope and should not be combined with other addendums.

An unusual characteristic of mining projects is that some portion of the mining scope needed for initial production may be capitalized and included in the project estimate. Therefore, the initial capitalized elements of the mining plan (e.g., tunnels, pre-stripping, initial water management, pit crushers, initial mining equipment, etc.) must have more advanced definition than later elements that will be charged to operations or later sustaining capital costs.

This guideline reflects generally-accepted cost engineering practices. This RP was based upon the practices of international companies who are engaged in mining projects around the world, as well as published references and standards.

## GEOPOLITICAL NATURE AND INVESTMENT REGULATION OF MINING INDUSTRIES

The geopolitical nature and significant investment risk of the mining project industries increases the public profile and influences the capital cost estimating process, including the interpretation of estimate classifications. The following are regulations and situations that are applicable to the mining industries.

Security exchanges in the various jurisdictions have established regulatory codes for reporting of mining project feasibility that cover reports to potential investors and other stakeholders in the projects. This includes well recognized national and international codes and standards such as the following:

- Canada: *Canadian Securities Administrators (CSA) National Instrument (NI) 43-101, Standards Of Disclosure For Mineral Projects*, which is widely used and representative proxy of international reporting standards and is a primary reference for this RP addendum[5] Note that NI 43-101 defers to the Canadian Institute of Mining and Metallurgy (CIM) to provide definition standards for mineral resources and reserves[5].
- United Kingdom: *Institution of Metals, Minerals and Mining (IMMM)* or *Pan-European Reserves and Resources Reporting Committee (PERC)*
- Australia (and New Zealand): *Joint Ore Reserves Committee (JORC)*
- South Africa: *South African Code for Reporting of Exploration Results, Mineral Resources and Mineral Reserves* (SAMREC)
- USA: *United States Securities And Exchange Commission (SEC) Industry Guide 7: Description of Property by Issuers Engaged or to be Engaged in Significant Mining Operations*
- International standards (for general reference):
    - *United Nations Framework Classification (UNFC) for Fossil Energy and Mineral Resources*
    - *Committee for Mineral Reserves International Reporting Standards (CRIRSCO)*

The regulatory codes recognize the evolutionary nature of feasibility studies (FS). NI 43-101 focuses on two aspects of estimates: 1) geological knowledge and confidence including volume and purity of the mineral ores based on

exploration results, and 2) modifying factors influencing the profitability of extraction including mining, processing, metallurgical, economic, marketing, legal, environmental, socio-economic and governmental factors. Capital costs are one of the drivers of profitability and hence one of the modifying factors. The geologic factors such as drilling and assay results are the basis for establishing if the asset is a resource which may or may not be profitable. Resource categories are inferred, indicated or measured (listed in the order of increasing confidence). The modifying factors are the basis for establishing if the resource is profitable and hence a reserve. Reserve categories are potential or probable.

To demonstrate that a geologic resource is profitable and hence an economic reserve, NI 43-101 requires that the economics be demonstrated through a study. The study must be at least a preliminary feasibility study (PFS). Based on this type of study an indicated resource can be established as a potential reserve, and a measured resource can be established as a proven reserve. The code prohibits disclosure of results of an economic analysis that includes inferred resources unless it includes certain declamatory statements (i.e., they are never a reserve). The regulatory codes require that feasibility study reports be signed by competent party (i.e., a Qualified Person or QP) responsible for the content. Interestingly, the code leaves the appropriate level of detail for the preliminary feasibility study to the discretion of the QP making the study. In respect to NI 43-101, this RP may be a useful guide for the QP's study in regards to capital cost estimates.

It is important to highlight the NI 43-101 terminology (defined by CIM[4]) relative to economic studies because these are often used as *de-facto* capital cost estimate categories in lieu of more defined estimate classifications such as this RP. NI 43-101 includes the following definitions for study types:

- **feasibility study** - means a comprehensive study of a mineral deposit in which all geological, engineering, legal, operating, economic, social, environmental and other relevant factors are considered in sufficient detail that it could reasonably serve as the basis for a final decision by a financial institution to finance the development of the deposit for mineral production.
- **preliminary feasibility study** and **pre-feasibility study** - each mean a comprehensive study of the viability of a mineral project that has advanced to a stage where the mining method, in the case of underground mining, or the pit configuration, in the case of an open pit, has been established and an effective method of mineral processing has been determined, and includes a financial analysis based on reasonable assumptions of technical, engineering, legal, operating, economic, social, and environmental factors and the evaluation of other relevant factors which are sufficient for a qualified person, acting reasonably, to determine if all or part of the mineral resource may be classified as a mineral reserve.

The primary distinction between the above is that the feasibility study is a suitable basis for a final decision. This RP recommends that a best industry practice to manage investment risk is to equate mining feasibility study capital cost estimates as AACE Class 3 (basis for full funding) and preliminary and pre-feasibility study estimates as AACE Class 4.

There is no economic study defined by CIM pursuant to NI 43-101 that is strictly equivalent to Class 5; however, NI 43-101 itself defines the following term that is usually applied to studies done prior to the PFS and FS but does not imply reserve status;

- **preliminary economic assessment (PEA)** - means a study, other than a pre-feasibility or feasibility study, that includes an economic analysis of the potential viability of mineral resources.[4]

In common mining practice, the term PEA usually is equivalent to Class 5, but not always; it may also be used for a more advanced study that simply does not meet the qualifications for a PFS or FS. Another term in common use is scoping study which is more or less equivalent to Class 5.

Mining industry estimators must be aware that other industries do not use the term feasibility (or the other terms above) for their estimates of an equivalent AACE Class. One of the reasons for this RP is to encourage the use of the common, numbered Class terminology.

Other geopolitical circumstances (or modifying factors per NI 43-101) for mining projects may directly or indirectly impact on the interpretation of the status and quality of project definition deliverables and hence estimate classifications. Examples of status considerations include:

- Mining projects are often in remote sites and have unique logistical and environmental issues.
- Resources are often seen as national legacies with attendant political, legal and socio-economic considerations.
- Improved metal prices and/or extraction technologies may lead to reacquisition of abandoned mining properties that have unforeseen environmental legacies and regulatory implications.
- Volatility in metal prices have led to abrupt study deferrals and resumptions causing problems such as ambiguous mining rates, skipped study steps and an unrealistic study schedule.
- Feasibility studies may tend to focus on technical issues at the expense of business and project delivery issues (e.g., execution strategy and planning deliverables).

## COST ESTIMATE CLASSIFICATION MATRIX FOR THE MINING AND MINERAL PROCESSING INDUSTRIES

Table 1 provides a summary of the characteristics of the five estimate classes. The maturity level of definition is the sole determining (i.e., primary) characteristic of Class. In Table 1, the maturity is roughly indicated by a % of complete definition; however, it is the maturity of the defining deliverables that is the determinant, not the percent. The specific deliverables, and their maturity or status are provided in Table 3. The other characteristics are secondary and are generally correlated with the maturity level of project definition deliverables, as discussed in the generic RP[1]. The post feasibility classes (Class 1 and 2) are only indirectly covered by the regulatory codes where new funding is indicated. Again, the characteristics are typical and may vary depending on the circumstances.

| | *Primary Characteristic* | *Secondary Characteristic* | | |
|---|---|---|---|---|
| **ESTIMATE CLASS** | **MATURITY LEVEL OF PROJECT DEFINITION DELIVERABLES** Expressed as % of complete definition | **END USAGE** Typical purpose of estimate | **METHODOLOGY** Typical estimating method | **EXPECTED ACCURACY RANGE** Typical variation in low(L), and high(H) ranges[a] |
| **Class 5** | 0% to 2% | Conceptual planning | Capacity factored, parametric models, judgment, or analogy | L: -20% to -50%<br>H: +30% to +100% |
| **Class 4** | 1% to 15% | Screening options | Equipment factored or parametric models | L: -15% to -30%<br>H: +20% to +50% |
| **Class 3** | 10% to 40% | Funding authorization | Semi-detailed unit costs with assembly level line items | L: -10% to -20%<br>H: +10% to +30% |
| **Class 2** | 30% to 75% | Project control | Detailed unit cost with forced detailed take-off | L: -5% to -15%<br>H: +5% to +20% |
| **Class 1** | 65% to 100% | Fixed price bid check estimate | Detailed unit cost with detailed take-off | L: -3% to -10%<br>H: +3% to +15% |

Notes: [a] The state of technology, availability of applicable reference cost data and many other risks affect the range markedly. The +/- values represent typical percentage variation of actual costs from the cost estimate after application of contingency (typically at a 50% level of confidence) for given scope.

