# Exhibit 8

# Annual Information Form

AFRICO RESOURCES LTD

For the Fiscal Year Ended December 31, 2007

March 28, 2008

**Table of Contents**


| | | |
|---|---|---|
| **ITEM 1** | **CORPORATE STRUCTURE** | **2** |
| 1.1 | Name, Address and Incorporation | 2 |
| 1.2 | Intercorporate Relationships | 2 |
| **ITEM 2** | **GENERAL DEVELOPMENT OF THE BUSINESS** | **2** |
| 2.1 | Overview | 2 |
| 2.2 | Three Year History | 3 |
| 2.3 | Significant Acquisitions | 3 |
| **ITEM 3** | **NARRATIVE DESCRIPTION OF THE BUSINESS** | **3** |
| 3.1 | General | 3 |
| 3.2 | Material Contracts | 4 |
| 3.3 | Competitive Conditions | 5 |
| 3.4 | Environmental Protection | 5 |
| 3.5 | Employees | 6 |
| 3.6 | Foreign Operations | 6 |
| 3.7 | Bankruptcy and Similar Procedures | 6 |
| 3.8 | Reorganization | 6 |
| 3.9 | Social or Environmental Policies | 6 |
| 3.10 | Mineral Projects – The Kalukundi Property | 7 |
| 3.11 | Risk Factors | 14 |
| **ITEM 4** | **DIVIDENDS** | **21** |
| **ITEM 5** | **DESCRIPTION OF CAPITAL STRUCTURE** | **21** |
| **ITEM 6** | **MARKET FOR SECURITIES** | **21** |
| 6.1 | Trading Price and Volume | 21 |
| **ITEM 7** | **ESCROWED SECURITIES** | **22** |
| **ITEM 8** | **DIRECTORS AND OFFICERS** | **22** |
| 8.1 | Name, Occupation and Security Holding | 22 |
| 8.2 | Cease Trade Orders, Bankruptcies, Penalties or Sanctions | 23 |
| 8.3 | Conflicts of Interest | 24 |
| **ITEM 9** | **PROMOTERS** | **24** |
| **ITEM 10** | **AUDIT COMMITTEE** | **24** |
| 10.1 | The Audit Committee's Charter | 24 |
| 10.2 | Composition of the Audit Committee | 24 |
| 10.3 | Relevant Education and Experience | 24 |
| 10.4 | External Auditor Service Fees | 25 |
| **ITEM 11** | **LEGAL PROCEEDINGS** | **25** |
| **ITEM 12** | **INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS** | **26** |
| **ITEM 13** | **TRANSFER AGENTS AND REGISTRARS** | **26** |
| **ITEM 14** | **MATERIAL CONTRACTS** | **26** |
| **ITEM 15** | **INTERESTS OF EXPERTS** | **26** |
| **ITEM 16** | **ADDITIONAL INFORMATION** | **26** |

Schedule A – Audit Committee Charter

AFRICO
RESOURCES LTD

All information contained in this Annual Information Form ("**AIF**") for the fiscal year ended December 31, 2007 of **AFRICO RESOURCES LTD.**, referred to herein as "**Africo**" or the "**Corporation**", is as at December 31, 2007, unless otherwise indicated.

## FORWARD LOOKING STATEMENTS

This AIF may include or incorporate by reference certain statements that are "forward looking statements". All statements, other than statements of historical fact, included or incorporated by reference in this AIF that address activities, events or developments that Africo or its management expects or anticipates will or may occur in the future, including such things as future capital expenditures (including the amounts and nature thereof), business strategies and measures to implement strategies, goals, expansion and growth of its business and operations, plans and references to the future success of Africo, and other such matters, are forward-looking statements. Forward looking statements are statements that are not historical facts and are generally, but not always, identified by the words "expects", "plans", "anticipates", "believes", "intends", "estimates", "projects", "potential" and similar expressions, or that events or conditions "will", "would", "may", "could" or "should" occur. These forward-looking statements are based on certain assumptions and analyses made by Africo and its management in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. Although Africo believes the expectations expressed in such forward-looking statements are based on reasonable assumptions, such statements are not guarantees of future realities and actual realities may differ materially from those in forward looking statements. Investors are cautioned that any such statements are not guarantees of future realities and actual realities or developments may differ materially from those projected in the forward-looking statements. Whether actual results and developments will conform to the expectations and predictions of Africo and its management is subject to a number of risks and uncertainties, including those risk factors discussed under "Risk Factors" and elsewhere in this AIF and the documents incorporated by reference. Consequently, all of the forward-looking statements made in this AIF and the documents incorporated herein by reference are qualified by these cautionary statements and other cautionary statements or factors contained herein or in documents incorporated by reference herein, and there can be no assurance that the actual results or developments anticipated by Africo and its management will be realized or, even if substantially realized, that they will have the expected consequences for, or effects on, Africo. Forward looking statements are based on the beliefs, estimates and opinions of Africo's management on the date the statements are made. Unless otherwise required by law, Africo expressly disclaims any intention and assumes no obligation to update or revise any forward-looking statements in the event that management's beliefs, estimates or opinions, or other factors, should change, whether as a result of new information, future events or otherwise.

## ASSUMPTIONS IN PREPARING THIS AIF

**Pursuant to legal proceedings described elsewhere in this AIF (see "Item 11 – Legal Proceedings") and as outlined in Africo's Management Discussion & Analysis for the year ended December 31, 2007, Africo's indirect interest in Swanmines s.p.r.l ("Swanmines"), the holder of the permit for the Kalukundi Property was sold without Africo's consent in execution of a judgement against Africo. Africo and its subsidiaries have initiated legal proceedings to set aside the judgment and to have H&J Swanepoel Famille Trust s.p.r.l. ("H&J") regain its interest in Swanmines. The proceedings are at an early stage and the outcome cannot be known or predicted. There is a significant risk that the outcome will not be favourable to Africo.**

**Africo's principal active business as of the date of this AIF is the prosecution of the legal proceedings referenced above. However, this AIF has been prepared on the assumption that (i) Africo, through its**

**subsidiaries, will regain its interest in Swanmines and its principal active business will once again be the exploration and development of the Kalukundi property and (ii) in regaining its interest, Africo and its subsidiaries will revert to precisely the position they were in prior to the forced sale. This assumption has been made for the sole purpose of preparing this AIF. No inference from the fact that it has been made to the likelihood of it becoming true is warranted or intended.**

## ITEM 1 CORPORATE STRUCTURE

### 1.1 Name, Address and Incorporation

Africo was incorporated under the *Canada Business Corporations Act* on July 4, 2006 under the name "CopperCo Resource Corp.". On December 8, 2006, it completed a Plan of Arrangement with Rubicon Minerals Corporation, and Africo Resources Ltd. (now called Africo Resources (B.C.) Ltd.), among others. It also changed its name to "Africo Resources Ltd." concurrent with the completion of the Plan of Arrangement. See "Item 3.8 – Narrative Description of the Business – Reorganization".

Africo's head office and principal business address is #1108 - 1030 West Georgia Street, Vancouver, British Columbia and the registered and records office is located at Suite 1810 – 1111 West Georgia Street, Vancouver, British Columbia.

### 1.2 Intercorporate Relationships

The following chart identifies Africo's principal subsidiaries, Africo's current interest in such subsidiaries, directly or indirectly, and the jurisdictions of incorporation.




(1) Dr. Antony Harwood, the President and Chief Executive Officer of Africo, currently holds 52% of the shares of The Enterprise H&J Swanepoel Famille Trust sprl ("**H&J**") in trust for Kisankala Mining Corp. ("**Kisankala**"). Dr. Harwood has agreed to hold these shares in trust for Kisankala until such time as they can be re-transferred to Kisankala. See "Item 3.11 – Risk Factors".

***H&J was the holder of a 75% interest in Swanmines s.p.r.l, which is the holder of the permit for the Kalukundi Property. See "Item 11 – Legal Proceedings".***

## ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS

### 2.1 Overview

Africo is an exploration company that is focused on the further exploration and development of the Kalukundi Property which is located in the Democratic Republic of the Congo (the "**DRC**"). Africo's common shares are listed on The Toronto Stock Exchange (the "TSX")under the symbol "ARL". Africo's principal activities include mineral exploration, development and mining, with a focus on the copper and cobalt sectors in the DRC.

**2.2 Three Year History**

The following is a summary of the general development of Africo's business over the past three years.

***2005***

Africo Resources (B.C.) Ltd. ("**Africo BC**") funded exploration on the Kalukundi Property with a view to completing a feasibility study.

***2006***

May 18, 2006 – Africo BC funded a feasibility study on the Kalukundi Property for and on behalf of H&J and Swanmines.

November 23, 2006 – Africo BC completed a financing of subscription receipts which entitled holders to acquire Units of Africo for gross proceeds of $20,000,000.

December 8, 2006 – Africo completed the Plan of Arrangement with Rubicon Minerals Corporation and Africo BC, among others. See "Item 3.8 – Narrative Description of the Business – Reorganization".

December 15, 2006 – Africo's common shares commenced trading on The Toronto Stock Exchange.

***2007***

January 30, 2007 – Africo returned positive assay results from the Kalukundi Property resulting in further drilling being planned to delineate additional resources.

February 23, 2007 – Africo became aware of a default judgment in respect of a termination payment to an ex-employee. Sale in execution pursuant to this judgment created issues in respect of an ownership interest in Swanmines as further described in "Item 11 – Legal Proceedings".

March 31, 2007 – Kisankala acquired the remaining 52% of shares in H&J not held by Africo, taking Africo's interest in H&J to 100%. Subsequent to this date, however, the 52% interest in H&J was transferred to Dr. Antony Harwood, the President and Chief Executive Officer of Africo. Dr. Harwood has agreed to hold these shares in trust for Kisankala until such time as the shares are re-transferred to Kisankala, which transfer is anticipated to complete in April, 2008. See "Item 3.11 – Risk Factors" and "Item 1.2 – Intercorporate Relationships".

November 28, 2007 – Africo completed a financing with the International Finance Corporation for gross proceeds of $4,000,000.

**2.3 Significant Acquisitions**

Africo did not complete any significant acquisitions during its most recently completed fiscal year.

**ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS**

**3.1 General**

**Pursuant to legal proceedings described elsewhere in this AIF (see "Item 11 – Legal Proceedings") and in Africo's Management Discussion & Analysis for the year ended December 31, 2007, Africo has initiated legal proceedings to regain its interest in Swanmines, the holder of the permit for the Kalukundi Property (hereinafter referred to as the "Kalukundi Property" or the "Kalukundi Project" - see "Item 3.10 – Narrative Description of the Business – Mineral Projects – The Kalukundi Property"). Please see the section entitled "ASSUMPTIONS IN PREPARING THIS AIF".** In the event that Swanmines does re-establish

ownership to the Kalukundi Property, there can be no assurance that the Kalukundi Property will prove to be economic. Africo's primary objective, once ownership of the Kalukundi Property is established, is to carry out the exploration and development programs recommended by the Kalukundi Report (as defined below) and as may be amended from time to time. In order to develop the Kalukundi Project in accordance with the Feasibility Study (as herein defined), Africo will be required to secure additional equity and debt financing. There can be no assurance that Africo will be successful in its endeavours. See "Item 3.11 – Risk Factors".

### 3.2 Material Contracts

The following agreement governs Africo's business:

***Contract (as amended) for the Establishment of a Company between La Generale des Carrieres et des Mines ("GCM") and The Enterprise H&J Swanepoel Famille Trust sprl (H&J) for the Mining of the Kalukundi Deposits dated February 2001 (the "Swanmines Agreement")***

GCM, an entity controlled by the government of the DRC, was the exclusive holder of the rights relating to the Kalukundi Property as more particularly described in this AIF. Pursuant to the Swanmines Agreement, GCM and H&J set up a private limited liability company called Société d'exploitation des gisements de Kalukundi (hereinafter referred to as "**Swanmines**"), of which GCM was to own 45% of the outstanding share capital and H&J was to own 55% of such outstanding share capital. As described below, the Swanmines Agreement was amended to increase H&J's interest to 75%.

GCM covenanted to transfer to Swanmines all its right, title and interest in the Kalukundi Property and to provide to Swanmines all data, information, registers and reports on the Kalukundi Property in its possession. GCM also committed to obtain all regulatory approvals in connection with the mining operations on the Kalukundi Property.

H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi Property, to finance a feasibility study on the Kalukundi Property, to commit all necessary funds to commence commercial production on the Kalukundi Property and to finance the building of a metallurgical processing plant following the recommendations of the feasibility study. The Swanmines Agreement provides that: "…as from the date on which the feasibility study is made available to both parties, H&J will dispose of a period of 6 months to find, …" the financing necessary for the investments that will lead to commercial production as decided on the basis of the feasibility study (and the construction of the facilities should start within six months following the expiry of this six month period). In addition, the Swanmines Agreement provides that "…Advances made in the form of a loan by H&J will represent approximately 30% at least of the financing of the first phase of the project…". On or about November 15, 2006, Africo delivered a notice to Swanmines and GCM confirming Africo's decision to place the deposit into commercial production and to commence construction of the facilities necessary to do so, and provided such parties with a proposed program and budget with respect thereto.

The Swanmines Agreement also provides that GCM has no responsibility with regard to financing of the Kalukundi Property and should be informed of the procedures put in place to effect such financing and may give its opinion on such procedures, where relevant. In addition, the Swanmines Agreement requires GCM to be informed of whether or not Africo intends to obtain, in part, the financing necessary to put the Kalukundi Property into commercial production from international banks and agencies and H&J confirmed its capacity to do so. GCM agreed to give its full co-operation to Africo to facilitate the granting of such financing, in particular by signing any document and by giving all assurances that may be reasonably required to obtain such financing, without any financial commitment on the part of GCM.

Swanmines covenanted to carry out all mining and exploration activities on the Kalukundi Property, to undertake a feasibility study, to mine the Kalukundi deposits and to process the ore in plants according to the recommendations of such feasibility study on the condition that these recommendations would be accepted by both parties to the Swanmines Agreement, and comply with technical mining standards. Further, Swanmines also covenanted to provide the parties to the Swanmines Agreement with a feasibility study within 24 months of the date of its establishment (the "**Feasibility Study**"). The Feasibility Study was funded by Africo and delivered to the parties pursuant to the Swanmines Agreement on May 18, 2006.

The Swanmines Agreement provides that the net profits from the Kalukundi Property will be allocated as follows: 60% to repay all loans incurred by Swanmines and 40% to GCM and H&J, in accordance with their respective proportionate interests in Swanmines and, thereafter, the net profits will be allocated in proportion to the ownership interests of GCM and H&J in Swanmines.

The Swanmines Agreement is in effect until the Kalukundi Property can no longer be mined or until it is terminated by mutual agreement of the parties. The Swanmines Agreement may also be terminated by H&J on 30 days written notice in which case it will transfer its interest to GCM, any indebtedness of Swanmines to H&J will be cancelled, and H&J will remain solely responsible for commitments to third parties. GCM may also terminate the Swanmines Agreement if there is a serious and continuous default or non-compliance by H&J, or non compliance with the deadlines imposed on H&J, that is not remedied within 30 days of receipt of written notice from GCM, in which case GCM will be released of all of its obligations, H&J will remain solely responsible for all its commitments towards third parties, and the indebtedness of Swanmines to H&J will be cancelled. In addition, the Swanmines Agreement provides that "…should GCM fail to execute a non venial provision…" of the Swanmines Agreement, H&J may suspend the execution of its obligations until GCM's failure has been remedied and if GCM does not remedy a failure within 30 days of receipt of a warning from H&J, H&J may terminate the Swanmines Agreement in accordance with the dispute resolution provisions of the Swanmines Agreement.

The Swanmines Agreement was amended by subsequent amendments, the total effect of which was to reduce the interest of GCM in Swanmines to 25% and increase the interest of H&J to 75% effective May 18, 2004. The amendments also extended the time for Swanmines to present the Feasibility Study to 24 months from the last amendment dated May 18, 2004, and provided that Swanmines would pay a royalty of 2.5% on its gross turnover to GCM (a portion of which GCM could require to be paid in advance). In addition, the amendments provide that if the parties are unable to resolve a dispute, the dispute will be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce of Paris (the "**Rules**"), by one or more arbitrators appointment in accordance with the said Rules.

The Swanmines Agreement, as amended, provides for Swanmines to be administered by a management board made up of seven members: four appointed from candidates presented by H&J and three appointed from candidates presented by GCM (the "**Management Board**"). The president of the Management Board will be chosen from one of the members appointed by H&J, the vice-president will be chosen from one of the members appointed by GCM. The post of managing director will be filled by a candidate proposed by H&J and the post of deputy managing director will be filled by a candidate proposed by GCM.

The Management Board will appoint as the general manager the candidate put forward by H&J and as the deputy general manager the candidate put forward by GCM. The general manager will manage and control operations in accordance with certain programs and budgets that are adopted by the Management Board.

### 3.3 Competitive Conditions

Africo competes with numerous other companies and individuals, including competitors with greater financial, technical and other resources than Africo, in the search for and the acquisition of attractive mineral properties in the DRC and elsewhere in Africa. See "Item 3.11 – Risk Factors".

### 3.4 Environmental Protection

Africo BC, on behalf of H&J and Swanmines, has completed an Environmental Impact Assessment by virtue of obtaining an exploitation license on the Kalukundi Project. H&J and Swanmines submitted an Environmental Action Plan ("**EAP**") to the Ministry of Environment in the DRC which was approved on April 25, 2007. The EAP has a Relocation Action Plan component ("**RAP**"). The RAP details the relocation of the Kisankala Village where the Kalukundi Project is located and the compensation due to bone fide villagers. The first step in the RAP was to hold a meeting with the villagers where they were presented with the plans for a new village and were required to vote on whether to relocate or not. The result of the vote was in favour of relocating and, accordingly, plans will be put in place to implement the relocation as and when necessary. Africo expects to receive final approval of the RAP from the Ministry of Environment in the near future.

**3.5 Employees**

Africo employs in the DRC a total of 40 Congolese and 11 expatriates throughout the year on a full or part-time basis. In addition, it has two full time staff members in its Vancouver head office.

**3.6 Foreign Operations**

Substantially all of Africo's operations are currently conducted in the DRC. In the DRC, the assets and operations of Africo are subject to various political, economic and other uncertainties. See "Item 3.11 – Risk Factors".

**3.7 Bankruptcy and Similar Procedures**

Neither Africo nor any of its subsidiaries have been subject to any bankruptcy, receivership or similar proceedings within the three most recently completed financial years or during or proposed for the current financial year.

**3.8 Reorganization**

Africo, which was then CopperCo Resource Corp., entered into a plan of arrangement (the "**Arrangement**") pursuant to an Arrangement Agreement made as of July 6, 2006, as amended, among Rubicon Minerals Corporation ("**Rubicon**"), Paragon Minerals Corporation, and Africo BC. The Arrangement was effective on December 8, 2006. As a result of the Arrangement, Africo:

- acquired the shares of Africo BC then held by Rubicon;
- distributed common shares of Africo to Rubicon's shareholders; and
- acquired the remaining shares of Africo BC not then held by Rubicon in exchange for common shares of Africo;

with the result that Africo BC became a wholly-owned subsidiary of Africo.

**3.9 Social or Environmental Policies**

Africo has adopted an environmental policy and is committed to developing and fostering a culture of environmental care, both within the corporation and in the community. As such, Africo is committed to:

- complying with environmental legislation and regulations as the baseline for its environmental performance and striving to achieve best practice in every aspect;
- managing its operations to minimize or eliminate negative environmental impacts wherever practicable;
- conducting business with service providers and contractors who have a similar commitment to the environment and who embrace its environmental policy; and
- striving for the most efficient use of energy and water, the prevention of pollution and minimizing waste by recycling wherever possible.

Africo has also adopted a community relations policy as it understands that it is a guest in all the countries in which it operates. As such, Africo respects local culture and customs and integrates into the surrounding community through its social development programs. Expatriates are inducted in the local culture and encouraged to learn the local language, to ensure harmonious relationships and good communication are maintained. Where the required skills are available, Africo recruits from the surrounding community. Similarly, where price and quality are acceptable, Africo's policy is to purchase locally, supporting the local economy.

