# Exhibit 10

# Annual Information Form

AFRICO RESOURCES LTD

**For the Fiscal Year Ended December 31, 2010**

**March 30, 2011**

**Table of Contents**


**CAUTIONARY LANGUAGE REGARDING FORWARD-LOOKING INFORMATION ....1**

| | | |
|---|---|---|
| **ITEM 1** | **CORPORATE STRUCTURE** | **2** |
| 1.1 | Name, Address and Incorporation | 2 |
| 1.2 | Intercorporate Relationships | 2 |
| **ITEM 2** | **GENERAL DEVELOPMENT OF THE BUSINESS** | **3** |
| 2.1 | Overview | 3 |
| 2.2 | History | 3 |
| 2.3 | Significant Acquisitions | 4 |
| **ITEM 3** | **NARRATIVE DESCRIPTION OF THE BUSINESS** | **4** |
| 3.1 | General | 4 |
| 3.2 | Material Contracts | 4 |
| 3.3 | Competitive Conditions | 8 |
| 3.4 | Environmental Protection | 8 |
| 3.5 | Employees | 9 |
| 3.6 | Foreign Operations | 10 |
| 3.7 | Bankruptcy and Similar Procedures | 10 |
| 3.8 | Reorganization | 10 |
| 3.9 | Social or Environmental Policies | 10 |
| 3.10 | Mineral Projects – The Kalukundi Property | 10 |
| 3.11 | Management Update | 18 |
| 3.12 | Risk Factors | 19 |
| **ITEM 4** | **DIVIDENDS** | **26** |
| **ITEM 5** | **DESCRIPTION OF CAPITAL STRUCTURE** | **27** |
| **ITEM 6** | **MARKET FOR SECURITIES** | **27** |
| 6.1 | Trading Price and Volume | 27 |
| 6.2 | Prior Sales | 27 |
| **ITEM 7** | **ESCROWED SECURITIES** | **28** |
| **ITEM 8** | **DIRECTORS AND OFFICERS** | **28** |
| 8.1 | Name, Occupation and Security Holding | 28 |
| 8.2 | Cease Trade Orders, Bankruptcies, Penalties or Sanctions | 29 |
| 8.3 | Conflicts of Interest | 30 |
| **ITEM 9** | **AUDIT COMMITTEE** | **30** |
| 9.1 | The Audit Committee‟s Charter | 30 |
| 9.2 | Composition of the Audit Committee | 30 |
| 9.3 | Relevant Education and Experience | 31 |
| 9.4 | Pre-Approval Policies and Procedures | 31 |
| 9.5 | External Auditor Service Fees | 31 |
| **ITEM 10** | **INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS** | **32** |
| **ITEM 11** | **TRANSFER AGENT AND REGISTRAR** | **32** |
| **ITEM 12** | **MATERIAL CONTRACTS** | **32** |
| **ITEM 13** | **INTERESTS OF EXPERTS** | **32** |
| **ITEM 14** | **ADDITIONAL INFORMATION** | **33** |

**CHARTER FOR THE AUDIT COMMITTEE ....34**

All information contained in this Annual Information Form ("**AIF**") for the fiscal year ended December 31, 2010 of **AFRICO RESOURCES LTD.**, referred to herein as "**Africo**" or the "**Corporation**", is as at December 31, 2010, unless otherwise indicated. All dollar amounts presented in this Annual Information Form are expressed in Canadian dollars, unless otherwise indicated.

**CAUTIONARY LANGUAGE REGARDING FORWARD-LOOKING INFORMATION**

This AIF may include or incorporate by reference certain statements or disclosures that constitute "forward-looking information" under applicable securities laws. All information, other than statements of historical fact, included or incorporated by reference in this AIF that address activities, events or developments that Africo or its management expects or anticipates will or may occur in the future, including such things as future capital expenditures (including the amounts and nature thereof), business strategies and measures to implement strategies, goals, expansion and growth of its business and operations, plans and references to the future success of Africo, and other such matters, constitute forward-looking information. Forward-looking statements are statements that are not historical facts and are generally, but not always, identified by the words "expects", "plans", "anticipates", "believes", "intends", "estimates", "projects", "potential" and similar expressions, or that events or conditions "will", "would", "may", "could" or "should" occur or continue. These forward-looking statements are based on certain assumptions and analyses made by Africo and its management in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances.

Although Africo believes the expectations expressed in such forward-looking information is based on reasonable assumptions, such statements are not guarantees of future realities and actual realities may differ materially from those in forward-looking information. Investors are cautioned that any such statements are not guarantees of future realities and actual realities or developments may differ materially from those projected in the forward-looking statements. Whether actual results and developments will conform to the expectations and predictions of Africo and its management is subject to a number of risks and uncertainties, including those risk factors discussed under "Risk Factors" and elsewhere in this AIF and the documents incorporated by reference. In particular, if any of the risk factors outlined herein materialize, the expectations and predictions of Africo and its management may need to be reevaluated. Consequently, all of the forward-looking information in this AIF and the documents incorporated herein by reference is expressly qualified by these cautionary statements and other cautionary statements or factors contained herein or in documents incorporated by reference herein, and there can be no assurance that the actual results or developments anticipated by Africo and its management will be realized or, even if substantially realized, that they will have the expected consequences for, or effects on, Africo. Forward-looking statements are based on the beliefs, estimates and opinions of Africo"s management on the date the statements are made. Unless otherwise required by law, Africo expressly disclaims any intention and assumes no obligation to update or revise any forward-looking statements in the event that management"s beliefs, estimates or opinions, or other factors, should change, whether as a result of new information, future events or otherwise, and Africo does not have any policies or procedures in place concerning the updating of forward-looking information other than those required under applicable securities laws.

## ITEM 1 CORPORATE STRUCTURE

### 1.1 Name, Address and Incorporation

Africo was incorporated under the *Canada Business Corporations Act* on July 4, 2006 under the name "CopperCo Resource Corp.". On December 8, 2006, it completed a Plan of Arrangement with Rubicon Minerals Corporation and Africo Resources Ltd. (now called Africo Resources (B.C.) Ltd. and referred to in this AIF as "**Africo BC**"), among others. It changed its name from CopperCo Resource Corp. to "Africo Resources Ltd." concurrent with the completion of the Plan of Arrangement. See Item 3.8 – Narrative Description of the Business – Reorganization.

Africo‟s head office and principal business address is Suite 1108, 1030 West Georgia Street, Vancouver, British Columbia, and its registered and records office is located at Suite 1810 – 1111 West Georgia Street, Vancouver, British Columbia.

### 1.2 Intercorporate Relationships

The following chart identifies Africo‟s material subsidiaries, Africo‟s current interest in such subsidiaries, directly or indirectly, and the jurisdictions of incorporation.



## ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS

### 2.1 Overview

Africo is an exploration company that is focused on the further exploration and development of the Kalukundi Property located in the Democratic Republic of the Congo (the "**DRC**"). Africo‟s common shares are listed on The Toronto Stock Exchange (the "**TSX**") under the symbol "ARL". Africo‟s principal activities include mineral exploration, development and mining, with a focus on the copper and cobalt sectors in the DRC.

### 2.2 History

The following is a summary of the general development of Africo‟s business.

***2006***

May 2006 – Africo BC funded a Feasibility Study on the Kalukundi Property for and on behalf of H&J and Swanmines (as later defined in Item 3.2 – Material Contracts).

November 2006 – Africo BC completed a financing of subscription receipts which entitled holders to acquire Units of Africo for gross proceeds of $20,000,000.

December 2006 – Africo completed the Plan of Arrangement with Rubicon Minerals Corporation and Africo BC, among others. See Item 3.8 – Narrative Description of the Business – Reorganization.

December 2006 – Africo‟s common shares commenced trading on the TSX.

***2007***

January 2007 – Africo returned positive assay results from the Kalukundi Property resulting in further drilling being planned to delineate additional resources.

February 2007 – Africo became aware of a default judgment in respect of a termination payment to an ex-employee. Sale in execution pursuant to this judgment created issues in respect of an ownership interest in Swanmines, which has now been resolved, as further described at item 3.2 – Material Contracts and in Africo‟s Annual Information Form dated March 28, 2008, prepared in connection with its fiscal year ended December 31, 2007.

November 2007 – Africo completed a financing with the International Finance Corporation for gross proceeds of $4,000,000.

***2008***

July 2008 – Africo completed a financing with Camrose Resources Limited ("**Camrose**") pursuant to a Subscription Agreement dated as of April 17, 2008, as amended (the "**Subscription Agreement**"), between Camrose and Africo. Camrose was issued 40,000,000 common shares of Africo and 20,000,000 common share purchase warrants, each warrant entitling Camrose to acquire one common share of Africo at a price of $3.50 until January 24, 2010. The aggregate purchase price payable by Camrose was $100,000,000, being $2.50 for each common share and ½ of a warrant. The Subscription Agreement also provided for the settlement of the outstanding litigation that Africo was involved in. See Item 3.2 – Material Contracts and Africo‟s Annual Information Form dated March 28, 2008, prepared in connection with its fiscal year ended December 31, 2007.

***2009***

January 2009 – Amendment No. 4 to the Swanmines Agreement was entered into amending the terms governing the Kalukundi Property. See Item 3.2 – Material Contracts - the Swanmines Agreement as defined herein.

March 2009 – Swanmines Sprl signed a Memorandum of Understanding (the "**MOU**") with the Societe Nationale d"Electricite ("**SNEL**") relating to the supply of electricity to its Kalukundi Property. Pursuant to the MOU, Africo, through Swanmines, has agreed to finance studies targeting reinforcement of the capabilities of SNEL"s electrical system in order to guarantee power to Swanmines and the diversion of high voltage power lines to enable mining of the area that the lines currently overhang. Swanmines has agreed to pay the cost of the studies and raise the funding required for the installation of the required infrastructure. SNEL will supply high voltage as needed at the official rate and will reimburse Swanmines" funding of the studies out of revenue from the sale of power.

May 2009 – Africo entered into an agreement with Camrose and Comide Sprl pursuant to which all parties agreed to terminate the acquisition by Africo of the Exploitation Permit (as herein defined – see Item 3.2 – Material Contracts – Transfer Agreement) that was announced on April 21, 2008 and July 24, 2008, as certain conditions precedent were not fulfilled. The termination agreement was subject to approval by ordinary resolution of disinterested shareholders of Africo, which approval was obtained at Africo"s annual general meeting held June 18, 2009. See Item 3.2 – Material Contracts.

August 2009 – Africo reported results from a drilling program undertaken on the Kalukundi Property. A program of infill drilling was focused on establishing the continuity in depth of mineralization of the Principal Fragment and to determine the potential for mineralization of the SE Anticline Fragment.

November 2009 – Africo repurchased 1,731,000 of its common shares from its Chairman, Chris Theodoropoulos, at a price of $0.76 per share. The repurchased shares were cancelled and returned to treasury.

***2010***

Throughout the year, Africo continued to evaluate the Kalukundi Property (see Item 3.11 – Management Update), as well as potential acquisitions in the resource sector.

### 2.3 Significant Acquisitions

Africo did not complete any significant acquisitions during its most recently completed fiscal year.

## ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS

### 3.1 General

The transactions with Camrose, as more particularly described under Item 3.2 – Material Contracts, have provided Africo with adequate working capital to carry out its business objectives, and have resulted in the re-establishment of Africo"s 75% indirect ownership of the Kalukundi Property. Africo"s primary objective is to carry out the exploration and development programs recommended by the Kalukundi Report (as defined below), as may be amended from time to time. In order to develop the Kalukundi Property in accordance with the Feasibility Study (as herein defined), Africo will be required to secure additional equity and debt financing. There can be no assurance that Africo will be successful in its endeavours. See Item 3.12 – Risk Factors.

As a result of market conditions during the year ended December 31, 2009, Africo significantly scaled back its activities on its Kalukundi Property. Also in 2009, Africo laid off its expatriate development team in order to significantly reduce its costs on the Kalukundi Property.

Africo is considering an acquisition strategy that would take advantage of current market conditions, especially in the DRC, to acquire assets, provided that any potential acquisitions represent a good long term strategic fit.

