# Exhibit 15

# Annual Information Form

AFRICO RESOURCES LTD

For the Fiscal Year Ended December 31, 2015

March 16, 2016

## Table of Contents


**CAUTIONARY LANGUAGE REGARDING FORWARD-LOOKING INFORMATION ..................1**

**ITEM 1 CORPORATE STRUCTURE ..................2**
1.1 Name, Address and Incorporation ..................2
1.2 Intercorporate Relationships ..................2

**ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS ..................3**
2.1 Overview ..................3
2.2 History ..................3
2.3 Significant Acquisitions ..................3

**ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS ..................3**
3.1 General ..................3
3.2 Material Contracts ..................4
3.3 Competitive Conditions ..................7
3.4 Environmental Protection ..................7
3.5 Employees ..................8
3.6 Foreign Operations ..................8
3.7 Bankruptcy and Similar Procedures ..................8
3.8 Reorganization ..................8
3.9 Social or Environmental Policies ..................9
3.10 Mineral Projects – The Kalukundi Property ..................9
3.11 Management Update ..................17
3.12 Risk Factors ..................22

**ITEM 4 DIVIDENDS ..................30**

**ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE ..................31**

**ITEM 6 MARKET FOR SECURITIES ..................31**
6.1 Trading Price and Volume ..................31
6.2 Prior Sales ..................31

**ITEM 7 ESCROWED SECURITIES ..................31**

**ITEM 8 DIRECTORS AND OFFICERS ..................32**
8.1 Name, Occupation and Security Holding ..................32
8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions ..................33
8.3 Conflicts of Interest ..................33

**ITEM 9 AUDIT COMMITTEE ..................34**
9.1 The Audit Committee's Charter ..................34
9.2 Composition of the Audit Committee ..................34
9.3 Relevant Education and Experience ..................34
9.4 Pre-Approval Policies and Procedures ..................35
9.5 External Auditor Service Fees ..................35

**ITEM 10 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ..................35**

**ITEM 11 TRANSFER AGENT AND REGISTRAR ..................36**

**ITEM 12 MATERIAL CONTRACTS ..................36**

**ITEM 13 INTERESTS OF EXPERTS ..................36**

**ITEM 14 ADDITIONAL INFORMATION ..................37**

**SCHEDULE A – SUMMARY OF THE AMEC ASSESSMENT**
**SCHEDULE B – CHARTER FOR THE AUDIT COMMITTEE**

All information contained in this Annual Information Form ("**AIF**") for the fiscal year ended December 31, 2015 of **AFRICO RESOURCES LTD.**, referred to herein as "**Africo**" or the "**Corporation**", is as at December 31, 2015, unless otherwise indicated. All dollar amounts presented in this Annual Information Form are expressed in Canadian dollars, unless otherwise indicated.

## CAUTIONARY LANGUAGE REGARDING FORWARD-LOOKING INFORMATION

This AIF may include or incorporate by reference certain statements or disclosures that constitute "forward-looking information" under applicable securities laws. All information, other than statements of historical fact, included or incorporated by reference in this AIF that address activities, events or developments that Africo or its management expects or anticipates will or may occur in the future, including such things as future capital expenditures (including the amounts and nature thereof), business strategies and measures to implement strategies, goals, expansion and growth of its business and operations, plans and references to the future success of Africo, and other such matters, constitute forward-looking information. Forward-looking statements are statements that are not historical facts and are generally, but not always, identified by the words "expects", "plans", "anticipates", "believes", "intends", "estimates", "projects", "potential" and similar expressions, or that events or conditions "will", "would", "may", "could" or "should" occur or continue. These forward-looking statements are based on certain assumptions and analyses made by Africo and its management in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances.

Although Africo believes the expectations expressed in such forward-looking information are based on reasonable assumptions, such statements are not guarantees of future realities and actual realities may differ materially from those in forward-looking information. Investors are cautioned that any such statements are not guarantees of future realities and actual realities or developments may differ materially from those projected in the forward-looking statements. Whether actual results and developments will conform to the expectations and predictions of Africo and its management is subject to a number of risks and uncertainties, including those risk factors discussed under "Risk Factors" and elsewhere in this AIF and the documents incorporated by reference. In particular, if any of the risk factors outlined herein materialize, the expectations and predictions of Africo and its management may need to be re-evaluated. Consequently, all of the forward-looking information in this AIF and the documents incorporated herein by reference is expressly qualified by these cautionary statements and other cautionary statements or factors contained herein or in documents incorporated by reference herein, and there can be no assurance that the actual results or developments anticipated by Africo and its management will be realized or, even if substantially realized, that they will have the expected consequences for, or effects on, Africo. Forward-looking statements are based on the beliefs, estimates and opinions of Africo's management on the date the statements are made. Unless otherwise required by law, Africo expressly disclaims any intention and assumes no obligation to update or revise any forward-looking statements in the event that management's beliefs, estimates or opinions, or other factors, should change, whether as a result of new information, future events or otherwise, and Africo does not have any policies or procedures in place concerning the updating of forward-looking information other than those required under applicable securities laws.

## ITEM 1 CORPORATE STRUCTURE

### 1.1 Name, Address and Incorporation

Africo was incorporated under the *Canada Business Corporations Act* on July 4, 2006 under the name "CopperCo Resource Corp.". On December 8, 2006, it completed a Plan of Arrangement with Rubicon Minerals Corporation and Africo Resources Ltd. (now called Africo Resources (B.C.) Ltd. and referred to in this AIF as "**Africo BC**"), among others. It changed its name from CopperCo Resource Corp. to "Africo Resources Ltd." concurrent with the completion of the Plan of Arrangement. See Item 3.8 – Narrative Description of the Business – Reorganization.

Africo's head office and principal business address is Suite 520, 800 West Pender Street, Vancouver, British Columbia, and its registered and records office is located at Suite 530 – 355 Burrard Street, Vancouver, British Columbia.

### 1.2 Intercorporate Relationships

The following chart identifies Africo's material subsidiaries, Africo's current interest in such subsidiaries, directly or indirectly, and the jurisdictions of incorporation.



## ITEM 2 GENERAL DEVELOPMENT OF THE BUSINESS

### 2.1 Overview

Africo is an exploration company that is focused on the further exploration and development of the Kalukundi Property located in the Democratic Republic of the Congo (the "**DRC**"). Africo's common shares are listed on The Toronto Stock Exchange (the "**TSX**") under the symbol "ARL". Africo's principal activities include mineral exploration and development, with a focus on the copper and cobalt sectors in the DRC.

### 2.2 History

The following is a summary of the general development of Africo's business.

***2010 - 2015***

Throughout the years 2010-2015, Africo continued to evaluate the Kalukundi Property (see Item 3.11 – Management Update), as well as potential acquisitions in the resource sector. In addition, the services of AMEC E&C Services, Inc. ("**AMEC**") were secured to undertake a resource estimate including the 2011 and 2012 drilling programs and a re-assessment and incorporation of the previous work done on the Kalukundi Property with the main objective of developing a new and enhanced resource estimate of Africo's Kalukundi Property. In a news release dated April 10, 2013, Africo reported the results of the assessment undertaken by AMEC and indicated that the drilling was successful in substantiating continuity in the copper and cobalt mineralisation in the Mines Series geology and also proving the depth extent of the mineralisation to a vertical depth of 320m at which it is still open ended. These resources are estimated from five of the Fragments within the Kalukundi Project near Kolwezi in the DRC. The new resource assessment is a significant improvement from the previously reported resources and has been summarised as follows:

| | |
|---|---|
| Indicated resources: | 30.4 million tonnes grading @ 2.40% Cu and 0.46% Co. |
| Inferred resources: | 25.2 million tonnes grading @ 1.71% Cu and 0.45% Co. |

This assessment slightly more than doubles the resources at the Kalukundi Project that were outlined in the 2006 Technical Report. This new resource assessment also replaces the previous resource statement.

See Item 3.10 – Mineral Projects – The Kalukundi Property – New Resource Assessment.

### 2.3 Significant Acquisitions

Africo did not complete any significant acquisitions during its most recently completed fiscal year.

## ITEM 3 NARRATIVE DESCRIPTION OF THE BUSINESS

### 3.1 General

The transactions with Camrose Resources Limited ("**Camrose**"), as more particularly described under Item 3.2 – Material Contracts, have provided Africo with working capital and have resulted in the re-establishment of Africo's 75% indirect ownership of the Kalukundi Property. Africo's primary objective is to carry out the exploration and development programs recommended by the Kalukundi Report (as defined below), as may be amended from time to time. In order to develop the Kalukundi Property in accordance with the Feasibility Study (as herein defined), Africo will be required to secure additional equity and debt financing. There can be no assurance that Africo will be successful in its endeavours. See Item 3.12 – Risk Factors.

Reference is made to Item 3.11 outlining the recent exploration and other work that Africo has undertaken on the Kalukundi Property.

**3.2 Material Contracts**

The following agreements govern Africo's business:

***Contract (as amended) for the Establishment of a Company between La Generale des Carrieres et des Mines ("GCM") and The Enterprise H&J Swanepoel Famille Trust sprl ("H&J") for the Mining of the Kalukundi Deposits dated February 2001, as amended (the "Swanmines Agreement")***

GCM, an entity controlled by the government of the DRC, was the exclusive holder of the rights relating to the Kalukundi Property as more particularly described in this AIF. Pursuant to the Swanmines Agreement, GCM and H&J set up a private limited liability company called Société d'exploitation des gisements de Kalukundi (referred to herein as "**Swanmines**"), of which GCM was to own 45% of the outstanding share capital and H&J was to own 55% of such outstanding share capital. As described below, the Swanmines Agreement was amended to increase H&J's interest to 75%.

GCM covenanted to transfer to Swanmines all its right, title and interest in the Kalukundi Property and to provide to Swanmines all data, information, registers and reports on the Kalukundi Property in its possession. GCM also committed to obtain all regulatory approvals in connection with the mining operations on the Kalukundi Property.

H&J covenanted to provide all necessary financing to Swanmines in connection with its exploitation and development of the Kalukundi Property, to finance a feasibility study on the Kalukundi Property, to commit all necessary funds to commence commercial production on the Kalukundi Property and to finance the building of a metallurgical processing plant following the recommendations of the feasibility study. The Swanmines Agreement provides that: "…as from the date on which the feasibility study is made available to both parties, H&J will dispose of a period of 6 months to find, …" the financing necessary for the investments that will lead to commercial production as decided on the basis of the feasibility study (and the construction of the facilities should start within six months following the expiry of this six month period). In addition, the Swanmines Agreement provides that "…Advances made in the form of a loan by H&J will represent approximately 30% at least of the financing of the first phase of the project…".

The Swanmines Agreement also provided that GCM has no responsibility with regard to financing of the Kalukundi Property and should be informed of the procedures put in place to effect such financing and may give its opinion on such procedures, where relevant. In addition, the Swanmines Agreement required GCM to be informed of whether or not Africo intends to obtain, in part, the financing necessary to put the Kalukundi Property into commercial production from international banks and agencies and H&J confirmed its capacity to do so. GCM agreed to give its full co-operation to Africo to facilitate the granting of such financing, in particular by signing any document and by giving all assurances that may be reasonably required to obtain such financing, without any financial commitment on the part of GCM.

Swanmines covenanted to carry out all mining and exploration activities on the Kalukundi Property, to undertake a feasibility study, to mine the Kalukundi deposits and to process the ore in plants according to the recommendations of such feasibility study on the condition that these recommendations would be accepted by both parties to the Swanmines Agreement, and comply with technical mining standards. Further, Swanmines also covenanted to provide the parties to the Swanmines Agreement with a feasibility study within 24 months of the date of its establishment (the "**Feasibility Study**"). The Feasibility Study was funded by Africo and delivered to the parties pursuant to the Swanmines Agreement on May 18, 2006.

Subject to an additional provision contained in Amendment No. 4 to the Swanmines Agreement (see below), the Swanmines Agreement is in effect until the Kalukundi Property can no longer be mined or until it is terminated by mutual agreement of the parties. The Swanmines Agreement may also be terminated by H&J on 30 days' written notice in which case it will transfer its interest to GCM, any indebtedness of Swanmines to H&J will be cancelled, and H&J will remain solely responsible for commitments to third parties. GCM may also terminate the Swanmines Agreement if there is a serious and continuous default or non-compliance by H&J, or non-compliance with the deadlines imposed on H&J, that is not remedied within 30 days of receipt of written notice from GCM, in which case GCM will be released of all of its obligations, H&J will remain solely responsible for all its commitments

towards third parties, and the indebtedness of Swanmines to H&J will be cancelled. In addition, the Swanmines Agreement provides that "…should GCM fail to execute a non-venial provision…" of the Swanmines Agreement, H&J may suspend the execution of its obligations until GCM's failure has been remedied and if GCM does not remedy a failure within 30 days of receipt of a warning from H&J, H&J may terminate the Swanmines Agreement in accordance with the dispute resolution provisions of the Swanmines Agreement.

The initial Swanmines Agreement was amended by subsequent amendments Nos. 1 through 3, the total effect of which was to reduce the interest of GCM in Swanmines to 25% and increase the interest of H&J (now Africo DRC) to 75% effective May 18, 2004. The amendments also extended the time for Swanmines to present the Feasibility Study to 24 months from the last amendment dated May 18, 2004, and provided that Swanmines would pay a royalty of 2.5% on its gross turnover to GCM (a portion of which GCM could require to be paid in advance). In addition, the amendments provided that if the parties were unable to resolve a dispute, the dispute will be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce of Paris (the "**Rules**"), by one or more arbitrators appointment in accordance with the said Rules.

In late 2006 and during 2007, Akam Mining sprl ("**Akam**") purportedly acquired Africo's interest in Swanmines pursuant to a sale in execution in relation to a default judgment obtained by an ex-employee of Africo – the legality of which was disputed by Africo - however, as a result of which, GCM recognized Akam as its partner in Swanmines. (Detail with respect to the prior litigation regarding the Kalukundi Property is described in Africo's Annual Information Form dated March 28, 2008, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the Internet at www.sedar.com as well as under "Akam Agreement" below.)

On January 13, 2009, Akam (as a result of its purported ownership of the Swanmines Shares during the period of time the Kalukundi Property was the subject of litigation), entered into a further amendment to the Swanmines Agreement ("**Amendment No. 4**") with GCM regarding the amended terms governing the Kalukundi Property. Akam's interest in Swanmines was transferred to Africo as further described under the heading "Akam Agreement" below. Notwithstanding Amendment No. 4 is between Akam and GCM, Africo has been advised by Congolese legal counsel that, pursuant to Congolese commercial law, in a private limited liability company (such as Swanmines) transfer of shares has, as a consequence, transfer of rights and obligations of the prior shareholder (Akam) to the beneficiary of the share transfer (Africo DRC) in proportion to share ownership. As such, on transfer of the Swanmines Shares to Africo DRC on January 15, 2009 pursuant to the terms of the Akam Agreement (see below), Africo DRC assumed the rights and obligations of Akam pursuant to Amendment No. 4.

Pursuant to the terms of Amendment No. 4, Africo was required to pay GCM US$1,600,000 per year for a four year period as an entry premium, the first such payment having been made by Africo on January 28, 2009, while the second payment was made on or about January 7, 2010, the third payment was made on January 24, 2011 and the fourth and final payment was made on January 13, 2012. An additional payment to GCM by Swanmines will be required on the basis of U$35 per ton copper on reserves exceeding 180,000 tons. Pursuant to Amendment No. 4, Africo is under an obligation to carry out the Feasibility Study, including funding of up to 30% of the contribution amount required to develop the mining project to the point of commercial ore production, and to report thereon to GCM by January 13, 2010. A copy of the original Feasibility Study was translated into French and delivered to GCM on January 8, 2010. GCM may be in a position to cancel the Swanmines Agreement, as amended, before the official termination date should Africo fail to meet its obligation to carry out the Feasibility Study and in the event that it does not remedy such failure upon receipt of formal notice by GCM.

The Swanmines Agreement initially provided that the net profits from the Kalukundi Property will be allocated as follows: 60% to repay all loans incurred by Swanmines and 40% to GCM and H&J, in accordance with their respective proportionate interests in Swanmines and, thereafter, the net profits will be allocated in proportion to the ownership interests of GCM and H&J in Swanmines. Pursuant to Amendment No. 4, during the period of reimbursement of initial loans by Africo sufficient to provide working capital for Swanmines, 70% of the tax-free profit is to be allocated to reimburse the loan capital and interest, with 30% to be allocated to Africo and GCM in proportion to their ownership interests in Swanmines. In addition, Africo announced in June 2011 that it had retained MDM Engineering to review and update its planned increased throughput design update and cost revalidation of the Feasibility Study for the Kalukundi Property. In May 2006, MDM completed the initial

Feasibility Study based on a throughput of an 800,000 tonne per year plant. In June 2011, Africo requested that MDM complete a review and cost update for the Feasibility Study and the Front End Engineering Design ("FEED") that was previously completed. The review was to be based on the throughput of 1.25 million tonnes per annum that was evaluated during the FEED. In order to proceed with the development of the Property, Africo will be required to raise substantial additional debt and/or equity funding. Because of the anticipated higher funding requirements and the desire to complete a new resource assessment by AMEC, as detailed below, Africo has deferred finalisation of this update by MDM. This will also provide Africo with an opportunity to continue its discussions with its principal shareholder, Camrose, about a potential joint development project and the funding of such a plan. (See also "Recent Developments" in Item 3.11 of this AIF).

Amendment No. 4 provides for responsibility for the operations of Swanmines by a Board of Directors (the "**Swanmines Board**") composed of eight members: four to be proposed by GCM and four to be proposed by Africo; and for Swanmines to be administered by a management board made up of seven members: three (the Assistant General Manager, the Production Manager and the Human Resources Manager) to be appointed by the members of the Swanmines Board proposed by GCM and four (the General Manager, the Finance, Accounting and Budget Manager, the Supplies Manager and the Marketing Manager) to be appointed by the members of the Swanmines Board proposed by Africo (the "**Management Committee**"). The General Manager or, in his or her absence, the Assistant General Manager, will chair the Management Committee. The Swanmines Board determines the powers, the attributes, the appointments or indemnities of the members of the Management Committee and can revoke at any time a decision taken by it in this regard.

Pursuant to Amendment No. 4, GCM and Africo have agreed to enter into an association agreement with a view to consolidating the Swanmines Agreement and all of the amendments thereto to resolve any contradictions that may appear after applying all of the amendments and to introduce any other necessary or generally required contractual provisions. Although it is Africo's understanding that it is to receive a draft of an association agreement, as at the date of this AIF Africo has not received a draft association agreement and there is no assurance that Africo will receive or finalize such an association agreement. See Item 3.12 – Risk Factors. Once entered into, the association agreement will be electronically filed with regulators and available for viewing through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR).

***Subscription Agreement dated as of April 17, 2008, as amended (the "Subscription Agreement"), between Camrose and Africo***

Pursuant to the Subscription Agreement, Camrose agreed to subscribe for 40,000,000 common shares of Africo and 20,000,000 common share purchase warrants, each warrant entitling Camrose to acquire one common share of Africo at a price of $3.50 until January 24, 2010 (the "**Subscription**"). The aggregate purchase price payable by Camrose was $100,000,000, being $2.50 for each common share and ½ of a warrant. Completion of the Subscription was subject to, among other things, the Transfer Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect and the Akam Agreement (as defined and described below) being executed and delivered by each of the parties thereto and being in full force and effect. The warrants expired, unexercised, on January 24, 2010.

The Subscription Agreement also provided that Africo would support the nomination of four individuals designated by Camrose for appointment to Africo's Board of Directors, and would take all steps necessary to ensure that the Board was comprised of no more than seven directors and that a quorum is not more than a majority of all directors. In addition, Africo agreed to support Camrose's majority representation on Africo's Board indefinitely, provided that if (i) the percentage of issued and outstanding common shares of Africo beneficially owned by Camrose and its affiliates (the "**Camrose Interest**") is at least 40% but less than 50%, Africo will support the nomination of three Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (ii) the Camrose Interest is at least 30% but less than 40%, Africo will support the nomination of two Camrose representatives at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, (iii) the Camrose Interest is at least 20% but less than 30%, Africo will support the nomination of one Camrose representative at the first annual meeting of Africo shareholders held after the Camrose Interest enters this range, and (iv) the Camrose Interest is less than 20%, Africo shall have no further obligations until such time as the Camrose Interest is again 20% or more.

In addition, Africo executed an investors' rights agreement in favour of Camrose and any lenders to Camrose pursuant to which Africo agreed, at its cost, to qualify by prospectus the resale in Canada of the shares of Africo held by them on a demand and on a "piggyback" basis on customary terms.

