# Exhibit 50

# NOTICE OF ANNUAL AND SPECIAL MEETING

# AND

# MANAGEMENT PROXY CIRCULAR

# FOR THE MEETING OF SHAREHOLDERS

# TO BE HELD ON JUNE 29, 2016

**May 31, 2016**

These materials are important and require your immediate attention. They require Shareholders to make important decisions. If you are in doubt as to how to make such decisions, please contact your financial, legal or other professional advisors. If you have any questions or require more information with regard to voting your Company Shares, please contact Computershare Investor Services Inc. toll-free within North America at 1-866-249-7775; outside North America at 1-416-263-9524.

May 31, 2016

Dear Shareholder:

The Board of Directors cordially invites you to attend the annual and special meeting of shareholders of Africo Resources Ltd. ("Africo") to be held at 9:00 a.m. (Vancouver time) on Wednesday, June 29, 2016 at Suite 520, 800 West Pender Street, Vancouver, British Columbia.

At the meeting, Shareholders will be asked to consider and to approve, among other things, a special resolution approving a statutory arrangement pursuant to Section 192 of the *Canada Business Corporations Act* whereby, among other things, Camrose Resources Limited ("Camrose") will acquire all of the outstanding common shares of Africo (the "Arrangement") other than any common shares owned by Camrose.

**Under the Arrangement, Shareholders of Africo (other than Camrose) will receive $1.00 in cash for each common share of Africo. The Board of Directors, based in part on the recommendation of the Special Committee of the Board of Directors, has unanimously (with Messrs. Cordero and Lauer abstaining) determined that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of Africo, and recommends that Shareholders vote FOR the special resolution approving the Arrangement.** The recommendation of the Special Committee and the Board of Directors is based on various factors, including the opinion of Paradigm Capital Inc. ("Paradigm"), financial advisor to the Special Committee, to the effect that, as of the date of such opinion, the consideration under the Arrangement is fair, from a financial point of view, to Shareholders other than Camrose. A copy of the Paradigm Fairness Opinion is included as Appendix "C" to the management proxy circular accompanying this letter. Shareholders are urged to read the fairness opinion in its entirety.

The Arrangement also provides that if the Company completes certain transactions within 14 months following the Effective Date in respect of the Company's Kalukundi copper-cobalt project located in the Mutshatsha Territory of the Katanga Province in the Democratic Republic of Congo, then the Company will pay an additional aggregate of US$7.5 million to be divided among the number of Company Shares and Company Options immediately outstanding prior to the Effective Time (other than those held by Camrose). The additional amount, if paid, would be equal to approximately USD $0.27 per Company Share or Company Option.

To be effective, the Arrangement must be approved by a resolution passed by at least two-thirds of the votes cast at the meeting by Shareholders present in person or represented by proxy and by the affirmative vote of at least a majority of the votes cast by "minority" Shareholders. The Arrangement is also subject to certain conditions, including the approval of the Ontario Superior Court of Justice.

At the Meeting, Shareholders will also be asked to elect the directors of the Company for the ensuing year and to appoint PricewaterhouseCoopers LLP, Chartered Accountants as auditors for the ensuring year, and to authorize the directors to fix their remuneration.

The accompanying notice of annual and special meeting and Management Proxy Circular provide a full description of the Arrangement and include certain other information to assist you in considering how to vote. **You are urged to read this information carefully and, if you require assistance, to consult your financial or other professional advisor.**

Your vote is important regardless of the number of Africo common shares you own. If you are a Registered Shareholder, we encourage you to take the time now to complete, sign, date and return the enclosed form of proxy in accordance with the instructions set out therein and in the accompanying Circular so that your common shares can be voted at the meeting in accordance with your instructions. If you hold your shares through a broker, custodian, nominee or other intermediary, you should follow their instructions. In order to receive the cash that you are entitled to upon the implementation of the Arrangement, you must complete and sign the enclosed letter of transmittal and return it, together with your share certificate(s) and any other required documents and instruments to TSX Trust Company, in accordance with the procedures set out in the letter of transmittal. If the proposed Arrangement is not completed, share certificate(s) sent to the Depositary will be returned to you.

Subject to obtaining court approval and satisfying all other conditions of closing, including obtaining the approval of Shareholders, and Camrose obtaining a waiver from the lenders of its parent company, Eurasian Resources Group B.V., it is anticipated that the Arrangement will be completed in July 2016.

If you have any questions, please contact TSX Trust Company toll-free at 1(866)393-4891 ext. 205.

Yours truly,

*(Signed) Chris Theodoropoulos*
Chair of the Board, President and Chief Executive Officer

(This page has been left blank intentionally.)

**AFRICO RESOURCES LTD.**

**NOTICE OF ANNUAL AND SPECIAL MEETING OF SHAREHOLDERS**

**NOTICE IS HEREBY GIVEN** that an annual and special meeting (the “Meeting”) of the shareholders (“Shareholders”) of Africo Resources Ltd. (“Africo” or the “Company”) will be held at Suite 520, 800 West Pender Street, Vancouver, British Columbia at 9:00 a.m. (Vancouver time) on Wednesday, June 29, 2016 for the following purposes:

1. to consider, pursuant to an interim order of the Ontario Superior Court of Justice dated May 31, 2016, as the same may be amended (the “Interim Order”), and, if deemed advisable, to pass, with or without variation, a special resolution of the Shareholders (the “Arrangement Resolution”) to approve an arrangement (the “Arrangement”) under Section 192 of the Canada Business Corporations Act (the “CBCA”) involving, among other things, the acquisition by Camrose Resources Limited (“Camrose”) of all of the issued and outstanding common shares (the “Company Shares”) of Africo, other than any Company Shares owned by Camrose, for $1.00 in cash for each Company Share, all as more particularly described in the accompanying management proxy circular (the “Circular”);

2. to receive the audited consolidated financial statements of Africo for the year ended December 31, 2015, together with the report of the auditors thereon;

3. to elect the directors of the Company for the ensuing year;

4. to appoint PricewaterhouseCoopers LLP, Chartered Accountants as auditors for the ensuing year, and to authorize the directors to fix their remuneration; and

5. to transact such other business as may properly come before the Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on May 25, 2016 as the record date for determining Shareholders who are entitled to receive notice of and to vote at the Meeting. Only Shareholders of record at the close of business on May 25, 2016 are entitled to receive notice of the Meeting and to attend and vote at the Meeting. This Notice is accompanied by the Circular, a form of proxy and a letter of transmittal.

Whether or not you intend to attend the Meeting, if you are a registered Shareholder, you are requested to complete, sign, date and return the enclosed form of proxy for the Company Shares you own in the enclosed envelope to Africo Resources Ltd., c/o Computershare Investor Services Inc., 8th Floor, 100 University Avenue, Toronto, Ontario M5J 2Y1. Proxies must be received by no later than 9:00 a.m. (Vancouver time) on June 27, 2016 or, in the event that the Meeting is adjourned or postponed, 48 hours (excluding Saturdays, Sundays and holidays) before the date and time of any reconvened or postponed meeting. The time limit for the deposit of proxies may be waived by the Board of Directors at its discretion without notice. If you require assistance in completing your proxy, please call our transfer agent, Computershare Investor Services Inc., 8th Floor, 100 University Avenue, Toronto, Ontario M5J 2Y1 (facsimile numbers: within North America 1-866-249-7775; outside North America 1-416-263-9524).

Beneficial owners of Company Shares registered in the name of a broker, custodian, nominee or other intermediary should follow the instructions provided by your broker, custodian, nominee or other intermediary to vote your Company Shares.

Registered holders of Company Shares who validly dissent from the Arrangement will be entitled to be paid the fair value of their Company Shares, subject to strict compliance with Section 190 of the CBCA, as modified by the provisions of the Interim Order and the Plan of Arrangement. Failure to comply strictly with the requirements set forth in Section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement may result in the loss or unavailability of any right of dissent. This right is described in the Circular.

The Circular provides additional information relating to the matters to be dealt with at the Meeting and is deemed to form part of this Notice. Any adjourned or postponed meeting resulting from an adjournment or

postponement of the Meeting will be held at a time and place to be specified either by Africo before the Meeting or by the Chairman at the Meeting.

Dated at Vancouver, British Columbia on May 30, 2016.

By order of the Board of Directors,

*(Signed) Chris Theodoropoulos*
Chair of the Board, President and Chief Executive Officer

## TABLE OF CONTENTS


MANAGEMENT PROXY CIRCULAR ... 1

NOTICE TO SHAREHOLDERS IN THE UNITED STATES ... 1

CAUTIONARY STATEMENT REGARDING FORWARD LOOKING STATEMENTS ... 1

INFORMATION CONTAINED IN THIS CIRCULAR ... 2

VOTING ... 2

How a Vote is Passed ... 2
Who Can Vote? ... 3
Voting By Proxy ... 3
Non-Registered Shareholders ... 4

SUMMARY OF MANAGEMENT PROXY CIRCULAR ... 5

GLOSSARY OF TERMS ... 12

THE ARRANGEMENT ... 19

Background to the Arrangement ... 19
Recommendation of the Special Committee ... 20
Recommendation of the Board ... 20
Reasons for the Arrangement ... 21
Fairness Opinion ... 22
Required Shareholder Approval ... 23
Arrangement Mechanics ... 23
Interests of Executive Officers and Directors in the Arrangement ... 25
Intentions of Africo Directors and Executive Officers ... 26
Financing Arrangements ... 26
Stock Exchange De-Listing and Reporting Issuer Status ... 26
Effects on Africo if the Arrangement is Not Completed ... 26

THE ARRANGEMENT AGREEMENT ... 27

Conditions Precedent to the Arrangement ... 27
Representations and Warranties ... 29
Covenants of Africo ... 29
Covenants of Camrose ... 29
Non-Solicitation Covenants ... 29
Company Material Property Payment ... 30
Superior Proposals and Right to Match ... 31
Termination of the Arrangement Agreement ... 31

VOTING AGREEMENTS ... 32

PRINCIPAL LEGAL MATTERS ... 33

Court Approval of the Arrangement and Completion of the Arrangement ... 33
Canadian Securities Law Matters ... 33

DISSENT RIGHTS OF SHAREHOLDERS ... 34

CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS ... 36

EXPENSES OF THE ARRANGEMENT ... 40

INFORMATION CONCERNING CAMROSE .... 40

VOTING SHARES AND PRINCIPAL HOLDERS THEREOF .... 40

ANNUAL BUSINESS OF THE MEETING .... 41

FINANCIAL STATEMENTS .... 41
ELECTION OF DIRECTORS .... 41
APPOINTMENT OF THE AUDITOR .... 43

EXECUTIVE COMPENSATION .... 43

Compensation Discussion and Analysis .... 43
Performance Graph .... 45
Summary Compensation Table .... 46
Incentive Plan Awards .... 47
Termination and Change of Control Benefits .... 48
Director Compensation .... 51

SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS .... 53

Summary of the Company Stock Option Plan .... 53

AUDIT COMMITTEE .... 55

CORPORATE GOVERNANCE .... 55

OTHER INFORMATION .... 59

INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS .... 59
INTEREST OF CERTAIN PERSONS IN MATTERS TO BE ACTED ON AT THE MEETING .... 59
INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS .... 59
MANAGEMENT CONTRACTS .... 60
CEASE TRADE ORDERS AND CORPORATE BANKRUPTCY .... 60
PENALTIES AND SANCTIONS .... 60
PERSONAL BANKRUPTCY .... 61
OTHER MATTERS .... 61
MATTERS TO BE RAISED AT NEXT ANNUAL MEETING .... 61
ADDITIONAL INFORMATION .... 61

APPROVAL OF THE BOARD OF DIRECTORS .... 61

CONSENT OF PARADIGM CAPITAL INC. .... 62

APPENDIX "A" ARRANGEMENT RESOLUTION .... A-1

APPENDIX "B" PLAN OF ARRANGEMENT .... B-1

APPENDIX "C" PARADIGM FAIRNESS OPINION .... C-1

APPENDIX "D" SECTION 190 OF THE CBCA .... D-1

APPENDIX "E" INTERIM ORDER .... E-1

APPENDIX "F" NOTICE OF APPLICATION FOR FINAL ORDER .... F-1

APPENDIX "G" CHARTER OF THE AUDIT COMMITTEE .... G-1

# AFRICO RESOURCES LTD.

## MANAGEMENT PROXY CIRCULAR

This Circular is furnished in connection with the solicitation of proxies by and on behalf of the management of Africo Resources Ltd. ("Africo" or the "Company"). The accompanying form of proxy is for use at the Meeting and at any adjournment or postponement thereof and for the purposes set forth in the accompanying Notice of Meeting. A glossary of certain terms used in this Circular can be found on pages 12 to 18 of this Circular.

## NOTICE TO SHAREHOLDERS IN THE UNITED STATES

Africo is a company formed under the laws of Canada. The solicitation of proxies and the transactions contemplated in this Circular involve securities of a Canadian issuer and are being effected in accordance with Canadian corporate and Securities Laws. The proxy rules under the United States Securities Exchange Act of 1934, as amended, are not applicable to Africo or this solicitation and therefore this solicitation is not being effected in accordance with such U.S. securities laws. Shareholders should be aware that the disclosure requirements under Canadian laws may be different from such requirements under U.S. securities laws. Shareholders should also be aware that the requirements under Canadian laws may differ from requirements under United States corporate and securities laws relating to United States corporations.

The enforcement by investors of civil liabilities under U.S. securities laws may be affected adversely by the fact that Africo is organized under the laws of Canada, that its officers and directors are residents of Canada and that a substantial portion of its assets are located outside the United States. You may not be able to sue a Canadian company or its officers or directors in a Canadian court for violations of U.S. securities laws. It may be difficult to compel a Canadian company and its Affiliates to subject themselves to a judgment of a U.S. court.

THIS TRANSACTION HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER SECURITIES REGULATORY AUTHORITY NOR HAS ANY SECURITIES REGULATORY AUTHORITY PASSED UPON THE FAIRNESS OR MERITS OF THIS TRANSACTION OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## CAUTIONARY STATEMENT REGARDING FORWARD LOOKING STATEMENTS

Certain statements included herein constitute "forward looking statements". All statements, other than statements of historical fact, included in this Circular that address future activities, events, developments or financial performance, are forward looking statements. These forward looking statements can be identified by the use of forward looking words such as "may", "should", "will", "could", "expect", "intend", "plan", "estimate", "anticipate", "believe", "future" or "continue" or the negative thereof or similar variations. These forward-looking statements include (but are not limited to) statements and information concerning: payment of the Company Material Property Payment, the Arrangement; the timing for the implementation of the Arrangement and the potential benefits of the Arrangement; the likelihood of the Arrangement being completed; the statements made in, and based upon, the Paradigm Fairness Opinion; Shareholder approval and Court approval of the Arrangement; and other statements that are not historical facts. These forward looking statements are based on certain assumptions and analyses made by Africo and its management in light of their experiences and their perception of historical trends, current conditions and expected future developments, as well as other factors they believe are appropriate in the circumstances. Shareholders are cautioned not to put undue reliance on such forward looking statements, which are not a guarantee of performance and are subject to a number of uncertainties, assumptions and other factors, many of which are outside the control of Africo, that could cause actual results to differ materially from those expressed or implied by such forward looking statements. Factors that could cause the actual results to differ materially from those in forward-looking statements include market prices, exploitation and exploration success, continued

availability of capital and financing, inability to obtain required regulatory or governmental approvals and general economic, market or business conditions. Investors are cautioned that any such statements are not guarantees of future performance and actual results or developments may differ materially from those projected in the forward-looking statements. Such forward looking statements should, therefore, be construed in light of such factors. All forward looking statements are expressly qualified in their entirety by the cautionary statements set forth above. Readers of this Circular are cautioned not to place undue reliance on forward looking statements contained in this Circular, which reflect the analysis of the management of Africo, only as of the date of this Circular. This Circular should be read in conjunction with the unaudited financial statements of the Company for the three months ended March 31, 2016 and the associated management's discussion and analysis, both of which have been publicly filed by the Company and are available at www.sedar.com. Africo is under no obligation, and expressly disclaims any intention or obligation, to update or revise any forward looking statements, whether as a result of new information, future events or otherwise, except as required by applicable law.

## INFORMATION CONTAINED IN THIS CIRCULAR

Information contained in this Circular is given as of May 30, 2016, except as otherwise noted.

No Person has been authorized to give information or to make any representations in connection with the Arrangement other than those contained in this Circular and, if given or made, any such information or representations should not be relied upon in making a decision as to how to vote on the Arrangement Resolution, or be considered to have been authorized by Africo.

This Circular does not constitute an offer to buy, or a solicitation of an offer to sell, any securities, or the solicitation of a proxy, by any Person in any jurisdiction in which such offer or solicitation is not authorized or in which the Person making such offer or solicitation is not qualified to do so or to any Person to whom it is unlawful to make such offer or solicitation.

Shareholders should not construe the contents of this Circular as legal, tax or financial advice and should consult with their own professional advisors as to the relevant legal, tax, financial or other matters in connection herewith.

## VOTING

The Company is mailing this Circular in connection with the solicitation of proxies by and on behalf of management for use at the Meeting. The solicitation of proxies will be primarily by mail. Certain employees or directors of Africo may also solicit proxies by telephone or in person. The cost of solicitation will be borne by Africo.

Under Africo's by-laws, at least two persons must be present in person or represented by proxy, each being a Shareholder entitled to vote at the Meeting or a duly appointed proxy for an absent Shareholder so entitled, before any action may validly be taken at the Meeting. If such a quorum is not present in person or by proxy, the Company will reschedule the Meeting.

### How a Vote is Passed

Other than the Arrangement Resolution, all of the matters that are to be voted at the Meeting as described in the attached Notice of Meeting are ordinary resolutions and can be passed by a simple majority – that is, if more than half of the votes that are cast by Shareholders present in person or represented by proxy at the Meeting are in favour, then the resolution is approved.

Approval of the Arrangement Resolution will require the affirmative vote of at least two-thirds of the votes cast by Shareholders present in person or represented by proxy at the Meeting and by the affirmative vote of at least a majority of the votes cast by Minority Shareholders. See "The Arrangement — Required Shareholder Approval".

**Who Can Vote?**

If you are a registered Shareholder of Africo as at May 25, 2016, you are entitled to attend the Meeting and cast a vote for each Company Share registered in your name on all resolutions put before the Meeting. If the Company Shares are registered in the name of a corporation, a duly authorized officer of the corporation may attend on its behalf but documentation indicating such officer's authority should be presented at the Meeting. If you are a Registered Shareholder but do not wish to, or cannot, attend the Meeting in person you can appoint someone who will attend the Meeting and act as your proxyholder to vote in accordance with your instructions (see "Voting by Proxy" below). If your shares are registered in the name of a "nominee" (usually a bank, trust company, securities dealer or other financial institution) you should refer to the section entitled "Non-registered Shareholders" set out below.

Your vote is important regardless of the number of Africo common shares you own. If you are a registered shareholder, we encourage you to take the time now to complete, sign, date and return the enclosed form of proxy in accordance with the instructions set out therein and in the accompanying Circular so that your common shares can be voted at the Meeting in accordance with your instructions.

**Voting By Proxy**

If you do not attend the Meeting, you can still make your votes count by appointing a Person who will be there to act as your proxyholder. You can either tell that person how you want to vote or you can let your proxyholder decide for you. You can do this by completing a form of proxy.

Proxies must be received by no later than 9:00 a.m. (Vancouver time) on June 27, 2016 or, in the event that the Meeting is adjourned or postponed, 48 hours (excluding Saturdays, Sundays and holidays) before the date and time of any reconvened or postponed meeting. The time limit for the deposit of proxies may be waived by the Board of Directors at its discretion without notice. If you require assistance in completing your proxy, please call our transfer agent, Computershare Investor Services Inc., 8th Floor, 100 University Avenue, Toronto, Ontario, M5J 2Y1 (facsimile numbers: within North America 1-866-249-7775; outside North America 1-416-263-9524).

*What is a proxy?*

A form of proxy is a document that authorizes someone to attend the Meeting and cast your votes for you. We have enclosed a form of proxy with this Circular. You should use it to appoint a proxyholder, although you can also use any other legal form of proxy.

*Appointing a proxyholder*

**You can choose any individual to be your proxyholder.** It is not necessary for the person whom you choose to be a Shareholder of Africo. To make such an appointment, simply fill in the person's name in the blank space provided in the enclosed form of proxy. To vote your shares, your proxyholder must attend the Meeting. If you do not fill a name in the blank space in the enclosed form of proxy, the persons named in the form of proxy are appointed to act as your proxyholder. Those persons are directors and/or officers of Africo.

*Instructing your proxy*

You may indicate on your form of proxy how you wish your proxyholder to vote your shares. To do this, simply mark the appropriate boxes on the form of proxy. If you do this, your proxyholder must vote your shares in accordance with the instructions you have given.

If you do not give any instructions as to how to vote on a particular issue to be decided at the Meeting, your proxyholder can vote your shares as he or she thinks fit. If you have appointed the persons designated in the enclosed form of proxy as your proxyholder they will, unless you give contrary instructions, vote your shares at the Meeting as follows:

- FOR the Arrangement Resolution;
- FOR the election of the proposed nominees as directors;
- FOR the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor;
- FOR the resolution authorizing the Board of Directors to fix the auditor's remuneration.

For more information about these matters, see "Annual Business of the Meeting". The enclosed form of proxy gives the persons named on it the authority to use their discretion in voting on amendments or variations to matters identified on the Notice of Meeting. At the time of printing this Circular, the management of Africo is not aware of any other matter to be presented for action at the Meeting. If, however, other matters do properly come before the Meeting, the persons named on the enclosed form of proxy will vote on them in accordance with their best judgment, pursuant to the discretionary authority conferred by the form of proxy with respect to such matters.

*Changing your mind*

If you want to revoke your proxy after you have delivered it, you can do so at any time before it is used. You may do this by (a) attending the Meeting and voting in person; (b) signing a proxy bearing a later date; (c) signing a written statement which indicates, clearly, that you want to revoke your proxy and delivering this signed written statement to the registered office of Africo at Suite 530, 355 Burrard Street, Vancouver, British Columbia, V6C 2G8; or (d) in any other manner permitted by law.

Your proxy will only be revoked if a revocation is received by 5:00 p.m. (Vancouver time) on the last business day before the day of the Meeting, or any adjournment thereof, or delivered to the person presiding at the Meeting before it (or any adjournment) commences. If you revoke your proxy and do not replace it with another that is deposited with us before the deadline, you can still vote your shares but to do so you must attend the Meeting in person.

**Non-Registered Shareholders**

If your shares are not registered in your own name, they will be held in the name of a "nominee," usually a depository, bank, trust company, securities dealer or other financial institution and, as such, your nominee will be the entity legally entitled to vote your common shares and must seek your instructions as to how to vote your shares.

Accordingly, unless you have previously informed your nominee that you do not wish to receive material relating to shareholders' meetings, you will have received this Circular from your nominee, together with a form of proxy or a request for voting instruction form. If that is the case, **it is most important that you comply strictly with the instructions that have been given to you by your nominee on the form of proxy or voting instruction form**. If you have voted and wish to change your voting instructions, you should contact your nominee to discuss whether this is possible and what procedures you must follow.

If your shares are not registered in your own name, Africo's transfer agent will not have a record of your name and, as a result, unless your nominee has appointed you as a proxyholder, will have no knowledge of your entitlement to vote. If you wish to vote in person at the Meeting, therefore, please insert your own name in the space provided on the form of proxy or voting instruction form that you have received from your nominee. If you do this, you will be instructing your nominee to appoint you as proxyholder. Please adhere strictly to the signature and return instructions provided by your nominee. It is not necessary to complete the form in any other respect, since

you will be voting at the Meeting in person. Upon arrival at the Meeting, please register with the scrutineer at the Meeting.

The Notice of Meeting, this Circular and our audited consolidated financial statements and Management's Discussion and Analysis for the fiscal year ended December 31, 2015, are being sent to both registered and non-registered owners of common shares in the capital of Africo. If you are a non-registered owner and we have sent these materials to you directly, your name and address and information about your holdings of common shares of Africo have been obtained in accordance with applicable securities regulatory requirements from the nominee holding the securities on your behalf. By choosing to send these materials to you directly, Africo (and not your nominee) has assumed responsibility for (i) delivering these materials to you and (ii) executing your proper voting instructions. Please return your voting instructions as specified in the form of proxy or request for voting instructions form.

In accordance with National Instrument 54-101 – Communication With Beneficial Owners of Securities of a Reporting Issuer ("NI 54-101") of the Canadian Securities Administrators, Africo has elected to send proxy-related materials directly to non-objecting beneficial owners of its common shares. As Africo is unable to send proxy-related materials directly to the objecting beneficial owners ("OBOs") of its common shares (because OBOs are beneficial shareholders who have objected to the release of security ownership details to issuers), proxy-related materials for the Meeting will be sent to OBOs indirectly through the intermediaries who hold securities on behalf of the OBOs. The intermediaries/brokers (or their service companies) are responsible for forwarding the proxy-related materials to their OBO clients. Management of Africo does not intend to pay for intermediaries to forward to their OBO clients the proxy-related materials and Form 54-101F7 – Request for Voting Instructions Made by Intermediary under NI 54-101 and, as such, OBOs will not receive the proxy-related materials in connection with the Meeting unless such OBO's intermediary assumes the cost of delivery.

Africo has chosen to not use the notice-and-access delivery procedures provided by NI 54-101.

## SUMMARY OF MANAGEMENT PROXY CIRCULAR

*The following information is a summary of the contents of this Circular. This summary is provided for convenience only and the information contained in this summary should be read in conjunction with, and is qualified in its entirety by, the more detailed information appearing or referred to elsewhere in this Circular, including the Appendices. Certain capitalized words and terms used in this summary are defined in the Glossary of Terms. The full text of the Arrangement Agreement which is filed on SEDAR at www.sedar.com.*

### Meeting of Shareholders

The Meeting will be held on Wednesday, June 29, 2016 at Suite 520, 800 West Pender Street, Vancouver, British Columbia. At the Meeting, Shareholders will be asked to consider and, if deemed advisable, to pass the Arrangement Resolution. Shareholders of record at the close of business on May 25, 2016 will be entitled to receive notice of and to vote at the Meeting or any adjournment or postponement thereof.

In addition to the Arrangement, Shareholders at the Meeting will be asked to vote on the election of directors and to appoint PricewaterhouseCoopers LLP, Chartered Accountants as auditors for the ensuing year, and to authorize the directors to fix their remuneration.

### The Arrangement

If the Arrangement Resolution is approved by Shareholders and all of the other conditions to closing of the Arrangement are satisfied or waived, Camrose will acquire all of the outstanding Company Shares, other than Company Shares owned by Camrose, at a price per Company Share of $1.00 in cash. Each Option granted and outstanding immediately prior to the Effective Time (whether vested or unvested) shall be deemed to be unconditionally vested and exercisable and such Company Option shall, without any further action by or on behalf of the Company Optionholder be deemed to be assigned and transferred to the Company in exchange for (i) a cash

payment from the Company equal to the amount (if any) by which the Closing Payment Amount per Company Share exceeds the exercise price of such Company Option, less applicable withholdings, and (ii) in the event of a Change of Control of the Company Material Property, a right to receive a pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement. If the Arrangement Resolution is approved, the Arrangement will be implemented by way of a court approved plan of arrangement under the CBCA. See "The Arrangement". The Arrangement also provides that if a Change of Control of the Company Material Property is completed within 14 months following the Effective Date the Company will pay an additional aggregate amount of US$7.5 million to be divided among the number of Company Shares and Company Options immediately outstanding prior to the Effective Time (other than those held by Camrose). The additional amount, if paid, would be equal to approximately USD $0.27 per Company Share or Company Option.

**Recommendation of the Special Committee**

**The Special Committee has unanimously determined that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of Africo and has unanimously recommended that the Board approve the Arrangement and recommend that Shareholders vote in favour of the Arrangement Resolution.** See "The Arrangement — Recommendation of the Special Committee".

**Recommendation of the Board**

After careful consideration, the Board has unanimously (with Messrs. Cordero and Lauer abstaining) determined that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of Africo. **Accordingly, the Board has approved the Arrangement and unanimously recommends that Shareholders vote in favour of the Arrangement Resolution.** See "The Arrangement — Recommendation of the Board".

**Reasons for the Arrangement**

In the course of their evaluation of the Arrangement, the Special Committee and the Board consulted with Africo's senior management, legal counsel and financial advisors, and considered a number of factors in determining that the Arrangement is in the best interests of Africo and fair to the Shareholders, including the following:

- The consideration being offered to Shareholders under the Arrangement represents a premium of approximately 115% to the closing price of the Company Shares on the TSX on May 12, 2016, the trading day immediately prior to the announcement of the Arrangement.

- The Paradigm Fairness Opinion provided that as of May 11, 2016, subject to the limitations and assumptions set forth therein, the consideration of $1.00 in cash per Company Share to be received under the Arrangement is fair, from a financial point of view, to Shareholders other than Camrose. See "The Arrangement — Fairness Opinion".

- The consideration under the Arrangement is all cash, which provides certainty of value to Shareholders compared to a transaction in which Shareholders would receive all or part of the consideration in securities.

- That Shareholders and Optionholders may also receive an additional aggregate amount of USD $7.5 million if certain transactions, in respect of the Company's main Kalukundi project are completed within 14 months following the closing of the Arrangement with Camrose. The additional amount, if paid, would be equal to approximately USD $0.27 per Company Share or Company Option. See "The Arrangement – Company Material Property Payment".

- The terms of the Arrangement Agreement, including the fact that the Board remains able to respond, in accordance with its fiduciary duties, to unsolicited Acquisition Proposals that are or could reasonably be expected to lead to a Superior Proposal, and to engage in discussions with

certain persons as permitted by Camrose, and that there is no termination payment payable to Camrose in connection with a termination of the Arrangement Agreement.

- The required approvals are protective of the rights of Shareholders. The Arrangement Resolution must be approved by the affirmative vote of not less than two-thirds of the votes cast by Shareholders present in person or represented by proxy at the Meeting and by the affirmative vote of at least a majority of the votes cast by Minority Shareholders. The Arrangement must also be approved by the Court, which will consider, among other things, the fairness of the Arrangement to Shareholders.

- Registered Shareholders who oppose the Arrangement may, upon compliance with certain conditions, exercise their Dissent Rights and receive the fair value of their Company Shares.

- The unlikelihood of a competing offer for equal or greater consideration emerging.

- The liquidity in the Company Shares is limited. The Arrangement provides Minority Shareholders with a level of liquidity that may not otherwise be available.

In the course of its deliberations, the Special Committee and the Board also identified and considered a variety of risks, including but not limited to:

- The fact that Shareholders will not participate in any future earnings or growth of the Company.

- The conditions to Camrose's obligations to complete the Arrangement and the rights of Camrose to terminate the Arrangement Agreement in certain circumstances.

- The Arrangement will be a taxable transaction for Canadian federal income tax purposes (and may also be a taxable transaction under other applicable tax laws) and, as a result, Shareholders will generally be required to pay taxes on any gains that result from the receipt of the Consideration.

- The limitations contained in the Arrangement Agreement on the Company's ability to solicit additional interest from third parties.

The Special Committee and the Board believed that any possible adverse effects or risks were more than outweighed by the potential benefits of the Arrangement and therefore that the above factors, taken as a whole, supported its recommendation of the Arrangement.

See "The Arrangement — Reasons for the Arrangement".

**Fairness Opinion**

Paradigm has delivered an opinion to the Board to the effect that, as of May 11, 2016 and based upon certain analyses, assumptions, qualifications and limitations set forth therein, the consideration under the Arrangement is fair, from a financial point of view, to Shareholders other than Camrose.

The full text of the Paradigm Fairness Opinion, which sets forth, among other things, the assumptions made, information reviewed, matters considered and limitations on the scope of the review undertaken by Paradigm in rendering its opinion, is attached as Appendix "C" to this Circular. Shareholders are urged to read the Paradigm Fairness Opinion in its entirety. The summary of the Paradigm Fairness Opinion described in this Circular is qualified by reference to the full text of the Paradigm Fairness Opinion. The Paradigm Fairness Opinion was provided for the use of the Special Committee and the Board and may not be relied upon by any other person. Such opinion does not constitute a recommendation to any Shareholder as to how such Shareholder should vote on the Arrangement Resolution. See "The Arrangement — Fairness Opinion".

**Shareholder Approval Required for the Arrangement Resolution**

Approval of the Arrangement Resolution will require the affirmative vote of at least two-thirds of the votes cast by Shareholders present in person or represented by proxy at the Meeting and by the affirmative vote of at least a majority of the votes cast by Minority Shareholders. See "The Arrangement — Required Shareholder Approval".

**Non-Solicitation Covenants**

In the Arrangement Agreement, Africo has agreed not to, directly or indirectly, make, solicit, assist, initiate, knowingly encourage or otherwise knowingly facilitate (including by way of furnishing information) any inquiries, proposals or offers from any other Person relating to any Acquisition Proposal. Nonetheless, Africo is permitted to consider and accept an Acquisition Proposal under certain conditions, provided that Camrose shall have the opportunity, but not the obligation, to propose to amend the terms of the Arrangement Agreement within five days after receiving notice of the Superior Proposal so that the Acquisition Proposal is not a Superior Proposal compared to the terms of the Arrangement. In addition, the Parties have agreed that any discussions with persons identified in writing by Camrose shall not be considered to be a breach of the Arrangement Agreement. See "The Arrangement Agreement — Non-Solicitation Covenants".

**No Break Fee**

The Arrangement Agreement does not contain a break fee payable by either Africo or Camrose.

**Conditions to the Arrangement Becoming Effective**

The implementation of the Arrangement is subject to a number of conditions being satisfied or waived at or before the Effective Time, including, but not limited to, the following:

(a) the Arrangement Resolution shall have been approved by the affirmative vote of two-thirds of the votes cast by Shareholders present in person or by proxy at the Meeting and by the affirmative vote of at least a majority of the votes cast by Minority Shareholders;

(b) the Final Order shall have been obtained;

(c) performance in all material respects by Africo and Camrose of all covenants required to be performed under the Arrangement Agreement;

(d) that the representations and warranties of Africo and Camrose contained in the Arrangement Agreement are true and correct, in all material respects, as of the Effective Date (except, in the case of Africo, where the failure of such representations and warranties to be so true and correct do not have a Material Adverse Effect on Africo);

(e) no Company Material Adverse Effect shall have occurred;

(f) Camrose obtaining a waiver from the lenders of its parent company Eurasian Resources Group BV;

(g) Dissent Rights not having been exercised in respect of more than 5% of the Company Shares calculated on a fully-diluted basis; and

(h) the Company having no less than $29 million in Company Unrestricted Cash and no Debt.