**Table 1 – Cost Estimate Classification Matrix for Mining and Mineral Processing Industries**

This matrix and guideline outline an estimate classification system that is specific to mining industries. Refer to the generic estimate classification RP[1] for a general matrix that is non-industry specific, or to other addendums for guidelines that will provide more detailed information for application in other specific industries. These will provide additional information, particularly the project definition deliverable maturity matrix which determines the class in those particular industries.

Table 1 illustrates typical ranges of accuracy ranges that are associated with the mining industries. Depending on the technical and project deliverables (and other variables) and risks associated with each estimate, the accuracy range for any particular estimate is expected to fall into the ranges identified although extreme risks can lead to wider ranges. However, it should be noted that the average quality and accessibility of mineral bodies is declining, and processing complexity increasing over the years so the high end of the accuracy range may be increasing (this RP will be reviewed over time).

In addition to the degree of project definition, estimate accuracy is also driven by other systemic risks such as:

- Level of non-familiar or first of a kind technology in the project.
- Complexity of the project.
- Quality of reference cost estimating data.
- Quality of assumptions used in preparing the estimate.
- Experience and skill level of the estimator in the mining and mineral processing industries
- Estimating techniques employed.
- Time and level of effort budgeted to prepare the estimate.
- The accuracy of the geotechnical data.
- Remote nature of project locations and the lack of benchmark data for these remote locations.
- Political, environmental, and other regulatory circumstances.
- Socio-economic conditions

Copyright © AACE® International 

Systemic risks such as these are often the primary driver of accuracy; however, project-specific risks (e.g. risk events) also drive the accuracy range.

Mining projects are very sensitive to volatility in metal pricing and geopolitical issues. Early geological studies may be highly speculative and entail a lot of uncertainty as to the commercial viability of a new mining project. Conversely, a project may have a history of feasibility studies for current and previous owners that can readily be revived to meet securities disclosure rules when the technology and metal prices improve sufficiently to spark interest among investors. Accordingly, estimate classifications represent benchmarks for minimum definition recognizing the evolution of a mining project. Therefore, Table 1 provides a range in accuracy values. This allows application of the specific circumstances inherent in a project, and an industry sector, to the indication of realistic estimate class accuracy range percentages.

Figure 1 also illustrates that the estimating accuracy ranges overlap the estimate classes. There are cases where a Class 5 estimate for a particular project may be as accurate as a Class 3 estimate for a different project. For example, similar accuracy ranges this may occur if the Class 5 estimate of one project that is based on a repeat project with good cost history and data and, whereas the Class 3 estimate for another is for a project involving new technology. There are also cases where a Class 3 estimate has no better accuracy than a Class 5 estimate. It is for this reason that Table 1 provides ranges of accuracy range values. This allows application of the specific circumstances inherent in a project, and an industry sector, to the indication of realistic estimate class accuracy range percentages. While a target range may be expected of a particular estimate, the accuracy range is determined through risk analysis of the specific project and is never pre-determined.

Copyright © AACE® International 




**Figure 1 – Example of the Variability in Accuracy Ranges for a Mining Industry Estimate**

## DETERMINATION OF THE COST ESTIMATE CLASS

The cost estimator makes the determination of the estimate class based upon the maturity level of project definition based on the status of specific key planning and design deliverables. The percent design completion may be correlated with the status, but the percentage should not be used as the Class determinate. While the determination of the status (and hence the Class) is somewhat subjective, having standards for the design input data, completeness and quality of the design deliverables will serve to make the determination more objective. Alternatively, the estimator should make note of estimates that are released but do not fully meet the client-specified estimate class based on the available project definition deliverables.

## CHARACTERISTICS OF THE ESTIMATE CLASSES

The following tables (2a through 2e) provide detailed descriptions of the five estimate classifications as applied in the mining and ore processing industries. They are presented in the order of least-defined estimates to the most-defined estimates. These descriptions include brief discussions of each of the estimate characteristics that define an estimate class.

For each table, the following information is provided:

- **Description:** A short description of the class of estimate, including a brief listing of the expected estimate inputs based on the maturity level of project definition deliverables. The minimum inputs reflect the range of industry experience, but would not generally be recommended.
- **Maturity Level of Project Definition Deliverables Required:** Describes a particularly key deliverable and a typical target status in stage-gate decision processes, plus an indication of approximate percent of full definition of project and technical deliverables. For the mining industries, this correlates with the percent of engineering and design complete.
- **End Usage:** A short discussion of the possible end usage of this class of estimate.
- **Estimating Methods Used:** A listing of the possible estimating methods that may be employed to develop an estimate of this class.
- **Expected Accuracy Range:** Typical variation in low and high ranges after the application of contingency (determined at a 50% level of confidence). Typically, this represents about an 80% confidence that the actual cost will fall within the bounds of the low and high ranges. The estimate confidence interval or accuracy range is limited by the reliability of the scope information available at the time of the estimate in addition to the other variables and risks identified above.
- **Alternate Estimate Names, Terms, Expressions, Synonyms:** This section provides other commonly used names that an estimate of this class might be known by. These alternate names are not endorsed by this recommended practice. The user is cautioned that an alternative name may not always be correlated with the class of estimate as identified in Tables 2a-2e.

Copyright © AACE® International 

| CLASS 5 ESTIMATE | |
|---|---|
| **Description:**<br>Class 5 estimates are generally based on inferred resources defined by preliminary drilling exploration and metallurgical analysis and general experience with related projects to comply with disclosure standards such as NI 43-101. This would include a simple geological model and estimated grade of mineralization. A simple mine plan is then prepared that covers mining method (open pit, underground); gross production schedules; nominal plant capacity; assumed block flow diagrams and process rates; and conceptual definition of infrastructure needs. There may be a minimum of metallurgical test work and geotechnical, hydrological or other back up studies available. No design drawings or equipment specifications may be prepared beyond some rough notes and sketches by the project engineer, perhaps little more than proposed plant type, capacity and location.<br><br>**Maturity Level of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: Block flow diagram and assumed mine plan agreed by key stakeholders.<br>0% to 2% of full project definition.<br><br>**End Usage:**<br>Class 5 estimates are prepared for any number of strategic business planning purposes, such as but not limited to market studies, assessment of initial viability, evaluation of alternate schemes, rough project screening, project location studies, and long-range capital planning. | **Estimating Methods Used:**<br>Class 5 estimates generally rely on available internal and industry data for similar previous projects. Gross unit costs may be applied to mining and excavation volumes. Equipment factoring techniques may be used to extend major plant equipment costs to include all commodities, and gross unit costs applied to building volumes, pipeline and other elements. Cost/capacity methods may be used for some plant elements. Indirect costs are factored from directs based on internal and industry experience with typical cost ratios and other parametric and modeling techniques utilized.<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 5 estimates are<br>-20% to -50% on the low side, and +30% to +100% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information and other risks (after inclusion of an appropriate contingency determination). Ranges could exceed those shown if there are unusual risks. Declining quality and accessibility of ore bodies may be driving higher risks. The uncertainty varies by work type so that moderate ranges apply to structures, wider ranges apply to earthworks and infrastructure and narrower ranges apply to machinery (assuming applicable procurement data is available from similar past projects).<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Preliminary economic assessment or PEA (per NI 43-101), Geological study estimate, order of magnitude estimate, capacity factor estimate, conceptual study, venture analysis, scoping study, preliminary evaluation, |