### 3.10 Mineral Projects – The Kalukundi Property

**Africo is currently engaged in litigation to regain its interest in Swanmines, the holder of title to the Kalukundi Property - see "Item 11 – Legal Proceedings".** There can be no assurance that it will be successful in doing so.

The following summary with respect to the Kalukundi Property has been reproduced from a technical report on the Kalukundi Property dated June 2006 (the "**Kalukundi Report**" or the "**Technical Report**") written by John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., who was retained by Africo BC to prepare a technical report compliant with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* ("**NI 43-101**"). Both Mr. Hearne and Dr. Verbeek are a "Qualified Person" and considered "independent" as both those terms are defined in NI 43-101. Further details with respect to the Kalukundi Property are available from the Kalukundi Report, which is incorporated herein by reference and is available for public review on the Internet at the System for Electronic Document Analysis and Retrieval (SEDAR) website: www.sedar.com.

***Summary***

"Introduction

RSG Global Pty Ltd (RSG Global) has been commissioned by Africo Resources Limited (Africo) to compile a technical report on the Kalukundi copper cobalt Project located in the copper belt of the Democratic Republic of the Congo (DRC). This report is to comply with disclosure and reporting requirements set forth in National Instrument (NI) 43-101, Standards of Disclosure for Mineral Projects, and in compliance with Form 43-101F1 (the "**Technical Report**").

This report pertains to the four main deposits that comprise the Project, namely the Principal, Anticline, Kalukundi and Kii Fragments.

Location

The Kalukundi Project is located within the Kolwezi District of Katanga Province in the south-east of the DRC. The Kalukundi Project area is located 60km to the east of Kolwezi and just 4km to the north of the main road between Likasi and Kolwezi. The village of Kisankala is situated close to the Principal and North Fragments of the Kalukundi deposit. The Kalukundi Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years. The tenement is 19.5km2 in extent, consisting of 23 carres or blocks.

Ownership

The exploitation permit for Kalukundi is held by Swanmines and the ownership of Swanmines is shared between H & J Family trust (75%) and Gécamines (25%). Africo currently holds a 48% interest in H & J Family Trust and has the option to increase this holding to 100%. Rubicon Minerals Corporation (Rubicon), a publicly listed Canadian company (TSX and AMEX) holds a 39.6% interest in Africo. Africo is a private Canadian registered company and has secured funding through Rubicon and independent shareholders to provide funding for the exploration programme and feasibility study on the project. Thus far, over $9M has been committed to the project.

Project Geology

Base metal mineralisation in the world class Zambian and DRC Copperbelt provinces is hosted by sedimentary rocks of the Neo-Proterozoic Katangan Sequence, developed within the Lufilian Arc. This Copperbelt extends over 600km from Luanshya (Zambia) in the southeast and to Kolwezi in the Democratic Republic of the Congo (DRC) in the northwest. Even with sustained production over almost 100 years, there are still huge resources of Cu and Co in this extensive mineral province.

The Katangan Supergroup rocks are up to 7,000m thick and are underlain by basement granite, intermediate metavolcanic and metasedimentary rocks dated at between 1,800Ma to 2,000Ma.

The Katangan Supergroup is subdivided into Roan, Lower and Upper Kundelungu Groups. Mineralisation at Kalukundi occurs within the Mines Sequence (or *Series des Mines*) which is correlated with the Lower Roan rocks within the SE part of the Lufilian arc in Zambia. The sediments represent a facies continuum of proximal to intermediate and distal dolomitic mudstones, siltstones, sandstones and algal reef fragments. The Katangan Supergroup sediments in Zambia are deformed by a series of open folds, whereas in the DRC the Katangan Supergroup is preserved both as tightly folded, but relatively intact sequences and as complexly deformed, locally continuous but structurally dismembered 'rafts' of lower Roan strata (*Series Des Mines*) within a 'mega breccia' or melange that contains abundant evaporite minerals. The mega breccia is probably the result of decoullement at the northern margin of the basin and northward thrusting of the Katangan Supergroup over basement lithologies (granites and gneisses) and other, higher, Katangan Supergroup stratigraphy. The mega breccia is probably of tectonic origin, focussed on incompetent chemical sediments.

Metamorphic grade increases southwards but within the Kalukundi area very low-grade chlorite facies metamorphism is evident.

Of the twelve fragments identified in the Kalukundi concession area, only four are the subject of this report. These are the Principal, Anticline, Kalukundi and Kii Fragments.

The Mines series rocks in particular have undergone deep weathering and hypogene alteration, assisted possibly by the acids formed by the breakdown of sulphides. The core units have been silicified and the remobilisation processes have resulted in redistribution of the copper-cobalt mineralisation into open spaces within the Mines Series rocks.

Resource Drilling

The dimensions of the four fragments discussed in this report, expressed as strike length and drilled width, are:

- Principal 630m x 36.70m
- Anticline 150m x 80.25m
- Kalukundi 430m x 44.18m
- Kii 330m x 40.84m

Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the 'manual' drilling of shallow exploratory holes for mapping purposes.

Active exploration has been carried out by three main companies, Gécamines, JCI and Swanmines since about 1986.

Drilling for resource evaluation purposes has been carried out in three campaigns:

| | | | |
|---|---|---|---|
| Gécamines in 1986/87 | 8 holes | 2809m | 10% of the resource drillholes |
| JCI/Seo-Consult in 2001/02 | 12 holes | 1440m | 15% of the resource drillholes |
| Africo Resources/Swanmines 2004/05 | 58 holes | 5401m | 5% of the resource drillholes |
| **Totals** | **78 holes** | **9650m** | |

In addition to the above, 58 holes drilled by Africo, a further 30 boreholes, not used directly in the resource evaluation, were drilled for geotechnical, condemnation and exploration purposes.

Data Quality

QAQC data provided by Africo meets industry standard levels of precision and accuracy. The standards and blanks show good levels of accuracy, core duplicate and interlaboratory pulp-duplicate data showed high levels of precision.

Mineral Resources

Classification of the mineral resource at Kalukundi was based on data quality, drill spacing, confidence in continuity and various kriging efficiency measures. RSG Global considers confidence in the grade estimates to be good, even though drillhole density is limited down dip. Confidence is supported by low grade variability and low skewness parameters. Only resources above 200m below surface have been considered "potentially economically extractable". Resource models exist below this, but extraction of this material would most likely be by underground methods. No evaluations of underground parameters have yet been carried out and hence no resources have been quoted below this level. Furthermore these resources are predicated on very limited drilling information. Significant exploration potential is suggested by these models.

Mineral Resources are tabulated below, based on a 1.5% copper-equivalent cutoff at a 12:1 copper to cobalt equivalence ratio.

**Table 1.7_1**
**Kalukundi Project**
**Resources Between Surface and 200 Metres Below Surface**

| | Resource Tonnes | % Copper Grade | % Cobalt Grade | Copper (Mlbs) | Cobalt (Mlbs) |
|---|---|---|---|---|---|
| Measured | 9,648,484 | 2.45 | 0.61 | 521.5 | 130.1 |
| Indicated | 2,505,924 | 2.29 | 0.61 | 126.6 | 33.7 |
| **Total Measured + Indicated** | **12,154,408** | **2.42** | **0.61** | **648.1** | **163.8** |
| **Inferred** | **15,020,674** | **2.63** | **0.58** | **871.5** | **192.6** |

Resources with the highest confidence levels of continuity and grade occur from surface down to 150m where the density of drilling is greatest. The Resource from 150m to 200m falls almost entirely into the inferred category. Modelling below 200m suggests exploration potential for approximately 16Mt of mineralised material.

Mineral Reserves

The Project mineral Reserve estimate as of May 2006 is reported in Table 1.8_2. All stated Reserves are completely included within the quoted Resources. The input parameters used in the Reserve estimate are described in Section 17. For ease of reference, however, a summary of the most pertinent input parameters is provided in Table 1.8_1.

**THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

**Table 1.8_1**
**Kalukundi Project**
**Summary of Input Parameters used for Reserve Estimation**

| **Item** | | | **Value** |
|---|---|---|---|
| Cu Price | | $/lb | 1.25 |
| Co Price | | $/lb | 12.00 |
| Diesel fuel price | | $/lb | 1.29 |
| Mining cost | Ore | $/t | 3.12 |
| | Waste | $/t | 4.01 |
| Processing Costs | 0-10m | $/t | 35.35 |
| | 10-20m | $/t | 36.96 |
| | 20-30m | $/t | 39.02 |
| | 30-40m | $/t | 41.53 |
| | 40-50m | $/t | 44.50 |
| | 50-60m | $/t | 47.93 |
| | 60-70m | $/t | 51.80 |
| | 70-80m | $/t | 56.14 |
| | 80-90m | $/t | 60.92 |
| | 90-100 | $/t | 66.16 |
| | 100-110m | $/t | 71.86 |
| | 110-120m | $/t | 78.01 |
| Processing Recoveries | | % | Variable |
| G&A | | M$/yr | 7.2 |
| Mine supervision | | M$/yr | 1.27 |
| Grade control | | $/t | 0.06 |
| De-watering | | M$/yr | 0.5 |
| Stockpile rehandle | | $/t ore | 1.16 |
| Mining dilution | | % | 2 |
| Mining recovery | | % | 97 |
| Inter ramp slope angle | | Degrees | Variable |
| Royalty | Government | % | 2.0 |
| | Gecamines | % | 2.5 |
| Metal Transport | Cu | $/t | 300 |
| | Co | $/t | 377 |

**THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

**Table 1.8_2**

**Kalukundi Project**

**Reserve Summary by Fragment**

| Fragment | Reserves | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Proven | | | | | Probable | | | | | Total | | | | |
| | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | |
| | | Cu [%] | Co {%] | Cu [t] | Co [t] | | Cu [%] | Co {%] | Cu [t] | Co [t] | | Cu [%] | Co {%] | Cu [t] | Co [t] |
| Principal | 2.3 | 2.22% | 1.00% | 50,238 | 22,611 | 0.4 | 2.29% | 1.10% | 8,689 | 4,182 | 2.6 | 2.23% | 1.01% | 58,927 | 26,793 |
| Anticline | 1.4 | 2.59% | 0.54% | 35,550 | 7,358 | 0.2 | 1.60% | 0.65% | 2,984 | 1,223 | 1.6 | 2.47% | 0.55% | 38,534 | 8,581 |
| Kalukundi | 1.1 | 2.55% | 0.42% | 28,471 | 4,730 | 0.4 | 1.40% | 0.47% | 5,214 | 1,764 | 1.5 | 2.26% | 0.44% | 33,685 | 6,493 |
| Kii | 1.8 | 2.55% | 0.58% | 46,010 | 10,420 | 0.3 | 2.62% | 0.50% | 8,886 | 1,699 | 2.1 | 2.56% | 0.56% | 54,896 | 12,119 |
| **Total** | **6.6** | **2.44%** | **0.69%** | **160.268** | **45.119** | **1.3** | **2.02%** | **0.69%** | **25,773** | **8,867** | **7.8** | **2.37%** | **0.69%** | **186,041** | **53,986** |

Development and Operations

It is envisaged that the project could mine and process 0.80Mt per annum ("Mtpa") over approximately ten years. The plant is designed to produce 21,100t of Cu per year and 4,200t of Co per year at an average process cost of $44.42/t of ore treated.