### 3.2 Material Contracts

The following agreements govern Africo"s business:

***Contract (as amended) for the Establishment of a Company between La Generale des Carrieres et des Mines ("GCM") and The Enterprise H&J Swanepoel Famille Trust sprl ("H&J") for the Mining of the Kalukundi Deposits dated February 2001, as amended (the "Swanmines Agreement")***

GCM, an entity controlled by the government of the DRC, was the exclusive holder of the rights relating to the Kalukundi Property as more particularly described in this AIF. Pursuant to the Swanmines Agreement, GCM and H&J set up a private limited liability company called Société d‟exploitation des gisements de Kalukundi (referred to herein as "**Swanmines**"), of which GCM was to own 45% of the outstanding share capital and H&J was to own 55% of such outstanding share capital. As described below, the Swanmines Agreement was amended to increase H&J‟s interest to 75%.

GCM covenanted to transfer to Swanmines all its right, title and interest in the Kalukundi Property and to provide to Swanmines all data, information, registers and reports on the Kalukundi Property in its possession. GCM also committed to obtain all regulatory approvals in connection with the mining operations on the Kalukundi Property.

H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi Property, to finance a feasibility study on the Kalukundi Property, to commit all necessary funds to commence commercial production on the Kalukundi Property and to finance the building of a metallurgical processing plant following the recommendations of the feasibility study. The Swanmines Agreement provides that: "…as from the date on which the feasibility study is made available to both parties, H&J will dispose of a period of 6 months to find, …" the financing necessary for the investments that will lead to commercial production as decided on the basis of the feasibility study (and the construction of the facilities should start within six months following the expiry of this six month period). In addition, the Swanmines Agreement provides that "…Advances made in the form of a loan by H&J will represent approximately 30% at least of the financing of the first phase of the project…". On or about November 15, 2006, Africo delivered a notice to Swanmines and GCM confirming Africo‟s decision to place the deposit into commercial production and to commence construction of the facilities necessary to do so, and provided such parties with a proposed program and budget with respect thereto.

The Swanmines Agreement also provided that GCM has no responsibility with regard to financing of the Kalukundi Property and should be informed of the procedures put in place to effect such financing and may give its opinion on such procedures, where relevant. In addition, the Swanmines Agreement required GCM to be informed of whether or not Africo intends to obtain, in part, the financing necessary to put the Kalukundi Property into commercial production from international banks and agencies and H&J confirmed its capacity to do so. GCM agreed to give its full co-operation to Africo to facilitate the granting of such financing, in particular by signing any document and by giving all assurances that may be reasonably required to obtain such financing, without any financial commitment on the part of GCM.

Swanmines covenanted to carry out all mining and exploration activities on the Kalukundi Property, to undertake a feasibility study, to mine the Kalukundi deposits and to process the ore in plants according to the recommendations of such feasibility study on the condition that these recommendations would be accepted by both parties to the Swanmines Agreement, and comply with technical mining standards. Further, Swanmines also covenanted to provide the parties to the Swanmines Agreement with a feasibility study within 24 months of the date of its establishment (the "**Feasibility Study**"). The Feasibility Study was funded by Africo and delivered to the parties pursuant to the Swanmines Agreement on May 18, 2006.

Subject to an additional provision contained in Amendment No. 4 to the Swanmines Agreement (see below), the Swanmines Agreement is in effect until the Kalukundi Property can no longer be mined or until it is terminated by mutual agreement of the parties. The Swanmines Agreement may also be terminated by H&J on 30 days‟ written notice in which case it will transfer its interest to GCM, any indebtedness of Swanmines to H&J will be cancelled, and H&J will remain solely responsible for commitments to third parties. GCM may also terminate the Swanmines Agreement if there is a serious and continuous default or non-compliance by H&J, or non compliance with the deadlines imposed on H&J, that is not remedied within 30 days of receipt of written notice from GCM, in which case GCM will be released of all of its obligations, H&J will remain solely responsible for all its commitments towards third parties, and the indebtedness of Swanmines to H&J will be cancelled. In addition, the Swanmines Agreement

provides that "…should GCM fail to execute a non venial provision…" of the Swanmines Agreement, H&J may suspend the execution of its obligations until GCM‟s failure has been remedied and if GCM does not remedy a failure within 30 days of receipt of a warning from H&J, H&J may terminate the Swanmines Agreement in accordance with the dispute resolution provisions of the Swanmines Agreement.

The initial Swanmines Agreement was amended by subsequent amendments Nos. 1 through 3, the total effect of which was to reduce the interest of GCM in Swanmines to 25% and increase the interest of H&J (now Africo DRC) to 75% effective May 18, 2004. The amendments also extended the time for Swanmines to present the Feasibility Study to 24 months from the last amendment dated May 18, 2004, and provided that Swanmines would pay a royalty of 2.5% on its gross turnover to GCM (a portion of which GCM could require to be paid in advance). In addition, the amendments provided that if the parties were unable to resolve a dispute, the dispute will be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce of Paris (the "**Rules**"), by one or more arbitrators appointment in accordance with the said Rules.

In late 2006 and during 2007, Akam Mining sprl ("**Akam**") purportedly acquired Africo‟s interest in Swanmines pursuant to a sale in execution in relation to a default judgment obtained by an ex-employee of Africo – the legality of which was disputed by Africo - however, as a result of which, GCM recognized Akam as its partner in Swanmines. (Detail with respect to the prior litigation regarding the Kalukundi Property is described in Africo‟s Annual Information Form dated March 28, 2008, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo‟s other public disclosure documents through the Internet at www.sedar.com, as well as under "Akam Agreement" below.)

On January 13, 2009, Akam (as a result of its purported ownership of the Swanmines Shares during the period of time the Kalukundi Property was the subject of litigation), entered into a further amendment to the Swanmines Agreement ("**Amendment No. 4**") with GCM regarding the amended terms governing the Kalukundi Property. Akam‟s interest in Swanmines was transferred to Africo as further described under the heading "Akam Agreement" below. Notwithstanding Amendment No. 4 is between Akam and GCM, Africo has been advised by Congolese legal counsel that, pursuant to Congolese commercial law, in a private limited liability company (an "sprl" such as Swanmines) transfer of shares has, as a consequence, transfer of rights and obligations of the prior shareholder (Akam) to the beneficiary of the share transfer (Africo DRC) in proportion to share ownership. As such, on transfer of the Swanmines Shares to Africo DRC on January 15, 2009 pursuant to the terms of the Akam Agreement (see below), Africo DRC assumed the rights and obligations of Akam pursuant to Amendment No. 4.

Pursuant to the terms of Amendment No. 4, Africo is required to pay GCM US$1,600,000 per year for a four year period as an entry premium, the first such payment having been made by Africo on January 28, 2009, while the second payment was made on or about January 7, 2010 and the third payment was made on January 24, 2011. An additional payment to GCM by Swanmines will be required on the basis of U$35 per ton copper on reserves exceeding 180,000 tons. Pursuant to Amendment No. 4, Africo is under obligation to carry out the Feasibility Study, including funding of up to 30% of the contribution amount required to develop the mining project to the point of commercial ore production, and to report thereon to GCM by January 13, 2010. A copy of the original Feasibility Study was translated into French and delivered to GCM on January 8, 2010. GCM will be in a position to cancel the Swanmines Agreement, as amended, before the official termination date should Africo fail to meet its obligation to carry out the Feasibility Study and in the event that it does not remedy such failure upon receipt of formal notice by GCM. Africo is currently awaiting comments, if any, from GCM.

The Swanmines Agreement initially provided that the net profits from the Kalukundi Property will be allocated as follows: 60% to repay all loans incurred by Swanmines and 40% to GCM and H&J, in accordance with their respective proportionate interests in Swanmines and, thereafter, the net profits will be allocated in proportion to the ownership interests of GCM and H&J in Swanmines. Pursuant to Amendment No. 4, during the period of reimbursement of initial loans by Africo sufficient to provide working capital for Swanmines, 70% of the tax-free profit is to be allocated to reimburse the loan capital and interest, with 30% to be allocated to Africo and GCM in proportion to their ownership interests in Swanmines.

Amendment No. 4 provides for responsibility for the operations of Swanmines by a Board of Directors (the "**Swanmines Board**") composed of eight members: four to be proposed by GCM and four to be proposed by Africo; and for Swanmines to be administered by a management board made up of seven members: three (the Assistant General Manager, the Production Manager and the Human Resources Manager) to be appointed by the members of the Swanmines Board proposed by GCM and four (the General Manager, the Finance, Accounting and Budget Manager, the Supplies Manager and the Marketing Manager) to be appointed by the members of the Swanmines Board proposed by Africo (the "**Management Committee**"). The General Manager or, in his or her absence, the Assistant General Manager, will chair the Management Committee. The Swanmines Board determines the powers, the attributes, the appointments or indemnities of the members of the Management Committee and can revoke at any time a decision taken by it in this regard.

Pursuant to Amendment No. 4, GCM and Africo have agreed to enter into an association agreement with a view to consolidating the Swanmines Agreement and all of the amendments thereto to resolve any contradictions that may appear after applying all of the amendments and to introduce any other necessary or generally required contractual provisions. Although it is Africo"s understanding that it is to receive a draft of an association agreement, as at the date of this AIF Africo has not received a draft association agreement and there is no assurance that Africo will receive or finalize such an association agreement. See Item 3.12 – Risk Factors. Once entered into, the association agreement will be electronically filed with regulators and available for viewing through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR).

***Subscription Agreement dated as of April 17, 2008, as amended (the "Subscription Agreement"), between Camrose and Africo***

Pursuant to the Subscription Agreement, Camrose agreed to subscribe for 40,000,000 common shares of Africo and 20,000,000 common share purchase warrants, each warrant entitling Camrose to acquire one common share of Africo at a price of $3.50 until January 24, 2010 (the "**Subscription**"). The aggregate purchase price payable by Camrose was $100,000,000, being $2.50 for each common share and ½ of a warrant. Completion of the Subscription was subject to, among other things, the Transfer Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect and the Akam Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect. The warrants expired, unexercised, on January 24, 2010.

The Subscription Agreement also provided that Africo would support the nomination of four individuals designated by Camrose for appointment to Africo"s Board of Directors, and would take all steps necessary to ensure that the Board was comprised of no more than seven directors and that a quorum is not more than a majority of all directors (all of which have occurred as at the date of this AIF – see Item 8 – Directors and Officers). In addition, Africo agreed to support Camrose"s majority representation on Africo"s Board indefinitely, provided that if (i) the percentage of issued and outstanding common shares of Africo beneficially owned by Camrose and its affiliates (the "**Camrose Interest**") is at least 40% but less than 50%, Africo will support the nomination of three Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (ii) the Camrose Interest is at least 30% but less than 40%, Africo will support the nomination of two Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (iii) the Camrose Interest is at least 20% but less than 30%, Africo will support the nomination of one Camrose representative at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, and (iv) the Camrose Interest is less than 20%, Africo shall have no further obligations until such time as the Camrose Interest is again 20% or more.

In addition, Africo executed an investors" rights agreement in favour of Camrose and any lenders to Camrose pursuant to which Africo agreed, at its cost, to qualify by prospectus the resale in Canada of the shares of Africo held by them on a demand and on a "piggyback" basis on customary terms.

Further, the Subscription Agreement provided that as long as Camrose and its affiliates hold at least 10% of the issued and outstanding shares of Africo, if Africo or any subsidiary proposes to issue any further Africo shares or convertible securities, Camrose shall have the right to purchase the portion thereof equal to the percentage of shares

of Africo then beneficially owned by Camrose and its affiliates. However, this right will not apply to shares issued under a stock option plan established from time to time for the benefit of participating employees of Africo or upon the conversion or exchange of, or the exercise of any right attaching to, any convertible securities, or the issuance of securities in connection with a *bona fide* business acquisition by Africo or in connection with *bona fide* strategic partnerships, alliances and similar transactions.