Further, the Subscription Agreement provided that as long as Camrose and its affiliates hold at least 10% of the issued and outstanding shares of Africo, if Africo or any subsidiary proposes to issue any further Africo shares or convertible securities, Camrose shall have the right to purchase the portion thereof equal to the percentage of shares of Africo then beneficially owned by Camrose and its affiliates. However, this right will not apply to shares issued under a stock option plan established from time to time for the benefit of participating employees of Africo or upon the conversion or exchange of, or the exercise of any right attaching to, any convertible securities, or the issuance of securities in connection with a *bona fide* business acquisition by Africo or in connection with *bona fide* strategic partnerships, alliances and similar transactions.

***Agreement between Camrose and Africo dated April 17, 2008 regarding Akam Mining sprl (the "Akam Agreement")***

The Akam Agreement acknowledged that Camrose had, through a wholly-owned subsidiary, purchased the outstanding shares of Akam Mining sprl ("**Akam**"). The Akam Agreement resolved the existing litigation regarding the Kalukundi Property described in Africo's Annual Information Form dated March 28, 2008 (which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the Internet at www.sedar.com); and provided that Camrose would cause Akam to assign all of its rights, title and interest in Swanmines SAS (the "**Swanmines Shares**") to a wholly-owned subsidiary of Africo in consideration of the issuance to Camrose of 5,400,000 shares of Africo at a deemed price of $2.50 per share, subject to usual anti-dilution adjustments. The Akam Agreement also provided for mutual releases from Africo and Akam in connection with the Swanmines Shares. The Swanmines Shares were transferred to Africo DRC on January 15, 2009.

### 3.3 Competitive Conditions

Africo competes with numerous other companies and individuals, including competitors with greater financial, technical and other resources than Africo, in the search for and the acquisition of attractive mineral properties in the DRC and elsewhere in Africa. See Item 3.12 – Risk Factors.

### 3.4 Environmental Protection

An Environmental and Social Impact Assessment study ("**ESIA**") was commissioned by Africo in 2008. The ESIA was designed to conform with the requirements of the DRC and World Bank policies and procedures. The work undertaken by Envirolution Consultants on behalf of Africo was designed to evaluate the social impacts of the planned mining and processing activities, as well as to expand on knowledge of the local environment through a more detailed study of the local flora and fauna. This ESIA was finalized towards the end of 2008.

***Fish Study***

An independent ichthyofauna (fish) study was conducted in January 2008 as part of the ESIA. The study identified a number of rare fish species in the Kii stream which drains across the north, just off the Kalukundi Property area. In order to determine whether these species were more widespread, a follow up study in November 2008 of 13 streams in the area established that four out of the 13 steams in the area were considered to be suitable candidates for conservation or protection as river or fish reserves to offset the mining impacts. The other sites were rejected due to their location too far down the river system, or because the present ecological status was assessed as being largely modified to the point that a large loss of natural habitat, aquatic biota (including fish) and basic ecosystem functions have occurred. The main human activity contributing to the damaged environment is washing of cobalt residues in the streams by artisanal miners.

***New Kisankala Village Site Evaluation***

A recommendation was put forward to move the proposed new Kisankala village site about 300m south to the south of the Kalukundi concession boundary. The advantage of this move is to increase the buffer zone between the village and the tailings storage facility, as well as active mining operations, which will have health, safety and environmental benefits for the community.

A preliminary investigation of the site was carried out to determine the characteristics and suitability of the land and it was determined that the new site is almost identical in its characteristics to the original site and, hence, does not warrant a formal environmental impact assessment.

***Kalukundi Property Site Rehabilitation Provision***

Ongoing exploration and evaluation work has been in progress on the Kalukundi Property site since acquisition. During this period, progressive environmental rehabilitation has been undertaken. In 2008, a rehabilitation evaluation was undertaken to define a monetary provision for the rehabilitation work that was deemed to be required at the time. Most of the rehabilitation work pertained to cleaning of drilling sites and filling of trenches and pits. By the 2008 year end, most of the sites recommended for rehabilitation had been restored and the remaining sites are currently being restored in parallel with other activity at the site.

***Relocation of the Kisankala Village***

A relocation action plan was drawn up in 2007 and strong community communication and interaction formed part of the follow up actions to the derived plan. These meetings with the Chief of the local communities, his elders and the village populace continued through 2008. A brick making program made significant progress and provided the villagers with some confidence that the village relocation was being seriously considered. However, as a result of the economic downturn in 2008, the village relocation was postponed and the relocation is anticipated to be reviewed in the future once development work is re-commenced on the Kalukundi Property.

**3.5 Employees**

Africo currently employs in the DRC a total of nine Congolese nationals on a full or part-time basis. In addition, it has the equivalent of three full time staff members in its Vancouver head office, namely the Chief Executive Officer, the Chief Financial Officer and financial and administrative support staff.

**3.6 Foreign Operations**

Substantially all of Africo's operations are currently conducted in the DRC. In the DRC, the assets and operations of Africo are subject to various political, economic and other uncertainties. See Item 3.12 – Risk Factors.

**3.7 Bankruptcy and Similar Procedures**

Neither Africo nor any of its subsidiaries have been subject to any bankruptcy, receivership or similar proceedings within the three most recently completed financial years or during or proposed for the current financial year.

**3.8 Reorganization**

Neither Africo, nor any of its subsidiaries, completed a material reorganization within Africo's three most recently completed financial years. To the best of the knowledge of Africo's officers and directors as of the date of this AIF, no material reorganization is proposed to be completed during Africo's current financial year.

### 3.9 Social or Environmental Policies

Africo has adopted an environmental policy and is committed to developing and fostering a culture of environmental care, both within the Corporation and in the community. As such, Africo is committed to:

- complying with environmental legislation and regulations as the baseline for its environmental performance and striving to achieve best practice in every aspect;
- managing its operations to minimize or eliminate negative environmental impacts wherever practicable;
- conducting business with service providers and contractors who have a similar commitment to the environment and who embrace its environmental policy; and
- striving for the most efficient use of energy and water, the prevention of pollution and minimizing waste by recycling wherever possible.

Africo has also adopted a community relations policy as it understands that it is a guest in all the countries in which it operates. As such, Africo respects local culture and customs and integrates into the surrounding community through its social development programs. Expatriates are inducted in the local culture and encouraged to learn the local language, to ensure harmonious relationships and good communication are maintained. Where the required skills are available, Africo recruits from the surrounding community. Similarly, where price and quality are acceptable, Africo's policy is to purchase locally, supporting the local economy.

### 3.10 Mineral Projects – The Kalukundi Property

The following summary with respect to the Kalukundi Property has been reproduced from a technical report on the Kalukundi Property dated June 2006, as revised July 2008 (the "**Kalukundi Report**" or the "**Technical Report**"), written by John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., who were retained by Africo BC to prepare a technical report compliant with National Instrument 43-101 – *Standards of Disclosure for Mineral Projects* ("**NI 43-101**"). Both Mr. Hearne and Dr. Verbeek are a "Qualified Person" and considered "independent" as both those terms are defined in NI 43-101. Further details with respect to the Kalukundi Property are available from the Kalukundi Report, which is incorporated herein by reference and is available for public review on the Internet at the System for Electronic Document Analysis and Retrieval (SEDAR) website: www.sedar.com. It should be noted that the new resource assessment prepared by AMEC which is outlined below replaces the resource statement contained in the Kalukundi Report and in the "Summary of the Technical Report" below. However, it has been included as it provides valuable historical information and data.

***Summary of the Technical Report***

**"Introduction**

RSG Global Pty Ltd (RSG Global) has been commissioned by Africo Resources Limited (Africo) to compile a technical report on the Kalukundi copper cobalt Project located in the copper belt of the Democratic Republic of the Congo (DRC). This report is to comply with disclosure and reporting requirements set forth in National Instrument (NI) 43-101, Standards of Disclosure for Mineral Projects, and in compliance with Form 43-101F1 (the "**Technical Report**").

This report pertains to the four main deposits that comprise the Project, namely the Principal, Anticline, Kalukundi and Kii fragments.

**Location**

The Project is located within the Kolwezi District of Katanga Province in the south-east of the DRC. The Project area is located 60km to the east of Kolwezi and just 4km to the north of the main road between Likasi and Kolwezi. The village of Kisankala is situated close to the Principal and North fragments of the Kalukundi deposit.

The Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years. The tenement is 19.5km$^2$ in extent, consisting of 23 carres or blocks.

**Ownership**

The exploitation permit for the Project was held by Swanmines and the ownership of Swanmines is shared between H & J Family trust (75%) and Gécamines (25%). Africo held a 48% interest in H & J Family Trust and had option to increase this holding to 100%. Rubicon Minerals Corporation (Rubicon), a publicly listed Canadian company (TSX and AMEX) holds a 39.6% interest in Africo[*sic*]. **[*NOTE: The foregoing description of ownership of the Kalukundi Project is as at the date of, and is extracted verbatim from, the Technical Report. As at the date of this AIF, the exploitation permit for the Project is held by Swanmines and the ownership of Swanmines is shared between Africo Resources (DRC) sprl (75%) and Gécamines (25%). Africo currently holds a 100% interest in Africo Resources (DRC) sprl.*]**

**Project Geology**

Base metal mineralisation in the world class Zambian and DRC copper belt provinces is hosted by sedimentary rocks of the Neo-Proterozoic Katangan Sequence, developed within the Lufilian Arc. This copper belt extends over 600km from Luanshya (Zambia) in the southeast and to Kolwezi in the Democratic Republic of the Congo (DRC) in the northwest. Even with sustained production over almost 100 years, there are still huge resources of Cu and Co in this extensive mineral province.

The Katangan Supergroup rocks are up to 7,000m thick and are underlain by basement granite, intermediate metavolcanic and metasedimentary rocks dated at between 1,800Ma to 2,000Ma.

The Katangan Supergroup is subdivided into Roan, Lower and Upper Kundelungu Groups. Mineralisation at Kalukundi occurs within the Mines Sequence (or *Series des Mines*) which is correlated with the Lower Roan rocks within the SE part of the Lufilian arc in Zambia. The sediments represent a facies continuum of proximal to intermediate and distal dolomitic mudstones, siltstones, sandstones and algal reef fragments.

The Katangan Supergroup sediments in Zambia are deformed by a series of open folds, whereas in the DRC the Katangan Supergroup is preserved both as tightly folded, but relatively intact sequences and as complexly deformed, locally continuous but structurally dismembered 'rafts' of lower Roan strata (*Series Des Mines*) within a 'mega breccia' or melange that contains abundant evaporite minerals. The mega breccia is probably the result of decoullement at the northern margin of the basin and northward thrusting of the Katangan Supergroup over basement lithologies (granites and gneisses) and other, higher, Katangan Supergroup stratigraphy. The mega breccia is probably of tectonic origin, focussed on incompetent chemical sediments.

Metamorphic grade increases southwards but within the Kalukundi area very low-grade chlorite facies metamorphism is evident.

Of the twelve fragments identified in the Kalukundi concession area, only four are the subject of this report. These are the Principal, Anticline, Kalukundi and Kii Fragments.

The Mines series rocks in particular have undergone deep weathering and hypogene alteration, assisted possibly by the acids formed by the breakdown of sulphides. The core units have been silicified and the remobilisation processes have resulted in redistribution of the copper-cobalt mineralisation into open spaces within the Mines Series rocks.

**Resource Drilling**

The dimensions of the four fragments discussed in this report, expressed as strike length and drilled width, are:

- Principal 630m x 36.70m
- Anticline 150m x 80.25m
- Kalukundi 430m x 44.18m
- Kii 330m x 40.84m.

Exploration work in the vicinity of Kalukundi between 1927 and 1987 consisted largely of detailed surface mapping and excavation, mapping and sampling of pits and trenches and the 'manual' drilling of shallow exploratory holes for mapping purposes.

Active exploration has been carried out by three main companies, Gécamines, JCI and Swanmines since about 1986.

Drilling for resource evaluation purposes has been carried out in three campaigns:

| | | | |
|---|---|---|---|
| Gécamines in 1986/87 | 8 holes | 2,809m | 10% of the resource drillholes |
| JCI/Geo-Consult in 2001/02 | 12 holes | 1,440m | 15% of the resource drillholes |
| Africo/Swanmines 2004/05 | 58 holes | 5,401m | 5% of the resource drillholes |
| **Totals** | **78 holes** | **9,650m** | |

In addition to the above, 58 holes drilled by Africo, a further 30 boreholes, not used directly in the resource evaluation, were drilled for geotechnical, condemnation and exploration purposes.

**Data Quality**

QAQC data provided by Africo meets industry standard levels of precision and accuracy. The standards and blanks show good levels of accuracy, core duplicate and inter-laboratory pulp-duplicate data showed high levels of precision.

**Mineral Resources***

Classification of the mineral resource at Kalukundi was based on data quality, drill spacing, confidence in continuity and various kriging efficiency measures. RSG Global considers confidence in the grade estimates to be good, even though drillhole density is limited down dip. Confidence is supported by low grade variability and low skewness parameters.

Only resources above 200m below surface have been considered "potentially economically extractable". Resource models exist below this, but extraction of this material would most likely be by underground methods. No evaluations of underground parameters have yet been carried out and hence no resources have been quoted below this level. Furthermore these resources are predicated on very limited drilling information. Significant exploration potential is suggested by these models.

Mineral Resources are tabulated below, based on a 1.5% copper-equivalent cutoff at a 12:1 copper to cobalt equivalence ratio.

**Table 1.7_1**
**Kalukundi Project**
**Resources Between Surface and 200 Metres Below Surface**

| | Resource Tonnes | % Copper Grade | % Cobalt Grade | Copper (Mlbs) | Cobalt (Mlbs) |
|---|---|---|---|---|---|
| Measured | 9,648,484 | 2.45 | 0.61 | 521.5 | 130.1 |
| Indicated | 2,505,924 | 2.29 | 0.61 | 126.6 | 33.7 |
| **Total Measured + Indicated** | **12,154,408** | **2.42** | **0.61** | **648.1** | **163.8** |
| **Inferred** | **15,020,674** | **2.63** | **0.58** | **871.5** | **192.6** |

Resources with the highest confidence levels of continuity and grade occur from surface down to 150m where the density of drilling is greatest. The Resource from 150m to 200m falls almost entirely into the Inferred category. Modelling below 200m suggests exploration potential for further mineralised material.

**Reserves***

The Project Reserve estimate as of May 2006 is reported in Table 1.8_2. All stated Reserves are completely included within the quoted Resources. The input parameters used in the Reserve estimate are described in Section 17. For ease of reference, however, a summary of the most pertinent input parameters is provided in Table 1.8_1.

**Table 1.8_1**
**Kalukundi Project**
**Summary of Input Parameters used for Reserve Estimation**

| **Item** | | **USD** | **Value** |
|---|---|---|---|
| Cu Price | | $/lb | 1.25 |
| Co Price | | $/lb | 12.00 |
| Diesel fuel price | | $/l | 1.29 |
| Mining cost | Mill Feed | $/t | 3.12 |
| | Waste | $/t | 4.01 |
| Processing Costs | 0-10m | $/t | 35.35 |
| | 10-20m | $/t | 36.96 |
| | 20-30m | $/t | 39.02 |
| | 30-40m | $/t | 41.53 |
| | 40-50m | $/t | 44.50 |
| | 50-60m | $/t | 47.93 |
| | 60-70m | $/t | 51.80 |
| | 70-80m | $/t | 56.14 |
| | 80-90m | $/t | 60.92 |
| | 90-100 | $/t | 66.16 |
| | 100-110m | $/t | 71.86 |
| | 110-120m | $/t | 78.01 |
| Processing Recoveries | | % | Variable |
| G&A | | M$/yr | 7.2 |
| Mine supervision | | M$/yr | 1.27 |
| Grade control | | $/t | 0.06 |
| De-watering | | M$/yr | 0.5 |
| Stockpile rehandle | | $/t Mill Feed | 1.16 |
| Mining dilution | | % | 2 |
| Mining recovery | | % | 97 |
| Inter ramp slope angle | | Degrees | Variable |
| Royalty | Government | % | 2.0 |
| | Gecamines | % | 2.5 |
| Metal Transport | Cu | $/t | 300 |
| | Co | $/t | 377 |

**Table 1.8_2**
**Kalukundi Project**
**Reserve Summary by Fragment**

| Fragment | Reserves | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Proven | | | | | Probable | | | | | Total | | | | |
| | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | | MTonnes [Mt] | Grade | | Insitu Metal | |
| | | Cu [%] | Co [%] | Cu [t] | Co [t] | | Cu [%] | Co [%] | Cu [t] | Co [t] | | Cu [%] | Co [%] | Cu [t] | Co [t] |
| Principal | 2.3 | 2.22% | 1.00% | 50,238 | 22,611 | 0.4 | 2.29% | 1.10% | 8,689 | 4,182 | 2.6 | 2.23% | 1.01% | 58,927 | 26,793 |
| Anticline | 1.4 | 2.59% | 0.54% | 35,550 | 7,358 | 0.2 | 1.60% | 0.65% | 2,984 | 1,223 | 1.6 | 2.47% | 0.55% | 38,534 | 8,581 |
| Kalukundi | 1.1 | 2.55% | 0.42% | 28,471 | 4,730 | 0.4 | 1.40% | 0.47% | 5,214 | 1,764 | 1.5 | 2.26% | 0.44% | 33,685 | 6,493 |
| Kii | 1.8 | 2.55% | 0.58% | 46,010 | 10,420 | 0.3 | 2.62% | 0.50% | 8,886 | 1,699 | 2.1 | 2.56% | 0.56% | 54,896 | 12,119 |
| **Total** | **6.6** | **2.44%** | **0.69%** | **160,268** | **45,119** | **1.3** | **2.02%** | **0.69%** | **25,773** | **8,867** | **7.8** | **2.37%** | **0.69%** | **186,041** | **53,986** |

[***NOTE: *It should be noted that the Mineral Resources and Reserves outlined in the Technical Report are now considered to be historical and have been replaced by the NI 43-101 compliant report that was prepared by AMEC, which was filed on www.sedar.com on May 23, 2013 (see "New Resource Assessment" which follows this section).***]

**Development and Operations**

It is envisaged that the Project could mine and process 0.80Mt per annum ("Mtpa") over approximately ten years. The plant is designed to produce 21,100t of Cu per year and 4,200t of Co per year at an average process cost of US$44.42/t of ore treated.

All ore and waste will be mined via conventional, open pit mining methods, using a mining contractor. The operation plans to utilise selective mining techniques to separate ore and waste. The mining equipment that is considered to be suitable for the Project would include 80t backhoe configured, hydraulic excavators and off-highway haul trucks with a payload capacity of 35t.

The treatment plant flowsheet is based on processing 0.8Mtpa of mill feed. The testwork indicated that the Kalukundi ore could be processed using a single stage crushing circuit followed by a conventional SAG / ball milling circuit with the ball mill in closed circuit with a cyclone. Overall recovery after losses in processing was between 89% and 93% for Cu and between 70% and 78% for Co.

The leach product is then washed in a six stage counter current decantation plant to ensure a clarified liquor is sent to the copper recovery circuit whilst keeping losses due to entrainment below 1%. The copper recovery circuit consists of copper solvent extraction step where the copper is moved to an organic phase before being stripped to produce an advance liquor that is treated in the copper tank house. The copper tank house produces cathode plate that will be sold. A bleed stream from the copper circuit is sent to the cobalt recovery circuit.

The cobalt circuit consists of several purifying steps where impurities like iron, aluminium, manganese, zinc and finally copper are removed before the purified cobalt liquor is sent to solvent extraction circuit where cobalt is loaded onto an organic phase before being stripped to produce the advance solution that is treated in the cobalt tank house. The cobalt tank house produces cobalt cathode that will be binned and sold.

Africo and its contractors will employ approximately 524 people throughout the operating phase of the Project. Initially selected posts requiring specific skills or experience will be filled by expatriates. In addition to performing their job function, expatriate personnel will be expected to transfer knowledge and expertise in order to develop the capabilities of the national staff. In the longer term, it is anticipated that nationals of the DRC will fill most operating and management positions within the company.

A water pumping station has been planned to pump the full requirement of water from Lake Nzilo, on the Lualaba River, 22km to the site in a buried steel pipeline into the plant raw water storage dam. Water will be drawn from the storage dam water for plant make-up, fire and potable water. The fire water will be pumped to a fire water ring main by a dedicated electrical and standby diesel pumping system. The raw water will be treated through a chlorination plant for the production of potable water prior to storage in two separate storage tanks. The plant and camp sewerage will be treated in two bio-filter plants with the grey water being discharged to the environment.