See "The Arrangement Agreement – Conditions Precedent to the Arrangement".

**Termination of the Arrangement Agreement**

The Arrangement Agreement may be terminated in writing at any time prior to the Effective Time by mutual consent of Africo and Camrose. In addition, either Camrose or Africo may terminate the Arrangement Agreement and abandon the Arrangement at any time prior to the Effective Time in certain specified circumstances. See “The Arrangement Agreement — Termination of the Arrangement Agreement”.

**The Voting Agreements**

Certain shareholders (the “Locked-Up Shareholders”), holding as a group on the date hereof approximately 28% of the issued and outstanding Company Shares (and 77% of the outstanding Company Shares held by the minority Shareholders) have entered into Voting Agreements pursuant to which the Locked-Up Shareholders have agreed to, among other things, vote all of the Company Shares owned by them in favour of the Arrangement Resolution.

The Voting Agreements may be terminated in certain specified circumstances including if the Arrangement Agreement is terminated in accordance with its terms. See “The Voting Agreements”.

**Dissent Rights of Shareholders**

Registered Shareholders are entitled to exercise Dissent Rights by providing a Dissent Notice to Africo at or before 5:00 p.m. (Vancouver time) on the Business Day that is two Business Days prior to the date of the Meeting (or on the Business Day that is two Business Days immediately preceding any adjourned or postponed Meeting) in the manner described under the heading “Dissent Rights of Shareholders”.

If the Arrangement is completed, Dissenting Shareholders are entitled to be paid the “fair value” of the Dissent Shares determined as of the close of business on the day immediately preceding the Meeting, and will not be entitled to any other payment or consideration. There can be no assurance that a Dissenting Shareholder will receive consideration of equal value to the Consideration per Company Share that he or she would have received upon completion of the Arrangement. Only Registered Shareholders are entitled to dissent. Shareholders should carefully read the section entitled “Dissent Rights of Shareholders” if they wish to exercise Dissent Rights. Failure to comply strictly with the dissent procedures described in this Circular may result in the loss or unavailability of any right of dissent. It is a condition of the Arrangement that Dissent Rights not be exercised in respect of more than 5% of the Company Shares calculated on a fully-diluted basis.

**The Companies**

Africo is a reporting issuer in the provinces of British Columbia, Alberta, Ontario and Quebec. The Company Shares trade on the TSX under the symbol “ARL”. Africo is an exploration company that is focused on the further exploration and development of the Kalukundi Property located in the Democratic Republic of the Congo.

Camrose is a wholly-owned subsidiary of Eurasian Resources Group B.V. (“ERG”), previously known as Eurasian Natural Resources Corporation. Camrose is the Company’s largest shareholder, and as at the date hereof owns of record or beneficially, directly or indirectly, or exercises control or direction over approximately 63.7% of Africo’s outstanding common shares.

**Certain Canadian Federal Income Tax Considerations**

A Shareholder who, for the purposes of the Tax Act, is resident in Canada and holds the Company Shares as capital property will generally realize a capital gain (or a capital loss) on the transfer of the Company Shares to Camrose for cash under the Arrangement.

A Shareholder who is not resident in Canada for purposes of the Tax Act will generally not be subject to tax under the Tax Act on any capital gain realized on the disposition of the Company Shares under the Arrangement,

unless the Company Shares are "taxable Canadian property" of such Shareholder within the meaning of the Tax Act, and the capital gain is not otherwise exempt from tax under the Tax Act pursuant to the provisions of an applicable income tax treaty between Canada and the country in which such Shareholder is resident.

For a discussion of the tax treatment of the Company Material Property Payment amount see "Certain Canadian Federal Income Tax Considerations". The right to receive the Company Material Property Payment likely will not be considered a qualified investment for trusts governed by a registered retirement savings plans, registered retirement income funds, registered education savings plans ("**RESP**"), deferred profit sharing plans, registered disability savings plans or tax-free savings accounts (collectively, the "**Deferred Plans**"). **Shareholders are urged to consult with their own tax advisors in this regard.**

The foregoing is a brief summary of certain Canadian federal income tax considerations relating to the Arrangement that may be applicable to Shareholders. Shareholders should read carefully the information under "Certain Canadian Federal Income Tax Considerations", which qualifies the summary set out above. Shareholders are urged to consult their own tax advisors to determine the tax consequences to them of the Arrangement in their particular circumstances.

**Deposit of Share Certificates**

The Letter of Transmittal sent to Registered Shareholders with this Circular sets out the details of the procedures to be followed by each Registered Shareholder for delivering the share certificate(s) held by such Registered Shareholder to the Depositary. If the Arrangement is not completed, the Letter of Transmittal will be of no effect and Africo will cause the Depositary to return all deposited share certificate(s) to the registered holders thereof as soon as possible. Shareholders owning Company Shares that are registered in the name of an intermediary must contact their intermediary to arrange for the surrender of their Company Shares.

Provided that a Registered Shareholder has presented and surrendered share certificate(s) to the Depositary, together with such other documents and instruments as Camrose or the Depositary may reasonably require, as set forth in the Letter of Transmittal, as soon as practicable following the Effective Date, Camrose will cause a cheque: (a) to be sent to such Registered Shareholder representing the Consideration for each Company Share sold pursuant to the Arrangement; or (b) to be made available at the offices of the Depositary at 200 University Ave Suite 300, Toronto, ON M5H 4H1 for pick-up by the Registered Shareholder as requested by the Registered Shareholder in the Letter of Transmittal.

If a Registered Shareholder fails to present and surrender the share certificate(s) held by such Registered Shareholder in accordance with the Letter of Transmittal, such Registered Shareholder will not be entitled to receive a cheque (or wire transfer, as applicable) representing the proceeds payable to that Registered Shareholder until the Registered Shareholder delivers such share certificate(s) to the Depositary. Under no circumstances will interest be paid by Camrose, Africo or the Depositary on any outstanding amounts of money owed to a Shareholder.

If a Registered Shareholder fails to present and surrender a share certificate which, prior to the Effective Date, represented issued and outstanding Company Shares on or before the sixth anniversary of the Effective Date, the interest of the Registered Shareholder in any Consideration evidenced by the share certificate shall be terminated.

Non-Registered Holders whose Company Shares are registered in the name of a broker, investment dealer, bank, trust company or other nominee should contact that nominee for instructions and assistance in depositing those Company Shares.

See "The Arrangement – Arrangement Mechanics – Letter of Transmittal", "The Arrangement – Arrangement Mechanics – Deposit of Share Certificates" and "The Arrangement – Arrangement Mechanics – Delivery of Consideration for Company Shares and Options".

**Non-Registered Shareholders**

Should a Non-Registered Holder who receives either a proxy or a voting instruction form wish to attend and vote at the Meeting in person (or have another Person attend and vote on behalf of the Non-Registered Holder), the Non-Registered Holder should strike out the names of the Persons named in the applicable proxy and insert the Non-Registered Holder's (or such other Person's) name in the blank space provided or, in the case of the voting instruction form, follow the corresponding instruction on the form. In either case, Non-Registered Holders should carefully follow the instructions of their intermediaries and their service companies. See "Non-Registered Shareholders".

## GLOSSARY OF TERMS

The following glossary of terms used in this Circular, including the Summary, but not including the Appendices, is provided for ease of reference. Unless otherwise specified, all references to "$" or "dollars" are to Canadian dollars

"**143**" means 143 Investments Ltd.

"**Acquisition Proposal**" means, other than the transactions contemplated by the Arrangement Agreement, any *bona fide* offer, proposal or inquiry from any Person or group of Persons, after the date hereof relating to: (a) any acquisition or purchase, direct or indirect, of the assets of the Company and/or one or more of its Subsidiaries that, individually or in the aggregate, constitute 25% or more of the consolidated assets of the Company and its Subsidiaries, taken as a whole, or which contribute 25% or more of the consolidated revenues of the Company and its Subsidiaries, taken as a whole; (b) any take-over bid, tender offer or exchange offer that, if consummated, would result in any Person, or group of Persons or shareholders of the Company beneficially owning 25% or more of any class of voting or equity securities of the Company; or (c) a plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving the Company and/or any of its Subsidiaries whose assets or revenues, individually or in the aggregate, constitute 25% or more of the consolidated assets or revenues, as applicable, of the Company and its Subsidiaries, taken as a whole.

"**Affiliate**" has the meaning ascribed to "affiliate" in the Securities Act.

"**Arrangement**" means the arrangement involving Africo and Camrose under the provisions of Section 192 of the CBCA, on the terms and conditions set forth in the Plan of Arrangement.

"**Arrangement Agreement**" means the arrangement agreement between Africo and Camrose dated as of May 13, 2016 and any amendments thereto made in accordance with such agreement.

"**Arrangement Resolution**" means the special resolution of the Shareholders approving the Arrangement to be considered at the Meeting.

"**Articles of Arrangement**" means the articles of arrangement of Africo in respect of the Arrangement, to be filed with the Director after the Final Order is made.

"**Associate**" has the meaning ascribed to "associate" in the Securities Act.

"**Black Out Expiration Term**" has the meaning attributed to it under "Securities Reserved for Issuance Under Equity Compensation Plans — Summary of the Company Stock Option Plan".

"**Board**" or **"Board of Directors"** means the board of directors of Africo.

"**Bonus Plan**" has the meaning attributed to it in "Executive Compensation — Compensation Process".

"**Business Day**" means any day, other than a Saturday, a Sunday or a statutory or civic holiday in Toronto, Ontario or Vancouver, British Columbia.

"**CBCA**" means the *Canada Business Corporations Act* and the regulations made thereunder, as promulgated or amended from time to time.

"**CDS**" means CDS Clearing and Depository Services Inc.

"**Change of Control of the Company Material Property**" means any transaction that is completed within 14 months following the Effective Date that would result in: (a) an acquisition or purchase, direct or indirect, by any Person or group of Persons (other than by Eurasian Resources Group Sarl or its affiliates), of equal to or greater than

41% of the voting securities of Africo Resources (DRC) sprl or greater than 50% of the Company's interest in Swanmines SAS; (b) a disposition pursuant to which Camrose, Africo Resources (DRC) sprl, or Swanmines SAS, directly or indirectly, dispose of equal to or greater than 41% of the assets comprising the Company Material Property; or (c) a plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution, joint venture or other similar transaction involving Camrose, Africo Resources (DRC) sprl, or Swanmines SAS and, after giving effect to such plan of arrangement, merger, amalgamation, consolidation, share exchange, business combination, reorganization, recapitalization, liquidation, dissolution, joint venture or other similar transaction, Camrose and its affiliates and related parties holding voting securities of Africo Resources (DRC) sprl, or Swanmines SAS immediately after such transaction owning less than, directly or indirectly, 59% of the aggregate voting power of the controlling or resulting entity of such transaction (excluding any voting power that is held, directly or indirectly, by GCM); provided, however, the foregoing shall not include: (i) any restructuring of Eurasian Resources Group Sarl, Eurasian Resources Group B.V. or Camrose or any of its affiliates; (ii) any change in ownership in connection with the enforcement of any security granted by Eurasian Resources Group Sarl, Eurasian Resources Group B.V. or Camrose or any of their affiliates in connection with any loan arrangements provided, issued or arranged by JSC VTB Bank or Sberbank of Russia or their respective affiliates; or (iii) any change in ownership as a result of an acquisition, disposition or expropriation by a Governmental Entity or entity controlled by a Governmental Entity.

"**Circular**" means this management proxy circular of Africo, including the Notice of Meeting and all schedules, appendices and exhibits hereto.

"**Closing Payment Amount**" means $1.00 per Company Share (other than those held by Camrose).

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act and, in accordance with the Competition Act, includes a Person authorized by the Commissioner.

"**Company**" or "**Africo**" means Africo Resources Ltd.

"**Company Disclosure Letter**" means the disclosure letter executed by the Company and delivered to Camrose prior to execution of the Arrangement Agreement.

"**Company Material Adverse Effect**" means any change, effect, event, occurrence or state of fact that, individually or in the aggregate that is, or would reasonably be expected to be, material and adverse to (i) the assets, liabilities (whether absolute, accrued, conditional or otherwise, business, operations, results of operations, or financial condition of the Company and its Subsidiaries taken as a whole, or (ii) the continued ownership of the Company Material Property, other than any change, effect, event, occurrence or state of fact resulting from (i) the execution or announcement of the execution of the Arrangement Agreement or the transactions contemplated hereby or the performance of any obligation hereunder, (ii) changes or developments in financial, economic or political conditions or securities, credit, financial, banking or currency markets in general, (iii) changes affecting the industry and markets in which the Company and its Subsidiaries operate, (iv) any natural disaster or any climatic or other natural events or conditions, (v) any change or proposed change in applicable Law, regulations or IFRS or the interpretation thereof, (vi) any outbreak or escalation of hostilities declared or undeclared acts of war or terrorism, or (vii) any action taken by the Company that is permitted under the Arrangement Agreement or that was undertaken with the consent of Camrose, provided however that such change, effect, event, occurrence or state of fact referred to in clauses (ii), (iii), (iv), (v) or (vi) do not disproportionately adversely affect the Company and its Subsidiaries, taken as a whole, compared to other persons operating in the same industry as the Company and its Subsidiaries.

"**Company Material Property**" means the Company's 75% interest in the Kalukundi copper-cobalt project located in the Mutshatsha Territory of the Katanga Province in the Democratic Republic of Congo (and in particular the exploitation permit PE591, held by Swanmines SAS), which interest is held through the Company's ownership in Swanmines SAS (itself a joint venture entity in which the Company has a 75% interest and the remaining 25% interest is held by GCM).

"**Company Material Property Payment**" means US$7.5 million divided by the number of Company Shares and Options outstanding immediately prior to the Effective Time (other than those held by Camrose).

"**Company Optionholder**" means holders of Company Options.

"**Company Options**" or "**Options**" means the outstanding options to purchase Company Shares granted under the Company Stock Option Plan;

"**Company Shares**" means the common shares in the capital of Africo.

"**Company Shareholders**" or "**Shareholders**" means the holders of Company Shares.

"**Company Stock Option Plan**" means the stock option plan of the Company as described in "Securities Reserved for Issuance Under Equity Compensation Plans".

"**Company Stock Option Plan Reserve**" has the meaning attributed to it under "Securities Reserved for Issuance Under Equity Compensation Plans — Summary of the Company Stock Option Plan"

"**Company Unrestricted Cash**" means the Company's cash in the form of immediately available funds and will be calculated as immediately available funds after the loan to be provided to Camrose pursuant under the Arrangement, plus any consolidated accounts receivable and prepayments, less any consolidated liabilities (but excluding any accounts payable to Comide S.P.R.L.), less any potential payments required pursuant to subsection 7.4(c) of the Arrangement Agreement and set forth in the Company Disclosure Letter, and less any accrued liabilities to the Company's advisers and other costs incurred by the Company but not recorded up to Effective Time (for purposes of calculating such amount, the Company accounting principles as well as elected treatment of any assets and liabilities are to remain unchanged and equivalent to treatment applied for the preparation of the balance sheet as per December 31, 2015).

"**Consideration**" means the consideration to be received by the Company Shareholders and Option Holders other than Camrose pursuant to the Plan of Arrangement in exchange for their Company Shares or the cancellation of Options, being the Closing Payment Amount together with the Company Material Property Payment in the event a Change of Control of the Company Material Property.

"**Court**" means the Ontario Superior Court of Justice (Commercial List);

"**CRA**" means the Canada Revenue Agency.

"**Debt**" means all obligations, liabilities and indebtedness that would, in accordance with IFRS, be classified as debt on a balance sheet, other than (a) liabilities and obligations that are specifically presented on the audited balance sheet of the Company Balance Sheet or disclosed in the notes thereto: or (b) liabilities and obligations incurred in the ordinary course of business consistent with past practice since December 31, 2015; (c) liabilities and obligations owing to Camrose and its related entity Comide S.P.R.L.

"**Demand for Payment**" means a written notice containing a Dissenting Shareholder's name and address, the number Company Shares in respect of which that Dissenting Shareholder dissents, and a demand for payment of the fair value of such shares.

"**Depositary**" means TSX Trust Company.

"**Director**" means the Director appointed pursuant to Section 260 of the CBCA.

"**Dissent Notice**" means a written objection to the Arrangement Resolution provided by a Dissenting Shareholder in accordance with the Dissent Procedure.

"**Dissent Procedure**" means the procedure under section 190 of the CBCA (a copy of which is attached at Appendix "D"), as modified by the Interim Order and the Plan of Arrangement, by which a Dissenting Shareholder must exercise its Dissent Rights.

“**Dissent Provisions**” means Section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement.

“**Dissent Rights**” means the right of a Registered Shareholder pursuant to section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement, to dissent from the Arrangement Resolution and to be paid the fair value of the Company Shares in respect of which the Registered Shareholder dissents, all in accordance with section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement, as described under “Dissent Rights of Shareholders”.

“**Dissent Shares**” means those Company Shares in respect of which Dissent Rights have validly been exercised by the registered holders thereof in accordance with the Dissent Procedure.

“**Dissenting Shareholders**” means Registered Shareholders who have duly exercised their Dissent Rights and have not withdrawn or been deemed to have withdrawn such exercise of Dissent Rights, but only in respect of the Dissent Shares, and “**Dissenting Shareholder**” means any one of them.

“**DRC**” means Democratic Republic of the Congo.

“**Effective Date**” means the date the Arrangement is effective as established by the date shown on the certificate of arrangement issued pursuant to the CBCA.

“**Effective Time**” has the meaning ascribed thereto in the Plan of Arrangement.

“**ENRC**” means Eurasian Natural Resources Corporation plc.

“**ENRC Congo**” means ENRC Congo BV

“**ERG**” means Eurasian Resources Group B.V.

“**Final Order**” means the order of the Court under Section 192 of the CBCA approving the Arrangement, as such order may be amended by the Court at any time prior to the Effective Date or, if appealed, then, unless such appeal is withdrawn or denied, as affirmed on appeal.

“**Governmental Entity**” means: (a) any multinational, federal, provincial, territorial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, ministry bureau, agency or entity, domestic or foreign; (b) any stock exchange, including the TSX; (c) any subdivision, agent, commission, board or authority of any of the foregoing; or (d) any quasi-governmental or private body, including any tribunal, commission, regulatory agency or self-regulatory organization, exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

“**IFRS**” means International Financial Reporting Standards.

“**Interim Order**” means the interim order of the Court dated May 31, 2016 providing for, among other things, the holding of the Meeting, attached as Appendix “E” hereto, as such order may be amended, modified, supplemented or varied by the Court.

“**Intermediary**” means an intermediary with which a Non-Registered Holder deals with in respect of the Company Shares, including, among others, banks, trust companies, securities dealers or brokers and trustees or administrators of self-administered registered retirement savings plans, registered retirement income funds, registered education savings plans and similar plans.

“**Law**” or “**Laws**” means all laws (including common law), by-laws, statutes, rules, regulations, principles of law and equity, orders, rulings, ordinances, judgements, injunctions, determinations, awards, decrees or other requirements, whether domestic or foreign, and the terms and conditions of any Permit of or from any Governmental

Entity or self-regulatory authority (including the TSX), and the term "**applicable**" with respect to such Laws and in a context that refers to a Party, means such Laws as are applicable to such Party and/or its Subsidiaries or their business, undertaking, property or securities and emanate from a Person having jurisdiction over the Party and/or its Subsidiaries or its or their business, undertaking, property or securities.

"**Letter of Transmittal**" means the letter of transmittal to be sent to holders of Company Shares for use in connection with the Arrangement.

"**Lien**" has the meaning attributed to it in the Plan of Arrangement.

"**LMO**" has the meaning attributed to it in "Executive Compensation – Termination and Change of Control Benefits"

"**Locked-Up Shareholders**" means those Shareholders that have entered into Voting Agreements with Camrose.

"**Meeting**" means the annual and special meeting of the Shareholders, including any adjournment or postponement thereof, to be called pursuant to the Interim Order for the purpose of considering and, if deemed advisable, approving, among other things, the Arrangement Resolution.

"**Meeting Materials**" means the Notice of Meeting, the Circular, the form of proxy and the Letter of Transmittal.

**"MI 61-101"** means Multilateral Instrument 61-101 - *Protection of Minority Security Holders in Special Transactions* of the Canadian Securities Administrators.

"**Minority Shareholders**" means all of the Company Shareholders other than: (i) Camrose; (ii) any other "related party" of Camrose within the meaning of MI 61-101, subject to the exceptions set out therein; and (iii) any person acting jointly or in concert with any of the foregoing in respect of the Arrangement.

**"Named Executive Officers"** has the meaning attributed to it in "Executive Compensation — Compensation Discussion and Analysis".

"**NI 45-106**" means National Instrument 45-106 – *Prospectus Exempt Distributions*

"**NI 54-101**" means National Instrument 54-101 – *Communication With Beneficial Owners of Securities of a Reporting Issuer*

"**Non-Registered Holder**" means a non-registered holder of Company Shares.

"**Non-Resident Dissenter**" means a Non-Resident Shareholder who validly exercises Dissent Rights and consequently is paid the fair value of the Dissent Shares in accordance with the Plan of Arrangement.

"**Non-Resident Shareholder**" means a Shareholder who, for the purposes of the Tax Act and at all relevant times, is not resident or deemed to be resident in Canada and does not use or hold and is not deemed to use or hold Company Shares in connection with carrying on a business in Canada.

"**Notice of Appearance**" means the notice which must be filed by any Shareholder who wishes to appear, or to be represented, and to present evidence at the hearing in respect of the Final Order as set out in the Notice of Application for the Final Order.

"**Notice of Meeting**" means the Notice of annual and special meeting of Shareholders of Africo dated April 29 2016.

"**Offer to Pay**" means a written offer of Camrose to each Dissenting Shareholder to pay the fair value for the number of Company Shares in respect of which that Dissenting Shareholder dissents.

"**Okada Agreement**" has the meaning attributed to it in "Executive Compensation – Termination and Change of Control Benefits"

"**Optionholder**" means a holder of Company Options.

"**Outside Date**" means September 30, 2016, or such later date as may be agreed to in writing by the Parties.

"**Paradigm**" means Paradigm Capital Inc.

"**Paradigm Fairness Opinion**" means the opinion of Paradigm, a complete copy of which is attached hereto as Appendix "C".

**"Parties"** means Africo and Camrose; and "Party" means any of them.

"**Permit**" means any license, permit, certificate, consent, order, grant, approval, agreement, classification, restriction, registration or other Authorization of, from or required by any Governmental Entity.

"**Permitted Persons**" shall have the meaning attributed to it in the Arrangement Agreement.

"**Person**" includes an individual, partnership, association, body corporate, trustee, executor, administrator, legal representative, government (including any Governmental Entity) or any other entity, whether or not having legal status.

"**Plan of Arrangement**" means the plan of arrangement in respect of the Arrangement attached as Appendix "B" hereto and any amendments thereto.

"**Qualified Successor**" has the meaning attributed to it under "Securities Reserved for Issuance Under Equity Compensation Plans — Summary of the Company Stock Option Plan"

**"Record Date"** means May 25, 2016.

"**Registered Shareholder**" means a holder of Company Shares whose name appears in the register of holders of Company Shares maintained by or on behalf of the Company.

"**Reorganization**" has the meaning attributed to it under "Securities Reserved for Issuance Under Equity Compensation Plans — Summary of the Company Stock Option Plan"

"**Resident Dissenter**" means a Resident Shareholder who validly exercises Dissent Rights and consequently is paid the fair value of the Dissent Shares in accordance with the Plan of Arrangement.

"**Resident Shareholder**" means a Shareholder who, for purposes of the Tax Act and at all relevant time, is or is deemed to be a resident in Canada.

"**Securities Act**" means the *Securities Act* (Ontario) and the rules, regulations and published policies made thereunder, as now in effect and as they may be promulgated or amended from time to time.

"**Securities Laws**" means the Securities Act, together with all other applicable state, federal and provincial securities Laws, rules and regulations and published policies thereunder, as now in effect and as they may be promulgated or amended from time to time.

"**SEDAR**" means the System for Electronic Document Analysis and Retrieval of the Canadian Securities Administrators.

"**Superior Proposal**" means a *bona fide* written Acquisition Proposal made by a third party to the Company or its shareholders in writing after May 13, 2016, in respect of which the Board determines in good faith (after receipt of

advice from its outside legal counsel and financial advisors that such Acquisition Proposal would, taking into account all of the terms and conditions of such Acquisition Proposal (including the likelihood that such Acquisition Proposal will be approved by a majority of the shareholders of the Company), if consummated in accordance with its terms (but not assuming away any risk of non-completion), result in a transaction more favourable to its shareholders from a financial point of view than the Arrangement (including any adjustment to the terms and conditions of the Arrangement proposed by Camrose pursuant to the Arrangement Agreement.

"**Special Committee**" means the independent committee of the Board established to consider and make recommendations to the Board regarding the Arrangement.

"**Subsidiary**" has the meaning ascribed thereto in NI 45-106;

"**Tax**" means all federal, state, provincial, territorial, county, municipal, local or foreign taxes, duties, imposts, levies, assessments, tariffs and other charges imposed, assessed or collected by a Governmental Entity including, (i) any gross income, net income, gross receipts, business, royalty, capital, capital gains, goods and services, value added, severance, stamp, franchise, occupation, premium, capital stock, sales and use, real property, land transfer, personal property, ad valorem, transfer, licence, profits, windfall profits, environmental, payroll, employment, employer health, pension plan, anti-dumping, countervail, excise, severance, stamp, occupation, or premium tax, (ii) all withholdings on amounts paid to or by the relevant person, (iii) all employment insurance premiums, Canada, Québec and any other government pension plan contributions or premiums, (iv) any fine, penalty, interest, or addition to tax, (v) any tax imposed, assessed, or collected or payable pursuant to any tax-sharing agreement or any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee, and (vi) any liability for any of the foregoing as a transferee, successor, guarantor, or by contract or by operation of law.

"**Tax Act**" means the *Income Tax Act* (Canada), as amended.

"**Tax Indemnity Agreements**" means the tax indemnity agreements entered into between holders of Company Options and Camrose with respect to certain tax matters.

"**Tax Returns**" means all reports, forms, elections, designations, schedules, statements, estimates, declarations of estimated tax, information statements and Tax Returns relating to, or required to be filed with any Governmental Entity in connection with, any Taxes and including any other filings relating to Taxes whether in tangible or electronic form.

"**taxable capital gain**" means one half of the amount of any capital gain.

"**Transfer Agent**" means Computershare Investor Services Inc.

"**Theodoropoulos Agreement**" has the meaning attributed to it in "Executive Compensation – Termination and Change of Control Benefits"

"**TSX**" means the Toronto Stock Exchange.

"**Voting Agreements**" means the lock-up agreements among the Locked-Up Shareholders and Carmose, dated May 13, 2016.

# THE ARRANGEMENT

## Background to the Arrangement

The Arrangement is the result of arm's-length negotiations conducted between the Chairman of the Board, members of the Special Committee and their legal representatives, and representatives of Camrose and their legal representatives.

In July 2015 representatives of Camrose initiated discussions with the Company on the possibility of Camrose proposing a transaction to Africo. Throughout these discussions, Camrose emphasized that a formal proposal to Africo would be premised on Camrose being certain that such a proposal would be supported by the Board. On July 23, 2015, the Company received a non-binding proposal from Camrose indicating a desire to sell Camrose's 45,400,000 Company Shares to the Company in exchange for the Company's assets in the Democratic Republic of Congo and US$32 million in cash.

The Board convened numerous meetings to consider Camrose's proposal, and the various alternatives available to the Company, ultimately leading to the formation of the Special Committee consisting of George Ireland and James Cook on August 20, 2015. The Special Committee, along with management, was mandated to work with Camrose to enhance shareholder value and to find ways to lessen the discount in the trading price of the Company Shares versus the cash per share in Africo's treasury.

On September 23, 2015, the Company received a revised non-binding expression of interest from Camrose, this time proposing to sell Camrose's 45,400,000 Company Shares to the Company in exchange for the Company's assets in the Democratic Republic of Congo and $30.8 million in cash, subject to completion of satisfactory due diligence, the negotiation of mutually acceptable transaction documents and entry into an appropriate exclusivity arrangement that would cover the period required to completed due diligence and enter into a definitive agreement.

The Special Committee met to consider the revised Camrose proposal and the engagement of Stikeman Elliott LLP as legal advisors, and Paradigm as financial advisors, to assist the Special Committee during the transaction process. The Special Committee recommended that the Company agree to negotiate exclusively with Camrose, and on September 25, the Company and Camrose entered into an exclusivity agreement providing that the Company would exclusively negotiate a potential transaction with Camrose until October 29, 2015.

In the ensuing weeks, Camrose conducted its due diligence in respect of the Company and began to negotiate a potential transaction. The discussions between Africo and Camrose on the structure of a transaction also shifted away from a sale of the Company's assets and towards a potential transaction to privatize the Company.

Camrose and Africo were not able to agree on a potential transaction prior to the end of the exclusivity period, and the parties agreed to suspend their negotiations.

In the first quarter of 2016, the members of the Special Committee continued to discuss the Company's options for a potential transaction to enhance shareholder value. In this regard, during the week of April 3, 2016 the Chairman of the Board had a number of meetings with Edward Lauer, a director of Africo and an employee of ERG, and another representative of ERG, to work out certain parameters for a potential privatization transaction, subject to completion of satisfactory due diligence and the negotiation of mutually acceptable transaction documents. This culminated in Camrose providing the Company with another non-binding expression of interest on April 12, 2016. The Special Committee met to consider the Camrose proposal and advised the Board that certain structural elements of the Camrose proposal would need to be further revised in order to receive the Special Committee's support. As a result of further discussions between Camrose and Africo, Camrose revised its non-binding expression of interest on April 18, 2016.

The Special Committee held a meeting on April 19, 2016, with the Chairman of the Board and its legal advisors, to discuss Camrose's revised proposal. As a result of these discussions, the Special Committee determined that the revised proposal was a satisfactory basis on which to continue negotiations on a privatization transaction, and for the Special Commitee's legal advisors to commence negotiating the definitive transaction agreements. The

Special Committee also contacted Paradigm, its financial advisor, to assist in evaluating the revised Camrose proposal. On April 20, 2016, Africo notified Camrose that it was prepared to continue negotiations on a privatization transaction.

In the ensuing weeks, representatives of the Special Committee and Africo negotiated the transaction agreements. Camrose also resumed its due diligence investigations of the Company. On May 6, 2016, Paradigm made a detailed presentation to the Special Committee and the Chairman of the Board. Among other things, Paradigm advised the Special Committee that as at the date thereof, the consideration of $1.00 per share under the Arrangement was fair, from a financial point of view, to Shareholders other than Camrose. The advice of Paradigm was not premised on the Company making the additional Company Material Property Payment. The Special Committee's legal advisors also provided an update on the negotiation of the definitive transaction agreements.

In the afternoon of May 11, 2016, the Special Committee met to advise the Chairman of the Board and receive a presentation from Paradigm where, among other things, Paradigm advised the Special Committee that, based upon certain assumptions, qualifications and limitations, and in its opinion, as at the date thereof, the consideration of $1.00 per share under the Arrangement was fair, from a financial point of view, to Shareholders other than Camrose. The opinion of Paradigm was not premised on the Company making the additional Company Material Property Payment. Paradigm undertook to formalize its advice concerning the fairness, from a financial point of view, of the consideration to be received under the Arrangement in the written Paradigm Fairness Opinion. The Company's legal advisors then led the meeting through a discussion on the negotiated form of the arrangement agreement and other documents ancillary to the Arrangement. After a discussion, based in part on the financial advice of Paradigm as well as numerous other factors including those set forth below under the heading "Reasons for the Arrangement", the Special Committee concluded that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of the Company, and resolved to recommend to the Board that it approve the Arrangement and recommend to Shareholders that they vote in favour of the Arrangement Resolution.

Later in the day on May 11, 2016, the Board met to consider the draft Arrangement Agreement and to receive the report and the recommendation of the Special Committee with respect to the proposed transaction and the reasons supporting such recommendation. After a discussion and, based in part on the advice of Paradigm as well as other factors including those set forth below under the heading "Reasons for the Arrangement", the Board (with Messrs. Cordero and Lauer abstaining) resolved and determined that the Arrangement is fair to Shareholders and that that Arrangement is in the best interests of the Company and recommended that the Shareholders vote in favour of the Arrangement Resolution. At the conclusion of the Board meeting Mr. Lauer informed the Board that Camrose was in the process of obtaining certain approvals required by Camrose prior to moving forward with the proposed transaction. Mr. Lauer further advised that it was not able to proceed to enter into the Arrangement Agreement until Camrose had obtained these required approvals. It was not until the evening of May 12, 2016 that Mr. Lauer advised Africo that Camrose had received the necessary approvals and that it was prepared to enter into the Arrangement Agreement in the form presented at the May 11, 2016 Board Meeting.

The Arrangement Agreement was finalized and executed by the Company and Camrose in morning of May 13, 2016. Also on that morning, the Locked-Up Shareholders entered into the Voting Agreements. The Arrangement was publicly announced prior to the open of the May 13, 2016 trading session on the TSX.

**Recommendation of the Special Committee**

**The Special Committee has unanimously determined that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of Africo and has unanimously recommended that the Board approve the Arrangement and recommended that the Shareholders vote in favour of the Arrangement Resolution.**

**Recommendation of the Board**

After careful consideration, the Board has unanimously (with Messrs. Cordero and Lauer abstaining) determined that the Arrangement is fair to Shareholders and that the Arrangement is in the best interests of Africo. **Accordingly, the Board has approved the Arrangement and unanimously recommends that Shareholders vote in favour of the Arrangement Resolution.**

**Reasons for the Arrangement**

In the course of their evaluation of the Arrangement, the Special Committee and the Board consulted with Africo's senior management, legal counsel and financial advisors, and considered a number of factors in determining that the Arrangement is in the best interests of Africo and fair to the Shareholders, including the following:

(a) the consideration being offered to Shareholders under the Arrangement represents a premium of approximately 115% to the closing price of the Company Shares on the TSX on May 12, 2016, the trading day immediately prior to the announcement of the Arrangement;

(b) the Paradigm Fairness Opinion to the effect that as of May 11, 2016, subject to the limitations and assumptions set forth therein, the consideration of $1.00 in cash per Company Share to be received under the Arrangement is fair, from a financial point of view, to Shareholders other than Camrose. See "The Arrangement — Fairness Opinion";

(c) the fact that the consideration under the Arrangement is all cash, which provides certainty of value to Shareholders compared to a transaction in which Shareholders would receive all or part of the consideration in securities;

(d) that Shareholders and Optionholders may also receive an additional aggregate amount of USD $7.5 million if certain transactions, in respect of the Company's main Kalukundi project are completed within 14 months following the closing of the Arrangement with Camrose. The additional amount, if paid, would be equal to approximately USD $0.27 per Company Share or Company Option. See "The Arrangement – Company Material Property Payment";

(e) the terms of the Arrangement Agreement, including the ability of the Board to respond, in accordance with its fiduciary duties, to unsolicited Acquisition Proposals that are or could reasonably be expected to result in a Superior Proposal;

(f) the required approvals are protective of the rights of Shareholders. The Arrangement Resolution must be approved by an affirmative vote of not less than two-thirds of the votes cast by Shareholders present in person or represented by proxy at the Meeting and by the affirmative vote of at least a majority of the votes cast by Minority Shareholders. The Arrangement must also be approved by the Court, which will consider, among other things, the fairness of the Arrangement to Shareholders;

(g) Registered Shareholders who oppose the Arrangement may, upon compliance with certain conditions, exercise their Dissent Rights and receive the fair value of their Company Shares;

(h) the unlikelihood of a competing offer for equal or greater consideration, taking into account Camrose's 63.7% interest in Africo ; and

(i) the limited liquidity in the Company Shares. The Arrangement provides Minority Shareholders with a level of liquidity that may not otherwise be available.