**Table 2a – Class 5 Estimate**

| CLASS 4 ESTIMATE | |
|---|---|
| **Description:**<br>Class 4 estimate is usually carried out using indicated or measured resources defined by drilling confirmation of the mineralized zone(s). A preliminary geological model and detailed mine plan are required, including supporting pit optimization, geotechnical and hydro-geological studies, etc. The metallurgical test work should determine the probable process flow sheet and approximate material balance, and identify the major equipment. Engineering would comprise at a minimum: general arrangement (GA) drawings, equipment lists for major equipment, nominal plant capacity, block schematics, and process flow diagrams (PFDs) for the main process systems.<br><br>**Degree of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: Process flow diagram (PFD) issued for design for plant and detailed mine plan for the mine.<br>1% to 15% of full project definition.<br><br>**End Usage:**<br>Class 4 estimates are vitally important to mining investors internationally. A mineral resource cannot be identified as an economic reserve without an estimate of at least this class. They are held to disclosure requirements by the involved securities jurisdictions and are subject to analysis by third party reviewers. The estimates are used for refining and screening of options, analyzing technical and economic feasibility and then identifying the preferred option(s) for the final feasibility study (Class 3 estimate) prior to commitment. | **Estimating Methods Used:**<br>Major equipment costs are based on recent budget prices from vendors based on preliminary requirements. Facility costs are estimated by approximate quantity take-offs from the GA drawings and applying unit cost factors. Earthworks and infrastructure are not well defined in detail but allowances can be set based on preliminary contours for overland piping lengths and overhead electrical power lines, etc. Equipment installation is estimated by a combination of quantity take-offs and unit cost factors based on the available scope definition. The same method also applies to indirect costs (as a % of directs).<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 4 estimates are<br>-15% to -30% on the low side, and +20% to +50% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information, and other risks (after the inclusion of an appropriate contingency determination). The uncertainty varies by work type with moderate ranges applying to structures and plant commodities, wider ranges applying to earthworks and infrastructure and narrower ranges applying to equipment installation.<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Pre-feasibility or preliminary feasibility (per NI 43-101), intermediate economic study estimate, equipment factor estimate |

**Table 2b – Class 4 Estimate**

| CLASS 3 ESTIMATE | |
|---|---|
| **Description:**<br>A Class 3 estimate is prepared using probable or proven ore reserves as defined within acceptable confidence limits as per the securities codes. A detailed mine plan is required (pre-stripping may begin upon project approval). Metallurgical test work is sufficient to expand the detail in equipment lists and specifications. Engineering is expected to provide general arrangement drawings (GAs), preliminary piping and instrument diagrams (P&ID's) and single line electrical drawings. Also, plot plans and layout drawings are better defined.<br><br>**Degree of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: Piping and instrumentation diagrams (P&IDs) issued for design for plant and detailed mine plan for the mine.<br>10% to 40% of full project definition.<br><br>**End Usage:**<br>Class 3 estimates are typically prepared to support full project funding requests for internal and/or external investment. By default, the Class 3 estimate is the initial baseline for project and change control until superseded by the updated project control estimate (Class 2). | **Estimating Methods Used:**<br>Class 3 estimates are generally based on detail take-offs and estimates for significant cost items for direct and indirect costs where detailing can be done (e.g., pipe fittings not detailed). Major equipment and contracts are priced based on supplier quotations. Construction (bulks, labor and equipment) are estimated based on local pricing and trade agreements covering the available quantity take-offs. Mass earthwork and infrastructure such as transport pipelines and power transmission lines are based on take-off from preliminary contours and routing. Less significant costs may be factored such as small bore pipe as a % of large bore.<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 3 estimates are<br>-10% to -20% on the low side, and +10% to +30% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information, and other risks (after inclusion of an appropriate contingency determination). The uncertainty varies by work type with moderate ranges applying to structures and plant commodities, wider ranges applying to earthworks and infrastructure and narrower ranges applying to equipment installation.<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Feasibility estimate (per NI 43-101), bankable feasibility estimate, final feasibility estimate, initial budget (or baseline) estimate, forced detail estimate, design basis memorandum (DBM). |

**Table 2c – Class 3 Estimate**

Copyright © AACE® International 

| CLASS 2 ESTIMATE | |
|---|---|
| **Description:**<br>A Class 2 estimate is based upon a detailed mine design and production schedule using proven ore reserves and contains all of the input of a Class 3 estimate with regard to process information. Class 2 scope definitions will include all the information contained in Class 4 and Class 3 estimates as well as additional engineering information as the project proceeds into the execution phase such as detail project execution plan and schedules, accurate topographic maps, actual surveys of the plant site and foundation data, etc.<br><br>**Degree of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: All specifications and datasheets complete including for instrumentation. Mine design with production schedule (pre-stripping or ore body access likely underway).<br>30% to 75% of full project definition.<br><br>**End Usage:**<br>Class 2 estimates are typically prepared as the detailed contractor control baseline (and update to owner's control baseline) against which all actual costs and resources will now be monitored for variations to the budget, and form a part of the change management program. | **Estimating Methods Used:**<br>Class 2 estimates generally involve a high degree of deterministic estimating methods. Class 2 estimates are prepared in great detail as needed to support bidding, project administration and change control. Most of the equipment will have been ordered or have firm quotes Mass earthwork and infrastructure such as transport pipelines and power transmission lines are based on take-off from definitive contours and routing. Some subcontracts for early works may be underway. For those areas of the project still undefined, an assumed level of detail takeoff (forced detail) may be developed to use as line items in the estimate rather than factored allowances.<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 2 estimates are<br>-5% to -15% on the low side, and +5% to +20% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information, and other risks (after the inclusion of an appropriate contingency determination). Ranges could exceed those shown if there are unusual risks.<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Definitive cost estimate, project control estimate (PCE), revised baseline estimate, detailed control estimate, execution phase estimate, fall-out detail estimate. |

**Table 2d – Class 2 Estimate**

Copyright © AACE® International

| CLASS 1 ESTIMATE | |
|---|---|
| **Description:**<br>Class 1 estimates are generally prepared for discrete parts or sections of the total project rather than for the entire project based on extensive design definition. Reserves will be proven with civil and pre-stripping work usually being underway. The detail estimate may be used by subcontractors for bidding or by owners for check estimates for various purposes.<br><br>**Degree of Project Definition Deliverables Required:**<br>Key Deliverable and Target Status: All deliverables in the maturity matrix complete.<br>65% to 100% of full project definition.<br><br>**End Usage:**<br>Class 1 estimates are used by contractors to support their bids or by owners as a check on bids received. The estimates may be used by both parties to support their contract negotiations, change control process, and/or to analyze and resolve claims and disputes. | **Estimating Methods Used:**<br>Class 1 estimates generally involve the highest degree of deterministic estimating methods, and require a great amount of effort. Class 1 estimates are prepared in great detail, usually on a selected portion of the project scope. All items in the estimate are usually unit cost line items based on actual design quantities.<br><br>**Expected Accuracy Range:**<br>Typical accuracy ranges for Class 1 estimates are<br>-3% to -10% on the low side, and +3% to +15% on the high side, depending on the technological, geographical and geological complexity of the project, appropriate reference information, and other risks (after inclusion of an appropriate contingency determination). Ranges could exceed those shown if there are unusual risks.<br><br>**Alternate Estimate Names, Terms, Expressions, Synonyms:**<br>Full detail estimate, tender check estimate, firm price, bottoms-up estimate, detailed engineering estimate, detailed control estimate, forced detail estimate, change order estimate. |

**Table 2e – Class 1 Estimate**

## ESTIMATE INPUT CHECKLIST AND MATURITY MATRIX

Table 3 maps the extent and maturity of estimate input information (deliverables) against the five estimate classification levels. This is a checklist of basic deliverables found in common practice in the mining industries. The maturity level is an approximation of the completion status of the deliverable. The completion status is indicated by the following letters.