All ore and waste will be mined via conventional, open pit mining methods, using a mining contractor. The operation is planned to utilise selective mining techniques to separate ore and waste. The mining equipment that is considered to be suitable for the Project would include 80t backhoe configured, hydraulic excavators and off-highway haul trucks with a payload capacity of 35t.

The treatment plant flowsheet is based on processing 0.8Mtpa of mill feed. The testwork indicated that the Kalukundi ore could be processed using a single stage crushing circuit followed by a conventional SAG / ball milling circuit with the ball mill in closed circuit with a cyclone. Overall recovery after losses in processing was between 89% and 93% for Cu and between 70% and 78% for Co.

The leach product is then washed in a six stage counter current decantation plant to ensure a clarified liquor is sent to the copper recovery circuit whilst keeping losses due to entrainment below 1%. The copper recovery circuit consists of copper solvent extraction step where the copper is moved to an organic phase before being stripped to produce a advance liquor that is treated in the copper tank house. The copper tank house produces cathode plate that will be sold. A bleed stream from the copper circuit is sent to the cobalt recovery circuit.

The cobalt circuit consists of several purifying steps where impurities like iron, aluminium, manganese, zinc and finally copper are removed before the purified cobalt liquor is sent to solvent extraction circuit where cobalt is loaded onto an organic phase before being stripped to produce the advance solution that is treated in the cobalt tank house. The cobalt tank house produces cobalt cathode that will be binned and sold.

Africo and its contractors will employ approximately 524 people throughout the operating phase of the project. Initially selected posts requiring specific skills or experience will be filled by expatriates. In addition to performing their job function, expatriate personnel will be expected to transfer knowledge and expertise in order to develop the capabilities of the national staff. In the longer term, it is anticipated that nationals of the DRC will fill most operating and management positions within the company.

A water pumping station has been planned to pump the full requirement of water from Lake Nzilo, on the Lualaba River, 22km to the site in a buried steel pipeline into the plant raw water storage dam. Water will be drawn from the storage dam water for plant make-up, fire and potable water. The fire water will be pumped to a fire water ring main by a dedicated electrical and standby diesel pumping system. The raw water will be treated through a chlorination plant for the production of potable water prior to storage in two separate storage tanks. The plant and camp sewerage will be treated in two bio-filter plants with the grey water being discharged to the environment.

Power at 110kV will be supplied to the plant from the existing National Grid overhead power lines which pass 100m from the plant boundary. Plant power transformers will be situated in the plant main switchyard. Power distribution on site will be at 11kV.

Project Implementation

Production is assumed to commence after a pre-production period of 18 months, commencing 1 July 2006.

The development capital cost of the project has been estimated at $166M and is based on an EPCM (engineering, procurement, construction and management) implementation strategy. The estimate includes owner's costs, working capital, and a contingency, totalling approximately $12.23M.

Financial Summary

The overall operating costs for the plant and mining operation per tonne of ore mined are shown in Table 1.11_1.

**Table 1.11_1**
**Kalukundi Project**
**Overall Operating Costs – Average over Life of Mine**
**(Annualised at 801,000tpa)**

| Description | US$/t of ore |
|---|---|
| Mining | 4.32 |
| Process Plant and Infrastructure | 44.42 |
| General & Administration | 7.28 |
| **Total Operating Costs/t of ore** | **US$56.02** |

The investment in working capital and pre-production capital expenditure is $166.6M plus pre-production stripping of $6.85M.

The results of sensitivity analysis show that the project is relatively insensitive to changes in working cost and capital expenditure. Only metal price changes have a substantial effect.

Conclusions

The results of the economic analysis indicate that exploitation of the Kalukundi deposits is economically viable and should proceed. Opportunities exist in most areas of the project that will be more rigorously investigated during the detailed engineering phase and where appropriate will be incorporated into the project.

The current financial models are based on the scenario of 100% equity financing for the project. This, coupled with a conservatively projected base price of Copper and Cobalt gives a before tax IRR of 14.7%. No allowance has been made in the model for the effects and levels of debt financing available or required. When using the maximum allowed level of outside funding in terms of the agreement with Gecamines, the return on investment increases to 28.5%.

The anticipated project payback time is less than four years.

Opportunities exist in most areas of the project to be more rigorously investigated during the detailed engineering phase and to firm up certain assumptions, thereby mitigating and or removing some of the risks that have been identified during the FS.

Recommendations

It is recommended that Africo proceeds with:

- Development of a detailed mine implementation program.
- Compilation of tender documents for mine contracting and subsequent tender process.
- Consideration and evaluation of Africo supplying some major mining consumables (e.g. fuel and explosives) to share some risk and reduce contract mining costs.
- Geotechnical evaluation of the blasting and ‘diggability’ of the rock.
- Bench height optimisation for mining dilution and recovery control.
- Risk based geotechnical and geohydrological evaluation, which may lead to steepening of wall angles.
- Personnel recruitment, policies and procedures and training.

- More detailed or updates to mine design, scheduling and budgeting.
- Design and implementation of a number of technical and production systems and procedures.
- Continue the exploration on the satellite deposits to increase the life of the plant.
- Source local earthworks and civil contractors and machinery."

**3.11 Risk Factors**

The operations of Africo are speculative due to the nature of Africo's business, the location in which it operates, and the present stage of its development. The following risk factors pertain to the business operations of Africo and its subsidiaries.

***Litigation***

Pursuant to legal proceedings described elsewhere in this AIF (see "Item 11 – Legal Proceedings") and in Africo's Management Discussion & Analysis for the year ended December 31, 2007, Africo's indirect interest in Swanmines, the holder of the Kalukundi Property was sold without Africo's consent in execution of a judgement against Africo. Africo has initiated legal proceedings to regain its interest in Swanmines. The proceedings are at an early stage and the outcome cannot be known or predicted. There is a significant risk that the outcome will not be favourable to Africo. To date, Africo has had the available funds to cover the cost of the litigation, which has been significant. However, there is no assurance that Africo will be able to continue to fund any further costs, which could prove detrimental to Africo. Lastly, in the event that these or other legal actions redirect the focus and divert the time of key personnel and management, there is no assurance that Africo's day-to-day operations will not be materially affected.

***Ownership of H&J and Swanmines***

Dr. Antony Harwood, the President and Chief Executive Officer of Africo, currently holds 52% of the shares of H&J. He has agreed that he holds these shares in trust for Kisankala and has undertaken that the shares will be transferred back to Kisankala. The transfer is anticipated to take place in April, 2008. Dr. Harwood will be granted a power of attorney to represent Kisankala in H&J. Accordingly, as at the date of this AIF, Africo does not own, directly or indirectly, 100% of H&J. Africo will make every effort and take all steps available to it to ensure that these shares are transferred back to Kisankala. Also, as a result of the legal proceedings that are currently affecting Africo, there can be no assurance that H&J will be able to re-assert its ownership of Swanmines. See "Item 11 – Legal Proceedings".

***Political and Economic Instability***

The DRC has a long history of political instability, significant and unpredictable changes in government policies and laws, war and civil conflict, illegal mining activities, lack of law enforcement and labour unrest. Moreover, the northeast region of the DRC has undergone civil unrest and instability that could have an impact on political, social or economic conditions in the DRC generally. From time to time, governments have intervened in the export of mineral concentrates in response to concerns about the validity of export rights and payment of duties. In addition, the government of the DRC is reviewing compliance by mining companies with state deadlines and criteria and proposing to renegotiate or terminate contracts, licences and permits held by companies found to not be in compliance. These factors (which may include new or modified taxes or other government levies as well as other legislation) may result in the curtailment or cessation of Africo's activities, adversely affecting the value of its assets.

In February 2008, Swanmines, the owner of the Kalukundi Property, received notification from the Minister of Mines in connection with the revisitation of the Swanmines Agreement, which requires Africo to provide a feasibility study to the Government in order to assess the contributions of the partners with a view to the fair distribution of shares, to clarify the dispute regarding the ownership of Swanmines, to make certain payments to GCM and submit to the Government a schedule of visible impact social actions to be implemented. The Minister of

Mines also requested that GCM play an active role in the management of Swanmines. H&J has responded to the letter, for and on behalf of Swanmines, indicating that it has met its contractual obligations and that the equity interest was obtained in fair and balanced negotiations that yielded an outcome in line with similar transactions being concluded at the time. Africo expects to enter into negotiations with GCM in the second quarter of 2008, the outcome of which cannot be foreseen at this time. However, there can be no assurance that Africo will be successful in such negotiations.

***Government Regulation***

Africo's mineral exploration and planned development activities will be subject to various laws governing prospecting, mining, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. No assurance can be given that the new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit, suspend, terminate or curtail production or development. Government approvals and permits are currently, and may in the future be, required in connection with Africo's operations. Parties engaged in mining operations or in the exploration or development of mineral properties may be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed on them for violations of applicable laws or regulations. Amendments to current laws and regulations governing operations or more stringent implementation thereof could have a substantial adverse impact on Africo and cause increases in exploration expenses, capital expenditures or production costs or reduction in levels of production at producing properties, or require abandonment or delays in the development of new mining properties.