***Agreement between Camrose and Africo dated April 17, 2008 regarding Akam Mining sprl (the "Akam Agreement")***

The Akam Agreement acknowledged that Camrose had, through a wholly-owned subsidiary, purchased the outstanding shares of Akam Mining sprl ("**Akam**"). The Akam Agreement resolved the existing litigation regarding the Kalukundi Property described in Africo‟s Annual Information Form dated March 28, 2008 (which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo‟s other public disclosure documents through the Internet at www.sedar.com); and provided that Camrose would cause Akam to assign all of its rights, title and interest in Swanmines sprl (the "**Swanmines Shares**") to a wholly-owned subsidiary of Africo in consideration of the issuance to Camrose of 5,400,000 shares of Africo at a deemed price of $2.50 per share, subject to usual anti-dilution adjustments. The Akam Agreement also provided for mutual releases from Africo and Akam in connection with the Swanmines Shares. The Swanmines Shares were transferred to Africo DRC on January 15, 2009.

***Termination Agreement dated May 15, 2009 terminating the Agreement dated April 17, 2008 between Africo and La Congolaise des Mines et de Developpement (Comide sprl) ("Comide") (the "Transfer Agreement")***

Africo had entered into the Transfer Agreement with Comide, a joint venture company owned as to 75% by an affiliate of Camrose and as to 25% by La Générale des Carrières et des Mines ("**Gécamines**"), a mining company owned by the Government of the DRC. The Transfer Agreement provided that Comide would transfer to Swanmines (to be owned at least 75% by Africo and the balance by Gécamines) Exploitation Permit No. PE2607 (the "**Exploitation Permit**"), consisting of 41 squares or blocks (approximately 34.83155 $km^2$) for copper, cobalt, gold and nickel extraction, situated in the Territory of Lubudi, District of Kolwezi, Province of Katanga, at a purchase price that was to be based on a valuation and be satisfied by the issuance of common shares in the capital of Africo at a price of Cdn. $2.50 per share. The transfer was subject to a number of conditions precedent being satisfied, including the consent of Gécamines, which was not obtained. As a result of the economic conditions in 2009, the uncertain value of the Exploitation Permit and the corresponding uncertainty as to the number of shares to be issued, and the consent of Gécamines not being obtained, on May 15, 2009 Africo, Comide and Camrose entered into an agreement to terminate the Transfer Agreement subject to the approval of the disinterested shareholders of Africo, which approval was obtained at Africo‟s annual and special meeting held June 18, 2009.

### 3.3 Competitive Conditions

Africo competes with numerous other companies and individuals, including competitors with greater financial, technical and other resources than Africo, in the search for and the acquisition of attractive mineral properties in the DRC and elsewhere in Africa. See Item 3.12 – Risk Factors.

### 3.4 Environmental Protection

An Environmental and Social Impact Assessment study ("ESIA") was commissioned by Africo in 2008. The ESIA was designed to conform with the requirements of the DRC and World Bank policies and procedures. The work undertaken by Envirolution Consultants on behalf of Africo was designed to evaluate the social impacts of the planned mining and processing activities, as well as to expand on knowledge of the local environment through a more detailed study of the local flora and fauna. This ESIA was finalized towards the end of 2008.

***Fish Study***

An independent ichthyofauna (fish) study was conducted in January 2008 as part of the ESIA. The study identified a number of rare fish species in the Kii stream which drains across the north, just off the Kalukundi Property area. In order to determine whether these species were more widespread, a follow up study in November 2008 of 13 streams in the area established that four out of the 13 steams in the area were considered to be suitable candidates for conservation or protection as river or fish reserves to offset the mining impacts. The other sites were rejected due to their location too far down the river system, or because the present ecological status was assessed as being largely modified to the point that a large loss of natural habitat, aquatic biota (including fish) and basic ecosystem functions have occurred. The main human activity contributing to the damaged environment is washing of cobalt residues in the streams by artisanal miners.

***New Kisankala Village Site Evaluation***

A recommendation was put forward to move the proposed new Kisankala village site about 300m south to the south of the Kalukundi concession boundary. The advantage of this move is to increase the buffer zone between the village and the tailings storage facility, as well as active mining operations, which will have health, safety and environmental benefits for the community.

A preliminary investigation of the site was carried out to determine the characteristics and suitability of the land and it was determined that the new site is almost identical in its characteristics to the original site and, hence, does not warrant a formal environmental impact assessment.

***Kalukundi Property Site Rehabilitation Provision***

Ongoing exploration and evaluation work has been in progress on the Kalukundi Property site continuously for five years. During this period, progressive environmental rehabilitation has been undertaken. In 2008, a rehabilitation evaluation was undertaken to define a monetary provision for the rehabilitation work that was deemed to be required at the time. Most of the rehabilitation work pertained to cleaning of drilling sites and filling of trenches and pits. By the 2008 year end, most of the sites recommended for rehabilitation had been restored and the remaining sites are currently being restored in parallel with other activity at the site.

***Relocation of the Kisankala Village***

A relocation action plan was drawn up in 2007 and strong community communication and interaction formed part of the follow up actions to the derived plan. These meetings with the Chief of the local communities, his elders and the village populace continued through 2008. A brick making program made significant progress and provided the villagers with some confidence that the village relocation was being seriously considered. However, as a result of the economic downturn in 2008, the village relocation was postponed and the relocation is anticipated to be reviewed in the future.

**3.5 Employees**

Africo currently employs in the DRC a total of three Congolese nationals on a full or part-time basis. In addition, it has the equivalent of three full time staff members in its Vancouver head office, namely the acting Chief Executive Officer, the acting Chief Financial Officer and financial and administrative support staff. Effective August 1, 2009, Africo engaged Oakton Global South Africa (Pty) Ltd., a corporation associated with Camrose Resources Limited (Africo"s largest shareholder), to provide project management, logistical support and administrative and technical services for a fee of US$50,000 per month. In February 2010, this fee was reduced to US$40,000 per month. The original agreement lapsed on December 31, 2009, however, Africo has extended the agreement on a month-to-month basis.

### 3.6 Foreign Operations

Substantially all of Africo‟s operations are currently conducted in the DRC. In the DRC, the assets and operations of Africo are subject to various political, economic and other uncertainties. See Item 3.12 – Risk Factors.

### 3.7 Bankruptcy and Similar Procedures

Neither Africo nor any of its subsidiaries have been subject to any bankruptcy, receivership or similar proceedings within the three most recently completed financial years or during or proposed for the current financial year.

### 3.8 Reorganization

Africo, which was then known as CopperCo Resource Corp., entered into a plan of arrangement (the "**Arrangement**") pursuant to an Arrangement Agreement made as of July 6, 2006, as amended, with Rubicon Minerals Corporation ("**Rubicon**"), Paragon Minerals Corporation, and Africo BC. The Arrangement was effective on December 8, 2006. As a result of the Arrangement, Africo:

- acquired the shares of Africo BC then held by Rubicon;
- distributed common shares of Africo to Rubicon‟s shareholders; and
- acquired the remaining shares of Africo BC not then held by Rubicon in exchange for common shares of Africo;

with the result that Africo BC became a wholly-owned subsidiary of Africo. See Item 1.2 – Corporate Structure – Intercorporate Relationships.

### 3.9 Social or Environmental Policies

Africo has adopted an environmental policy and is committed to developing and fostering a culture of environmental care, both within the Corporation and in the community. As such, Africo is committed to:

- complying with environmental legislation and regulations as the baseline for its environmental performance and striving to achieve best practice in every aspect;
- managing its operations to minimize or eliminate negative environmental impacts wherever practicable;
- conducting business with service providers and contractors who have a similar commitment to the environment and who embrace its environmental policy; and
- striving for the most efficient use of energy and water, the prevention of pollution and minimizing waste by recycling wherever possible.

Africo has also adopted a community relations policy as it understands that it is a guest in all the countries in which it operates. As such, Africo respects local culture and customs and integrates into the surrounding community through its social development programs. Expatriates are inducted in the local culture and encouraged to learn the local language, to ensure harmonious relationships and good communication are maintained. Where the required skills are available, Africo recruits from the surrounding community. Similarly, where price and quality are acceptable, Africo‟s policy is to purchase locally, supporting the local economy.

### 3.10 Mineral Projects – The Kalukundi Property

The following summary with respect to the Kalukundi Property has been reproduced from a technical report on the Kalukundi Property dated June 2006, as revised July 2008 (the "**Kalukundi Report**" or the "**Technical Report**"), written by John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., who were retained by Africo BC to prepare a technical report compliant with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* ("**NI 43-**

**101**"). Both Mr. Hearne and Dr. Verbeek are a "Qualified Person" and considered "independent" as both those terms are defined in NI 43-101. Further details with respect to the Kalukundi Property are available from the Kalukundi Report, which is incorporated herein by reference and is available for public review on the Internet at the System for Electronic Document Analysis and Retrieval (SEDAR) website: www.sedar.com.

***Summary of the Technical Report***

**"Introduction**

RSG Global Pty Ltd (RSG Global) has been commissioned by Africo Resources Limited (Africo) to compile a technical report on the Kalukundi copper cobalt Project located in the copper belt of the Democratic Republic of the Congo (DRC). This report is to comply with disclosure and reporting requirements set forth in National Instrument (NI) 43-101, Standards of Disclosure for Mineral Projects, and in compliance with Form 43-101F1 (the "**Technical Report**").

This report pertains to the four main deposits that comprise the Project, namely the Principal, Anticline, Kalukundi and Kii Fragments.

**Location**

The Project is located within the Kolwezi District of Katanga Province in the south-east of the DRC. The Project area is located 60km to the east of Kolwezi and just 4km to the north of the main road between Likasi and Kolwezi. The village of Kisankala is situated close to the Principal and North Fragments of the Kalukundi deposit.

The Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years. The tenement is 19.5km$^2$ in extent, consisting of 23 carres or blocks.

**Ownership**

The exploitation permit for the Project was held by Swanmines and the ownership of Swanmines is shared between H & J Family trust (75%) and Gécamines (25%). Africo held a 48% interest in H & J Family Trust and had option to increase this holding to 100%. Rubicon Minerals Corporation (Rubicon), a publicly listed Canadian company (TSX and AMEX) holds a 39.6% interest in Africo[*sic*]. **[*NOTE: The foregoing description of ownership of the Kalukundi Project is as at the date of, and is extracted verbatim from, the Technical Report. As at the date of this AIF, the exploitation permit for the Project is held by Swanmines and the ownership of Swanmines is shared between Africo Resources (DRC) sprl (75%) and Gécamines (25%). Africo currently holds a 100% interest in Africo Resources (DRC) sprl.*]**

Africo is a private Canadian registered company and has secured funding through Rubicon and independent shareholders to provide funding for the exploration programme and FS on the Project. Thus far, over US$9M has been committed to the Project.

**Project Geology**

Base metal mineralisation in the world class Zambian and DRC copper belt provinces is hosted by sedimentary rocks of the Neo-Proterozoic Katangan Sequence, developed within the Lufilian Arc. This copper belt extends over 600km from Luanshya (Zambia) in the southeast and to Kolwezi in the Democratic Republic of the Congo (DRC) in the northwest. Even with sustained production over almost 100 years, there are still huge resources of Cu and Co in this extensive mineral province.

The Katangan Supergroup rocks are up to 7,000m thick and are underlain by basement granite, intermediate metavolcanic and metasedimentary rocks dated at between 1,800Ma to 2,000Ma.

The Katangan Supergroup is subdivided into Roan, Lower and Upper Kundelungu Groups. Mineralisation at Kalukundi occurs within the Mines Sequence (or *Series des Mines*) which is correlated with the Lower Roan rocks within the SE part of the Lufilian arc in Zambia. The sediments represent a facies continuum of proximal to intermediate and distal dolomitic mudstones, siltstones, sandstones and algal reef fragments.

The Katangan Supergroup sediments in Zambia are deformed by a series of open folds, whereas in the DRC the Katangan Supergroup is preserved both as tightly folded, but relatively intact sequences and as complexly deformed, locally continuous but structurally dismembered „rafts" of lower Roan strata (*Series Des Mines*) within a „mega breccia" or melange that contains abundant evaporite minerals. The mega breccia is probably the result of decoullement at the northern margin of the basin and northward thrusting of the Katangan Supergroup over basement lithologies (granites and gneisses) and other, higher, Katangan Supergroup stratigraphy. The mega breccia is probably of tectonic origin, focussed on incompetent chemical sediments.