Power at 110kV will be supplied to the plant from the existing National Grid overhead power lines which pass 100m from the plant boundary. Plant power transformers will be situated in the plant main switchyard. Power distribution on site will be at 11kV.

**Project Implementation**

Production is assumed to commence after a pre-production period of 18 months.

The development capital cost of the Project has been estimated at US$166M* and is based on an EPCM (engineering, procurement, construction and management) implementation strategy. The estimate includes owner's costs, working capital, and a contingency, totalling approximately US$12.23M.

***see Note in the Financial Summary***

**Financial Summary**

The overall operating costs for the plant and mining operation per tonne of ore mined are shown in Table 1.11_1.

**Table 1.11_1**
**Kalukundi Project**
**Overall Operating Costs – Average over Life of Mine**
**(Annualised at 801,000tpa)**

| **Description** | **US$/t of ore** |
|---|---|
| Mining | 4.32 |
| Process Plant and Infrastructure | 44.42 |
| General & Administration | 7.28 |
| **Total Operating Costs/t of ore** | **US$56.02** |

The investment in working capital and pre-production capital expenditure is US$166.6M plus pre-production stripping of US$6.85M. **[*Note: *These costs and estimates are based on the work that was done in 2005 and 2006 and, on a going forward basis, will have to be reviewed by Africo based on current prices and conditions. In fact, based on preliminary indications provided to Africo by MDM Engineering it is anticipated that the pre-production capital expenditure will be substantially higher than previously estimated.*]**

The results of sensitivity analysis show that the Project is relatively insensitive to changes in working cost and capital expenditure. Only metal price changes have a substantial effect.

**Conclusions**

The results of the economic analysis indicate that exploitation of the Kalukundi deposits is economically viable and should proceed. Opportunities exist in most areas of the Project that will be more rigorously investigated during the detailed engineering phase and where appropriate will be incorporated into the Project.

The current financial models are based on the scenario of 100% equity financing for the Project. This, coupled with a conservatively projected base price of Copper and Cobalt gives a before tax IRR of 14.7%. No allowance has been made in the model for the effects and levels of debt financing available or required.

The anticipated Project payback time is less than four years.

Opportunities exist in most areas of the Project to be more rigorously investigated during the detailed engineering phase and to firm up certain assumptions, thereby mitigating and or removing some of the risks that have been identified during the FS.

**Recommendations**

The exploitation of the Kalukundi deposits should proceed.

It is recommended that Africo proceeds with:

- Development of a detailed mine implementation program.
- Compilation of tender documents for mine contracting and subsequent tender process.
- Risk based geotechnical and geohydrological evaluation, which may lead to steepening of wall angles.

- Personnel recruitment, policies and procedures and training.
- More detailed or updates to mine design, scheduling and budgeting.
- Continue the exploration on the satellite deposits to increase the life of the plant.
- Source local earthworks and civil contractors and machinery.

There is considerable scope to increase the Project Reserve of 7.8Mt by proving up existing Resources, by carrying out follow up studies and also through drilling of other mineralized surface bodies on the property, all of which will be aggressively pursued by Africo in 2006."

**NEW RESOURCE ASSESSMENT**

**Africo retained the services of AMEC in order to undertake a resource estimate including the recently completed drilling program that is outlined in Item 3.11 below and a re-assessment of the previous work done on the Kalukundi Property, with the main objective of developing a new and enhanced resource estimate at Africo's Kalukundi Property**. In a news release dated April 10, 2013, Africo reported the results of the assessment (the "**AMEC Assessment**") undertaken by AMEC and indicated that the drilling was successful in substantiating continuity in the copper and cobalt mineralisation in the Mines Series geology and also proving the depth extent of the mineralisation to a vertical depth of 320m at which it is still open ended. These resources are estimated from five of the Fragments within the Kalukundi Project near Kolwezi in the DRC. The new resource assessment is a significant improvement from the previously reported resources and has been summarised as follows:

Indicated resources: 30.4 million tonnes grading @ 2.40% Cu and 0.46% Co.
Inferred resources: 25.2 million tonnes grading @ 1.71% Cu and 0.45% Co.

The AMEC Assessment slightly more than doubles the resources at the Kalukundi Project that were outlined in the 2006 Technical Report. This new resource assessment also replaces the previous resource statement.

Table 1 - Resource tonnages, grades and metal contents for the five main Fragments at the Kalukundi Project, DRC.

| **Deposit** | **Tonnes (x1000)** | **Copper (%)** | **ASCu (%)** | **Cobalt (%)** | **Contained Cu (kt)** | **Contained Co (kt)** |
|---|---|---|---|---|---|---|
| **Indicated** | | | | | | |
| Kii | 4,220 | 2.47 | 2.12 | 0.49 | 104 | 21 |
| Kalukundi | 5,470 | 2.50 | 1.30 | 0.35 | 137 | 19 |
| Kesho | 0 | ----- | ----- | ----- | 0 | 0 |
| Anticline | 9,570 | 2.47 | 1.48 | 0.37 | 236 | 36 |
| Principal | 11,200 | 2.26 | 1.74 | 0.58 | 252 | 64 |
| **Total** | **30,400** | **2.40** | **1.63** | **0.46** | **730** | **140** |
| | | | | | | |
| **Deposit** | **Tonnes (x1000)** | **Copper (%)** | **ASCu (%)** | **Cobalt (%)** | **Contained Cu (kt)** | **Contained Co (kt)** |
| **Inferred** | | | | | | |
| Kii | 0 | ----- | ----- | ----- | 0 | 0 |
| Kalukundi | 3,190 | 2.76 | 0.55 | 0.30 | 88 | 10 |
| Kesho | 10,700 | 1.46 | 1.43 | 0.59 | 157 | 63 |
| Anticline | 2,730 | 1.65 | 0.88 | 0.15 | 45 | 4 |
| Principal | 8,580 | 1.65 | 0.85 | 0.43 | 142 | 37 |
| **Total** | **25,200** | **1.71** | **1.06** | **0.45** | **431** | **114** |

Notes:

1. Mineral Resources have an effective date of November 15, 2012. The qualified person for the Mineral Resources is Gordon Seibel, SME Registered Member, and an employee of AMEC. The Mineral Resource estimate was prepared by Mr. Seibel.
2. Mineral Resources are reported as undiluted. No mining recovery has been applied.
3. Acid-soluble copper (ASCu) is a sub-set of, and is not additive to, total copper (TCu).
4. There are reasonable prospects for economic extraction by constraining the resources within a conceptual economic open pit shell constructed using a long-term copper price of US$3.16/lb, cobalt price of US$9.20/lb., mining cost at US$1.77/tonne, G&A cost at US$2.50/tonne processed, a pit slope angle of 45 degrees, and variable processing costs ranging from US$25.00/tonne to US$50.00/tonne.
5. Mineral Resources are reported within the pit shell at a cut-off using a net value per tonne of US$0.01. The net value assumes the block is potentially economic after G&A and variable block processing costs have been met.
6. Processing is assumed to be on site. Transportation costs for shipping material off-site for processing are not included.
7. Copper grade shells to define the geometry of the copper mineralization were shaped manually using a cut-off grade of 0.3% Cu. Cobalt grade shells to define the geometry of the cobalt mineralization were shaped manually using a cut-off grade of 0.1% Co.
8. Tonnages are reported in metric units and grades in percent. Tonnages are rounded to the nearest thousand tonnes; grades are rounded to two decimal places.

The AMEC Assessment represents a major increase in the tonnage estimates for the Kalukundi Project. The detail provided by the infill drilling has also increased the confidence levels on continuity of mineralisation in the near surface environment. The resources delineated as inferred could be targeted for additional infill drilling where warranted with a view to improving the confidence levels in continuity of the geology and the grade distribution.

A summary of the AMEC Assessment is attached as Schedule A to the AIF dated March 24, 2014 and is also attached hereto as Schedule A. This summary is an extract reproduced from the NI 43-101 compliant technical report dated May 23, 2013 and titled “Africo Resources Ltd., Kalukundi Copper – Cobalt Project, Democratic Republic of Congo, NI 43-101 Technical Report on Updated Mineral Resource Estimate”, as prepared by Gordon Seibel, RM SME, and Stella Searston, RM SME, both principal geologists, as well as John Rust, RM SME, senior metallurgist with AMEC, who were retained by Africo to prepare a technical report with respect to the AMEC Assessment. Each of Mr. Seibel, Ms. Searston and Mr. Rust are a “Qualified Person” and considered “independent” in compliance with NI 43-101. The NI 43-101 compliant technical report prepared by AMEC with respect to the AMEC Assessment, which is incorporated herein by reference, was electronically filed by Africo with regulators on May 23, 2013, and it is available for review at www.sedar.com.

### 3.11 Management Update

As a result of global economic conditions during 2008 and 2009, Africo significantly scaled back activities on the Kalukundi Property and also laid off its expatriate development team in order to reduce its costs on the Kalukundi Property.

Exploration activities and drilling activity focused on the search for mineralization within new fragments in 2008 and 2009. A total of 39 diamond core boreholes (4786m) were drilled on 5 fragments to search for extensions to the known mineralisation or to explore for new mineralisation. This was accompanied by 1139m of Reverse Circulation (“RC”) drilling from 13 boreholes at selected localities on the Kii, Kalukundi, SE Anticline and Principal Fragments to identify the hydrogeological characteristics of the RAT Lilas formation. Evaluation of the core including sampling, SG measurements, etc was followed by monitoring and evaluation of the assay data to comply with QA/QC requirements. All borehole collar positions were accurately surveyed for inclusion in the detailed geological models. Accordingly, on August 4, 2009, Africo reported initial results from the drilling program on the Principal and SE Anticline Fragments. The August 4, 2009 announcement has been electronically filed with regulators and is available for review at www.sedar.com.

Results from the drilling in 2008 and 2009 returned some of the best values encountered on the Kalukundi Property to date and confirmed that the central part of the Principal Fragment is highly anomalous in cobalt as well as hosting excellent copper grades. The best intersection from BH K107 grades at 7.75% copper and 2.68% cobalt over a drilled width of 32.88m (true width 30.00m). This intersection runs from 157.0m to 189.88m and has established that oxide mineralization on this fragment can be confirmed to a vertical depth of 140m. Assay results from the

drilling on the SE Anticline Fragment were also received and were very encouraging, particularly in respect of cobalt values, with the best intersection grading at 1.47% cobalt over a drilled width of 28.86m (true width 25.0m).

The SE Anticline Fragment is located to the south of the Kesho fragment. Pitting and trenching exploration plus assay data from a percussion borehole in 2008 established the presence of high grade cobalt mineralization on this fragment. A limited amount of drilling at 200m centers in 2009 was designed to determine the prospectivity of this fragment and the potential continuity of the mineralization. The drilling was successful in locating mineralization, which is copper-rich in the north and cobalt-rich in the south. One RC hole drilled in the north intersected significant copper mineralization in the hanging wall SDS unit.

As the Kalukundi Report focused on the Principal, Anticline, Kalukundi and Kii Fragments, Africo continued to evaluate the prospects of an assessment on the Kesho Fragment, which is a completely new geological model, plus to update the existing data on the Principal Fragment as well as the Property's other fragments. In this regard it has been recommended by independent mining consultant Coffey Mining (SA) Pty. Ltd. ("**Coffey Mining**") that:

- Additional drilling is needed at the Kesho Fragment to reduce the borehole spacing to 50m x 50m and replace all RC with core.
- Additional drilling is still needed at the Principal Fragment to fill in gaps in the drilling and to evaluate the mineralization in the southern portion of the Fragment.
- Hanging wall mineralization be evaluated and included in the mineral resource models.

Accordingly, during 2011, 2012 and 2013, Africo undertook the work and the drilling programs outlined below.

During 2011 and 2012, Africo assessed and evaluated the recommendations in the Kalukundi Report with respect to the Kalukundi Property.

In June 2011, Africo announced that it had retained MDM Engineering to review and update its planned increased throughput design and cost revalidation of the Feasibility Study for Africo's Kalukundi Property. In May 2006, MDM completed the initial Feasibility Study, based on a throughput of 800,000 tonne per annum plant. Africo requested that MDM complete a review and cost update for the Feasibility Study and the Front End Engineering Design (FEED) that was previously completed. The review is to be based on the throughput of 1.25 million tonnes per annum that was evaluated during the FEED. In this regard, it is anticipated that the costs to develop the Kalukundi Property will be substantially higher than the costs outlined in the 2006 Technical Report due to the increased throughput and current labour and material costs. In order to proceed with the development of the Property, Africo will be required to raise substantial additional debt and/or equity funding. Because of the anticipated higher funding requirements and the desire to complete a new resource assessment by AMEC , Africo deferred finalisation of this update by MDM. This deferral will also provide Africo with an opportunity to continue its discussions with its principal shareholder, Camrose, about a potential joint development project and the funding of such a plan.

Also in June 2011, and in accordance with certain of the recommendations made by Coffey Mining, Africo announced that it had re-commenced drilling at its Kalukundi Property. The initial program of borehole drilling focused on the Principal and Anticline Fragments of the Property where the highest grades of copper and cobalt were encountered during Africo's last exploration activities conducted in 2008 and 2009. An initial program of 4,000 metres of drilling commenced as infill drilling with the objective of intersecting the hanging wall mineralization, to confirm continuity and grade of the currently defined geology and mineralization and to search for extensions of the known mineralization.

Exploration drilling initially focused on the Principal Fragment as recommended by Coffey Mining. In addition, a program of shallow drill holes for the Kii and Kalukundi Fragments was undertaken. Twenty-five (25) short holes were planned over the two Fragments. This drilling was focused on defining the grade of the near surface mineralization on these two Fragments with a view to commissioning a preliminary mining plan on the northeast extensions of each of these two Fragments.

Accordingly, on May 9, 2012, Africo announced that a total of **46 boreholes on 4 fragments (5430m)** had been drilled from June 2011 to the end of March 2012. Assay data is at hand for the initial boreholes drilled on the Principal Fragment and this data provided confirmation of the high grade values previously drilled on this fragment. The announcement indicated that the drilling program was initially focused on the copper and cobalt rich Principal Fragment. The objective was to prove continuity of the geology and grade at 50 metre intervals, to establish the nature and extent of the mineralization in both the Mines Series and the hangingwall formations and to drill down to the sulphide zone to confirm continuity and grade of the main Mines series mineralization. All of these objectives were achieved.

At the end of the first quarter of 2012, drilling had been finalized on the Principal and Kii Fragments and had been commenced on the Kalukundi Fragment. During the second quarter of 2012, the drilling was completed on the Kalukundi Fragment and taken to an advanced stage on the Anticline Fragment. In addition, exploratory holes were completed on the SE Anticline, C5 West, Nzilo and the Mashitu Fragments. By the end of the second quarter, an additional 33 boreholes (8,730m) had been drilled. Drilling continued with a further 7 holes (1,900m) of which five were still in progress. On July 11, 2012, unrest by the local artisanal workers resulted in the suspension of drilling activities at a time when the last 5 holes in the overall campaign were being drilled. The unrest resulted in all drilling activities being suspended, however, Africo continues to have and has always had unimpeded access to its Kalukundi Property. A decision to complete the final 5 holes has yet to be taken.

| **Fragment** | **Number of Boreholes** | **Metres Drilled** |
|---|---|---|
| **June 2011 - March 2012** | | |
| Principal | 17 | 2,489 |
| Kii | 9 | 541 |
| Kalukundi | 10 | 831 |
| SE Anticline | 10 | 1,569 |
| **Sub Total – March 2012** | **46** | **5,430** |
| **April 2012 – June 2012** | | |
| Kalukundi | 16 | 2,612 |
| Anticline | 10 | 4,666 |
| Kinshasa | 4 | 821 |
| C5 West | 1 | 143 |
| Nzilo | 1 | 343 |
| Mashitu | 1 | 145 |
| **Sub Total – June 2012** | **33** | **8,730** |
| Anticline * | 7 | 1,900 |
| **Total** | **86** | **16,060** |
| ** 7 x 1,900m undertaken in July 2012.* | | |

All of the boreholes drilled to date have been logged and sampled and the samples have been submitted for analysis. The 9 infill boreholes (541m) drilled near surface on the **Kii Fragment** were sufficient to provide the extra data to potentially convert the inferred resource near surface to a higher category of confidence. The intersections of the Footwall Ore Body zone in particular were positive and this data ties in well with the surface mineralised outcrops on the northern side of the hill. One of the best continuous intersections on section 1 is from KiiD001, which is a shallow 60.60m hole which intersected 2.96% Cu and 0.51% Co over a drilled width of 45.54m (42.20m true width). This borehole added significant value in the near surface zone in particular and similar to better mineralisation was intersected in the adjacent section 2.

The Roches Silicieuses Cellulaires ("RSC") unit is shown to be differentially leached of both copper and cobalt in the near surface zone. The precise areas of low grade still need to be delineated, but some mineralisation projects close to the surface in places and the leached zone is shallow for most fragments. On the Kalukundi Fragment the depth of the leached zone is limited to a maximum depth of about 25m over a short strike length mainly within the RSC unit. All of the assay data for this drilling was received and assessed in the 3rd quarter and is very positive, confirming the above observations and substantiating the continuity of the previously drilled mineralisation. The new drilling adds significant value to the geological understanding of the Kii Fragment and especially to the mineral distribution and Cu and Co grades (see press release dated September 28, 2012).

A total of 26 infill boreholes (3,443m) were drilled near surface on the **Kalukundi Fragment.** From geological observations it has been noted that a number of boreholes intersected poor or low grade mineralization. Other deeper holes intersected sulphide mineralization, which is not uncommon on this fragment where the sulphides are preserved between depths of 40m near the centre of the fragment and 70m at the edges. Here too, the RSC unit is shown to be differentially leached of both copper and cobalt in the near surface zone. The precise areas of low grade still need to be delineated. For example, there are high grade copper mineralisation outcrops on the NE end of the Fragment however the central and SW end of the Fragment is devoid of surface mineralisation with the exception of some heterogenite (Co) in the RSF unit and adjacent areas. The near surface drilling has shown the near surface Mines Series units to be heavily leached of mineralisation and locally barren. The leaching extends down to a maximum depth of up to 25m, but is continuous over a strike of 200m, being shallow in the NE and deeper in the centre and SW.

Assay results for the near surface drilling have been received and assessed (see press release September 28, 2012). The assay data for the deeper holes has also been received and assessed and these results are very encouraging. They confirm in-depth continuity of the copper and cobalt mineralisation with very encouraging copper mineralisation and in particular in the NE extent of the Fragment. The new drilling has significantly improved the mineral potential and the geological understanding of this fragment.

A total of 10 exploratory boreholes (1,569m) were drilled on the **South East Anticline Fragment.** Drilling in 2009 had established the presence of significant cobalt concentrations within this fragment, especially the central and southern areas, with some copper mineralization in the northern extent from 7 core boreholes and two percussion holes drilled for water. The current program of drilling had limited success and intersected mainly cobalt mineralization. All of the assay data for this Fragment has been received and assessed. The drilling confirms the complex structure of the Fragment, but also the presence of significant concentrations of cobalt mineralisation mainly >1% Co, with the best intersection being 0.15% Cu and 1.35% Co over a drilled width of 30.20m (see press release September 28, 2012). Certain structural discontinuities show limited continuity of the mineralisation defined to date. However, only a small proportion of this extensive Fragment has been drilled. Hence there is still upside potential to define a new resource on this Fragment.

The main focus of the drilling during the second quarter of 2012 was on the **Anticline Fragment.** A total of 10 infill boreholes (4,666m) were drilled through to the end of June 2012. Drilling continued in July, but was disrupted by vandalism from the artisanal workers in the area. This resulted in Force Majeure being declared and immediate cessation for drilling activities, only a few weeks before the program would have been completed. At this point an additional 7 holes had been drilled (1,900m) of which 5 were still in progress. It was considered that the Anticline Fragment had the best potential to locate significant additional tonnages of mineralization, both near surface and in depth. An up faulted block near surface to the east had been inferred from previous drilling, as had significant mineralization in the hangingwall formations. A visual assessment of the first 4 boreholes confirmed the presence of significant copper mineralization in particular. On the basis of the initial success, a number of the drill holes were drilled deep with the additional advantage of testing the hangingwall and footwall mineralization and of intersecting the down dip extension of the Principal Fragment mineralised zone in depth.