In the course of its deliberations, the Special Committee and the Board also identified and considered a variety of risks, including but not limited to:

(a) the fact that Shareholders will not participate in any future earnings or growth of the Company; and

(b) the risks to the Company if the Arrangement is not completed, including the costs to the Company in pursuing the Arrangement and the diversion of management attention away from the conduct of the Company's business in the ordinary course.

The Special Committee and the Board believed that any possible adverse effects or risks were more than outweighed by the potential benefits of the Arrangement and therefore that the above factors, taken as a whole, supported its recommendation of the Arrangement.

**Fairness Opinion**

Paradigm was retained to act as a financial advisor to the Special Committee in connection with a review of the Arrangement and the consideration payable thereunder, and to provide an opinion as to the fairness of the consideration, from a financial point of view, to the shareholders of Africo other than Camrose.

At meetings of the Special Committee on May 11, 2016, Paradigm made a presentation to the Special Committee that, based upon certain analyses, assumptions, qualifications and limitations, in its opinion, as at that date thereof, the consideration of $1.00 per Company Share under the Arrangement was fair, from a financial point of view, to Shareholders other than Camrose. Paradigm's opinion concerning the fairness, from a financial point of view, of the consideration to be received under the Arrangement was subsequently formalized in the written Paradigm Fairness Opinion.

**The full text of the Paradigm Fairness Opinion, which sets forth, among other things, the assumptions made, information reviewed, matters considered and limitations on the scope of the review undertaken by Paradigm in rendering its Fairness Opinion, is attached as Appendix "C" to this Circular. Shareholders are urged to read the Fairness Opinion in its entirety. The summary of the Fairness Opinion described in this Circular is qualified in its entirety by reference to the full text of the Fairness Opinion.**

The Paradigm Fairness Opinion was provided for the use of the Special Committee and the Board and may not be used or relied upon by any other person. The Paradigm Fairness Opinion should not be construed as a recommendation to any Shareholder as to how such Shareholder should vote on the Arrangement Resolution.

The Paradigm Fairness Opinion was rendered on the basis of the securities markets, economic, geopolitical, financial and general business conditions prevailing as at the date thereof and on information relating to the subject matter thereof as represented to Paradigm. As set forth in the Paradigm Fairness Opinion, Paradigm has, subject to the exercise of its professional judgement, relied upon the completeness, accuracy and fair presentation of all financial and other information, data, advice, opinions and representations obtained by it from public sources or provided to it and has not attempted to independently verify the accuracy or completeness of such information. The Paradigm Fairness Opinion assumes, and is conditional upon, such completeness, accuracy and fair presentation. Paradigm was not asked to prepare, and has not prepared, a formal valuation of Africo or any of its securities or assets.

Neither Paradigm nor any of its Affiliates is an insider, Associate or Affiliate of Africo, Camrose or any of their respective Associates or Affiliates, and Paradigm has not provided any financial advisory services or participated in any financings involving any such parties within the past two years except as described in the Paradigm Fairness Opinion.

Paradigm acts as a trader and dealer, both as principal and agent, in major financial markets and, as such, may have had and may in the future have positions in the securities of Africo or any of its Associates or Affiliates and, from time to time, may have executed or may execute transactions on behalf of such companies or clients for which it received or may receive compensation. As an investment dealer, Paradigm conducts research on securities and may, in the ordinary course of its business, provide research reports and investment advice to its clients on investment matters, including with respect to Africo or the Arrangement.

Pursuant to its agreement with Paradigm, Africo will pay Paradigm a fixed fee for the provision of the Paradigm Fairness Opinion, and reimburse Paradigm for reasonable costs and expenses incurred in connection therewith. Africo has also agreed to indemnify Paradigm in certain circumstances.

**Required Shareholder Approval**

At the Meeting, Shareholders will be asked to approve the Arrangement Resolution. The approval of the Arrangement Resolution will require the affirmative vote of at least two-thirds of the votes cast by Shareholders present in person or represented by proxy at the Meeting and the affirmative vote of at least a majority of the votes cast by the Minority Shareholders. The Arrangement Resolution must receive the requisite Shareholder approval in order for Africo to seek the Final Order and implement the Arrangement on the Effective Date in accordance with the Final Order. Notwithstanding the approval by Shareholders of the Arrangement Resolution, Africo reserves the right, in certain circumstances, not to proceed with the Arrangement in accordance with the terms of the Arrangement Agreement.

**Arrangement Mechanics**

The following description is qualified in its entirety by reference to the full text of the Plan of Arrangement attached as Appendix "B" to this Circular. The Arrangement will occur on the Effective Date which is currently anticipated to be in July 2016, subject to the satisfaction or waiver of the conditions to completion. Under the Plan of Arrangement, commencing at the Effective Time, the following principal steps shall occur and shall be deemed to occur in the following order (at five minute intervals), without any further act or formality:

- each Company Share in respect of which Dissent Rights have been validly exercised will be, and be deemed to have been, assigned and transferred, without any further act or formality, by the Dissenting Holder thereof, to Camrose (free and clear of all Liens) in consideration for the right to be paid the fair value of their Company Shares by Camrose in accordance with the Plan of Arrangement;

- each Company Share outstanding immediately prior to the Effective Time (other than any Company Shares in respect of which Dissent Rights have been validly exercised before the Effective Time and any Company Shares held by Camrose or any Affiliate thereof, which shall not be transferred under the Arrangement) shall be deemed to be transferred by the holder thereof to Camrose in exchange for (i) payment by Camrose of the Closing Payment Amount; and (ii) in the event of a Change of Control of the Company Material Property, the pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement; and Camrose shall be recorded as the registered holder of Company Shares so transferred and shall be deemed to be the legal and beneficial owner thereof, in each case free and clear of all Liens; and

- each Company Option outstanding immediately prior to the Effective Time (whether vested or unvested), notwithstanding the terms of the Company Stock Option Plan, shall be deemed to be unconditionally vested and exercisable, and such Company Option shall, without any further action by or on behalf of a Company Optionholder, be deemed to be assigned and transferred by such holder to the Company in exchange for (i) a cash payment from the Company equal to the amount (if any) by which the Closing Payment Amount per Company Share exceeds the exercise price of such Company Option, less applicable withholdings; and (ii) in the event of a Change of Control of the Company Material Property, a right to receive a pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement.

*Letter of Transmittal*

In order to receive the Consideration for the Company Shares, Registered Shareholders must complete, sign and date and return the enclosed Letter of Transmittal in accordance with the instructions set out therein and in this Circular. In order to receive the consideration per Company Option, net of any Taxes required to be withheld and remitted by Africo, such Optionholder should not take any further action.

*Deposit of Share Certificates*

The Letter of Transmittal sent to Registered Shareholders with this Circular sets out the details of the procedure to be followed by each Registered Shareholder for delivering the certificates representing the Company Shares owned by such Shareholder to the Depositary. If the Arrangement is not completed, the Letter of Transmittal will be of no effect and Africo will cause the Depositary to return all deposited share certificate(s) representing Company Shares to the registered holders thereof as soon as possible. Shareholders holding Company Shares that are registered in the name of an intermediary must contact their intermediary to arrange for the surrender of their Company Shares.

Provided that a Registered Shareholder has presented and surrendered share certificates to the Depositary, as soon as practicable following the Effective Date, Camrose will cause a cheque: (a) to be sent to such Registered Shareholder representing the Consideration for each Company Share sold pursuant to the Arrangement. The holders of Company Shares so acquired shall thereafter have no rights against Camrose in respect of such shares other than to receive payment for such shares; or (b) to be made available at the offices of the Depositary at 200 University Ave Suite 300, Toronto, ON M5H 4H1 for pick-up by the Registered Shareholder as requested by the Registered Shareholder in the Letter of Transmittal.

If a Registered Shareholder fails to present and surrender the share certificates held by such Registered Shareholder in accordance with the Letter of Transmittal, such Registered Shareholder will not be entitled to receive a cheque (or wire transfer, as applicable) representing the proceeds payable to that Registered Shareholder until the Registered Shareholder delivers such share certificate(s) to the Depositary. Under no circumstances will interest be paid by Camrose, Africo or the Depositary on any outstanding amounts of money owed to a Shareholder.

If any Registered Shareholder fails for any reason to surrender to the Depositary for cancellation the certificates formerly representing Company Shares, together with such other documents or instruments required to entitle the holder to receive the Consideration, on or before the sixth anniversary of the Effective Date, such certificate shall cease to represent a claim by or interest of any former Shareholder of any kind or nature.

Non-Registered Holders whose Company Shares are registered in the name of a broker, investment dealer, bank, trust company or other nominee should contact that nominee for instructions and assistance in depositing those Company Shares.

*Lost Share Certificates*

A Registered Shareholder who has lost or misplaced its share certificates should complete the Letter of Transmittal as fully as possible and forward it, together with a letter explaining the loss or misplacement to the Depositary. The Depositary will assist in making arrangements for the necessary affidavit (which will include a bonding requirement) for payment of the consideration in accordance with the Arrangement.

*Delivery of Consideration for Company Shares*

Prior to the filing of the Articles of Arrangement, the Company shall loan to Camrose cash in the aggregate amount equal to the payments required by the Plan of Arrangement (other than the Company Material Property Payment). On or immediately prior to the Effective Date, Camrose will deliver to the Depositary the consideration to be paid to Shareholders (other than Dissenting Shareholders).

Upon surrender to the Depositary for cancellation of certificate(s) which immediately prior to the Effective Time represented one or more Company Shares that were exchanged for cash under the Arrangement, together with the Letter of Transmittal, the holder of such surrendered certificate(s) shall be entitled to receive in exchange therefor, and the Depositary shall deliver to such holder, a cheque issued by the Depositary representing that amount of cash which such holder has the right to receive, and the certificate so surrendered shall forthwith be cancelled. On and after the Effective Time, all certificates that represented Company Shares (other than Dissent Shares) immediately prior to the Effective Time will cease to represent any rights with respect to such Company Shares and will only represent the right to receive the Consideration payable pursuant to the Plan of Arrangement.

Any use of the mail to transmit certificate(s) for Company Shares and/or Letters of Transmittal is at the risk of the relevant Shareholder. If these documents are mailed, it is recommended that registered mail, with return receipt requested, and with proper insurance, be used.

In the event of a transfer of ownership of Company Shares prior to the Effective Time that is not registered in the transfer records of Africo, a cheque representing the proper amount of cash may be delivered to the transferee if the certificate representing such Company Shares is presented to the Depositary, accompanied by all documents required to evidence and effect such transfer prior to the Effective Time.

Under no circumstances will interest on the consideration payable in connection with the Arrangement accrue or be paid by Africo, Camrose or the Depositary to former Shareholders or holders of Company Options in connection with the Arrangement, regardless of any delay in making such payment.

The Depositary will act as the agent of former Shareholders or holders of Company Options in connection with the Arrangement for the purpose of receiving any applicable payment from Camrose and transmitting payment from Camrose to such Persons, and receipt of payment by the Depositary will be deemed to constitute receipt of payment by former Shareholders or holders of Company Options. If and when any amount of the Company Material Property Payment becomes payable, Camrose shall cause the Company Material Property Payment to be deposited with the Depositary for the benefit of the eligible former Shareholders and former holders of Company Options.

Settlement with Persons who deposit Company Shares will be effected by the Depositary: (a) forwarding cheques payable in Canadian funds in consideration for such Company Shares by first-class insured mail, postage prepaid; or (b) making cheques available at the offices of the Depositary at 200 University Ave Suite 300, Toronto, ON M5H 4H1 for pick-up by the Registered Shareholder as requested by the Registered Shareholder in the Letter of Transmittal.

Unless otherwise directed in the Letter of Transmittal, the cheque to be issued pursuant to the Arrangement will be issued in the name of the Registered Shareholder of the Company Shares so deposited. Unless the Person who deposits the certificates representing the Company Shares instructs the Depositary to hold the cheque for pick-up by checking the appropriate box in the Letter of Transmittal, cheques will be forwarded by first-class insured mail to the addresses supplied in the Letter of Transmittal. If no address is provided, cheques will be forwarded to the address of the Shareholder as shown on the register of the Transfer Agent.

The Depositary will receive reasonable and customary compensation from Camrose for its services in connection with the Arrangement, will be reimbursed for certain out-of-pocket expenses and will be indemnified against certain liabilities under applicable Securities Laws and expenses in connection therewith.

**Interests of Executive Officers and Directors in the Arrangement**

*Company Shares*

The executive officers and directors of Africo beneficially own, directly or indirectly, or exercise control or direction over, in the aggregate, 13,926,695 Company Shares, representing approximately 19.5% of the Company Shares outstanding as at the date of this Circular. All of the Company Shares held by the executive officers and directors of Africo will be treated in the same manner under the Arrangement as Company Shares held by any other Shareholder.

*Options*

The executive officers and directors of Africo beneficially own, directly or indirectly, or exercise control or direction over, in the aggregate, Options to acquire 1,610,200 Company Shares outstanding as at the date of this Circular. All of the Options held by the executive officers and directors of Africo will be treated in the same manner under the Arrangement as Options held by every other holder of Options. Pursuant to the Arrangement, each Company Option outstanding immediately prior to the Effective Time (whether vested or unvested), notwithstanding the terms of the Stock Option Plan, shall be deemed to be unconditionally vested and exercisable,

and such Company Option shall, without any further action by or on behalf of a Company Optionholder, be deemed to be assigned and transferred by such holder to the Company in exchange for (i) a cash payment from the Company equal to the amount (if any) by which the Closing Payment Amount per Company Share exceeds the exercise price of such Company Option, less applicable withholdings, and (ii) in the event of a Change of Control of the Company Material Property, a right to receive a pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement

*Directors' and Officers' Insurance*

Prior to the Effective Date, the Company shall purchase customary "tail" policies of directors' and officers' liability insurance providing protection no less favourable in the aggregate to the protection provided by the policies maintained by the Company and its Subsidiaries which are in effect immediately prior to the Effective Date and providing protection in respect of claims arising from facts or events which occurred on or prior to the Effective Date and Camrose will, or will cause the Company and its Subsidiaries to, maintain such tail policies in effect without any reduction in scope or coverage for six years from the Effective Date; provided, that Camrose shall not be required to pay any amounts in respect of such coverage prior to the Effective Time and provided, further that the cost of such policy shall not exceed 150% of the Company's current annual aggregate premium for policies currently maintained by the Company or its Subsidiaries.

**Intentions of Africo Directors and Executive Officers**

Chris Theodoropoulos, James Cook, and George Ireland, who collectively beneficially own, directly or indirectly, or exercise control or direction over, in the aggregate, 13,926,695 Company Shares, representing approximately 19.5% of the Company Shares outstanding as at the date of this Circular, have entered into Voting Agreements to vote in favour of the Arrangement Resolution, subject to the terms and conditions of the Voting Agreements.

**Financing Arrangements**

Prior to the filing of the Articles of Arrangement, the Company shall loan to Camrose cash in the aggregate amount equal to the payments required by the Plan of Arrangement.

**Stock Exchange De-Listing and Reporting Issuer Status**

The Company Shares are expected to be de-listed from the TSX following the Effective Date. Africo will also seek to be deemed to have ceased to be a reporting issuer under the securities legislation of the provinces of British Columbia, Alberta, Ontario and Quebec.

**Effects on Africo if the Arrangement is Not Completed**

If the Arrangement Resolution is not approved by Shareholders or if the Arrangement is not completed for any other reason, Shareholders will not receive any payment for their Company Shares in connection with the Arrangement. Instead, Africo will remain an independent public company, and Company Shares will continue to be traded on the TSX. In addition, if the Arrangement is not completed, it is expected that management will operate Africo in a manner similar to that in which it is being operated today and that Shareholders will continue to be subject to the same risks and opportunities to which they are currently subject.

## THE ARRANGEMENT AGREEMENT

The following description of certain material provisions of the Arrangement Agreement is a summary only, is not comprehensive and is qualified in its entirety by reference to the full text of the Arrangement Agreement, which is filed on SEDAR at www.sedar.com.

Pursuant to the Arrangement Agreement, it was agreed that the Parties would carry out the Arrangement in accordance with the Arrangement Agreement on the terms set out in the Plan of Arrangement. See "The Arrangement – Arrangement Mechanics".

### Conditions Precedent to the Arrangement

#### *Mutual Conditions Precedent*

The Arrangement Agreement provides that the obligations of the Parties to complete the Arrangement are subject to the satisfaction of, or mutual waiver by the Parties on or before the Effective Date, of the following conditions precedent:

(a) the Arrangement Resolution shall have been approved and adopted by the Shareholders at the Meeting in accordance with the Interim Order;

(b) the Interim Order and the Final Order shall each have been obtained on terms consistent with the Arrangement Agreement, and shall not have been set aside or modified in a manner unacceptable to the Company and Camrose, acting reasonably, on appeal or otherwise;

(c) no Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law which is then in effect and has the effect of making the Arrangement illegal or otherwise preventing or prohibiting consummation of the Arrangement; and

(d) the Arrangement Agreement shall not have been terminated.

#### *Additional Conditions Precedent to the Obligations of Africo*

The Arrangement Agreement provides that the obligation of Africo to complete the Arrangement is also subject to the satisfaction of, or waiver by Africo, on or before the Effective Date of the following conditions precedent, each of which is for the exclusive benefit of Africo:

(a) all covenants of Camrose under the Arrangement Agreement to be performed on or before the Effective Time shall have been duly performed by Camrose in all material respects and the Company shall have received a certificate of Camrose, addressed to the Company and dated the Effective Date, signed on behalf of Camrose by two of its senior executive officers (on Camrose's behalf and without personal liability), confirming the same as of the Effective Date;

(b) the representations and warranties of Camrose set forth in the Arrangement Agreement shall be true and correct in all respects, without regard to any materiality qualifications contained in them, as of the Effective Time as though made on and as of the Effective Time (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), and the Company shall have received a certificate signed on behalf of Camrose by two senior executive officers of Camrose (on Camrose's behalf and without personal liability) to this effect; and

(c) Camrose shall have complied with its obligations under the Arrangement Agreement for the payment of the Consideration and the Depositary shall have confirmed receipt of the Consideration.

***Additional Conditions Precedent to the Obligations of Camrose***

The Arrangement Agreement provides that the obligation of Camrose to complete the Arrangement is also subject to the satisfaction of, or waiver by Camrose, on or before the Effective Date of the following conditions precedent, each of which is for the exclusive benefit of Camrose:

(a) all covenants of the Company under the Arrangement Agreement to be performed on or before the Effective Time shall have been duly performed by the Company in all material respects and Camrose shall have received a certificate of the Company addressed to Camrose and dated the Effective Date, signed on behalf of the Company by two senior executive officers of the Company (on the Company's behalf and without personal liability), confirming the same as at the Effective Time;

(b) the representations and warranties of the Company set forth in the Arrangement Agreement shall be true and correct in all respects, without regard to any materiality or Company Material Adverse Effect qualifications contained in them, as of the Effective Time as though made on and as of the Effective Time (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), except where the failure or failures of all such representations and warranties to be so true and correct in all respects would not reasonably be expected to have a Company Material Adverse Effect; provided, however, that the representations and warranties of the Company in respect of capitalization and listing shall be true and correct in all respects as of the Effective Time, and Camrose shall have received a certificate of the Company addressed to Camrose and dated the Effective Date, signed by two senior executive officers of the Company (on the Company's behalf and without personal liability), confirming the same as at the Effective Time;

(c) there shall not be pending or threatened in writing any suit, action or proceeding by any Governmental Entity or other Person that is reasonably likely to result in a prohibition or restriction on the acquisition by Camrose of any Company Shares, or any restriction or prohibition of the consummation of the transactions contemplated by the Arrangement;

(d) between the date hereof and the Effective Time, there shall not have occurred a Company Material Adverse Effect resulting from facts or circumstances arising during such period;

(e) waivers of the Eurasian Resources Group B.V. major lenders have been obtained;

(f) the Tax Indemnity Agreements shall be delivered to Camrose, in form and content acceptable to Camrose, acting reasonably;

(g) Voting Agreements shall not have been terminated or otherwise breached in any manner by any of the Locked-Up Shareholders;

(h) holders of no more than 5% of the Company Shares shall have exercised Dissent Rights and Camrose shall have received a certificate of the Company addressed to Camrose and dated the Effective Date, signed on behalf of the Company by two senior executive officers of the Company (on the Company's behalf and without personal liability), confirming the same as at the Effective Time;

(i) the Company and its Subsidiaries shall have no less than $29 million in Company Unrestricted Cash and no Debt (each as defined in the Arrangement Agreement) and Camrose shall have received a certificate of the Company addressed to Camrose and dated the Effective Date, signed on behalf of the Company by two senior executive officers of the Company (on the Company's behalf and without personal liability), confirming the same as at the Effective Time and that includes a detailed calculation of Company Unrestricted Cash (as defined in the Arrangement

Agreement) and supporting documentation, in form and content acceptable to Camrose, acting reasonably; and

(j) the Company shall have delivered to Camrose resignations and releases from each officer and director of the Company to be effective as at the Effective Time, in form and content satisfactory to Camrose, acting reasonably.

**Representations and Warranties**

The Arrangement Agreement contains customary representations and warranties of Africo relating to matters that include, among other things: board approval, organization and qualification, authority relative to the Arrangement Agreement, absence of violation, breach or default under Africo's organizational documents, applicable Law and contracts, subsidiaries, compliance with laws, capitalization and listing, shareholder agreements, public filings, financial statements, the auditors, undisclosed liabilities, interest in property and mineral rights, mineral resources and reserves, absences of certain changes or events, litigation, taxes, books and records, insurance, non-arm's length transactions, benefit plans, environmental matters, restrictions on business activities, brokers, reporting issuer status, expropriation matters, corrupt practices legislation, arrangements with shareholders and available cash.

The Arrangement Agreement also contains customary representations and warranties of Camrose relating to matters that include, among other things: organization and qualification, authority relative to the Arrangement Agreement, absence of violation, breach or default under Camrose's organizational documents, applicable Law and contracts and litigation.

**Covenants of Africo**

Africo has agreed to covenants in the Arrangement Agreement which are customary for arrangements of this nature, including, but not limited to, a covenant to carry on business in the ordinary course of business consistent with past practice between the date of the Arrangement Agreement and the Effective Date, a covenant not to undertake certain actions outside the ordinary course of business without Camrose's consent, and a covenant to use commercially reasonable efforts to satisfy the conditions precedent to its obligation to complete the Arrangement.

**Covenants of Camrose**

Camrose has agreed to covenants in the Arrangement Agreement which are customary for arrangements of this nature, including, but not limited to, a covenant to use commercially reasonable efforts to satisfy the conditions precedent to its obligation to complete the Arrangement.

**Non-Solicitation Covenants**

Africo has agreed that, except as otherwise provided in the Arrangement Agreement, it will not, directly or indirectly, through any officer, director, employee, advisor, representative, agent or otherwise (i) make, solicit, assist, initiate, knowingly encourage or otherwise knowingly facilitate (including by way of furnishing information) any inquiries, proposals or offers from any other Person relating to any Acquisition Proposal, (ii) enter into, continue, or participate in any discussion or negotiation with any Person regarding an Acquisition Proposal or furnish to any Person any information with respect to the Company or its Subsidiaries provided that, for greater certainty, the Company may advise any Person making an unsolicited Acquisition Proposal that such Acquisition Proposal does not constitute a Superior Proposal when the Board has so determined, (iii) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in any manner adverse to Camrose, the approval or recommendation of the Board or any committee thereof of the Arrangement Agreement or the Arrangement, (iv) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal for the Company (it being understood that publicly taking no position or a neutral position with respect to an Acquisition Proposal in respect of which a confidentiality agreement has been executed, or a publicly announced or otherwise publicly disclosed Acquisition Proposal for a period of 15

days, in each case, shall not be considered a violation of the Arrangement Agreement); (v) accept or enter into, or publicly propose to accept or enter into, any letter of intent, agreement in principle, agreement, understanding, arrangement or undertaking related to any Acquisition Proposal (other than a confidentiality agreement executed in accordance with the Arrangement Agreement), provided, however, that nothing contained in the Arrangement Agreement shall prevent the Board, or any committee thereof, from engaging in discussions or negotiations with, or responding to enquiries from any Person that has made an unsolicited written Acquisition Proposal that the Board, or any committee thereof, has determined constitutes or could reasonably be expected to lead to a Superior Proposal.

Notwithstanding the non-solicitation provisions of the Arrangement Agreement, if the Company receives a request for material non-public information from a Person who proposes to the Company an unsolicited bone fide written Acquisition Proposal and (i) the Board, or any committee thereof, determines that such Acquisition Proposal constitutes or could reasonably be expected to lead to a Superior Proposal; and (ii) and in the opinion of the Board, or any committee thereof, acting in good faith and on advice from their outside legal advisors, the failure to provide such party with access to information regarding the Company and its Subsidiaries would be inconsistent with the fiduciary duties of the Board, then the Company may provide such Person with access to information regarding the Company and its Subsidiaries, subject to the execution of a confidentiality and standstill agreement which is customary in such situations; provided that the Company sends a copy of any such confidentiality and standstill agreement to Camrose promptly upon its execution and Camrose is provided with a list of and copies of, the information provided to such Person and immediately provided with access to similar information to which such Person was provided.

Africo has also agreed to promptly (and in any event within 24 hours) provide notice to Camrose of any unsolicited Acquisition Proposal or any proposal, inquiry or offer that is reasonably expected to lead to an Acquisition Proposal or any request for non-public information relating to the Company or any of its Subsidiaries or request for access to the properties, books or records of the Company or any Subsidiary by any Person that informs the Company, any member of the Board or such Subsidiary that it is considering making, or has made, an Acquisition Proposal. The Company shall keep Camrose promptly and fully informed of the status, including any change to the material terms, of any such Acquisition Proposal, offer, inquiry or request and will respond promptly to all inquiries by Camrose with respect thereto.

Notwithstanding anything in the Arrangement Agreement, the Parties have agreed that any discussions with persons identified in writing by Camrose ("Permitted Persons") shall not be considered to be a breach of the Arrangement Agreement and the Company may provide such Permitted Persons with access to information regarding the Company and its Subsidiaries, subject to the execution of a confidentiality and standstill agreement which is customary in such situations; provided further that the Company sends a copy of any such confidentiality and standstill agreement to Camrose promptly upon its execution and Camrose is provided with a list of and copies of, the information provided to such Permitted Persons and immediately provided with access to similar information to which such Permitted Persons are provided.

**Company Material Property Payment**

The Arrangement Agreement provides that if the Company completes certain transactions within 14 months following the Effective Date in respect of the Company's Kalukundi copper-cobalt project located in the Mutshatsha Territory of the Katanga Province in the Democratic Republic of Congo, then the Company will pay an additional aggregate of U.S. $7.5 million to be divided among the number of Company Shares and Company Options immediately outstanding prior to the Effective Time (other than those held by Camrose). The transactions which will trigger the Company Material Property Payment are more specifically defined as a "Change of Control of the Company Material Property" within the Arrangement Agreement. These transactions include, but are not limited to, (a) an acquisition by certain Persons of a direct or indirect interest equal to or greater than 41% of the voting securities of Africo Resources (DRC) sprl or greater than 50% of the Company's interest in Swanmines SAS; (b) a disposition of equal to or greater than 41% of the assets comprising the Company Material Property; or (c) certain transactions involving Camrose, Africo Resources (DRC) sprl, or Swanmines SAS which, after giving effect to such such transactions, result in Camrose and related parties holding less than, directly or indirectly, 59% of the aggregate voting power of a controlling or resulting entity of such transaction, subject to certain exceptions and limitations. There can be no assurance that the additional payment will be made. If and when any amount of the Company Material Property Payment becomes payable, Camrose shall cause the Company Material Property Payment to be

deposited with the Depositary for the benefit of the eligible former Shareholders and former holders of Company Options. The foregoing summary is qualified in its entirety by reference to the applicable provisions in the Arrangement Agreement, which is filed on SEDAR at www.sedar.com, and the Plan of Arrangement, attached as Appendix "B".

**Superior Proposals and Right to Match**

Notwithstanding the non-solicitation provisions in the Arrangement Agreement, the Company may accept, approve or enter into any agreement (a "**Proposed Agreement**"), other than a confidentiality agreement, to facilitate any Acquisition Proposal as permitted by the Arrangement Agreement, provided that (i) the Board determines that the Acquisition Proposal constitutes a Superior Proposal; (ii) Meeting has not occurred; (iii) Africo has complied with the relevant non-solicitation provisions of the Arrangement Agreement; (iv) the Company has provided Camrose with a notice in writing that there is a Superior Proposal together with all documentation related to and detailing the Superior Proposal not less than five business days prior to the proposed acceptance, approval, recommendation or execution of the Proposed Agreement by the Company; (v) five days shall have elapsed from the date Camrose received the notice and documentation from the Company and, if Camrose has proposed to amend the terms of the Arrangement the Board shall have determined, in good faith, after consultation with its financial advisors and outside legal counsel, that the Acquisition Proposal is a Superior Proposal compared to the proposed amendment to the terms of the Arrangement by Camrose; and (vi) the Company terminates the Arrangement Agreement in accordance with its terms.

During the five day period following notice of a Superior Proposal, or such longer period as Africo may approve for such purpose, Africo has agreed that Camrose will have the right, but not the obligation, to offer to amend the terms of the Arrangement Agreement and the Arrangement. The Board will review any proposal by Camrose to amend the terms of the Arrangement in order to determine whether Camrose's proposal to amend the Arrangement would result in the Acquisition Proposal not being a Superior Proposal compared to the proposed amendment to the terms of the Arrangement. If the Board determines that an Acquisition Proposal is not a Superior Proposal as compared to the proposed amendment to the terms of the Arrangement, it will promptly enter into the proposed amendment to the Arrangement.

**Termination of the Arrangement Agreement**

The Arrangement Agreement may be terminated at any time before the Effective Time (notwithstanding any approval of the Arrangement by the Shareholders and/or by the Court, as applicable):

(a) by mutual agreement in writing executed by Camrose and Africo;

(b) by either Africo or Camrose, if:

  (i) if the Effective Date does not occur on or before the Outside Date, other than as a result of the breach by such party of any of its covenants or obligations under the Arrangement Agreement or as a result of any representation or warranty of such party in the Arrangement Agreement being untrue or incorrect;

  (ii) there shall be enacted or made any applicable Law that makes consummation of the Arrangement illegal or otherwise prohibited or enjoins the Company or Camrose from consummating the Arrangement and such applicable Law, prohibition or enjoinment shall have become final and non-appealable; or

  (iii) if the Meeting is held and the Arrangement Resolution is not approved by the Shareholders in accordance with the Interim Order;

(c) by Camrose if:

(i) the Board fails to recommend or withdraws, amends, modifies or qualifies, in a manner adverse to Camrose or fails to publicly reaffirm its recommendation of the Arrangement within three calendar days (and in any case prior to the Meeting) after having been requested in writing by Camrose to do so;

(ii) the Board or a committee thereof shall have approved or recommended, or proposed to approve or recommend, any Acquisition Proposal;

(iii) the Company breaches the non-solicitation provisions of the Arrangement Agreement; or

(iv) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of the Company (other than those relating to Company non-solicitation) shall have occurred that would cause the conditions in the Arrangement Agreement incapable of being satisfied by the Outside Date, as reasonably determined by Camrose and provided that Camrose is not then in breach of the Arrangement Agreement so as to cause any applicable conditions not to be satisfied;

(d) by Africo if:

(i) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of Camrose shall have occurred that would cause the conditions in the Arrangement Agreement incapable of being satisfied by the Outside Date, as reasonably determined by Africo and provided that Africo is not then in breach of the Arrangement Agreement so as to cause any applicable conditions not to be satisfied; or

(ii) the Company wishes to enter into a binding written agreement with respect to a Superior Proposal in the circumstances contemplated under the heading "Superior Proposals and Right to Match".

## VOTING AGREEMENTS

On May 13, 2016, the Locked-Up Shareholders entered into the Voting Agreements. The Voting Agreements set forth, among other things, the agreement of the Locked-Up Shareholders to vote their Company Shares in favour of the Arrangement and any matter necessary for the consummation of the Arrangement and against any Acquisition Proposal and/or any other matter that could reasonably be expected to adversely affect or reduce the likelihood of the successful completion of the Arrangement or delay or interfere with, the completion of the Arrangement. As of the date hereof, 19,878,102 Company Shares, representing approximately 28% of the issued and outstanding Company Shares (77% of the outstanding Company Shares held by the Minority Shareholders) have entered into Voting Agreements.

The Locked-Up Shareholders have agreed, among other things, from the date of the Voting Agreements to the earlier of the Effective Date and the termination of the Voting Agreements, subject to the terms thereof, to: (a) not option, sell, transfer, pledge, encumber, grant a security interest in, hypothecate or otherwise convey any Company Shares, or any right or interest therein (legal or equitable), to any Person or group or agree to do any of the foregoing; (b) not grant or agree to grant any proxy or other right to vote any Company Shares, or enter into any voting trust, vote pooling or other agreement with respect to the right to vote, call meetings of shareholders or give consents or approval of any kind as to the Company Shares; and (c) not exercise any dissent or appraisal rights with respect to the resolution approving the Arrangement or any other resolution relating to the approval of the Arrangement.

Under the terms of the Voting Agreements, Camrose has acknowledged that nothing in the Voting Agreements shall limit or restrict any Locked-Up Shareholders from properly fulfilling their fiduciary duties as a director or officer of Africo.

The Voting Agreements may be terminated in certain specified circumstances including if the Arrangement Agreement has been terminated in accordance with its terms.