- **None (Blank):** Development of the deliverable has not begun.
- **Started (S):** Work on the deliverable has begun. Development is typically limited to sketches, rough outlines, or similar levels of early completion.
- **Preliminary (P):** Work on the deliverable is advanced. Interim, cross-functional reviews have usually been conducted. Development may be near completion except for final reviews and approvals.
- **Complete (C):** The deliverable has been reviewed and approved as appropriate.

The terms for resource and reserve determination are from NI 43-101.

Copyright © AACE® International 

| | ESTIMATE CLASSIFICATION | | | | |
|---|---|---|---|---|---|
| | **CLASS 5** | **CLASS 4** | **CLASS 3** | **CLASS 2** | **CLASS 1** |
| **MATURITY LEVEL OF PROJECT DEFINITION DELIVERABLES** | **0% to 2%** | **1% to 15%** | **10% to 40%** | **30% to 75%** | **65% to 100%** |
| **General Project Data:** | | | | | |
| Project Scope Description | General | Preliminary | Defined | Defined | Defined |
| Mine and Plant Production/Facility Capacity | Assumed | Preliminary | Defined | Defined | Defined |
| Plant Location | General | Approximate | Specific | Specific | Specific |
| Soils & Hydrology | None | Preliminary | Defined | Defined | Defined |
| Resource Determination | Inferred | Indicated | Measured | Measured | Measured |
| Reserve Determination | Assumed | Probable | Proven | Proven | Proven |
| Geology | General | Preliminary | Defined | Defined | Defined |
| Geotechnical and Rock Mechanics | General | Preliminary | Defined | Defined | Defined |
| Metallurgical Test Work | General | Preliminary | Defined | Defined | Defined |
| Integrated Project Plan | None | Preliminary | Defined | Defined | Defined |
| Project Master Schedule | Assumed | Preliminary | Defined | Defined | Defined |
| Mine Life Plan/Schedule | General | Preliminary | Preliminary | Defined | Defined |
| Initial Mine/Ore Access (Roads, Prestripping, Tunnels, Shafts, Water Management, Waste Management, etc.) | General | Preliminary | Defined | Defined | Defined |
| Mine Operations Layout (Pit Design, Dumps, Roads, Water Management, Waste Management, etc.) | General | Preliminary | Preliminary | Defined | Defined |
| Escalation Strategy | None | Preliminary | Defined | Defined | Defined |
| Work Breakdown Structure | None | Preliminary | Defined | Defined | Defined |
| Project Code of Accounts | None | Preliminary | Defined | Defined | Defined |
| Contracting Strategy | Assumed | Assumed | Preliminary | Defined | Defined |
| Mine (Production Equipment, Prestripping, etc.) | Assumed | Preliminary | Defined | Defined | Defined |
| Non-Process Facilities (Infrastructure, Ports, Pipeline, Power Transmission, etc.) | Assumed | Preliminary | Defined | Defined | Defined |
| **Engineering Deliverables:** | | | | | |
| Block Flow Diagrams | S/P | P/C | C | C | C |
| Plot Plans | | S/P | P | C | C |
| Process Flow Diagrams (PFDs) | | P | C | C | C |
| Utility Flow Diagrams (UFDs) | | S/P | C | C | C |

Copyright © AACE® International 

| | | | | | |
|---|---|---|---|---|---|
| Piping & Instrument Diagrams (P&IDs) | | S/P | C | C | C |
| Heat & Material Balances | | S/P | C | C | C |
| Process Equipment List | | S/P | C | C | C |
| Utility Equipment List | | S/P | C | C | C |
| Electrical One-Line Drawings | | S/P | C | C | C |
| Specifications & Datasheets | | S | P/C | C | C |
| General Equipment Arrangement Drawings | | S | C | C | C |
| Spare Parts Listings | | | P | C | C |
| Mechanical Discipline Drawings | | | S/P | P/C | C |
| Electrical Discipline Drawings | | | S/P | P/C | C |
| Instrumentation/Control System Discipline Drawings | | | S/P | P/C | C |
| Civil/Structural/Architectural Discipline Drawings | | | S/P | P/C | C |

**Table 3 – Estimate Input Checklist and Maturity Matrix (Primary Classification Determinate)**

## REFERENCES

1. AACE International Recommended Practice No.17R-97, *Cost Estimate Classification System*, AACE International, Morgantown, WV. (Latest revision).
2. AACE International Recommended Practice No.18R-97, *Cost Estimate Classification System – As Applied In Engineering, Procurement, And Construction For The Process Industries*, AACE International, Morgantown, WV. (Latest revision).
3. AACE International, Recommended Practice 10S-90, *Cost Engineering Terminology*, AACE International, Morgantown, WV. (Latest revision).
4. Canadian Institute of Mining and Metallurgy, "CIM Definition Standards - For Mineral Resources and Mineral Reserves, CIM Standing Committee on Reserve Definitions (Latest revision).
5. Canadian Securities Administrators (CSA), National Instrument 43-101 - Standards of Disclosure for Mineral Projects (Latest revision).
6. John Scott & Brian Johnston, *Guidelines to Feasibility Studie*s, Mineral Processing Plant Design, Practice, and Control, Editors: A.L. Mular, D.N. Halbe, D.J. Barratt, SME (2002).
7. Jasper Bertisen & Graham A. Davis, *Bias and Error in Mine Project Capital Cost Estimation*, Entrepreneur (April-June, 2008).
8. D.J. Noort & C Adams, *Effective Mining Project Management Systems,* International Mine Management Conference, Melbourne, Australia, October 16 - 18, 2006.
9. W. Mackenzie & N. Cusworth, *The Use and Abuse of Feasibility Studies*, Project Evaluation Conference, Melbourne, Vic, June 19 – 20, 2007.

## CONTRIBUTORS

*Disclaimer: The opinions expressed by the authors and contributors to this recommended practice are their own and do not necessarily reflect those of their employers, unless otherwise stated.*

Allison Bull (Author)
John K. Hollmann, PE CCE CEP (Author)
Gord Zwaigenbaum, P.Eng. CCE (Author)
Nelson Augusto Alvares da Silva
Jonathon Brown
Simon P. Hoadley
Roy K. Howes
Gordon Robert Lawrence
Bruce A. Martin
Luis Miralles
Martin R. Oros Bergeret
Geoffrey A. Wilkie, P.Eng.
John A. Wilson
Allen Wong

Copyright © AACE® International

# Exhibit RPA-012



# CHAPTER 4

# Capital Cost Estimation

Sponsored by:

METALS X LIMITED

# SPONSOR PROFILE

METALS X LIMITED

Metals X Limited is a diversified resource group with a considerable portfolio of growth assets at all stages of development; from exploration through to production; with principle exposure to tin, nickel and gold and investment exposure to gold and bauxite.

Metals X is Australia's largest tin producer with its 50 per cent owned Tasmanian Tin Operations, encompassing the Renison Underground Mine and Concentrator, producing approximately 2.5 per cent of the global supply of tin concentrates. The Tasmanian Tin Operations are currently targeting approximately 8000 tonnes per annum of tin in concentrate and 1000 tonnes per annum of copper.

Metals X owns 100 per cent of the world-class Wingellina Nickel-Cobalt Project, which hosts a total global resource of over 183 Mt at 0.98 per cent Ni including a mining reserve of 167 Mt at 0.98 per cent Ni, 0.08 per cent Co and 47.3 per cent $Fe_2O_3$. A project development feasibility study completed in 2008 concluded a robust project for the construction of a nickel and cobalt operation producing approximately 40000 t/a of nickel and 3000 t/a of cobalt for an initial mine life of 40 years at an operating cost of US$3.34 per pound of nickel after cobalt credits.