***Lack of Infrastructure in the DRC***

The transportation and service infrastructure in the DRC is sub-standard and unpredictable. Material delays in the transportation of equipment, supplies and resources may delay the development of the Kalukundi Property. Any such delay is likely to increase the cost of developing the Kalukundi Property, and such increase may be material to Africo's business, results of operations and financial condition. Further, the Kalukundi Property will be accessed over lands that may be subject to the interests of third parties. Any assertion by such parties of their interests may delay or disrupt the development and operation of the Kalukundi Property.

***Effects of Inflation on Results of Operations***

The DRC has historically experienced relatively high rates of inflation. Accordingly, Africo's costs may be materially affected, which may adversely affect its business and results of operations.

***Health Risks***

HIV/AIDS, malaria and other diseases represent a serious threat to maintaining a skilled workforce in the mining industry throughout Africa. HIV/AIDS, malaria and other diseases are a major healthcare challenge faced by Africo's operations in the DRC. There can be no assurance that Africo will not lose members of its workforce or workforce man-hours or incur increased medical costs as a result of these high health risks, which may have a material adverse effect on Africo's operations.

***Limited Business History***

Africo has no history of developing a mineral resource property. The likelihood of Africo's success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the establishment of any business, factors that are exacerbated by the fact that Africo's business is conducted in the DRC. There is no assurance that Africo can successfully develop the Kalukundi Property, generate revenues, operate profitably, or provide a return on investment in the future.

***No Assurance of Titles***

The Kalukundi Property consists of an exploitation permit that confers on Swanmines certain exclusive rights in relation to 19.54 square kilometers in the DRC. The mineral title records in the DRC are incomplete, may not fully reflect the transfer history and may not disclose agreements, charges and claims that could impact on title to the Kalukundi Property. Africo is currently in litigation regarding its ownership of Swanmines, which holds title to the Kalukundi Property – see "Item 11 – Legal Proceedings". There can be no assurance that Africo's title in Swanmines will be re-established.

***Swanmines Agreement***

The Swanmines Agreement contains a number of provisions which may be subject to differing interpretations. In addition, the Swanmines Agreement does not deal with its subject matter comprehensively. It is, therefore, not possible to accurately and adequately describe in this AIF all of the terms of the Swanmines Agreement. Although Africo has made every effort to comply with what it considers to be the material terms of the Swanmines Agreement, there can be no assurance that it and H&J have complied with such terms. In addition, if the Swanmines Agreement is determined by a court of competent jurisdiction to have a meaning that differs from the interpretation of the Swanmines Agreement as disclosed in this AIF, Africo could be materially adversely affected. Failure to perform its obligations under, and otherwise to comply with, the terms of the Swanmines Agreement may result in a forfeiture without compensation of its interest in the Kalukundi Property.

***Need for Water Rights***

Africo requires the ready availability of water if the Kalukundi Property becomes operational. Management believes that Africo's current surface rights and water rights are sufficient to carry on the activities of Africo's current work program. However, the need may arise for Africo to purchase or lease additional surface rights or obtain additional water rights in order to further explore and develop the Kalukundi Property, and its ability to further explore or develop such property may be dependent upon Africo's ability to secure such additional surface or water rights.

***Requirement for Permits and Licences***

The operations of Africo will require licences, permits and, in some cases, renewals of existing licences and permits from various governmental authorities. Africo's ability to obtain, sustain or renew such licences and permits or obtain other required licences or permits on acceptable terms is subject to changes in regulations and policies and to the discretion of the applicable governmental authorities.

***Electricity Supply***

Africo must negotiate an adequate power supply agreement with the appropriate utility in the DRC. There is no assurance that Africo will be able to secure power or a supply agreement. In addition, failure in electrical power and shortages of the supply of diesel, mechanical parts and other items required for Africo's operations occur frequently in the DRC. Extended periods without electricity or other necessary elements required to support its operations could have an adverse effect on Africo's business, results of operations and financial condition.

***Dependence on Qualified Personnel***

Africo's business is dependent on retaining the services of a small number of key management personnel with a variety of skills and experience, including in relation to development and operation of mineral projects. The success of Africo is, and will continue to be, dependent to a significant extent on the expertise and experience of its directors and senior management. The failure to retain, or loss of, one or more of these people could have a materially adverse effect on Africo. Africo does not maintain insurance on any of its key employees at this time, but this is currently under review. Africo's success will also depend to a significant degree upon the contributions of qualified technical personnel and its ability to attract and retain highly skilled personnel in the DRC and elsewhere. Competition for such personnel is intense, and Africo may not be successful in attracting and retaining

qualified personnel in the DRC, or in obtaining the necessary work permits to hire qualified expatriates. Its inability to do so in the future may have a materially adverse impact on its business and results of operations.

***Uncertainty in the Estimation of Mineral Reserves and Resources***

There is a degree of uncertainty with respect to the calculation of mineral reserves and mineral resources and corresponding grades being mined or dedicated to future production. Until mineral reserves or mineral resources are actually mined and processed, the quantity of mineral resources and mineral reserve grades must be considered as estimates only. In addition, the quantity of mineral reserves and mineral resources may vary depending on, among other things, metal prices. Any material change in quantity of mineral reserves, mineral resources, grade or stripping ratio may affect the economic viability of the Kalukundi Property. In addition, there can be no assurance that copper recoveries or other metal recoveries in small-scale laboratory tests will be duplicated in larger scale tests under on-site conditions or during production.

Moreover, the economic evaluation of the mineral resources and reserves of the Kalukundi Property includes inferred mineral resources that are considered not to be defined in sufficient detail to have the economic consideration applied to them that would enable them to be categorized as mineral reserves, and there is currently no certainty that the economic analysis proposed will be achieved. Metal price fluctuations, as well as increased production costs or reduced recovery rates, may render ore reserves containing relatively lower grades uneconomic and may ultimately result in a restatement of such ore reserves. Short-term operating factors relating to ore reserves, such as the need for sequential development of ore bodies and the processing of new or different ore types or grades may cause a mining operation to be unprofitable in any particular accounting period.

Fluctuation in copper, cobalt and other base or precious metals prices, results of drilling, metallurgical testing and production and the evaluation of mine plans subsequent to the date of any estimate may require revision of such estimate. The volume and grade of reserves mined and processed and recovery rates may not be the same as currently anticipated. In particular, no assurance can be given that the anticipated tonnages and grades will be achieved or that the indicated level of copper and cobalt recovery will be realized. Any material reductions in estimates of mineral reserves and mineral resources, or estimates of Africo's ability to extract these mineral reserves, could have a material adverse effect on Africo's results of operations and financial condition.

***Potential Dilution***

Pursuant to the Swanmines Agreement, Africo is contractually obligated to provide the funding for the Kalukundi Property. There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt securities of Africo, the interests of shareholders in the net assets of Africo may be significantly diluted. If additional financing is not available, Africo may be unable to satisfy its obligations under the Swanmines Agreement. Any such failure, and any failure of Africo to obtain the required financing on acceptable terms, could have a material adverse effect on Africo's financial condition, results of operations and liquidity, may require Africo to cancel or postpone planned capital investments, and may result in the loss of its interest in the Kalukundi Property.

***Foreign Investments and Operations***

Mineral exploration and mining in certain countries may be affected in varying degrees by political stability and government regulations relating to the mining industry and foreign investment. There can be no assurance that the government of the DRC will not institute regulatory policies that adversely affect the exploration and development on the Kalukundi Property. Any changes in regulations or shifts in political conditions in these countries are beyond Africo's control and may adversely affect its business. Investors should assess the political and regulatory risks related to Africo's foreign country investments. Operations may be affected in varying degrees by government regulations with respect to restrictions on production, price controls, export controls, foreign exchange controls, income taxes, expropriation of property, environmental legislation and mine safety.

***Risk of Expropriation and Enforceability of Contracts with Government, Parastatal Organizations or Joint Venture Partners***

It is possible that the current system of exploration and mine permitting in the DRC may change, resulting in impairment of their rights and possibly expropriation of Africo's properties without adequate compensation. In addition, there is a possibility that Africo's agreements with governments, parastatal organizations or joint venture partners may be unenforceable against these parties.

***Mining and Development Plan***

Although Africo has received the Feasibility Study from its consultants, Africo's Board of Directors is considering ways in which to optimize the deposit potential contained on the Kalukundi Property and may elect to modify, expand or otherwise embark on a different course of action regarding the Kalukundi Property depending on, among other things, the amount of capital Africo raises and the development plan that it ultimately undertakes.

***Exploration, Development and Operating Risk***

The exploration for, and the development of, mineral deposits involves significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate. While the discovery of an ore body may result in substantial rewards, few properties which are explored are ultimately developed into producing mines. Major expenses will be required to develop metallurgical processes and to construct mining and processing facilities at the Kalukundi Property. Notwithstanding the Feasibility Study, there is no certainty that ongoing expenditures to be made by Africo towards mining operations on the Kalukundi Property will result in commercial quantities of ore. It may take many years until production is possible, if at all, during which time the economic feasibility of production may change. Whether a mineral deposit will be commercially viable depends on a number of factors, some of which are: the particular attributes of the deposit, such as size, grade and proximity to infrastructure; metal prices, which are highly cyclical; currency exchange rates, which are volatile; and government regulations, including regulations relating to prices, taxes, royalties, land tenure, land use, importing and exporting of minerals and environmental protection. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in Africo not receiving an adequate return on its invested capital.

Africo's activities will be primarily directed towards the exploration for, and the development of, mineral deposits. Exploration programs entail risks relating to the location of economic ore bodies, the development of appropriate metallurgical processes, the receipt of necessary governmental permits and regulatory approvals, and the timely completion of capital projects, including the construction of mining and processing facilities at mining sites. Major expenses will be required to establish reserves by drilling and to construct mining and processing facilities at a particular site.

Mining operations generally involve a high degree of risk. Although Africo does not yet operate a mine on the Kalukundi Property, it intends to develop a mine as indicated in the Kalukundi Report. Such operations are subject to all the hazards and risks normally encountered in the exploration, development and production of copper, cobalt and other base or precious metals, including unusual and unexpected geologic formations, seismic activity, rock bursts, cave-ins, flooding, and other conditions involved in the drilling and removal of material, any of which could result in damage to, or destruction of, mines and other producing facilities, damage to life or property, environmental damage and possible legal liability. Processing operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas, which may result in environmental pollution and consequent liability.