Metamorphic grade increases southwards but within the Kalukundi area very low-grade chlorite facies metamorphism is evident.

Of the twelve fragments identified in the Kalukundi concession area, only four are the subject of this report. These are the Principal, Anticline, Kalukundi and Kii Fragments.

The Mines series rocks in particular have undergone deep weathering and hypogene alteration, assisted possibly by the acids formed by the breakdown of sulphides. The core units have been silicified and the remobilisation processes have resulted in redistribution of the copper-cobalt mineralisation into open spaces within the Mines Series rocks.

**Resource Drilling**

The dimensions of the four fragments discussed in this report, expressed as strike length and drilled width, are:-

- Principal 630m x 36.70m
- Anticline 150m x 80.25m
- Kalukundi 430m x 44.18m
- Kii 330m x 40.84m

Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the „manual" drilling of shallow exploratory holes for mapping purposes.

Active exploration has been carried out by three main companies, Gécamines, JCI and Swanmines since about 1986.

Drilling for resource evaluation purposes has been carried out in three campaigns:-

| | | | |
|---|---|---|---|
| Gécamines in 1986/87 | 8 holes | 2,809m | 10% of the resource drillholes |
| JCI/Geo-Consult in 2001/02 | 12 holes | 1,440m | 15% of the resource drillholes |
| Africo/Swanmines 2004/05 | 58 holes | 5,401m | 5% of the resource drillholes |
| **Totals** | **78 holes** | **9,650m** | |

In addition to the above, 58 holes drilled by Africo, a further 30 boreholes, not used directly in the resource evaluation, were drilled for geotechnical, condemnation and exploration purposes.

**Data Quality**

QAQC data provided by Africo meets industry standard levels of precision and accuracy. The standards and blanks show good levels of accuracy, core duplicate and inter-laboratory pulp-duplicate data showed high levels of precision.

**Mineral Resources**

Classification of the mineral resource at Kalukundi was based on data quality, drill spacing, confidence in continuity and various kriging efficiency measures. RSG Global considers confidence in the grade estimates to be good, even though drillhole density is limited down dip. Confidence is supported by low grade variability and low skewness parameters.

Only resources above 200m below surface have been considered "potentially economically extractable". Resource models exist below this, but extraction of this material would most likely be by underground methods. No evaluations of underground parameters have yet been carried out and hence no resources have been quoted below this level. Furthermore these resources are predicated on very limited drilling information. Significant exploration potential is suggested by these models.

Mineral Resources are tabulated below, based on a 1.5% copper-equivalent cutoff at a 12:1 copper to cobalt equivalence ratio.

**Table 1.7_1**
**Kalukundi Project**
**Resources Between Surface and 200 Metres Below Surface**

| | Resource Tonnes | % Copper Grade | % Cobalt Grade | Copper (Mlbs) | Cobalt (Mlbs) |
|---|---|---|---|---|---|
| Measured | 9,648,484 | 2.45 | 0.61 | 521.5 | 130.1 |
| Indicated | 2,505,924 | 2.29 | 0.61 | 126.6 | 33.7 |
| **Total Measured + Indicated** | **12,154,408** | **2.42** | **0.61** | **648.1** | **163.8** |
| **Inferred** | **15,020,674** | **2.63** | **0.58** | **871.5** | **192.6** |

Resources with the highest confidence levels of continuity and grade occur from surface down to 150m where the density of drilling is greatest. The Resource from 150m to 200m falls almost entirely into the Inferred category. Modelling below 200m suggests exploration potential for further mineralised material.

**Reserves**

The Project Reserve estimate as of May 2006 is reported in Table 1.8_2. All stated Reserves are completely included within the quoted Resources. The input parameters used in the Reserve estimate are described in Section 17. For ease of reference, however, a summary of the most pertinent input parameters is provided in Table 1.8_1.

THE BALANCE OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**Table 1.8_1**
**Kalukundi Project**
**Summary of Input Parameters used for Reserve Estimation**

| **Item** | | **USD** | **Value** |
|---|---|---|---|
| Cu Price | | $/lb | 1.25 |
| Co Price | | $/lb | 12.00 |
| Diesel fuel price | | $/l | 1.29 |
| Mining cost | Mill Feed | $/t | 3.12 |
| | Waste | $/t | 4.01 |
| Processing Costs | 0-10m | $/t | 35.35 |
| | 10-20m | $/t | 36.96 |
| | 20-30m | $/t | 39.02 |
| | 30-40m | $/t | 41.53 |
| | 40-50m | $/t | 44.50 |
| | 50-60m | $/t | 47.93 |
| | 60-70m | $/t | 51.80 |
| | 70-80m | $/t | 56.14 |
| | 80-90m | $/t | 60.92 |
| | 90-100 | $/t | 66.16 |
| | 100-110m | $/t | 71.86 |
| | 110-120m | $/t | 78.01 |
| Processing Recoveries | | % | Variable |
| G&A | | M$/yr | 7.2 |
| Mine supervision | | M$/yr | 1.27 |
| Grade control | | $/t | 0.06 |
| De-watering | | M$/yr | 0.5 |
| Stockpile rehandle | | $/t Mill Feed | 1.16 |
| Mining dilution | | % | 2 |
| Mining recovery | | % | 97 |
| Inter ramp slope angle | | Degrees | Variable |
| Royalty | Government | % | 2.0 |
| | Gecamines | % | 2.5 |
| Metal Transport | Cu | $/t | 300 |
| | Co | $/t | 377 |

**Table 1.8_2**
**Kalukundi Project**
**Reserve Summary by Fragment**

| Fragment | Reserves | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Proven | | | | | Probable | | | | | Total | | | | |
| | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | |
| | | Cu [%] | Co [%] | Cu [t] | Co [t] | | Cu [%] | Co [%] | Cu [t] | Co [t] | | Cu [%] | Co [%] | Cu [t] | Co [t] |
| Principal | 2.3 | 2.22% | 1.00% | 50,238 | 22,611 | 0.4 | 2.29% | 1.10% | 8,689 | 4,182 | 2.6 | 2.23% | 1.01% | 58,927 | 26,793 |
| Anticline | 1.4 | 2.59% | 0.54% | 35,550 | 7,358 | 0.2 | 1.60% | 0.65% | 2,984 | 1,223 | 1.6 | 2.47% | 0.55% | 38,534 | 8,581 |
| Kalukundi | 1.1 | 2.55% | 0.42% | 28,471 | 4,730 | 0.4 | 1.40% | 0.47% | 5,214 | 1,764 | 1.5 | 2.26% | 0.44% | 33,685 | 6,493 |
| Kii | 1.8 | 2.55% | 0.58% | 46,010 | 10,420 | 0.3 | 2.62% | 0.50% | 8,886 | 1,699 | 2.1 | 2.56% | 0.56% | 54,896 | 12,119 |
| **Total** | **6.6** | **2.44%** | **0.69%** | **160,268** | **45,119** | **1.3** | **2.02%** | **0.69%** | **25,773** | **8,867** | **7.8** | **2.37%** | **0.69%** | **186,041** | **53,986** |

**Development and Operations**

It is envisaged that the Project could mine and process 0.80Mt per annum ("Mtpa") over approximately ten years. The plant is designed to produce 21,100t of Cu per year and 4,200t of Co per year at an average process cost of US$44.42/t of ore treated.

All ore and waste will be mined via conventional, open pit mining methods, using a mining contractor. The operation plans to utilise selective mining techniques to separate ore and waste. The mining equipment that is considered to be suitable for the Project would include 80t backhoe configured, hydraulic excavators and off-highway haul trucks with a payload capacity of 35t.

The treatment plant flowsheet is based on processing 0.8Mtpa of mill feed. The testwork indicated that the Kalukundi ore could be processed using a single stage crushing circuit followed by a conventional SAG / ball milling circuit with the ball mill in closed circuit with a cyclone. Overall recovery after losses in processing was between 89% and 93% for Cu and between 70% and 78% for Co.

The leach product is then washed in a six stage counter current decantation plant to ensure a clarified liquor is sent to the copper recovery circuit whilst keeping losses due to entrainment below 1%. The copper recovery circuit consists of copper solvent extraction step where the copper is moved to an organic phase before being stripped to produce a advance liquor that is treated in the copper tank house. The copper tank house produces cathode plate that will be sold. A bleed stream from the copper circuit is sent to the cobalt recovery circuit.

The cobalt circuit consists of several purifying steps where impurities like iron, aluminium, manganese, zinc and finally copper are removed before the purified cobalt liquor is sent to solvent extraction circuit where cobalt is loaded onto an organic phase before being stripped to produce the advance solution that is treated in the cobalt tank house. The cobalt tank house produces cobalt cathode that will be binned and sold.

Africo and its contractors will employ approximately 524 people throughout the operating phase of the Project. Initially selected posts requiring specific skills or experience will be filled by expatriates. In addition to performing their job function, expatriate personnel will be expected to transfer knowledge and expertise in order to develop the capabilities of the national staff. In the longer term, it is anticipated that nationals of the DRC will fill most operating and management positions within the company.

A water pumping station has been planned to pump the full requirement of water from Lake Nzilo, on the Lualaba River, 22km to the site in a buried steel pipeline into the plant raw water storage dam. Water will be drawn from the storage dam water for plant make-up, fire and potable water. The fire water will be pumped to a fire water ring main by a dedicated electrical and standby diesel pumping system. The raw water will be treated through a chlorination plant for the production of potable water prior to storage in two separate storage tanks. The plant and camp sewerage will be treated in two bio-filter plants with the grey water being discharged to the environment.

Power at 110kV will be supplied to the plant from the existing National Grid overhead power lines which pass 100m from the plant boundary. Plant power transformers will be situated in the plant main switchyard. Power distribution on site will be at 11kV.

**Project Implementation**

Production is assumed to commence after a pre-production period of 18 months.

The development capital cost of the Project has been estimated at US$166M and is based on an EPCM (engineering, procurement, construction and management) implementation strategy. The estimate includes owner"s costs, working capital, and a contingency, totalling approximately US$12.23M.

**Financial Summary**

The overall operating costs for the plant and mining operation per tonne of ore mined are shown in Table 1.11_1.

**Table 1.11_1**
**Kalukundi Project**
**Overall Operating Costs – Average over Life of Mine**
**(Annualised at 801,000tpa)**

| **Description** | **US$/t of ore** |
|---|---|
| Mining | 4.32 |
| Process Plant and Infrastructure | 44.42 |
| General & Administration | 7.28 |
| **Total Operating Costs/t of ore** | **US$56.02** |

The investment in working capital and pre-production capital expenditure is US$166.6M plus pre-production stripping of US$6.85M. **[*Note: These costs and estimates are based on the work that was done in 2005 and 2006 and, on a going forward basis, will have to be reviewed by Africo based on current prices and conditions.*]**

The results of sensitivity analysis show that the Project is relatively insensitive to changes in working cost and capital expenditure. Only metal price changes have a substantial effect.

**Conclusions**

The results of the economic analysis indicate that exploitation of the Kalukundi deposits is economically viable and should proceed. Opportunities exist in most areas of the Project that will be more rigorously investigated during the detailed engineering phase and where appropriate will be incorporated into the Project.

The current financial models are based on the scenario of 100% equity financing for the Project. This, coupled with a conservatively projected base price of Copper and Cobalt gives a before tax IRR of 14.7%. No allowance has been made in the model for the effects and levels of debt financing available or required.

The anticipated Project payback time is less than four years.

Opportunities exist in most areas of the Project to be more rigorously investigated during the detailed engineering phase and to firm up certain assumptions, thereby mitigating and or removing some of the risks that have been identified during the FS.

**Recommendations**

The exploitation of the Kalukundi deposits should proceed.