During the fourth quarter of 2012, all of the drilling data and assays for the Anticline Fragment were received and assessed. Excellent continuity of the Mines Series units within the Anticline structure were confirmed to a vertical depth of up to 150m. One of the most productive holes is ANTD002 which intersected a folded sequence of the Mines Series grading at 2.65% Cu and 0.57% Co over a true width of 71.85m. In addition, at a vertical depth of over 300m, the down dip continuity of the Principal Fragment geology and sulphide mineralisation was intersected

grading at 3.85% Cu and 0.37% Co over a drilled width of 33.11m which is close to being a true width. This intersection confirms the data from BH KDI2 drilled by Gecamines which intersected the Principal Fragment at a vertical depth of 250m to 280m. Reference is also made to Africo's press release dated October 25, 2012.

Exploratory drilling was also undertaken on 4 other fragments to assess whether more detailed exploration is warranted. Drilling was done on the Kinshasa fragment (4 boreholes, 821m), the C5 West Fragment (1 borehole, 143m), the Nzilo Fragment (1 borehole, 343m) and the Mashitu Fragment (1 borehole, 145m). Mixed results were observed from the geological observations of these intersections and assay results are pending to fully assess the potential of these fragments as outlined by this limited drilling program.

The drilling program was successful in providing confirmation of the continuity of the Mines Series formation on the four main mineralised fragments and in defining continuity of and extension to the Cu and Co mineralisation. Accordingly, the services of AMEC were secured to undertake a resource estimate including the 2011 and 2012 drilling programs and a re-assessment and incorporation of the previous work done on the Kalukundi Property with the main objective of developing a new and enhanced resource estimate of Africo's Kalukundi Property. In a news release dated April 10, 2013, Africo reported the results of the assessment undertaken by AMEC and indicated that the drilling was successful in substantiating continuity in the copper and cobalt mineralisation in the Mines Series geology and also proving the depth extent of the mineralisation to a vertical depth of 320m at which it is still open ended. These resources are estimated from five of the Fragments within the Kalukundi Project near Kolwezi in the DRC. The new resource assessment is a significant improvement from the previously reported resources and has been summarised as follows:

| | | |
|---|---|---|
| Indicated resources: | 30.4 million tonnes | grading @ 2.40% Cu and 0.46% Co. |
| Inferred resources: | 25.2 million tonnes | grading @ 1.71% Cu and 0.45% Co. |

This assessment slightly more than doubles the resources at the Kalukundi Project that were outlined in the 2006 Technical Report. This new resource assessment also replaces the previous resource statement.

See Item 3.10 – Mineral Projects – The Kalukundi Property – New Resource Assessment.

**RECENT DEVELOPMENTS**

In August 2012, GCM requested a full budget for the remainder of 2012 which included details of Africo's drilling plan. The drilling plan was to include both planned and completed drilling, quantity of samples (collected and to be collected) and a plan to commence construction of a plant.

In response to the request from GCM to commence mining development at Kalukundi, Africo approached MDM Engineering to put forward a site establishment plan with the objective of preparing the plant site and layout in advance of a major construction program. Following detailed discussions with the MDM team, a work program and a budget of approximately $5.8 million was compiled and submitted to GCM in respect of the plan to commence construction of a plant. This program and budget was approved by Swanmines, which includes representatives from GCM, however, the program and budget has been deferred by the Company pending further discussions with GCM and the possibility of further discussions with Camrose regarding the potential joint development with their La congolaise des mines et de développement (sarl) ("**Comide**") project. In addition to this program, Africo will also likely have to take steps to move the permanent residents from the Kisankala village to the site of a new village. Details of the village relocation are still to be outlined and planned in detail.

The ability to commence this development program is dependent upon establishment of security control on the Kalukundi Property such that the MDM staff and new plant, equipment and infrastructure will be secure and not subject to vandalism. To assess the security situation, Africo appointed Erinys Holdings Ltd. ("Erinys"), from Johannesburg, South Africa, to undertake an independent review and report back on the security situation on the Kalukundi Project site. This assessment was undertaken in the first half of October 2012 and an overview report advised that the artisanal workers had largely retreated from the area and at this stage the security situation on the property was quiet and secure. Unfortunately, the artisanal miners returned to the project site in large numbers during the first week of May 2013 and a number of times thereafter, however, Africo was, following each

occurrence, able to have most of the artisanal miners retreat from the property. From time-to-time, intermittent illegal mining activity may continue on the property.

The Company has also had and continues to have discussions with its principal shareholder, Camrose, about the possibility of a joint development program with their Comide project, which is adjacent to the Kalukundi project, as well as the funding of same going forward. However, no definitive agreement has been entered into in this regard and any agreement that may be reached will also require the consent of GCM. Given current financial conditions and the price for copper, it does not appear likely that an agreement will be able to be reached with Camrose on the potential joint development of the Kalukundi and Comide projects. GCM owns 25% of the shares of Swanmines, which is the entity that owns the Kalukundi property. Africo has a 75% indirect interest in Swanmines. There can be no assurance that Africo will be able to negotiate a joint development program or the funding of such a program. In addition, based on the trading price of Africo's shares, it is unlikely that Africo will be able to fund the development of its Kalukundi project without third party financial backing. GCM has urged Africo and its principal shareholders to try and move forward with developing the Kalukundi Project. Camrose is a wholly-owned subsidiary of Eurasian Resources Group ("**ERG**"), previously known as Eurasian Natural Resources Corporation ("**ENRC**").

On August 20, 2015, Africo announced that its Board of Directors had appointed a Special Committee, consisting of George Ireland and James Cook. The Special Committee, along with management, have been mandated to work with Africo's largest shareholder, Camrose, with a view to enhancing shareholder value and to try and lessen the significant discount in the trading price of Africo's shares versus its cash per share in the treasury. While there can be no assurance that this can be achieved, Africo will keep its shareholders apprised as this process moves forward.

Also on August 20, 2015, Africo announced that it was advised that Comide may be carrying out mining operations on a portion of the Kalukundi property in the DRC without the consent and approval of Africo and Swanmines. Africo and Swanmines are currently investigating the situation in an effort to protect the value of Kalukundi for the benefit of all of the shareholders of Africo.

The disclosure in this Item 3.11 has been prepared under the supervision of Michael J. Evans, Africo's Consulting Geologist, who is a Qualified Person as defined in NI 43-101.

### 3.12 Risk Factors

The operations of Africo are speculative due to the nature of Africo's business, the location in which it operates, and the present stage of its development. The following risk factors pertain to the business operations of Africo and its subsidiaries and could have a material adverse effect on, among other things, the operating results, earnings, properties, business and condition (financial or otherwise) of, or realities faced by, Africo.

***Financing***

Significant additional debt and/or equity funding is required to bring the Kalukundi Property into production. Due to the current economic environment, there can be no guarantee that such financing will be available at economic terms to enable the Kalukundi Property to be developed. Further, in order for Africo to raise additional financing, it will have to review and revise the capital cost estimates that are currently outlined in the Technical Report, which capital cost estimates will be significantly higher than those currently outlined in the Technical Report.

***Swanmines Agreement***

The Swanmines Agreement, as amended, contains a number of provisions that may be subject to differing interpretations. In addition, the Swanmines Agreement and the amendments thereto do not deal with its subject matter comprehensively. It is, therefore, not possible to accurately and adequately describe in this AIF all of the terms of the Swanmines Agreement, as amended. In addition, if the Swanmines Agreement is determined by a court of competent jurisdiction to have a meaning that differs from the interpretation of the Swanmines Agreement as disclosed in this AIF, Africo could be materially adversely affected. Failure to perform its obligations under, and otherwise to comply with, the terms of the Swanmines Agreement may result in a forfeiture without compensation of Africo's interest in the Kalukundi Property. It should also be noted that, pursuant to the Swanmines Agreement,

Africo was originally required to organise financing for Kalukundi within 6 months of the provision of the relevant feasibility study, and to begin construction within 6 months thereafter. These deadlines have not been met. Failure by Africo to meet such deadlines may entitle GCM to terminate the Swanmines Agreement, thereby rendering all loans from Africo to Swanmines non-refundable, and transfer Swanmines' license to GCM without consideration. Although these intended deadlines were not met, to date, GCM has not issued any notices of default. As noted above, Africo has submitted a programme and budget for 2012, including details of the drilling plan, and plan for commencement of operations to GCM, however, to date, Africo has not as yet implemented the non-drilling portions of this programme and budget. Whilst Africo has no reason to believe that GCM will not remain supportive of Africo's development of the Kalukundi Project, there can be no assurance that GCM will not, in the future, if Africo does not develop the project to GCM's satisfaction, pursue its rights under the Swanmines Agreement, in which case Africo may risk losing title to the Kalukundi Project without compensation.

Further, Amendment No. 4, that was entered into in January 2009 following completion of the mining review by the Government of the DRC, is between GCM and Akam Mining sprl, not Africo. This is because at the time of negotiation of this agreement, Akam was the purported holder of the Swanmines Shares. Although Amendment No. 4 acknowledges the impending transfer of the Swanmines Shares from Akam to Africo DRC as a result of the settlement of the litigation involving the Kalukundi Property pursuant to the Akam Agreement (which transfer of shares was effected on January 15, 2009), it does not contain specific assignment provisions for the rights and obligations of Akam under Amendment No. 4 to be assigned to Africo DRC. While, on advice of Congolese legal counsel, it is Africo's understanding that, pursuant to Congolese commercial law, in a private limited liability company (an "sprl" or "SAS" such as Swanmines) transfer of shares has, as a consequence, transfer of rights and obligations of the prior shareholder (Akam) to the beneficiary of the share transfer (Africo DRC) in proportion to share ownership; and further, Amendment No. 4 contemplates the entering into of a definitive association agreement and it is Africo's understanding that it is to receive a draft of a definitive association agreement in the near future, there can be no assurance that this definitive agreement will be entered into between GCM and Africo DRC, or at all. (See Item 3.2 – Material Contracts – Swanmines Agreement and Item 3.2 – Material Contracts – Akam Agreement.)

***Commitments and Potential for Liability from Akam's Purported Management of Swanmines***

Although Africo's management has reviewed the minutes of meetings of Swanmines held during the period of time that the Kalukundi Property was subject of litigation (as described in Africo's Annual Information Form dated March 28, 2008, which has been filed with regulators through the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) and is available for viewing with Africo's other public disclosure documents through the Internet at www.sedar.com) and Akam was the purported manager of Swanmines, and has found no indication of additional liabilities or commitments incurred by Akam during this period, Africo has no other way of knowing what commitments and liabilities were incurred by Akam during such period. There is no assurance that decisions made or liabilities incurred by Akam during this period, if any exist, will not become Africo's responsibility.

***Political and Economic Instability***

The DRC has a long history of political instability, significant and unpredictable changes in government policies and laws, war and civil conflict, illegal mining activities, lack of law enforcement and labour unrest. More recently, the DRC has undergone civil unrest and instability that could have an impact on political, social or economic conditions. From time to time, governments have intervened in the export of mineral concentrates in response to concerns about the validity of export rights and payment of duties. In addition, the government of the DRC has renegotiated the Swanmines Agreement with Africo (see Item 3.2 – Material Contracts). These factors (which may include new or modified taxes or other government levies as well as other legislation) may result in the curtailment or cessation of Africo's activities, adversely affecting the value of its assets.

***Stress in the Global Economy***

Reduction in credit, combined with reduced economic activity and the fluctuations in the United States dollar, may adversely affect businesses and industries that purchase commodities, affecting commodity prices in more

significant and unpredictable ways than the normal risks associated with commodity prices. The availability of services such as drilling contractors and geological service companies and/or the terms on which these services are provided may be adversely affected by the economic impact on the service providers. The adverse effects on the capital markets generally make the raising of capital by equity or debt financing much more difficult and Africo is dependent upon the capital markets to raise financing. Any of these events, or any other events caused by turmoil in world financial markets, may have a material adverse effect on Africo's business, operating results, and financial condition.

***Current Global Financial Condition***

Global financial conditions have been subject to increased volatility. Access to financing has been negatively impacted by numerous factors, including sub-prime mortgages in the United States and elsewhere, the liquidity crisis affecting the asset-backed commercial paper market, and most recently sovereign debt crises. As such, Africo is subject to counterparty risk and liquidity risk. Africo is exposed to various counterparty risks including, but not limited to: (i) through financial institutions that hold Africo's cash; (ii) through companies that have payables to Africo; and (iii) through Africo's insurance providers. Africo is also exposed to liquidity risks in meeting its operating expenditure requirements in instances where cash positions are unable to be maintained or appropriate financing is unavailable. These factors may impact the ability of Africo to obtain loans and other credit facilities in the future and, if obtained, on terms favourable to Africo. If these increased levels of volatility and market turmoil continue, Africo's operations could be adversely impacted and the trading price of the common shares could be adversely affected.

***Government Regulation***

Africo's mineral exploration and planned development activities will be subject to various laws governing prospecting, mining, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. No assurance can be given that the new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner that could limit, suspend, terminate or curtail production or development. Government approvals and permits are currently, and may in the future be, required in connection with Africo's operations. Parties engaged in mining operations or in the exploration or development of mineral properties may be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed on them for violations of applicable laws or regulations. Amendments to current laws and regulations governing operations or more stringent implementation thereof could have a substantial adverse impact on Africo and cause increases in exploration expenses, capital expenditures or production costs or reduction in levels of production at producing properties, or require abandonment or delays in the development of new mining properties.

***Lack of Infrastructure in the DRC***

The transportation and service infrastructure in the DRC is sub-standard and unpredictable. Material delays in the transportation of equipment, supplies and resources including the supply of power may delay the development of the Kalukundi Property. Any such delay is likely to increase the cost of developing the Kalukundi Property, and such increase may be material to Africo's business, results of operations and financial condition. Further, the Kalukundi Property will be accessed over lands that may be subject to the interests of third parties. Any assertion by such parties of their interests may delay or disrupt the development and operation of the Kalukundi Property.

***Effects of Inflation on Results of Operations***

The DRC has historically experienced relatively high rates of inflation. Accordingly, Africo's costs may be materially affected, which may adversely affect its business and results of operations.

***Limited Business History***

Africo has no history of developing a mineral resource property. The likelihood of Africo's success must be considered in light of the problems, expenses, difficulties, complications and delays frequently encountered in

connection with the establishment of any business, factors that are exacerbated by the fact that Africo's business is conducted in the DRC. There is no assurance that Africo can successfully develop the Kalukundi Property, generate revenues, operate profitably, or provide a return on investment in the future.

***No Assurance of Title***

The Kalukundi Property consists of an exploitation permit that confers on Swanmines certain exclusive rights in relation to 19.5$km^2$ in the DRC. The mineral title records in the DRC are incomplete, may not fully reflect the transfer history and may not disclose agreements, charges and claims that could impact on title to the Kalukundi Property.

The Kalukundi Project is secured under an Exploitation License, PE591, which was issued on October 11, 2001 for a term of 20 years. There can be no assurance that the Exploitation License will be able to be renewed for two additional 15-year terms or at all.

***Need for Water Rights***

Africo requires the ready availability of water if the Kalukundi Property becomes operational. Management believes that Africo's current surface rights and water rights are sufficient to carry on the activities of Africo's current work program. However, the need may arise for Africo to purchase or lease additional surface rights or obtain additional water rights in order to further explore and develop the Kalukundi Property, and its ability to further explore or develop such property may be dependent upon Africo's ability to secure such additional surface or water rights.

***Requirement for Permits and Licences***

The operations of Africo will require licences, permits and, in some cases, renewals of existing licences and permits from various governmental authorities. Africo's ability to obtain, sustain or renew such licences and permits or obtain other required licences or permits on acceptable terms is subject to changes in regulations and policies and to the discretion of the applicable governmental authorities.

***Electricity Supply***

Notwithstanding Africo has entered into a Memorandum of Understanding (the "**MOU**") with the Societe Nationale d'Electricite ("**SNEL**") relating to the supply of electricity to its Kalukundi Property, there is no assurance that studies proposed in the MOU will result in reinforcement of SNEL's electrical system capabilities sufficient to guarantee power to the Kalukundi Property or that Africo will be provided with adequate power in the future. In addition, it is likely that Africo may need to make arrangements for the supply of additional power or alternate power resources which may render the Project uneconomic. Failure in electrical power and shortages of the supply of diesel, mechanical parts and other items required for Africo's operations will likely frequently occur in the DRC. Extended periods without electricity or other necessary elements required to support its operations could have an adverse effect on Africo's business, results of operations and financial condition.

***Dependence on Qualified Personnel***

Africo's business is dependent on retaining the services of a small number of key management personnel with a variety of skills and experience, including in relation to development and operation of mineral projects. The success of Africo is, and will continue to be, dependent to a significant extent on the expertise and experience of its directors and senior management. The failure to retain, or loss of, one or more of these people could have a materially adverse effect on Africo. Africo does not maintain insurance on any of its key officers or employees at this time, but this is currently under review. Africo's success will also depend to a significant degree upon the contributions of qualified technical personnel and its ability to attract and retain highly skilled personnel in the DRC and elsewhere. Competition for such personnel is intense, and Africo may not be successful in attracting and retaining qualified personnel in the DRC, or in obtaining the necessary work permits to hire qualified expatriates. Its inability to do so in the future may have a materially adverse impact on its business and results of operations.

***Uncertainty in the Estimation of Mineral Reserves and Resources***

There is a degree of uncertainty with respect to the calculation of mineral reserves and mineral resources and corresponding grades being mined or dedicated to future production. Until mineral reserves or mineral resources are actually mined and processed, the quantity of mineral resources and mineral reserve grades must be considered as estimates only. In addition, the quantity of mineral reserves and mineral resources may vary depending on, among other things, metal prices. Any material change in quantity of mineral reserves, mineral resources, grade or stripping ratio may affect the economic viability of the Kalukundi Property. In addition, there can be no assurance that copper recoveries or other metal recoveries in small-scale laboratory tests will be duplicated in larger scale tests under on-site conditions or during production.

Moreover, the economic evaluation of the mineral resources and reserves of the Kalukundi Property includes inferred mineral resources that are considered not to be defined in sufficient detail to have the economic consideration applied to them that would enable them to be categorized as mineral reserves, and there is currently no certainty that the economic analysis proposed will be achieved. Metal price fluctuations, as well as increased production costs or reduced recovery rates, may render ore reserves containing relatively lower grades uneconomic and may ultimately result in a restatement of such ore reserves. Short-term operating factors relating to ore reserves, such as the need for sequential development of ore bodies and the processing of new or different ore types or grades may cause a mining operation to be unprofitable in any particular accounting period.

Fluctuation in copper, cobalt and other base or precious metals prices, results of drilling, metallurgical testing and production and the evaluation of mine plans subsequent to the date of any estimate may require revision of such estimate. The volume and grade of reserves mined and processed and recovery rates may not be the same as currently anticipated. In particular, no assurance can be given that the anticipated tonnages and grades will be achieved or that the indicated level of copper and cobalt recovery will be realized. Any material reductions in estimates of mineral reserves and mineral resources, or estimates of Africo's ability to extract these mineral reserves, could have a material adverse effect on Africo's results of operations and financial condition.

***Potential Dilution***

Pursuant to the Swanmines Agreement, Africo is contractually obligated to provide the funding for the Kalukundi Property. There can be no assurance that such additional financing will be available to Africo or, if it is, that it will be offered on acceptable terms. If additional financing is raised through the issuance of equity or convertible debt securities of Africo, the interests of shareholders in the net assets of Africo may be significantly diluted. If additional financing is not available, Africo may be unable to satisfy its obligations under the Swanmines Agreement. Any such failure, and any failure of Africo to obtain the required financing on acceptable terms, could have a material adverse effect on Africo's financial condition, results of operations and liquidity, may require Africo to cancel or postpone planned capital investments, and may result in the loss of its interest in the Kalukundi Property.

***Foreign Investments and Operations***

Mineral exploration and mining in certain countries may be affected in varying degrees by political instability and government regulations relating to the mining industry and foreign investment. There can be no assurance that the government of the DRC will not institute regulatory policies that adversely affect the exploration and development on the Kalukundi Property. Any changes in regulations or shifts in political conditions in these countries are beyond Africo's control and may adversely affect its business. Investors should assess the political and regulatory risks related to Africo's foreign country investments. Operations may be affected in varying degrees by government regulations with respect to restrictions on production, price controls, export controls, foreign exchange controls, income taxes, expropriation of property, environmental legislation and mine safety.

***Risk of Expropriation and Enforceability of Contracts with Government, Parastatal Organizations or Joint Venture Partners***

GCM renegotiated the Swanmines Agreement as a result of a mining review (see Item 3.2 – Material Contracts). It is possible that the current system of exploration and mine permitting in the DRC may change further, resulting in impairment of Africo's rights and possibly expropriation of Africo's properties without adequate compensation. In addition, there is a possibility that Africo's agreements with governments, parastatal organizations or joint venture partners may be unenforceable against these parties.