## PRINCIPAL LEGAL MATTERS

### Court Approval of the Arrangement and Completion of the Arrangement

An arrangement under the CBCA requires Court approval. Prior to the mailing of this Circular, Africo obtained the Interim Order, which provides for the calling and holding of the Meeting, Dissent Rights for Registered Shareholders and other procedural matters. A copy of the Interim Order is attached as Appendix “E” to this Circular.

Subject to the approval of the Arrangement Resolution by Shareholders at the Meeting, the hearing in respect of the Final Order is currently scheduled to take place on June 30, 2016 at 10:00 a.m. (Toronto time) in the Court at 330 University Avenue, Toronto, Ontario. Any Shareholder who wishes to appear, or to be represented, and to present evidence or arguments must serve and file a notice of appearance (a “**Notice of Appearance**”) as set out in the Notice of Application and satisfy any other requirements of the Court. The Court will consider, among other things, the fairness and reasonableness of the Arrangement. The Court may approve the Arrangement in any manner the Court may direct, subject to compliance with any terms and conditions, if any, as the Court deems fit. In the event that the hearing is postponed, adjourned or rescheduled, subject to further order of the Court, only those Persons having previously served a Notice of Appearance in compliance with the Notice of Application and the Interim Order will be given notice of the postponement, adjournment or rescheduled date. A copy of the Notice of Application is attached as Appendix “F” to this Circular.

Assuming the Final Order is granted and the other conditions to closing contained in the Arrangement Agreement are satisfied or waived, then the Articles of Arrangement will be filed with the Director to give effect to the Arrangement.

### Canadian Securities Law Matters

Africo is a reporting issuer (or the equivalent) under applicable Canadian securities legislation in British Columbia, Alberta, Ontario and Quebec and is, among other things, subject to applicable Securities Laws, including MI 61-101. MI 61-101 is intended to regulate certain transactions to ensure the protection and fair treatment of minority securityholders. The Arrangement constitutes a “business combination” under MI 61-101 because: (i) it may involve the termination of certain Shareholders’ interest in Africo without such Shareholders’ consent; and (ii) a related party of Africo would, as a consequence of the Arrangement, indirectly acquire Africo. MI 61-101 provides that, unless an exemption is available, a reporting issuer proposing to carry out a business combination is required to obtain a formal valuation of the affected securities from a qualified independent valuator and to provide the holders of the affected securities with a summary of such valuation. For the purposes of the Arrangement, the Company Shares are considered “affected securities” within the meaning of MI 61- 101.

MI 61-101 provides for an exemption from the formal valuation requirement where the consideration per security under the business combination is at least equal in value to and is in the same form as the highest consideration agreed to, through arm’s length negotiations, with one or more selling security holders of a control block of securities or a selling security holder of a sizeable block of securities and such security holder had full knowledge of and access to information concerning the issuer and its securities.

The Locked-Up Shareholders, who, as of the date hereof, beneficially own or exercise control or direction over approximately 28% of the Company Shares, have entered into the Voting Agreements and agreed to vote all of the Company Shares over which they exercise control or direction in favour of the Arrangement. The Company has considered the Voting Agreements and the other relevant factors to conclude that all of the conditions set out in Subsection 4.4(b) of MI 61-101 are satisfied such that a formal valuation pursuant to Section 4.3 of MI 61-101 is not required.

MI 61-101 also requires that, in addition to any other required securityholder approval, in order to complete a business combination, the approval of a simple majority of the votes cast by Minority Shareholders must be

obtained. Accordingly, votes attaching to Company Shares owned by Camrose and any "related party" of Camrose within the meaning of MI 61-101 (subject to the exceptions set out therein) and any person acting jointly or in concert with the foregoing in respect of the Arrangement will be excluded from the "majority of the minority" vote at the Meeting. As at the date hereof, to the knowledge of Africo, Camrose and related parties own 45,400,000 Company Shares and these are the only Company Shares that will be excluded from the minority vote. Accordingly, it is expected that the approval of a majority of the Minority Shareholders will be obtained as the Locked-Up Shareholders have agreed under the Voting Agreement to vote their Company Shares in favour of the Arrangement Resolution. To the knowledge of Africo, after reasonable inquiry, there has been no prior valuation of Africo, the Company Shares or Africo's material assets in the 24 months prior to the date hereof.

## DISSENT RIGHTS OF SHAREHOLDERS

If you are a Registered Shareholder, you are entitled to dissent from the Arrangement Resolution in the manner provided in section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement.

This section summarizes the provisions of section 190 of the CBCA, as modified by the Interim Order and the Plan of Arrangement. If you are a Registered Shareholder and wish to dissent, you should obtain your own legal advice and carefully read the provisions of the Plan of Arrangement, the provisions of section 190 of the CBCA and the Interim Order which are attached at Appendix "B", Appendix "D" and Appendix "E", respectively.

Anyone who is a beneficial owner of Company Shares registered in the name of an Intermediary and who wishes to dissent should be aware that only Registered Shareholders are entitled to exercise Dissent Rights. A Non-Registered Holder who wishes to exercise Dissent Rights should contact the Intermediary with whom the Non-Registered Holder deals in respect of its Company Shares. A Registered Shareholder who holds Company Shares as nominee for one or more beneficial owners, one or more of whom wish to exercise Dissent Rights, must exercise such Dissent Rights on behalf of such holder(s). In such case, the Dissent Notice should specify the number of Company Shares covered by it. A Dissenting Shareholder may only dissent with respect to all the Company Shares held on behalf of any one beneficial owner and registered in the name of the Dissenting Shareholder.

Any Dissenting Shareholder will be entitled, in the event that the Arrangement becomes effective, to be paid the fair value of the Dissent Shares held by such Dissenting Shareholder, determined as at the close of business on the day immediately preceding the Meeting, and will not be entitled to any other payment or consideration. There can be no assurance that a Dissenting Shareholder will receive consideration for its Dissent Shares of equal value to the Consideration that such Dissenting Shareholder would have received upon completion of the Arrangement.

**A Registered Shareholder who wishes to dissent must ensure that a Dissent Notice is received by the Company at its registered office located at Suite 520, 800 West Pender Street, Vancouver, British Columbia on or prior to 5:00 p.m. (Toronto time) on the Business Day which is two Business Days preceding the date of the Meeting, or, if the Meeting is adjourned or postponed, 5:00 p.m. (Toronto time) on the Business Day which is two Business Days preceding the date of such adjourned or postponed Meeting. It is important that Shareholders strictly comply with this requirement, which is different from the statutory Dissent Provisions of the CBCA which would permit a Dissent Notice to be provided at or prior to the Meeting.**

The filing of a Dissent Notice does not deprive a Registered Shareholder of the right to vote; however, a Registered Shareholder who has submitted a Dissent Notice and who votes in favour of the Arrangement Resolution will no longer be considered a Dissenting Shareholder with respect to Company Shares voted in favour of the Arrangement Resolution. If such Dissenting Shareholder votes in favour of the Arrangement Resolution in respect of a portion of the Company Shares registered in his, her or its name and held by same on behalf of any one beneficial owner, such vote approving the Arrangement Resolution will be deemed to apply to the entirety of Company Shares held by such Dissenting Shareholder in the name of that beneficial owner, given that section 190 of the CBCA provides that there is no right of partial dissent. The CBCA does not provide and Africo does not assume that a vote against the Arrangement Resolution constitutes a Dissent Notice. A Registered Shareholder need not vote its Company Shares against the Arrangement Resolution in order to dissent. Similarly, the revocation of a proxy conferring authority on the proxyholder to vote in favour of the Arrangement Resolution does not constitute a Dissent Notice. However, any proxy granted by a Registered Shareholder who intends to dissent, other than a proxy that instructs the proxyholder to vote against the Arrangement Resolution, should be validly revoked in order to

prevent the proxyholder from voting such Company Shares in favour of the Arrangement Resolution and thereby causing the Registered Shareholder to forfeit its Dissent Rights.

Within 10 days after the approval of the Arrangement Resolution, Africo is required to notify each Dissenting Shareholder that the Arrangement Resolution has been approved. Such notice is however not required to be sent to a Registered Shareholder who voted for the Arrangement Resolution or who has withdrawn a Dissent Notice previously filed.

A Dissenting Shareholder must, within 20 days after the Dissenting Shareholder receives notice that the Arrangement Resolution has been approved or, if the Dissenting Shareholder does not receive such notice, within 20 days after the Dissenting Shareholder learns that the Arrangement Resolution has been approved, send to the Company at its registered office located at Suite 520, 800 West Pender Street, Vancouver, British Columbia, a Demand for Payment containing the Dissenting Shareholder's name and address, the number of Dissent Shares held by the Dissenting Shareholder, and a Demand for Payment of the fair value of such Dissent Shares. Within 30 days after sending a Demand for Payment, the Dissenting Shareholder must send to the Company at its registered office located at Suite 520, 800 West Pender Street, Vancouver, British Columbia or to Computershare Investor Services Inc., the registrar and transfer agent of Africo, located at 8th Floor, 100 University Avenue, Toronto, Ontario, M5J 2Y1, the certificates representing the Dissent Shares. A Dissenting Shareholder who fails to send the certificates representing the Dissent Shares forfeits its right to make a claim under section 190 of the CBCA. Africo or Computershare will endorse on Company Share certificates received from a Dissenting Shareholder a notice that the holder is a Dissenting Shareholder under section 190 of the CBCA and will forthwith return the Company Share certificates to the Dissenting Shareholder.

On the filing of a Demand for Payment (and in any event upon the Effective Date), a Dissenting Shareholder ceases to have any rights in respect of its Dissent Shares, other than the right to be paid the fair value of its Dissent Shares as determined pursuant to section 190 of the CBCA and the Interim Order, except where, prior to the date at which the Arrangement becomes effective: (i) the Dissenting Shareholder withdraws its Demand for Payment before Camrose makes an Offer to Pay to the Dissenting Shareholder; (ii) an Offer to Pay is not made and the Dissenting Shareholder withdraws its Demand for Payment; or (iii) the Board revokes the Arrangement Resolution, in which case Africo will reinstate the Dissenting Shareholder's rights in respect of its Dissent Shares as of the date the Demand for Payment was sent, all subject to the terms of the Interim Order which provides that Registered Shareholders who exercise the rights of dissent as set out in the CBCA as modified by the Interim Order will be deemed to have transferred their Dissent Shares to Camrose, free and clear of any liens, as of the Effective Date, and if they (a) ultimately are entitled to be paid fair value for their Dissent Shares, shall be deemed to have transferred such Company Shares to Camrose on the Effective Date in exchange for the fair value of such Company Shares, and will not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement in respect of such Company Shares had such holders not exercised their Dissent Right, or (b) are ultimately not entitled, for any reason, to be paid fair value for their Dissent Shares, will be deemed to have participated in the Arrangement on the same basis as non-Dissenting Shareholders. Pursuant to the Plan of Arrangement, in no case will Camrose, Africo or any other Person be required to recognize any Dissenting Shareholder as a Shareholder after the Effective Date, and the names of such Shareholders will be deleted from the list of Registered Shareholders at the Effective Date. In addition to any other restrictions under section 190 of the CBCA, none of the following shall be entitled to exercise Dissent Rights: (i) holders of Company Options; and (ii) holders of Company Shares who vote or have instructed a proxyholder to vote such Company Shares in favour of the Arrangement Resolution (but only in respect of such Company Shares).

No later than 7 days after the later of the Effective Date and the date on which, as applicable, a Demand for Payment of a Dissenting Shareholder is received, each Dissenting Shareholder who has sent a Demand for Payment must be sent a written Offer to Pay for its Dissent Shares in an amount considered by Camrose to be the fair value thereof, accompanied by a statement showing how the fair value was determined. Every Offer to Pay in respect of Company Shares must be on the same terms as every other offer to pay in respect of Company Shares.

Payment for the Dissent Shares of a Dissenting Shareholder must be made within 10 days after an Offer to Pay has been accepted by a Dissenting Shareholder, but any such Offer to Pay lapses if an acceptance thereof is not received within 30 days after the Offer to Pay has been made. If an Offer to Pay for the Dissent Shares of a Dissenting Shareholder is not made, or if a Dissenting Shareholder fails to accept an Offer to Pay that has been

made, an application to a court to fix a fair value for the Dissent Shares of Dissenting Shareholders may be made within 50 days after the Effective Date or within such further period as a court may allow. If no such application is made, a Dissenting Shareholder may apply to the court for the same purpose within a further period of 20 days or within such further period as a court may allow. A Dissenting Shareholder is not required to give security for costs in such an application.

Upon an application to the court, all Dissenting Shareholders whose Dissent Shares have not been purchased will be joined as parties and bound by the decision of the court, and each affected Dissenting Shareholder shall be notified of the date, place and consequences of the application and of their right to appear and be heard in person or by counsel. Upon any such application to the court, the court may determine whether any other Person is a Dissenting Shareholder who should be joined as a party, and the court will then fix a fair value for the Dissent Shares of all such Dissenting Shareholders. The final order of the court will be rendered against Camrose in favour of each Dissenting Shareholder joined as a party and for the amount of the Dissent Shares as fixed by the court. The court may, in its discretion, allow a reasonable rate of interest on the amount payable to each such Dissenting Shareholder from the Effective Date until the date of payment. Registered Shareholders who are considering exercising Dissent Rights should be aware that there can be no assurance that the fair value of their Company Shares as determined under the applicable provisions of the CBCA (as modified by the Plan of Arrangement and the Interim Order) will be more than or equal to the Consideration under the Arrangement. In addition, any judicial determination of fair value will result in delay of receipt by a Dissenting Shareholder of consideration for such Dissenting Shareholder's Dissent Shares.

**The above is only a summary of the provisions of the CBCA pertaining to Dissent Rights, as modified by the Interim Order and the Plan of Arrangement, which are technical and complex. If you are a Registered Shareholder and wish to exercise Dissent Rights, you should seek your own legal advice as failure to strictly comply with the provisions of the CBCA, as modified by the Interim Order and the Plan of Arrangement, may prejudice your Dissent Rights.**

For a general summary of certain income tax implications to a Dissenting Shareholder, see "Certain Canadian Federal Income Tax Considerations".

## CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of the principal Canadian federal income tax considerations relating to the Arrangement generally applicable to a Shareholder who, at all relevant times, for the purposes of the Tax Act: (a) deals at arm's length with Camrose and Africo; (b) is not affiliated with Camrose or Africo; and (c) holds the Company Shares as capital property.

Company Shares will generally be considered to be capital property to a Shareholder unless such shares are held in the course of carrying on a business or were acquired in one or more transactions considered to be an adventure in the nature of trade. Certain Shareholders who are resident in Canada for the purposes of the Tax Act and whose Company Shares might not otherwise qualify as capital property may be entitled to make the irrevocable election provided by subsection 39(4) of the Tax Act to have their Company Shares and every other "Canadian security" (as defined in the Tax Act) owned by them in the taxation year of the election, and in all subsequent taxation years, deemed to be capital property. Shareholders who do not hold their Company Shares as capital property should consult their own tax advisors for advice with respect to whether an election under subsection 39(4) of the Tax Act is available and advisable in their particular circumstances.

This summary is based on the current provisions of the Tax Act and the current published administrative practices of the Canada Revenue Agency (the "**CRA**"). This summary also takes into account all specific proposals to amend the Tax Act which have been publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof. This summary does not take into account or anticipate any other changes in law, whether by judicial, governmental or legislative action or decision, or changes in the administrative practices of the CRA, nor does it take into account provincial, territorial or foreign income tax legislation or considerations, which may differ significantly from the Canadian federal income tax considerations described herein.

This summary is not applicable to a Shareholder that is: (i) a "financial institution" for purposes of the "mark-to-market property" rules in the Tax Act; (ii) a "specified financial institution" (as defined in the Tax Act); (iii) an interest in which is a "tax shelter investment" (as defined in the Tax Act); (iv) a Shareholder who has elected to report its Canadian tax results in a currency other than Canadian currency; (v) a Shareholder that has entered or enters into a "derivative forward agreement" (as defined in the Tax Act) with respect to a Company Share, or (vi) a Shareholder who acquired their Company Shares on the exercise of employee stock options. Such Shareholders should consult their own tax advisors. In addition, this summary does not describe the tax consequences of the Arrangement to holders of Company Options.

In general, for purposes of the Tax Act, all amounts relating to the acquisition, holding or disposition of property must be converted into Canadian dollars based on the daily noon rate as quoted by the Bank of Canada for the applicable day or such other rate of exchange that is acceptable to the CRA.

This summary is not exhaustive of all Canadian federal income tax considerations and is of a general nature only. It is not intended to be, nor should it be construed to be, legal or tax advice to any particular Shareholder, and no representations with respect to the tax consequences to any particular Shareholder are made. Accordingly, Shareholders should consult their own tax advisors with respect to their particular circumstances, including the application and effect of the income and other tax laws of any country, province or other local tax authority.

**Shareholders Resident in Canada**

This portion of the summary is generally applicable to a Shareholder who, for the purposes of the Tax Act and at all relevant times, is or is deemed to be resident in Canada for purposes of the Tax Act (a "**Resident Shareholder**").

*Disposition under the Arrangement*

A Resident Shareholder whose Company Shares are transferred to Camrose for the Consideration under the Arrangement will realize a capital gain (or capital loss) equal to the amount by which such Resident Shareholder's proceeds of disposition exceed (or are less than) the sum of the adjusted cost base of the Company Shares to the Resident Shareholder at the time of such disposition and any reasonable costs of disposition. A Resident Shareholder's proceeds of disposition will include the Closing Payment Amount plus the fair market of the right to acquire the Company Material Property Payment (the "**CMPP Right**"). A Resident Shareholder's cost of the CMPP Right will be equal to its fair market value.

A Resident Shareholder generally will be required to include one-half of the amount of any such capital gain (a "**taxable capital gain**") in income, and will be required to deduct one-half of the amount of any such capital loss (an "**allowable capital loss**") against taxable capital gains realized in the year of disposition. Allowable capital losses in excess of taxable capital gains for the year of disposition generally may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years, to the extent and under the circumstances specified in the Tax Act.

In general, a capital loss otherwise arising upon the disposition of a Company Share by a Resident Shareholder that is a corporation may be reduced by dividends previously received or deemed to have been received by it on such Company Share, to the extent and under the circumstances prescribed in the Tax Act. Similar rules may apply where Company Shares are owned by a partnership or trust of which a corporation, trust or partnership is a member or a beneficiary. Resident Shareholders to whom these rules may be relevant should consult their own tax advisors.

A Resident Shareholder that throughout the taxation year is a "Canadian-controlled private corporation" (as defined in the Tax Act) may be liable to pay an additional refundable tax on certain investment income, including taxable capital gains.

Capital gains realized by an individual or a trust, other than certain specified trusts, may be subject to alternative minimum tax under the Tax Act. Resident Shareholders should consult their own tax advisors with respect to the alternative minimum tax provisions.

*Holding and Disposition of CMPP Right and Payments under the CMPP Rights*

The tax consequences of the CMPP Right to a Resident Shareholder are uncertain as the legal characterization of the CMPP Right as capital property of a Resident Shareholder is uncertain. Resident Shareholders are advised to contact their own advisors for advice with regard to the treatment of the CMPP Rights in their particular circumstances.

A disposition or deemed disposition of a CMPP Right will result in a gain (or loss) to the extent the proceeds received or deemed to be received for the CMPP Right, net of any costs of disposition, exceed (or are less than) the cost of the CMPP Right, or if the CMPP Right is capital property to the Resident Shareholder, the adjusted cost base of the CMPP Right. In addition to the transfer of a CMPP Right, a disposition includes the termination of a CMPP Right at the time Camrose's obligation to make a payment in respect of the CMPP Right is satisfied or at the time such contingent obligation terminates because the conditions for making the Company Material Property Payment have not been met during the 14 months following the Effective Date.

If a CMPP Right is capital property of a Resident Shareholder, the gain (or loss) resulting on its disposition will be a capital gain (or capital loss) and will be taxable as discussed above under ‘‘Disposition under the Arrangement’’. If a CMPP Right does not constitute capital property of a Resident Shareholder, such gain (or loss) will be ordinary income. A Resident Shareholder will be required to include in income the amount of the gain and will generally be entitled to deduct the amount of the loss against any income to the extent and in the circumstances described in the Tax Act.

**The CMPP Rights will likely not be considered a qualified investment for trusts governed by Deferred Plans. The acquisition of a non-qualified investment may result in tax to the trust and the annuitant or beneficiary and, in the case of an RESP, possible deregistration. Shareholders are urged to consult their own tax advisors in this regard.**

*Dissenting Resident Shareholders*

A Resident Shareholder who validly exercises dissent rights (a "**Resident Dissenter**") and consequently is paid the fair value of the Resident Dissenter's Company Shares in accordance with the Arrangement should be considered to realize a capital gain (or a capital loss) equal to the amount by which the payment (other than any portion thereof that is in respect of interest awarded by the Court) exceeds (or is exceeded by) the sum of the Resident Shareholder's adjusted cost base of the Company Shares determined at the time such Company Shares are deemed by the Arrangement to be disposed of and any reasonable costs of disposition. The Resident Dissenter will be required to include any resulting taxable capital gain in income, or be entitled to deduct any resulting allowable capital loss, in accordance with the usual rules applicable to capital gains and losses. See "— Disposition under the Arrangement" above. The Resident Dissenter must include in computing its income any interest awarded to it by the Court.

**Shareholders Not Resident in Canada**

This portion of the summary is generally applicable to a Shareholder who, for the purposes of the Tax Act and at all relevant times, is not resident or deemed to be resident in Canada and does not use or hold, and is not deemed to use or hold, Company Shares in connection with carrying on a business in Canada (a "**Non-Resident Shareholder**"). Special rules not discussed in this summary may apply to a non-resident insurer carrying on an insurance business in Canada and elsewhere.

*Disposition under the Arrangement*

A Non-Resident Shareholder whose Company Shares are transferred to Camrose for the Consideration under the Arrangement will not be subject to income tax under the Tax Act on any capital gain realized on the disposition of such Company Shares provided the Company Shares are not "taxable Canadian property" (as defined in the Tax Act) of the Non-Resident Shareholder at the time of such transfer.

Generally, the Company Shares will not constitute taxable Canadian property of a Non-Resident Shareholder if such shares are listed on "designated stock exchange" (which currently includes the TSX) unless at any time during the 60-month period immediately preceding the disposition (i) the Non-Resident Shareholder, persons with whom the Non-Resident Shareholder did not deal at arm's length, partnerships in which the Non-Resident Shareholder or persons with whom the Non-Resident Shareholder does not deal at arm's length, holds a membership interest directly, or indirectly, through one or more partnerships or the Non-Resident Shareholder together with all such persons, owned or was considered to own 25% or more of the issued shares of any class or series of shares of the capital stock of the Company, and (ii) more than 50% of the fair market value of the shares was derived directly or indirectly from one or any combination of real or immovable property situated in Canada, "Canadian resource properties", "timber resource properties" (each as defined in the Tax Act), and options in respect of, or interests in, or for civil law rights in, any such properties (whether or not such property exists). Shares may also be deemed to be "taxable Canadian property" pursuant to the Tax Act. Non-Resident Shareholders should consult their own tax advisors with respect to whether their shares constitute "taxable Canadian property".

Even if the Company Shares are taxable Canadian property of a Non-Resident Shareholder, any capital gain realized upon the disposition or deemed disposition thereof may not be subject to tax under the Tax Act if such gain is exempt from tax pursuant to the provisions of an applicable income tax treaty or convention. Non-Resident Shareholders should consult their own advisors with respect to the availability of any relief under the terms of an applicable income tax treaty or convention in their particular circumstances.

In the event that the Company Shares are taxable Canadian property of a Non-Resident Shareholder and the capital gain realized upon a disposition of such Company Shares to Camrose is not exempt from Canadian tax by virtue of an applicable income tax treaty or convention, then in such circumstances, the tax consequences as described above under "Shareholders Resident in Canada — Disposition under the Arrangement" will generally apply to such Non-Resident Shareholder. Non-Resident Shareholders whose Company Shares are taxable Canadian property should consult their own tax advisors in this regard.

*Holding and Disposition of CMPP Right and Payments under the CMPP Rights*

A Non-Resident Shareholder should not be taxable on the disposition of a CMPP Right or on any payment received in respect of a CMPP Right provided that the Non-Resident Shareholder did not use or hold and was not deemed to use or hold such CMPP Right in carrying on a business in Canada.

*Dissenting Non-Resident Shareholders*

A Non-Resident Shareholder who validly exercises dissent rights (a "**Non-Resident Dissenter**") and consequently is paid the fair value of the Non-Resident Dissenter's Company Shares in accordance with the Arrangement should be considered to realize a capital gain or a capital loss as discussed under "Shareholders Resident in Canada — Dissenting Resident Shareholders". As discussed above under "Shareholders Not Resident in Canada — Disposition under the Arrangement", any resulting taxable capital gain would be subject to tax under the Tax Act only if the Shares are "taxable Canadian property" of the Non-Resident Dissenter at the time they are deemed to be disposed of under the Arrangement and the capital gain is not exempt from Canadian tax by virtue of an applicable tax treaty or convention. Any interest awarded to a Non-Resident Dissenter by the Court should not be subject to non-resident withholding tax.

## EXPENSES OF THE ARRANGEMENT

Pursuant to the Arrangement Agreement each of Africo and Camrose will pay their respective expenses incurred in connection with the preparation, execution and delivery of the Arrangement Agreement and all documents and instruments executed pursuant to the Arrangement Agreement and any other costs and expenses whatsoever and howsoever incurred. Africo estimates that expenses in the aggregate amount of approximately $450,000 will be incurred by Africo in connection with the Arrangement if the Arrangement is completed, including, without limitation legal, certain financial advisory, accounting, filing and printing costs and the costs of preparing and mailing this Circular.

## INFORMATION CONCERNING CAMROSE

Camrose is a wholly-owned subsidiary of Eurasian Resources Group, previously known as Eurasian Natural Resources Corporation. Camrose is the Company's largest shareholder, and as at the date hereof owns of record or beneficially, directly or indirectly, or exercises control or direction over approximately 63.7% of Africo's outstanding common shares.

## VOTING SHARES AND PRINCIPAL HOLDERS THEREOF

Africo has authorized voting capital of unlimited common shares. Each shareholder is entitled to one vote for each Company Share registered in his or her name at the close of business on May 25, 2016, the date fixed by our directors as the record date for determining who is entitled to receive notice of and to vote at the Meeting.

At the close of business on May 25, 2016, 71,313,127 Company Shares were outstanding. To the knowledge of Africo's directors and officers, the only entities that beneficially owned, directly or indirectly, or exercised control or direction over 10% or more of Africo's common shares on the date thereof were:

| **Name**(1) | **Number of common shares**(1) | **Percentage of issued shares** |
|---|---|---|
| Camrose Resources Limited(2)(3) | 45,400,000(2)(3) | 63.7% |
| Geologic Resource Partners LLC(4) | 11,276,100(4) | 15.8% |

(1) Information as to ownership of shares has been taken from the list of registered shareholders maintained by Africo's transfer agent, Computershare Investor Services Inc., or has been extracted from insider reports or other disclosure documents filed with regulators by the entity and publicly available through the Company's profile on the Canadian System for Disclosure by Insiders (SEDI) at www.sedi.ca or SEDAR at www.sedar.com.

(2) The transactions relating to the acquisition by Camrose of common shares in the capital of Africo are disclosed in Africo's Management Information Circular dated May 14, 2008, prepared in connection with the annual and special meeting of shareholders held on June 12, 2008, which has been filed with regulators and is available for viewing through the Company's profile on SEDAR at www.sedar.com. See "Rights for Representation on the Board of Directors" below, "Annual Business of the Meeting – Election of Directors" and "Other Information – Interest of Informed Persons in Material Transactions".

(3) As disclosed in a report dated August 20, 2010, filed with regulators by Eurasian Natural Resources Corporation plc ("**ENRC**") pursuant to applicable early warning legislation, ENRC reported that, through its wholly owned subsidiary, ENRC Congo BV ("**ENRC Congo**"), it acquired 13,130 ordinary shares of Camrose representing 50.5% of the issued and outstanding common shares of Camrose, the result of which is that, as reported by ENRC, ENRC Congo was at that time deemed for purposes of Canadian securities laws to indirectly beneficially own 45,400,000 common shares of Africo, representing approximately 64% of the outstanding common shares of Africo.
As disclosed in a subsequent report dated December 7, 2012, filed with regulators by ENRC pursuant to applicable early warning legislation, ENRC Congo entered into a purchase agreement to acquire the remaining 49.5% of the issued and outstanding ordinary shares of Camrose, upon the closing of which ENRC Congo held (and to the best of the knowledge of management of Africo as of the date of this Circular continues to hold) 100% of Camrose such that ENRC indirectly owns and exercises control or direction over approximately 64% of the issued and outstanding common shares of Africo. See "Rights for Representation on the Board of Directors" below, as well as "Annual Business of the Meeting – Election of Directors" and "Other Information – Interest of Informed Persons in Material Transactions". ENRC is currently named Eurasian Resources Group B.V.

(4) This information with respect to shareholdings by Geologic Resource Partners LLC was extracted from an Alternative Monthly Report dated April 9, 2010, filed with regulators by Geologic Resource Partners LLC pursuant to applicable early warning legislation, which is available for public viewing through the Company's profile on SEDAR www.sedar.com.

Certain information in the table above was derived from publicly available reports filed with securities regulators by the respective entities. We have no way of determining if these securityholdings have changed between the time of filing of the report by the respective entity and the date of this Circular.

***Rights for Representation on the Board of Directors***

Pursuant to the terms of a subscription agreement dated as of April 17, 2008, as amended, between Camrose Resources Limited and Africo, Africo has agreed to support majority representation on its Board of Directors by representatives of Camrose, subject to a reduction in the number of representatives to be designated by Camrose should its percentage ownership of Africo decrease. See "Annual Business of the Meeting – Election of Directors".

## ANNUAL BUSINESS OF THE MEETING

### FINANCIAL STATEMENTS

The audited consolidated financial statements of Africo for the year ended December 31, 2015 will be placed before you at the Meeting. These financial statements, together with Management's Discussion & Analysis for the year ended December 31, 2015, have been mailed to Shareholders together with this Circular and the Notice of the Meeting to which this Circular relates and have been electronically filed by Africo with regulators and are available on SEDAR at www.sedar.com.

### ELECTION OF DIRECTORS

Directors of Africo are elected for a term of one year. The current term of office of each of the current directors will expire at the Meeting. Each of the nominees named in the table below, if elected, will serve until the close of the next annual meeting, unless he resigns or otherwise vacates office before that time.

***Number of Directors***

Under Africo's articles, Africo shall have a minimum of one and a maximum of nine directors, the exact number of directors, within such limits, to be determined from time to time by the Board. Pursuant to the terms of the subscription agreement dated as of April 17, 2008, as amended, between Camrose and Africo, Africo agreed to support the nomination of four individuals designated by Camrose for election to Africo's Board of Directors and to take all steps necessary to ensure that the Board is comprised of no more than seven directors. In accordance with Africo's by-laws, the Board of Directors has set the number of directors to be elected at the Meeting at five and five individuals (all of whom are current directors of Africo, three of whom are nominees of Camrose Resources Limited, and one of whom is a representative of Geologic Resource Partners LLC, a principal shareholder of Africo) are being proposed by management as nominees for election as directors at the Meeting. See "Voting Shares and Principal Holders Thereof – Rights for Representation on the Board of Directors".

***Nominees for Election***

The following are the nominees proposed for election as directors of Africo, together with the number of common shares beneficially owned, directly or indirectly, or over which control or direction is exercised, and the number of stock options held by each nominee as of the record date for the Meeting to which this Circular relates. Each of the nominees has agreed to stand for election and we are not aware of any intention of any of them not to do so. However, if one or more of them should become unable to stand for election, it is likely that one or more other persons would be nominated at the Meeting for election and, in that event, the persons designated in the form of proxy will vote in their discretion for a substitute nominee.

All of the nominees are current directors of Africo, having been elected by shareholders as a director by a majority of votes cast at the last annual meeting held on June 25, 2015.

Africo has not adopted a majority voting policy for election of directors at uncontested shareholder meetings at which directors are to be elected and is exempted from the majority voting requirements of Toronto Stock Exchange policy. See "Corporate Governance – Nomination and Election of Directors".

Voting for the election of directors of Africo is by individual voting and not by slate voting. You can vote your shares for the election of all of these nominees as directors of Africo, or you can vote for some of these nominees for election as directors and withhold your votes for others, or you can withhold all of the votes attaching to the shares you own and, thus, not vote for the election of any of these nominees.

Africo's management recommends that shareholders vote in favour of all of the nominees for election as directors. **Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the election of the five nominees as directors of Africo for the ensuing year.**

| Name and place of residence | Principal occupation | Director since | Number of common shares[(1)] |
|---|---|---|---|
| **JAMES COOK**[(2)]<br>Québec, Canada<br>*Director*<br>*Chair of the Audit Committee and Member of the Compensation Committee* | Senior Vice President Strategic Materials (since June 2011) of Bloom Energy Corporation, a producer of solid oxide fuel cells; retired (May 2007 to June 2011). | September 23, 2008 | 80,000 |
| **JONATHAN CORDERO**[(2) (3)]<br>Germany<br>*Director*<br>*Member of the Audit Committee* | Director of Strategic Finance at Eurasian Resources Group ("**ERG**") in Luxembourg. Responsible for Project Financings and Strategic Partnerships. He joined ERG after its privatization in March 2014 where he was involved in the development of group strategy. | June 25, 2015 | Nil[(3)] |
| **EDWARD LAUER**[(2) (3)]<br>Switzerland<br>*Director*<br>*Member of the Compensation Committee* | Currently the head of Portfolio Optimisation at ERG. He worked previously at Pala Investments, an investment fund focused on the mining sector and the Boston Consulting Group, where he was a member of both the mining and energy practices. | June 25, 2015 | Nil[(3)] |
| **GEORGE IRELAND**<br>Massachusetts, USA<br>*Director*<br>*Chair of the Compensation Committee*<br>*Member of the Audit Committee* | Founder, Chief Investment Officer and Chief Executive Officer of Geologic Resource Partners (manager privately owned investment firm) | October 16, 2014 | 11,314,600 |
| **CHRIS THEODOROPOULOS**[(4)]<br>British Columbia, Canada<br>*Chair of the Board, President and Chief Executive Officer* | Self-employed businessman (since March 2007); Chief Executive Officer of Africo; Chair of the Board of Africo. | July 4, 2006 | 2,531,102 |

(1) Information as to ownership of shares has been obtained from insider reports filed by the individuals and available through the Company's profile on System for Electronic Disclosure by Insiders (SEDI), or has been provided by the individuals. Shareholdings are as of May 25, 2016, the record date for the Meeting to which this Circular relates.