Metals X continues to move Wingellina towards development and has signed a landmark Native Title Mining Agreement with the Traditional Owners, enabling the project to be advanced and developed. On 4 September 2012 Metals X announced that it had signed a non-binding Memorandum of Understanding (MOU) with Samsung C&T Corporation to establish a framework for collaboration and cooperation to develop Wingellina towards production. Samsung has agreed to use its financial reputation and capacity to assist Metals X with the financing and developing of the project. Metals X's objective of the collaboration is for the Company to retain a 30 per cent interest in Wingellina free carried to production.

Metals X also holds resources of over 3.9 Moz of gold within its Murchison goldfield in Western Australia and Rover project near Tennant Creek in the Northern Territory. Both exciting development ready projects that Metals X is focused on bringing into production.

Metals X makes strategic investments in projects that have been identified by its highly experienced mining and technical personnel that exhibit strong qualities for capital appreciation. Metals X actively provides technical and financial support to those companies, these strategic investments including:

- Mongolian Resource Corporation Limited (14.76 per cent interest) is a Mongolian-focused resource company that is involved in the mining and exploration of gold
- Aziana Limited (25 per cent interest) is an established gold and bauxite explorer with highly prospective projects in Madagascar
- Reed Resources Limited (5.17 per cent interest) is a diversified explorer and emerging producer with gold, lithium, titanium, vanadium and iron projects throughout Australia (the majority of this holding was acquired in late June and early July 2012)

# CHAPTER CONTENTS


| | |
|---|---|
| **Definitions** | **44** |
| Estimating methodology | 44 |
| Quality of deliverables | 44 |
| Other definitions | 44 |
| **Basis of estimate** | **45** |
| Project scope | 45 |
| Work breakdown structure | 45 |
| Organisational breakdown structure | 45 |
| Project execution plan | 45 |
| Schedule | 46 |
| **Developing and presenting the cost estimate** | **46** |
| Resources and organisation | 46 |
| Estimate | 47 |
| Contingency | 48 |
| Escalation | 48 |
| **Quality definitions** | **48** |
| **Levels of definition** | **48** |


# CONTRIBUTORS

**Neil Cusworth** FAusIMM, Executive Director, Enthalpy

# Capital Cost Estimation

This chapter sets out the basis of the content, extent of definition required and accuracy of estimates of capital costs for investments in mineral projects during each phase of the study. This chapter also sets out the quality of definitive estimates, which may need to be prepared during the project execution phase.

Studies include scoping, prefeasibility and feasibility phases of mining projects as defined in Chapter 2 – Basis of Studies.

The quality of capital cost estimates should be based on achieving defined quality levels for:

- defining the scope of the project
- defining the resources needed to carry out the project
- defining the engineering and project deliverables required to support the capital cost estimate
- defining the cost rates and provisions to be included in the capital cost estimate
- estimating costs that can be validated by supporting documentation that contains sufficient detail and is structured so that it can be used for cost management purposes during the delivery of the project (ie costs are demonstrable)
- identifying risks and related contingency plans or allowances, including uncertainties that require greater definition in future phases of study
- ensuring that the cash flow needed for the project can be forecast and then monitored during the project execution phase.

Certain projects will require a definitive estimate to be prepared during the project execution phase. Chapter 2 – Basis of Studies sets out the basis and the approach to these types of estimates. This chapter sets out the minimum quality and accuracy required for capital cost estimates prepared during:

- scoping studies
- prefeasibility studies
- feasibility studies
- the project execution phase.

## DEFINITIONS

Following are the defined terms and their description for the estimating methodology.

### Estimating methodology

The definitions outlined in Table 4.1 are used to describe the methodology applied to cost estimation.

### Quality of deliverables

The definitions outlined in Table 4.2 are used to describe the degree of completeness of engineering and other documents that provide data and quantities for the basis of estimates.

The specifics of the individual or group of deliverables used to define specification, drawing and design completeness needs to be evaluated on a case-by-case basis.

### Other definitions

Other terms commonly used in cost estimation are defined in Table 4.3. Some of these terms can be misunderstood; these are explained below.

A contingency allowance addresses known risks that are considered likely although initially ill-defined. It might include, for example, an extra budget of time or cost to cover possible weather delays. With reference to Chapter 1 – Using the Handbook, it includes Rumsfeld's 'known unknowns'. The term 'management reserve' is often used to cover the unknown unknowns and, if used, the two types of allowance should be kept separate. Neither should be used to cover scope changes, which require approval of a revised budget.

An escalation allowance covers cost increases due to general inflation or to increases in specific costs, such as labour, fuel or materials, over the term of the project. A detailed analysis of expected changes in costs in each area is usually required. Individual contracts usually include escalation clauses that reflect major sources of change that are beyond the control of the contractor.

The term 'allowance for growth' is sometimes used interchangeably with 'contingency allowance', but should be reserved for increases in cost resulting from increases in physical quantities that may occur after estimates have been prepared. For example, experience may suggest that the length of pipework required will be five per cent more than the length taken off plans because of the practicalities of installation.

While direct and indirect costs are adequately defined below, the term 'indirect costs' includes temporary

TABLE 4.1
Definitions of estimation methodologies.

| Methodology | Definition of methodology | Description |
|---|---|---|
| 1 | None | Work on development of deliverable has not begun, or is only conceptual in nature so a plug number is used. |
| 2 | Assessed | Costs based on judgement of general benchmarks but no quantities can be measured specifically and hence are not yet available. |
| 3 | Factorised | Proportioned from previous cost data and benchmarks.<br>Some general quantities can be measured for rating against benchmarks, sizing the growth allowances, contingency and escalation. |
| 4 | Budget priced | Supplier, vendor or contract developed cost estimate not necessarily a binding or detailed offer or tender. |
| 5 | Calculated | Using deliverables inputs, can accurately derive sizes or features on a detailed and trackable basis and to take-off quantities. |
| 6 | Detailed | All quantities can be from take-off.<br>Equipment and material supply costs quoted.<br>Labour cost rates and productivity either fully calculated or supported by budget or bids. |
| 7 | Final | Knowledge of quantities level of completeness based on engineering deliverables approved for construction status.<br>Equipment and material on order or firm quotes available.<br>Contracts awarded or evaluated tenders are available. |

facilities; construction support; and engineering, procurement and construction management (EPCM). However, it is often used as a catch-all including EPCM plus owners' costs and commissioning. The meaning of indirect costs in an estimate should always be made clear.

Owners' costs are defined in Table 4.3 and further defined in Table 4.5. They vary significantly according to the management approach taken by the owners, which in turn may depend on the size and experience of that company.

## BASIS OF ESTIMATE

The basis of estimate for the capital costs of a project must be capable of being reviewed as part of the normal quality assurance and peer review processes. The basis of estimate should be included to explain the estimating process and qualifications.

### Project scope

The basis of estimate should include a brief description of the scope of the potential project and reference the scoping, prefeasibility or feasibility study statement of the scope of the potential project.

Any exclusions from the project scope must be clearly stated in the basis of estimate. This includes work that will be performed by other parties, but which is needed so the potential project can be executed and/or operated.

The project scope statement included in the basis of estimate must present the work breakdown structure (WBS) at least down to and including Level 3 so that it includes areas, subareas and systems. The WBS ensures that the capital and operating cost estimates address each element of the project's scope of work and the operations basis and plan.

### Work breakdown structure

The capital cost estimate must be based on the project's WBS, which should follow a structure similar to:

- Level 1 – prime areas
- Level 2 – subarea of the project
- Level 3 – systems or work packages
- Level 4 – assets such as equipment or elements of construction
- Level 5 – commodity or trade-discipline components of costs
- Level 6 – type of cost (eg supply, freight, install).

### Organisational breakdown structure

The organisational breakdown structure (OBS) presents the operating costs for operating departments and general administration or process structure. The OBS may be aligned with the owners' costs section of the project WBS.