***Environmental Risks and Hazards and Village Relocation***

All phases of Africo's operations will be subject to environmental regulation in the DRC. These regulations will mandate, among other things, the maintenance of air and water quality standards, land reclamation and relocation of people. They will also set forth limitations on the generation, transportation, storage and disposal of sulphuric acid and of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental

assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Africo's operations. Although Africo has received a favourable vote from the individuals to be affected, there is no assurance that it will be able to effect any required relocation of people in order to develop the Kalukundi Property.

Environmental hazards may exist on the properties in which Africo holds interests, which are unknown to Africo at present and which have been caused by previous or existing owners or operators of the properties. There can be no assurance that these hazards, if any exist, will not be Africo's responsibility and, consequently, may adversely affect Africo's operations.

***Commodity Prices***

The development and success of Africo's projects will be primarily dependent on the future price of base and precious metals and the price of copper and cobalt in particular. Commodity prices are subject to significant fluctuation and are affected by a number of factors that are beyond Africo's control. Such factors include, but are not limited to, the sale or purchase of base or precious metals by various central banks and financial institutions, interest rates, exchange rates, inflation or deflation, fluctuation in the value of the United States dollar (the currency in which resource prices generally are quoted) and other currencies, global and regional supply and demand, speculative trading, the overall level of forward commodity sales, international or regional political and economic events or trends and the political and economic conditions of major producing countries throughout the world. The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of, and commercial production from, Africo's properties to be impracticable. Depending on the price of base and precious metals, projected cash flows from planned mining operations may not be sufficient and Africo could be forced to discontinue development and may lose its interest in, or may be forced to sell, some of its properties. Future production from Africo's mining properties is dependent on commodity prices that are adequate to make these properties economic.

In addition to adversely affecting Africo's reserve estimates and its financial condition, declining commodity prices can impact operations by requiring a reassessment of the feasibility of a particular project. Such a reassessment may be the result of a management decision or may be required under financing arrangements related to a particular project. Even if the Kalukundi Property is ultimately determined to be economically viable, the need to conduct such a reassessment may cause substantial delays or may interrupt operations until the reassessment can be completed.

***Competition***

The mining industry is competitive in all of its phases. Africo will face strong competition from other mining companies in connection with the acquisition of properties producing, or capable of producing, precious and base metals. Many of these companies have greater financial resources, operational experience and technical capabilities than Africo. As a result of this competition, Africo may be unable to maintain or acquire additional attractive mining properties on terms it considers acceptable, or at all. Consequently, Africo's revenues, operations and financial condition could be materially adversely affected.

***Insurance and Uninsured Risks***

In December 2007, Africo put in place commercial general liability insurance coverage providing $5,000,000 of coverage worldwide. In addition, it has in place director and officer liability insurance providing $10,000,000 of coverage since April 2007. Africo's business will be subject to a number of risks and hazards generally, including: adverse environmental conditions, industrial accidents, labour disputes, unusual or unexpected geological conditions, ground or slope failures, cave-ins, changes in the regulatory environment and natural phenomena such as inclement weather conditions, floods and earthquakes. Such occurrences could result in damage to mineral properties or production facilities, personal injury or death, environmental damage to Africo's properties or the properties of others, delays in development or mining, monetary losses and possible legal liability. Although Africo will maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance

may not cover all of the potential risks associated with its operations. In addition, Africo may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against political risk, and risks such as environmental pollution or other hazards as a result of exploration and production, is not generally available to Africo or to other companies in the mining industry on acceptable terms. Losses from these events may cause Africo to incur significant costs that could have a material adverse effect upon its financial performance, solvency and results of operations.

***Currency Risks***

A significant portion of Africo's operating expenses will be incurred in United States dollars and Congolese francs. From time to time, Africo may borrow funds and will incur capital expenditures that are denominated in foreign currency. In addition, any revenue generated from operations may be in United States dollars. Accordingly, foreign currency fluctuations may adversely affect Africo's financial position and results of operations.

***Increased Labour Costs, Construction Costs and Availability of Mining Equipment***

Wages and related labour and consulting costs account for a large portion of Africo's costs. Accordingly, Africo's costs may be materially affected by increases in wages and related labour and consulting costs. A number of the items that Africo requires for mine construction are currently in high demand due to an increased level of activity in the global mining industry. If Africo cannot identify and procure new equipment on a timely basis, or identify and purchase suitable used equipment, this may result in delays to the Kalukundi Property construction schedule and, therefore, may also delay the start-up of mining operations and/or increase estimated costs. The amount of capital costs associated with the development of a mining property is adversely impacted by escalations in the price of items related to construction, including steel, fuel, concrete and other construction consumables. Such price escalations are caused by numerous factors beyond Africo's control. Furthermore, although the Kalukundi Report indicates an investment in working capital and pre-production expenditure of $166.6 million, it is likely that the capital expenditure requirement will be higher.

***Conflicts of Interest***

Some of the directors and officers of Africo will not be devoting all of their time to the affairs of Africo. The directors and officers of Africo are directors and officers of other companies, some of which are in the same business as Africo. The directors and officers of Africo are required by law to act in the best interests of Africo. They have the same obligations to the other companies in respect of which they act as directors and officers. Discharge by the directors and officers of their obligations to Africo may result in a breach of their obligations to the other companies and, in certain circumstances, this could expose Africo to liability to those companies. Similarly, discharge by the directors and officers of their obligations to the other companies could result in a breach of their obligation to act in the best interests of Africo. Such conflicting legal obligations may expose Africo to liability to others and impair its ability to achieve its business objectives.

***Future Mining Operations***

There is no assurance that Africo will produce revenue, operate profitably or provide a return on investment in the future from mining operations.

***Fluctuation in Market Value of Africo's Common Shares***

The market price of a publicly-traded stock is affected by many variables not directly related to the corporate performance of Africo, including the market in which it is traded, the strength of the economy generally, the availability and attractiveness of alternative investments, and the breadth of the public market for the stock. The effect of these and other factors on the market price of the common shares of Africo on the TSX in the future cannot be predicted. **An investment in Africo's common shares is highly speculative and can result in an investor losing its entire investment.**

## ITEM 4 DIVIDENDS

Africo has not declared nor paid any dividends or distributions and does not foresee the declaration or payment of dividends or distributions in the near future. Any decision to pay dividends or distributions on its securities will be made by the Board of Directors on the basis of Africo's earnings, financial requirements and other conditions existing at such future time.

## ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE

### General Description of Capital Structure

Africo is authorized to issue an unlimited number of common shares. The common shares rank equally as to dividends, voting powers and participation in assets upon dissolution or winding-up. No common shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the common shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. As at December 31, 2007, 27,211,705 common shares of Africo were issued and outstanding.

### Loan Capital

Africo does not have any debt obligations outstanding.

## ITEM 6 MARKET FOR SECURITIES

### 6.1 Trading Price and Volume

Africo's common shares are listed on the TSX and trade under the symbol "ARL". The following table sets out the price ranges and volume traded on a monthly basis through the financial year ended December 31, 2007.

| Month | Trading Price High | / Low | Volume |
|---|---|---|---|
| January 2007 | $3.85 | $2.74 | 2,031,714 |
| February 2007 | $4.75 | $3.01 | 1,457,253 |
| March 2007 | $3.95 | $3.45 | 1,556,491 |
| April 2007 | $4.18 | $2.06 | 5,904,189 |
| May 2007 | $2.79 | $1.90 | 2,421,051 |
| June 2007 | $2.50 | $1.68 | 2,244,394 |
| July 2007 | $2.91 | $2.06 | 1,277,409 |
| August 2007 | $3.00 | $0.80 | 1,018,646 |
| September 2007 | $2.40 | $0.89 | 2,053,784 |
| October 2007 | $2.90 | $1.83 | 2,058,079 |
| November 2007 | $2.80 | $2.00 | 1,105,174 |
| December 2007 | $2.19 | $1.51 | 483,753 |

## ITEM 7 ESCROWED SECURITIES

Africo does not have any escrowed securities.

## ITEM 8 DIRECTORS AND OFFICERS

### 8.1 Name, Occupation and Security Holding

| Director/Officer | Director or Officer Since | Principal occupation for the last five years |
|---|---|---|
| **DAVID W. ADAMSON**[1]<br>*Director*<br>British Columbia, Canada | July 4, 2006 | Exploration Geologist; President, CEO and a director of Rubicon Minerals Corporation, a Canadian based mineral exploration-stage company that explores for commercially viable gold and base metal deposits. |
| **JOHN DIXON**[1]<br>*Director*<br>Tanzania | July 4, 2006 | President of Oryx Mining and Exploration, a Canadian company exploring for viable gold deposits in Africa (since July, 2006); Independent Geologist with Bastillion Resources (Pty) Ltd., an independent geological and mining consulting company specialising in Africa (1996 – 2006). |
| **ANTONY (TONY) HARWOOD**<br>*President, Chief Executive Officer & Director*<br>England, United Kingdom | July 4, 2006 | President and CEO of Africo (since May 31, 2006); Vice President, Placer Dome Inc., a publicly listed international gold mining company (June 1998 to March 2006). |
| **LUKAS MARTHINUS (TINUS) MAREE**[1]<br>*Director & Secretary*<br>British Columbia, Canada | July 4, 2006 | President, River Capital Partners Ltd., a private investment company (since January 2001); Director, River Group (since January 1998). |
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>British Columbia, Canada | July 4, 2006 | Self-employed businessman; Chairman of the Board of Africo (since April 2005) and its now wholly-owned subsidiary, Africo Resources (BC) Ltd. (since July 2006); Associate Counsel, Getz Prince Wells LLP, a law firm in Vancouver (November 2003 to March 2007); independent legal and business consultant (1996 to November 2003). |
| **MICHAEL O'BRIEN**<br>*Chief Financial Officer*[2]<br>British Columbia, Canada | March 27, 2007 | Chief Financial Officer of Africo (since March 2007); acting Chief Financial Officer (December 2006 to March 2007); Consultant (August 2005 to February 2007); Chief Financial Officer and director of Irvin & Johnson Ltd (South Africa) (September 2004 to July 2005); Group Financial Manager of Irvin and Johnson Ltd (South Africa) (January 2003 to August 2004); Manager: Finance of Soekor Exploration and Production (Pty) Ltd (now part of PetroSA, South Africa)(August 1996 to September 2002). |

(1) Member of the Audit Committee.