It is recommended that Africo proceeds with:-

- Development of a detailed mine implementation program.
- Compilation of tender documents for mine contracting and subsequent tender process.
- Risk based geotechnical and geohydrological evaluation, which may lead to steepening of wall angles.
- Personnel recruitment, policies and procedures and training.
- More detailed or updates to mine design, scheduling and budgeting.
- Continue the exploration on the satellite deposits to increase the life of the plant.

- Source local earthworks and civil contractors and machinery.

There is considerable scope to increase the Project Reserve of 7.8Mt by proving up existing Resources, by carrying out follow up studies and also through drilling of other mineralized surface bodies on the property, all of which will be aggressively pursued by Africo in 2006."

**3.11 Management Update**

As a result of global economic conditions during 2008 and 2009, Africo significantly scaled back activities on the Kalukundi Property and also laid off its expatriate development team in order to reduce its costs on the Kalukundi Property.

Exploration activities and drilling activity, which focused on the search for mineralization within new fragments, commenced in 2008 and continued into 2009. The core drilling programme, amounting to 3971m, was undertaken on three fragments:

| | | |
|---|---|---|
| Kesho | 18 holes | 2282m |
| SE Anticline | 6 holes | 674m |
| Principal | 6 holes | 1015m |
| **Totals** | **30 holes** | **3971m** |

This was accompanied by 1139m of RC drilling from 13 boreholes at selected localities on the Kii, Kalukundi, SE Anticline and Principal Fragments to identify the hydrogeological characteristics of the RAT Lilas formation.

Evaluation of the core including sampling, SG measurements, etc., was followed by monitoring and evaluation of the assay data to comply with QA/QC requirements. All borehole collar positions were accurately surveyed for inclusion in the detailed geological models. Accordingly, on August 4, 2009, Africo reported initial results from the drilling programme on the Principal and SE Anticline Fragments. The August 4, 2009 announcement has been electronically filed with regulators and is available for review through the Internet on SEDAR at www.sedar.com.

As Africo outlined in its August 4, 2009 announcement, results from the drilling have returned some of the best values encountered on the Project to date and confirm that the central part of the Principal Fragment is highly anomalous in cobalt, as well as hosting copper grades. The best intersection from BH K107 grades at 7.75% copper and 2.68% cobalt over a drilled width of 32.88m (true width 30.00m). This intersection runs from 157.00m to 189.88m and has established that oxide mineralization on this fragment can be confirmed to a vertical depth of 140m.

Assay results from the drilling on the SE Anticline Fragment have been received and are encouraging, particularly in respect of cobalt values, with the best intersection grading at 1.47% cobalt over a drilled width of 28.86m (true width 25.00m).

The core drilling on the Kesho fragment followed a programme of RC drilling undertaken in 2007, which also confirmed the presence of continuous mineralization. The results of the core drilling were positive with each borehole intersection locating both copper and cobalt mineralization. The better intersections encountered are summarized as follows:

| BH No. | From | To | Drilled Width | Cu | Co |
|---|---|---|---|---|---|
| KES 1 | 8.00m | 44.00m | 36.00M | 3.08% | 0.54% |
| KES 3B | 18.50m | 56.00m | 37.50m | 2.87% | 0.54% |
| KES 5 | 3.35m | 45.50m | 39.15m | 1.65% | 0.71% |
| KES 15 | 53.00m | 87.50m | 34.50m | 1.35% | 0.89% |

The SE Anticline Fragment is located to the south of the Kesho fragment. Pitting and trenching exploration plus assay data from a percussion borehole in 2008 established the presence of high grade cobalt mineralization on this fragment. A limited amount of drilling at 200m centers in 2009 was designed to determine the prospectivity of this fragment and the potential continuity of the mineralization. The drilling was successful in locating mineralization, which is copper-rich in the north and cobalt-rich in the south. One RC hole drilled in the north intersected significant copper mineralization in the hanging wall SDS unit.

As the Technical Report focused on the Principal, Anticline, Kalukundi and Kii Fragments, Africo is evaluating the prospects of an assessment on the Kesho Fragment, which is a completely new geological model, and an update of the existing data on the Principal Fragment. In this regard it has been recommended by Coffey Mining (SA) Pty Ltd. that:

- additional drilling is needed at the Kesho Fragment to reduce the borehole spacing to 50m x 50m and replace all RC with core;
- additional drilling is still needed at the Principal Fragment to fill in gaps in the drilling and to evaluate the mineralization in the southern portion of the Fragment; and
- hanging wall mineralization be evaluated and included in the mineral resource models.

As was previously noted, estimates for pre-production capital expenditure plus pre-production stripping identified in the Technical Report are based on work completed in 2005 and 2006 and will have to be reviewed by Africo‟s management based on current prices and conditions.

The disclosure in this Item 3.11 has been prepared under the supervision of Michael J. Evans, Africo‟s Consulting Geologist, who is a Qualified Person as defined in NI 43-101.

**3.12 Risk Factors**

The operations of Africo are speculative due to the nature of Africo‟s business, the location in which it operates, and the present stage of its development. The following risk factors pertain to the business operations of Africo and its subsidiaries and could have a material adverse effect on, among other things, the operating results, earnings, properties, business and condition (financial or otherwise) of, or realities faced by, Africo.

***Financing***

Significant additional debt and/or equity funding is required to bring the Kalukundi Property into production. Due to the current economic environment, there can be no guarantee that such financing will be available at economic terms to enable the Kalukundi Property to be developed. Further, in order for Africo to raise additional financing, it may have to review and revise the capital cost estimates that are currently outlined in the Technical Report, which capital cost estimates could be significantly higher than as currently outlined in the Technical Report.

***Swanmines Agreement***

The Swanmines Agreement, as amended, contains a number of provisions that may be subject to differing interpretations. In addition, the Swanmines Agreement and the amendments thereto do not deal with its subject matter comprehensively. It is, therefore, not possible to accurately and adequately describe in this AIF all of the terms of the Swanmines Agreement, as amended. Although Africo has made every effort to comply with what it considers to be the material terms of the Swanmines Agreement, there can be no assurance that it has complied with such terms. In addition, if the Swanmines Agreement is determined by a court of competent jurisdiction to have a meaning that differs from the interpretation of the Swanmines Agreement as disclosed in this AIF, Africo could be materially adversely affected. Failure to perform its obligations under, and otherwise to comply with, the terms of the Swanmines Agreement may result in a forfeiture without compensation of its interest in the Kalukundi Property.

Further, Amendment No. 4, that was entered into in January 2009 following completion of the mining review by the Government of the DRC, is between GCM and Akam Mining sprl, not Africo. This is because at the time of negotiation of this agreement, Akam was the purported holder of the Swanmines Shares. Although Amendment No. 4 acknowledges the impending transfer of the Swanmines Shares from Akam to Africo DRC as a result of the settlement of the litigation involving the Kalukundi Property pursuant to the Akam Agreement (which transfer of shares was effected on January 15, 2009), it does not contain specific assignment provisions for the rights and obligations of Akam under Amendment No. 4 to be assigned to Africo DRC. While, on advice of Congolese legal counsel, it is Africo"s understanding that, pursuant to Congolese commercial law, in a private limited liability company (an "sprl" such as Swanmines) transfer of shares has, as a consequence, transfer of rights and obligations of the prior shareholder (Akam) to the beneficiary of the share transfer (Africo DRC) in proportion to share ownership; and further, Amendment No. 4 contemplates the entering into of a definitive association agreement and it is Africo"s understanding that it is to receive a draft of a definitive association agreement in the near future, there can be no assurance that this definitive agreement will be entered into between GCM and Africo DRC, or at all. (See Item 3.2 – Material Contracts – Swanmines Agreement and Item 3.2 – Material Contracts – Akam Agreement.)

***Commitments and Potential for Liability from Akam's Purported Management of Swanmines***

Although Africo"s management has reviewed the minutes of meetings of Swanmines held during the period of time that the Kalukundi Property was subject of litigation (as described in Africo"s Annual Information Form dated March 28, 2008, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo"s other public disclosure documents through the Internet at www.sedar.com) and Akam was the purported manager of Swanmines, and has found no indication of additional liabilities or commitments incurred by Akam during this period, Africo has no other way of knowing what commitments and liabilities were incurred by Akam during such period. There is no assurance that decisions made or liabilities incurred by Akam during this period, if any exist, will not become Africo"s responsibility.

***Political and Economic Instability***

The DRC has a long history of political instability, significant and unpredictable changes in government policies and laws, war and civil conflict, illegal mining activities, lack of law enforcement and labour unrest. More recently, the DRC has undergone civil unrest and instability that could have an impact on political, social or economic conditions. From time to time, governments have intervened in the export of mineral concentrates in response to concerns about the validity of export rights and payment of duties. In addition, the government of the DRC has renegotiated the Swanmines Agreement with Africo (see Item 3.2 – Material Contracts). These factors (which may include new or modified taxes or other government levies as well as other legislation) may result in the curtailment or cessation of Africo"s activities, adversely affecting the value of its assets.

***Stress in the Global Economy***

Reduction in credit, combined with reduced economic activity and the fluctuations in the United States dollar, may adversely affect businesses and industries that purchase commodities, affecting commodity prices in more significant and unpredictable ways than the normal risks associated with commodity prices. The availability of services such as drilling contractors and geological service companies and/or the terms on which these services are provided may be adversely affected by the economic impact on the service providers. The adverse effects on the capital markets generally make the raising of capital by equity or debt financing much more difficult and Africo is dependent upon the capital markets to raise financing. Any of these events, or any other events caused by turmoil in world financial markets, may have a material adverse effect on Africo"s business, operating results, and financial condition.

***Current Global Financial Condition***

Current global financial conditions have been subject to increased volatility. Access to financing has been negatively impacted by both sub-prime mortgages in the United States and elsewhere and the liquidity crisis affecting the asset-backed commercial paper market. As such, Africo is subject to counterparty risk and liquidity risk. Africo is exposed to various counterparty risks including, but not limited to: (i) through financial institutions that hold Africo"s

cash; (ii) through companies that have payables to Africo; and (iii) through Africo‟s insurance providers. Africo is also exposed to liquidity risks in meeting its operating expenditure requirements in instances where cash positions are unable to be maintained or appropriate financing is unavailable. These factors may impact the ability of Africo to obtain loans and other credit facilities in the future and, if obtained, on terms favourable to Africo. If these increased levels of volatility and market turmoil continue, Africo‟s operations could be adversely impacted and the trading price of the common shares could be adversely affected.

***Government Regulation***

Africo‟s mineral exploration and planned development activities will be subject to various laws governing prospecting, mining, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. No assurance can be given that the new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner that could limit, suspend, terminate or curtail production or development. Government approvals and permits are currently, and may in the future be, required in connection with Africo‟s operations. Parties engaged in mining operations or in the exploration or development of mineral properties may be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed on them for violations of applicable laws or regulations. Amendments to current laws and regulations governing operations or more stringent implementation thereof could have a substantial adverse impact on Africo and cause increases in exploration expenses, capital expenditures or production costs or reduction in levels of production at producing properties, or require abandonment or delays in the development of new mining properties.

***Lack of Infrastructure in the DRC***

The transportation and service infrastructure in the DRC is sub-standard and unpredictable. Material delays in the transportation of equipment, supplies and resources may delay the development of the Kalukundi Property. Any such delay is likely to increase the cost of developing the Kalukundi Property, and such increase may be material to Africo‟s business, results of operations and financial condition. Further, the Kalukundi Property will be accessed over lands that may be subject to the interests of third parties. Any assertion by such parties of their interests may delay or disrupt the development and operation of the Kalukundi Property.

***Effects of Inflation on Results of Operations***

The DRC has historically experienced relatively high rates of inflation. Accordingly, Africo‟s costs may be materially affected, which may adversely affect its business and results of operations.

***Limited Business History***

Africo has no history of developing a mineral resource property. The likelihood of Africo‟s success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in connection with the establishment of any business, factors that are exacerbated by the fact that Africo‟s business is conducted in the DRC. There is no assurance that Africo can successfully develop the Kalukundi Property, generate revenues, operate profitably, or provide a return on investment in the future.