***Mining and Development Plan***

Although Africo has received the Feasibility Study from its consultants, Africo's Board of Directors is considering ways in which to optimize the deposit potential contained on the Kalukundi Property and may elect to modify, expand or otherwise embark on a different course of action regarding the Kalukundi Property depending on, among other things, the amount of capital Africo raises and the development plan that it ultimately undertakes.

***Exploration, Development and Operating Risks***

The exploration for, and the development of., mineral deposits involves significant risks, which even a combination of careful evaluation, experience and knowledge may not eliminate. While the discovery of an ore body may result in substantial rewards, few properties which are explored are ultimately developed into producing mines. Major expenses will be required to develop metallurgical processes and to construct mining and processing facilities at the Kalukundi Property. Notwithstanding the Feasibility Study, there is no certainty that ongoing expenditures to be made by Africo towards mining operations on the Kalukundi Property will result in commercial quantities of ore. It may take many years until production is possible, if at all, during which time the economic feasibility of production may change. Whether a mineral deposit will be commercially viable depends on a number of factors, some of which are: the particular attributes of the deposit, such as size, grade and proximity to infrastructure; metal prices, which are highly cyclical; currency exchange rates, which are volatile; and government regulations, including regulations relating to prices, taxes, royalties, land tenure, land use, importing and exporting of minerals and environmental protection. The exact effect of these factors cannot be accurately predicted, but the combination of these factors may result in Africo not receiving an adequate return on its invested capital.

Africo's activities will be primarily directed towards the exploration for, and the development of, mineral deposits. Exploration programs entail risks relating to the location of economic ore bodies, the development of appropriate metallurgical processes, the receipt of necessary governmental permits and regulatory approvals, and the timely completion of capital projects, including the construction of mining and processing facilities at mining sites. Major expenses will be required to establish reserves by drilling and to construct mining and processing facilities at a particular site.

Mining operations generally involve a high degree of risk. Although Africo does not yet operate a mine on the Kalukundi Property, it wishes to develop a mine. Such operations are subject to all the hazards and risks normally encountered in the exploration, development and production of copper, cobalt and other base or precious metals, including unusual and unexpected geologic formations, seismic activity, rock bursts, cave-ins, flooding, and other conditions involved in the drilling and removal of material, any of which could result in damage to, or destruction of., mines and other producing facilities, damage to life or property, environmental damage and possible legal liability. Processing operations are subject to hazards such as equipment failure or failure of retaining dams around tailings disposal areas, which may result in environmental pollution and consequent liability.

***Environmental Risks and Hazards and Village Relocation***

All phases of Africo's operations will be subject to environmental regulation in the DRC. These regulations will mandate, among other things, the maintenance of air and water quality standards, land reclamation and relocation of people. They will also set forth limitations on the generation, transportation, storage and disposal of sulphuric acid and of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental

assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Africo's operations. Although Africo has received a favourable vote from the individuals to be affected, there is no assurance that it will be able to effect any required relocation of people in order to develop the Kalukundi Property.

Environmental hazards may exist on the properties in which Africo holds interests, which are unknown to Africo at present and which have been caused by previous or existing owners or operators of the properties. There can be no assurance that these hazards, if any exist, will not be Africo's responsibility and, consequently, may adversely affect Africo's operations.

***Commodity Prices***

The development and success of Africo's projects will be primarily dependent on the future price of base and precious metals and the price of copper and cobalt in particular. Commodity prices are subject to significant fluctuation and are affected by a number of factors that are beyond Africo's control. Such factors include, but are not limited to, the sale or purchase of base or precious metals by various central banks and financial institutions, interest rates, exchange rates, inflation or deflation, fluctuation in the value of the United States dollar (the currency in which resource prices generally are quoted) and other currencies, global and regional supply and demand, speculative trading, the overall level of forward commodity sales, international or regional political and economic events or trends and the political and economic conditions of major producing countries throughout the world. The price of base and precious metals has fluctuated widely in recent years, and future serious price declines could cause the continued development of, and commercial production from, Africo's properties to be impracticable. Depending on the price of base and precious metals, projected cash flows from planned mining operations may not be sufficient and Africo could be forced to discontinue development and may lose its interest in, or may be forced to sell, some of its properties. Future production from Africo's mining properties is dependent on commodity prices that are adequate to make these properties economic.

In addition to adversely affecting Africo's reserve estimates and its financial condition, declining commodity prices can impact operations by requiring a reassessment of the feasibility of a particular project. Such a reassessment may be the result of a management decision or may be required under financing arrangements related to a particular project. Even if the Kalukundi Property is ultimately determined to be economically viable, the need to conduct such a reassessment may cause substantial delays or may interrupt operations until the reassessment can be completed.

***Competition***

The mining industry is competitive in all of its phases. Africo will face strong competition from other mining companies in connection with the acquisition of properties producing, or capable of producing, precious and base metals. Many of these companies have greater financial resources, operational experience and technical capabilities than Africo. As a result of this competition, Africo may be unable to maintain or acquire additional attractive mining properties on terms it considers acceptable, or at all. Consequently, Africo's revenues, operations and financial condition could be materially adversely affected.

***Insurance and Uninsured Risks***

Africo maintains commercial general liability insurance coverage providing $5,000,000 of coverage worldwide. In addition, it has, since April 2007, maintained director and officer liability insurance providing $10,000,000 of coverage. Africo's business will be subject to a number of risks and hazards generally, including: adverse environmental conditions, industrial accidents, labour disputes, unusual or unexpected geological conditions, ground or slope failures, cave-ins, changes in the regulatory environment and natural phenomena such as inclement weather conditions, floods and earthquakes. Such occurrences could result in damage to mineral properties or production facilities, personal injury or death, environmental damage to Africo's properties or the properties of others, delays in development or mining, monetary losses and possible legal liability. Although Africo will maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance

may not cover all of the potential risks associated with its operations. In particular, Africo's director and officer insurance policy specifically excludes coverage in the event of a claim by Africo's significant shareholder(s). In addition, Africo may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against political risk, and risks such as environmental pollution or other hazards as a result of exploration and production, is not generally available to Africo or to other companies in the mining industry on acceptable terms. Losses from these events may cause Africo to incur significant costs that could have a material adverse effect upon its financial performance, solvency and results of operations.

***Currency Risks***

A significant amount of Africo's working capital is currently in Canadian dollars, however, a large number of Africo's operating expenses are and will continue to be incurred in United States dollars and Congolese francs. From time to time, Africo may borrow funds and will incur capital expenditures that are denominated in foreign currency. In addition, any revenue generated from operations may be in United States dollars. Accordingly, foreign currency fluctuations may adversely affect Africo's financial position and results of operations. Presently, Africo holds more Canadian dollars than United States dollars. As a result, Africo's working capital position has significantly lessened in terms of United States dollars and may continue to do so.

***Illegal Mining Activity***

With respect to illegal mining activities, reference is made to Item 3.11 – Management Update – Recent Developments.

***Increased Labour Costs, Construction Costs and Availability of Mining Equipment***

Wages and related labour and consulting costs account for a large portion of Africo's costs. Accordingly, Africo's costs may be materially affected by increases in wages and related labour and consulting costs. A number of the items that Africo may require for mine construction may be unavailable. If Africo cannot identify and procure new equipment on a timely basis, or identify and purchase suitable used equipment, this may result in delays to the Kalukundi Property construction schedule and, therefore, may also delay the start-up of mining operations and/or increase estimated costs. The amount of capital costs associated with the development of a mining property is adversely impacted by escalations in the price of items related to construction, including steel, fuel, concrete and other construction consumables. Such price escalations are caused by numerous factors beyond Africo's control. Furthermore, although the Kalukundi Report indicates an investment in working capital and pre-production expenditure of US$166.6 million based on the 2006 Feasibility Report, it is likely that the capital expenditure requirement will be significantly higher. Based on preliminary indications provided to Africo by MDM Engineering, who is currently reviewing and updating Africo's planned increased throughput design update and cost revalidation of the Technical Report, it is anticipated that these costs will be substantially higher than initially estimated.

***Conflicts of Interest***

Some of the directors and officers of Africo will not be devoting all of their time to the affairs of Africo. The directors and officers of Africo are directors and officers of other companies, some of which are in the same business as Africo. The directors and officers of Africo are required by law to act in the best interests of Africo. They have the same obligations to the other companies in respect of which they act as directors and officers. Discharge by the directors and officers of their obligations to Africo may result in a breach of their obligations to the other companies and, in certain circumstances, this could expose Africo to liability to those companies. Similarly, discharge by the directors and officers of their obligations to the other companies could result in a breach of their obligation to act in the best interests of Africo. Such conflicting legal obligations may expose Africo to liability to others and impair its ability to achieve its business objectives.

***Future Mining Operations***

There is no assurance that Africo will produce revenue, operate profitably or provide a return on investment in the future from mining operations.

***Substantial Number of Authorized but Unissued Shares***

Africo has an unlimited number of Common Shares that may be issued by the Board of Directors without further action or approval of Africo's shareholders. While the Board of Directors is required to fulfil its fiduciary obligations in connection with the issuance of such shares, the shares may be issued in transactions with which not all shareholders agree, and the issuance of such shares will cause dilution to the ownership interests of Africo's shareholders.

***Fluctuation in Market Value of Africo's Common Shares***

The market price of a publicly-traded stock is affected by many variables not directly related to the corporate performance of Africo, including the market in which it is traded, the strength of the economy generally, the availability and attractiveness of alternative investments, and the breadth of the public market for the stock. The effect of these and other factors on the market price of the common shares of Africo on the TSX in the future cannot be predicted. **An investment in Africo's common shares is highly speculative and can result in an investor losing its entire investment.**

***Control of Africo in the Hands of a Small Number of Shareholders***

Camrose, which is a wholly-owned subsidiary of ERG, owns of record or beneficially, directly or indirectly, or exercises control or direction over approximately 63.7% of Africo's outstanding common shares. As such, Camrose has the ability to determine the outcome of matters submitted to the shareholders of Africo for approval, including the election and removal of directors, amendments to Africo's corporate governing documents and business combinations. Africo's interests and those of Camrose may at times conflict, and this conflict might be resolved against Africo's interests. The concentration of control in the hands of one shareholder, as is the case of Africo, may practically preclude an unsolicited bid for Africo's Common Shares, and this may adversely impact the value and trading price of its shares.

***Health Risks***

HIV/AIDS, malaria and other diseases represent a serious threat to maintaining a skilled workforce in the mining industry throughout Africa. HIV/AIDS, malaria and other diseases are a major healthcare challenge faced by Africo's operations in the DRC. There can be no assurance that Africo will not lose members of its workforce or workforce man-hours or incur increased medical costs as a result of these high health risks, which may have a material adverse effect on Africo's operations.

**ITEM 4 DIVIDENDS**

Africo has not declared nor paid any dividends or distributions and does not foresee the declaration or payment of dividends or distributions in the near future. Any decision to pay dividends or distributions on its securities will be made by the Board of Directors on the basis of Africo's earnings, financial requirements and other conditions existing at such future time.

## ITEM 5 DESCRIPTION OF CAPITAL STRUCTURE

### General Description of Capital Structure

Africo is authorized to issue an unlimited number of common shares. The common shares rank equally as to dividends, voting powers and participation in assets upon dissolution or winding-up. No common shares have been issued subject to call or assessment. There are no pre-emptive or conversion rights attached to the common shares and no provisions for redemption, retraction, or purchase for cancellation, surrender, or sinking or purchase funds, or provision permitting or restricting the issuance of additional securities, or requiring a security holder to contribute additional capital. As at December 31, 2015, 71,313,127 common shares of Africo were issued and outstanding.

### Loan Capital

Africo does not have any debt obligations outstanding.

## ITEM 6 MARKET FOR SECURITIES

### 6.1 Trading Price and Volume

Africo's common shares are listed on the TSX and trade under the symbol "ARL". The following table sets out the price ranges and volume traded on a monthly basis through the fiscal year ended December 31, 2015.

| | Trading Price ($) | | |
|---|---|---|---|
| **Month** | **High** | **/ Low** | **Volume** |
| January 2015 | 0.32 | 0.34 | 73,774 |
| February 2015 | 0.31 | 0.35 | 166,568 |
| March 2015 | 0.315 | 0.34 | 170,095 |
| April 2015 | 0.31 | 0.36 | 114,482 |
| May 2015 | 0.325 | 0.39 | 35,975 |
| June 2015 | 0.37 | 0.385 | 41,773 |
| July 2015 | 0.30 | 0.385 | 289,077 |
| August 2015 | 0.335 | 0.42 | 236,717 |
| September 2015 | 0.37 | 0.41 | 256,555 |
| October 2015 | 0.38 | 0.435 | 148,081 |
| November 2015 | 0.40 | 0.54 | 116,935 |
| December 2015 | 0.365 | 0.49 | 140,081 |

### 6.2 Prior Sales

There were no securities issued by Africo during its fiscal year ended December 31, 2015.

## ITEM 7 ESCROWED SECURITIES

Africo does not have any escrowed securities.

## ITEM 8 DIRECTORS AND OFFICERS

### 8.1 Name, Occupation and Security Holding

| Director/Officer | Director or Officer Dates | Principal occupation for the last five years |
|---|---|---|
| **CHRIS THEODOROPOULOS**<br>*Director & Chairman of the Board*<br>*President & Chief Executive Officer*<br>British Columbia, Canada | July 4, 2006 to current | Self-employed businessman (since March 2007); President and Chief Executive Officer of Africo (since July 17, 2015); Acting Chief Executive Officer of Africo (December 9, 2009 to July 17, 2015); Chairman of the Board of Africo (since April 2005) and its now wholly-owned subsidiary, Africo Resources (BC) Ltd. (since July 2006). |
| **JAMES COOK**(1)(2)(3)<br>*Director*<br>Québec, Canada | September 23, 2008 to current | Senior Vice President Strategic Materials (since June 2011) of Bloom Energy Corporation, a producer of solid oxide fuel cells; retired (May 2007 to June 2011); President and Chief Executive Officer of Rio Tinto Iron & Titanium, an iron mining company and titanium dioxide producer with operations in Quebec, South Africa and Madagascar (July 2001 to April 2007). |
| **JONATHAN CORDERO**(1)<br>*Director*<br>Germany | June 25, 2015 to current | Director of Strategic Finance at Eurasian Resources Group ("ERG") in Luxembourg. responsible for Project Financing and Strategic Partnerships. He joined ERG shortly after its privatization in March 2014 where he was involved in the development of Group Strategy. |
| **EDWARD LAUER**(2)<br>*Director*<br>Switzerland | June 25, 2015 to current | Currently the Head of Portfolio Optimisation at ERG; worked previously at Pala Investments, an investment fund focused on the mining sector and The Boston Consulting Group, where he was a member of both the mining and energy practices. |
| **GEORGE IRELAND**(1)(2)(3)<br>*Director*<br>Massachusetts, USA | October 16, 2014 to current | Founder, chief investment officer and CEO of Geologic Resource Partners LLC, a privately owned investment firm. |
| **LARRY OKADA**<br>*Chief Financial Officer & Corporate Secretary*<br>British Columbia, Canada | January 1, 2010 to current | Chief Financial Officer and Corporate Secretary of Africo (since July 17, 2015); Acting Chief Financial Officer of Africo (January 1, 2010 to July 17, 2015); Acting Corporate Secretary of Africo (June 19, 2012 to July 17, 2015); Chief Financial Officer of BC Gold Corp. (August 2008 to June 2014); consultant with PricewaterhouseCoopers LLP (August 2006 to July 2008). |

(1) Member of the Audit Committee.

(2) Member of the Compensation Committee.

(3) Member of the Special Committee (see Item 3.11 – Management Update – Recent Developments).

Directors of Africo are elected at each annual meeting of shareholders for a term of one year, serving until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time.

As of the date of this AIF, the directors and executive officers of Africo, as a group, beneficially owned, or exercised control or direction over, directly or indirectly, an aggregate 13,926,695 common shares of Africo representing approximately 19.5% of Africo's outstanding common shares. Information as to ownership of shares has been provided by the directors and executive officers of Africo or has been extracted from insider reports filed by these individuals and publicly available through the Internet at the Canadian System for Electronic Disclosure by Insiders (SEDI) at www.sedi.ca.

**8.2 Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

As at the date of this AIF, no director or executive officer of Africo is, or has been, within 10 years before the date of this AIF a director, chief executive officer or chief financial officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity:

(a) was subject to a cease trade order (including any management cease trade order which applied to directors or executive officers of a company, whether or not the person is named in the order) or an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, which were in effect for a period of more than 30 consecutive days (together, an "**Order**"); or

(b) was subject to an Order that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in the capacity as director, chief executive officer or chief financial officer.

No director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo:

(a) is, as of the date of this AIF, or has been within the ten years before the date of this AIF, a director or executive officer of any company (including Africo and any personal holding company of the director or executive officer) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets; or

(b) has, within the ten years before the date of this AIF, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the director, executive officer or shareholder.

As at the date of this AIF, no director or executive officer of Africo and, to the knowledge of management of Africo, no shareholder holding a sufficient number of securities of Africo to affect materially the control of Africo has been subject to:

(a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

**8.3 Conflicts of Interest**

Certain directors and officers of Africo are also directors, officers or shareholders of other companies that are similarly engaged in the business of acquiring, developing and exploiting natural resource properties. Such

associations may give rise to conflicts of interest from time to time. The directors of Africo are required by law to act honestly and in good faith with a view to the best interests of Africo and to disclose any interest which they may have in any property or opportunity of Africo. If a conflict of interest arises at a meeting of the Board of Directors, any director in a conflict will disclose his interest and abstain from voting on such matter.

In October 2012, Africo loaned US$963,203 or CDN $944,595 to a director and officer of Africo to acquire a block of shares from a minority shareholder. The loan bore interest at 5% per annum and was secured by the block of shares. This block of shares could not be sold, exchanged or pledged unless the loan was repaid. The loan was initially scheduled to be repaid by December 31, 2013, however repayment was extended until December 31, 2015. On December 22, 2014, interest in the amount of US$79,915 or CDN $93,000 was repaid. During the year ended December 31, 2015, the principal amount of CDN $944,595 was repaid and, therefore, as at December 31, 2015, the only amount due to Africo under this loan was accrued interest of US$42,844 or CDN $59,299, which amount was repaid subsequent to Africo's year ended December 31, 2015. Reference is made to Item 10 – Interest of Management and Others in Material Transactions.

## ITEM 9 AUDIT COMMITTEE

The purpose of the Audit Committee of Africo's Board of Directors is to provide assistance to the Board of Directors of Africo in fulfilling its legal and fiduciary obligations with respect to matters involving accounting, auditing, financial reporting, internal control and legal compliance functions of Africo. It is the objective of the Audit Committee to maintain communication among the Board of Directors of Africo, the external auditor and senior management of Africo.

### 9.1 The Audit Committee's Charter

The full text of the Charter of the Audit Committee, as adopted by Africo's Board of Directors on March 25, 2009, is included as Schedule B to this AIF.

### 9.2 Composition of the Audit Committee

During 2015, James Cook, Beat Ehrensberger and Charles Forster were members of the Audit Committee of Africo's Board of Directors, of which James Cook, the Chair of the Audit Committee, is considered by Africo's Board as "independent" pursuant to and applying the guidance contained in applicable securities legislation. It should be noted, however, that during 2015 both Messrs. Ehrensberger and Forster were full-time employees of ERG, Africo's largest shareholder. All three of the Audit Committee members have the ability to read and understand financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the issues that can reasonably be expected to be raised by Africo's financial statements. On June 25, 2015, Messrs. Ehrensberger and Forster resigned as directors of Africo and were replaced by George Ireland and Jonathan Cordero as members of the committee. Jonathan Cordero is a full time employee of ERG and George Ireland is considered by Africo's Board to be independent of management.

### 9.3 Relevant Education and Experience

*James Cook*

Dr. Cook is the Senior Vice President Strategic Materials of Bloom Energy Corporation, a producer of solid oxide fuel cells. Prior to joining Bloom Energy, he was the President and Chief Executive Officer from July 2001 to April 2007 and the President of the Sales Division from January 1998 to July 2001 of Rio Tinto Iron & Titanium, an iron mining company and titanium dioxide producer, with operations in Quebec, Richards Bay (South Africa) and Madagascar. Prior to his tenure as President he held various technical, operations and sales and marketing positions including General Manager of Richards Bay Iron and Titanium. He earned both his Bachelor of Science (in 1974) and his Ph.D (in 1977) in Metallurgy from the University of Strathclyde in Glasgow, Scotland.