(2) Nominee of Camrose Resources Limited (see "Voting Shares and Principal Holders Thereof").

(3) ERG, Mr. Cardero's and Mr. Lauer's former employer, has reported to securities regulators that ENRC Congo, its wholly-owned subsidiary, indirectly beneficially owns 45,400,000 common shares of Africo, representing approximately 64% of the outstanding common shares of Africo. See "Voting Shares and Principal Holders Thereof".

(4) See "Other Information – Indebtedness of Directors and Executive Officers".

See also "Other Information – Interest of Informed Persons in Material Transactions."

## APPOINTMENT OF THE AUDITOR

During the financial year ended December 31, 2015, PricewaterhouseCoopers LLP, Chartered Accountants, served as Africo's auditor, having served as the Company's auditor since June 30, 2005. For details of fees paid by Africo to PricewaterhouseCoopers LLP for audit services during the last two completed financial years, see "Item 9 – Audit Committee" in Africo's Annual Information Form dated March 16, 2016, for the financial year ended December 31, 2015, which has been electronically filed with regulators through SEDAR and is available for viewing with Africo's other public disclosure documents under the Company's profile at www.sedar.com.

Africo's management recommends that shareholders vote in favour of the re-appointment of PricewaterhouseCoopers LLP, Chartered Accountants, as Africo's auditor for the ensuing year and in favour of authorizing the Board of Directors to fix the auditor's remuneration. **Unless you give other instructions, the persons named in the enclosed form of proxy intend to vote FOR the resolution to appoint PricewaterhouseCoopers LLP as Africo's auditor until the close of Africo's next annual meeting and to vote FOR authorizing the Board of Directors to fix the auditor's remuneration.**

## EXECUTIVE COMPENSATION

### Compensation Discussion and Analysis

The purpose of this Compensation Discussion and Analysis is to provide information about Africo's executive compensation objectives and processes and to discuss compensation decisions relating to its named executive officers ("**Named Executive Officers**") listed in the Summary Compensation Table below. During the Company's fiscal year ended December 31, 2015, the following individuals were "Named Executive Officers" (pursuant to applicable securities legislation) of Africo, namely:

- Chris Theodoropoulos, Chair of the Board, President and Chief Executive Officer; and
- Larry Okada, Chief Financial Officer.

***Background***

Africo is a development stage company with an operational base in the Democratic Republic of the Congo (the "**DRC**") and with corporate offices in Vancouver. Africo's primary objective is pursuing further exploration and development of its copper cobalt deposit near Kolwezi in the DRC known as the Kalukundi Project and also seeking to acquire other strategic mining investments.

Additional information about Africo and its operations is available in its audited consolidated financial statements, Management's Discussion & Analysis and Annual Information Form for the year ended December 31, 2015, which have been electronically filed with regulators through SEDAR and are available for viewing under the Company's profile at www.sedar.com.

***Role of the Compensation Committee and Compensation Governance***

In order to assist the Board with fulfilling its oversight responsibilities with respect to human resources matters, the Board has established a Compensation Committee, the responsibilities of which include, among others, making recommendations to the Board of Directors relating to the compensation of the Chief Executive Officer, the Chief Financial Officer and the Chair of the Board; reviewing and approving the Chief Executive Officer's recommendations regarding the compensation of the other officers and employees of, and consultants to, Africo; approving compensation of the directors; and making recommendations to the Board of Directors for option-based awards to be granted under Africo's Stock Option Incentive Plan. See "Corporate Governance – Committees of the Board" and also Appendix G to this Circular, which is the Charter of the Compensation Committee.

The members of the Compensation Committee have experience relevant to executive compensation either through their Committee experience or through experience gained during their professional careers and they bring a broad base of skills and experience that contributes to their abilities to make decisions on Africo's compensation policies and practices, including knowledge of the industry and operational experience, as well as financial experience and legal background.

***Compensation Objectives and Principles***

The primary goal of Africo's executive compensation process is to attract and retain the key executives necessary for Africo's long term success, to encourage executives to further the development of Africo and its operations, and to motivate top quality and experienced executives. The key elements of Africo's executive compensation are: (i) base salary; (ii) an annual incentive award; and (iii) incentive stock options. In establishing levels of remuneration and in awarding stock options and bonuses, the executive's performance, level of expertise, responsibilities, length of service to Africo and comparable levels of remuneration paid to executives of other companies of comparable size and development within the industry are taken into consideration, as well as Africo's financial position. The program is designed to ensure that the compensation provided to Africo's executive officers is determined with regard to its business strategy and objectives, such that the financial interests of the executive officers are matched with the financial interests of the shareholders.

Africo currently has no significant revenues from operations and may operate, from time to time, with limited financial resources and under cost controls to ensure that funds are available to complete scheduled exploration and development programs. As a result, the Compensation Committee and the Board of Directors has to consider not only Africo's financial situation at the time of the determination of executive compensation, but also its estimated financial situation in the mid- and long-term. An important element of executive compensation is stock options, which do not require cash disbursements by Africo (see "Option-based Awards" below).

***Compensation Process***

The Compensation Committee typically relies on the knowledge and experience of its members and the recommendations of the Chief Executive Officer to set appropriate levels of compensation for executive officers.

In December 2009, Africo's Board of Directors mandated its Compensation Committee to establish and implement a bonus entitlement plan (the "**Bonus Plan**") in the aggregate amount of 1.5% of the value of any future transaction or transactions that Africo undertakes, including any merger, plan of arrangement, acquisition of shares and/or assets, or financing. Awards under the Bonus Plan will be recommended by the Compensation Committee (based on recommendations by the Chair) to the Board of Directors for approval prior to any award being made. All of Africo's directors, officers and employees are entitled to participate in the Bonus Plan at the discretion of the Compensation Committee. As of the date of this Circular, no bonuses have been awarded under the Bonus Plan.

***Option Based Awards***

Options to purchase common shares of Africo are intended to align the interests of Africo's employees, directors and its senior executives with those of its shareholders, to provide a long term incentive that rewards these individuals for their contribution to the creation of shareholder value, and to reduce the cash compensation Africo

would otherwise have to pay. The Company Stock Option Plan is administered by the Compensation Committee. The Company Stock Option Plan is designed to give each option holder an interest in preserving and maximizing shareholder value in the longer term, to enable Africo to attract and retain individuals with experience and ability, and to reward individuals for current performance and expected future performance. Stock option awards are considered when reviewing executive officer compensation packages as a whole.

In establishing the number of the incentive stock options to be granted to the Named Executive Officers, reference is made to the incentive stock options granted to officers of publicly traded companies that, are involved in the mining industry, as well as publicly traded Canadian companies of a comparable size to that of Africo in respect of assets. The Compensation Committee also considers previous awards of options and the overall number of options that are outstanding relative to the number of outstanding common shares in determining whether to grant any new options and the size and terms of any such grants, as well as the level of effort, time, responsibility, ability, experience and level of commitment of the Named Executive Officers in determining the level of incentive stock option compensation. See "Incentive Plan Awards - Outstanding Option-Based Awards" below, as well as "Securities Authorized for Issuance Under Equity Compensation Plans", for a summary of the principal features of Africo's Company Stock Option Plan.

***Benefits and Perquisites***

Except as otherwise disclosed herein, the Named Executive Officers of Africo do not receive benefits or perquisites that are not generally available to all employees of Africo. See "Summary Compensation Table" below.

***Risks Associated with Africo's Compensation Practises***

Africo's Board of Directors has not considered the implications of any risks to Africo associated with decisions regarding compensation of Africo's executive officers.

***Hedging by Named Executive Officers or Directors***

Africo has not, as yet, adopted a policy restricting its executive officers and directors from purchasing financial instruments, including, for greater certainty, prepaid variable forward contracts, equity swaps, collars, or units of exchange funds, that are designed to hedge or offset a decrease in market value of equity securities granted or awarded as compensation or held, directly or indirectly, by executive officers or directors. As of the date of this Circular, entitlement to grants of incentive stock options under Africo's Company Stock Option Plan is the only equity security element awarded by Africo to its executive officers and directors.

**Performance Graph**

The following graph compares the five-year cumulative total shareholder return for $100 invested in common shares of Africo assuming an investment was made on December 31, 2011, against the cumulative total shareholder return of the S&P/TSX Composite Index over the five most recently completed financial years of trading for Africo, assuming reinvestment of dividends, notwithstanding no dividends have been declared or paid by Africo since its incorporation. As at May 30, 2016 Africo's closing share price as traded on the TSX was $0.96. Africo's Board of Directors and its Compensation Committee do not rely on share performance as the basis for executive compensation decisions.




| | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 |
|---|---|---|---|---|---|
| Africo Resources Ltd.[(1)] | 100 | $ 86.57 | $ 63.43 | $ 52.24 | $ 73.13 |
| S&P/TSX Composite[(1)] | 100 | $ 104.00 | $ 113.94 | $ 122.40 | $ 108.82 |

(1) References to "$" are to Canadian dollars. The above computation assumes that dividends are reinvested (notwithstanding the fact that no dividends have been declared or paid by Africo since its incorporation).

### Summary Compensation Table

The following table provides a summary of the compensation earned by, paid to, or accrued and payable to, each Named Executive Officer during the past three fiscal years ended December 31, 2015, 2014 and 2013. See also "Incentive Plan Awards – Outstanding Option-Based Awards" below.

Amounts reported in the table below are stated in U.S. dollars, the currency that Africo uses in its financial statements. All of Africo's compensation arrangements are contracted in Canadian dollars and, for the purposes of the table below, have been converted herein to U.S. dollars using an average exchange rate of C$1 = US$0.7490 (2014 - $US .8803; 2013 - US$0.9710).

| | | | | | Non-equity incentive plan compensation (US$) | | | |
|---|---|---|---|---|---|---|---|---|
| **Name and principal position** | **Fiscal year ended Dec 31** | **Salary/ Fee (US$)** | **Share-based awards (US$)** | **Option-based awards (US$)** | **Annual incentive plans (US$)** | **Long-term incentive plans (US$)** | **All other compensation (US$)** | **Total compensation (US$)** |
| Chris Theodoropoulos[(1)] *Chair, President & CEO* | 2015 | 297,540[(3)] | Nil | Nil[(2)] | Nil | Nil | 5,896 | 303,436 |
| | 2014 | 323,290[(3)] | Nil | Nil | Nil | Nil | 33,339[(3)] | 356,629 |
| | 2013 | 356,600[(3)] | Nil | Nil | Nil | Nil | 36,772[(3)] | 393,372 |
| Larry Okada[(4)] *CFO* | 2015 | 89,880[(5)] | Nil | Nil[(2)] | Nil | Nil | 2,066 | 91,946 |
| | 2014 | 85,917[(5)] | Nil | Nil | Nil | Nil | 2,429 | 88,346 |
| | 2013 | 83,894[(5)] | Nil | Nil | Nil | Nil | Nil | 83,894 |

(1) Mr. Theodoropoulos was appointed Acting Chief Executive Officer of Africo on December 9, 2009, and as President and Chief Executive Officer effective January 1, 2015.

(2) Africo uses the Black-Scholes pricing model to value stock options for financial statement purposes only. The grant date fair value of options to purchase 930,000 common shares in the capital of Africo at a per share price of $0.45 until December 5, 2019, estimated using the Black-Scholes option pricing model, is US$Nil (see Note 10(b) to Africo's consolidated financial statements for the year ended December 31, 2015 for the assumptions and estimates used for these calculations). We use the intrinsic method which values stock options at the excess of the trading price of Africo's common shares over the per share exercise price of the option. The aggregate value of the stock options based on the intrinsic method on December 5, 2014, the date of grant, was $Nil and at December 31, 2015, was $Nil.

(3) Of this amount:

- for fiscal 2015, $3,993 relates to perquisites for parking and $3,879 related to life insurance for 2015.
- for fiscal 2014, $3,993 relates to perquisites for parking and $3,879 relates to life insurance and $30,000 is for director fees; and
- for fiscal 2013, $7,870 relates to perquisites for life insurance and parking and $30,000 represents director fees.

(4) Mr. Okada has served as (Acting) Chief Financial Officer of Africo since January 1, 2010.

(5) Consulting fees of $120,000 (2014 – $97,600 and 2013 - $79,200) was paid to L.M. Okada Ltd., a private company controlled by Mr. Okada, in accordance with the terms of a Consulting Services Agreement dated January 1, 2010, among Africo, L.M. Okada Ltd. and Mr. Okada, pursuant to which Mr. Okada provides consulting services to Africo is customarily provided by a Chief Financial Officer.

(6) Africo uses the Black-Scholes pricing model to value stock options for financial statement purposes only. The grant date fair value of options to purchase 190,000 common shares in the capital of Africo at a per share price of $0.45 until December 5, 2019, estimated using the Black-Scholes option pricing model, is US$Nil (see Note 10(b) to Africo's consolidated financial statements for the year ended December 31, 2015 for the assumptions and estimates used for these calculations). We use the intrinsic method which values stock options at the excess of the trading price of Africo's common shares over the per share exercise price of the option. The aggregate value of the stock options based on the intrinsic method on December 5, 2014, the date of grant, was $Nil and at December 31, 2015, was $Nil.

## Incentive Plan Awards

### *Outstanding Option-Based Awards*

Africo's Board granted incentive stock options to its Named Executive Officers on December 5, 2014, which options entitle the purchase of an aggregate 1,120,000 of Africo's common shares at $0.45 per share until December 5, 2019.

The following table summarizes all option-based awards granted in prior years to the Named Executive Officers that were outstanding at December 31, 2015. No other share-based awards have been granted to the Named Executive Officers.

| | Option-based Awards | | | | Share-based Awards | | |
|---|---|---|---|---|---|---|---|
| **Named Executive Officer** | **Number of common shares underlying unexercised options** | **Option exercise price ($)** | **Option expiry date** | **Value of unexercised in-the-money options(1) ($)** | **Number of shares or units of shares that have not vested** | **Market or payout value of share-based awards that have not vested ($)** | **Market or payout value of vested share-based awards not paid out or distributed ($)** |
| Chris Theodoropoulos | 930,000 | 0.45 | Dec 5, 2019 | 37,200 | N/A | N/A | N/A |
| Larry Okada | 190,000 | 0.45 | Dec 5, 2019 | 7,600 | N/A | N/A | N/A |

(1) The value of unexercised "in-the-money options" at the financial year-end is the difference between the option exercise price and the market value of the underlying stock on the TSX on December 31, 2015. The market value of the shares is the closing price of the common shares on the TSX on December 31, 2015, which was $0.49.

### *Incentive Plan Awards – Value Vested or Earned During the Year*

No incentive stock options were exercised by our Named Executive Officers during Africo's fiscal year ended December 31, 2015. As such, no value was earned by the Named Executive Officers as a result of option exercise.

The value of options vested is represented by the aggregate dollar value that would have been realized if options had been exercised on the vesting date – that is, the difference between the market price of the underlying shares and the option exercise price on the vesting date. All options granted by Africo to its Named Executive Officers, as summarized in the table above, were either fully vested and exercisable on the date of grant or had fully vested in accordance with the terms of the relevant vesting schedule and were fully exercisable by December 31, 2014, and the option exercise prices on the dates of grant and/or the vesting dates were either equal to or greater than the market price of Africo's common shares on the dates of grant. As such, no value vested in favour of the Named Executive Officers during the fiscal year ended December 31, 2015, as a result of options vesting.

The following table summarizes the value to the Named Executive Officers of equity and non-equity incentive plan compensation during the fiscal year ended December 31, 2014.

| Named Executive Officer | Option-based awards – Value vested during the year ended Dec 31/2015[(1)] (US$) | Share-based awards – Value vested during the year ended Dec 31/2015 (US$) | Non-equity incentive plan compensation – Value earned during the year ended Dec 31/2015 (US$) |
|---|---|---|---|
| Chris Theodoropoulos | Nil | N/A | N/A |
| Larry Okada | Nil | N/A | N/A |

(1) Represents the aggregate dollar value that would have been realized if the options had been exercised on the vesting date - which is, the difference between the market price of the underlying shares and the option exercise price on the vesting date.

## Termination and Change of Control Benefits

Below is a summary of the terms of each contract, agreement, plan or arrangement between Africo and its Named Executive Officers as at December 31, 2015, which provide for payments to Named Executive Officers at, following, or in connection with any termination (whether voluntary, involuntary or constructive), resignation or retirement, or as a result of a change in control of Africo or a change in a Named Executive Officer's responsibilities. See "Other Information – Management Contracts".

*Chris Theodoropoulos, Chair, President and Chief Executive Officer*

Africo was party to an agreement dated December 9, 2009, with Chris Theodoropoulos and 143 Investments Ltd. ("**143**"), a private company controlled by Mr. Theodoropoulos, pursuant to which Mr. Theodoropoulos served as Chair of the Board and was engaged in the capacity of acting Chief Executive Officer of Africo until such time as Africo appointed a permanent President and Chief Executive Officer. This agreement was amended and restated effective January 1, 2015, such that Mr. Theodoropoulos now serves as Chair of the Board, President and Chief Executive Officer of Africo. The agreement between Mr. Theodoropoulos and Africo, as amended and restated, is referred to herein as the "**Theodoropoulos Agreement**".

Pursuant to the Theodoropoulos Agreement, Africo will pay Mr. Theodoropoulos, through 143, a monthly fee of $33,104 plus applicable GST or $397,250 per annum in the aggregate plus applicable GST. Mr. Theodoropoulos is entitled to participate in Africo's Company Stock Option Plan as determined by Africo's Board. He is also entitled to participate in the Bonus Plan as determined by Africo's Compensation Committee or the Board. Mr. Theodoropoulos may terminate the Theodoropoulos Agreement by giving Africo at least one month's advance notice in writing, which Africo may waive in whole or in part, in which case Mr. Theodoropoulos' engagement will terminate on the date of such waiver. Africo may terminate the Theodoropoulos Agreement at its sole discretion for any reason, without cause, upon providing Mr. Theodoropoulos and 143 24 months' notice of termination or, at Africo's option, pay in lieu of notice equal to 24 months' of the monthly fee of $33,104 plus applicable taxes, together with a pro-rata portion of any bonus or other form of additional compensation that Mr. Theodoropoulos and 143 would be, but for the termination, entitled to for the year in which the engagement is terminated.

In addition, if Africo terminates the Theodoropoulos Agreement, Mr. Theodoropoulos's rights and entitlements to any performance bonus (except for rights and entitlements, if any, accrued up to the date of

termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date that a notice of termination is given, if pay in lieu of notice is provided. In addition, Africo has agreed that all options granted to Mr. Theodoropoulos but not vested as at the date of termination shall vest immediately and, where pay in lieu of notice is made, any option which, but for such termination, would in due course have been granted to Mr. Theodoropoulos during the 12 months following termination, shall be granted by Africo as fully vested and immediately exercisable.

Medical and dental benefits provided to Mr. Theodoropoulos will continue for a period of six months after the date of termination of his engagement with Africo under the Theodoropoulos Agreement.

The Theodoropoulos Agreement will also terminate upon the death of Mr. Theodoropoulos. In this case, his estate and 143 will be entitled to payment of the monthly fee of $33,104 to the date of death and a pro-rata portion of any bonus or other form of additional compensation that Mr. Theodoropoulos and 143 would be, but for his death, entitled to for the year in which he died. In addition, any options granted but not vested as at the date of death shall vest immediately and any option which but for his death would have been granted in due course within the six months following his death shall be granted and immediately vest and may be exercised at any time within one year of Mr. Theodoropoulos' death. In addition, his dependents will be entitled for continued benefits for a period of six months following his death.

If within six months of (i) a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 50.1% of the common shares of Africo is acquired; or (ii) the majority of the directors serving on Africo's Incumbent Board (being James Cook, Jonathan Cordero, Edward Lauer, Chris Theodoropoulos and George Ireland) no longer being directors of Africo; or (iii) a change of control of Camrose Resources Ltd. or its parent company Eurasian Resources Group; or (iv) Africo selling its interest in the Kalukundi Project; or (v) Camrose Resources Ltd. ceasing to be Africo's single largest shareholder; or (vi) Africo ceasing to be listed on the TSX or completing a going private transaction, Mr. Theodoropoulos's engagement is terminated, or within such six months Mr. Theodoropoulos elects to treat his engagement as terminated, Mr. Theodoropoulos shall be entitled to pay in lieu of notice equal to 24 months of the monthly fee payable under the Theodoropoulos Agreement together with payment of any pro-rated bonus entitlement. In addition, all options granted but not vested as at the date of such termination upon change of control shall immediately vest, and any options which, but for such termination, would have been granted in due course within the six months following such termination on change of control shall be granted to Mr. Theodoropoulos as fully vested and immediately exercisable. In the event Mr. Theodoropoulos elects to treat his engagement as terminated after a change in control as outlined above, and the transaction resulting in the change of control was one that was recommended by the directors of Africo to shareholders for approval, provided all monies due to Mr. Theodoropoulos and 143 in lieu of notice have been paid, Mr. Theodoropoulos has agreed to continue to provide services to Africo pursuant to the terms of his engagement for a period of no less than 120 days following termination on change of control.

Based on Mr. Theodoropoulos's annual compensation and other benefit entitlements as of the date of this Circular, payments in lieu of notice upon termination of Mr. Theodoropoulos' engagement with Africo or termination upon a change of control would be as follows:

| **Payment element** | **Monthly** | **Aggregate payment** |
|---|---|---|
| Fee ........................................................................................... | $33,104 (1) | $794,500 (1) (24 months) |
| Reimbursement of medical and dental coverage and life, travel and international insurance premiums ............................................. | $658 | $3,950 (six months) |

(1) Plus applicable tax.

The Theodoropoulos Agreement also contains standard confidentiality provisions.

*Larry Okada, Chief Financial Officer*

Africo is party to an agreement dated January 1, 2015 (the "**Okada Agreement**"), which agreement supercedes all prior agreements, with Larry Okada and L M Okada Ltd. ("**LMO**"), a private company controlled by Mr. Okada, pursuant to which Mr. Okada serves as the Chief Financial Officer and is engaged in such capacity pursuant to the terms of the Okada Agreement.

Pursuant to the Okada Agreement, Africo will pay Mr. Okada, through LMO, a monthly fee of $10,000 plus applicable GST or $120,000 per annum in the aggregate plus applicable GST. Mr. Okada is entitled to participate in Africo's Company Stock Option Plan as determined by Africo's Board. He is also entitled to participate in the Bonus Plan as determined by Africo's Compensation Committee or the Board. Mr. Okada may terminate the Okada Agreement by giving Africo at least one month's advance notice in writing, which Africo may waive in whole or in part, in which case Mr. Okada's engagement will terminate on the date of such waiver. Africo may terminate the Okada Agreement at its sole discretion for any reason, without cause, upon providing Mr. Okada and LMO 18 months' notice of termination or, at Africo's option, pay in lieu of notice equal to 18 months' of the monthly fee of $10,000 plus applicable taxes, together with a pro-rata portion of any bonus or other form of additional compensation that Mr. Okada and LMO would be, but for the termination, entitled to for the year in which the engagement is terminated.

In addition, if Africo terminates the Okada Agreement, Mr. Okada's rights and entitlements to any performance bonus (except for rights and entitlements, if any, accrued up to the date of termination of employment and unpaid at the date of such termination) shall otherwise terminate effective as of the date of termination, or as at the date that a notice of termination is given, if pay in lieu of notice is provided. In addition, Africo has agreed that all options granted to Mr. Okada but not vested as at the date of termination shall immediately vest and, where pay in lieu of notice is made, any option which, but for such termination, would in due course have been granted to Mr. Okada during the 12 months following termination, shall be granted by Africo as fully vested and immediately exercisable.

Medical and dental benefits provided to Mr. Okada will continue for a period of six months after the date of termination of his engagement with Africo under the Okada Agreement.

The Okada Agreement will also terminate upon the death of Mr. Okada. In this case, his estate and LMO will be entitled to payment of the monthly fee of $10,000 to the date of death and a pro-rata portion of any bonus or other form of additional compensation that Mr. Okada and LMO would be, but for his death, entitled to for the year in which he died. In addition, any options granted but not vested as at the date of death shall vest immediately and any option which but for his death would have been granted in due course within the six months following his death shall be granted and immediately vest and may be exercised at any time within one year of Mr. Okada's death. In addition, his dependents will be entitled for continued benefits for a period of six months following his death.

If within six months of (i) a change in control of Africo by way of a successful take-over bid, merger, amalgamation or reorganization pursuant to which ownership of more than 50.1% of the common shares of Africo is acquired; or (ii) the majority of the directors serving on Africo's Incumbent Board (being James Cook, Jonathan Cordero, Edward Lauer, Chris Theodoropoulos and George Ireland) no longer being directors of Africo; or (iii) a change of control of Camrose Resources Ltd. or its parent company Eurasian Resources Group; or (iv) Africo selling its interest in the Kalukundi Project; or (v) Camrose Resources Ltd. ceasing to be Africo's single largest shareholder; or (vi) Africo ceasing to be listed on the TSX or completing a going private transaction, Mr. Okada's engagement is terminated, or within such six months Mr. Okada elects to treat his employment as terminated, Mr. Okada shall be entitled to pay in lieu of notice equal to 18 months of the monthly fee payable under the Okada Agreement together with payment of any pro-rated bonus entitlement. In addition, all options granted but not vested as at the date of such termination on change of control shall immediately vest, and any options which, but for such termination, would have been granted in due course within the six months following such termination on change of control shall be granted to Mr. Okada as fully vested and immediately exercisable. In the event Mr. Okada elects to treat his engagement as terminated after a change in control as outlined above, and the transaction resulting in the change of control was one that was recommended by the directors of Africo to shareholders for approval, provided all monies due to Mr. Okada and LMO in lieu of notice have been paid, Mr. Okada has agreed to continue to provide

services to Africo pursuant to the terms of his engagement for a period of no less than 120 days following termination on change of control.

Based on Mr. Okada's annual compensation and other benefit entitlements as of the date of this Circular, payments in lieu of notice on termination of Mr. Okada's engagement with Africo or termination on a change of control would be as follows:

| Payment element | Monthly | Aggregate payment |
|---|---|---|
| Fee | $10,000[(1)] | $180,000[(1)] (18 months) |
| Reimbursement of medical and dental coverage and life, travel and international insurance premiums | $203 | $1,218 (six months) |

(1) Plus applicable tax.

The Okada Agreement also contains standard confidentiality provisions.

## Director Compensation

Prior to the 2012 fiscal year, directors who were also officers and received compensation from Africo did not receive any remuneration from Africo for serving as directors, with the exception of the reimbursement of any out-of-pocket expenses incurred while serving as a director and entitlement to participate in Africo's Company Stock Option Plan. During the fiscal year ended December 31, 2015, directors' remuneration from Africo was $2,500 per month.

With effect from December 1, 2006, the Chair of the Audit Committee received an additional $5,000 per annum and the Chair of the Compensation Committee received $2,000 per annum for their respective services, and committee members received $500 per committee meeting attended. In September 2012, upon recommendation of the Compensation Committee, the Board approved payment of director fees for Africo's Chairman retroactive to January 1, 2011 (see disclosure in the Summary Compensation Table above).

During the year ended December 31, 2015, Africo paid and/or accrued directors' fees totaling US$92,876 (2014 - US$115,319). The following table summarizes the compensation provided to Africo's non-executive directors during Africo's most recently completed financial year ended December 31, 2015, and excludes the compensation of Chris Theodoropoulos, the Chair of the Board and then acting CEO, whose compensation, including director fees, is disclosed above at "Executive Compensation – Summary Compensation Table".

Amounts reported in the table below are stated in U.S. dollars, the currency used in Africo's financial statements. All of Africo's compensation arrangements are contracted in Canadian dollars and, for the purposes of the table below, have been converted herein to U.S. dollars using an average exchange rate of $1 = US$0.7490.

| Name | Director fees earned (US$) | Share-based awards (US$) | Option-based awards (US$) | Non-equity incentive plan compensation (US$) | Pension value (US$) | All other compensation (US$) | Total (US$) |
|---|---|---|---|---|---|---|---|
| James M. Cook | 24,717 | Nil | Nil[(1)] | Nil | Nil | Nil | 24,717 |
| Beat Ehrensberger | 11,235 | Nil | Nil | Nil | Nil | Nil | 11,235 |
| Charles Forster | 11,235 | Nil | Nil | Nil | Nil | Nil | 11,235 |
| George Ireland | 22,845 | Nil | Nil[(2)] | Nil | Nil | Nil | 22,845 |
| Jonathan Cordero | 11,610 | Nil | Nil | Nil | Nil | Nil | 11,610 |
| Edward Lauer | 11,235 | Nil | Nil | Nil | Nil | Nil | 11,235 |

(1) Africo uses the Black-Scholes pricing model to value stock options for financial statement purposes only. The grant date fair value of options to purchase 290,000 common shares in the capital of Africo at a per share price of $0.45 until December 5, 2019, estimated using the Black-Scholes option pricing model, is US$Nil. See Note 10(b) to Africo's consolidated financial statements for the year ended December 31, 2015 for the assumptions and estimates used for these calculations. We use the intrinsic method which values stock options

at the excess of the trading price of Africo's common shares over the per share exercise price of the option. The aggregate value of the stock options based on the intrinsic method on December 5, 2014, the date of grant, was $Nil and at December 31, 2014 and 2015, was $Nil.

(2) Africo uses the Black-Scholes pricing model to value stock options for financial statement purposes only. The grant date fair value of options to purchase 200,000 common shares in the capital of Africo granted to Mr. Ireland at a per share price of $0.45 until December 5, 2019, estimated using the Black-Scholes option pricing model, is US$Nil. See Note 10 to Africo's consolidated financial statements for the year ended December 31, 2015, for the assumptions and estimates used for these calculations. We use the intrinsic method which values stock options at the excess of the trading price of Africo's common shares over the per share exercise price of the option. The aggregate value of the stock options based on the intrinsic method on December 5, 2014, the date of grant, was $Nil and at December 31, 2014 and 2015, was $Nil.

***Outstanding Option-Based Awards***

Africo's Board granted incentive stock options to the Company's non-executive directors on December 5, 2014, which options entitle the purchase of an aggregate 490,000 of Africo's common shares at a per share price of $0.45 until December 5, 2019.

The following table summarizes all option-based awards granted to Africo's non-executive directors that were outstanding as at December 31, 2015. No other share-based awards have been granted to the non-executive directors. See also Part 4 – Executive Compensation – Incentive Plan Awards for outstanding options held by Chris Theodoropoulos.

| | Option-based Awards | | | | Share-based Awards | | |
|---|---|---|---|---|---|---|---|
| **Named** | **Number of common shares underlying unexercised options** | **Option exercise price ($)** | **Option expiry date** | **Value of unexercised in-the-money options[1] ($)** | **Number of shares or units of shares that have not vested** | **Market or payout value of share-based awards that have not vested ($)** | **Market or payout value of vested share-based awards not paid out or distributed ($)** |
| James M. Cook | 290,000 | 0.45 | Dec 5, 2019 | $11,600 | N/A | N/A | N/A |
| George Ireland | 200,000 | 0.45 | Dec 5, 2019 | $8,000 | N/A | N/A | N/A |

(1) The value of unexercised "in-the-money options" at the financial year-end is the difference between the option exercise price and the market value of the underlying stock on the TSX on December 31, 2015. The market value of the shares is the closing price of the common shares on the TSX on December 31, 2015, which was $0.49.

***Incentive Plan Awards – Value Vested or Earned During the Year***

No incentive stock options were exercised by Africo's directors during the fiscal year ended December 31, 2015. As such, no value was earned by the directors as a result of option exercise.

The value of options vested is represented by the aggregate dollar value that would have been realized if options had been exercised on the vesting date – that is, the difference between the market price of the underlying shares and the option exercise price on the vesting date. All options granted by Africo to its non-executive directors, as summarized in the table above, were either fully vested and exercisable on the date of grant or had fully vested in accordance with the terms of the relevant vesting schedule and were fully exercisable by December 31, 2015, and the option exercise prices on the dates of grant and/or the vesting dates were either equal to or greater than the market price of Africo's common shares on the dates of grant.

## SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS

The following information is as of December 31, 2015, Africo's most recently completed financial year.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in the first column) |
|---|---|---|---|
| Equity compensation plans approved by securityholders(1) | 2,155,000 | $0.45 | 7,845,000 |
| Equity compensation plans not approved by securityholders | N/A | N/A | N/A |

(1) The Company Stock Option Plan was approved by shareholders of Africo (who were, at the time, not insiders entitled to participate in the Company Stock Option Plan or associates of such insiders) at the annual and special meeting held on June 12, 2008. Additional information with respect to the Company Stock Option Plan is disclosed in Africo's Management Information Circular dated May 14, 2008, which has been filed with regulators and is available for viewing under the Company's profile on SEDAR at www.sedar.com.

### Summary of the Company Stock Option Plan

The Company Stock Option Plan was put in place to enable Africo appropriately compensate directors, executive officers, employees and consultants of Africo and its affiliates, and their permitted assigns, and management company employees (the "**Participants**"), as well as to attract and retain additional key personnel on a going-forward basis, to enable Africo to better align the interests of its directors, management and employees with those of its shareholders, reduce the cash compensation Africo would otherwise have to pay, and to encourage Participants to promote Africo's business affairs to the best of their abilities. The Company Stock Option Plan provides that the Board of Directors may grant options to the Participants on terms that the Board may determine within the limitations set out in the Company Stock Option Plan. Africo has not to date nor does it currently intend to provide financial assistance to any Participants under the Company Stock Option Plan.

The maximum number of common shares issuable under the Company Stock Option Plan (the "**Company Stock Option Plan Reserve**") is 10,000,000, which represents approximately 14% of Africo's issued and outstanding common shares as of the date of this Circular. As of the date hereof, there are outstanding incentive stock options entitling the holders to purchase an aggregate 2,155,000 common shares of Africo, representing approximately 21.5% of the Company Stock Option Plan Reserve and approximately 3.0% of Africo's issued and outstanding common shares.

Since adoption of the Company Stock Option Plan by Africo's Board of Directors on April 22, 2008, options to purchase an aggregate 10,395,000 common shares of Africo have been granted, options to purchase an aggregate 8,040,000 common shares have expired or have been cancelled or forfeited (unexercised), and options to purchase 200,000 common shares have been exercised, leaving a balance in the Company Stock Option Plan Reserve for grants of options entitling the purchase of up to 7,845,000 common shares. No amendments have been made to the Company Stock Option Plan since it was adopted by the Board of Directors and approved by Africo's shareholders and the TSX.