### Project execution plan

The basis of estimate should present an extract of the project execution plan (PEP), which presents the

TABLE 4.2
Definitions of quality of deliverables.

| Quality | Definition of quality level | Description |
|---|---|---|
| 1 | Assumed | Basis, criteria, layouts and sizes based on non-demonstrable experience and professional judgement. |
| 2 | Started | Work on deliverable has begun. Development is typically limited to sketches, rough outlines or similar levels of early completion, and may be sufficient to indicate, but not define, the scope. |
| 3 | Outlined | Primary features shown. Basis derived from valid data; that is, preliminary survey data. Dimensions are specified. |
| 4 | Approximate | Engineers' concept drawings or similar outlines based on assessed data and measured dimensions. Both primary and secondary features are shown. Some multidisciplinary checking has been completed. |
| 5 | Preliminary | Work on the deliverables is advanced. Interim cross-functional reviews have usually been conducted. Development may be near completion except for final reviews and approvals. Documents are sufficient to define scope and major sizes and locations, so that material take-offs (MTOs) can be be prepared. Better quality than 'approximate' but not yet defined or 'complete'. |
| 6 | Optimised | Complete documents are nearing status of approved for issue. Documents are at a defined level or quality with the technical and economic value of effort best case identified and are based on survey data, geotechnical data and selected equipment (but not certified equipment data). Multidisciplinary checking is complete. |
| 7 | Final | The physical dimensions and performance features of all items or areas can be set, such that design quantities can be measured for final estimating purposes. Documents are sufficient for issue for tender, or approved for construction with holds in place. All checking is complete and final, only awaiting certified data on some equipment. |
| 8 | Complete | Engineering has been reviewed, approved and completed. Documents are sufficient to define scope and quantities to allow trackable MTOs to be prepared, based on the status of released or for award of construction. Holds have been released. Certified data are now included. |

proposed approach to execute the project and bring the operations to readiness stage.

In summary, this requires each level of the project's WBS to be assigned to either the owners' project and operations groups, to the engineer or implementation contractor and to suppliers and construction contractors or other third-party organisations. In this way, the cost estimate basis of each work package can be defined.

The contracting plan, which will be included in the basis of estimate, should list the scope of each work package to identify:

- costs of the work being delivered through internal company costs, or external contracts or purchase orders
- tasks to be performed
- work or outcomes.

Each estimate item will be assigned to a work package, purchase order, contract or services agreement.

### Schedule

The project schedule is a necessary part of the basis of estimate. Most projects are highly sensitive to the cost–time relationship and the point of transition from capital to operations.

As the capital cost estimate depends on time, it is essential that the project schedule be aligned to the same project WBS as used for the cost estimate.

## DEVELOPING AND PRESENTING THE COST ESTIMATE

This section outlines the factors needed in a cost estimate, and methods to present them.

### Resources and organisation

The cost estimates must be based on a documented presentation of the resources and organisation proposed to deliver the scope of work. Typically a PEP presents the organisation and staffing plan (the resources) needed to execute the project and bring the operation into production.

It is essential that this information be developed and presented in the basis of estimate for the capital costs of the project. The information then directly translates to the cost estimate for the project. Hence, it is critical

TABLE 4.3
Other definitions used in cost estimation.

| Definition | Description |
|---|---|
| Allowance for growth | Amounts to cover the expected differences between measurements and final design quantities. Based on experience or corporate records. |
| Allowance for waste | Amounts added to cover the quantities needed for cutting to size or losses incurred in construction. |
| Baseline | Defined quantum used for a key performance indicator (KPI). |
| Budget price | Quoted price by a supplier or vendor that is based on defined technical requirements but limited to commercial and project definitions. Not necessarily a commercially binding offer. |
| Capex | Capital cost estimate (capital expenditures). |
| Class | Quality of estimate ranked in levels according to phases (Table 4.4). |
| Contingency allowance | Amount allowed for 'known unknowns' that will be spent during the project. |
| Direct costs | Supply and construction costs including contractor margins and freight but excluding project indirect and owners' costs. |
| EIS/EIA | Environmental impact study or assessment. |
| Escalation allowance | Amount to cover increasing inflationary costs over the schedule of the project. |
| Factor | Multiplier applied to a base criterion or provision, such that the total cost can be estimated; for example, known mechanical equipment supply cost times a multiplier gives the all-up installed cost of the equipment. |
| Indirect cost | Cost that is not a fixed asset of the project or that is a temporary asset removed after the project is completed. |
| Labour productivity | Difference between the budgeted hours and the real hours spent on a work task or activity. |
| P90, P10 | Probability of 90 per cent or ten per cent that the estimate will not exceed the stated value. |
| Proved and Probable | Reserve classifications as per the JORC Code. |
| MTO | Material take-off, which is a measure of quantities from drawings, sketches or output of a computer-aided design (CAD) system. Neat quantity[a]. |
| Opex | Operating cost estimate (operating expenses). |
| Owners' cost | Cost directly managed and normally delivered by the client of a project. |
| QS | Quantity survey; MTO is the result. |
| Quotes (firm/budget) | Defined offers with set prices for supply that can be accepted. |
| Prices (firm) | Defined prices set from multiple quotes from multiple suppliers; these are not a commercially binding offer, but the price is accurate. |
| Single check price | Telephone or short-form price from a vendor, supplier or contractor to validate an in-house detailed estimate. |
| Specific | Version developed uniquely for the project, not a generalised or generic version. |
| Take-off sketch | Engineer's or designer's sketch or diagram that is used to generate an MTO. |
| Tender price | Firm defined offer able to be accepted for the supply of equipment and materials for construction works. |
| Unit price | Cost per standard quantity of measure. |

a. Neat quantity is the as-measured amounts for the drawings or models, with no allowances for cutting, waste or order lengths or sizes, nor for growth, design or contingency-allowances.

to define the project staff and other support personnel needed, as well as the time that they will be engaged on the project.

## Estimate

The cost estimate for a project should include:

- costs by summary, area or departments
- costs by subareas
- costs by systems
- individual equipment numbers or elements of construction work
- indirect costs clearly identified by subareas and work packages
- owners' costs clearly identified by subareas, functions and positions
- each cost element for:

  - common distributable consumable cost
  - construction equipment
  - currency of each component of the estimate item
  - direct construction cost applicable
  - freight cost to site of the material or equipment
  - growth allowances
  - indirect costs of labour
  - installation or construction cost components
  - quantity and unit of measure
  - supply cost of the material or equipment
  - WBS code and estimate item number unique description
  - work package number for supply and/or installation
- trade type (eg civil, mechanical)
- indirect costs separately identifiable, contractors indirect cost or project indirect cost
- contingency and other provisions separately identified
- method of calculation fully described for each element
- sources of cost data fully described
- estimate split by currency for exchange rate purposes
- construction cash flow forecast
- benchmark comparisons.

### Contingency

All contingency calculations must be presented in detail in the estimate or study report. If the contingency calculation recommends a level of contingency lower than the minimum standard amounts set out in Section A4.1 of Table 4.5 then the study report should:

- state that the recommended contingency is less than the minimum standard
- demonstrate that the recommended contingency is adequate, and why.

### Escalation

Detailed escalation calculations should be presented in the appendices to the study report. The basis of the calculations must clearly state the factors, published basis or data used. The escalation will be a recommended value, and will be either included in the capital cost estimate, or in the financial evaluation model, depending on the owners' policy. Escalation calculations for feasibility study class estimates should be prepared by the estimator, with current experience of actual escalation.

## QUALITY DEFINITIONS

Table 4.4 presents quality definitions used in this chapter for capital cost estimates. The definitions generally align with the American Association of Cost Engineers Guidelines.

## LEVELS OF DEFINITION

Levels of definition required for each class of estimate (as defined in Table 4.4) are set out in Table 4.5. In this table, the purpose and phase of development are shown along with Class as given by the American Association of Cost Engineers (AACE).