(2) Mr. O'Brien was acting Chief Financial Officer from December 1, 2006 until his appointment as Chief Financial Officer of Africo in March 2007.

Directors of Africo are elected at each annual meeting of shareholders for a term of one year, serving until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time.

As of the date of this AIF, the directors and executive officers of Africo, as a group, beneficially own, or control or direct, directly or indirectly, 527,737 common shares of Africo representing 1.94% of its outstanding common shares. Information as to ownership of shares has been provided by the directors and executive officers of Africo or has been extracted from insider reports filed by these individuals and publicly available through the Internet at the Canadian System for Electronic Disclosure by Insiders (SEDI) at www.sedi.ca.

### 8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions

Except as disclosed herein, as at the date of this AIF, no director or executive officer of Africo is, or has been, within 10 years before the date of this AIF:

1. a director, chief executive officer or chief financial officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity:

   (a) was subject to a cease trade order (including any management cease trade order which applied to directors or executive officers of a company, whether or not the person is named in the order) or an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation that was in effect for a period of more than 30 consecutive days (an "Order"); or

   (b) was subject to an Order that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in the capacity as director, chief executive officer or chief financial officer.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the British Columbia Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an AIF for the fiscal year ended November 30, 2005. This cease trade order was revoked by the British Columbia Securities Commission on May 31, 2006.

No director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo:

1. is, as of the date of this AIF, or has been within the ten years before the date of this AIF, a director or executive officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets; or

2. has, within the ten years before the date of this AIF, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the director, executive officer or shareholder.

As at the date of this AIF, no director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo has been subject to:

(a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

**8.3 Conflicts of Interest**

Certain directors and officers of Africo are also directors, officers or shareholders of other companies that are similarly engaged in the business of acquiring, developing and exploiting natural resource properties. Such associations may give rise to conflicts of interest from time to time. The directors of Africo are required by law to act honestly and in good faith with a view to the best interests of Africo and to disclose any interest which they may have in any property or opportunity of Africo. If a conflict of interest arises at a meeting of the Board of Directors, any director in a conflict will disclose his interest and abstain from voting on such matter.

**ITEM 9 PROMOTERS**

Within the three most recently completed financial years of Africo, Rubicon has been the promoter of Africo within the meaning of applicable securities legislation, by virtue of having taken the initiative in founding Africo. Prior to the Plan of Arrangement described in "Item 3.8 – Narrative Description of the Business – Reorganization", Rubicon was the holder of approximately 39% of the outstanding shares of Africo BC. Upon completion of the Plan of Arrangement, Rubicon distributed its equity interest in Africo BC to its shareholders who acquired shares of Africo. As at the date of this AIF, Rubicon holds 81,015 common shares of Africo.

**ITEM 10 AUDIT COMMITTEE**

The purpose of the Audit Committee of Africo's Board of Directors is to provide assistance to the Board of Directors of Africo in fulfilling its legal and fiduciary obligations with respect to matters involving accounting, auditing, financial reporting, internal control and legal compliance functions of Africo. It is the objective of the Audit Committee to maintain communication among the Board of Directors of Africo, the external auditor and senior management of Africo.

**10.1 The Audit Committee's Charter**

The full text of the Charter of the Audit Committee, as adopted on July 7, 2006, is included as Schedule A to this AIF.

**10.2 Composition of the Audit Committee**

David Adamson, Tinus Maree and John Dixon are members of the Audit Committee of Africo's Board of Directors. Only Mr. Dixon is considered "independent" as that term is defined in applicable securities legislation, and all three of the Audit Committee members have the ability to read and understand financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the issues that can reasonably be expected to be raised by Africo's financial statements.

**10.3 Relevant Education and Experience**

*David Adamson, Chair of Audit Committee*

David W. Adamson, received his B.Sc. (Hons.) at the University of Southampton, U.K. in 1980, an M.Sc. in 1984 at the University of Regina, Saskatchewan and Ph.D. in 1988 at the University of Aston in Birmingham, U.K. He is currently President and Chief Executive Officer and a director of Rubicon Minerals Corporation.

*John Dixon*

John Dixon obtained a B.SC (Honours) in Geology and Applied Geology from the University of Natal in South Africa in 1987. He obtained his PhD from the University of Kwazulu-Natal in 2004. He is currently President of Oryx Mining and Exploration.

*Tinus Maree*

Tinus Maree obtained his BLC in 1985, and his Bachelor of Laws in 1987, both from the University of Pretoria, South Africa. He received the professional designation as an Attorney of the High Court of South Africa in 1988. He is currently the President of River Capital Partners Ltd. a private investment company.

**10.4 External Auditor Service Fees**

Follows is a summary of the external auditor service fees relating to Africo's last two fiscal years:

***Audit Fees***

As at the date of this AIF, PricewaterhouseCoopers LLC, Africo's external auditor, has billed Africo $71,000 for the audit of the fiscal year ended December 31, 2007 ("**Fiscal 2007**"). The amount billed by our external auditor for the year ended December 31, 2006 ("**Fiscal 2006**") was $74,338.

***Audit Related Fees***

As at the date of this AIF, PricewaterhouseCoopers LLC, Africo's external auditor, has billed Africo $43,980 for assurance and related services that are reasonably related to the performance of the audit of Africo's financial statements of Fiscal 2007. No amount was billed by our external auditor for Fiscal 2006 for audit related fees.

***Tax Fees***

For Fiscal 2007, Africo paid its external auditor an aggregate $3,454 for professional services rendered pertaining to tax compliance, tax advice and tax planning. This amount was $11,564 for Fiscal 2006.

***All Other Fees***

No fees were paid by Africo to its external auditor for Fiscal 2007 or for Fiscal 2006 for products and services provided by Africo's external auditor, other than services reported above.

**ITEM 11 LEGAL PROCEEDINGS**

Mr. Alessandro Berardone, a former employee of Africo, initiated legal proceedings against Africo before the Court of Grande Instance of Lubumbashi in the DRC seeking US$30 million for breach of his employment contract. Specifically, he claimed that the performance bonus he was entitled to was not paid when Africo terminated his employment, nor was he properly compensated for his efforts in helping Africo to acquire its interest in the Kalukundi Property and certain other mining concessions. Mr. Berardone obtained a US$3.4 million default judgement (the "**Berardone Judgement**") against Africo, which did not learn of the proceedings brought against it until it received notice of the Berardone Judgement in February 2007. Subsequent thereto, a court in Lubumbashi declared (the "**Akam Declaration**") that Akam Mining s.p.r.l. had acquired by way of a sale in execution of the Berardone Judgement, and is the owner of, a 75% interest in Swanmines, the owner of the Kalukundi Property. Africo learned of the Akam Declaration in April 2007.

In May 2007, Africo brought a motion for judicial misconduct against the judges who presided over the hearings that resulted in the Berardone Judgement and the Akam Declaration. In August 2007, the Supreme Court of Justice in Kinshasa dismissed this motion on the basis that the actions of these judges could not be examined by the Supreme Court, and indicated that the appeal of these decisions could be initiated before the lower courts. In

September 2007, Africo obtained an ordinance (the "**Ordinance**") from the Tribunal de Grande Instance de Kinshasa/Gombe indicating that H&J is still a holder of 75% of the shares of Swanmines, that GCM and H&J are the only partners in Swanmines and that they alone are authorized to carry on the business of Swanmines.

As the Ordinance is not a judgement and does not negate the effect of the Beradone Judgement or the Akam Declaration, Africo has commenced proceedings to set aside the Berardone Judgment and the Akam Decision, and challenging the sale of H&J's interest in Swanmines to Akam Mining.

On March 19, 2008, H&J obtained a ruling in the Supreme Court in Kinshasa, pursuant to which all of the outstanding litigation matters in Lubumbashi affecting H&J are to be moved to the equivalent courts in Kinshasa.

## ITEM 12 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Management is unaware of any material interest of any director or executive officer of Africo, or of any person that is the direct or indirect beneficial owner of, or who exercises control or direction over, more than ten percent of any class or series of Africo's outstanding voting securities, or any associate or affiliate of any such persons, in any transaction within the three most recently completed financial years or during the current financial year of Africo that has materially affected or will materially affect Africo or any of its affiliates.

## ITEM 13 TRANSFER AGENTS AND REGISTRARS

Africo's registrar and transfer agent for its common shares is Computershare Investor Services Inc. with offices at:

510 Burrard Street
Vancouver, British Columbia V6C 3B9
Telephone: (604) 661-9400
Facsimile: (604) 661-9549

100 University Avenue, 11th Floor
Toronto, Ontario M5J 2Y1
Telephone: (416) 263-9200
Facsimile: (416) 263-9261

## ITEM 14 MATERIAL CONTRACTS

The following is the only material contract that Africo is party to, directly or indirectly, other than those entered into in the ordinary course of business, which is still in effect.

1. The Swanmines Agreement. See "Item 3.2 – Narrative Description of the Business – Material Contracts".

## ITEM 15 INTERESTS OF EXPERTS

No persons or companies have prepared or certified any report, valuation, statement or opinion during Africo's most recently completed financial year. The auditor of Africo is PricewaterhouseCoopers LLP, Chartered Accountants, of Vancouver, British Columbia. PricewaterhouseCoopers LLP, Chartered Accountants, report that they are independent of the Company in accordance with the Rules of Professional Conduct in British Columbia, Canada

## ITEM 16 ADDITIONAL INFORMATION

Additional information about Africo Resources Ltd. is available at Africo's website at www.africoresources.com and on SEDAR at www.sedar.com. Information about Africo, including directors' and officers' remuneration and indebtedness, principal holders of Africo's securities, and securities authorized for issuance under equity compensation plans is contained in our Management Information Circular dated May 25, 2007, for the annual and special meeting of our shareholders which was held on June 25, 2007.