***No Assurance of Title***

The Kalukundi Property consists of an exploitation permit that confers on Swanmines certain exclusive rights in relation to 19.5km$^2$ in the DRC. The mineral title records in the DRC are incomplete, may not fully reflect the transfer history and may not disclose agreements, charges and claims that could impact on title to the Kalukundi Property.

***Need for Water Rights***

Africo requires the ready availability of water if the Kalukundi Property becomes operational. Management believes that Africo‟s current surface rights and water rights are sufficient to carry on the activities of Africo‟s current work program. However, the need may arise for Africo to purchase or lease additional surface rights or obtain additional water rights in order to further explore and develop the Kalukundi Property, and its ability to further explore or develop such property may be dependent upon Africo‟s ability to secure such additional surface or water rights.

***Requirement for Permits and Licences***

The operations of Africo will require licences, permits and, in some cases, renewals of existing licences and permits from various governmental authorities. Africo‟s ability to obtain, sustain or renew such licences and permits or obtain other required licences or permits on acceptable terms is subject to changes in regulations and policies and to the discretion of the applicable governmental authorities.

***Electricity Supply***

Notwithstanding Africo has entered into an MOU with SNEL relating to the supply of electricity to its Kalukundi Property (see Item 2.2 – History – 2009), there is no assurance that studies proposed in the MOU will result in reinforcement of SNEL‟s electrical system capabilities sufficient to guarantee power to the Kalukundi Property or that Africo will be provided with adequate power in the future. In addition, failure in electrical power and shortages of the supply of diesel, mechanical parts and other items required for Africo‟s operations occur frequently in the DRC. Extended periods without electricity or other necessary elements required to support its operations could have an adverse effect on Africo‟s business, results of operations and financial condition.

***Dependence on Qualified Personnel***

Africo‟s business is dependent on retaining the services of a small number of key management personnel with a variety of skills and experience, including in relation to development and operation of mineral projects. The success of Africo is, and will continue to be, dependent to a significant extent on the expertise and experience of its directors and senior management. The failure to retain, or loss of, one or more of these people could have a materially adverse effect on Africo. Africo does not maintain insurance on any of its key officers or employees at this time, but this is currently under review. Africo‟s success will also depend to a significant degree upon the contributions of qualified technical personnel and its ability to attract and retain highly skilled personnel in the DRC and elsewhere. Competition for such personnel is intense, and Africo may not be successful in attracting and retaining qualified personnel in the DRC, or in obtaining the necessary work permits to hire qualified expatriates. Its inability to do so in the future may have a materially adverse impact on its business and results of operations.

***Uncertainty in the Estimation of Mineral Reserves and Resources***

There is a degree of uncertainty with respect to the calculation of mineral reserves and mineral resources and corresponding grades being mined or dedicated to future production. Until mineral reserves or mineral resources are actually mined and processed, the quantity of mineral resources and mineral reserve grades must be considered as estimates only. In addition, the quantity of mineral reserves and mineral resources may vary depending on, among other things, metal prices. Any material change in quantity of mineral reserves, mineral resources, grade or stripping ratio may affect the economic viability of the Kalukundi Property. In addition, there can be no assurance that copper recoveries or other metal recoveries in small-scale laboratory tests will be duplicated in larger scale tests under on-site conditions or during production.

Moreover, the economic evaluation of the mineral resources and reserves of the Kalukundi Property includes inferred mineral resources that are considered not to be defined in sufficient detail to have the economic consideration applied to them that would enable them to be categorized as mineral reserves, and there is currently no certainty that the economic analysis proposed will be achieved. Metal price fluctuations, as well as increased production costs or reduced recovery rates, may render ore reserves containing relatively lower grades uneconomic

and may ultimately result in a restatement of such ore reserves. Short-term operating factors relating to ore reserves, such as the need for sequential development of ore bodies and the processing of new or different ore types or grades may cause a mining operation to be unprofitable in any particular accounting period.

Fluctuation in copper, cobalt and other base or precious metals prices, results of drilling, metallurgical testing and production and the evaluation of mine plans subsequent to the date of any estimate may require revision of such estimate. The volume and grade of reserves mined and processed and recovery rates may not be the same as currently anticipated. In particular, no assurance can be given that the anticipated tonnages and grades will be achieved or that the indicated level of copper and cobalt recovery will be realized. Any material reductions in estimates of mineral reserves and mineral resources, or estimates of Africo"s ability to extract these mineral reserves, could have a material adverse effect on Africo"s results of operations and financial condition.

***Potential Dilution***

Pursuant to the Swanmines Agreement, Africo is contractually obligated to provide the funding for the Kalukundi Property. There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt securities of Africo, the interests of shareholders in the net assets of Africo may be significantly diluted. If additional financing is not available, Africo may be unable to satisfy its obligations under the Swanmines Agreement. Any such failure, and any failure of Africo to obtain the required financing on acceptable terms, could have a material adverse effect on Africo"s financial condition, results of operations and liquidity, may require Africo to cancel or postpone planned capital investments, and may result in the loss of its interest in the Kalukundi Property.

***Foreign Investments and Operations***

Mineral exploration and mining in certain countries may be affected in varying degrees by political instability and government regulations relating to the mining industry and foreign investment. There can be no assurance that the government of the DRC will not institute regulatory policies that adversely affect the exploration and development on the Kalukundi Property. Any changes in regulations or shifts in political conditions in these countries are beyond Africo"s control and may adversely affect its business. Investors should assess the political and regulatory risks related to Africo"s foreign country investments. Operations may be affected in varying degrees by government regulations with respect to restrictions on production, price controls, export controls, foreign exchange controls, income taxes, expropriation of property, environmental legislation and mine safety.

***Risk of Expropriation and Enforceability of Contracts with Government, Parastatal Organizations or Joint Venture Partners***

GCM renegotiated the Swanmines Agreement as a result of a mining review (see Item 3.2 – Material Contracts). It is possible that the current system of exploration and mine permitting in the DRC may change further, resulting in impairment of Africo"s rights and possibly expropriation of Africo"s properties without adequate compensation. In addition, there is a possibility that Africo"s agreements with governments, parastatal organizations or joint venture partners may be unenforceable against these parties.

***Mining and Development Plan***

Although Africo has received the Feasibility Study from its consultants, Africo"s Board of Directors is considering ways in which to optimize the deposit potential contained on the Kalukundi Property and may elect to modify, expand or otherwise embark on a different course of action regarding the Kalukundi Property depending on, among other things, the amount of capital Africo raises and the development plan that it ultimately undertakes.

***Exploration, Development and Operating Risks***

The exploration for, and the development of, mineral deposits involves significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate. While the discovery of an ore body may result

in substantial rewards, few properties which are explored are ultimately developed into producing mines. Major expenses will be required to develop metallurgical processes and to construct mining and processing facilities at the Kalukundi Property. Notwithstanding the Feasibility Study, there is no certainty that ongoing expenditures to be made by Africo towards mining operations on the Kalukundi Property will result in commercial quantities of ore. It may take many years until production is possible, if at all, during which time the economic feasibility of production may change. Whether a mineral deposit will be commercially viable depends on a number of factors, some of which are: the particular attributes of the deposit, such as size, grade and proximity to infrastructure; metal prices, which are highly cyclical; currency exchange rates, which are volatile; and government regulations, including regulations relating to prices, taxes, royalties, land tenure, land use, importing and exporting of minerals and environmental protection. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in Africo not receiving an adequate return on its invested capital.

Africo‟s activities will be primarily directed towards the exploration for, and the development of, mineral deposits. Exploration programs entail risks relating to the location of economic ore bodies, the development of appropriate metallurgical processes, the receipt of necessary governmental permits and regulatory approvals, and the timely completion of capital projects, including the construction of mining and processing facilities at mining sites. Major expenses will be required to establish reserves by drilling and to construct mining and processing facilities at a particular site.

Mining operations generally involve a high degree of risk. Although Africo does not yet operate a mine on the Kalukundi Property, it intends to develop a mine as indicated in the Kalukundi Report. Such operations are subject to all the hazards and risks normally encountered in the exploration, development and production of copper, cobalt and other base or precious metals, including unusual and unexpected geologic formations, seismic activity, rock bursts, cave-ins, flooding, and other conditions involved in the drilling and removal of material, any of which could result in damage to, or destruction of, mines and other producing facilities, damage to life or property, environmental damage and possible legal liability. Processing operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas, which may result in environmental pollution and consequent liability.

***Environmental Risks and Hazards and Village Relocation***

All phases of Africo‟s operations will be subject to environmental regulation in the DRC. These regulations will mandate, among other things, the maintenance of air and water quality standards, land reclamation and relocation of people. They will also set forth limitations on the generation, transportation, storage and disposal of sulphuric acid and of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Africo‟s operations. Although Africo has received a favourable vote from the individuals to be affected, there is no assurance that it will be able to effect any required relocation of people in order to develop the Kalukundi Property.

Environmental hazards may exist on the properties in which Africo holds interests, which are unknown to Africo at present and which have been caused by previous or existing owners or operators of the properties. There can be no assurance that these hazards, if any exist, will not be Africo‟s responsibility and, consequently, may adversely affect Africo‟s operations.

***Commodity Prices***

The development and success of Africo‟s projects will be primarily dependent on the future price of base and precious metals and the price of copper and cobalt in particular. Commodity prices are subject to significant fluctuation and are affected by a number of factors that are beyond Africo‟s control. Such factors include, but are not limited to, the sale or purchase of base or precious metals by various central banks and financial institutions, interest rates, exchange rates, inflation or deflation, fluctuation in the value of the United States dollar (the currency

in which resource prices generally are quoted) and other currencies, global and regional supply and demand, speculative trading, the overall level of forward commodity sales, international or regional political and economic events or trends and the political and economic conditions of major producing countries throughout the world. The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of, and commercial production from, Africo‟s properties to be impracticable. Depending on the price of base and precious metals, projected cash flows from planned mining operations may not be sufficient and Africo could be forced to discontinue development and may lose its interest in, or may be forced to sell, some of its properties. Future production from Africo‟s mining properties is dependent on commodity prices that are adequate to make these properties economic.

In addition to adversely affecting Africo‟s reserve estimates and its financial condition, declining commodity prices can impact operations by requiring a reassessment of the feasibility of a particular project. Such a reassessment may be the result of a management decision or may be required under financing arrangements related to a particular project. Even if the Kalukundi Property is ultimately determined to be economically viable, the need to conduct such a reassessment may cause substantial delays or may interrupt operations until the reassessment can be completed.

***Competition***

The mining industry is competitive in all of its phases. Africo will face strong competition from other mining companies in connection with the acquisition of properties producing, or capable of producing, precious and base metals. Many of these companies have greater financial resources, operational experience and technical capabilities than Africo. As a result of this competition, Africo may be unable to maintain or acquire additional attractive mining properties on terms it considers acceptable, or at all. Consequently, Africo‟s revenues, operations and financial condition could be materially adversely affected.

***Insurance and Uninsured Risks***

Africo maintains commercial general liability insurance coverage providing $5,000,000 of coverage worldwide. In addition, it has, since April 2007, maintained director and officer liability insurance providing $10,000,000 of coverage. Africo‟s business will be subject to a number of risks and hazards generally, including: adverse environmental conditions, industrial accidents, labour disputes, unusual or unexpected geological conditions, ground or slope failures, cave-ins, changes in the regulatory environment and natural phenomena such as inclement weather conditions, floods and earthquakes. Such occurrences could result in damage to mineral properties or production facilities, personal injury or death, environmental damage to Africo‟s properties or the properties of others, delays in development or mining, monetary losses and possible legal liability. Although Africo will maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance may not cover all of the potential risks associated with its operations. In particular, Africo‟s director and officer insurance policy specifically excludes coverage in the event of a claim by Africo‟s significant shareholder(s). In addition, Africo may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against political risk, and risks such as environmental pollution or other hazards as a result of exploration and production, is not generally available to Africo or to other companies in the mining industry on acceptable terms. Losses from these events may cause Africo to incur significant costs that could have a material adverse effect upon its financial performance, solvency and results of operations.