*George Ireland*

Mr. Ireland founded Geologic Resource Partners LLC ("**Geologic**") in 2004 and serves as its chief investment officer and CEO. He has over 35 years of experience in many aspects of the resource sector, ranging from field geology to banking and venture capital. From 2000 to 2004, he was General Partner of Ring Partners, LP, a predecessor investment partnership to Geologic. From 1993 to 2000, Mr. Ireland was an analyst for and a partner in Knott Partners LP where he specialized in resource investing. Prior to 1993, Mr. Ireland held a variety of positions at Cleveland-Cliffs Inc., The Chase Manhattan Bank, ASARCO Inc. and Ventures Trident LP. Mr. Ireland graduated from the University of Michigan with a BS from the School of Natural Resources and is a Fellow in the Society of Economic Geologists. Mr. Ireland also serves on the boards of Amerigo Resources Ltd., Western Lithium USA Corporation and Merrill & Ring Inc, a private timber company in the US.

*Jonathan Cordero*

Mr. Cordero is currently the Director of Strategic Finance at ERG in Luxembourg responsible for Project Financing and Strategic Partnerships. He joined ERG shortly after its privatization in March 2014 where he was involved in the development of Group Strategy. Prior to his assignment at ERG, Mr. Cordero was a Project Manager with Bryanston Resources in Zug, Switzerland, a specialised advisory and investment boutique for clients in the commodities space. He advised major players in the Mining & Metals as well as the Iron & Steel space in Africa, CIS and Central Asia on M&A, Turnaround & Restructuring as well as Marketing & Sales. Mr. Cordero holds a Master of Science in Management from HHL- Leipzig Graduate School of Management.

### 9.4 Pre-Approval Policies and Procedures

While the Audit Committee is responsible for pre-approving all non-audit services to be provided to Africo or any of its subsidiaries by Africo's external auditor, no specific policies and procedures for the engagement of non-audit services have yet been adopted.

### 9.5 External Auditor Service Fees

As at the date of this AIF, PricewaterhouseCoopers LLC, Africo's external auditor, has billed Africo for the following services during the two most recently completed financial years:

| | **Fiscal year ended December 31, 2015** | **Fiscal year ended December 31, 2014** |
|---|---|---|
| Audit fees ................................................... | $105,000[(1)] | $110,000 |
| Audit related fees[(2)] ..................................... | $2,110[(1)] | $500 |

(1) Estimated fees for 2015.

(2) Professional services provided by the external auditor for assurance and related services that are reasonably related to the performance of the audit of Africo's financial statements.

## ITEM 10 INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Other than as disclosed below, management of Africo is unaware of any material interest of any director or executive officer of Africo, or of any person that is the direct or indirect beneficial owner of, or who exercises control or direction over, more than ten percent of any class or series of Africo's outstanding voting securities, or any associate or affiliate of any such persons, in any transaction within the three most recently completed financial years or during the current financial year of Africo that has materially affected or is reasonably expected to materially affect Africo or any of its affiliates.

Pursuant to a Loan Agreement dated October 10, 2012 between Africo and Chris Theodoropoulos (Africo's then Acting Chief Executive Officer and Chairman and as of the date of this AIF Africo's Chief Executive Officer and

Chairman), Africo loaned US$963,203 to Mr. Theodoropoulos in order that he acquire an aggregate 2,218,066 common shares of Africo from a minority shareholder. The loan bore interest at 5% per annum and was secured by a pledge on the 2,218,066 common shares. The shares acquired by Mr. Theodoropoulos could not be sold, exchanged or pledged to any other party unless the loan was repaid. The loan was initially scheduled to be repaid by December 31, 2013, however repayment was extended until December 31, 2015. On December 22, 2014, interest in the amount of CDN $93,000 was repaid. During the year ended December 31, 2015, the principal amount of CDN $944,595 was repaid and, therefore, as at December 31, 2015, the only amount due to Africo under this loan was accrued interest of US$42,844 or CDN $59,299, which amount was repaid subsequent to Africo's year ended December 31, 2015.

## ITEM 11 TRANSFER AGENT AND REGISTRAR

Africo's registrar and transfer agent for its common shares is Computershare Investor Services Inc. with offices at:

510 Burrard Street
Vancouver, British Columbia V6C 3B9
Telephone: (604) 661-9400
Facsimile: (604) 661-9549

100 University Avenue, 8th Floor
Toronto, Ontario M5J 2Y1
Telephone: (416) 263-9200
Facsimile: 1-888-453-0330

## ITEM 12 MATERIAL CONTRACTS

The following are the only material contracts that Africo is party to, directly or indirectly, which are still in effect, other than those entered into in the ordinary course of business and not otherwise required by legislation to be publicly disclosed:

1. The Swanmines Agreement, as amended. See Item 3.2 – Narrative Description of the Business – Material Contracts.

2. The Subscription Agreement. See Item 3.2 – Narrative Description of the Business – Material Contracts.

3. The Akam Agreement. See Item 3.2 – Narrative Description of the Business – Material Contracts.

## ITEM 13 INTERESTS OF EXPERTS

John Hearne, BEng., MBA, MAusIMM, and Dr. Julian Verbeek, BSc (Honours), PhD (Geol.), MAusIMM, both principal consultants with RSG Global Pty Ltd., prepared or certified the Technical Report referred to in Item 3.10 – Narrative Description of the Business – Mineral Projects – The Kalukundi Property, which is incorporated by reference in this AIF, whose profession or business gives authority to the Technical Report. Neither Mr. Hearne or Dr. Verbeek, nor RSG Global Pty Ltd. or any designated professionals of RSG Global Pty Ltd., held at the time the Technical Report was prepared and revised, or is expected to receive subsequent to preparation and/or revision of the Technical Report, any registered or beneficial interest, direct or indirect, in any securities or other property of Africo, nor are any of them expected to be elected, appointed or employed as a director, officer or employee of Africo or any of its affiliates.

Gordon Seibel, RM SME, and Stella Searston, RM SME, both principal geologists, as well as John Rust, RM SME, senior metallurgist with AMEC E&C Services Inc., prepared or certified the AMEC Assessment referred to in Item 3.10 Mineral Projects – The Kalukundi Property – New Resource Assessment, which is incorporated by reference in this AIF, whose profession or business gives authority to the AMEC Assessment. None of the aforementioned persons, nor AMEC E&C Services Inc., or any designated professionals of AMEC E&C Services Inc., held at the time the AMEC Assessment was prepared and revised, or is expected to receive subsequent to preparation and/or revision of the AMEC Assessment, any registered or beneficial interest, direct or indirect, in any securities or other property of Africo, nor are any of them expected to be elected, appointed or employed as a director, officer or employee of Africo or any of its affiliates.

The auditor of Africo is PricewaterhouseCoopers LLP, Chartered Accountants, of Vancouver, British Columbia. PricewaterhouseCoopers LLP, Chartered Accountants, report that they are independent of Africo in accordance with the Rules of Professional Conduct in British Columbia, Canada.

**ITEM 14 ADDITIONAL INFORMATION**

Additional information about Africo Resources Ltd. is available through the Internet on the Canadian System for Electronic Document Analysis and Retrieval (SEDAR) at www.sedar.com. Information about Africo, including directors' and officers' remuneration and indebtedness, principal holders of Africo's securities, and securities authorized for issuance under equity compensation plans is contained in our Management Information Circular dated May 15, 2015, prepared for the annual meeting of our shareholders that was held on June 25, 2015, which is available for viewing on SEDAR.

Additional financial information about Africo is provided in Africo's audited consolidated financial statements for the fiscal year ended December 31, 2015, the notes thereto and the report of Africo's auditor thereon, as well as Management's Discussion and Analysis for the fiscal year then ended, all of which are available for viewing on SEDAR.

**SCHEDULE A**

**SUMMARY OF THE AMEC ASSESSMENT**
**EXTRACTED AND REPRODUCED FROM THE**

**Africo Resources Ltd.**
**Kalukundi Copper – Cobalt Project, Democratic Republic of Congo**
**NI 43-101 Technical Report on Updated Mineral Resource Estimate**

**dated May 23, 2013**

# 1.0 SUMMARY

Africo Resources Ltd. (Africo) requested AMEC E&C Services Inc. (AMEC) to prepare a technical report (the Report) on the results of an updated mineral resource estimate for the Kalukundi Copper–Cobalt Project (the Project) located in the Mutshatsha Territory (Ville de Kolwezi) of the Katanga Province in the Democratic Republic of Congo (DRC).

Africo holds a 75% interest in the Project through its indirectly wholly-owned subsidiary, Africo Resources DRC Sprl, which has formed a joint venture vehicle, Swanmines Sprl (Swanmines), with la Generale des Carrieres et des Mines (Gécamines). Under the joint venture agreement, Africo holds 75% of the joint venture company and the Project, and Gécamines holds 25%. For the purposes of this Report, "Swanmines", the operating entity in the DRC, is used interchangeably for Swanmines and Africo.

Africo is using the Report in support of a press release dated 10 April 2013, and entitled "Revised Resource Assessment Delineates Significantly Improved Copper and Cobalt Mineral Resources at Africo's Kalukundi Copper-Cobalt Project".

A feasibility study, managed by MDM Engineering Ltd, was completed on the Project in 2006. Many of the inputs to the feasibility study are no longer current and Africo is no longer treating the Mineral Resources, Mineral Reserves and financial analysis in the study as current. Information collected during baseline environmental, geotechnical, and hydrogeologic studies and metallurgical testwork is summarized in this Report in the relevant sections and sub-sections. Assumptions in the 2006 feasibility study were also used when considering reasonable prospects of economic extraction for the current Mineral Resource estimate.

## 1.1 Project Setting

The Kalukundi Project is located within the Kolwezi District of Katanga Province in southeastern DRC, 60 km to the east of Kolwezi and approximately 4 km to the north of the main road between Likasi and Kolwezi. The Project is about 15 km by road from the Tenke Project and 25 km from the Fungurume Project. An electrified railway line passes about 4 km to the south of the Project, linking Lubumbashi and Kolwezi. Air services are available at Kolwezi and Lubumbashi.

The Kalukundi license is located on gently undulating topography with a mean elevation of 1,400 m above mean sea level (amsl). The Project area is part of the Miombo woodlands, which consist of broadleaf deciduous woodland (10 to 20 m in height) and savannas.

The Project area has distinct dry (May to October) and wet (November to April) seasons. Rainfall mainly occurs in short-duration, high-intensity thunderstorms during the wet season. Temperatures are generally mild. The prevailing wind direction during most of the year is from the east–southeast.

Most supplies are sourced from Kolwezi. Mining-specialized personnel are available in Kolwezi and Lubumbashi; however, there is significant competition for well-trained and qualified local staff.

Currently, potable water in the Project area is supplied from two small springs and an equipped borehole located on the North of Anticline deposit. Three major regional powerlines pass through the southern part of the Project area. Cellular telephone coverage extends over most of the Project area.

Subsistence agricultural activity is undertaken in small cleared areas along the Kisankala stream, which extends 50 m from the river bank. Cassava is the most important crop within the concession area, followed by maize. Animal husbandry is limited to the keeping of pigs and poultry.

Exploration activities undertaken since 2010 have not been affected by seasonal changes, with work proceeding during the wet season from 2010 to date. Mining activities in the established mining areas at Kolwezi are operated year round, and it would be expected that any future mining activities within the Project would also be able to be operated on a year-round basis.

## 1.2 Ownership

The Project is operated through Swanmines Sprl (Swanmines). Swanmines was formed in 2001 by a joint venture agreement between Gécamines (100% owned by the DRC) and Africo Resources DRC Sprl (100% indirectly owned by Africo Resources Ltd). AMEC was provided with legal opinion that shows 25% of shares of Swanmines belong to Gécamines and 75% to Africo Resources DRC Sprl.

Legal opinion provided to AMEC notes that Swanmines was created in 2001 in accordance with the laws in force in the DRC and all legal and administrative formalities have been completed. The legal opinion concluded that the company is appropriately registered to operate in the jurisdiction of the DRC.

## 1.3 Mineral Tenure and Royalties

The Project is secured under an Exploitation or Mining License, PE591, which was issued on 11 October 2001 for a term of 20 years, expiring 10 October 2021. The tenement is 19.5 $km^2$ in extent, consisting of 23 carrés or sub-blocks. The permit can have two further renewal periods, each of 15 years duration.

The legal opinion provided to AMEC notes that the Kalukundi PE 591 was granted for copper, cobalt, gold and nickel (and associated substances if Swanmines applies for PE 591 to include such substances).

Permit PE591 was converted from the old Concession No. 242 issued under the former mining legislation pursuant to Ministerial Decree No. 1351/CAB Mines-HYDRO/OI/2001 of 11 October 2001 and transferred to Swanmines by la Generale des Carrieres et des Mines (Gécamines) in accordance with the Joint Venture agreement No.460/10269/SG/GC/2001 dated 3 March 2001 entered into between Gécamines and a subsidiary of Africo Resources Ltd. (the Formation Agreement). The Formation Agreement has been subsequently amended and completed by various addenda.

Pursuant to the mining review made by DRC Government in 2008, as an access right to business (Pas de Porte), Africo Resources DRC Sprl paid to Gécamines, as regularisation, a non-refundable cash bonus. The joint venture partners agreed that Africo Resources DRC Sprl would make up to Gécamines the amount and the payment of cash bonus, if a tonnage exceeding 180,000 tons of copper is outlined as reserves in the Project area.

A royalty is payable to Gécamines of 2.5% of gross turnover. This is defined as 2.5% of the total product sales made by Swanmines. Once production begins, the Project owners will be required to pay royalties to the DRC government, which would amount to a 2% gross royalty on sales.

## 1.4 Surface Rights

Legal opinion provided to AMEC indicates that there is no record or evidence of land ownership or certificates allowing exploitation of natural resources within PE 591 apart from traditional rights to land controlled by local authorities. The legal opinion also noted that there are no landowners located in the permit area. The legal opinion indicated that chiefs attribute land to each family or household according to the traditional land ownership system, but there are no landowner title holders in the zone. The legal opinion noted that the permit is not subject to outstanding liens or encumbrances, and is not pledged in any way.

An easement right was negotiated on 16 November 2004 between La Congolaise des Mines et de Développements Sprl (Comide) and Swanmines, which granted Swanmines an easement from the Kisanfu railway station, perpendicularly to the SNEL power line on the Mashitu deposit extension up to PE591. The agreement has been listed with the DRC Mining Registry.

Because of the relatively small size of the permit, there are limited options for siting of any future infrastructure. However, the 2006 feasibility study was able to identify appropriate sites for the mining and processing infrastructure, waste rock dumps and tailings storage facilities in the permit area.

## 1.5 Permits

Legal opinion provided to AMEC supports Africo's position that the company holds a valid exploitation permit, and a valid environmental adjustment plan. These permits are sufficient to support exploration activities.

Additional permits would be required to support any mine development activities and would be defined during future more detailed studies.

## 1.6 Environment and Social Licence

An assessment of baseline environmental conditions was carried out between October 2004 and April 2006 to support the 2006 feasibility study. Studies completed included evaluation of land usage, soils, seismicity, noise and vibration, air and water quality, stream sediment sampling, acid rock drainage, flora, terrestrial and aquatic wildlife, fish distribution and aquatic habitat.

A mitigation and rehabilitation plan (MRP) was carried out in 2004 by African Mining Consultants (AMC) and submitted to the Direction chargée de la Protection de l'Environnement Minier (DPEM) in May 2006. The MRP outlined preliminary closure objectives based on the mine plan in the 2006 feasibility study, and included flooding of the open pits to provide water sources for the local populace, removal of all infrastructure, and contouring and rehabilitation of any waste dumps and tailings disposal facilities.

During early 2006, AMC prepared an environmental adjustment plan (EAP) that was submitted to the DRC government in April 2007 and approved by the Secrétariat Général des Mines, Ministere des Mines on 25 April 2007 under decision No. 480/CPE/. The EAP grant was independently reviewed and included in a legal opinion provided to AMEC.

A draft Environmental and Social Management Plan (ESMP) for the Kalukundi Project was prepared by USK Consulting Ltd in 2008. Africo had a conceptual health, safety, environment and community management system (HSECMS) outlined at the time the ESMP was being drafted. The HSECMS was designed as a framework for managing the health, safety, environmental and social impacts of the mining project as envisaged in the 2006 feasibility study. The draft ESMP outlined the areas of potential social and environmental impact of the operation as envisaged in the 2006 feasibility study, and assigned a risk level of high, moderate and low to each issue noted.

Envirolution Consulting prepared an Environmental and Social Impact Assessment (ESIA) in June 2007. The report concluded that additional impacts that would be imposed by the Project development as envisaged in the 2006 feasibility study were similar in nature to the impacts that have already occurred through the migration of significant numbers of artisanal miners into the study area. The Project as then conceived was not considered to add substantially new impacts to those that were already present.

### 1.6.1 Kisankala Village Relocation

The 2006 feasibility study indicated that any mining activity was likely to require the resettlement of the population of the Kisankala village, as the village would be in close proximity to any proposed mining activities, and therefore mining could pose a safety risk. A site in the southern portion of the Project was selected as a potential location for the new village. The first Resettlement Action Plan (RAP) was completed by AMC in 2006. Synergy Global Consulting Ltd (Synergy) completed an updated RAP in May 2007.

### 1.6.2 Environmental Liabilities

Legal opinion provided to AMEC indicates that a consensus was reached with the local population. The proposed relocation plan has been studied, proposed, discussed and agreed by all parties. The legal opinion states that minutes of the meetings and other evidence of vote are available to support the consensus approach. Significant artisanal mining activity has occurred within the concession area. The mineralization is mined from deep trenches and tunnels and brought to the surface by individuals. Where-ever possible, the artisanal workings are closed over by bulldozer to prevent ongoing mining activity. The majority of the mining was halted in October 2004, but some activity remains ongoing. There is an expectation that there will be environmental contamination associated with any active sites.

Trenches and pits that were excavated by Gécamines were re-opened, mapped and sampled during the 2002–2005 exploration programs. Some of these trenches have

been closed where the trenches were excavated near artisanal workings that have been remediated. However, some trenches and the numerous pits excavated by Gécamines during their mapping programs remain open and present a safety hazard. As exploration drill programs concluded, Swanmines completed rehabilitation of the drill sumps and drill sites.

## 1.7 Geology and Mineralization

The Project is located within the Central African Copperbelt (CAC), a 600 km-long, metallogenic unit that intermittently crops out from Kolwezi, in the DRC's Katanga province in the northwest, to Luanshya, in northern Zambia in the southeast.

Mineralization is hosted within lithologies of the Roan R2 Subgroup. These rocks occur as isolated allochthonous outliers (also termed klippes, ecailles, or fragments) bounded by large shear and fault zones. The R2 Subgroup is a carbonate unit consisting of dolostones, dolomitic shales and siltstones. The principal mineralized sub-units are (from lower to upper units):

- Roches Argilleuses Talceuse (RAT) or Argillaceous and Talcose Rock: A sequence of massive dolomitic and talcose argillaceous units that are divided into the lower RAT Lilas and upper RAT Grise. Mineralization, in the form of supergene malachite and cobalt/iron oxides can be hosted in the RAT Lilas unit
- Dolomie Stratifiee (D Strat) or Stratified Dolomite: well-bedded to algal-laminated, argillaceous dolomite; a significant host to copper and cobalt mineralization, and may display malachite-rich vein stockworks
- Roches Siliceuses Feuilletées (RSF) or Foliated (Laminated) and Silicified Rocks: thinly bedded laminated and highly silicified dolomites; a significant host to copper and cobalt mineralization
- Roches Siliceuses Cellulaires (RSC): fine- to coarse-grained, massive, variably silicified dolomite, stromatolitic, vuggy and cellular cherty in appearance, normally resistant to erosion and forms conspicuous ridges, commonly mineralized near contacts with RSF and SDB
- Schistes De Base (SDB) or Basal Schists: silty and nodular dolomite and siltstones; a significant host to copper and cobalt mineralization
- Shales Dolomitiques (SD or SDS): finely laminated dolomitic shale with local dolomite and discontinuous graphitic bands
- Calcaire a Minerais Noirs (CMN) or Calcareous Rock with Black Minerals: banded, laminated and silicified dolomite, frequently mineralized with wad, heterogenite, and iron oxides.

Within the Kalukundi concession, 11 larger fragments have been identified in addition to two small fragments. Fragments are exposed over several hundreds of meters of strike length and some fragments have mineralization that has been delineated for at least 500 m downdip. Mineralization within five of the larger fragments (Principal, Anticline, Kii, Kalukundi and Kesho) has been extensively explored; the remaining fragments are considered to retain exploration potential.

Copper mineralization is present in the form of copper sulphides (bornite, covellite, chalcopyrite, and chalcocite), copper phosphates, and copper oxides (malachite, brochantite, and cuprite). Cobalt is primarily in the form of heterogenite with small amounts of spherocobaltite and wad and in cobalt sulphide form as carrollite.