The Company Stock Option Plan is administered by the Compensation Committee of the Board. The exercise price of each option, as determined by the Compensation Committee, may not be less than the last closing price of Africo's common shares on the TSX immediately prior to the time of the grant of an option. Should

Africo's common shares be suspended or no longer listed for trading on the TSX but are listed for trading on another stock exchange or over-the-counter market, the exercise price of options shall not be less than the last closing price of Africo's common shares as quoted on such exchange or over-the-counter market for the trading day immediately prior to the date of grant of the option.

Options granted under the Company Stock Option Plan must be exercised within a period of time established by the Board of Directors at the time each option is granted, which may not exceed ten years from the date of grant. Any options granted pursuant to the Company Stock Option Plan shall terminate within 90 days of the option holder ceasing to act as a director, officer, employee or consultant of Africo or any of its affiliates, unless otherwise extended by the Board, or if such cessation is on account of death, disability or termination of employment with cause. If such cessation is on account of disability, the options terminate on the first anniversary of such cessation, and if it is on account of termination of employment or consultancy with cause, the options terminate immediately or on such later date determined by the Board, which can be no later than the original expiry date of the option. If such cessation is on account of death, the options shall terminate on the original expiry date of the option.

The Board of Directors of Africo, taking into account the recommendation of the Compensation Committee, has complete discretion to set the terms of any vesting schedule for each option granted, including the discretion to permit partial vesting in stated percentage amounts based on the term of such option or to permit full vesting after a stated period of time has passed from the date of grant.

All options shall be non-assignable and non-transferable except as to a Qualified Successor, as defined herein, or as otherwise permitted by applicable securities laws. "**Qualified Successor**" means a person who is entitled to ownership of an option upon the death of an optionee, pursuant to a will or the applicable laws of descent and distribution upon death.

The Board may, subject to TSX approval, terminate, suspend, or amend the terms of the Company Stock Option Plan. The Compensation Committee may amend the terms of the Company Stock Option Plan to comply with the requirements of any applicable regulatory authority without obtaining shareholder approval, including but not limited to amendments of an administrative, grammatical or typographical nature. However, without obtaining shareholder approval or disinterested shareholder approval, as applicable, within 12 months either before or after the Board's adoption of a resolution authorizing such action, the Board may not: a) increase the number of common shares which may be issued under the Company Stock Option Plan; b) materially modify the requirements as to eligibility for participation in the Company Stock Option Plan, which would have the potential of broadening insider participation; or c) materially increase the benefits accruing to Participants under the Company Stock Option Plan.

If there is a material alteration in the capital structure of Africo resulting from a recapitalization, stock split, reverse stock split, or stock dividend, the Compensation Committee shall make such adjustments to the Company Stock Option Plan and to the options then outstanding under the Company Stock Option Plan as the Compensation Committee determines to be appropriate and equitable under the circumstances, so that the proportionate interest of the holder of each such option shall, to the extent practicable, be maintained as before the occurrence of such event. If Africo merges, consolidates, enters into a plan of arrangement, sells all or substantially all of its assets, or sells, pursuant to an agreement, its securities pursuant to which Africo is or becomes a wholly-owned subsidiary of another corporation (collectively, a "**Reorganization**"), the shares received on exercise of the options thereafter will reflect the shares that would have been received had the options been exercised immediately prior to the record date for the Reorganization and the exercise price will be adjusted proportionately by the Board and such adjustment shall be binding for all purposes of the Company Stock Option Plan. Additionally, the Company Stock Option Plan also contains provisions such that all unexercised options shall become immediately exercisable (whether vested or not), without shareholder approval, in the event of a Change of Control, (as such term in defined in the Company Stock Option Plan, which includes but is not limited to a take-over bid in respect of the common shares of Africo or a sale of all or substantially all of Africo's assets).

The Company Stock Option Plan also provides for the adjustment of the expiry term of options notwithstanding the date of expiration of the term of such options, without being subject to the Board of Directors' or the Compensation Committee's discretion, to take into account any black out period imposed on the Participants by Africo. In particular, if the expiration date falls within a black out period imposed by Africo, then the expiration

date is extended to the close of business on the 10th business day after the end of such black out period (the "**Black Out Expiration Term**"). Further, if the expiration date falls within two business days after the end of a black out period imposed by Africo, then the expiration date is extended to the date which is the Black Out Expiration Term reduced by the number of business days between the expiration date of such options and the end of such black out period.

## AUDIT COMMITTEE

For disclosure with respect to composition of the Audit Committee of Africo's Board of Directors during the 2015 fiscal year, the Audit Committee Charter, fees paid to Africo's external auditor during the last two fiscal years and other related information, see "Item 9 – Audit Committee" in Africo's Annual Information Form dated March 16, 2016, for the financial year ended December 31, 2015, which has been electronically filed with regulators under the Company's profile on SEDAR and is available for viewing along with other Africo public disclosure documents at www.sedar.com.

## CORPORATE GOVERNANCE

Below is a summary of Africo's current approach to corporate governance.

***Composition of the Board of Directors***

The Board of Directors of Africo is currently comprised of five directors, two of whom are considered to be independent of management, being James Cook and George Ireland. Mr. Cook is a representative of Camrose Resources Limited and Mr. Ireland is a representative of Geologic Resource Partners LLC ( see "Voting Shares and Principal Holders Thereof – Rights for Representation on the Board of Directors" and "The Annual Business of the Meeting – Election of Directors"). In determining whether a director is independent, the Board considers, for example, whether the director has a relationship, which could, or could be perceived to, interfere with the director's ability to objectively assess the performance of management. On this basis, Mr. Chris Theodoropoulos, as Chair of the Board, President and Chief Executive Officer, is not considered to be independent, and Messrs. Cordero and Lauer, as a result of their association with Camrose Resources Limited and ERG, are not considered to be independent.

***Board Mandate***

The Board of Directors of Africo has not, as yet, adopted a written mandate. The Board is, however, responsible for approving long-term strategic plans and annual operating plans and budgets recommended by management. Board consideration and approval is also required for all material contracts, business transactions and all debt and equity financing proposals.

Africo's Board of Directors delegates to management, through the President and Chief Executive Officer, responsibility for meeting defined corporate objectives, implementing approved strategic and operating plans, carrying on Africo's business in the ordinary course, managing Africo's cash flow, evaluating new business opportunities, recruiting staff and complying with applicable regulatory requirements. The Board also looks to management to furnish recommendations respecting corporate objectives, long-term strategic plans and annual operating plans.

The Board has appointed two Committees: an Audit Committee and a Compensation Committee, each of which is responsible for making recommendations to the Board in their respective areas of responsibility (see "Committees of the Board" below for further detail on the mandate of each Committee).

***Position Descriptions***

Africo's Board of Directors has not yet developed written position descriptions for the Chair of the Board or the Chair of the Board Committees. The role of the Chair of the Audit Committee flows from and is guided by the factors identified in the Audit Committee Charter (see "Audit Committee").

The Board of Directors has also not developed a written position description for the Chief Executive Officer. The Chief Executive Officer is responsible for management of the business and affairs of Africo and its subsidiaries, subject always to Board approval of business plans and decisions relating to major expenditures, financing arrangements and significant acquisitions or divestitures (see "Board Mandate" above).

***Attendance***

The following table provides a summary of attendance by the directors at Board meetings held during the fiscal year ended December 31, 2015.

| Name | Period served as a director | Board meetings attended during fiscal 2015 |
|---|---|---|
| James Cook | September 23, 2008 to present | 7 of 7 |
| Beat Ehrensberger | June 28, 2011 to June 25, 2015 | 1 of 2 |
| Charles Forster | June 28, 2011 to June 25, 2015 | 2 of 2 |
| George Ireland | October 14, 2014 to present | 6 of 7 |
| Chris Theodoropoulos | July 4, 2006 to present | 7 of 7 |
| Jonathan Cordero | June 25, 2015 to present | 5 of 5 |
| Edward Lauer | June 25, 2015 to present | 5 of 5 |

***Other Directorships***

Certain of the current directors of Africo (who are also nominees for re-election as directors at the Meeting) are also directors of other reporting issuers as follows:

| Name | Name of Reporting Issuer |
|---|---|
| James Cook | None |
| Jonathan Cordero | None |
| Edward Lauer | None |
| Chris Theodoropoulos | None |

| Name | Name of Reporting Issuer |
|---|---|
| George Ireland | Amerigo Resources Ltd.<br>Kiska Metals Corporation<br>Rathdowney Resources Ltd. |

***Orientation and Continuing Education***

Our Board has not yet developed an official orientation or training program for new directors. New directors will have the opportunity to become familiar with Africo by meeting with the other directors and with officers and employees. Orientation activities will be tailored to the particular needs and experience of each director and the overall needs of the Board.

Africo's management endeavours to provide a continuous flow of information to its directors for continuing education purposes relating to Africo's business and operations, as well as information and other initiatives intended to keep the Board abreast of any new developments and challenges that Africo may face. Africo's directors are encouraged to attend, at the Company's expense, industry conferences and director education seminars and courses.

***Ethical Business Conduct***

Africo's Board of Directors has adopted a Code of Ethics, a copy of which is available for review through SEDAR at www.sedar.com. The Board of Directors promotes a culture of ethical business conduct for officers and employees of Africo through its own high standards of ethical business behavior in fulfilling its mandate.

Africo's Board of Directors monitors the ethical conduct of its affairs by its directors, employees and contractors to ensure that it complies with applicable legal and regulatory requirements, such as those of relevant securities commissions and stock exchanges. The Board has found that the fiduciary duties placed on individual directors by applicable corporate law, as well as the restrictions placed by applicable corporate legislation on an individual director's participation in decisions of the Board in which the director has an interest, have been sufficient to ensure that the Board operates independently of management and in the best interests of Africo's business and operations, as well as shareholders' interests.

Africo's Board of Directors has adopted a "Whistleblower Policy" which provides employees, management, officers, directors, contractors, consultants and Committee members with the ability to report, on a confidential and anonymous basis, any complaints and concerns regarding accounting, internal controls or auditing matters, including, but not limited to, unethical and unlawful accounting and auditing policies, practices or procedures, fraudulent or misleading financial information and instances of corporate fraud, in addition to other wrong doing. The Board believes that providing a forum for such individuals to raise concerns about ethical conduct and treating all complaints with the appropriate level of seriousness fosters a culture of ethical conduct within Africo.

The Board of Directors has also adopted a Corporate Disclosure Policy to ensure that communications to the investing public about the business and affairs of Africo and its subsidiaries are made in accordance with all applicable legal and regulatory requirements, covering disclosure in documents filed with regulators and written disclosure documents sent to shareholders, presentations by senior management, information contained on Africo's website and other electronic communications. The Corporate Disclosure Policy extends to oral statements made in meetings and telephone conversations with analysts and investors, interviews with the media, as well as speeches, industry or press conferences and conference calls.

Further, Africo's Board has adopted an Insider Trading Policy to ensure that persons having knowledge of material information not generally disclosed to the public do not take advantage of such information through trading in securities issued by Africo or in securities of other corporations whose price would be affected by such undisclosed material information. This policy is intended to ensure that Africo's directors, officers, employees and

other insiders, or associates of such persons, act, and are perceived to act, in accordance with applicable laws and the highest standards of ethical and professional behaviour.

***Nomination and Election of Directors***

The Board as a whole annually examines the number of directors to ensure that it is optimum for decision making. The current Board comprised of five directors is effective for constructive interaction, as well as a sufficient number of directors to efficiently carry out the duties of the Board, while enhancing the diversity of views, skills, competencies and experience the directors bring to the Board.

Voting for election of directors of Africo is by individual voting and not by slate voting.

Africo has not adopted a majority voting policy for election of directors at uncontested shareholder meetings at which directors are to be elected. A majority voting policy generally provides that a director who has received a majority of "withhold" votes must tender his resignation immediately after the meeting, to be effective upon acceptance by the Board of Directors. The Board can then consider whether to accept the resignation and publicly disclose its decision by news release within a reasonable period of time after the meeting. Given the majority shareholding position of the ERG as disclosed in "Voting Shares and Principal Holders Thereof" and "Other Information – Interest of Informed Persons in Material Transactions", Africo's Board is of the view that a majority voting policy is irrelevant for Africo at this time. Further and in accordance with the policies of the TSX, as a majority controlled listed issuer, Africo is exempt from the majority voting requirements of the TSX.

Africo has not yet considered adopting an advance notice policy which requires that a shareholder proposing to nominate a person for election as a director at a meeting of shareholders must provide Africo with advance notice of, and prescribed details concerning the proposed nominee.

***Assessments***

The Board is responsible for assessing, at least annually, the effectiveness of the Board as a whole, the Committees of the Board and the contribution of individual directors (including the competencies and skills that each individual director is expected to bring to the Board), including considering the appropriate size of the Board.

***Compensation***

See "Executive Compensation."

***Committees of the Board***

*Audit Committee*

The current members of the Audit Committee of the Board of Directors are James Cook (Chair), George Ireland and Jonathan Cordero. See "Audit Committee".

*Compensation Committee*

The current members of the Compensation Committee of the Board of Directors are James Cook (Chair), George Ireland and Edward Lauer. Mr. Cook is considered to be independent of management (see "Composition of the Board of Directors" above). The Compensation Committee is responsible for, among other responsibilities, reviewing the performance of and reviewing and recommending to the Board for approval all compensation of the Chief Executive Officer, the Chief Financial Officer and the Chair of the Board; and for reviewing and approving the remuneration of the directors (see "Executive Compensation – Role of the Compensation Committee and Compensation Governance").

***Board Renewal***

As of the date of this Circular, Africo had not adopted term limits for its directors, nor has it adopted other mechanisms for Board renewal.

Given the state of the industry over the last several years and the difficulty for boards in recruiting qualified candidates willing to serve as directors of public mining companies, and given the control block position in Africo held by Camrose, director terms have not been considered a priority by Africo's Board.

***Diversity Policy***

As of the date of this Circular, Africo has not adopted written policies regarding Board diversity, including the identification and nomination of women candidates for director positions and in senior leadership roles.

## OTHER INFORMATION

### INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS

Except as disclosed below, since the beginning of the most recently completed financial year ended December 31, 2015, and as at the date of this Circular, no director, executive officer or employee or former director, executive officer or employee of Africo or its subsidiaries, nor any nominee for election as a director of Africo, nor any associate of any such person, was indebted to Africo or any of its subsidiaries; nor was any indebtedness to another entity the subject of a guarantee, support agreement, letter of credit or other similar arrangement or understanding provided by Africo or any of its subsidiaries.

During the year ended December 31, 2012, upon recommendation of the Compensation Committee and approval by the Board of Directors with Mr. Theodoropoulos abstaining, Africo agreed to make certain credit facilities available to Mr. Theodoropoulos providing for a $1,150,000 non-revolving term loan to finance Mr. Theodoropoulos's purchase from a minority shareholder through a private transaction a block of 2,218,066 Africo common shares. On October 10, 2012, Africo loaned US$963,203 (CDN$944,595) to Mr. Theodoropoulos. At December 31, 2015, the loan was fully repaid. The loan bore interest at 5% per annum (with interest payable semi-annually not in advance, on December 31st and June 30th) and is secured by the shares. The remaining unpaid interest on the loan in the amount of U$42,844 ($59,299) was accrued at year end and was repaid in full subsequent to December 31, 2015.

### INTEREST OF CERTAIN PERSONS IN MATTERS TO BE ACTED ON AT THE MEETING

Except as described herein, none of the directors or executive officers of Africo or its subsidiaries, no proposed nominee for election as a director of Africo, none of the persons who have been directors or executive officers of Africo or its subsidiaries since the commencement of Africo's most recently completed financial year, and no associate or affiliate of any of the foregoing persons has any material interest, direct or indirect, by way of beneficial ownership of securities or otherwise, in any matter to be acted upon at the meeting other than the election of the directors and the Proposed Plan of Arrangement. See "The Business of the Meeting".

### INTEREST OF INFORMED PERSONS IN MATERIAL TRANSACTIONS

To the knowledge of Africo's management and except as otherwise disclosed herein, no proposed nominee for election as a director, and no director or executive officer of Africo or any of its subsidiaries who has served in such capacity since the beginning of Africo's most recently completed financial year, and no shareholder holding of

record or beneficially, directly or indirectly, more than 10% of Africo's outstanding common shares, and none of the respective associates or affiliates of any of the foregoing, had any interest in any transaction with Africo since the beginning of the most recently completed financial year, or in any proposed transaction, that has materially affected Africo or any of its subsidiaries or is likely to do so.

**MANAGEMENT CONTRACTS**

Except as otherwise disclosed herein, the management functions of Africo and its subsidiaries are performed by Africo's directors and executive officers and the Company has no management agreements or arrangements under which such management functions are performed by persons other than the directors and executive officers of Africo and its subsidiaries, respectively. See "The Business of the Meeting – Election of Directors" and "Executive Compensation".

**CEASE TRADE ORDERS AND CORPORATE BANKRUPTCY**

As at the date of this Circular, no proposed nominee for election as a director of Africo is, or has been, within 10 years before the date of this Circular:

1. a director, chief executive officer or chief financial officer of any company (including Africo and any personal holding company of the proposed director) that, while that person was acting in that capacity:

    (a) was subject to:

        (i) a cease trade order (including any management cease trade order which applied to directors or executive officers of a company, whether or not the person is named in the order); or

        (ii) an order similar to a cease trade order; or

        (iii) an order that denied the relevant company access to any exemption under securities legislation;

that was in effect for a period of more than 30 consecutive days (an "**Order**"); or

    (b) was subject to an Order that was issued after the proposed director ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in the capacity as director, chief executive officer or chief financial officer; or

2. a director or executive officer of any company (including Africo and any personal holding company of the proposed director) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

**PENALTIES AND SANCTIONS**

As at the date of this Circular, no proposed nominee for election as a director of Africo (nor any of his or her personal holding companies) has been subject to:

(a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable shareholder in deciding whether to vote for a proposed director.

**PERSONAL BANKRUPTCY**

As at the date of this Circular, no proposed nominee for election as a director of Africo has, within the ten years before the date of this Circular, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the proposed director.

**OTHER MATTERS**

Management of Africo is not aware of any other matters to come before the Meeting other than as set forth in the Notice of Annual Meeting that accompanies this Circular. If any other matter properly comes before the Meeting, it is the intention of the persons named in the enclosed form of proxy to vote the shares represented thereby in accordance with their best judgment on such matter.

**MATTERS TO BE RAISED AT NEXT ANNUAL MEETING**

Any shareholder who wishes to submit a notice to Africo of any matter that the shareholder proposes to raise at Africo's next annual shareholder meeting to be held during calendar 2017, and have the proposal included in Africo's proxy materials for that meeting, must send notice of the proposal as required by and in compliance with section 137 of the *Canada Business Corporations Act* to Africo no later than February 13, 2017. Any such proposal should be sent to Africo at its registered office at Suite 530, 355 Burrard Street, Vancouver, British Columbia, V6C 2G8. Africo is not obligated to include any shareholder proposal in its proxy materials for the annual shareholder meeting to be held during calendar 2017 if the proposal is received after the February 13, 2017 deadline.

**ADDITIONAL INFORMATION**

You may obtain additional financial information about Africo in our comparative audited consolidated financial statements and Management's Discussion and Analysis for the year ended December 31, 2015, copies of which are included with this Circular. Additional copies may be obtained without charge upon request to us at Suite 520 - 800 West Pender Street, Vancouver, British Columbia, V6C 2V6, telephone (604) 646-3225; fax (604) 646-3226. You may also access our disclosure documents under the Company's profile on SEDAR at www.sedar.com.

**APPROVAL OF THE BOARD OF DIRECTORS**

The contents and the sending of the Notice of Meeting and this Circular to Shareholders have been approved by the Board of Directors.

DATED this 31st day of May, 2016.

*(Signed) Chris Theodoropoulos*
Chair of the Board, President and Chief Executive Officer

**CONSENT OF PARADIGM CAPITAL INC.**

May 31, 2016

To: The Board of Directors of Africo Resources Ltd.

We hereby consent to the reference under the headings “Summary of Management Proxy Circular – Reasons for the Arrangement”, “Summary of Management Proxy Circular – Fairness Opinion”, “The Arrangement – Reasons for the Arrangement” and “The Arrangement – Fairness Opinion” to the opinion of our firm dated May 11, 2016, which we prepared for the Special Committee of Africo Resources Ltd. in connection with the arrangement agreement dated May 13, 2016 entered into among Africo Resrouces Ltd. and Camrose Resources Limited, and to the inclusion of the text of the foregoing opinion dated May 13, 2016 in this Circular. In providing such consent, we do not intend that any person other than the Board of Directors and the Special Committee rely upon such opinion.

Toronto, Ontario
May 31, 2016

*(Signed) PARADIGM CAPITAL INC.*

**APPENDIX "A"**
**ARRANGEMENT RESOLUTION**

**BE IT RESOLVED THAT**:

1. The arrangement (the "**Arrangement**") under Section 192 of the *Canada Business Corporations Act* (the "**CBCA**") of Africo Resources Ltd. (the "**Company**"), pursuant to the arrangement agreement (the "**Arrangement Agreement**") between the Company and Camrose Resources Limited dated May 13, 2016, all as more particularly described and set forth in the management information circular of the Company dated May 31, 2016 (the "**Circular**"), accompanying this notice of meeting (as the Arrangement may be modified or amended in accordance with its terms) is hereby authorized, approved and adopted.

2. The plan of arrangement (as it has been or may be amended, modified or supplemented in accordance with the Arrangement Agreement and its terms, the "**Plan of Arrangement**"), the full text of which is set out as Schedule A to the Arrangement Agreement, is hereby authorized, approved and adopted.

3. The (i) Arrangement Agreement and related transactions, (ii) actions of the directors of the Company in approving the Arrangement Agreement, and (iii) the actions of the directors and officers of the Company in executing and delivering the Arrangement Agreement, and any amendments, modifications or supplements thereto, are hereby ratified and approved.

4. Notwithstanding that this resolution has been passed (and the Arrangement adopted) by the Company Shareholders (as defined in the Arrangement Agreement) or that the Arrangement has been approved by the Ontario Superior Court of Justice (Commercial List) (the "**Court**"), the directors of the Company are hereby authorized and empowered, at their discretion, without notice to or approval of the Company Shareholders: (i) to amend, modify or supplement the Arrangement Agreement or the Plan of Arrangement to the extent permitted by the Arrangement Agreement; and (ii) subject to the terms of the Arrangement Agreement, not to proceed with the Arrangement.

5. Any officer or director of the Company be and is hereby authorized for and on behalf of the Company to make an application to the Court for an order approving the Arrangement and to execute, under corporate seal or otherwise, and to deliver or cause to be delivered, for filing with the Director under the CBCA, articles of arrangement and all such other documents and instruments as are necessary or desirable to give effect to the Arrangement in accordance with the Arrangement Agreement, such determination to be conclusively evidenced by the execution and delivery of such articles of arrangement or any such other document or instrument.

6. Any officer or director of the Company is hereby authorized and directed for and on behalf of the Company to execute or cause to be executed and to deliver or cause to be delivered, all such other documents and instruments and to perform or cause to be performed all such other acts and things as, in such person's opinion, may be necessary or desirable to give full force and effect to the foregoing resolutions and the matters authorized thereby, such determination to be conclusively evidenced by the execution and delivery of such other document or instrument or the doing of any other such act or thing.

**APPENDIX "B"**

**PLAN OF ARRANGEMENT**

**PLAN OF ARRANGEMENT UNDER SECTION 192 OF THE CANADA BUSINESS CORPORATIONS ACT**

# ARTICLE I
# INTERPRETATION

**Section 1.01 Definitions**

Unless indicated otherwise, capitalized terms used in this Plan of Arrangement but not defined will have the meanings specified in the Arrangement Agreement and the following terms will have the following meanings (and grammatical variations of such terms will have corresponding meanings):

"**Affected Securityholders**" means the Company Shareholders.

"**Arrangement**" means the arrangement under Section 192 of the CBCA on the terms and subject to the conditions set out in this Plan of Arrangement, subject to any amendments or variations made in accordance with the terms of the Arrangement Agreement or Section 5.01 of this Plan of Arrangement or made at the direction of the Court in the Final Order with the prior written consent of the Company and Camrose, each acting reasonably.

"**Arrangement Agreement"** means the arrangement agreement made as of May 13, 2016 among Camrose and the Company (including the Schedules thereto) as it may be amended, restated, supplemented or novated from time to time in accordance with its terms.

"**Arrangement Resolution**" means the special resolution approving this Plan of Arrangement to be considered at the Company Meeting by the Company Shareholders.

"**Articles of Arrangement**" means the articles of arrangement of the Company in respect of the Arrangement, required by the CBCA to be sent to the Director after the Final Order is made, which will include this Plan of Arrangement and otherwise be in a form and content satisfactory to the Company and Camrose, each acting reasonably.

"**Business Day**" means any day, other than a Saturday, a Sunday or a statutory or civic holiday in Toronto, Ontario or Vancouver, British Columbia.

"**Camrose**" means Camrose Resources Limited, a corporation existing under the laws of the British Virgin Islands.

"**CBCA**" means the *Canada Business Corporations Act* and the regulations made thereunder, as promulgated or amended from time to time;

"**Certificate of Arrangement"** means the certificate of arrangement issued by the Director pursuant to subsection 192(7) of the CBCA in respect of the Articles of Arrangement.

"**Change of Control of the Company Material Property**" has the meaning attributed to it in the Arrangement Agreement.

"**Closing Payment Amount**" means $1.00 per Company Share (other than those held by Camrose).

"**Company**" means Africo Resources Ltd., a corporation existing under the laws of Canada.

"**Company Circular**" means, as the context requires, the notice of the Company Meeting and accompanying management Company Circular, including all schedules, appendices and exhibits thereto and enclosures therewith, to be sent to the Company Shareholders in connection with the Company Meeting, as amended, supplemented or otherwise modified from time to time.

"**Company Material Property Payment**" means US$7.5 million divided by the number of Common Shares and Options. outstanding immediately prior to the Effective Time (other than those held by Camrose).

"**Company Meeting**" means the special meeting of Company Shareholders, including any adjournment or postponement thereof, to be called and held in accordance with the Interim Order to consider the Arrangement Resolution.

"**Company Public Documents**" means all forms, reports, schedules, statements and other documents filed by the Company on SEDAR since December 31, 2014.

"**Company Shares**" means the common shares in the capital of the Company.

"**Company Shareholders**" means the holders of Company Shares (other than Camrose).

"**Company Stock Option Plan**" means the stock option plan of the Company.

"**Company Options**" means the outstanding options to purchase Company Shares granted under the Company Stock Option Plan.

"**Consideration Loan**" has the meaning specified in Section 4.01 of this Plan of Arrangement.

"**Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Depositary**" means TMX Equity Transfer Services Inc.

"**Director**" means the Director appointed pursuant to Section 260 of the CBCA.

"**Dissent Rights**" has the meaning specified in Section 3.01 of this Plan of Arrangement.

"**Dissenting Holder**" means a registered holder of Company Shares who has validly exercised its Dissent Rights and has not withdrawn or been deemed to have withdrawn such exercise of Dissent Rights, but only in respect of the Company Shares in respect of which Dissent Rights are validly exercised by such registered holder of Company Shares.

"**Effective Date**" means the date upon which the Arrangement becomes effective as established by the date of issue shown on the certificate giving effect to the Arrangement issued by the Director pursuant to the CBCA.

"**Effective Time**" means 12:01 a.m. (Toronto time) on the Effective Date, or such other time as the Parties agree to in writing before the Effective Date.

"**Final Order**" means the final order of the Court, in a form acceptable to the Company and Camrose, each acting reasonably, approving the Arrangement, as such order may be amended by the Court (with the consent of both the Company and Camrose, each acting reasonably) at any time prior to the Effective Date or, if appealed, then, unless such appeal is withdrawn or denied, as affirmed or as amended (provided that any such amendment is acceptable to both the Company and Camrose, each acting reasonably) on appeal.

"**Former Holders**" means the holders of Options and Company Shares immediately prior to the Effective Time who have not exercised Dissent Rights.

"**Governmental Entity**" means: (a) any multinational, federal, provincial, territorial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, ministry bureau, agency or entity, domestic or foreign; (b) any stock exchange, including the TSX; (c) any subdivision, agent, commission, board or authority of any of the foregoing; or (d) any quasi-governmental or private body, including any tribunal, commission, regulatory agency or self-regulatory organization, exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

"**Interim Order**" means the interim order of the Court in a form acceptable to the Company and Camrose, each acting reasonably, providing for, among other things, the calling and holding of the Company Meeting, as such order may be amended by the Court with the consent of the Company and Camrose, each acting reasonably.

"**Law**" or "**Laws**" means all laws (including common law), by-laws, statutes, rules, regulations, principles of law and equity, orders, rulings, ordinances, judgments, injunctions, determinations, awards, decrees or other requirements, whether domestic or foreign, and the terms and conditions of any Permit of or from any Governmental Entity or self-regulatory authority (including the TSX), and the term "applicable" with respect to such Laws and in a context that refers to a Party, means such Laws as are applicable to such Party and/or its Subsidiaries or their business, undertaking, property or securities and emanate from a Person having jurisdiction over the Party and/or its Subsidiaries or its or their business, undertaking, property or securities.

"**Liens**" means any hypothecs, mortgages, pledges, assignments, liens, charges, security interests, encumbrances and adverse rights or claims, other third party interest or encumbrance of any kind, whether contingent or absolute, and any agreement, option, right or privilege (whether by Law, contract or otherwise) capable of becoming any of the foregoing.

"**Letter of Transmittal**" means the letter of transmittal sent to holders of Company Shares for use in connection with the Arrangement.

"**Person**" includes an individual, partnership, association, body corporate, trustee, executor, administrator, legal representative, government (including any Governmental Entity) or any other entity, whether or not having legal status.

"**Plan of Arrangement**" means this plan of arrangement, and any amendments or variations made in accordance with Section 8.4 of the Arrangement Agreement or Section 5.01 of this plan of arrangement or made at the direction of the Court in the Final Order with the prior written consent of the Company and Camrose, each acting reasonably.

"**SEDAR**" means the System for Electronic Document Analysis and Retrieval.

"**Shareholder Representative**" means George R. Ireland.

"**Tax Act**" means the *Income Tax Act* (Canada) and the regulations made thereunder, as now in effect and as they may be promulgated or amended from time to time.

**Section 1.02 Certain Rules of Interpretation**

In this Plan of Arrangement, unless otherwise specified:

(a) **Headings, etc.** The division of this Plan of Arrangement into Articles and Sections and the insertion of headings are for convenient reference only and do not affect the construction or interpretation of this Plan of Arrangement.

(b) **Currency.** All references to dollars or to $ are references to Canadian dollars.

(c) **Gender and Number.** Any reference to gender includes all genders. Words importing the singular number only include the plural and vice versa.

(d) **Certain Phrases, etc.** The words (i) "including", "includes" and "include" mean "including (or includes or include) without limitation," and (ii) unless stated otherwise, "Article", "Section", and "Schedule" followed by a number or letter mean and refer to the specified Article or Section of or Schedule to this Plan of Arrangement.

(e) **Statutes.** Any reference to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended or re-enacted, unless stated otherwise.

(f) **Computation of Time.** A period of time is to be computed as beginning on the day following the event that began the period and ending at 4:30 p.m. on the last day of the period, if the last day of the period is a Business Day, or at 4:30 p.m. on the next Business Day if the last day of the period is not a Business Day. If the date on which any action is required or permitted to be taken under this Plan of Arrangement by a Person is not a Business Day, such action will be required or permitted to be taken on the next succeeding day which is a Business Day.

(g) **Time References.** References to time are to local time, Toronto, Ontario.

## ARTICLE II
## THE ARRANGEMENT

### Section 2.01 Arrangement Agreement

This Plan of Arrangement is made pursuant to, is subject to the provisions of, and forms part of the Arrangement Agreement.

### Section 2.02 Binding Effect

This Plan of Arrangement and the Arrangement, upon the filing of the Articles of Arrangement and the issuance of the Certificate of Arrangement, will become effective, and be binding on Camrose, the Company, all registered and beneficial Company Shareholders and all registered and beneficial owners of Company Options, at and after, the Effective Time without any further act or formality required on the part of any Person.

### Section 2.03 Arrangement

At the Effective Time each of the following events will occur and will be deemed to occur sequentially as set out below without any further authorization, act or formality, in each case, unless stated otherwise, effective as at five minute intervals starting at the Effective Time:

(a) each Company Share held by Dissenting Holders in respect of which Dissent Rights have been validly exercised will be, and be deemed to have been, assigned and transferred, without any further act or formality, by the Dissenting Holder thereof, to Camrose (free and clear of all Liens) in consideration for a debt claim against Camrose for the amount determined in accordance with Article III, and:

(i) such Dissenting Holders will cease to be the holders of such Company Shares and to have any rights as holders of such Company Shares other than the right to be paid the fair value for such Company Shares as set out in Section 3.01;

(ii) such Dissenting Holders' names will be removed from the register of Company Shares maintained by or on behalf of the Company; and

(iii) Camrose will be, and be deemed to be, the transferee of such Company Shares (free and clear of all Liens) and will be entered in the register of Company Shares maintained by or on behalf of the Company;

(b) each Company Share outstanding immediately prior to the Effective Time, other than (i) a Company Share held by a Dissenting Holder who has validly exercised such holder's Dissent Right, and (ii) a Company Share held by Camrose or any affiliate thereof, will be, and be deemed to have been, assigned and transferred, without any further act of formality, by the holder thereof to Camrose (free and clear of all Liens) in exchange for the Closing Payment Amount for each Company Share, and:

(i) the holders of such Company Shares will cease to be the holders thereof and to have any rights as holders of such Company Shares other than the right to be paid (i) the Closing Payment Amount per Company Share; and (ii) in the event of a Change of Control of the Company Material Property, the pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement;

(ii) such holders' names will be removed from the register of Company Shares maintained by or on behalf of the Company; and

(iii) Camrose will be, and be deemed to be, the transferee of such Company Shares (free and clear of all Liens) and will be entered in the register of the Company Shares maintained by or on behalf of the Company; and

(c) with respect to the Company Options:

(i) each Company Option outstanding immediately prior to the Effective Time (whether vested or unvested), notwithstanding the terms of the Stock Option Plan, shall be deemed to be unconditionally vested and exercisable, and such Company Option shall, without any further action by or on behalf of a Company Optionholder, be deemed to be assigned and transferred by such holder to the Company in exchange for (i) a cash payment from the Company equal to the amount (if any) by which the Closing Payment Amount per Company Share exceeds the exercise price of such Company Option, less applicable withholdings, and (ii) in the event of a Change of Control of the Company Material Property, a right to receive a pro rata share of the Company Material Property Payment, in accordance with this Plan of Arrangement;

(ii) the holder of each Company Option will cease to be the holder thereof or to have any rights as a holder in respect of such Company Option or under the Company Stock Option Plan and the name of the holder thereof will be removed from the applicable securities register of the Company with respect to such Company Option; and

(iii) the Company Stock Option Plan shall be terminated and neither the Company nor Camrose or any of their respective affiliates or successors will have any liability in respect thereof.