Although Table 4.5 defines the classes of estimates, the classes should not be considered absolute levels. It is not necessary that the classes comply with all categories of cost estimates to achieve a certain accuracy in estimates for each phase.

TABLE 4.4
Classes of estimate.

| | |
|---|---|
| Class 5 | **Purpose – scoping study**<br>Methodology – generally estimated none to assessed<br>Deliverables – generally estimated assumed to outlined |
| Class 4 | **Purpose – prefeasibility study**<br>Methodology – generally estimated budget priced to calculated<br>Deliverables – generally estimated approximate to preliminary<br>Some calculated costs based on MTOs, preliminary budgets and some factorised limited assessed costs |
| Class 3 | **Purpose – feasibility study**<br>Methodology – generally estimated to detailed<br>Deliverables – generally estimated defined to complete |
| Class 2 | **Purpose – definitive**<br>Methodology – generally estimated to final<br>Deliverables – generally estimated to complete |
| Class 1 | 'As-built' cost estimates used to prepare asset registers on the estimate and completion cost of any project |

TABLE 4.5
Basis of capital cost estimate.

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| Level of definition – (expressed as a percentage of complete engineering using appropriate indicators; ie % of EPCM, % of engineering cost | 1 - 2% of full project engineering definition | 10 - 15% of full project study definition | 15 - 25% of full project study definition | 40 - 60% of full project definition being completed with minimum 60% engineering completed, minimum 40% procurement by value fixed by quotation and minimum 10% construction fixed by quotation or tender |
| Typical accuracy range based on P10 and P90 levels | ±30 to ±35%<br>For novel technology or underground projects for which there are no benchmarks the accuracy may be +35 to +50% | ±20 to ±25% | ±10 to ±15% | ±5 to ±10% |
| Quotations/tenders – supporting the estimates | None – benchmark data derived from existing mine, rail and port contracts | Equipment quotes and benchmark material supply and construction rates.<br>Mine, rail and port contracts factorised from existing arrangements with preliminary negotiations as to the likely differences | Multiple firm and budgetary equipment quotes. Multiple material supply and construction quotes and rates checked. Mine, rail and port, power, tailings facilities and water supply contracts negotiated to binding heads of agreement or near final agreements specific to the business case | Equipment selected or on order, tendered or firm quotes available. Tenders for material supply and construction costs. Some contracts awarded. Completed and executed mine, rail and port contracts specific to the project |
| **A. Capital cost estimates methodology** | | | | |
| **A1 – Mining costs** | | | | |
| A1.1 Mineral Resource classification | Indicated and Inferred | Indicated and Inferred | Measured, Indicated and Inferred | Measured, Indicated and Inferred |
| A1.2 Geotechnical conditions | Assumed or started | Preliminary | Defined | Detailed |
| A1.3 Hydrological conditions | Assumed or started | Preliminary | Defined | Detailed |
| A1.4 Site layout | Sketch | Preliminary | Defined – generally optimised | Complete |
| A1.5 Mine design criteria | Assumed or started | Preliminary | Defined – generally optimised | Complete for year 1 and defined thereafter |
| A1.6 Waste dump design criteria | Assumed or started | Preliminary | Defined – generally optimised | Complete for year 1 and defined thereafter |
| A1.7 Mine schedule | Assumed | Approximated | Optimised or preliminary – matched to fleet | Complete for year 1 and defined thereafter |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| A1.8 Mine equipment | None or assessed | Budget priced | Calculated or detailed | Final – quoted specifically |
| A1.9 Mine services | Assessed | Budget priced – sketch designed | Calculated or detailed – full outlines | Final |
| A1.10 Mine environmental compliance | Assumed | Preliminary | Defined – generally optimised | Complete |
| A1.11 Ore Reserve classification | Not required | Probable | Payback × 1.5 Proved; balance Probable | Payback × 1.5 Proved; balance Probable |
| **A2 – Plant and infrastructure costs** | | | | |
| A.2.1 Equipment quotes | None or factorised | Budget priced – single check price | Detailed – multiple firm or budgetary quotes | Final on prices – firm major equipment |
| A.2.2 Civil/structural | Assessed – sketched only | Budget priced – take-off sketch | Calculated or detailed – MTO and multiple quotes for supply costs, benchmarked hours to install | Final – tender or contract prices major contract packages |
| A2.3 Mechanical/piping | Assessed – calculate as % of key equipment or benchmarked costs | Budget priced – mix of MTOs and unit supply and construct factors | Calculated or detailed – MTO and multiple quotes – benchmarked to similar plus hours to install data | Final – tender or contract prices |
| A.2.4 Electrical/instruments | Assessed – calculate as $ per kW | Calculated for high voltage drives and medium voltage / low voltage over 100-kw drives. Factorised – $ per kW per drive for LV and less than 100 kW | Calculated – MTO and hours with benchmarked or budget quotes for installation and construction quotes | Final – estimates or tender prices |
| A2.5 Information systems/control systems | Calculate as % of total direct costs | Calculate as % of total direct costs | Calculated – mix of calculated and multiple quotes | Detailed tender or contract prices |
| A2.6 Labour rates | Not required | Factorised or benchmarked off best current information | Budget priced by contractors or equivalent, and benchmarked | Detailed or final – tenders or contracts prices |
| A2.7 Labour productivity | Included in general factorisation | Assessed | Calculated | Detailed – tenders or contracts prices |
| A2.8 Construction equipment | Not required | Factorised – $/h on labour rates | Calculated – $/h on labour rates – quoted or calculated for large cranes and special equipment costs | Detailed or final on quotes – firm |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| **A3 – Indirect costs** | | | | |
| A3.1 Temporary facilities | Calculate as % of direct costs | Calculate as % of direct costs | Calculated | Detailed or final – tender or contract price |
| A3.2 Construction support (eg camp, catering, third-party services, freight and duties, vendor representatives, first-fills, start-up and commissioning services, ramp-up assistance, insurance bonds permit support, operational manuals) | Calculate as % of direct costs | Calculate as % of direct costs for each component listed or identified | Calculated for each component at Level 3<br>Major cost items must be supported by budget quotations or fixed priced offers. | Detailed or final – tender or contract price |
| A3.3 EPCM services | Calculate as % of direct costs | Calculate as % of direct costs, checked to benchmarks | Calculated in detail – benchmarks used to verify detailed hours estimates by person and function. Overheads, project office costs quoted. Fee declared | Detailed or final – tender or contract price |
| **A4 – Owners' management services** | | | | |
| A4.1 Contingency (refer to notes in text)<br>Basis<br>Minimum<br>Others | Assessed or factorised for overall project<br>25 - 35% of total costs<br>Add up to 5% for project in existing operation<br>Add up to 5% for new or novel technology or underground projects | Calculated or detailed – by area<br>15 - 25% of total costs<br>Add up to 5% for project in existing operation<br>Add up to 5% for new or novel technology or underground projects | Detailed – by trade and area<br>10 - 15% of total costs<br>Add up to 5% for project in existing operation<br>Add up to 5% for new or novel technology or underground projects | Final – by trade and area<br>5 - 10% of total costs<br>Add up to 5% for project in existing operation<br>Add up to 5% for new or novel technology or underground projects |
| A4.2 Commissioning | Calculate as % of direct costs | Calculate as % of direct costs | Calculated or detailed | Detailed or final based quotes – firm |
| A4.3 Preproduction | Calculate as % of direct costs | Calculate as % of direct costs | Calculated or detailed | Detailed or final based quotes – firm |
| A4.4 Corporate costs | Calculate as % of direct costs | Calculate as % of direct costs | Calculated or detailed | Detailed or final based on quotes – firm |
| A4.5 Provisions | Calculate as % of direct costs | Calculate as % of direct costs | Calculated or detailed | Detailed or final based on quotes – firm |
| A4.6 Foreign exchange | Only identify major equipment components exposed to foreign exchange | Identify equipment and commodities to be imported, basis, values and likely currency. Quantify to Level 3. | Identify equipment and commodities to be imported basis, values and likely currency. Provide forecasts of changes. Quantify to Level 3. | Detailed – calculations of some actuals or basis. Would have knowledge of currencies |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| **B. Basis of deliverables and general project data needed to be available** | | | | |
| **B1 – General project** | | | | |
| B1.1 Baseline reports – climate, soils, geotechnical, hydrology, wind, wave etc | Assumed | Preliminary | Defined or complete | Complete |
| B1.2 Environment and community reports | Started – general assessment | Preliminary – focusing on constraints and issues | Defined – specific constraints, issues and commitments declared | Complete – management plans defined and detailed |
| B1.3 Project scope description | Started | Approximate to preliminary | Defined | Complete |
| B1.4 Integrated project execution plan | Started | Approximate | Defined – specific | Complete – specific |
| B1.5 Contracting strategy – implementation | Assumed | Outlined | Defined and generally optimised | Defined and detailed |
| B1.6 Project master schedule – implementation | Outlined to Level 2 | Preliminary (bar chart) to Level 3 and critical path verified. Preliminary resource analysis | Defined and resourced to Level 4 and the critical path fully detailed to activity Level 4. Resourced at Level 3 or lower | Actual to date, detailed and resourced to go |
| B1.7 Project master schedule – commissioning and ramp-up | Assumed to Level 2 | Outlined to Level 3 and critical path verified | Defined to Level 4 and the critical path fully detailed to activity Level 4 | Complete – resources and critical path detailed |
| B1.8 Work breakdown structure | Outlined to Level 2 | Level 3 and preliminary to Level 4 | Defined to Level 4 list of deliverables/ units of property, equipment items and tagged material items | Defined to Levels 5 and 6 |
| B1.9 Project code of accounts | None | Preliminary | Defined not to a cost report at Level 4 | Defined |
| B1.10 Escalation strategy | None | Preliminary | Defined and detailed to source currency for individual items | Defined |
| B1.11 Foreign exchange strategy | None | Preliminary | Defined multiple currency quotes may not be defined | Defined |
| B1.12 Contingency methodology | Assessed overall, or by areas | Approximate or calculated by area or trade. Maybe based on risk analysis | Detailed calculation and risk analysis. Detailed evaluations and presentations of design, growth and contingency allowances | Complete – calculation on the committed and the to go costs checked with risk analysis |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| B1.13 Accuracy | Assessed by judgement | Evaluated by area and subareas | Detailed analysis – Monte Carlo. Benchmarked with prior practices by subarea methodology | Detailed analysis – Monte Carlo |
| B1.14 Basis of estimate and methodology statement | Outline | Preliminary | Complete | Complete |
| **B2 – Engineering deliverables** | | | | |
| B2.1 Block flow diagrams | Started to optimised | Preliminary to complete | Complete | Complete |
| B2.2 Process flow diagrams | Assumed – basic outline | Started to preliminary | Preliminary to complete | Complete |
| B2.3 Piping and instrumentation diagrams | Some sketch only | Started. Maybe mark-ups of process flow diagram have started but must have main process lines and control valves defined | Preliminary to complete status. Only small bore piping remains to be defined | Complete |
| B2.4 Heat and material balances | Started | Preliminary | Complete | Final |
| B2.5 Design criteria | Outline | Preliminary | Complete | Final |
| B2.6 Overall site plan | Outline sketch | Started to preliminary | Preliminary to complete | Final |
| B2.7 Plot plans | None | Started to preliminary | Preliminary to complete | Final |
| B2.8 Process/mechanical equipment list | Started/preliminary | Started to preliminary | Preliminary to complete | Final |
| B2.9 Electrical equipment list | None | Started to preliminary | Preliminary to complete | Final |
| B2.10 Specifications and datasheets | None<br>Preliminary – possibly for some major mechanical | Started<br>Preliminary – for major mechanicals | Preliminary to complete | Final |
| B2.11 General arrange,ent drawings by facility or area | None | Started and some initial preliminary | Preliminary to complete | Final |
| B2.12 Mechanical/piping discipline drawings | None | Started | Preliminary to complete – small bore piping may only be 'started' | Complete |
| B2.13 Civil/structural discipline drawings | None | Started | Preliminary to complete | Complete |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| B2.14 Electrical single line diagrams | None | Started to optimised | Preliminary to complete – low voltage cabling and trays may only be 'started' | Complete |
| B2.15 Electrical discipline drawings | None | Started | Started to optimised – low voltage cabling and trays may only be 'started' | Preliminary/complete |
| B2.16 Instrumentation and control discipline drawings | None | None | Started to optimised – low voltage cabling and trays may only be 'started' | Preliminary/complete |
| B2.17 Process/system capacity simulations | None | Preliminary | Complete | Complete |
| B2.18 Communications and data capture systems | None | Stated to optimised | Preliminary to complete | Complete |
| B2.19 Spare parts listings | None | Started | Optimised or preliminary | Complete |
| B2.20 Environmental management | Assumed | Preliminary | Defined | Complete |
| B2.21 Cash flow | Not required | Preliminary – annual | Detailed | Updated monthly |
| B2.22 Information systems | None | Started to preliminary | Preliminary to complete | Complete |
| B2.23 Information systems plan, as per PEP | None | Started | Preliminary to complete | Complete |
| **B3 – Owners' deliverables** | | | | |
| B3.1 Project execution phase and procedures | Assumed | Outline or preliminary execution plan | Defined – project execution phase | Complete – PEP and defined operations plans |
| B3.2 Operational readiness plan | Assumed | Outlined | Preliminary – included in project execution phase | Defined |
| B3.3 Permits and approvals | Assumed | Identified and commenced | Essentially complete with approval document and management plans issued | Complete |
| B3.4 Baseline environmental conditions | Desktop review | Baselines commenced | Complete (known basis) | Complete |