Additional financial information about Africo is provided in Africo's audited consolidated financial statements for the fiscal year ended December 31, 2007, the notes thereto and the report of Africo's auditor thereon, as well as Management's Discussion and Analysis for the fiscal year then ended. Copies of these documents, together with copies of any interim financial statements of Africo for periods subsequent to the year ended December 31, 2007,

copies of this AIF and copies of any documents or the pertinent pages of any documents incorporated by reference in this AIF, are available upon request to Africo's Chief Financial Officer at #1108 - 1030 West Georgia Street, Vancouver, British Columbia V6E 2Y3, provided that Africo may require payment of a reasonable charge if the request is made by a person who is not a security holder of Africo.

**SCHEDULE A**

---

**AUDIT COMMITTEE CHARTER**

---

PURPOSE

The Audit Committee (the "Committee") is a committee of the board of directors (the "Board") of Africo Resources Ltd. formerly CopperCo Resource Corp. (the "Company") the primary function of which is to assist the Board in its oversight of the nature and scope of the annual audit, management's reporting on internal accounting standards and practices, financial information and accounting systems and procedures and financial reporting and statements and to recommend, for approval of the Board, or to approve, the audited financial statements, interim financial statements and any other releases containing financial information.

The primary objectives of the Committee are as follows:

(a) To assist directors meet their responsibilities (especially for accountability) in respect of the preparation and disclosure of the financial statements of the Company and related matters.

(b) To oversee the work of the external auditors.

(c) To provide better communication between directors and external auditors.

(d) To enhance the external auditors' independence.

(e) To increase the credibility and objectivity of financial reports.

(f) To strengthen the role of the outside directors by facilitating in depth discussions between directors on the Committee, management and the external auditors.

RESPONSIBILITY OF MANAGEMENT AND EXTERNAL AUDITORS

The Committee's role is one of oversight. Management is responsible for preparing the Company's financial statements and other financial information and for the fair presentation of the information set forth in the financial statements in accordance with generally accepted accounting principles ("GAAP"). Management is also responsible for establishing internal controls and procedures and for maintaining the appropriate accounting and financial reporting principles and policies designed to assure compliance with accounting standards and all applicable laws and regulations.

The external auditors' responsibility is to audit the Company's financial statements and provide their opinion, based on their audit conducted in accordance with generally accepted auditing standards, that the financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company in accordance with GAAP.

MEMBERSHIP AND ORGANIZATION

(a) **Composition -** The Committee shall be comprised of not less than three independent members of the Board.

(b) **Independence -** None of the members of the Committee shall be members of management of the Company, and all of them shall be "unrelated directors" (as such term is used in the Report of the

Toronto Stock Exchange on Corporate Governance in Canada) and "independent" (as such term is used in Multilateral Instrument 52-110 - Audit Committees ("MI 52-110").

(c) **Appointment and Removal of Committee Members -** Each member of the Committee shall be appointed by the Board on an annual basis and shall serve at the pleasure of the Board or until the earlier of: (a) the close of the next annual meeting of the shareholders of the Company at which the member's term of office expires; (b) the death of the member; or (c) the resignation, disqualification or removal of the member from the Committee or from the Board. The Board may fill the vacancy in the membership of the Committee.

(d) **Financial Literacy -** All of the members of the Committee shall be "financially literate" within the meaning used in MI 52-110 or a member who is not financially literate must become so within a reasonable period of time following his or her appointment.

(e) **Chair -** At the time of the annual appointment of the members of the Committee, the Board shall appoint a Chair of the Audit Committee. The Chair shall be a member of the Committee, preside over all Committee meetings, coordinate the Committee's compliance with this Charter, work with management to develop the Committee's annual work plan and provide reports of the Committee to the Board. The Chair may vote on any matter requiring a vote. In the case of an equality of votes, the Chair shall be entitled to a second or casting vote. The Chair shall report to the Board, as required by applicable law or as deemed necessary by the Committee or as requested by the Board, on matters arising at Committee meetings and, where applicable, shall present the Committee's recommendation to the Board for its approval.

FUNCTIONS AND RESPONSIBILITIES

The Committee shall have the functions and responsibilities set out below as well as any other functions that are specifically delegated to the Committee by the Board. In addition to these functions and responsibilities, the Committee shall perform the duties required of an audit committee by the British Columbia *Business Corporations Act*, by any requirements of stock exchanges on which the securities of the Company are listed, and all other applicable laws.

(a) **Oversee External Auditors -** The Committee shall oversee the work of the external auditors, including reviewing any significant disagreements between management and the external auditors in connection with the preparation of financial statements.

(b) **Internal Controls -** The Committee shall monitor the system of internal control. The Committee shall require management to implement and maintain appropriate systems of internal control in accordance with applicable laws, regulations and guidance, including internal control over financial reporting and disclosure and to review, evaluate and approve these procedures. At least annually, the Committee shall consider and review with management and the external auditors:

(1) the effectiveness of, or weaknesses or deficiencies in: the design or operation of the Company's internal controls (including computerized information system controls and security); the overall control environment for managing business risks; and accounting, financial and disclosure controls (including, without limitation, controls over financial reporting), non financial controls, and legal and regulatory controls and the impact of any identified weaknesses in internal controls on management's conclusions.

(2) any significant changes in internal control over financial reporting that are disclosed, or considered for disclosure, including those in the Company's periodic regulatory filings;

(3) any material issues raised by any inquiry or investigation by the Company's regulators;

(4) any related significant issues and recommendations of the external auditors together with management's responses thereto, including the timetable for implementation of recommendations to correct weaknesses in internal controls over financial reporting and disclosure controls.

(c) **Review Financial Statements -** The Committee shall review the annual and interim financial statements of the Company and related management's discussion and analysis ("MD&A") prior to their approval. The process should include but not be limited to:

(1) reviewing changes in accounting principles and policies, or in their application, which may have a material impact on the current or future years' financial statements;

(2) reviewing significant accruals, reserves or other estimates;

(3) reviewing any "related party" transactions, with related party having the meaning ascribed to it by Canadian securities regulations;

(4) reviewing accounting treatment of unusual or non-recurring transactions;

(5) ascertaining compliance with covenants under loan agreements;

(6) reviewing disclosure requirements for commitments and contingencies;

(7) reviewing unresolved differences between management and the external auditors;

(8) obtain explanations of significant variances with comparative reporting periods;

(9) reviewing any legal matters which could significantly impact the financial statements as reported on by the general counsel and meet with outside counsel whenever deemed appropriate; and

(10) reviewing audit response letters from the Company's legal counsel made under the Joint Policy Statement of the Canadian Bar Association and the Canadian Institute of Chartered Accountants.

(d) **Public Disclosure -** The Committee shall review the financial statements, MD&A, annual information forms ("AIF"), management information circulars and any prospectuses as well as all public disclosure containing audited or unaudited financial information (including, without limitation, any press releases disclosing earnings or financial results) before release and prior to Board approval.

(e) **Interim Financial Statements -** The Committee shall review the interim financial statements and disclosures, and obtain explanations from management as required. After completing its review of the interim financial statements, if advisable, the Committee shall, if so authorized by the Board, approve the interim financial statements and the related MD&A, or if not so authorized by the Board, then approve and recommend them for approval by the Board.

(f) **Hiring Policies -** The Committee shall review and approve the Company's hiring policies regarding the hiring of partners, employers and former partners and employees of the present and former external auditors of the Company. The Committee shall review candidates for the position of Chief Financial Officer of the Company and make recommendations to the Board with respect to the appointment of a Chief Financial Officer.

(g) **Appointment of External Auditors -** With respect to the appointment of external auditors by the Board, the Committee shall:

(1) recommend to the Board the appointment of the external auditors;

(2) recommend to the Board the terms of engagement of the external auditor, including the compensation of the auditors and a confirmation that the external auditors shall communicate directly to the Committee;

(3) on an annual basis, review and discuss with the external auditors all significant relationships such auditors have with the Company to determine the auditors' independence;

(4) review the performance of the external auditors;

(5) when there is to be a change in auditors, review the issues related to the change and the information to be included in the required notice to securities regulators of such change; and

(6) review and approve in advance any non-audit services to be provided to the Company or its subsidiaries by the external auditors and consider the impact on the independence of such auditors, including reviewing the range of services provided in the context of all consulting services bought by the Company. The Committee may delegate to one or more members the authority to approve non–audit services, provided that the member report to the Committee at the next scheduled meeting such pre–approval and the member comply with such other procedures as may be established by the Committee from time to time.

(h) **Evaluation and Rotation of Lead Partner -** At least annually, the Committee shall review the qualifications and performance of the lead partners of the external auditors. The Committee shall obtain a report from the external auditors annually verifying that the lead partner of the external auditors has served in that capacity for no more than five fiscal years of the Company and that the engagement team collectively possesses the experience and competence to perform an appropriate audit.

(i) **Review with External Auditors -** Review with external auditors (and internal auditor if one is appointed by the Company) their assessment of the internal controls of the Company, their written reports containing recommendations for improvement, and management's response and follow-up to any identified weaknesses. The Committee shall also review annually with the external auditors their plan for their audit and, upon completion of the audit, their reports upon the financial statements of the Company and its subsidiaries.

(j) **Risk Policies and Procedures -** The Committee shall review risk management policies and procedures of the Company (e.g. hedging, litigation and insurance), regarding current areas of great financial risk and whether management is managing these effectively.

(k) **Treatment of Complaints/Submissions -** The Committee shall review and approve the establishment by management of procedures for the receipt, retention and treatment of complaints received by the Company from employees or others, regarding accounting, internal accounting controls, or auditing matters.

(l) **Investigations -** The Committee shall have the authority to investigate any financial activity of the Company. All employees of the Company are to cooperate as requested by the Committee.

(m) **Retain Experts -** The Committee may retain independent counsel, persons having special expertise and/or obtain independent professional advice to assist in filling their responsibilities at the expense of the Company without any further approval of the Board. The Committee has the authority to set, and have the Company, pay the compensation for any such persons engaged by the Committee.

(n) **Advising Board -** The Committee shall ensure that the Board is aware of matters which may significantly impact the financial condition or affairs of the business.

(o) **Updates to Charter -** The Committee shall review and recommend to the Board any updates to the Audit Committee Charter. All changes to the Audit Committee Charter shall be approved by the Board.

EFFECTIVE DATE

This Policy will become effective on the date the Company becomes a public company as the result of a plan of arrangement under sections 288-299 of the *Business Corporations Act* (British Columbia) of Rubicon Minerals Corporation.

Approved and Adopted by the Board of the Company on July 7, 2006.