***Currency Risks***

A significant portion of Africo‟s operating expenses will be incurred in United States dollars and Congolese francs. From time to time, Africo may borrow funds and will incur capital expenditures that are denominated in foreign currency. In addition, any revenue generated from operations may be in United States dollars. Accordingly, foreign currency fluctuations may adversely affect Africo‟s financial position and results of operations.

***Increased Labour Costs, Construction Costs and Availability of Mining Equipment***

Wages and related labour and consulting costs account for a large portion of Africo"s costs. Accordingly, Africo"s costs may be materially affected by increases in wages and related labour and consulting costs. A number of the items that Africo may require for mine construction may be unavailable. If Africo cannot identify and procure new equipment on a timely basis, or identify and purchase suitable used equipment, this may result in delays to the Kalukundi Property construction schedule and, therefore, may also delay the start-up of mining operations and/or increase estimated costs. The amount of capital costs associated with the development of a mining property is adversely impacted by escalations in the price of items related to construction, including steel, fuel, concrete and other construction consumables. Such price escalations are caused by numerous factors beyond Africo"s control. Furthermore, although the Kalukundi Report indicates an investment in working capital and pre-production expenditure of US$166.6 million, it is likely that the capital expenditure requirement will be higher.

***Conflicts of Interest***

Some of the directors and officers of Africo will not be devoting all of their time to the affairs of Africo. The directors and officers of Africo are directors and officers of other companies, some of which are in the same business as Africo. The directors and officers of Africo are required by law to act in the best interests of Africo. They have the same obligations to the other companies in respect of which they act as directors and officers. Discharge by the directors and officers of their obligations to Africo may result in a breach of their obligations to the other companies and, in certain circumstances, this could expose Africo to liability to those companies. Similarly, discharge by the directors and officers of their obligations to the other companies could result in a breach of their obligation to act in the best interests of Africo. Such conflicting legal obligations may expose Africo to liability to others and impair its ability to achieve its business objectives.

***Future Mining Operations***

There is no assurance that Africo will produce revenue, operate profitably or provide a return on investment in the future from mining operations.

***Fluctuation in Market Value of Africo's Common Shares***

The market price of a publicly-traded stock is affected by many variables not directly related to the corporate performance of Africo, including the market in which it is traded, the strength of the economy generally, the availability and attractiveness of alternative investments, and the breadth of the public market for the stock. The effect of these and other factors on the market price of the common shares of Africo on the TSX in the future cannot be predicted. **An investment in Africo's common shares is highly speculative and can result in an investor losing its entire investment.**

***Health Risks***

HIV/AIDS, malaria and other diseases represent a serious threat to maintaining a skilled workforce in the mining industry throughout Africa. HIV/AIDS, malaria and other diseases are a major healthcare challenge faced by Africo"s operations in the DRC. There can be no assurance that Africo will not lose members of its workforce or workforce man-hours or incur increased medical costs as a result of these high health risks, which may have a material adverse effect on Africo"s operations.

**ITEM 4 DIVIDENDS**

Africo has not declared nor paid any dividends or distributions and does not foresee the declaration or payment of dividends or distributions in the near future. Any decision to pay dividends or distributions on its securities will be made by the Board of Directors on the basis of Africo"s earnings, financial requirements and other conditions existing at such future time.

## ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE

### General Description of Capital Structure

Africo is authorized to issue an unlimited number of common shares. The common shares rank equally as to dividends, voting powers and participation in assets upon dissolution or winding-up. No common shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the common shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a securityholder to contribute additional capital. As at December 31, 2010, 71,311,278 common shares of Africo were issued and outstanding.

### Loan Capital

Africo does not have any debt obligations outstanding.

## ITEM 6 MARKET FOR SECURITIES

### 6.1 Trading Price and Volume

Africo"s common shares are listed on the TSX and trade under the symbol “ARL”. The following table sets out the price ranges and volume traded on a monthly basis through the fiscal year ended December 31, 2010.

| Month | Trading Price ($) High | / Low | Volume |
|---|---|---|---|
| January 2010 | 1.49 | 0.80 | 140,649 |
| February 2010 | 1.02 | 0.84 | 294,330 |
| March 2010 | 1.03 | 0.85 | 1,743,991 |
| April 2010 | 1.01 | 0.86 | 154,094 |
| May 2010 | 0.97 | 0.82 | 164,519 |
| June 2010 | 0.97 | 0.78 | 73,640 |
| July 2010 | 0.93 | 0.76 | 48,968 |
| August 2010 | 0.97 | 0.76 | 188,970 |
| September 2010 | 0.97 | 0.81 | 338,380 |
| October 2010 | 0.86 | 0.80 | 215,913 |
| November 2010 | 1.19 | 0.82 | 463,046 |
| December 2010 | 1.30 | 0.77 | 515,140 |

### 6.2 Prior Sales

### Prior Sales

The following table sets out the securities not listed or quoted on a marketplace but issued by Africo during its fiscal year ended December 31, 2010.

| Type of security issued | Date of issue | Exercise/conversion price per security | Number of securities |
|---|---|---|---|
| Incentive stock options[(1)] | January 11, 2010 | $1.00 | 100,000 |
| Incentive stock options[(2)] | October 7, 2010 | $1.00 | 325,000 |

(1) Options granted to the interim CFO and Controller of Africo under its 2008 Stock Option Plan exercisable for a term of five years to January 11, 2015. Underlying securities are common shares in the capital of the Africo.

(2) Options granted to directors, a consulting geologist and an employee of Africo under its 2008 Stock Option Plan exercisable for a term of five years to September 16, 2015. Underlying securities are common shares in the capital of the Africo.

## ITEM 7 ESCROWED SECURITIES

Africo does not have any escrowed securities.

## ITEM 8 DIRECTORS AND OFFICERS

### 8.1 Name, Occupation and Security Holding

| Director/Officer | Director or Officer Since | Principal occupation for the last five years |
|---|---|---|
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>*Acting Chief Executive Officer*<br>British Columbia, Canada | July 4, 2006 | Self-employed businessman (since March 2007); Acting Chief Executive Officer of Africo (since December 9, 2009), Chairman of the Board of Africo (since April 2005) and its now wholly-owned subsidiary, Africo Resources (BC) Ltd. (since July 2006); Associate Counsel, Getz Prince Wells LLP, a law firm in Vancouver (November 2003 to March 2007). |
| **LUKAS MARTHINUS (TINUS) MAREE**[(2)]<br>*Director & Secretary*<br>British Columbia, Canada | July 4, 2006 | President, River Capital Partners Ltd., a private investment company (since January 2001); Director, River Group (since January 1998). |
| **JAMES COOK**[(1)(2)]<br>*Director*<br>Québec, Canada | September 23, 2008 | Retired (since May 2007); President and Chief Executive Officer of Rio Tinto Iron & Titanium, an iron mining company and titanium dioxide producer with operations in Quebec, South Africa and Madagascar (July 2001 to April 2007). |
| **PIETER DEBOUTTE**<br>*Director*<br>Democratic Republic of the Congo | August 14, 2008 | Chief Executive Officer of Emaxon, sprl, a diamond mining infrastructure investment and project financing company (since September 2002). |
| **MATTHEW FISHER**[(1)(2)]<br>*Director*<br>Israel | September 23, 2008 | Self-employed lawyer (since August 2007); lawyer at Herzog, Fox & Neeman (April 2004 to August 2007). |
| **DOUGLAS RYAN**[(1)]<br>*Director*<br>Gibraltar | August 14, 2008 | Business author and accredited mediator; officer with the government of Gibraltar (May 1996 to March 2007). |

| Director/Officer | Director or Officer Since | Principal occupation for the last five years |
|---|---|---|
| **LARRY OKADA**<br>*Acting Chief Financial Officer*<br>British Columbia, Canada | January 1, 2010 | Acting Chief Financial Officer of Africo (since January 1, 2010); Chief Financial Officer of BC Gold Corp. (August 2008 to present); consultant with PricewaterhouseCoopers LLP (August 2006 to July 2008); Managing Partner of Staley,Okada & Partners (November 1977 to July 2006). |

(1) Member of the Audit Committee.

(2) Member of the Compensation Committee

Directors of Africo are elected at each annual meeting of shareholders for a term of one year, serving until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time.

As of the date of this AIF, the directors and executive officers of Africo, as a group, beneficially owned, or exercised control or direction over, directly or indirectly, an aggregate 513,677 common shares of Africo representing 0.72% of Africo"s outstanding common shares. Information as to ownership of shares has been provided by the directors and executive officers of Africo or has been extracted from insider reports filed by these individuals and publicly available through the Internet at the Canadian System for Electronic Disclosure by Insiders (SEDI) at www.sedi.ca.

**8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

Except as disclosed herein, as at the date of this AIF, no director or executive officer of Africo is, or has been, within 10 years before the date of this AIF a director, chief executive officer or chief financial officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity:

(a) was subject to a cease trade order (including any management cease trade order which applied to directors or executive officers of a company, whether or not the person is named in the order) or an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, which were in effect for a period of more than 30 consecutive days (together, an "Order"); or

(b) was subject to an Order that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in the capacity as director, chief executive officer or chief financial officer.

Lukas Marthinus (Tinus) Maree was a director of Energem Resources Inc. from July 2005 until May 2006. On March 7, 2006, the British Columbia Securities Commission ordered that all trading by the insiders in the securities of Energem cease until Energem filed comparative financial statements for the fiscal year ended November 30, 2005, related Management Discussion and Analysis, and an AIF for the fiscal year ended November 30, 2005. This cease trade order was revoked by the British Columbia Securities Commission on May 31, 2006.

No director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo:

(a) is, as of the date of this AIF, or has been within the ten years before the date of this AIF, a director or executive officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation

relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets; or

(b) has, within the ten years before the date of this AIF, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the director, executive officer or shareholder.

As at the date of this AIF, no director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo has been subject to:

(a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

### 8.3 Conflicts of Interest

Certain directors and officers of Africo are also directors, officers or shareholders of other companies that are similarly engaged in the business of acquiring, developing and exploiting natural resource properties. Such associations may give rise to conflicts of interest from time to time. The directors of Africo are required by law to act honestly and in good faith with a view to the best interests of Africo and to disclose any interest which they may have in any property or opportunity of Africo. If a conflict of interest arises at a meeting of the Board of Directors, any director in a conflict will disclose his interest and abstain from voting on such matter.

Africo has engaged Oakton Global South Africa (Pty) Ltd., a corporation associated with Camrose (Africo‟s largest shareholder), to provide project management, logistical support and administrative and technical services. See Item 3.5 – Employees. Four of the current members of Africo‟s Board are nominees of Camrose.

## ITEM 9 AUDIT COMMITTEE

The purpose of the Audit Committee of Africo‟s Board of Directors is to provide assistance to the Board of Directors of Africo in fulfilling its legal and fiduciary obligations with respect to matters involving accounting, auditing, financial reporting, internal control and legal compliance functions of Africo. It is the objective of the Audit Committee to maintain communication among the Board of Directors of Africo, the external auditor and senior management of Africo.

### 9.1 The Audit Committee's Charter

The full text of the Charter of the Audit Committee, as adopted by Africo‟s Board of Directors on March 25, 2009, is included as Schedule A to this AIF.

### 9.2 Composition of the Audit Committee

James Cook, Matthew Fisher and Douglas Ryan are members of the Audit Committee of Africo‟s Board of Directors, all of whom are considered "independent" as that term is defined in applicable securities legislation. All three of the Audit Committee members have the ability to read and understand financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the issues that can reasonably be expected to be raised by Africo‟s financial statements.

### 9.3 Relevant Education and Experience

*Douglas Ryan, Chair of Audit Committee*

Mr. Ryan is a business author and an accredited mediator. He was an officer with the government of Gibraltar from May 1996 to March 2007, and has held various managerial positions in business and commerce including National Representative to the European Union Regional Transitional Cooperation. He earned his Bachelor of Arts (Honours) in 1990 from Middlesex University in London, England, his Executive Diploma in 2005 from the Chartered Management Institute in London, England, and his Post Graduate Certificate from Durham University in Durham, England, in 2007.