## 1.8 Exploration

Prior to Swanmines' interest in the Project, work had been conducted by Union Minière du Haut Katanga (UMHK), Gécamines (the successor to UMHK), and Geo-Consult International (Pty) Ltd (Geo-Consult), on behalf of Johannesburg Consolidated Investment Limited (JCI). Work programs comprised detailed surface mapping and excavation, mapping and sampling of pits and trenches, 20 core holes (4,330 m), bulk density determinations, and mineral resource estimates. JCI assessed project economics using a number of alternative production rate and processing route scenarios.

Swanmines performed a review of previous data, re-opened and sampled selected trenches, and conducted delineation, exploration, condemnation and geotechnical drilling, baseline environmental and social studies, and metallurgical testwork. This culminated in completion of a feasibility study in 2006. The 2006 feasibility study envisaged a conventional, open pit mine, using a mining contractor, to feed a conventional mill and solvent extraction/electrowinning plant, at a rate of 0.8 Mt/a over a 10-year mine life. Saleable products were expected to be copper and cobalt cathode. Under the assumptions in the study, the Project returned a positive financial outcome.

Subsequent to the study completion, additional drilling has been undertaken, and Mineral Resource estimates updated. The most recent drilling program was completed in 2012.

In the opinion of the QPs, the exploration programs completed to date are appropriate to the style of the deposits within the Project.

## 1.9 Drilling

The database provided to AMEC dated 16 November 2012 contains 206 drill holes (29,883 m). The November 2012 database is restricted to drilling on the Kii, Kalukundi, Kesho, Anticline, Principal and Mashitu fragments. Only the portion of the database that was flagged as the Kii, Kalukundi, Kesho, Anticline and Principal fragments was used.

Of this total, 194 core holes (17,692 m with assays) were used to support the resource estimate. Twelve holes with no assays were excluded. Gécamines completed eight holes (2,809 m), and JCI 10 holes (1,194 m). The remaining drilling was completed by, or for, Africo. Of the Africo holes, 65 core holes (7,630 m) were completed in 2011–2012.

Drill hole azimuths and inclinations varied by fragment. There is no information on drill logging details prior to the 2004–2005 Africo drilling campaign. Africo geologists routinely logged core recovery, core diameter, stratigraphic unit, lithology, oxidation, weathering, mineralisation, bedding angles, alteration, colour and grain size. Rock quality designation (RQD) measurements were also undertaken on selected intervals. Specific gravity (SG) measurements were systematically taken on competent half-core from each sample representative of the lithology. In some drill programs, core was checked with a scintillometer to assess whether any anomalous zones of radioactivity could be detected. All core was photographed.

Africo noted that the JCI and Gécamines drill holes were most likely surveyed using a theodolite. For the Africo programs, collar surveys were set up using a hand-held global positioning system (GPS) instrument, but were subsequently surveyed by registered surveyors.

There is no information currently available on down-hole survey methods used during the JCI or Gécamines drill campaigns. Africo drill holes were down-hole surveyed using a digital single shot Reflex instrument in the early 2002–2005 programs, with readings being taken at the collar, end of hole, and in-between on 45 m to 100 m intervals (generally at 50 m intervals). This typically resulted in at least two survey points between the collar and the end of the drill hole. A Reflex EZ-Trac multishot down-hole survey tool was used for the more recent drilling. Vertical drill holes were surveyed using the single shot function of the tool near the end of the hole for holes less than 200 m in total depth. For vertical drill holes greater than 200 m in depth, down-hole readings were taken at 100 m intervals. Inclined drill holes were surveyed at 50 m intervals as the hole progressed downwards, using the multi-shot function.

No information is available on the Gécamines drill campaign core recoveries. For the JCI program, core loss varied but was large in certain sections due to the highly-weathered nature of the deposit at the relatively shallow depths of drilling.

Based on the 2011–2012 drill program, core recovery in the mineralized zones averages 90%, is relatively consistent between fragments, and varies slightly with stratigraphy and weathering profile depth. In general the RSC recoveries are approximately 3-4% lower than recoveries in the RSF, DSTRAT or SDB units.

Most drill hole intersections are oblique to the mineralization orientation so drill hole intersections are typically wider than the mineralization true thickness. The average sample length is approximately one metre, and mineralised zones are typically much thicker than the average sample length.

In the opinion of the QPs, the quantity and quality of the lithological, core recovery, collar and down-hole survey data collected in the exploration and infill drill programs are sufficient to support Mineral Resource estimation.

## 1.10 Sampling

Gécamines drill holes were sampled at variable lengths, averaging approximately 2 m, and did not honour lithologic breaks. During the JCI-era drilling, core was sampled by cutting longitudinally along the core axis, perpendicular to the core-bedding angle. Cutting was done either by diamond saw, chisel, or sliced with a machete, depending on the condition of the core.

For the Africo programs, the core was marked for sampling, split using a diamond saw and then re-marked on the cut surface remaining behind to preserve sampling depths. Where the core was very soft it was cut with a clean machete, and where very broken, the “half core” removed with a spoon. During the earlier, 2002–2005 drill programs, samples were taken to honour geology and also to separate high or low grade zones. Minimum size was limited to 30 cm and maximum to 2.00 m. In zones where recovery was especially poor, samples were taken over the whole drill run to ensure that the depths were accurate. For the later programs, sample intervals were selected by the logging geologist in response to stratigraphy and visual mineralization. All mineralized zones were sampled irrespective of how weak the perceived grade was (based upon visual estimations). Sampling continued approximately 2 m either side of mineralized zones into barren core. Sample lengths were approximately one metre. Sampling was done on either side of zones of no core recovery and did not include the no-recovery zone.

Geo-Consult determined densities on representative cores within the mineralised zones, and applied a mean of 2.34 in their resource estimates. No information as to any other legacy density determinations is available. Density data were available for the Mineral Resource estimates that supported the 2006 feasibility study, but no information as to the number of measurements or how the densities were measured was included in the study documentation provided to AMEC. During the 2011–2012 program, density determinations were performed on competent core using the wax-coated water-immersion method. AMEC noted during inspection of drill core that mineralization is commonly porous and contains natural open-space voids, and locally not competent enough to perform representative density measurements. As a result, modeled densities were adjusted during the resource estimation.

Sampling methods are acceptable, meet industry-standard practices, and are acceptable for Mineral Resource estimation purposes.

## 1.11 Sample Preparation and Analysis

A number of laboratories have been used over the Project history. Gécamines samples were analysed by an in-house laboratory operated by Gécamines personnel. No information as to accreditations is available. JCI/GeoConsult samples were sent to Set Point Laboratories (Set Point) in Johannesburg. Set Point is an independent analytical facility. Accreditations at the time of the JCI analytical program are not known.

During the Africo campaigns, the following laboratories have been used:

- SGS Lakefields Laboratory (SGS Lakefields) in Johannesburg: 2004–2005 and 2007 sample preparation and analyses; accredited to ISO17025 in December 2002; 2004–2005 drill campaign check assays performed by SGS Lakefields laboratory in Toronto
- Genalysis Laboratory in Johannesburg: 2007 and 2008–2009 sample preparation and analysis; ISO/IEC 17025:2005 accreditation
- Set Point Laboratories in Johannesburg: 2007 and 2008–2009 check analyses; accredited to ISO17025 in 2003
- Boss Mining Kakanda laboratory facility: 2011–2012 sample preparation; preparation laboratory is managed by a fully-trained ALS employee under contract from ALS Minerals to Boss Mining; procedures followed are stated to be as per the standards in all ALS Minerals laboratories. However, the laboratory is not certified.

- ALS Minerals in Johannesburg: 2011–2012 analyses; ISO/IEC 17025:2005 accreditation.

Analyses completed by Gécamines were carried out at in-house laboratories at Kolwezi, using by atomic absorption (AA). Details of the sample preparation and analysis procedures are not known. Limited information is available on the JCI analytical program. Analyses for copper and cobalt were performed by pressed pellet X-ray fluorescence (XRF).

During the 2004–2005 Africo drill programs, sample preparation and analysis involved crushing, drying and milling followed by XRF analysis by pyrosulphate fusion for Cu, Co, Pb, Zn, Ni, Fe and Mn. Reject samples and pulps were retained for repeat analysis and further analysis. Selected composite samples were also analysed for acid soluble Cu, Co, acid consumption, and gangue acid consumption. In addition composite samples from each of the Africo boreholes were also analysed by inductively-coupled plasma-optical emission spectroscopy (ICP-OES) using a multi acid leach for Al, Ba, Be, Bi, Ca, Cd, Co, Cr, Cu, Fe, K, Li, Mg, Mn, Mo, Na, Ni, P, Pb, Sb, Sn, Sr, Ti, V, Zn, and Zr.

For the 2007 and 2008–2009 Africo campaigns, sample preparation comprised drying, crushing to 2 mm, and pulverising to >85% passing 75 µm. Samples were analysed by SGS Lakefield using XRF for Cu, Co, Fe, Pb, Zn and Ni. Analyses for Mn were only performed on the last three analytical batches submitted; as the laboratory experienced calibration problems with the XRF instrument during the timeframe the analyses were performed. Samples sent to Genalysis were analysed using either inductively-coupled plasma (ICP) or atomic absorption spectroscopy (AAS) finish, following four-acid digestion. Analyses were completed on all samples for Cu, Co, Fe, Mn, Pg, Zn, and Ni, with selected later samples also assayed for Al, Ca and Mg.

During the 2011–2012 Africo campaign, sample preparation consisted of drying, crushing to better than 95% of the sample passing a 2.8 mm sieve and pulverizing to better than 90% of the sample passing a 106 µm sieve. Analyses performed included Co, Cu and Ag.

There are no data on quality assurance/quality control (QA/QC) sample submissions that may have been performed by Gécamines. The JCI program was reported to have employed submission of blank and standard samples and re-assay of about 10% of the samples, but no information as to the number or sources of the samples is available.

In the 2004–2005 Africo campaign, blank and internal standards were used. Three internal standards were made up comprising a low-grade, intermediate-grade and a

high-grade sample by milling and homogenising a large sample of oxide mineralization from the surface exposures on the Principal Fragment.

For the 2007 and 2008–2009 Africo campaigns, reject samples and excess pulps were retained for “repeat analysis and further analysis”. Standards used for the campaigns were prepared by Swanmines as the standards used in the 2004–2005 campaign were depleted.

Mr Keith Kenyon, an independent consultant, designed and monitored the QA/QC for the 2011–2012 drill program. Blanks, standards, and duplicate samples were submitted in the sample stream to the analytical laboratory using pre-set templates that governed the number and locations of the QA/QC samples. Efforts were also made to ensure that any run of samples that the logging geologist considered to be high-grade were accompanied in the sample stream by additional blank samples, and additional duplicate samples were inserted to check for preparation contamination and laboratory precision respectively. When a batch of assay results was returned from the primary laboratory, the performance of blanks, duplicates and standards were reviewed for that batch. If an unacceptable deviation was noted, then ALS Minerals was requested to repeat the analysis of the entire batch. Check samples (10%) were randomly selected and then sent by ALS Chemex to Setpoint Laboratories in Johannesburg for analysis. Samples were selected using a random number generator throughout the assay value range.

## 1.12 Database and Security

Gécamines and JCI drill and assay data were supplied by Coffey Mining (Coffey Mining) in database format. Data from the drilling completed by Swanmines in support of the 2006 Feasibility Study were also included in the Coffey database provided, and subsequently added to the Africo acQuire database. Prior to upload into the acQuire database, each drill entry was checked to ensure the drill hole had collar, geology and assay data. If a drill hole had missing or inconsistent geology intervals, it was not uploaded. Where collar locations were considered suspect, the drill hole was flagged. Assay data were directly uploaded from Genalysis-supplied assay files.

No data are available on any security measures associated with the early legacy data. For the Africo programs, sample security relied upon the fact that the samples were always attended or locked at the core facility or at the sample dispatch facility. Sample collection and transportation have always been undertaken by company personnel using corporately-owned vehicles in the case of core transport, and by or laboratory or courier company personnel in the case of sample transport. Chain of custody procedures consisted of filling out sample submittal forms that were sent to the

laboratory with sample shipments to make certain that all samples were received by the laboratory.

Half core for the Gécamines drilling campaign is still stored in wooden core boxes at their core storage facility adjacent to their geological offices in Likasi. There is no information on the JCI core. Africo core is stored at the adjacent Comide camp and core storage facility. Some sample rejects and pulps are still available, and stored in Johannesburg.

The quality of the analytical data is considered to be generally reliable, and sample preparation, analysis, and security are generally performed in accordance with exploration best practices and industry standards.

## 1.13 Data Verification

RSG Global visited the site in 2006, and validated the logging of four of the boreholes. RSG Global specifically noted issues with core recovery during the review, attributing much of the low recovery to poor drilling control, and commented that density sampling of zones with very friable or vuggy material was under-represented. RSG Global reviewed the analytical data available on the Project to be used in supporting resource estimation for the 2006 feasibility study, and concluded for the Gécamines and JCI programs that the results of the drilling were broadly consistent with the results of the drilling from the available Africo programs. RSG Global performed a review of available QA/QC data, and concluded that overall, the QA/QC data presented met industry standard levels of precision and accuracy. The internal company standards and blanks showed good levels of accuracy, as did the SGS Lakefield Johannesburg blanks samples. The core duplicate and inter-laboratory pulp-duplicate data showed high levels of precision. Extensive manual validation of the database was carried out by Africo Resources against original assay certificates. In addition, RSG Global validated data electronically to track changes between versions and to check for structural deficiencies (such as overlapping samples, duplicate entries) and checked 10% of the data at random against the assay certificates. RSG Global reported that agreement between checked assay certificates and logs was 100%.

Coffey Mining performed a data review of the data and database for the 2007–2009 drill programs. A number of items were noted, including:

- Time differences between batches analysed at SGS Lakefield were noticeable, and attributed to machine calibration issues with the XRF machine following maintenance and the lack of appropriate analytical standards

- A significant sample switching issue was identified in 2007; most sample swap cases were identified, and it was primarily neighbouring samples that had been swapped.
- Two XRF batches were noted to have anomalous values that were attributed to typing errors, as some of the assay certificates had required manual data entry
- ALS Chemex were unable to provide accurate Co assays; a bias was detected in the range of 1–1.5% Co in the ALS Chemex results; cobalt calibration issues were also noted at Genalysis
- Assays for Al below 50,000 ppm were considered acceptable limits; above this value, Coffey Mining considered the assay method to be inappropriate as inaccurate results were reported by one of the laboratories.

Despite these identified issues, Coffey Mining considered that the data quality was good and acceptable for use in mineral resource estimation.

AMEC conducted a review of historical QA/QC material that was available and conducted an audit of the database. Data selected for the audit cover all of the drilling campaigns conducted on the Project that are in the database.

No discrepancies were found between the collar survey records inspected and the database. The 45 audited drill hole down-hole survey records had an error rate of 20%. Most of the errors were the result of surveys being recorded on historical logs but not being entered into the database. Other sources of errors were slight differences in elevation, dip, or azimuth and records in the database that did not have supporting survey records.

There was a 6% error rate in “From” and “To” intervals and stratigraphy resulting mostly from what appears to be transcription errors from entering historic handwritten logs into the database.

A check of 100% of the assays for TCo, TCu, ASCo, ASCu, Ca, Fe, Mg, Mn, Ni, and S in the database was performed against assay certificates from ALS, Intertek, and SGS; of the sample IDs that matched assay certificates only the SGS samples returned errors.

The audit of the acid-soluble Cu found a 15% error rate resulting from 100 samples having different values in the database from what is on the assay certificate. These values were removed from the database used to support Mineral Resource estimation.

AMEC compared the check assay results between ALS Chemex and Set Point Laboratories. The check assays for total Co show that ALS is 3.8% high in comparison to Set Point. Check assays for total Cu show that ALS is 10% high but Set Point is 10% low when comparing standards analyzed at Set Point with the standard best values.

The audit results indicated that there were no material issues which could significantly affect Mineral Resource estimation.

For mineralisation verification, AMEC selected nine witness sample intervals from drill core boxes. Under AMEC supervision, these samples were cut, crushed, pulverised, sealed in bags and submitted to the Set Point laboratory in South Africa for independent analysis. Results were sent directly from Setpoint to AMEC and showed very good agreement with original analyses of core samples for a comparison of this type.

The QPs consider that the data verification programs undertaken by third-party consultants, including AMEC, acceptably support the geological interpretations and the database quality, and support the use of the data in Mineral Resource estimation.

## 1.14 Metallurgical Testwork

The main metallurgical testwork programs were conducted in support of the 2006 Feasibility Study. AMEC has reviewed metallurgical test work data from the Africo deposit that is based on samples from four fragments: Principal, Anticline, Kii, and Kalukundi. DMS tests were completed on two samples from the Kalukundi fragment. Gangue acid consumption tests were completed on samples from each of the four fragments. Near surface trench samples from three of the fragments, (Kalukundi fragment not included) were used for bench top hydrometallurgical tests. These samples were also used for comminution testing. The samples from these three fragments were then combined into a composite and a hydrometallurgical pilot plant test was performed by the Mintek metallurgical testwork laboratory in South Africa, complete with final copper and cobalt production.

Two samples from the Kalukundi fragment were submitted for dense media separation (DMS) testing, with the following results:

- Dense media separation proved effective for both samples
- A separation at 2.85 gives a copper recovery of 48% with only 11.3% of the weight on sample 1

- A separation at 2.85 gives a copper recovery of 58% and cobalt recovery of nearly 62% with only 12.8% of the weight on sample 2
- Sample 2 has a much higher tendency to slime as is evidenced by the much higher weight percentage reporting to the -53 µm fraction.

The results of these two tests indicate that the Kalukundi fraction shows potential for processing using DMS. An operating DMS plant processing material from a near-by fragment on a third-party held permit and not included in the Project, is currently achieving approximately 50% copper recovery and 40% cobalt recovery so these test work data compare well with the recoveries reported from the adjacent operating plant.

Hydrometallurgical testing completed on 22 samples. The copper recoveries are quite good, >90%, when the copper grade is above 1%; however, the cobalt recovery on several of the tests was quite disappointing. In an effort to improve the cobalt recovery, additional tests were done using a “fine grind”. No test conditions or detailed test results were available for the “fine grind” work but a summary of the test results stating a 95% cobalt recovery.

Kinetic tests were done on two samples, HC7 and HC3, using a 24 hour leach time. Detailed results of the tests were not available, only a summary description that stated that the results showed a cobalt recovery of 86% after 12 hours leaching.

A portion of the samples tested were then combined into a bulk composite. The samples used in this test program were from the surface or near-surface trench cuts. Two additional samples were collected from intermediate and deep zones within the deposit; however the sample depths were not recorded. The test results show very good cobalt recovery and good copper recovery from the intermediate sample. The cobalt recovery stays high in the deep sample but the copper recovery is significantly reduced. The copper recovery problem is suspected to be due to sulphide mineralogy; however, significant additional testing is required to fully understand potential recovery problems that may be encountered at depth.

Mintek used two tons of material from the bulk sample to complete a hydrometallurgical pilot plant test. The pilot plant was operated continuously for 12 hours per day for 12 days and produced the following results:

- An average of 97% of the copper was leached into solution
- Final copper recovery, after processing losses ranged from 89% to 93%
- An average of 94% of the cobalt was leached into solution

- Final cobalt recovery, after processing losses ranged from 70% to 78%
- Sodium metabisulfite addition in place of $SO_2$ gas resulted in only 80% of the cobalt being leached compared to the 94% when $SO_2$ gas was added
- The average gangue acid consumption was 48 kg/ton
- The average $SO_2$ consumption was 23.8 kg/ton
- The copper and cobalt solution tenors reached a steady state of 14 and 11 g/L respectively
- The level of impurities, primarily iron, manganese, magnesium, aluminum, and calcium reached a steady state during the pilot plant.

The pilot plant demonstrated that hydrometallurgical processing is a viable alternative to process the Africo material, assuming the acid consumption remains relatively low. There were no significantly detrimental issues discovered during the testing. The sample used in the pilot plant included only three of four fragments and there were no samples taken at depth for pilot plant testing.

Several gangue acid consumption tests were completed by SGS on samples from each of the Principal, Kalukundi, Kii and Anticline fragments. In addition one drill hole from each of the Principal, Kalukundi and Kii fragments were tested for gangue acid consumption at depth. Results were:

- Acid consumption increases with depth
- Acid consumption increases with calcium concentration
- Calcium concentration alone cannot be used to predict acid consumption
- Each of the deposits at depth appears to have an acid consumption too high to allow for the feasible operation of a hydrometallurgical plant.