## ARTICLE III
## DISSENT RIGHTS

### Section 3.01 Dissent Rights

Registered Company Shareholders may exercise dissent rights with respect to the Company Shares held by such holders ("**Dissent Rights**") in connection with the Arrangement pursuant to and in the manner set forth in Section 190 of the CBCA, as modified by the Interim Order, the Final Order and this Section 3.01; provided that, notwithstanding subsection 190(5) of the CBCA, the written objection to the Arrangement Resolution referred to in subsection 190(5) of the CBCA must be received by the Company not later than 5:00 p.m. (Toronto time) two

Business Days immediately preceding the date of the Meeting (as it may be adjourned or postponed from time to time). Dissenting Holders who duly exercise their Dissent Rights will be deemed to have transferred the Company Shares held by them and in respect of which Dissent Rights have been validly exercised to Camrose (free and clear of all Liens), as provided in Section 2.03(a) and if they:

(a) ultimately are entitled to be paid fair value for such Company Shares:

(i) will be deemed not to have participated in the transactions in Article II (other than Section 2.03(a));

(ii) will be entitled to be paid the fair value of such Company Shares which fair value, notwithstanding anything to the contrary contained in Part XV of the CBCA, will be determined as of the close of business on the day before the Arrangement Resolution was adopted; and

(iii) will not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such holders not exercised their Dissent Rights in respect of such Company Shares; or

(b) ultimately are not entitled, for any reason, to be paid fair value for such Company Shares will be deemed to have participated in the Arrangement on the same basis as a non-dissenting holder of Company Shares.

**Section 3.02 Recognition of Dissenting Holders**

(a) In no circumstances will Camrose, the Company or any other Person be required to recognize a Person exercising Dissent Rights unless such Person is the registered holder of those Company Shares in respect of which such rights are sought to be exercised.

(b) For greater certainty, in no case will Camrose, the Company or any other Person be required to recognize Dissenting Holders as holders of Company Shares in respect of which Dissent Rights have been validly exercised after the completion of the transfer under Section 2.03(a), and the names of such Dissenting Holders will be removed from the registers of holders of Company Shares in respect of which Dissent Rights have been validly exercised at the same time as the event described in Section 2.03(a) occurs. In addition to any other restrictions under Section 190 of the CBCA, holders of Company Shares who vote or have instructed a proxyholder to vote such Company Shares in favour of the Arrangement Resolution (but only in respect of such Company Shares) will not be entitled to exercise Dissent Rights.

## ARTICLE IV
## CERTIFICATES AND PAYMENTS

**Section 4.01 Payment of Consideration**

(a) Prior to the filing of the Articles of Arrangement, the Company shall loan to Camrose, cash in the aggregate amount equal to the payments required by this Plan of Arrangement to pay the Closing Payment Amount, with the amount per Company Share in respect of which Dissent Rights have been exercised being deemed to be the Closing Payment Amount per Company Share for this purpose, net of applicable withholdings (the "**Consideration Loan**") and Camrose will deposit or arrange to be deposited with the Depositary, for the benefit of Company Shareholders, cash in an amount equal to the Consideration Loan. The cash deposited with the Depositary by or on behalf of Camrose will be held in an interest-bearing account, and any interest earned on such funds will be for the account of Camrose.

(b) The Purchaser shall, if and when any amount of the Company Material Property Payment becomes payable to the Former Holders pursuant to the Arrangement Agreement, cause to be deposited

with the Depositary for the benefit of the Former Holders entitled to receive such Company Material Property Payment, US$7.5 million, and the Depositary will deliver to the Former Holders, the cash which such Former Shareholders have the right to receive under the Arrangement less any amounts withheld pursuant to Section 4.03. The Shareholder Representative, without any personal liability, shall be provided prompt notice by Camrose of any Change of Control of the Company Material Property during the 14 month period following the Effective Date or, following the end of such 14 month period, a certificate from the Chief Executive Officer and Chief Financial Officer of Camrose confirming that a Change of Control of the Company Material Property has not occurred.

(c) Upon surrender to the Depositary for cancellation of a certificate which immediately prior to the Effective Time represented outstanding Company Shares that were transferred pursuant to Section 2.03(b), together with a duly completed and executed Letter of Transmittal and such additional documents and instruments as the Depositary may reasonably require, the holder of Company Shares represented by such surrendered certificate will be entitled to receive in exchange therefor, and the Depositary will deliver to such holder, the cash which such holder has the right to receive under the Arrangement for such Company Shares less any amounts withheld pursuant to Section 4.03, and any certificate so surrendered will forthwith be cancelled.

(d) Until surrendered as contemplated by this Section 4.01, each certificate that immediately prior to the Effective Time represented Company Shares will be deemed after the Effective Time to represent only the right to receive upon such surrender a cash payment in lieu of such certificate as contemplated in this Section 4.01, less any amounts withheld pursuant to Section 4.03. Any such certificate formerly representing Company Shares not duly surrendered on or before the sixth anniversary of the Effective Date will cease to represent a claim by or interest of any former holder of Company Shares of any kind or nature against or in the Company or Camrose. On such date, all cash to which such former holder was entitled will be deemed to have been surrendered to Camrose or the Company, as applicable, and will be paid over by the Depositary to Camrose or as directed by Camrose.

(e) The Company and Camrose will cause the Depositary, as soon as a former holder of Company Shares becomes entitled to a net cash payment in accordance with Section 4.01(b) and Section 4.01(c), as applicable, to:

(i) forward or cause to be forwarded by first class mail (postage paid) to such former holder of Company Shares at the address specified by such former holder;

(ii) if requested by such former holder of Company Shares, make available at the offices of the Depositary for pick-up by such former holder; or

(iii) if such former holder of Company Shares neither specifies an address as described in Section 4.01(e)(i) nor provides a request as described in Section 4.01(e)(ii), forward or cause to be forwarded by first class mail (postage paid) to such former holder at the address of such former holder as shown on the applicable securities register maintained by or on behalf of the Company immediately prior to the Effective Time;

a cheque representing the net cash payment, if any, payable to such former holder in accordance with the provisions hereof.

(f) Any payment made by way of cheque by the Depositary (or the Company, if applicable) pursuant to this Plan of Arrangement that has not been deposited or has been returned to the Depositary (or the Company) or that otherwise remains unclaimed, in each case, on or before the sixth anniversary of the Effective Time, and any right or claim to payment hereunder that remains outstanding on the sixth anniversary of the Effective Time will cease to represent a right or claim of any kind or nature and the right of the holder to receive the applicable consideration for the

Company Shares pursuant to this Plan of Arrangement will terminate and be deemed to be surrendered and forfeited to Camrose or the Company, as applicable, for no consideration.

(g) No holder of Company Shares will be entitled to receive any consideration with respect to such Company Shares other than the cash payment(s), to which such holder is entitled to receive in accordance with Section 2.03 and this Section 4.01 and, for greater certainty, no such holder will be entitled to receive any interest, dividends, premium or other payment in connection therewith.

**Section 4.02 Lost Certificates**

In the event any certificate that immediately prior to the Effective Time represented one or more outstanding Company Shares that were transferred pursuant to Section 2.03 will have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate to be lost, stolen or destroyed, the Depositary will pay to such holder, in exchange for such lost, stolen or destroyed certificate, the cash which such holder has the right to receive under the Arrangement for such Company Shares, deliverable in accordance with such holder's Letter of Transmittal. When authorizing such payment in exchange for any lost, stolen or destroyed certificate, the Person to whom such cash is to be delivered will, as a condition precedent to the delivery of such cash, give a bond satisfactory to the Company, Camrose and the Depositary (acting reasonably) in such sum as Camrose may direct, or otherwise indemnify Camrose and the Company in a manner satisfactory to Camrose and the Company, acting reasonably, against any claim that may be made against Camrose or the Company with respect to the certificate alleged to have been lost, stolen or destroyed.

**Section 4.03 Withholding Rights**

Camrose, the Company or the Depositary, as applicable, will be entitled to deduct and withhold from any consideration otherwise payable or otherwise deliverable to any Affected Securityholders under the Plan of Arrangement such amounts as Camrose, the Company or the Depositary, as applicable, are required or reasonably believe to be required to deduct and withhold from such consideration under any provision of any Laws in respect of Taxes. Any such amounts will be deducted, withheld and remitted from the consideration payable pursuant to the Plan of Arrangement, provided that such deducted and withheld amounts are actually remitted to the appropriate Governmental Entity in accordance with applicable Law, be treated for all purposes under this Agreement as having been paid to the Affected Securityholders in respect of which such deduction, withholding and remittance was made.

**Section 4.04 No Liens**

Any exchange or transfer of securities pursuant to this Plan of Arrangement will be free and clear of any Liens or other claims of third parties of any kind.

**Section 4.05 Paramountcy**

From and after the Effective Time: (a) this Plan of Arrangement will take precedence and priority over any and all Company Shares and Company Options issued or outstanding prior to the Effective Time, (b) the rights and obligations of each of the holders of Company Shares and Company Options, the Company, Camrose, the Depositary and any transfer agent or other depositary therefor in relation thereto, will be solely as provided for in this Plan of Arrangement, and (c) all actions, causes of action, claims or proceedings (actual or contingent and whether or not previously asserted) based on or in any way relating to any Company Shares or Company Options will be deemed to have been settled, compromised, released and determined without liability except as set forth in this Plan of Arrangement.

## ARTICLE V
## AMENDMENTS

**Section 5.01 Amendments to Plan of Arrangement**

(a) The Company and Camrose may amend, modify and/or supplement this Plan of Arrangement in accordance with Arrangement Agreement at any time and from time to time prior to the Effective

Time, provided that each such amendment, modification and/or supplement must (i) be set out in writing, (ii) be approved by the Company and Camrose, each acting reasonably, (iii) made following the Meeting, approved by the Court, and (iv) communicated to the Former Shareholders and each holder of Company Options if and as required by the Court.

(b) Any amendment, modification or supplement to this Plan of Arrangement made in accordance with the Arrangement Agreement may be proposed by the Company at any time prior to the Meeting (provided that Camrose will have consented thereto) with or without any other prior notice or communication, and if so proposed and accepted by the Persons voting at the Meeting (other than as may be required under the Interim Order), will become part of this Plan of Arrangement for all purposes.

(c) Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the Meeting will be effective only if (i) it is consented to in writing by each of the Company and Camrose (in each case, acting reasonably), and (ii) if required by the Court, it is consented to by some or all of the Affected Securityholders voting in the manner directed by the Court.

(d) Any amendment, modification or supplement to this Plan of Arrangement may be made following the Effective Date unilaterally by Camrose, provided that it concerns a matter which, in the reasonable opinion of Camrose, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement.

## ARTICLE VI
## FURTHER ASSURANCES

**Section 6.01 Further Assurances**

Notwithstanding that the transactions and events set out in this Plan of Arrangement will occur and will be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each of the parties to the Arrangement Agreement will make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by either of them in order to further document or evidence any of the transactions or events set out in this Plan of Arrangement.

**APPENDIX "C"**
**PARADIGM FAIRNESS OPINION**

**(See attached)**

PARADIGM
CAPITAL

May 11, 2016

**The Special Committee of the Board of Directors**
**Africo Resources Ltd.**
520 – 800 West Pender St.
Vancouver, BC
Canada, V6C 2V6

Dear Sirs:

Paradigm Capital Inc. ("**Paradigm Capital**") understands that Africo Resources Ltd. ("**Africo**") proposes to enter into an arrangement agreement (the "**Arrangement Agreement**") with Camrose Resources Limited ("**Camrose**") pursuant to which Camrose will acquire all of the outstanding common shares of Africo not already owned by Camrose by way of a statutory plan of arrangement under the provisions of the *Canada Business Corporations Act* (the "**Transaction**"), for consideration of $1.00 cash (the "**Consideration**") per common share of Africo. Shareholders and optionholders may also receive a pro rata share of the contingent consideration (the "**Contingent Consideration**") equal to US$7.5 million divided by the number of Africo common shares and stock options outstanding (other than those held by Camrose) immediately prior to the effective time of the arrangement (the "**Effective Time**"), which will be payable in the event that there is a Change of Control of the Company Material Property (as defined in the Arrangement Agreement) which is in relation to the Kalukundi cobalt-copper project in Katanga Province, in the south-eastern part of the Democratic Republic of the Congo ("**Kalukundi**"). All outstanding stock options of Africo will be "in-the-money" when compared to the Consideration and will be cancelled immediately prior to the Effective Time and will be exchanged for the Consideration less the exercise price, plus a right to the Contingent Consideration, if any. The Consideration was determined to reflect a 115% premium to the closing price of $0.465 of Africo's common shares on the Toronto Stock Exchange (the "**TSX**") as of May 10, 2016.

Paradigm Capital further understands that (i) the Transaction will constitute a "business combination" for purposes of Multilateral Instrument 61-101 *Protection of Minority Security Holders in Special Transactions* ("**MI 61-101**"), (ii) the board of directors of Africo (the "**Board**") has appointed an independent committee of directors (the "**Special Committee**") to consider and evaluate the Transaction and make recommendations thereon to the Board, and (iii) the material terms of and risks associated with the Transaction will be described in a management information circular, which will be prepared by Africo in compliance with applicable laws, regulations, policies and rules and will be mailed to the securityholders of Africo.

The Special Committee has retained Paradigm Capital to assist it in, among other things, evaluating the Consideration payable pursuant to the Transaction and to prepare and deliver to the Special Committee this opinion (the "**Opinion**") as to the fairness of the Transaction, from a financial point of view, to the shareholders of Africo other than Camrose. Paradigm Capital has not prepared a formal valuation (as defined in MI 61-101) of Africo or any of its respective securities or assets, and this Opinion should not be construed as such. Paradigm Capital understands that Africo will be relying on the exemption set out in Section 4.4(1)(b) of MI 61-101 from the requirement under that instrument to prepare a formal valuation, on the basis of certain significant shareholders of Africo having entered into voting lock-up agreements with Camrose in support of the Transaction. The Opinion does not constitute a recommendation to the Special Committee or the shareholders of Africo as to whether such shareholders should vote in favour of the Transaction. Furthermore, the Opinion is not, and should not be construed as, advice as to the price at which Africo securities may trade at any future date, whether before or after completion of the Transaction.

PARADIGM CAPITAL

Unless otherwise noted, all dollar values stated in the Opinion are denominated in Canadian dollars.

**Paradigm Capital Engagement and Background**

Paradigm Capital was initially contacted by the Chairman of Africo in July 2015 and asked to complete certain financial analysis in contemplation of a possible business combination transaction. Paradigm Capital was again contacted in October 2015 and asked to update its analysis from July 2015, and the delivery of a fairness opinion in connection with a potential transaction was discussed. Paradigm Capital was not formally engaged at either such time. Most recently, Paradigm Capital was contacted by the Chairman of Africo on April 19, 2016 and again on April 26, 2016, on behalf of the Special Committee. On April 26, 2016 Paradigm Capital and Africo's Chairman discussed Paradigm Capital's ability to act as the financial advisor to the Special Committee in connection with the Transaction and to complete the Opinion. The discussion held with Africo's Chairman involved a review of Paradigm Capital's familiarity with Africo, its assets and Africo's ongoing discussions with Camrose, as well as Paradigm Capital's ability to deliver a fairness opinion on a timely basis in light of the advanced state of negotiations between Africo and Camrose regarding the Transaction. Paradigm Capital began work immediately and entered into an agreement with the Special Committee on May 6, 2016 (the "**Engagement Agreement**") pursuant to which Paradigm Capital was engaged to act as financial advisor to the Special Committee in connection with the Transaction. Paradigm Capital made a detailed presentation to the Special Committee on May 6, 2016, issued a verbal opinion on May 11, 2016 and subsequently confirmed its opinion in writing.

The Engagement Agreement provides that Paradigm Capital is to be paid a fixed fee for the provision of the Opinion, and to be reimbursed for reasonable costs and expenses incurred in connection therewith (the "**Fee**"). The Fee is not contingent on the completion of the Transaction or on the conclusions reached in the Opinion, and is payable upon delivery of the Opinion to the Special Committee. Africo has also agreed to indemnify Paradigm Capital, its affiliates and subsidiaries, and their respective officers, directors, employees, partners and shareholders for certain liabilities arising from the services performed by Paradigm Capital under the Engagement Agreement.

Subject to the terms of the Engagement Agreement, Paradigm Capital consents to the inclusion of the Opinion in its entirety, together with a summary thereof (in a form acceptable to Paradigm Capital, acting reasonably), in any disclosure document required by applicable securities laws to be delivered to the shareholders of Africo in connection with the Transaction, and to the filing thereof, as necessary, by Africo with the securities commissions or similar regulatory authorities in each province of Canada. Paradigm Capital also consents to references to the Opinion and to any summary of information derived therefrom, to be included in press releases issued by Africo in connection with the Transaction (in a form acceptable to Paradigm Capital, acting reasonably).

**Credentials and Independence of Paradigm Capital**

Paradigm Capital is an independent Canadian investment banking firm with a sales, trading, research and corporate finance focus, providing services for institutional investors and corporations. Paradigm Capital was founded in 1999 and is a member of the TSX, the TSX Venture Exchange and the Investment Industry Regulatory Organization of Canada ("**IIROC**"). Paradigm Capital has participated in many transactions involving both public and private companies.

The opinion expressed herein represents that of Paradigm Capital and the form and content hereof has been approved for release by a committee of directors and other professionals of Paradigm Capital, each of whom is experienced in mergers, acquisitions, business combinations, divestitures, valuation and fairness opinion matters.

Paradigm Capital is independent of Africo and none of Paradigm Capital or its associates or affiliates is an insider, associate or affiliate (as those terms are defined in the *Securities Act* (Ontario)), or holds

any securities, of Africo or any of its associates or affiliates. Paradigm Capital is not an advisor to any person or company other than the Special Committee with respect to the Transaction. Paradigm Capital has not previously provided any financial advisory or capital raising services to Africo or any of its associates or affiliates for which it has received compensation in the past 24 months.

Paradigm Capital may, in the ordinary course of its business, provide financial advisory or investment banking services to Africo from time to time. Additionally, in the ordinary course of its business, Paradigm Capital may actively trade common shares and other securities of Africo for its own account and for its client accounts, and, accordingly, may at any time hold a long or short position in such securities. As an investment dealer, Paradigm Capital conducts research on securities and may, in the ordinary course of its business, provide research reports and investment advice to its clients on investment matters, including with respect to Africo or the Transaction, when disclosed.

**Scope of the Review**

In connection with the Transaction, Paradigm Capital has reviewed and relied upon and in some cases carried out, among other things, the following:

a) Draft Arrangement Agreement between Africo and Camrose dated May 5, 2016;

b) Draft form of Lock-Up Agreement between Camrose and certain shareholders of Africo dated May 4, 2016;

c) Africo's annual information forms for the fiscal years ended December 31, 2015 and 2014;

d) Africo's audited annual consolidated financial statements and management's discussion and analysis for the fiscal years ended December 31, 2015 and 2014;

e) Technical report entitled "*Africo Resources Ltd., Kalukundi Copper-Cobalt Project, Democratic Republic of Congo, NI 43-101 Technical Report on Updated Mineral Resource Estimate*" prepared for Africo by AMEC E&C Services, Inc. with an effective date of January 21, 2013;

f) Technical report entitled "*Kalukundi Project, Democratic Republic of the Congo*" prepared for Africo by RSG Global Pty Ltd dated June 2006;

g) Press releases and material change reports issued by Africo during the 12-month period ended May 5, 2016;

h) Various independent and institutional research reports on other mining companies and the mining sector generally;

i) Representations contained in a certificate addressed to Paradigm Capital dated May 10, 2016 from two senior officers of Africo (the "**Certificate**") as to, among other things, certain factual matters including the completeness, accuracy and fair presentation of the information upon which the Opinion is based;

j) Comparable project economic studies; and

k) Discussions with the Chairman of Africo.

Paradigm Capital has not, to the best of its knowledge, been denied access by Africo to any information requested. Paradigm Capital did not meet with the auditors of Africo, and has assumed the accuracy and fair presentation of the audited consolidated financial statements of Africo and the reports of the auditors thereon.

PARADIGM CAPITAL

This Opinion has been prepared in accordance with the Disclosure Standards for Formal Valuations and Fairness Opinions of IIROC but IIROC has not been involved in the preparation or review of this Opinion.

**Assumptions and Limitations**

With the approval of the Special Committee and as provided in the Engagement Agreement, Paradigm Capital has relied upon, without independent verification, all financial and other information that was obtained by us from public sources or that was provided to us by Africo and its affiliates, associates, advisors or otherwise. We have assumed that this information was complete and accurate as of the date thereof, and no necessary or material facts were omitted that may make the information misleading. In accordance with the terms of our engagement, but subject to the exercise of our professional judgment, we have not conducted any independent investigation to verify the completeness or accuracy of such information. This Opinion is conditional upon such completeness and accuracy. With respect to the financial forecasts and budgets provided to us and used in our analysis, we have assumed that they have been prepared using the best currently available estimates and reasonable judgments of management of Africo as to the matters covered thereby. Two senior representatives of Africo have represented to us in the Certificate, among other things, that (i) the information, opinions and other materials (the "**Information**") provided to us by or on behalf of Africo are complete and accurate as of the date of the Information and that, since the date of the Information, except as publicly disclosed, there has been no material change, financial or otherwise, in Africo or in its assets, liabilities (contingent or otherwise), business, financial condition or operations and there has been no change in any material fact which is of a nature as to render the Information untrue or misleading in any material respect, except to the extent disclosed in subsequent Information, and (ii) Africo has no knowledge of any facts or circumstances, public or otherwise, not contained in or referred to in the Information that could reasonably be expected to affect the Opinion, including the assumptions used, procedures adopted, the scope of the review undertaken or the conclusions reached.

This Opinion is based on the securities markets, economic, financial and general business conditions prevailing as of the date of this Opinion and the conditions and prospects, financial and otherwise, of Africo as they were reflected in the Information reviewed by us. In its analysis and in preparing this Opinion, Paradigm Capital has made a number of assumptions with respect to industry performance, general business and economic conditions, and other matters, many of which are beyond the control of Paradigm Capital, Africo, Camrose and any other party involved in the Transaction.

Paradigm Capital is not a legal, tax, or accounting expert and expresses no opinion concerning any legal, tax, or accounting matters concerning the Transaction or the sufficiency of the Opinion for the Special Committee's purposes.

Paradigm Capital has also assumed that the final terms of the Transaction will be fully complied with, and will be substantially the same as those described by Africo's senior officers and directors to Paradigm Capital and those contained in the draft Arrangement Agreement provided to Paradigm Capital. Finally, Paradigm Capital has assumed that all material governmental, regulatory or other required consents and approvals necessary for the consummation of the Transaction will be obtained without any material adverse effect on Africo or the contemplated benefits of the Transaction to Africo's shareholders.

This Opinion has been provided for the use of the Special Committee and, other than as contemplated herein, may not be used or relied upon by any other person without the express written consent of Paradigm Capital. This Opinion is given as of the date hereof and Paradigm Capital disclaims any undertaking or obligation to advise any person of any change in any fact or matter affecting this Opinion which may come or be brought to Paradigm Capital's attention after such date. The Opinion is limited to Paradigm Capital's understanding of the Transaction as of the date hereof and Paradigm

Capital assumes no obligation to update this Opinion to take into account any changes regarding the Transaction after such date.

**Opinions of Financial Advisors**

In preparing this Opinion, Paradigm Capital performed a variety of financial and comparative analyses, including those described below. The summary of Paradigm Capital's analyses described below is not a complete description of the analyses underlying this Opinion. The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses, and the application of those methods to the particular circumstances. Therefore, a fairness opinion is not readily susceptible to partial analysis or summary description. In forming the Opinion, Paradigm Capital made qualitative judgements as to the significance and relevance of each analysis and factor that it considered. Accordingly, Paradigm Capital believes that its analyses must be considered as a whole, and that selecting portions of its analyses and factors, without considering all analyses and factors, including the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying its analyses and this Opinion. This Opinion is not to be construed as a recommendation to any holder of Africo's common shares as to whether to vote in favour of the Transaction. Paradigm Capital expresses no opinion as to whether the Transaction is consistent with the best interests of the shareholders of Africo.

In its analyses, Paradigm Capital considered industry performance, general business, economic, market, political and financial conditions and other matters, many of which are beyond the control of Africo. No company, transaction or business used in Paradigm Capital's analyses as a comparison is identical to Africo or the Transaction, and an evaluation of the results of those analyses is not entirely mathematical. Rather, the analyses involve complex considerations and judgements concerning financial and operating characteristics and other factors that could affect the business combination, public trading or other values of the companies, business segments or transactions being analyzed. The estimates contained in Paradigm Capital's analyses, and the ranges of valuations resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favourable than those suggested by the analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, Paradigm Capital's analyses and estimates are inherently subject to substantial uncertainty and the Opinion is conditional upon the correctness of all of the assumptions indicated herein. This Opinion should be read in its entirety.

**Africo Overview**

Africo is a Canadian company with a corporate head office in Vancouver, British Columbia primarily engaged in the exploration and development of the Kalukundi cobalt-copper project in the Katanga Province, in the Democratic Republic of the Congo. Kalukundi is secured under an Exploitation or Mining License, which was issued on October 11, 2001 for a term of 20 years. The tenement is 19.5km$^2$ in extent, consisting of 23 carres or blocks. There is a risk that the license will not be renewed in October 2021. Furthermore, there has been no material development on the property over the past several years.

Camrose owns 63.7% of Africo’s outstanding shares, giving it a controlling interest in the Company. As recently highlighted by Africo, Camrose’s affiliate, Comide, is believed to be carrying out mining operations on a portion of Kalukundi without the consent and approval of Africo.

As of December 31, 2015, Africo reported US$44.2 million in cash, US$44.3 million of working capital and a book value of US$63.1 million. As of the date hereof, Africo had a market capitalization of $32.1 million.

PARADIGM CAPITAL

***Overview of the Kalukundi Project***

Africo holds a 75% interest in Kalukundi through its indirectly wholly-owned subsidiary, Africo Resources DRC Sprl, which has formed a joint venture vehicle, Swanmines SAS, with La Generale des Carrieres et des Mines. Under the joint venture agreement, Africo holds 75% of the joint venture company and Kalukundi. Kalukundi is located within the Kolwezi District of Katanga Province in the south-eastern Democratic Republic of the Congo, 60 km to the east of Kolwezi. Africo released an independent NI 43-101 technical report and updated mineral resource estimate completed by AMEC E&C Services Inc. with an effective date of January 21, 2013.

**Fairness Methodology**

The Opinion has been prepared based on techniques that Paradigm Capital considers appropriate in the circumstances, after considering all relevant facts and taking into account Paradigm Capital's assumptions, in order to determine the fairness, from a financial point of view, of the Transaction to the shareholders of Africo.

Paradigm Capital relied on a variety of financial and comparative analyses, including those described below:

a) Price/Paradigm Capital Net Asset Value ("**NAV**");
b) Comparable Enterprise Value ("**EV**")/Copper Equivalent Pound;
c) Precedent Transaction EV/Copper Equivalent Pound;
d) Precedent Transaction Bid Premiums;
e) Price/Adjusted Book Value;
f) Historical Trading; and
g) Takeovers of Cash Rich Companies.

***a) Price/Paradigm Capital Net Asset Value Analysis***

NAV Analysis was conducted on Africo based on the technical report prepared by AMEC E&C Services Inc. with an effective date of January 21, 2013 and the technical report prepared by RSG Global Pty Ltd dated June 2006 as well as Paradigm Capital's estimates. In determining the NAV for Africo, Paradigm Capital used a discounted cash flow ("**DCF**") analysis. The DCF considered the present value of the free cash flows to the firm generated by Africo's assets using an appropriate discount rate. This approach took into account the timing and relative certainty of projected cash flows, and required that certain assumptions be made regarding, among other things, commodity prices, timing and discount rates. The Africo NAV ranges were determined by adding the value of the Kalukundi and current assets and subtracting debt outstanding, current liabilities and corporate general and administrative costs. Paradigm Capital then applied the mean Price/NAV of four copper exploration/development comparables.

***b) Comparable EV/Copper Equivalent Pound***

Paradigm Capital compared financial, asset and operational data of Africo to the corresponding data of a comparable group of seven companies determined by Paradigm Capital. Paradigm Capital has chosen comparable companies with non-producing copper assets in Africa and other geopolitically "high risk" jurisdictions and countries. The valuation metric selected by Paradigm Capital to be the most appropriate to determine the value of Africo was the trading range of EV per pound of copper equivalent resource.

Comparable multiple analysis involves complex considerations of the selected companies and other factors that could affect the fair market value of Africo and the selected companies.

PARADIGM CAPITAL

### c) *Precedent Transaction EV/Copper Equivalent Pound*

Paradigm Capital identified a list of 10 comparable transactions comprising acquisitions of non-producing copper companies, where public information was available, and examined the mean and median EV per pound of copper equivalent resource. Paradigm applied a political discount multiple to the implied enterprise value given the jurisdictions of the precedent transactions versus Africo's jurisdiction.

### d) *Precedent Transaction Bid Premiums*

Paradigm Capital identified a list of 11 comparable mining transactions where the majority shareholder acquired the remaining minority stake, where public information was available, and examined the mean and median premiums paid to previous closing price.

### e) *Price/Adjusted Book Value*

Paradigm Capital compared financial, asset and operational data of Africo to the corresponding data of a comparable group of seven companies determined by Paradigm Capital. Paradigm Capital has chosen comparable companies with non-producing copper assets in Africa and other geopolitically "high risk" jurisdictions and countries. The second valuation metric selected by Paradigm Capital to be the most appropriate to determine the value of Africo was the trading range of comparable price to adjusted book value.

### f) *Historical Trading*

Paradigm Capital examined the trading range of Africo for the twelve months preceding the Opinion.

### g) *Takeovers of Cash Rich Companies*

Paradigm Capital identified a list of several comparable transactions where companies were acquired solely for their large cash balances, where public information was available, and examined the premiums paid to cash values. Paradigm used this piece of analysis to arrive at the floor of its fair market value range of Africo shares.

### Conclusion

Based upon and subject to the foregoing and such other factors as Paradigm Capital considered relevant, Paradigm Capital is of the opinion that, as of the date hereof, the Consideration payable pursuant to the Transaction is fair, from a financial point of view, to the shareholders of Africo other than Camrose.

Yours very truly,

Paradigm Capital Inc.

**PARADIGM CAPITAL INC.**

## APPENDIX "D"
## SECTION 190 OF THE CBCA

**Right to dissent – s. 190(1)**

(1) Subject to sections 191 and 241, a holder of shares of any class of a corporation may dissent if the corporation is subject to an order under paragraph 192(4)(d) that affects the holder or if the corporation resolves to

(a) amend its articles under section 173 or 174 to add, change or remove any provisions restricting or constraining the issue, transfer or ownership of shares of that class;

(b) amend its articles under section 173 to add, change or remove any restriction on the business or businesses that the corporation may carry on;

(c) amalgamate otherwise than under section 184;

(d) be continued under section 188;

(e) sell, lease or exchange all or substantially all its property under subsection 189(3); or

(f) carry out a going-private transaction or a squeeze-out transaction.

**Further right -- s. 190(2)**

(2) A holder of shares of any class or series of shares entitled to vote under section 176 may dissent if the corporation resolves to amend its articles in a manner described in that section.

**If one class of shares -- s. 190(2.1)**

(2.1) The right to dissent described in subsection (2) applies even if there is only one class of shares.

**Payment for shares -- s. 190(3)**

(3) In addition to any other right the shareholder may have, but subject to subsection (26), a shareholder who complies with this section is entitled, when the action approved by the resolution from which the shareholder dissents or an order made under subsection 192(4) becomes effective, to be paid by the corporation the fair value of the shares in respect of which the shareholder dissents, determined as of the close of business on the day before the resolution was adopted or the order was made.

**No partial dissent -- s. 190(4)**

(4) A dissenting shareholder may only claim under this section with respect to all the shares of a class held on behalf of any one beneficial owner and registered in the name of the dissenting shareholder.

**Objection -- s. 190(5)**

(5) A dissenting shareholder shall send to the corporation, at or before any meeting of shareholders at which a resolution referred to in subsection (1) or (2) is to be voted on, a written objection to the resolution, unless the corporation did not give notice to the shareholder of the purpose of the meeting and of their right to dissent.

**Notice of resolution -- s. 190(6)**

(6) The corporation shall, within ten days after the shareholders adopt the resolution, send to each shareholder who has filed the objection referred to in subsection (5) notice that the resolution has been adopted, but such notice is not required to be sent to any shareholder who voted for the resolution or who has withdrawn their objection.

**Demand for payment -- s. 190(7)**

(7) A dissenting shareholder shall, within twenty days after receiving a notice under subsection (6) or, if the shareholder does not receive such notice, within twenty days after learning that the resolution has been adopted, send to the corporation a written notice containing

(a) the shareholder's name and address;

(b) the number and class of shares in respect of which the shareholder dissents; and

(c) a demand for payment of the fair value of such shares.

**Share certificate -- s. 190(8)**

(8) A dissenting shareholder shall, within thirty days after sending a notice under subsection (7), send the certificates representing the shares in respect of which the shareholder dissents to the corporation or its transfer agent.

**Forfeiture -- s. 190(9)**

(9) A dissenting shareholder who fails to comply with subsection (8) has no right to make a claim under this section.

**Endorsing certificate -- s. 190(10)**

(10) A corporation or its transfer agent shall endorse on any share certificate received under subsection (8) a notice that the holder is a dissenting shareholder under this section and shall forthwith return the share certificates to the dissenting shareholder.

**Suspension of rights -- s. 190(11)**

(11) On sending a notice under subsection (7), a dissenting shareholder ceases to have any rights as a shareholder other than to be paid the fair value of their shares as determined under this section except where

(a) the shareholder withdraws that notice before the corporation makes an offer under subsection (12),

(b) the corporation fails to make an offer in accordance with subsection (12) and the shareholder withdraws the notice, or

(c) the directors revoke a resolution to amend the articles under subsection 173(2) or 174(5), terminate an amalgamation agreement under subsection 183(6) or an application for continuance under subsection 188(6), or abandon a sale, lease or exchange under subsection 189(9),

in which case the shareholder's rights are reinstated as of the date the notice was sent.

**Offer to pay -- s. 190(12)**

(12) A corporation shall, not later than seven days after the later of the day on which the action approved by the resolution is effective or the day the corporation received the notice referred to in subsection (7), send to each dissenting shareholder who has sent such notice

(a) a written offer to pay for their shares in an amount considered by the directors of the corporation to be the fair value, accompanied by a statement showing how the fair value was determined; or

(b) if subsection (26) applies, a notification that it is unable lawfully to pay dissenting shareholders for their shares.