TABLE 4.5 CONT ...

| | Scoping study – Phase 1 | Prefeasibility study – Phase 2 | Feasibility study – Phase 3 and investment decision quality | Project execution – Phase 4 and definitive estimate |
|---|---|---|---|---|
| | Class 5 | Class 4 | Class 3 | Class 2 |
| B3.5 Health, safety, environment and community standards and policies | Declared policy | Declared policy and basis | Declared policy and expanded to suit circumstances | Complete |
| B3.6 Communications and stakeholder liaison | Not required | Started/preliminary | Preliminary/complete | Complete – ongoing status review |
| B3.7 Human resources strategy | Not required | Preliminary | Defined | Complete – ongoing status review |
| B3.8 Financing plan and strategy | Not required | Not required | Defined – conditions precedent identified | Complete |
| B3.9 Marketing plan and strategy | Not required | Broad market assessed and particular market identified | Defined plan and off take negotiated | Complete |
| B3.10 Purchasing plan and strategy | Not required | Not required | Defined plan | Complete |
| B3.11 Economic modelling | Assumed – rudimentary annual cash flows | Optimised – cash flow model integrated with production scenarios | Defined – cash flow model with all cash flows (including financing and taxation), plus multiple scenario analysis and simulation | Complete – regular update and review |

Note: Class 1 does not appear in Table 4.5 because this class represents the actual final costs after the project has been completed.

Similarly, a particular class of estimate for capital costs may be met, but for demonstrable reasons the operating cost estimates may achieve a different class of estimate.

As represented above, classes of estimates for capital costs span a range of likely accuracies for each methodology.

*It is noteworthy that the accuracy should typically be +35 to +50 per cent for the scoping phase, novel technology or underground projects for which there are no benchmarks.* A similar relationship exists for accuracy of the operating cost estimate.

The *lowest class of the quality of an estimate* achieved for any area of an estimate should decide the overall class achieved for the overall project estimate. Should one or more individual cost items not achieve the stated accuracy levels, but other items *exceed* the stated accuracy level, then the overall class in that area may be achieved for the whole project estimate.

The methodology used and the quality of deliverables will determine the class of estimate, and hence the accuracy achieved by the end of a phase.