*James Cook*

Dr. Cook was the President and Chief Executive Officer from July 2001 to April 2007 and the President of the Sales Division from January 1998 to July 2001 of Rio Tinto Iron & Titanium, an iron mining company and titanium dioxide producer, with operations in Quebec, Richards Bay (South Africa) and Madagascar. Prior to his tenure as President he held various technical, operations and sales and marketing positions including General Manager of Richards Bay Iron and Titanium. He earned both his Bachelor of Science (in 1974) and his Ph.D (in 1977) in Metallurgy from the University of Strathclyde in Glasgow, Scotland.

*Matthew Fisher*

Mr. Fisher has practised law in England and Israel since 1998 and has advised on joint ventures, as well as public and private merger and acquisition transactions in the African mining sector, since 2004. He was called to the Supreme Court of England and Wales in 2000 and to the Israel Bar Association in November 2005. Mr. Fisher is currently self-employed and practising in Tel Aviv. Previously, Mr. Fisher was a lawyer at Herzog, Fox & Neeman in Israel from April 2004 to August 2007; and a lawyer at M. Fisher & Co. from August 2002 to December 2003 and at Allen & Overy from September 1998 to August 2002, both based in London, England. Mr. Fisher earned both his Bachelor of Arts in Law in 1996 and his Master of Arts in 2000 from Cambridge University.

### 9.4 Pre-Approval Policies and Procedures

While the Audit Committee is responsible for pre-approving all non-audit services to be provided to Africo or any of its subsidiaries by Africo‟s external auditor, no specific policies and procedures for the engagement of non-audit services have yet been adopted.

### 9.5 External Auditor Service Fees

As at the date of this AIF, PricewaterhouseCoopers LLC, Africo‟s external auditor, has billed Africo for the following services during the two most recently completed financial years:

| | **Fiscal year ended December 31, 2010** | **Fiscal year ended December 31, 2009** |
|---|---|---|
| Audit fees | $57,500 | $75,000 |
| Audit related fees(1) | $29,450 | $38,400 |

(1) Professional services provided by the external auditor for assurance and related services that are reasonably related to the performance of the audit of Africo‟s financial statements.

## ITEM 10 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Other than in connection with:

(a) the Subscription by, and the Akam Agreement with, Camrose described under Item 3.2 – Narrative Description of the Business – Material Contracts; and

(b) the engagement of Oakton Global South Africa (Pty) Ltd., a corporation associated with Camrose, to provide project management, logistical support and administrative and technical services as described under Item 3.5 – Employees;

management of Africo is unaware of any material interest of any director or executive officer of Africo, or of any person that is the direct or indirect beneficial owner of, or who exercises control or direction over, more than ten percent of any class or series of Africo‟s outstanding voting securities, or any associate or affiliate of any such persons, in any transaction within the three most recently completed financial years or during the current financial year of Africo that has materially affected or is reasonably expected to materially affect Africo or any of its affiliates.

## ITEM 11 TRANSFER AGENT AND REGISTRAR

Africo‟s registrar and transfer agent for its common shares is Computershare Investor Services Inc. with offices at:

510 Burrard Street
Vancouver, British Columbia V6C 3B9
Telephone: (604) 661-9400
Facsimile: (604) 661-9549

100 University Avenue, 9th Floor
Toronto, Ontario M5J 2Y1
Telephone: (416) 263-9200
Facsimile: 1-888-453-0330

## ITEM 12 MATERIAL CONTRACTS

The following are the only material contracts that Africo is party to, directly or indirectly, which are still in effect, other than those entered into in the ordinary course of business and not otherwise required by legislation to be publicly disclosed:

1. The Swanmines Agreement, as amended. See Item 3.2 – Narrative Description of the Business – Material Contracts.

2. The Subscription Agreement. See Item 3.2 – Narrative Description of the Business – Material Contracts.

3. The Akam Agreement. See Item 3.2 – Narrative Description of the Business – Material Contracts.

## ITEM 13 INTERESTS OF EXPERTS

John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., prepared or certified the Technical Report referred to in Item 3.10 – Narrative Description of the Business – Mineral Projects – The Kalukundi Property, which is incorporated by reference in this AIF, whose profession or business gives authority to the Technical Report. Neither Mr. Hearne or Dr. Verbeek, nor RSG Global Pty Ltd. or any designated professionals of RSG Global Pty Ltd., held at the time the Technical Report was prepared and revised, or is expected to receive subsequent to preparation and/or revision of the Technical Report, any registered or beneficial interest, direct or indirect, in any securities or other property of Africo, nor are any of them expected to be elected, appointed or employed as a director, officer or employee of Africo or any of its affiliates.

The auditor of Africo is PricewaterhouseCoopers LLP, Chartered Accountants, of Vancouver, British Columbia. PricewaterhouseCoopers LLP, Chartered Accountants, report that they are independent of the Company in accordance with the Rules of Professional Conduct in British Columbia, Canada.

## ITEM 14 ADDITIONAL INFORMATION

Additional information about Africo Resources Ltd. is available through the Internet on the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) at www.sedar.com. Information about Africo, including directors‟ and officers‟ remuneration and indebtedness, principal holders of Africo‟s securities, and securities authorized for issuance under equity compensation plans is contained in our Management Information Circular dated May 17, 2010, prepared for the annual meeting of our shareholders that was held on June 21, 2010, which is available for viewing on SEDAR.

Additional financial information about Africo is provided in Africo‟s audited consolidated financial statements for the fiscal year ended December 31, 2010, the notes thereto and the report of Africo‟s auditor thereon, as well as Management‟s Discussion and Analysis for the fiscal year then ended, all of which are available for viewing on SEDAR.

## SCHEDULE A

## CHARTER FOR THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS OF AFRICO RESOURCES LTD.

### 1. Purpose

1.1. The Audit Committee‟s primary function is assisting the Corporation‟s Board of Directors in fulfilling its oversight responsibilities to shareholders. The Committee is ultimately responsible for the policies and practices relating to integrity of financial and regulatory reporting, as well as internal controls to achieve the objectives of safeguarding of corporate assets; reliability of information; and compliance with policies and laws. Within this mandate, the Audit Committee‟s role is to:

(a) oversee the work and ensure the independence of the external auditor;

(b) ensure effective communications between management and the external auditor and provide a link between the external auditor and the Board of Directors;

(c) ensure the credibility and objectivity of the Corporation‟s financial reports and public disclosure; and

(d) review the Corporation‟s annual financial statements prior to approval thereof by the Board of Directors.

1.2. The Audit Committee will make recommendations to the Board of Directors regarding items relating to financial and regulatory reporting and the system of internal controls following the execution of the Committee‟s responsibilities as described herein.

1.3. The Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board of Directors from time to time prescribe.

### 2. Membership

2.1. Each member of the Audit Committee must be a director of the Corporation.

2.2. The Audit Committee will consist of at least three members, the majority of whom are not officers or employees of the Corporation, and each of whom must be "independent" and "financially literate" as those terms are defined by, and subject to the provisions of, National Instrument 52-110 – *Audit Committees* as adopted by the Canadian Securities Administrators, as such Instrument is revised or replaced from time to time.

2.3. The members of the Audit Committee will be appointed annually by and will serve at the discretion of the Board of Directors.

### 3. Authority

3.1. In addition to all authority required to carry out the duties and responsibilities included in this charter, the Audit Committee has specific authority to:

(a) engage and terminate, and set and pay the compensation for, independent counsel and other advisors as it determines necessary to carry out its duties and responsibilities;

(b) communicate directly with management and any internal auditor, and with the external auditor without management involvement; and

(c) approve interim financial statements and interim MD&A on behalf of the Board of Directors.

**4. Duties and Responsibilities**

4.1. The duties and responsibilities of the Audit Committee include:

(a) recommending to the Board of Directors the external auditor to be nominated by the Board of Directors for appointment by shareholders;

(b) recommending to the Board of Directors the terms of engagement for and compensation of the external auditor;

(c) reviewing the external auditor‟s audit plan, fee schedule and any related services proposals;

(d) overseeing the work of the external auditor;

(e) ensuring that the external auditor is in good standing with the Canadian Public Accountability Board and enquiring if there are any sanctions imposed by the CPAB on the external auditor;

(f) ensuring that the external auditor meets the rotation requirements for partners and staff on the Corporation‟s audits;

(g) where there is to be a change in external auditor, reviewing the issues related to the change and the information to be included in the required notice to be filed with securities regulators with respect to such change;

(h) reviewing and discussing with management and the external auditor the annual audited financial statements, including discussion of material transactions with related parties, accounting policies, as well as the external auditor‟s written communications to the Committee and to management;

(i) reviewing any disagreements in financial reporting between the external auditor and the Corporation‟s management;

(j) reviewing the external auditor‟s report, audit results and financial statements prior to approval of same by the Board of Directors;

(k) reporting on and recommending to the Board of Directors the annual financial statements and the external auditor‟s report on those financial statements prior to Board approval and dissemination of annual financial statements to shareholders and the public;

(l) reviewing the Corporation‟s financial statements, MD&A and annual and interim earnings press releases prior to public disclosure of this information by the Corporation;

(m) ensuring adequate procedures are in place for review of all public disclosure of financial information by the Corporation prior to is dissemination to the public;

(n) overseeing the adequacy of the Corporation‟s system of internal accounting controls and internal audit process and obtaining from the external auditor summaries and recommendations for improvement of such internal accounting controls;

(o) ensuring the integrity of the Corporation‟s disclosure controls and internal controls over financial reporting;

(p) resolving disputes between management and the external auditor regarding financial reporting;

(q) reviewing the external auditor‟s internal quality control procedures and any material issues raised with respect thereto by any peer, governmental or professional authority review and the steps taken to deal with those issues; and examining all relationships between the external auditor and the Corporation, in order to assess and ensure the external auditor‟s independence;

(r) reviewing risk management policies and procedures (for example, hedging, litigation and insurance), as well as current areas of financial risk and whether management is managing these effectively;

(s) establishing procedures for:

  (i) the receipt, retention and treatment of complaints received by the Corporation from employees and others regarding accounting, internal accounting controls or auditing matters and questionable practises relating thereto; and

(ii) the confidential, anonymous submission by employees of the Corporation or concerns regarding questionable accounting or auditing matters;

(t) reviewing and approving the Corporation"s hiring policies with respect to partners or employees (or former partners or employees) of either a former or the present external auditor;

(u) pre-approving all non-audit services to be provided by the Corporation"s external auditor to the Corporation or any of its subsidiaries and, in this regard, considering whether the external auditor"s performance of any such non-audit services is compatible with the external auditor"s independence; and

(v) overseeing compliance with regulatory authority requirements for disclosure of external auditor services and fees and Audit Committee activities.

4.2. The Audit Committee will report, at least annually, to the Board regarding the Committee"s examinations and recommendations.

**5. Meetings**

5.1. The quorum for a meeting of the Audit Committee is a majority of the members of the Committee who are not officers or employees of the Corporation or of an affiliate of the Corporation.

5.2. The members of the Audit Committee must elect a chair from among their number and may determine their own procedures.

5.3. The Audit Committee may establish its own schedule that it will provide to the Board of Directors in advance.

5.4. The external auditor is entitled to receive reasonable notice of every meeting of the Audit Committee and to attend and be heard thereat.

5.5. A member of the Audit Committee or the external auditor may call a meeting of the Audit Committee.

5.6. The Audit Committee will meet separately with the President and separately with the Chief Financial Officer of the Corporation at least annually to review the financial affairs of the Corporation.

5.7. The Audit Committee will meet with the external auditor of the Corporation at least once each year, at such time(s) as it deems appropriate, to review the external auditor"s examination and report.

5.8. The chair of the Audit Committee must convene a meeting of the Audit Committee at the request of the external auditor, to consider any matter that the auditor believes should be brought to the attention of the Board of Directors or the shareholders.

**6. Reports**

6.1. The Audit Committee will record its recommendations to the Board in written form which will be incorporated as a part of the minutes of the Board of Directors" meeting at which those recommendations are presented.

**7. Minutes**

7.1. The Audit Committee will maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board of Directors.