The remaining portion of sample material used in the bulk composite was used to do comminution testing. The comminution testing indicates the mineralization types tested will respond well to a standard semi-autogenous grind (SAG) mill/ball mill circuit. However, the samples tested were from surface and near surface trench sampling. Additional grinding testwork is required on samples from depth to compare with the current results to understand if the comminution parameters required change with depth.

Two processing methods have been tested to date for the Kalukundi project: DMS and a grind/acid leach hydrometallurgy process. The completed DMS testwork indicates

that both samples tested respond to DMS procedures. An operating DMS plant in a permit contiguous with the Kalukundi permit boundary is currently returning a copper recovery of 50% and cobalt recovery of 40%. Results from the two Kalukundi samples tested are in line with these operating results. Additional samples from the other fragments will need to be tested to verify similar results.

The mineralization responds well to hydrometallurgical processing as long as the acid consumption remains at a reasonable level. The pilot plant indicates 97% of the copper and 94% of the cobalt would be leached into solution. The final net recovery of the two metals, after processing losses are included, is from 89% to 93% for copper and 70% to 78% for the cobalt.

Additional testing is required to understand potential variability in the response to DMS processing from the various fragments. Further testing is required to better define the acid consumption; however, at this time it is apparent that a portion of the oxide copper will not be processed using the hydrometallurgical plant due to high acid consumption. The acid consumption value where hydrometallurgical processing no longer is feasible will need to be verified with additional testwork and engineering study. Additional testwork is required to understand the depth where the copper recovery begins to fall and to the extent that it is reduced. Additional testing is required to understand if the cobalt recovery remains constant at depth or is reduced.

At the current state of Project knowledge, the various acid consuming minerals represent the primary deleterious elements. A better understanding of the relationship between these elements concentration and acid consumption is required in order to predict acid consumption in order to ensure the very high acid consuming mineralization is not sent to any future hydrometallurgical processing facility.

## 1.15 Mineral Resource Estimates

AMEC completed a mineral resource estimate for the Kalukundi, Kii, Kesho, Anticline and Principal deposits. Five models were constructed, based on 194 holes totalling 17,692 m of drilling with assays that intercepts both oxide and sulphide mineralization.

For each deposit total copper (TCu %), acid-soluble copper (ASCu %), total cobalt (TCo %), calcium (Ca %), iron (Fe %), magnesium (Mg %), manganese (Mn %), sulphur (S %) and specific gravity (SG g/cm$^3$) were estimated. The Ca, Fe, Mg and Mn values were estimated for future gangue acid consumption studies.

Separate copper and cobalt mineralized envelopes or grade shells were constructed to define the geometry of the mineralization. The copper grade shell was constructed using a 0.3% cut-off grade for TCu, and a 0.1% cut-off grade was used for TCo.

Separate TCu and TCo wireframes were constructed. Stratigraphic wireframes for the major stratigraphic units were also constructed.

Grade caps were applied to the TCu and TCo data. After the assays in the drill hole file were capped, the assays were composited into 2 m down-the-hole intervals, and flagged as being inside or outside the grade shell based on the centroid on the composite. The composites were not broken at the grade shell boundaries.

For the resource estimation, two prototype block models were used, one for Kii and Kalukundi and the second for Kesho, Anticline, and Principal. After the estimates were complete, the models were combined into a single model where the 5 x 5 x 5 m blocks became sub-cells in a larger model with 50 x 50 x 50 m blocks.

For the TCu resource estimate, only the TCu composites that lie within the TCu wire frame were used for the TCu estimation. The estimation method for TCo was identical to TCu except the estimation occurred within the cobalt wireframes using only those TCo composites that lie within the cobalt grade shell. Dip and dip-direction were calculated for the centroid of each of the triangles in the stratigraphic wireframe. These dip and dip-directions were first estimated into each model block using a spherical inverse distance method, and were then used to control the search ellipses for each block for all other estimations. To prevent smearing and enrichment, an indicator model was used to delineate a TCu>=0.3% domain and TCu<0.3% domain.

All elements were estimated using: inverse distance to the third power (ID3), and nearest-neighbour (NN) estimation methods. Estimation and search parameters were kept the same for all deposits, and the search strategy required all blocks to be estimated using a minimum of two drill holes. A three-step search was utilized where, 58% of blocks were estimated during first search range, 24% estimated during second search range and 18% were estimated during third search range. Due to the presence of a few isolated very high-grade composites, an outlier restriction was applied to the second and third search range where the capping threshold was lowered to approximately one-half the original capping value to prevent these high-grade samples from projecting these high grades too far with wide-spaced drilling.

The SG values were capped at 3 g/cm$^3$. Because the density determinations were made on competent core, rather than the more typical weathered and broken material, the SG data were considered to be biased high. The modeled SG was adjusted using the following formula:

*Adjusted SG = estimated SG * 0.95 - (100 - core recovery)*

Since the overall core recovery is 90%, this ended up in an over reduction in density of 6.5%. For the Kesho deposit, no SG measurements are available so the overall average of 2.56 g/cm$^3$ was applied, and the deposit classification was downgraded to Inferred.

Estimated block model grades and composite grades were visually examined using cross sections, plans and 3D visualizations. Review of the data showed that composites and model blocks agree well.

Drilling at the Africo deposits have shown the continuity of the stratigraphy and the mineralization. At 100 m spacing using a cut-off grade at 0.3% for TCu or 0.1% for TCo, the geology and mineralization can be projected from hole to hole as was demonstrated during the construction of the stratigraphic and grade shell wireframes. However, the grades may vary significantly so mineralization was classified as Inferred. Due to lack of SG data at Kesho, the entire deposit was classified as Inferred. For Indicated, the drill hole spacing was halved to 50 x 50 m drill hole spacing where the continuity of both stratigraphy and grade can be assumed between drill holes can support mine planning. In addition, there are many neighbouring, third-party held deposits with very similar geology that have been mined and have shown the continuity of the mineralization at these distances.

A “two hole” spacing criteria was used to classify the estimates, and was implemented by calculating the distances to the closest and second closest holes, and if the distance to the first hole was less than half diagonal distance of the drill hole spacing plus 10%, and if the distance to the second drill hole spacing is the drill hole spacing plus 10%, the block met the requirements to be classified. The additional 10% was added to account for irregularities in the drill spacings. Resource classification was recorded in the model using the CLASS field, with CLASS = 3 for Inferred, CLASS = 2 for Indicated, and CLASS = 1 for Measured. After reviewing the classification, however, the few blocks that met the Measured criteria were scattered and did not form any significant coherent zones. As a result, no material is being reported as Measured in this estimate.

A Lerchs-Grossmann (LG) optimization was performed to support reasonable prospects of economic extraction, and used the following conceptual parameters, based on benchmarking against operations mining similar material in the DRC:

- The ASCu:TCu ratio (RATIO_Cu) was used to delineate oxide from sulphide material where blocks with ASCU:TCu ratio >=0.5 were flagged as oxide, and blocks with ASCu:TCu ratio <0.5 were flagged as sulphide

- Estimated calcium (Ca) was used to delineate between high- and low- gangue acid consumption (GAC) material where blocks with estimated Ca >=1.0 were flagged high GAC, and blocks with Ca <1.0 flagged as low GAC
- Four metallurgical processing types were established and flagged in the MET_TYPE field in the model as follows;
  - 1 = Oxide-Low GAC; RATIO_Cu >=0.5 and Ca<1.0
  - 2 = Oxide-High GAC; RATIO_Cu >=0.5 and Ca>=1.0
  - 3 = Sulphide-Low GAC; RATIO_Cu <0.5 and Ca<1.0
  - 4 = Sulphide-High GAC; RATIO_Cu <0.5 and Ca>=1.0
  - Since no Ca estimates are available for Kesho and the RATIO_Cu is high, the entire deposit was assigned a MET_TYPE value of 1 or Oxide-Low GAC.
- Processing method, costs and recoveries for the different metallurgical processing types were assigned as follows;
  - 1 = oxide leach, US$50/tonne, copper recovery of 90% and a cobalt recovery of 75%
  - 2 = oxide flotation, US$25/tonne copper recovery of 67.5% a cobalt recovery of 39%
  - 3 and 4 = sulphide flotation; US$50/tonne, copper recovery of 90% and a cobalt recovery of 75%.
- Long-term copper price of US$3.16/lb and a cobalt price of US$9.20/lb
- Mining cost at US$1.77/tonne
- General and administrative (G&A) cost at US$2.50/tonne processed
- Generalized overall pit slope angle of 45 degrees.

## 1.16 Mineral Resource Statement

The Mineral Resources were classified in accordance with the 2010 CIM Definition Standards for Mineral Resources and Mineral Reserves. Mineral Resources are reported within the LG pit shell using a net value per tonne cut-off of US$0.01. The net value assumes the block is potentially economic after G&A and variable block processing costs have been met.

Mineral Resources have an effective date of 15 November 2012. Mr Gordon Seibel, RM SME is the Qualified Person for the estimate. Mineral Resources are summarized in Table 1-1.

**Table 1-1: Mineral Resources Statement**

| Deposit | Tonnes (x1000) | TCu (%) | ASCu (%) | TCo (%) | Contained Cu (kt) | Contained Co (kt) |
|---|---|---|---|---|---|---|
| *Indicated* | | | | | | |
| Kii | 4,220 | 2.47 | 2.12 | 0.49 | 104 | 21 |
| Kalukundi | 5,470 | 2.50 | 1.30 | 0.35 | 137 | 19 |
| Kesho | 0 | ----- | ----- | ----- | 0 | 0 |
| Anticline | 9,570 | 2.47 | 1.48 | 0.37 | 236 | 36 |
| Principal | 11,200 | 2.26 | 1.74 | 0.58 | 252 | 64 |
| *Total* | *30,400* | *2.40* | *1.63* | *0.46* | *730* | *140* |
| *Inferred* | | | | | | |
| Kii | 0 | ----- | ----- | ----- | 0 | 0 |
| Kalukundi | 3,190 | 2.76 | 0.55 | 0.30 | 88 | 10 |
| Kesho | 10,700 | 1.46 | 1.43 | 0.59 | 157 | 63 |
| Anticline | 2,730 | 1.65 | 0.88 | 0.15 | 45 | 4 |
| Principal | 8,580 | 1.65 | 0.85 | 0.43 | 142 | 37 |
| *Total* | *25,200* | *1.71* | *1.06* | *0.45* | *431* | *114* |

Notes to Accompany Mineral Resource Tables:

1. Mineral Resources have an effective date of November 15, 2012. The qualified person for the Mineral Resources is Gordon Seibel, SME Registered Member, and an employee of AMEC. The Mineral Resource estimate was prepared by Mr. Seibel.
2. Mineral Resources that are not Mineral Reserves do not have demonstrated economic viability.
3. Mineral Resources are reported as undiluted. No mining recovery has been applied.
4. Acid-soluble copper (ASCu) is a sub-set of, and is not additive to, total copper (TCu).
5. There are reasonable prospects for economic extraction by constraining the resources within a conceptual economic open pit shell constructed using a long-term copper price of US$3.16/lb, cobalt price of US$9.20/lb., mining cost at US$1.77/tonne, G&A cost at US$2.50/tonne processed, a pit slope angle of 45 degrees, and variable processing costs ranging from US$25.00/tonne to US$50.00/tonne.
6. Mineral Resources are reported within the pit shell at a cut-off using a net value per tonne of US$0.01. The net value assumes the block is potentially economic after G&A and variable block processing costs have been met.
7. Processing is assumed to be on site. Transportation costs for shipping material off-site for processing are not included.
8. Tonnages are reported in metric units and grades in percent. Tonnages are rounded to the nearest thousand tonnes; grades are rounded to two decimal places.
9. Copper grade shells to define the geometry of the copper mineralization were shaped manually using a cut-off grade of 0.3%TCu.
10. Cobalt grade shells to define the geometry of the cobalt mineralization were shaped manually using a cut-off grade of 0.1% TCo.
11. Copper and cobalt shells are where the copper and cobalt grade shells overlap.
12. Rounding as required by reporting guidelines may result in apparent summation differences between tonnes, grade and contained metal content.

Factors which may affect the Mineral Resource estimate include:

- Commodity prices and exchange rates
- Changes to the assumptions used in the LG shell
- Metallurgical domains are preliminary and should be refined
- The DRC is emerging from a period of political instability, and the fiscal and political regime under which mining operations might occur are uncertain. There is provision within the DRC Mining Code for the Government to change the DRC Mining Code and mining rights by decree.

## 1.17 Exploration Targets and Additional Exploration Potential

Canadian disclosure standards under NI 43-101 allow the estimated quantities of an exploration target to be disclosed as a range of tonnes and grade. The ranges of tonnages and grades of targets for further exploration inside the grade shells and adjacent to the Indicated and Inferred Mineral Resources are:

- 2.4 Mt to 3.7 Mt grading 1.3–1.9% TCu and 0.2–0.4% TCo.

AMEC cautions that the potential quantity and grade of targets for further exploration are conceptual in nature, and that it is uncertain if additional drilling will result in the material targeted being delineated as a Mineral Resource.

Additional fragments near the Africo deposits have been identified with stratigraphic units known to contain copper and cobalt mineralization, but these fragments have not been thoroughly explored. Mineralization is open a depth below the Kii, Kalukundi and Principal deposits; however, due to the depth of the mineralization, the mining method would most likely be underground. Mineralisation is still open or not well defined along strike for most of the deposits.

The area between Anticline and Principal is complex and additional fragments of mineralization may be found.

There is still exploration potential over a large area between the known fragments, but this would require wide-spaced deep drilling to properly test these prospect areas.

## 1.18 Recommendations

A two-phase work program is recommended, with the phases able to be conducted concurrently. Phase 2 is not dependent on the results of Phase 1.

The Phase 1 program consists of a desktop-based assessment and review of the Project database to ensure data consistency and accuracy. This program is estimated at $10,000.

The Phase 2 program consists of metallurgical testwork on freshly-drilled metallurgical core samples, and is estimated at $650,000, including drilling costs. Testwork includes SMC and dense media separation tests, liquid/solid testing, including counter-current decant efficiency, bench flotation, bulk flotation, acid/$SO_2$ leach and acid consumption. The drill program assumes 12 PQ-size core holes will provide the test material.

**SCHEDULE B**

**CHARTER FOR THE AUDIT COMMITTEE**

**OF THE BOARD OF DIRECTORS OF AFRICO RESOURCES LTD.**

## 1. Purpose

1.1. The Audit Committee's primary function is assisting the Corporation's Board of Directors in fulfilling its oversight responsibilities to shareholders. The Committee is ultimately responsible for the policies and practices relating to integrity of financial and regulatory reporting, as well as internal controls to achieve the objectives of safeguarding of corporate assets; reliability of information; and compliance with policies and laws. Within this mandate, the Audit Committee's role is to:

(a) oversee the work and ensure the independence of the external auditor;

(b) ensure effective communications between management and the external auditor and provide a link between the external auditor and the Board of Directors;

(c) ensure the credibility and objectivity of the Corporation's financial reports and public disclosure; and

(d) review the Corporation's annual financial statements prior to approval thereof by the Board of Directors.

1.2. The Audit Committee will make recommendations to the Board of Directors regarding items relating to financial and regulatory reporting and the system of internal controls following the execution of the Committee's responsibilities as described herein.

1.3. The Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board of Directors from time to time prescribe.

## 2. Membership

2.1. Each member of the Audit Committee must be a director of the Corporation.

2.2. The Audit Committee will consist of at least three members, the majority of whom are not officers or employees of the Corporation, and each of whom must be "independent" and "financially literate" as those terms are defined by, and subject to the provisions of, National Instrument 52-110 – *Audit Committees* as adopted by the Canadian Securities Administrators, as such Instrument is revised or replaced from time to time.

2.3. The members of the Audit Committee will be appointed annually by and will serve at the discretion of the Board of Directors.

## 3. Authority

3.1. In addition to all authority required to carry out the duties and responsibilities included in this charter, the Audit Committee has specific authority to:

(a) engage and terminate, and set and pay the compensation for, independent counsel and other advisors as it determines necessary to carry out its duties and responsibilities;

(b) communicate directly with management and any internal auditor, and with the external auditor without management involvement; and

(c) approve interim financial statements and interim MD&A on behalf of the Board of Directors.

**4. Duties and Responsibilities**

4.1. The duties and responsibilities of the Audit Committee include:

(a) recommending to the Board of Directors the external auditor to be nominated by the Board of Directors for appointment by shareholders;

(b) recommending to the Board of Directors the terms of engagement for and compensation of the external auditor;

(c) reviewing the external auditor's audit plan, fee schedule and any related services proposals;

(d) overseeing the work of the external auditor;

(e) ensuring that the external auditor is in good standing with the Canadian Public Accountability Board and enquiring if there are any sanctions imposed by the CPAB on the external auditor;

(f) ensuring that the external auditor meets the rotation requirements for partners and staff on the Corporation's audits;

(g) where there is to be a change in external auditor, reviewing the issues related to the change and the information to be included in the required notice to be filed with securities regulators with respect to such change;

(h) reviewing and discussing with management and the external auditor the annual audited financial statements, including discussion of material transactions with related parties, accounting policies, as well as the external auditor's written communications to the Committee and to management;

(i) reviewing any disagreements in financial reporting between the external auditor and the Corporation's management;

(j) reviewing the external auditor's report, audit results and financial statements prior to approval of same by the Board of Directors;

(k) reporting on and recommending to the Board of Directors the annual financial statements and the external auditor's report on those financial statements prior to Board approval and dissemination of annual financial statements to shareholders and the public;

(l) reviewing the Corporation's financial statements, MD&A and annual and interim earnings press releases prior to public disclosure of this information by the Corporation;

(m) ensuring adequate procedures are in place for review of all public disclosure of financial information by the Corporation prior to is dissemination to the public;

(n) overseeing the adequacy of the Corporation's system of internal accounting controls and internal audit process and obtaining from the external auditor summaries and recommendations for improvement of such internal accounting controls;

(o) ensuring the integrity of the Corporation's disclosure controls and internal controls over financial reporting;

(p) resolving disputes between management and the external auditor regarding financial reporting;

(q) reviewing the external auditor's internal quality control procedures and any material issues raised with respect thereto by any peer, governmental or professional authority review and the steps taken to deal with those issues; and examining all relationships between the external auditor and the Corporation, in order to assess and ensure the external auditor's independence;

(r) reviewing risk management policies and procedures (for example, hedging, litigation and insurance), as well as current areas of financial risk and whether management is managing these effectively;

(s) establishing procedures for:

(i) the receipt, retention and treatment of complaints received by the Corporation from employees and others regarding accounting, internal accounting controls or auditing matters and questionable practices relating thereto; and

(ii) the confidential, anonymous submission by employees of the Corporation or concerns regarding questionable accounting or auditing matters;

(t) reviewing and approving the Corporation's hiring policies with respect to partners or employees (or former partners or employees) of either a former or the present external auditor;

(u) pre-approving all non-audit services to be provided by the Corporation's external auditor to the Corporation or any of its subsidiaries and, in this regard, considering whether the external auditor's performance of any such non-audit services is compatible with the external auditor's independence; and

(v) overseeing compliance with regulatory authority requirements for disclosure of external auditor services and fees and Audit Committee activities.

4.2. The Audit Committee will report, at least annually, to the Board regarding the Committee's examinations and recommendations.

**5. Meetings**

5.1. The quorum for a meeting of the Audit Committee is a majority of the members of the Committee who are not officers or employees of the Corporation or of an affiliate of the Corporation.

5.2. The members of the Audit Committee must elect a chair from among their number and may determine their own procedures.

5.3. The Audit Committee may establish its own schedule that it will provide to the Board of Directors in advance.

5.4. The external auditor is entitled to receive reasonable notice of every meeting of the Audit Committee and to attend and be heard thereat.

5.5. A member of the Audit Committee or the external auditor may call a meeting of the Audit Committee.

5.6. The Audit Committee will meet separately with the President and separately with the Chief Financial Officer of the Corporation at least annually to review the financial affairs of the Corporation.

5.7. The Audit Committee will meet with the external auditor of the Corporation at least once each year, at such time(s) as it deems appropriate, to review the external auditor's examination and report.

5.8. The chair of the Audit Committee must convene a meeting of the Audit Committee at the request of the external auditor, to consider any matter that the auditor believes should be brought to the attention of the Board of Directors or the shareholders.

**6. Reports**

6.1. The Audit Committee will record its recommendations to the Board in written form which will be incorporated as a part of the minutes of the Board of Directors' meeting at which those recommendations are presented.

**7. Minutes**

7.1. The Audit Committee will maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board of Directors.