**Same terms -- s. 190(13)**

(13) Every offer made under subsection (12) for shares of the same class or series shall be on the same terms.

**Payment -- s. 190(14)**

(14) Subject to subsection (26), a corporation shall pay for the shares of a dissenting shareholder within ten days after an offer made under subsection (12) has been accepted, but any such offer lapses if the corporation does not receive an acceptance thereof within thirty days after the offer has been made.

**Corporation may apply to court -- s. 190(15)**

(15) Where a corporation fails to make an offer under subsection (12), or if a dissenting shareholder fails to accept an offer, the corporation may, within fifty days after the action approved by the resolution is effective or within such further period as a court may allow, apply to a court to fix a fair value for the shares of any dissenting shareholder.

**Shareholder application to court -- s. 190(16)**

(16) If a corporation fails to apply to a court under subsection (15), a dissenting shareholder may apply to a court for the same purpose within a further period of twenty days or within such further period as a court may allow.

**Venue -- s. 190(17)**

(17) An application under subsection (15) or (16) shall be made to a court having jurisdiction in the place where the corporation has its registered office or in the province where the dissenting shareholder resides if the corporation carries on business in that province.

**No security for costs -- s. 190(18)**

(18) A dissenting shareholder is not required to give security for costs in an application made under subsection (15) or (16).

**Parties -- s. 190(19)**

(19) On an application to a court under subsection (15) or (16),

(a) all dissenting shareholders whose shares have not been purchased by the corporation shall be joined as parties and are bound by the decision of the court; and

(b) the corporation shall notify each affected dissenting shareholder of the date, place and consequences of the application and of their right to appear and be heard in person or by counsel.

**Powers of court -- s. 190(20)**

(20) On an application to a court under subsection (15) or (16), the court may determine whether any other person is a dissenting shareholder who should be joined as a party, and the court shall then fix a fair value for the shares of all dissenting shareholders.

**Appraisers -- s. 190(21)**

(21) A court may in its discretion appoint one or more appraisers to assist the court to fix a fair value for the shares of the dissenting shareholders.

**Final order -- s. 190(22)**

(22) The final order of a court shall be rendered against the corporation in favour of each dissenting shareholder and for the amount of the shares as fixed by the court.

**Interest -- s. 190(23)**

(23) A court may in its discretion allow a reasonable rate of interest on the amount payable to each dissenting shareholder from the date the action approved by the resolution is effective until the date of payment.

**Notice that subsection (26) applies -- s. 190(24)**

(24) If subsection (26) applies, the corporation shall, within ten days after the pronouncement of an order under subsection (22), notify each dissenting shareholder that it is unable lawfully to pay dissenting shareholders for their shares.

**Effect where subsection (26) applies -- s. 190(25)**

(25) If subsection (26) applies, a dissenting shareholder, by written notice delivered to the corporation within thirty days after receiving a notice under subsection (24), may

(a) withdraw their notice of dissent, in which case the corporation is deemed to consent to the withdrawal and the shareholder is reinstated to their full rights as a shareholder; or

(b) retain a status as a claimant against the corporation, to be paid as soon as the corporation is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors of the corporation but in priority to its shareholders.

**Limitation -- s. 190(26)**

(26) A corporation shall not make a payment to a dissenting shareholder under this section if there are reasonable grounds for believing that

(a) the corporation is or would after the payment be unable to pay its liabilities as they become due; or the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities.

**APPENDIX "E"**
**INTERIM ORDER**

**(See attached)**

Court File No. CV-16-11402-00CL

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE | ) | TUESDAY, THE 31ST |
| | ) | |
| JUSTICE NEWBOULD | ) | DAY OF MAY, 2016 |

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED, AND RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE***

**AND IN THE MATTER OF A PROPOSED PLAN OF ARRANGEMENT INVOLVING AFRICO RESOURCES LTD. AND CAMROSE RESOURCES LIMITED**

## INTERIM ORDER

**THIS MOTION** made by the Applicant, Africo Resources Ltd. ("**Africo**"), for an interim order for advice and directions pursuant to section 192 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended, (the "CBCA") was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the Notice of Motion, the Notice of Application issued on May 20, 2016 and the affidavit of Christos Theodoropoulos sworn May 25, 2016, (the "**Theodoropoulos Affidavit**"), including the Plan of Arrangement, which is attached as Appendix B to the draft management proxy circular of Africo (the "**Information Circular**"), which is attached as Exhibit A to the Theodoropoulos Affidavit, and on hearing the submissions of counsel for Africo and counsel for Camrose Resources Limited ("**Camrose**") and on being advised that the Director appointed under the CBCA (the "**Director**") does not consider it necessary to appear.

**Definitions**

1. **THIS COURT ORDERS** that all definitions used in this Interim Order shall have the meaning ascribed thereto in the Information Circular or otherwise as specifically defined herein.

**The Meeting**

2. **THIS COURT ORDERS** that Africo is permitted to call, hold and conduct an annual and special meeting (the "**Meeting**") of the holders of voting common shares (the "**Shareholders**") in the capital of Africo to be held at Suite 520, 800 West Pender Street, Vancouver, British Columbia, V6C 1J8, on June 29, 2016 at 9:00 a.m. (Vancouver time) in order for the Shareholders to consider and, if determined advisable, pass a special resolution authorizing, adopting and approving, with or without variation, the Arrangement and the Plan of Arrangement (collectively, the "**Arrangement Resolution**").

3. **THIS COURT ORDERS** that the Meeting shall be called, held and conducted in accordance with the CBCA, the notice of meeting of Shareholders, which accompanies the Information Circular (the "**Notice of Meeting**") and the articles and by-laws of Africo, subject to what may be provided hereafter and subject to further order of this court.

4. **THIS COURT ORDERS** that the record date (the "**Record Date**") for determination of the shareholders entitled to notice of, and to vote at, the Meeting shall be May 25, 2016.

5. **THIS COURT ORDERS** that the only persons entitled to attend or speak at the Meeting shall be:

a) the Shareholders or their respective proxyholders;

b) the officers, directors, auditors and advisors of Africo;

c) representatives and advisors of Camrose;

d) the Director; and

e) other persons who may receive the permission of the Chair of the Meeting.

6. **THIS COURT ORDERS** that Africo may transact such other business at the Meeting as is contemplated in the Information Circular, or as may otherwise be properly before the Meeting.

**Quorum**

7. **THIS COURT ORDERS** that the Chair of the Meeting shall be determined by Africo and that the quorum at the Meeting shall be not less than two persons present in person at the opening of the Meeting who are entitled to vote at the Meeting either as Shareholders or proxyholders.

**Amendments to the Arrangement and Plan of Arrangement**

8. **THIS COURT ORDERS** that Africo is authorized to make, subject to the terms of the Arrangement Agreement, and paragraph 9, below, such amendments, modifications or supplements to the Arrangement and the Plan of Arrangement as it may determine without any additional notice to the Shareholders, or others entitled to receive notice under paragraphs 12 and 13 hereof and the Arrangement and Plan of Arrangement, as so amended, modified or supplemented shall be the Arrangement and Plan of Arrangement to be submitted to the Shareholders at the Meeting and shall be the subject of the Arrangement Resolution. Amendments, modifications or supplements may be made following the Meeting,

but shall be subject to review and, if appropriate, further direction by this Honourable Court at the hearing for the final approval of the Arrangement.

9. **THIS COURT ORDERS** that, if any amendments, modifications or supplements to the Arrangement or Plan of Arrangement as referred to in paragraph 8, above, would, if disclosed, reasonably be expected to affect a Shareholder's decision to vote for or against the Arrangement Resolution, notice of such amendment, modification or supplement shall be distributed, subject to further order of this Honourable Court, by press release, newspaper advertisement, prepaid ordinary mail, or by the method most reasonably practicable in the circumstances, as Africo may determine.

**Amendments to the Information Circular**

10. **THIS COURT ORDERS** that Africo is authorized to make such amendments, revisions and/or supplements to the draft Information Circular as it may determine and the Information Circular, as so amended, revised and/or supplemented, shall be the Information Circular to be distributed in accordance with paragraphs 12 and 13.

**Adjournments and Postponements**

11. **THIS COURT ORDERS** that Africo, if it deems advisable and subject to the terms of the Arrangement Agreement, is specifically authorized to adjourn or postpone the Meeting on one or more occasions, without the necessity of first convening the Meeting or first obtaining any vote of the Shareholders respecting the adjournment or postponement, and notice of any such adjournment or postponement shall be given by such method as Africo may determine is appropriate in the circumstances. This provision shall not limit the authority of the Chair of the Meeting in respect of adjournments and postponements.

**Notice of Meeting**

12. **THIS COURT ORDERS** that, in order to effect notice of the Meeting, Africo shall send the Information Circular (including the Notice of Application and this Interim Order), the Notice of Meeting, the form of proxy and the letter of transmittal, along with such amendments or additional documents as Africo may determine are necessary or desirable and are not inconsistent with the terms of this Interim Order (collectively, the "**Meeting Materials**"), to the following:

a) the registered Shareholders at the close of business on the Record Date, at least twenty-one (21) days prior to the date of the Meeting, excluding the date of sending and the date of the Meeting, by one or more of the following methods:

i) by pre-paid ordinary or first class mail at the addresses of the Shareholders as they appear on the books and records of Africo, or its registrar and transfer agent, at the close of business on the Record Date and if no address is shown therein, then the last address of the person known to the Corporate Secretary of Africo;

ii) by delivery, in person or by recognized courier service or inter-office mail, to the address specified in (i) above; or

iii) by facsimile or electronic transmission to any Shareholder, who is identified to the satisfaction of Africo, who requests such transmission in writing and, if required by Africo, who is prepared to pay the charges for such transmission;

b) non-registered Shareholders by providing sufficient copies of the Meeting Materials to intermediaries and registered nominees in a timely manner, in accordance with National Instrument 54-101 of the Canadian Securities Administrators; and

c) the respective directors and auditors of Africo, and to the Director appointed under the CBCA, by delivery in person, by recognized courier service, by pre-paid ordinary or first class mail or, with the consent of the person, by facsimile or electronic transmission, at least twenty-one (21) days prior to the date of the Meeting, excluding the date of sending and the date of the Meeting;

and that compliance with this paragraph shall constitute sufficient notice of the Meeting.

13. **THIS COURT ORDERS** that, in the event that Africo elects to distribute the Meeting Materials, Africo is hereby directed to distribute the Information Circular (including the Notice of Application, and this Interim Order), and any other communications or documents determined by Africo to be necessary or desirable (collectively, the "**Court Materials**") to the holders of Africo options to acquire voting common shares of Africo by any method permitted for notice to Shareholders as set forth in paragraphs 12(a) or 12(b), above, concurrently with the distribution described in paragraph 12 of this Interim Order. Distribution to such persons shall be to their addresses as they appear on the books and records of Africo or its registrar and transfer agent at the close of business on the Record Date.

14. **THIS COURT ORDERS** that accidental failure or omission by Africo to give notice of the meeting or to distribute the Meeting Materials or Court Materials to any person entitled by this Interim Order to receive notice, or any failure or omission to give such notice as a result of

events beyond the reasonable control of Africo, or the non-receipt of such notice shall, subject to further order of this Honourable Court, not constitute a breach of this Interim Order nor shall it invalidate any resolution passed or proceedings taken at the Meeting. If any such failure or omission is brought to the attention of Africo, it shall use its best efforts to rectify it by the method and in the time most reasonably practicable in the circumstances.

15. **THIS COURT ORDERS** that Africo is hereby authorized to make such amendments, revisions or supplements to the Meeting Materials and Court Materials, as Africo may determine in accordance with the terms of the Arrangement Agreement ("**Additional Information**"), and that notice of such Additional Information may, subject to paragraph 9, above, be distributed by press release, newspaper advertisement, pre-paid ordinary mail, or by the method most reasonably practicable in the circumstances, as Africo may determine.

16. **THIS COURT ORDERS** that distribution of the Meeting Materials and Court Materials pursuant to paragraphs 12 and 13 of this Interim Order shall constitute notice of the Meeting and good and sufficient service of the within Application upon the persons described in paragraphs 12 and 13 and that those persons are bound by any orders made on the within Application. Further, no other form of service of the Meeting Materials or the Court Materials or any portion thereof need be made, or notice given or other material served in respect of these proceedings and/or the Meeting to such persons or to any other persons, except to the extent required by paragraph 9, above.

**Solicitation and Revocation of Proxies**

17. **THIS COURT ORDERS** that Africo is authorized to use the letter of transmittal and proxies substantially in the form of the drafts accompanying the Information Circular, with

such amendments and additional information as Africo may determine are necessary or desirable, subject to the terms of the Arrangement Agreement. Africo is authorized, at its expense, to solicit proxies, directly or through its officers, directors or employees, and through such agents or representatives as they may retain for that purpose, and by mail or such other forms of personal or electronic communication as it may determine. Africo may waive generally, in its discretion, the time limits set out in the Information Circular for the deposit or revocation of proxies by Shareholders, if Africo deems it advisable to do so.

18. **THIS COURT ORDERS** that Shareholders shall be entitled to revoke their proxies in accordance with section 148(4) of the CBCA (except as the procedures of that section are varied by this paragraph) provided that any instruments in writing delivered pursuant to s.148(4)(a)(i) of the CBCA: (a) may be deposited at the registered office of Africo or with the transfer agent of Africo as set out in the Information Circular; and (b) any such instruments must be received by Africo or its transfer agent not later than 5:00 pm (Pacific Time) on the last business day immediately preceding the Meeting (or any adjournment or postponement thereof).

**Voting**

19. **THIS COURT ORDERS** that the only persons entitled to vote in person or by proxy on the Arrangement Resolution, or such other business as may be properly brought before the Meeting, shall be those Shareholders who hold voting common shares of Africo as of the close of business on the Record Date. Illegible votes, spoiled votes, defective votes and abstentions shall be deemed to be votes not cast. Proxies that are properly signed and dated but which do not contain voting instructions shall be voted in favour of the Arrangement Resolution.

20. **THIS COURT ORDERS** that votes shall be taken at the Meeting on the basis of one vote per common share and that in order for the Plan of Arrangement to be implemented, subject to further Order of this Honourable Court, the Arrangement Resolution must be passed, with or without variation, at the Meeting by:

(i) an affirmative vote of at least two-thirds (66 2/3%) of the votes cast in respect of the Arrangement Resolution at the Meeting in person or by proxy by the Shareholders; and

(ii) a simple majority of the votes cast in respect of the Arrangement Resolution at the Meeting in person or proxy by the Shareholders, other than (i) Camrose, (ii) any person that is a related party to Camrose, and (iii) any person that is a "joint actor" with Camrose, as determined pursuant to Multilateral Instrument 61-101 – *Protection of Minority Security Holders in Special Transactions* of the Canadian Securities Regulatory Authorities, but subject to the exemptions noted therein and any exemptions granted thereunder.

Such votes shall be sufficient to authorize Africo to do all such acts and things as may be necessary or desirable to give effect to the Arrangement and the Plan of Arrangement on a basis consistent with what is provided for in the Information Circular without the necessity of any further approval by the Shareholders, subject only to final approval of the Arrangement by this Honourable Court.

21. **THIS COURT ORDERS** that in respect of matters properly brought before the Meeting pertaining to items of business affecting Africo (other than in respect of the

Arrangement Resolution), each Shareholder is entitled to one vote for each voting common share held.

**Dissent Rights**

22. **THIS COURT ORDERS** that each registered Shareholder shall be entitled to exercise Dissent Rights in connection with the Arrangement Resolution in accordance with section 190 of the CBCA (except as the procedures of that section are varied by this Interim Order and the Plan of Arrangement) provided that, notwithstanding subsection 190(5) of the CBCA, any Shareholder who wishes to dissent must, as a condition precedent thereto, provide written objection to the Arrangement Resolution to Africo in the form required by section 190 of the CBCA and the Arrangement Agreement, which written objection must be received by Africo not later than 5:00 p.m. (Toronto time) on the business day that is two business days prior to the date of the Meeting (or any adjournment or postponement thereof), and must otherwise strictly comply with the requirements of the CBCA. For purposes of these proceedings, the "court" referred to in section 190 of the CBCA means this Honourable Court.

23. **THIS COURT ORDERS** that, notwithstanding section 190(3) of the CBCA, Camrose, not Africo, shall be required to offer to pay fair value, as of the day prior to approval of the Arrangement Resolution, for voting common shares held by Shareholders who duly exercise Dissent Rights, and to pay the amount to which such Shareholders may be entitled pursuant to the terms of the Plan of Arrangement. In accordance with the Plan of Arrangement and the Information Circular, all references to the "corporation" in subsections 190(3) and 190(11) to 190(26), inclusive, of the CBCA (except for the second reference to the "corporation" in subsection 190(12) and the two references to the "corporation" in subsection 190(17)) shall be deemed to refer to "Camrose" in place of the "corporation", and Camrose shall have all of the

rights, duties and obligations of the "corporation" under subsections 190(11) to 190(26), inclusive, of the CBCA.

24. **THIS COURT ORDERS** that any Shareholder who duly exercises such Dissent Rights set out in paragraph 22 above and who:

i) is ultimately determined by this Honourable Court to be entitled to be paid fair value for his, her or its voting common shares, shall be deemed to have transferred those voting common shares as of the Effective Time, without any further act or formality and free and clear of all liens, claims, encumbrances, charges, adverse interests or security interests to Camrose for cancellation in consideration for a payment of cash from Camrose equal to such fair value; or

ii) is for any reason ultimately determined by this Honourable Court not to be entitled to be paid fair value for his, her or its voting common shares pursuant to the exercise of the Dissent Right, shall be deemed to have participated in the Arrangement on the same basis and at the same time as any non-dissenting Shareholder;

but in no case shall Africo, Camrose or any other person be required to recognize such Shareholders as holders of voting common shares of Africo at or after the date upon which the Arrangement becomes effective and the names of such Shareholders shall be deleted from Africo's register of holders of voting common shares at that time.

**Hearing of Application for Approval of the Arrangement**

25. **THIS COURT ORDERS** that upon approval by the Shareholders of the Plan of Arrangement in the manner set forth in this Interim Order, Africo may apply to this Honourable Court for final approval of the Arrangement.

26. **THIS COURT ORDERS** that distribution of the Notice of Application and the Interim Order in the Information Circular, when sent in accordance with paragraphs 12 and 13 shall constitute good and sufficient service of the Notice of Application and this Interim Order and no other form of service need be effected and no other material need be served unless a Notice of Appearance is served in accordance with paragraph 27.

27. **THIS COURT ORDERS** that any Notice of Appearance served in response to the Notice of Application shall be served on the solicitors for Africo, with a copy to counsel for Camrose, as soon as reasonably practicable, and, in any event, no less than two days before the hearing of this Application at the following addresses:

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada M5L 1B9

**Alex Rose LSUC#: 49415P**
Tel: (416) 869-5261
**David Spence LSUC#: 64625R**
Tel: (416) 869-5689
Fax: (416) 947-0866

Lawyers for the Applicant

GOODMANS LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto ON M5H 2S7

**Peter Kolla LSUC#: 54608K**
Tel: (416) 597-6279
**Danny Wakeling LSUC#: 64659G**
Tel: (416) 597-6280
Fax: (416) 979-1234

Lawyers for Camrose

28. **THIS COURT ORDERS** that, subject to further order of this Honourable Court, the only persons entitled to appear and be heard at the hearing of the within application shall be:

i) Africo;

ii) Camrose;

iii) the Director; and

iv) any person who has filed a Notice of Appearance herein in accordance with the Notice of Application, this Interim Order and the *Rules of Civil Procedure*.

29. **THIS COURT ORDERS** that any materials to be filed by Africo in support of the within Application for final approval of the Arrangement may be filed up to one day prior to the hearing of the Application without further order of this Honourable Court.

30. **THIS COURT ORDERS** that in the event the within Application for final approval does not proceed on the date set forth in the Notice of Application, and is adjourned, only those persons who served and filed a Notice of Appearance in accordance with paragraph 27 shall be entitled to be given notice of the adjourned date.

**Precedence**

31. **THIS COURT ORDERS** that, to the extent of any inconsistency or discrepancy between this Interim Order and the terms of any instrument creating, governing or collateral to the voting common shares, Africo options to acquire voting common shares of Africo, or the articles or by-laws of Africo, this Interim Order shall govern.

**Extra-Territorial Assistance**

32. **THIS COURT** seeks and requests the aid and recognition of any court or any judicial, regulatory or administrative body in any province of Canada and any judicial, regulatory or administrative tribunal or other court constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States or other country to act in aid of and to assist this Honourable Court in carrying out the terms of this Interim Order.

**Variance**

33. **THIS COURT ORDERS** that Africo shall be entitled to seek leave to vary this Interim Order upon such terms and upon the giving of such notice as this Honourable Court may direct.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

MAY 3 1 2016

PER / PAR:

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED, AND RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE***

Court File No. CV-16-11402-00CL

**AND IN THE MATTER OF A PROPOSED PLAN OF ARRANGEMENT INVOLVING AFRICO RESOURCES LTD. AND CAMROSE RESOURCES LIMITED**

May 31/16

The application for interim order is justified & order to go.

[signature] J.

E-16

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD OF THE APPLICANT/MOVING PARTY**
**(Returnable on May 31, 2016)**

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada M5L 1B9

**Alexander D. Rose LSUC#: 49415P**
*arose@stikeman.com*
Tel: (416) 869-5261
**David Spence LSUC# 64625R**
*dspence@stikeman.com*
Tel: (416) 869-5689
Fax: (416) 947-0866

Lawyers for the Applicant,
Africo Resources Ltd.

SUPERIOR COURT OF JUSTICE / COUR SUPÉRIEURE DE JUSTICE
FILED / DÉPOSÉ
MAY 26 2016
RW
AT / À
LOCAL REGISTRAR · GREFFIER LOCAL
TORONTO

**APPENDIX "F"**
**NOTICE OF APPLICATION FOR FINAL ORDER**

**(See attached)**

CV16-11402-00CL

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED, AND RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE***

**AND IN THE MATTER OF A PROPOSED PLAN OF ARRANGEMENT INVOLVING AFRICO RESOURCES LTD. AND CAMROSE RESOURCES LIMITED**

**AFRICO RESOURCES LTD.**

Applicant

**NOTICE OF APPLICATION**

TO THE RESPONDENTS:

A LEGAL PROCEEDING HAS BEEN COMMENCED by the applicant. The claim made by the applicant appears on the following page.

THIS APPLICATION will come on for a hearing on June 30, 2016, at 10:00 a.m., at 330 University Avenue, Toronto, Ontario, M5G 1R7.

IF YOU WISH TO OPPOSE THIS APPLICATION, to receive notice of any step in the application or to be served with any documents in the application, you or an Ontario lawyer acting for you must forthwith prepare a notice of appearance in Form 38A prescribed by the Rules of Civil Procedure, serve it on the applicant's lawyer or, where the applicant does not have a lawyer, serve it on the applicant, and file it, with proof of service, in this court office, and you or your lawyer must appear at the hearing.

IF YOU WISH TO PRESENT AFFIDAVIT OR OTHER DOCUMENTARY EVIDENCE TO THE COURT OR TO EXAMINE OR CROSS-EXAMINE WITNESSES ON THE APPLICATION, you or your lawyer must, in addition to serving your notice of appearance, serve a copy of the evidence on the applicant's lawyer or, where the applicant does not have a lawyer, serve it on the applicant, and file it, with proof of service, in the court office where the application is to be heard as soon as possible, but at least four days before the hearing.

IF YOU FAIL TO APPEAR AT THE HEARING, JUDGMENT MAY BE GIVEN IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO OPPOSE THIS APPLICATION BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL

AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date May 20, 2016

Issued by ______________________

Local registrar

A. Anissimova
Registrar

Address of court office 330 University Ave. Toronto ON M5G 1R7

**TO:** **ALL HOLDERS OF COMMON SHARES OF AFRICO RESOURCES LTD.**

**AND TO:** **ALL DIRECTORS OF AFRICO RESOURCES LTD.**

**AND TO:** **ALL HOLDERS OF OPTIONS TO ACQUIRE COMMON SHARES OF AFRICO RESOURCES LTD.**

**AND TO:** **THE AUDITOR FOR AFRICO RESOURCES LTD.**

**AND TO:** **THE DIRECTOR APPOINTED UNDER THE *CANADA BUSINESS CORPORATIONS ACT***

**AND TO:** **CAMROSE RESOURCES LIMITED**

c/o GOODMANS LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

**Peter Kolla LSUC#: 54608K**
Tel: (416) 597-6279
Fax: (416) 979-1234

Lawyers for Camrose Resources Limited

**APPLICATION**

1. **THE APPLICANT MAKES APPLICATION FOR:**

(a) an interim order (the "**Interim Order**") for advice and directions pursuant to section 192(4) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "**CBCA**"), with respect to an arrangement (the "**Arrangement**") arising out of an arrangement agreement between Africo Resources Ltd. ("**Africo**") and Camrose Resources Limited ("**Camrose**") as described in the Africo management information circular to be distributed to the shareholders of Africo (the "**Africo Shareholders**") in connection with a meeting at which the Africo Shareholders will consider and vote upon the Arrangement (the "**Meeting**");

(b) a final order approving the Arrangement pursuant to sections 192(3) and 192(4) of the CBCA; and

(c) such further and other relief as to this Honourable Court seems just.

2. **THE GROUNDS FOR THE APPLICATION ARE:**

(a) Africo is a corporation governed by the CBCA.

(b) Africo's common shares (the "**Common Shares**") are listed for trading on the Toronto Stock Exchange under the ticker symbol "ARL";

(c) Camrose is a corporation existing under the laws of the British Virgin Islands. It is the largest shareholder of Africo, which owns approximately 63.7% of Africo's Common Shares;

(d) Africo wishes to effect a fundamental change in the nature of an arrangement under the provisions of the CBCA;

(e) the Arrangement contemplates, amongst other things, the acquisition by Camrose of all issued and outstanding Common Shares not already held

by Camrose or an affiliate thereof in exchange for Cdn$1.00 per Common Share;

(f) the Arrangement further contemplates that each option to purchase Common Shares (the "**Options**") shall be disposed of and surrendered by the holder thereof to Africo for a payment in cash equal to the in-the-money amount of such option;

(g) the Arrangement further contemplates that Africo Shareholders and holders of Options may also receive an additional aggregate amount of US$7.5 million if certain transactions, in respect of the Company's main Kalukundi copper-cobalt project located in the Democratic Republic of Congo, are completed within 14 months following the closing of the Arrangement with Camrose. The additional amount, if paid, would be equal to approximately US$0.27 per Common Share or Option.

(h) the Arrangement is an "arrangement" within the meaning of section 192(1) of the CBCA;

(i) the Arrangement is in the best interests of Africo and is put forward in good faith;

(j) the Arrangement is fair and reasonable;

(k) there is no practicable way to effect the Arrangement other than under section 192 of the CBCA;

(l) Africo is not insolvent;

(m) all statutory procedures under section 192 of the CBCA and other applicable provisions of the CBCA either have been fulfilled or will be fulfilled by the return date of this Application;

(n) the directions set forth in any Interim Order this Court may grant, and the shareholder approvals required, will be followed and obtained by the return date of this Application;

(o) the Meeting is scheduled to take place in Vancouver, British Columbia;

(p) certain Africo Shareholders are resident outside of Ontario and will be served at their addresses as they appear on the books and records of Africo pursuant to Rule 17.02(m) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, and the terms of any Interim Order for advice and directions granted by this Honourable Court;

(q) section 192 of the CBCA;

(r) National Instrument 54-101 – *Communication with Beneficial Owners of the Securities of a Reporting Issuer* of the Canadian Securities Administrators;

(s) Rules 1.05, 14.05, 17.02, 37 and 38 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194; and

(t) such further and other grounds as counsel may advise and this Honourable Court may permit.

3. **THE FOLLOWING DOCUMENTARY EVIDENCE WILL BE USED AT THE HEARING OF THE APPLICATION:**

(a) the Affidavit of Chris Theodoropoulos on behalf of Africo, to be sworn, and the exhibits thereto;

(b) a further or supplementary Affidavit to be sworn, and the exhibits thereto, on behalf of Africo, reporting as to compliance with any Interim Order and the results of any meeting conducted pursuant to such Interim Order; and

(c) such further and other materials as counsel may advise and this Honourable Court may permit.

-6-

May 20, 2016

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada M5L 1B9

**Alexander D. Rose LSUC#: 49415P**
*arose@stikeman.com*
Tel: (416) 869-5261
**David Spence LSUC# 64625R**
*dspence@stikeman.com*
Tel: (416) 869-5689
Fax: (416) 947-0866

Lawyers for the Applicant, Africo Resources Ltd.

CV-14-11402-00CL

Court File No.

**IN THE MATTER OF AN APPLICATION UNDER SECTION 192 OF THE *CANADA BUSINESS CORPORATIONS ACT*, R.S.C. 1985, c. C-44, AS AMENDED, AND RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE***

**AND IN THE MATTER OF A PROPOSED PLAN OF ARRANGEMENT INVOLVING AFRICO RESOURCES LTD. AND CAMROSE RESOURCES LIMITED**

F-8

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**NOTICE OF APPLICATION**

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada M5L 1B9

**Alexander D. Rose LSUC#: 49415P**
*arose@stikeman.com*
Tel: (416) 869-5261
**David Spence LSUC# 64625R**
*dspence@stikeman.com*
Tel: (416) 869-5689
Fax: (416) 947-0866

Lawyers for the Applicant, Africo Resources Ltd.

# APPENDIX "G"
# CHARTER OF THE AUDIT COMMITTEE

**(See attached)**

**AFRICO RESOURCES LTD.**
(the "Corporation")

**CHARTER FOR THE CORPORATE GOVERNANCE COMMITTEE OF THE BOARD OF DIRECTORS**

*For the purposes of this Charter, all references to "the Corporation" includes all subsidiaries of the Corporation.*

**1. Purpose**

1.1. The Corporate Governance Committee's mandate is:

(a) to assist the Board of Directors in assessing and fulfilling its oversight responsibilities to ensure that the Corporation has an effective governance regime and engage in sound and ethical business conduct in compliance with regulatory guidelines;

(b) to ensure the independence of the Board of Directors in its functioning and operation and its ability to effectively supervise management's operation of the Corporation, its affiliates and related businesses.

1.2. The Corporate Governance Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board of Directors may from time to time prescribe.

**2. Membership**

2.1. Each member of the Corporate Governance Committee must be a director of the Corporation.

2.2. The Corporate Governance Committee will consist of at least three members, all of whom are neither officers (and for this purpose the Chairman of the Board is not considered to be an officer) nor employees of the Corporation or any of its affiliates.

2.3. The members of the Corporate Governance Committee will be appointed annually, and may be removed at any time, by the Board of Directors.

**3. Authority**

3.1. The Corporate Governance Committee shall have the authority necessary to carry out the duties and responsibilities of this Charter and shall have and exercise the powers and shall carry out the obligations imposed by the Canada Business Corporations Act and the by-laws of the Corporation.

**4. Duties and Responsibilities**

4.1. The duties and responsibilities of the Corporate Governance Committee include reviewing and recommending to the Board of Directors with respect to:

(a) development and maintenance of a written Statement of Corporate Governance Practices and a Code of Business Conduct and Ethics for the Corporation;

(b) development and maintenance of a written Board Charter;

(c) criteria for membership on the Board of Directors, taking into account the size and existing composition of the Board, the needs of the Corporation, the experience, knowledge and skills required of the directors, the relevance of a candidate's background, experience to issues facing the Corporation and the past performance of directors being considered for re-election;

(d) the qualifications of and recruitment of individuals for nomination or appointment as new directors such that the Board is, as reasonably as possible given the current circumstances, comprised of a majority of independent (as that term is defined in applicable legislation) directors;

(e) conduct of the Board and the powers, mandates and membership of its committees;

(f) the division of duties and the relationship between the Board and management;

(g) ensuring appropriate policies and procedures are in place to ensure compliance by the Corporation, its directors, officers, and employees, with all applicable legal and regulatory requirements relating to corporate governance, code of conduct and business ethics; and

(h) generally, all matters that affect corporate governance and compliance with applicable regulatory rules and guidelines;

for the Corporation and its affiliates.

4.2. The Corporate Governance Committee is responsible for annually assessing:

(a) the effectiveness of the Board as a whole, each committee of the Board, and the contribution made by each of the Corporation's directors, and for making recommendations for improving such effectiveness and contribution; and

(b) the Corporation's ethics and business conduct practices, trends and issues and reporting its findings to the Board of Directors.

4.3. The Corporate Governance Committee is responsible for:

(a) reviewing, on an on-going basis, all legislation related to and developments in corporate governance, best practices for corporate governance and the effectiveness of the Corporation's corporate governance practices;

(b) an appropriate orientation program for new directors and ongoing education for existing directors; and

(c) ensuring the Corporation's shareholders are properly informed about the Corporation's activities.

4.4. The Corporate Governance Committee will report to the Board of Directors at each meeting of the Board regarding the Committee's examinations and recommendations.

**5. Meetings**

5.1. The quorum for a meeting of the Corporate Governance Committee is a majority of the members of the Committee.

5.2. The members of the Corporate Governance Committee:

(a) must elect a chair from among their number;

(b) may determine their own procedures; and

(c) may establish their own schedule of meeting dates.

5.3. Unless waived, reasonable notice of each meeting of the Corporate Governance Committee, specifying the place, day and time of that meeting must be given to each of the members of the Corporate Governance Committee by electronic mail, orally, or by telephone.

**6. Reports**

6.1. The Corporate Governance Committee will record its recommendations and will report to the Board on its activities, which will be incorporated as a part of the minutes of the Board of Directors' meeting at which those recommendations are presented.

**7. Minutes**

7.1. The Corporate Governance Committee will maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board of Directors.

*Adopted by the Board of Directors of Africo Resources Ltd. on July 17, 2015.*

If you have any questions regarding the information contained in this document or require assistance in completing your proxy form, please contact the transfer agent at:

**COMPUTERSHARE INVESTOR SERVICES INC.**

**BY MAIL:**

8th Floor, 100 University Avenue,
Toronto, Ontario
M5J 2Y1

Toll Free (North America): 1-866-249-7775
Outside North America: 1-416-263-9524

The Depositary may be contacted at:

**TSX TRUST COMPANY**

**BY MAIL:**

Suite 300, 200 University Avenue,
Toronto, Ontario
M5H 4H1

Toll Free (North America): 1-866-393-4891 ext: 205
Email: TMXEInvestorServices@tmx.com